# EXHIBIT 3

# EXHIBIT 3A



**International Chamber of Commerce**

*The world business organization*

**International Court of Arbitration** ● **Cour internationale d'arbitrage**

# SENTENCE

**ICC International Court of Arbitration** ● **Cour internationale d'arbitrage de la CCI**

38, Cours Albert 1er, 75008 Paris, France
Telephone +33 1 49 53 28 28   Fax +33 1 49 53 29 33
Web site www.iccarbitration.org   E-mail arb@iccwbo.org

# COUR INTERNATIONALE D'ARBITRAGE DE LA CCI

## AFFAIRE No. 16257/EC/ND/MCP

COMMISSIONS IMPORT EXPORT S.A., AYANT POUR DENOMINATION
COMMERCIALE COMMISIMPEX

(Rép. du Congo)

**c/**

LA REPUBLIQUE DU CONGO

(BRAZZAVILLE) (Rép. du Congo)

Ce document est un original de la Sentence Finale rendue conformément au Règlement
d'arbitrage de la Cour internationale d'arbitrage de la CCI.

# CHAMBRE DE COMMERCE INTERNATIONALE

## SENTENCE FINALE

### Affaire CCI n° 16 257/EC/ND/MCP

**ENTRE:**

**COMMISSIONS IMPORT EXPORT S.A.,** ayant pour dénomination commerciale « Commisimpex » et son siège social 86, avenue Foch, Quartier Cathédrale, BP 1244 BRAZZAVILLE, **REPUBLIQUE DU CONGO ;**

Représentée par M. Michael Polkinghorne, M. Charles Nairac, M. Christophe Seraglini et Mme Elizabeth Lefebvre-Gross, WHITE & CASE, 19 place Vendôme, 75001 Paris, **FRANCE**

> Demanderesse,
>
> Ci-après « Commisimpex » ou « la Demanderesse »

**ET :**

**LA REPUBLIQUE DU CONGO,** Président de la République, Palais Présidentiel, Quartier Plateau, BRAZZAVILLE, **REPUBLIQUE DU CONGO ;**

Représentée par M. Jean-Pierre Vignaud, M. Jean-Yves Garaud et M. Charles de Taffin, CLEARY, GOTTLIEB, STEEN & HAMILTON LLP, 12 rue de Tilsitt, 75008 Paris, **FRANCE**

> Défenderesse,
>
> Ci-après « le Congo » ou « la République du Congo » ou « la Défenderesse »

# TABLE DES MATIERES

I.   FAITS ........................................................................................................... 3
II.  PROCÉDURE .............................................................................................. 4
III. POSITION DES PARTIES ......................................................................... 32
   A.   Position de la Demanderesse .............................................................. 32
   B.   Position de la Défenderesse ................................................................ 38
IV. DISCUSSION ............................................................................................. 45
   ●   QUESTIONS PRELIMINAIRES SOULEVEES PAR LA MISE EN LIQUIDATION
JUDICIAIRE DE COMMISIMPEX ......................................................... 45
   ●   LE LITIGE ENTRE LES PARTIES ........................................................ 52
   A.   Sur l'autorité de chose jugée de la Sentence CCI no. 9899 du 3 décembre 2000 ..... 52
   B.   Sur la validité du Protocole de 2003 et son caractère contraignant ...................... 54
      a.   Sur l'absence de pouvoirs alléguée des signataires du Protocole de 2003 ............ 54
      b.   Sur l'absence alléguée de caractère contraignant du Protocole de 2003 .............. 59
      c.   Sur l'ignorance du montant de la créance tel que présenté dans le Protocole de
2003 .................................................................................................... 64
      d.   Sur l'absence alléguée de cause du Protocole de 2003 ......................................... 65
   C.   Sur les montants dus par la République du Congo à Commisimpex ................... 73
      a.   La dette de 440.000.000 FRF  (Article 1$^{er}$ du Protocole de 2003)........................ 74
      b.   La dette de 520.000.000 FRF (Articles 3 et 4 du Protocole de 2003)............... 76
   D.   La répartition de la charge des frais de l'arbitrage ................................................. 78

## I.    **FAITS**

**1.** De 1984 à 1986, Commisimpex et la République du Congo ont conclu divers marchés de travaux publics et de fournitures de matériels et avenants à ces contrats[1], financés au moyen de crédits consentis par Commisimpex au profit de l'État, matérialisés par des billets à ordre émis par la Caisse Congolaise d'Amortissement (ci-après la « CCA ») et devant être avalisés par l'État. Ces travaux ont tous fait l'objet d'attestations de bonne fin des travaux.

**2.** Le 22 décembre 1986, la République du Congo, représentée par le Ministère des Finances et du Budget et la Caisse Congolaise d'Amortissement, a émis au profit de Commisimpex une garantie de paiement de certains des marchés et avenants conclus avec celle-ci, sous réserve de leur parfaite exécution (ci-après la « Garantie de 1986 »).

**3.** La société Commisimpex et la République du Congo ont conclu le 14 octobre 1992 le Protocole n°566 (ci-après « le Protocole de 1992 », Pièce C-5). Le Protocole de 1992 visait à établir les modalités de règlement des « *dettes restant dues* » pour rembourser les crédits fournisseurs consentis par Commisimpex pour les « *marchés et avenants joints en annexe au présent protocole* »[2]. Les « *dettes restant dues* » étaient libellées en Francs français, Livres sterling, dollars US et FCFA et représentaient environ 22 milliards de FCFA.

**4.** Par requête d'arbitrage à la Cour internationale d'arbitrage de la CCI (ci-après « la Cour Internationale d'Arbitrage ») en date du 13 mars 1998 (Pièce R-2), dans l'affaire n°9899, Commisimpex a sollicité la condamnation de la République du Congo et de la CCA au paiement de montants non honorés en exécution du Protocole de 1992. Aux termes d'une sentence finale rendue le 3 décembre 2000 (Pièce C14), ce tribunal arbitral condamnait solidairement la République du Congo et la CCA au paiement de 107 millions de dollars US, limitant la condamnation au montant correspondant aux anciens billets à ordre restitués par Commisimpex.

La sentence a été revêtue de l'exequatur par le Tribunal de grande instance de Paris le 12 décembre 2000. Le Congo et la CCA ont formé un recours en annulation devant la Cour d'appel de Paris le 2 janvier 2001 qui a été rejeté le 23 mai 2002.

**5.** Le 23 août 2003, la société Commisimpex, d'une part, et Monsieur Gabriel Longobé, Ministre délégué, Secrétaire Général de la Présidence de la République, et Monsieur Jean-Dominique Okemba, Secrétaire d'État, Secrétaire Général du Conseil de Sécurité, d'autre part, ont signé le Protocole d'accord n°706 (ci-après « le Protocole de 2003 ») (Pièce C27). Le Protocole de 2003 fixait les modalités de remboursement de la dette de la République du Congo, considérablement augmentée par rapport au Protocole de 1992 et évaluée à 48 milliards de FCFA au 30 septembre 1992. Le Protocole de 2003 décrivait « *la dette de l'État*

---

[1]    Le marché 353/83 a été conclu entre le Congo et la société APV Hall International Limited le 10 novembre 1983 (Pièce C-40). Commisimpex et l'État ont ensuite conclu les avenants n°1, 3, 4 et 5 au marché 353/83 (Pièces R-23, R-24, R-21 et R-22) ; ainsi que le marché 185/84 du 25 juin 1984 (Pièce R-6) ; le marché 83/85 du 24 juin 1985 et son avenant n°1 (Pièces R-25 et R-26) ; le marché 009/86/G du 12 février 1986 (Pièce R-19) ; le marché 015/86 du 26 mars 1986 et son avenant n°1 (Pièces R-4 et R-20) et le marché 53/86 du 1er juillet 1986 (Pièce R-5).

[2]    L'annexe au Protocole de 1992 n'a cependant pas été communiquée dans la présente procédure.

*du Congo* » comme étant composée d'une « *première partie* » de 22 milliards de FCFA, « *objet du Protocole [de 1992]* », et d'une « *deuxième partie* » de 26 milliards de FCFA. Le Protocole de 2003 prévoyait que l'État s'engageait « *à conclure avec la société Commisimpex un Protocole d'Accord Définitif en remplacement du présent Protocole, pour clore les négociations en cours* » (article 6).

**6.** Le présent litige porte sur les effets du Protocole de 2003 dont Commisimpex demande l'exécution en arguant qu'il vaut reconnaissance de la dette totale de la République du Congo à son égard tandis que celle-ci soutient qu'il est nul et de nul effet. Pour le Congo, la question de sa dette vis-à-vis de Commisimpex a été réglée définitivement par le Protocole de 1992 et le tribunal arbitral constitué dans la procédure CCI no. 9899 dont la sentence a autorité de chose jugée.

## II.  PROCÉDURE

**7.** Le 21 avril 2009, le Secrétariat de la Cour internationale d'arbitrage de la CCI (ci-après « le Secrétariat de la CCI ») a accusé réception de la requête d'arbitrage soumise par Commisimpex le 17 avril 2009. La Demanderesse a indiqué souhaiter que le litige soit soumis à un collège de trois arbitres et a nommé comme arbitre M. le Professeur Bernard Hanotiau.

**8.** Le 22 avril 2009, le Secrétariat de la CCI a transmis cette requête d'arbitrage à la République du Congo.

**9.** Les 4 et 5 mai 2009, la Demanderesse a adressé au Secrétariat de la CCI une lettre accompagnée de deux pages modifiant sa requête d'arbitrage, dont le Secrétariat a accusé réception le 6 mai 2009.

**10.** Le 26 mai 2009, le cabinet Cleary Gottlieb a informé le Secrétariat de la CCI qu'il représentait la Défenderesse dans ce litige et a indiqué que celle-ci, ayant accepté que le litige soit soumis à un collège de trois arbitres, nommait Me Carole Malinvaud en qualité d'arbitre.

**11.** Le 3 juin 2009, le Secrétariat de la CCI a adressé aux parties copie de la déclaration d'acceptation et d'indépendance de Me Carole Malinvaud.

**12.** Le 4 juin 2009, le Secrétariat de la CCI a adressé aux parties copie de la déclaration d'acceptation et d'indépendance de M. Le Professeur Bernard Hanotiau.

**13.** Le 8 juin 2009, la Défenderesse a indiqué au Secrétariat de la CCI qu'elle entendait contester l'existence, la portée et la validité de la clause compromissoire invoquée par la Demanderesse dans sa requête. Elle a ajouté qu'elle consentait à ce que le lieu de l'arbitrage soit Paris et que l'arbitrage soit conduit en langue française.

**14.** Le même jour, la Demanderesse a accepté la proposition de la Défenderesse quant à la désignation conjointe du Président du Tribunal Arbitral par les co-arbitres et a suggéré le 30 juin 2009 comme date limite pour cette désignation.

**15.** Le 11 juin 2009, le Secrétariat de la CCI a demandé aux parties si, dans l'hypothèse où l'arbitrage avait lieu, elles s'accorderaient sur un délai exprès à accorder aux co-arbitres à compter de la date à laquelle ils recevraient notification de leur confirmation pour tenter de désigner conjointement le Président du Tribunal Arbitral.

**16.** Le 18 juin 2009, les parties ont indiqué par lettres respectives au Secrétariat de la CCI que les co-arbitres disposaient, pour nommer conjointement le Président du Tribunal Arbitral, d'un délai de trois semaines à compter de la date à laquelle ils avaient reçu notification de leur confirmation. Le Secrétariat de la CCI a accusé réception de ces lettres le 19 juin 2009.

**17.** Le 25 juin 2009, la Défenderesse a sollicité un délai supplémentaire de quinze jours, soit jusqu'au 10 juillet 2009, pour soumettre sa réponse à la requête d'arbitrage.

**18.** Le 26 juin 2009, la Demanderesse a indiqué espérer que la Défenderesse soumette sa réponse à la requête d'arbitrage dans les meilleurs délais.

**19.** Le 29 juin 2009, le Secrétariat de la CCI a étendu au 6 juillet 2009 le délai accordé à la Défenderesse pour soumettre sa réponse à la requête d'arbitrage.

**20.** Le 8 juillet 2009, le Secrétariat de la CCI a accusé réception de la réponse à la requête d'arbitrage de la Défenderesse datée du 6 juillet 2009.

**21.** Le 17 juillet 2009, la Demanderesse a adressé ses commentaires sur les objections à la compétence du Tribunal soulevées par la Défenderesse. Le Secrétariat de la CCI a accusé réception de cette lettre le 20 juillet 2009.

**22.** Le 30 juillet 2009, le Secrétariat de la CCI a informé les parties que la Cour internationale d'arbitrage de la CCI avait décidé que l'arbitrage aurait lieu conformément à l'article 6 (2) du Règlement et avait confirmé le Professeur Bernard Hanotiau et Me Carole Malinvaud en qualité de co-arbitres.

**23.** Le même jour, le Secrétariat de la CCI a indiqué aux co-arbitres qu'ils disposaient de 21 jours pour désigner conjointement le Président du Tribunal Arbitral.

**24.** Le 7 août 2009, Me Carole Malinvaud a indiqué au Secrétariat de la CCI que le Professeur Hanotiau et elle-même proposaient conjointement Me Yves Derains comme Président du Tribunal Arbitral.

**25.** Le 10 août 2009, le Professeur Bernard Hanotiau a confirmé au Secrétariat de la CCI que Me Carole Malinvaud et lui-même proposaient conjointement Me Yves Derains comme Président du Tribunal Arbitral.

**26.** Le 14 août 2009, le Secrétariat de la CCI a adressé aux parties une copie de la déclaration d'acceptation et d'indépendance de Me Yves Derains.

**27.** Le 28 août 2009, le Secrétaire Général de la Cour internationale d'arbitrage de la CCI a confirmé Me Yves Derains en qualité de Président du Tribunal Arbitral, le Tribunal étant donc constitué comme suit :

Monsieur le Professeur Bernard HANOTIAU
HANOTIAU & VAN DEN BERG
IT Tower, 9th Floor
480 Avenue Louise- Box 9
1050 Bruxelles
Belgique
Tel: +32 2 290 39 00
Fax: +32 2 290 39 39
E-mail: bernard.hanotiau@hvdb.com
(Co-arbitre)

Maître Carole MALINVAUD
GIDE LOYRETTE NOUEL
26, Cours Albert 1$^{er}$
75008 Paris
France
Tel : + 33 (0) 1 40 75 36 66
Fax : + 33 (0) 1 40 75 69 36
E-mail : malinvaud@gide.com
(Co-arbitre)

Maître Yves DERAINS
DERAINS & GHARAVI
25 rue Balzac
75008 Paris
France
Tel : +33 (0) 1 40 55 51 00
Fax : +33 (0) 1 40 55 51 05
E-mail : yvesderains@derainsgharavi.com
(Président du Tribunal Arbitral)

**28.** Le même jour, le dossier de l'affaire a été transmis aux arbitres.

**29.** Le 11 septembre 2009, le Tribunal Arbitral a adressé aux parties des projets d'Acte de Mission et d'Ordonnance de Procédure n°1 afin d'obtenir leurs commentaires ainsi que le résumé de leurs positions.

**30.** Le 21 septembre 2009, les parties ont adressé au Tribunal Arbitral leurs commentaires sur l'Acte de Mission ainsi que le résumé de leurs positions.

**31.** Le 24 septembre 2009, le Tribunal Arbitral a adressé aux parties un nouveau projet d'Acte de Mission intégrant les positions des parties ainsi que leurs commentaires.

**32.** Le 30 septembre 2009, la Demanderesse a formulé une nouvelle demande de réparation de son préjudice moral.

**33.** Le 1$^{er}$ Octobre 2009, une réunion s'est tenue à Paris entre le Tribunal Arbitral et les parties.

**34.** Le même jour, le Tribunal Arbitral a communiqué à la Cour Internationale d'Arbitrage l'Acte de Mission signé par les parties et le Tribunal.

**35.** Le même jour, le Tribunal Arbitral a également adressé aux parties l'Ordonnance de Procédure n° 1 dont la teneur est la suivante:

> *« Attendu que le 1er octobre, une réunion s'est tenue à Paris en présence du Tribunal Arbitral, des parties et de leurs conseils;*
>
> *Attendu qu'à la même date, les parties ont signé l'Acte de Mission ;*
>
> *Attendu que Me. Catherine Schroeder a été désignée comme Secrétaire du Tribunal Arbitral ;*
>
> *Attendu que par lettre du 30 octobre 2009, la partie demanderesse a indiqué qu'elle n'était pas en état de discuter dès à présent du calendrier prévisionnel ;*
>
> ***Le Tribunal Arbitral décide ce qui suit :***
>
> ***1.    Calendrier Prévisionnel***
>
> *1.1.1    Les Parties tenteront d'établir conjointement un calendrier prévisionnel et indiqueront, pour le 16 octobre 2009, au Tribunal Arbitral l'état de leur discussion.*
>
> *1.1.2    Une conférence téléphonique entre les Parties et le Tribunal Arbitral aura lieu le 20 octobre afin de finaliser le calendrier prévisionnel.*
>
> ***2.    Echange d'écritures***
>
> *2.1    Les Parties pourront présenter leurs arguments de fait et de droit dans deux échanges successifs de mémoires, selon le calendrier établi.*
>
> *2.2    Les mémoires devront être soumis sous format A4 et A5 et en version électronique (word et pdf).*
>
> *2.3    Les mémoires des parties doivent comprendre tous les arguments de fait et tous les arguments de droit justifiant les conclusions prises, sous la forme de paragraphes numérotés. Les parties présenteront séparément, en les numérotant spécialement, chacun de leurs arguments.*
>
> *2.4    Dans leurs mémoires, les parties indiqueront la nature des moyens de preuve qu'elles entendent soumettre à l'appui de leurs arguments de fait (pièces, témoignages, expertises, etc.) ou de droit (extraits de doctrine ou de jurisprudence, avec références complètes). Les mémoires seront accompagnés d'une table des matières.*
>
> *2.5    Les pièces soumises par les parties au Tribunal Arbitral seront numérotées de façon continue (pour la Demanderesse « C- ... » ; pour la Défenderesse « R-... ») et annexées aux mémoires auxquels elles se réfèrent. Elles seront de plus accompagnées d'une liste indiquant la date et l'auteur de chacune d'elles; cette liste sera mise à jour par les parties chaque fois qu'une nouvelle pièce sera soumise. Les annexes reproduisant des passages de doctrine ou de jurisprudence seront numérotées de façon continue (pour la Demanderesse « CL-... » ; pour la Défenderesse « RL-... »).*

2.6    *Les pièces soumises au Tribunal Arbitral doivent l'être dans leur intégralité et les passages visés devront être identifiés. Les photocopies seront suffisantes, à moins que la partie adverse conteste l'authenticité du document, auquel cas le Tribunal Arbitral pourra demander la production du document original ou d'une copie certifiée conforme de l'original.*

2.7    *Une partie pourra demander à la partie adverse de soumettre tout document dont elle ne dispose pas si celui-ci en a la possession ou, sous le contrôle de la partie adverse, si le document est suffisamment identifié et pertinent pour la résolution du litige.*

*Si la partie à qui une telle requête a été soumise refuse de s'exécuter, le Tribunal Arbitral pourra ordonner la production du (des) document(s) en question, sur requête de la partie concernée. Les parties devront former leurs éventuelles requêtes au Tribunal Arbitral de manière conjointe, à la date indiquée dans le calendrier prévisionnel ci-dessus. Cette requête conjointe devra identifier le(s) document(s) avec suffisamment de précision et devra indiquer en quoi le(s) document(s) est (sont) pertinent(s) (« Redfern Schedule »). Le Tribunal Arbitral aura tout pouvoir de statuer et tiendra en particulier compte des intérêts légitimes de la partie à qui la requête de production a été adressée. Si un document était considéré comme confidentiel par la partie à qui la requête est adressée, elle devra en informer le Tribunal Arbitral et la partie adverse. Le Tribunal Arbitral prendra alors toutes les mesures nécessaires pour assurer la protection de ce document tout en s'efforçant, dans la mesure du possible, à en autoriser la production.*

*Le Tribunal Arbitral appréciera librement et tirera toutes conséquences du refus d'une partie d'obtempérer à son ordre de production.*

2.8    *Le Tribunal Arbitral pourra également à tout moment demander à l'une des parties de soumettre un document qu'il considère pertinent pour la résolution du litige.*

2.9    *Les parties ne seront pas autorisées à présenter des pièces nouvelles après l'échange d'écritures, sous réserve d'une autorisation expresse du Tribunal Arbitral.*

**3.    Auditions des témoins et experts**

3.1    *Toute personne peut être entendue, y compris les parties et leurs dirigeants.*

3.2    *Les parties soumettront en annexe à leurs écritures les déclarations écrites des témoins indiqués dans leurs écritures, sauf pour les témoins qui sont sous contrôle de la partie adverse ou refusent de témoigner.*

3.3    *Seuls seront entendus les témoins dont une partie requiert le contre-examen. Les autres seront dispensés de comparaître, sauf si le Tribunal Arbitral souhaite les entendre. Dans l'hypothèse où une partie ne requiert pas le contre-examen d'un témoin, elle n'est pas pour autant réputée avoir accepté le contenu de son attestation. Dans ce cas, le Tribunal Arbitral juge de la valeur à accorder à l'attestation dans son entière discrétion.*

3.4    *Les témoins/experts seront en principe cités par la partie pour laquelle ils ont fourni une déclaration écrite ou un rapport.*

3.5    *Lorsqu'un témoin cité est sous le contrôle de la partie adverse, celle-ci engagera tous ses efforts pour que ce témoin paraisse.*

3.6    Si un témoin dûment cité ne devait pas comparaître pour une raison valable, sa déclaration écrite pourra néanmoins être prise en compte par le Tribunal Arbitral, selon les circonstances et pour autant qu'elle ne soit pas contestée.

3.7    Les auditions de témoins et experts se dérouleront en principe selon la procédure suivante :

a. Les témoins et les experts seront d'abord invités par le Tribunal Arbitral à confirmer leur déclaration écrite. Celle-ci tiendra lieu d'examen direct sous réserve d'une éventuelle brève présentation.

b. Sauf ordre contraire du Tribunal Arbitral, les témoins et les experts dont le témoignage a été consigné dans une déclaration écrite seront interrogés uniquement par le conseil de la partie adverse (« contre-examen »).

c. Le conseil de l'autre partie aura s'il le souhaite l'occasion de poser des questions en relation avec les réponses données (« ré-examen ») ; l'occasion sera ensuite également offerte au conseil de l'autre partie de poser des questions complémentaires.

d. Le Tribunal Arbitral peut interroger les témoins et les experts en tout temps et autoriser des interrogatoires complémentaires.

3.8    S'ils le jugent nécessaire, les experts peuvent commencer par une introduction, qui devra toutefois être brève.

3.9    Le Tribunal Arbitral se réserve le droit de faire entendre plusieurs témoins ou experts simultanément afin de pouvoir confronter leurs points de vue.

3.10    Les représentants des parties peuvent assister à toutes les audiences ; les témoins et les experts ne peuvent y assister qu'après leur audition.

3.11    Les coûts liés à l'audition d'un témoin ou d'un expert seront supportés par la partie qui l'a cité, sous réserve de la décision finale du Tribunal Arbitral sur la répartition de tels frais. Si un témoin est cité par les deux parties, la partie sous le contrôle de laquelle se trouve ce témoin supportera les coûts liés à son audition. Si un témoin ne se trouve pas sous le contrôle de l'une ou l'autre partie, les coûts liés à son audition seront partagés par moitié entre les parties.

3.12    Les audiences d'audition feront l'objet d'un procès-verbal en français, établi par un(e) sténotypiste dont les coûts seront avancés par parts égales par les parties. »

**36.** Le 16 octobre 2009, la Demanderesse a fait connaître au Tribunal Arbitral l'état des discussions des parties quant au calendrier prévisionnel, indiquant qu'elle souhaiterait que le Tribunal Arbitral se prononce, par une sentence partielle, sur la question de sa compétence, et ce avant tout examen au fond des demandes des parties. Elle adressait un calendrier prévisionnel établi par les parties dans l'hypothèse où le Tribunal ferait droit à cette demande.

**37.** Le même jour, la Défenderesse a indiqué que, pour sa part, la question de la compétence se mélangeait au fond mais qu'elle s'en remettait à la sagesse du Tribunal. Elle a ajouté que dans l'hypothèse où le Tribunal Arbitral accepterait la bifurcation de la procédure, celle-ci devrait porter sur toutes les exceptions de procédure et que c'est dans ce cas seulement qu'elle

accepterait le calendrier fixé par Commisimpex. Dans le cas inverse, elle a confirmé qu'elle était d'accord pour fixer avec la Demanderesse un calendrier prévisionnel.

**38.** Le 19 octobre 2009, le Tribunal Arbitral a accusé réception des lettres respectives des parties et a confirmé la conférence téléphonique devant avoir lieu entre les parties et le Tribunal le 20 octobre 2009 afin que celles-ci puissent développer leurs positions respectives. Le 20 octobre 2009, une conférence téléphonique a eu lieu entre les parties et le Tribunal Arbitral.

**39.** Le même jour, le conseil de la Défenderesse a adressé au Tribunal Arbitral son pouvoir pour représenter la République du Congo, signé par M. l'Ambassadeur Lopès.

**40.** Le même jour, le Tribunal Arbitral a adressé aux parties l'Ordonnance de procédure n°2 qui dispose que :

> *« Attendu que conformément à l'Ordonnance de Procédure no.1, les parties ont, par lettres du 16 octobre 2009, fait part au Tribunal Arbitral de l'état de leurs discussions quant à l'établissement d'un calendrier de procédure ;*
>
> *Attendu que les parties ont fait part de leurs positions respectives quant à la bifurcation de la procédure lors d'une conférence téléphonique entre elles et le Tribunal Arbitral le 20 octobre 2009 ;*
>
> ***Le Tribunal Arbitral décide ce qui suit :***
>
> *1.1.   Le Tribunal Arbitral accepte le calendrier prévisionnel établi par les parties, dans l'hypothèse d'une bifurcation, comme suit :*
>
> *- Mémoire de la Défenderesse sur la compétence et ses exceptions de procédure : 11 décembre 2009 ;*
>
> *- Mémoire en réponse de la Demanderesse : 29 janvier 2010 ;*
>
> *- Mémoire en réplique de la Défenderesse : 26 février 2010 ;*
>
> *- Mémoire en duplique de la Demanderesse : 26 mars 2010.*
>
> *- Une audience est prévue le 26 avril 2010.*
>
> *1.1.1.  Le Tribunal Arbitral se réserve le droit, à l'issue de ces deux échanges de mémoires, ou à l'issue de l'audience prévue de renvoyer les exceptions de compétence et/ou de procédure au fond s'il s'estimait insuffisamment informé pour trancher ces questions. »*

**41.** Le 29 octobre 2009, la Demanderesse a demandé que la Défenderesse fournisse un pouvoir signé devant notaire ainsi qu'une copie des documents attestant des pouvoirs de l'Ambassadeur Lopès pour engager le Congo.

**42.** Le même jour, le Tribunal Arbitral a invité la Défenderesse à soumettre ses commentaires sur la lettre de la Demanderesse pour le 3 novembre 2009.

**43.** Le 3 novembre 2009, la Défenderesse s'est opposée à la fourniture d'un pouvoir de représentation devant être signé par notaire, le droit français ne l'exigeant pas et posant, au contraire, une présomption de mandat *ad litem* au profit des avocats.

**44.** Le 5 novembre 2009, la Demanderesse a indiqué qu'elle était satisfaite des assurances données par la Défenderesse quant à sa qualité de représentant de la République du Congo.

**45.** A la même date, la Défenderesse a indiqué au Secrétariat de la CCI qu'elle considérait cette procédure comme abusive et a fait état de difficultés financières importantes.

**46.** Le 6 novembre 2009, le Tribunal Arbitral a accusé réception des lettres respectives des parties et a noté que la question de la représentation de la Défenderesse était maintenant réglée.

**47.** Le 12 décembre 2009, la Défenderesse a adressé au Tribunal Arbitral et à la Demanderesse son Mémoire sur la Compétence.

**48.** Le 29 janvier 2010, la Demanderesse a adressé au Tribunal Arbitral et à la Défenderesse son Mémoire en Réponse sur la Compétence.

**49.** Le 26 février 2010, la Défenderesse a adressé au Tribunal Arbitral et à la Demanderesse son Mémoire en Réplique sur la Compétence.

**50.** La Cour Internationale d'Arbitrage, lors de sa session du 11 mars 2010, conformément à l'Article 24 (2) du Règlement, a prolongé le délai pour rendre la Sentence Finale jusqu'au 30 juin 2010.

**51.** Le 26 mars 2010, la Demanderesse a adressé au Tribunal Arbitral et à la Défenderesse son Mémoire en Duplique sur la Compétence.

**52.** Le 08 avril 2010, le Tribunal Arbitral a confirmé aux parties qu'une audience se tiendrait le 26 avril 2010.

**53.** Le 14 avril 2010, le Tribunal Arbitral a reçu une lettre de la Demanderesse faisant part de l'accord des parties sur les modalités d'organisation de l'audience, sous réserve de son propre accord.

**54.** Le même jour, le Tribunal Arbitral a accusé réception de la lettre de la Demanderesse et a donné son accord sur les modalités d'organisation de l'audience.

**55.** Par lettre du 22 avril 2010, le Tribunal Arbitral a adressé aux parties un courriel rédigé dans les termes suivants :

> « *Le Tribunal Arbitral serait reconnaissant si les parties voulaient bien s'exprimer lors de l'audience de lundi sur la notion et les conséquences juridiques de « l'inscription par la CCA de la créance de Commisimpex au titre de la dette de l'Etat » qui apparait dans le par ces motifs des deux décisions congolaises de première instance :*
> - *« ordonne à la caisse congolaise d'amortissement d'inscrire la totalité de ces sommes au titre de la dette de l'Etat etc… » (C 20 p.34 et 35)*

- « *ordonne à la Caisse Congolaise d'amortissement (CCA) d'inscrire la totalité des créances confirmées par la société Commisimpex, reconnues et arrêtées sur la fiche d'audition du 27 mars 2002 etc.. » (C24 p 47- 49) »*.

**56.** L'audience s'est tenue le 26 avril comme prévu. À l'occasion de cette audience, il a été décidé que les parties indiqueraient au Tribunal Arbitral si, et dans quel délai, elles seraient en mesure de lui remettre des éléments de droit congolais précisant la nature de l'inscription de créance au titre de la dette de l'État.

**57.** En date du 3 mai 2010, le Tribunal Arbitral fixa aux parties un délai expirant au 7 mai 2010 pour fournir ces informations.

**58.** À la demande de la Défenderesse, ce délai fut prorogé jusqu'au 19 mai 2010 par lettre du Tribunal Arbitral du 10 mai 2010. Par le même courrier, le Tribunal Arbitral prononçait la clôture des débats, conformément à l'article 22 (1) du règlement d'arbitrage de la CCI.

**59.** Par communication du 11 mai 2010, le Tribunal Arbitral précisait que, dans l'hypothèse où la Demanderesse formulerait une demande après examen des documents éventuellement remis par la Défenderesse, il prendrait les mesures appropriées.

**60.** Par courrier du 19 mai 2010, la Défenderesse communiqua les textes de droit congolais suivants :

- Loi n°1.2000 du 1$^{er}$ février 2000, portant loi organique relative au régime financier de l'État ;
- Décret n°2000-187 du 10 août 2000, portant règlement général sur la comptabilité publique.

**61.** La Demanderesse n'a pas formulé de demande quelconque après la communication de ces textes.

**62.** Le 09 juin 2010, le Tribunal Arbitral a accusé réception, pour la bonne règle, des textes de droit congolais soumis par la Défenderesse le 19 mai 2010.

**63.** La Cour Internationale d'Arbitrage, lors de sa session du 10 juin 2010, conformément à l'Article 24 (2) du Règlement, a prolongé le délai pour rendre la Sentence Finale jusqu'au 31 août 2010.

**64.** Le 20 août 2010, le Tribunal Arbitral a rendu sa Sentence Partielle, notifiée aux parties par le Secrétariat de la Cour le 24 août 2010. Dans cette sentence le Tribunal Arbitral décidait que

« *1) Le Tribunal Arbitral se déclare compétent pour trancher le présent litige ;*

*2) Le Tribunal Arbitral renvoie au fond la question de l'autorité de la chose jugée de la sentence arbitrale du 3 décembre 2000 rendue dans l'affaire CCI n°9899 ;*

*3) L'allocation des coûts de l'arbitrage propres à cette phase de la procédure sera décidée dans la sentence finale ;*

*4) Toutes autres demandes des parties sont renvoyées au fond. »*

Pour rendre cette sentence, le Tribunal Arbitral s'était fondé sur la clause d'arbitrage suivante :

> *« En cas de différend portant sur l'interprétation, l'exécution ou toutes autres difficultés entre les parties relativement au présent protocole d'accord, les parties conviennent de se concerter pour aboutir à un règlement amiable ; à défaut, le différend sera résolu par un ou plusieurs arbitres désignés conformément au règlement d'arbitrage de la Chambre de Commerce International (Paris) statuant en premier et dernier ressort. »*

figurant à l'article 10 du Protocole du 14 octobre 1992, dont les signataires sont la République du Congo et la société Commisimpex, et applicable en l'espèce comme déclaré par la Sentence Partielle du 20 août 2010. Cette clause étant silencieuse sur le droit applicable, il a été décidé, par accord des parties, que le droit applicable était le droit français (VIII de l'Acte de Mission).

**65.** Le 2 septembre 2010, le Tribunal Arbitral a informé les parties que la Cour Internationale d'Arbitrage, lors de sa session du 12 août 2010, a prolongé le délai pour rendre la Sentence Finale jusqu'au 30 novembre 2010.

**66.** Le 7 septembre 2010, le Tribunal Arbitral a demandé aux parties de lui adresser pour le 17 septembre 2010 leurs propositions sur la procédure au fond, ajoutant qu'à l'issue de cet échange une conférence téléphonique avec le Tribunal Arbitral aurait lieu.

**67.** Le 17 septembre 2010, la Demanderesse a indiqué que les parties étaient en train d'élaborer un calendrier commun et qu'elles reviendraient vers le Tribunal Arbitral dans les prochains jours avec une proposition commune de calendrier. Elles demandaient en outre de reporter la conférence téléphonique à une date ultérieure.

**68.** Le 20 septembre 2010, le Tribunal Arbitral a accusé réception du courriel de la Demanderesse du 20 septembre 2010 et a indiqué que la conférence téléphonique prévue n'aurait pas lieu. Le même jour, le Tribunal Arbitral a proposé aux parties d'autres dates pour la tenue de cette conférence téléphonique.

**69.** Après échange avec les parties, le Tribunal Arbitral a indiqué le 23 septembre 2010 que la conférence téléphonique aurait lieu le 30 septembre 2010.

**70.** Le 27 septembre 2010, la Demanderesse a fait part au Tribunal Arbitral de l'accord des parties sur le calendrier de procédure. Le même jour, le Tribunal Arbitral a accusé réception de ce mail.

**71.** Le 30 septembre 2010, une conférence téléphonique a eu lieu entre le Tribunal Arbitral et les parties.

**72.** Le 4 octobre 2010, le Tribunal Arbitral a transmis aux parties l'Ordonnance de Procédure no. 3 dont les termes étaient les suivants:

> *« Attendu qu'une conférence téléphonique s'est tenue entre le Tribunal Arbitral et les parties le 30 septembre 2010 aux fins d'organisation de la procédure au fond;*

*Attendu que les parties ont indiqué s'être entendues sur les dates de remise de leurs mémoires respectifs comme suit :*
- *Mémoire en Demande le 10 janvier 2011,*
- *Mémoire en Défense le 10 mai 2011,*
- *Mémoire en Réplique le 10 août 2011 ;*
- *Mémoire en Duplique le 10 novembre 2011.*

*Attendu qu'il a été prévu que les parties indiqueraient au Tribunal Arbitral le 18 novembre 2011 le nom des témoins qu'elles souhaitent faire entendre à l'audience ;*
*Attendu qu'une conférence téléphonique, pour préparer l'audience, a été prévue entre le Tribunal Arbitral, qui pourra être représenté par son Président, et les parties le 23 novembre 2011 à 18h ;*
*Attendu que les dates des 19 décembre au 23 décembre 2011 ont été retenues pour tenir à Paris l'audience au fond, étant entendu qu'il est possible qu'elles ne soient pas toutes utilisées.*

### *LE TRIBUNAL ARBITRAL DECIDE :*

*1.    Le calendrier suivant est adopté :*

| *Acte de Procédure* | *Date* | *Parties* |
|---|---|---|
| *Mémoire en Demande* | *10 janvier 2011* | *Demanderesse* |
| *Mémoire en Défense* | *10 mai 2011* | *Défenderesse* |
| *Mémoire en Réplique* | *10 août 2011* | *Demanderesse* |
| *Mémoire en Duplique* | *10 novembre 2011* | *Défenderesse* |
| *Nom des témoins qui seront entendus à l'audience* | *18 novembre 2011* | *Demanderesse/Défenderesse* |
| *Conférence téléphonique* | *23 novembre 2011* | *Tribunal Arbitral (Président)/ Parties* |
| *Audience* | *19 au 23 décembre 2011* | *Tribunal Arbitral/Parties* |

*2.    Les dispositions de l'Ordonnance de Procédure no. 1 demeurent applicables. »*

**73.** Le 17 novembre 2010, le Tribunal Arbitral a informé les parties que la Cour Internationale d'Arbitrage avait, lors de sa session du 10 novembre 2010, et conformément à l'article 24 (2) du Règlement de la CCI, prolongé le délai pour la remise de la Sentence Finale jusqu'au 31 mai 2011.

**74.** Le 10 janvier 2011, la Demanderesse a remis son Mémoire en Demande.

**75.** Le 9 mai 2011, la Défenderesse a informé le Tribunal Arbitral qu'elle n'était pas en mesure de rendre son Mémoire en Défense pour le 10 mai et sollicitait, en accord avec la Demanderesse, un report jusqu'au 15 mai 2011. Le même jour, le Tribunal Arbitral a accusé réception de la lettre de la Défenderesse et a accepté l'extension de délai jusqu'au 15 mai 2011.

**76.** Le 10 mai 2011, la Demanderesse a pris acte du report, pour lequel elle avait donné son accord, soulignant que la suite du calendrier procédural demeurait inchangée. Le même jour, le Tribunal Arbitral a accusé réception de la lettre de la Demanderesse.

**77.** Le 16 mai 2011, la Défenderesse a adressé au Tribunal Arbitral son Mémoire en Défense sur le fond.

**78.** Le 17 mai 2011, le Secrétariat de la CCI a informé le Tribunal Arbitral et les parties que, lors de sa session du 12 mai 2011, et conformément à l'article 24 (2) du Règlement, la Cour Internationale d'Arbitrage avait prolongé le délai pour rendre la Sentence Finale jusqu'au 31 mars 2012.

**79.** Le 19 mai 2011, le Tribunal Arbitral a demandé aux parties si elles avaient pris les dispositions nécessaires relatives à la réservation d'une salle pour l'audience.

**80.** Le 20 juillet 2011, la Demanderesse a indiqué, au nom des parties, qu'elles s'étaient entendues pour que l'audience se déroule sur une période de 4 jours- du 19 au 22 décembre 2011- et pour que l'audience ait lieu dans les locaux du cabinet White and Case. Le même jour, le Tribunal Arbitral a accusé réception de la lettre commune des parties.

**81.** Le 11 août 2011, la Demanderesse a adressé au Tribunal Arbitral son Mémoire en Réplique sur le fond.

**82.** Le 26 octobre 2011, le Tribunal Arbitral a proposé de modifier l'heure de la conférence téléphonique prévue le 23 novembre 2011 et a demandé aux parties de lui communiquer pour le 15 novembre au plus tard les points qu'elles souhaitaient aborder lors de cette conférence téléphonique.

**83.** Le 4 novembre 2011, le Tribunal Arbitral, en l'absence de contestation par l'une des parties, a confirmé le changement d'heure de la conférence téléphonique.

**84.** Le 9 novembre 2011, la Défenderesse a indiqué ne pas être en mesure de déposer son Mémoire en Duplique pour le 10 novembre 2011 et a sollicité un report jusqu'au 20 novembre 2011. Le même jour, le Tribunal Arbitral a accusé réception de la lettre de la Défenderesse et a invité la Demanderesse à faire part de ses commentaires pour le 10 novembre 2011. Le même jour, la Demanderesse s'est opposée à ce report et a demandé au

Tribunal Arbitral d'ordonner à la Défenderesse de remettre son mémoire au plus tard le 13 novembre 2011. Le 10 novembre 2011, le Tribunal Arbitral a indiqué avoir pris connaissance de la demande de report de la Défenderesse ainsi que des objections de la Défenderesse et a reporté au 15 novembre 2011 la date de soumission du Mémoire en Duplique, jugeant la demande de délai sollicité par la Défenderesse excessive.

**85.** Le 15 novembre 2011, la Demanderesse a communiqué au Tribunal Arbitral les points qu'elle souhaitait aborder lors de la conférence téléphonique prévue le 23 novembre 2011. Le même jour, la Défenderesse a également fait part des sujets qu'elle jugeait utile d'aborder.

**86.** Le 16 novembre 2011, la Défenderesse a adressé au Tribunal Arbitral son Mémoire en Duplique.

**87.** Le même jour, le Tribunal Arbitral a accusé réception des lettres des parties du 15 novembre 2011 relatives à l'organisation de l'audience et a indiqué l'ordre du jour pour la conférence téléphonique du 23 novembre 2011.

**88.** Le 18 novembre 2011, les parties ont indiqué au Tribunal Arbitral la liste des témoins et experts qu'elles souhaitaient entendre à l'audience.

**89.** Le 23 novembre 2011, la Demanderesse a demandé au Tribunal Arbitral de bien vouloir accepter le versement aux débats d'une nouvelle attestation de M. Mbéri, témoin, qu'elle joignait à son courriel. Le même jour, la Défenderesse a fait part de ses commentaires sur la production d'une telle attestation, précisant que si le Tribunal Arbitral venait à accepter cette production, un délai devrait être octroyé à la Défenderesse pour qu'elle puisse produire une réponse.

**90.** Le même jour, une conférence téléphonique a eu lieu entre le Tribunal Arbitral et les parties.

**91.** Le même jour, la Défenderesse a indiqué avoir omis de mentionner lors de la conférence téléphonique que le Président de la République, Monsieur Sassou N'Guesso, témoin, n'était pas en mesure de venir témoigner aux audiences compte tenu de son emploi du temps. Par ailleurs, la Défenderesse a communiqué une copie complète de l'attestation de Monsieur Ikemo, témoin, d'octobre 2011, dont une annexe manquait.

**92.** Le 24 novembre 2011, le Tribunal Arbitral a communiqué l'Ordonnance de Procédure no. 4 qui dispose que :

> « *Attendu qu'une conférence téléphonique s'est tenue entre le Tribunal Arbitral et les parties le 23 novembre 2011 aux fins d'organisation de l'audience d'audition de témoins prévue entre le 19 et le 22 décembre 2011;*
> *Attendu que par lettre du 23 Novembre 2011, la Demanderesse a adressé au Tribunal Arbitral ainsi qu'à la Défenderesse une attestation supplémentaire de M. Mbéri, en sollicitant son admission au dossier ;*
> *Attendu que par lettre du même jour, la Défenderesse s'y est opposée tout en indiquant qu'elle sollicitait subsidiairement le droit de présenter des documents et/ou une attestation en réponse ;*
>
> *Attendu que les parties ont eu l'opportunité de clarifier leur position à cet égard lors de la conférence téléphonique ;*

*LE TRIBUNAL ARBITRAL DECIDE :*

1) *Organisation de l'audience*

- *L'audience débutera tous les jours à 9h30 et se terminera à 17h30 (tout en réservant la possibilité de la prolonger en cas de besoin);*

- *Il y aura deux brèves pauses dans la journée et une pause déjeuner d'une durée de 1h30 pendant laquelle chacun est libre de s'organiser comme il l'entend (le Tribunal Arbitral acceptant cependant la proposition des parties relative aux plateaux repas pour le 1er jour de l'audience );*

- *L'audition des plaidoiries introductives de la Demanderesse puis de la Défenderesse durera une heure chacune ;*

- *Les témoins et experts seront ensuite entendus, dans un ordre sur lequel les parties sont invitées à se mettre d'accord, sachant qu'en tout état de cause, les témoins de la Demanderesse seront interrogés en premier, suivis par les témoins et experts de la Défenderesse ;*

- *Les auditions de témoins de la Demanderesse auront lieu jusqu'au 20 décembre au soir et seront suivis par ceux de la Défenderesse jusqu'au 22 au soir ;*

- *Les parties pourront interroger directement leurs témoins/experts pendant une période de 10 minutes avant qu'ils soumis [sic] au contre-interrogatoire de la partie adverse ;*

- *Il sera décidé à la fin de l'audience si le Tribunal Arbitral souhaite entendre des plaidoiries conclusives des parties à une date ultérieure ou s'il préfère recevoir des conclusions récapitulatives écrites ;*

- *Les parties devront remettre au témoin/expert interrogé, à la partie adverse et à chaque membre du Tribunal Arbitral une copie des documents qu'elles souhaitent utiliser lors de l'examen dudit témoin, et ce, sous la forme jugée la plus adéquate par chacune des parties ;*

- *Les parties devront en outre mettre à la disposition du Tribunal Arbitral un classeur complet de toutes les pièces du dossier ainsi qu'un classeur chronologique contenant les références initiales des pièces, la Demanderesse se chargeant de la constitution de ce dernier.*

2) *L'attestation de M. Mberi est admise au dossier ;*

3) *Il est accordé à la Défenderesse jusqu'au 12 décembre 2011 la possibilité de commenter cette attestation et/ou d'en remettre une nouvelle en réponse, accompagné ou non de documents ;*

4) *Les parties sont invitées à communiquer au Tribunal Arbitral l'ordre d'audition des témoins et experts convenu entre elles, au plus tard le 12 décembre 2011. »*

**93.** Le 25 novembre 2011, la Demanderesse a commenté la lettre de la Défenderesse relative à l'impossibilité pour Monsieur le Président Sassou N'Guesso de venir témoigner à l'audience

indiquant qu'elle inviterait le Tribunal Arbitral à tirer toutes les conclusions qui s'imposent du refus de Monsieur le Président Sassou N' Guesso de témoigner.

**94.** Le 12 décembre 2011, la Défenderesse a indiqué qu'elle ne remettrait pas de nouvelle attestation en réponse à celle de Monsieur Mbéri, communiquée par Commisimpex le 23 novembre 2011. A la même date, la Demanderesse a communiqué l'ordre dans lequel elle souhaitait interroger les témoins présentés par la Défenderesse et a demandé à verser aux débats quatre nouveaux documents.

**95.** Le 15 décembre 2011, la Défenderesse a demandé au Tribunal Arbitral de l'autoriser à soumettre une nouvelle attestation de Monsieur Boukamany, témoin, et a indiqué l'ordre de passage dans lequel elle souhaitait interroger les témoins présentés par Commisimpex. Le même jour, le Tribunal Arbitral a écrit aux parties au sujet de l'ordre de passage des témoins et leur a rappelé de mettre à la disposition du Tribunal Arbitral un classeur complet de toutes les pièces du dossier ainsi qu'un classeur chronologique.

**96.** Le même jour, la Demanderesse a indiqué au Tribunal Arbitral que M. Mbéri n'était toujours pas arrivé à Paris alors qu'il devait arriver le 11 décembre, précisant qu'il avait été physiquement empêché, et lui a demandé de bien vouloir ordonner à la République du Congo de prendre toutes les mesures nécessaires pour assurer la sécurité de M. Mbéri et lui permettre de quitter Brazzaville pour participer à l'audience.

**97.** Le 16 décembre 2011, le Tribunal Arbitral a accusé réception de la lettre de la Défenderesse du 15 décembre par laquelle celle-ci indiquait vouloir verser aux débats une nouvelle attestation de M. Boukamany et a invité la Demanderesse à se prononcer pour le 17 décembre 2011. Le même jour, la Demanderesse a indiqué ne pas avoir d'objection à ce que l'attestation de M. Boukamany soit versée aux débats si les pièces C200 à C203 étaient également acceptées par le Tribunal Arbitral. Elle a demandé en outre que l'ordre d'audition des témoins du Congo par Commisimpex demeure inchangé.

**98.** Le même jour, la Défenderesse a demandé à ce que la Demanderesse lui indique où se trouvait M. Mbéri et de préciser les mesures qu'elle attendait de la République du Congo pour lui permettre de quitter le territoire.

**99.** Le même jour, le Tribunal Arbitral a accusé réception des correspondances respectives des parties des 15 et 16 décembre 2011 relatives à M. Mbéri. Il a indiqué ne pas douter de ce que la République du Congo prendrait toutes les mesures nécessaires pour faciliter le déplacement à Paris d'un témoin qu'elle souhaitait contre-interroger, tout en précisant que si M. Mbéri ou tout autre témoin n'avait pu être présent à l'audience du fait d'actions ou d'omissions d'une des parties, il en tirerait toutes les conséquences à l'égard de la partie en cause.

**100.** Le 17 décembre 2011, la Demanderesse a indiqué où se trouvait M. Mbéri et précisé qu'il était toujours empêché de sortir. Elle a alors réitéré sa demande que la Défenderesse fasse tout le nécessaire pour rendre immédiatement sa liberté de mouvement à M. Mbéri.

**101.** Le même jour, la Défenderesse a confirmé que les témoins pourraient être entendus dans l'ordre souhaité par la Demanderesse à l'exception de M. Andély. Par ailleurs, elle a sollicité l'autorisation de communiquer en pièce R100 une attestation de M. Mouamba.

**102.** Par un autre courrier du même jour, la Défenderesse a également indiqué qu'elle n'entravait en rien la liberté de mouvement de M. Mbéri et que celui-ci avait déclaré avoir choisi de rester à Brazzaville pour des raisons personnelles et avait prévu de venir à Paris par le vol du lundi ou mercredi soir suivant.

**103.** Le même jour, le Tribunal Arbitral a accusé réception des correspondances des parties relatives à la situation de M. Mbéri et a invité la Demanderesse à commenter les précisions données par la Défenderesse. Dans la soirée, le Tribunal Arbitral a à nouveau écrit aux parties s'étonnant que son mail soit resté sans réponse. La Demanderesse a alors indiqué ne pas être parvenu à clarifier la situation et a indiqué qu'elle reviendrait vers le Tribunal Arbitral le lendemain.

Par ailleurs, le Tribunal Arbitral a accusé réception de la lettre de la Défenderesse du même jour relative à l'ordre d'audition des témoins et à la demande d'admission d'une nouvelle attestation, précisant que les éventuels problèmes procéduraux en résultant seraient débattus à l'audience.

**104.** Le 18 décembre, la Demanderesse a informé le Tribunal Arbitral qu'un proche de M. Mbéri l'avait informé que ce dernier avait fait l'objet de pressions de la part du gouvernement congolais qui avait indiqué que son témoignage ne serait pas le bienvenu. Il a ajouté que si une conférence téléphonique était organisée, la parole de M. Mbéri ne serait pas libre. Elle s'est également opposée aux procédés du Congo.

Le même jour, la Demanderesse a demandé au Tribunal Arbitral s'il souhaitait qu'elle exprime sa position par écrit concernant la demande d'admission par la Défenderesse d'une attestation de M. Mouamba.

Le Tribunal Arbitral a répondu qu'il n'avait pas d'objection à ce que la Demanderesse exprime par écrit sa position avant l'audience sur la demande d'admission d'une nouvelle attestation mais ne l'estimait pas indispensable. Par ailleurs, il a noté que la Demanderesse n'attendait aucune action particulière, à ce stade, concernant l'audition de M. Mbéri mais a précisé qu'il souhaitait vivement que M. Mbéri puisse être entendu à l'audience et qu'il était certain que la Défenderesse ferait tout ce qui était en son pouvoir pour faciliter son déplacement. Enfin, le Tribunal Arbitral a indiqué être disponible pour participer à une conférence téléphonique avec un représentant de chacune des parties et M. Mbéri afin de clarifier la situation.

La Défenderesse a donné son accord pour participer à une telle conférence téléphonique, précisant que la Demanderesse avait indiqué être en mesure de l'organiser. Le Président du Tribunal Arbitral a précisé qu'il ferait cette conférence téléphonique, en accord avec ses co-arbitres. La Demanderesse a par la suite précisé qu'elle n'était pas en mesure d'organiser cette conférence téléphonique, contrairement à ce que prétendait la Défenderesse, n'étant pas parvenue à parler à M. Mbéri directement. Elle a alors invité le Président du Tribunal Arbitral à le contacter directement, tout en disant qu'elle était disponible pour une conférence téléphonique après que le Président ait pu parler à M. Mbéri ou son entourage. La Défenderesse a réaffirmé que M. Mbéri n'avait jamais fait l'objet d'une interdiction de sortir du Congo et que celui-ci avait indiqué au Ministre d'Etat, Coordonateur du pôle de la souveraineté, Ministre de la Justice et des droits humains, qu'il n'avait pas quitté le Congo pour raisons personnelles et qu'il avait l'intention de prendre un vol le 19 décembre. Le

Tribunal Arbitral a alors conclu qu'il n'était plus nécessaire, au vu de ces informations, d'avoir un entretien avec M. Mbéri avant l'audience. La Demanderesse a exprimé son accord et remercié la Défenderesse pour ces informations.

**105.** Une audience a eu lieu à Paris du 19 au 22 décembre 2011. Le 19 décembre 2011, la Demanderesse a remis par écrit au Tribunal Arbitral la pièce R101 (décret no. 92-978 du 25 décembre 1992 portant nomination des membres du gouvernement) soumise par la Défenderesse à la fin de l'audience.

**106.** Le 26 décembre 2011, le Tribunal Arbitral a adressé aux parties l'Ordonnance de Procédure no. 5 dont les termes sont les suivants :

> « *Attendu qu'une audience sur le fond a eu lieu à Paris entre le 19 et le 22 décembre 2011 ;*
> *Attendu qu'ont été entendus en qualité de témoins : Messrs Hajaij, Wehbe, Longobé, Lenga, Andély, Ikounga, Boueno, Ikémo, Gossaki et Mouamba;*
> *Attendu que les parties ont eu l'opportunité de présenter pleinement leurs positions respectives ;*
> *Attendu que le Tribunal Arbitral souhaite recevoir des mémoires après audience ;*
> *Attendu que le Tribunal Arbitral a précisé qu'il souhaiterait que ces mémoires soient limités en taille (environ une cinquantaine de pages) ;*
> *Attendu que ces mémoires ne devront pas être accompagnées de nouvelles pièces sauf après autorisation préalable du Tribunal Arbitral;*
> *Attendu que ces mémoires devraient avoir pour but principal d'exploiter les témoignages entendus lors de l'audience;*
>
> *Attendu que le Tribunal Arbitral souhaite plus particulièrement que les parties précisent les deux questions suivantes : la portée du Protocole de 2003 et le contenu de la créance de Commisimpex, sur lesquelles les deux parties sont invitées à se prononcer ;*
>
> *Attendu cependant que les mémoires après audience ne devront pas être strictement limités à ces questions ;*
>
> ### LE TRIBUNAL ARBITRAL DECIDE :
>
> 1. *Les parties remettront simultanément leurs mémoires après audience le 17 février 2012.*
>
> 2. *Les parties disposeront jusqu'au 23 mars 2012 pour remettre simultanément leurs mémoires en réponse. »*

**107.** Le 27 janvier 2012, Mme. Carole Malinvaud a déclaré aux parties qu'un des associés de son cabinet avait signé un contrat de services avec la société Quantic Finance Ltd quant à la réalisation d'une étude générale de la règlementation congolaise en vue de la mise en place d'un cadre règlementaire relatif à la création de zones économiques spéciales et a confirmé son indépendance vis-à-vis des parties.

**108.** Le 14 février 2012, la Demanderesse a indiqué n'avoir aucune observation quant aux informations données par Mme. Carole Malinvaud.

**109.** Le 16 février 2012, le Président du Tribunal Arbitral a reçu une lettre de M. Mbéri par laquelle il s'excusait de son absence à l'audience et confirmait la validité des termes de ses attestations. Le Président du Tribunal Arbitral a transmis cette lettre aux parties le 17 février 2012 en les invitant à communiquer leurs commentaires pour le 24 février 2012.

**110.** Le 17 février 2012, Mme. Carole Malinvaud a accusé réception de la lettre de la Demanderesse du 14 février 2012 et précisé qu'elle ne manquerait pas d'informer les parties si la mission de son cabinet venait à évoluer.

**111.** Le même jour, les parties ont adressé au Tribunal Arbitral leur premier mémoire après-audience.

**112.** Le 18 février 2012, le Tribunal Arbitral a accusé réception des mémoires après audience des parties.

**113.** Le 20 février 2012, la Défenderesse a adressé au Tribunal Arbitral ses commentaires sur la lettre envoyée par M. Mbéri, proposant une audience pour l'entendre en suggérant son éventuelle présence à Paris. Le jour même, le Tribunal Arbitral a accusé réception de cette lettre.

**114.** Le 24 février 2012, la Demanderesse a sollicité du Tribunal Arbitral un délai jusqu'au 27 février 2012 pour remettre ses commentaires sur la lettre de M. Mbéri, qui lui a été accordé par le Tribunal Arbitral le même jour.

**115.** Le 27 février 2012, la Demanderesse a informé le Tribunal Arbitral que M. Mbéri était de retour au Congo mais a précisé que si celui-ci pouvait se rendre à Paris, elle répondrait favorablement à l'organisation d'une audience. Elle a ajouté que dans une telle hypothèse, il serait opportun d'en profiter pour entendre M. le Président Sassou N'Guesso et a en outre proposé d'opposer à cette occasion les points de vue de MM. Mbéri, Mouamba, Boueno et du Président Sassou N'Guesso, ayant tous versé des attestations relatives aux réunions de septembre et octobre 1992.

**116.** Le 1ᵉʳ mars 2012, le Tribunal Arbitral a indiqué aux parties avoir pris connaissance de leurs correspondances des 20 et 27 février 2012 et a proposé que son Président tienne une conférence téléphonique seul avec les parties.

**117.** Le 8 mars 2012, une conférence téléphonique a donc eu lieu entre le Président du Tribunal Arbitral et les parties.

**118.** Le 9 mars 2012, la Demanderesse a communiqué la lettre de M. Mbéri du 14 février 2012 en tant que pièce C204 comme convenu lors de la conférence téléphonique.

**119.** Le même jour, le Tribunal Arbitral a adressé aux parties l'Ordonnance de Procédure no.6 qui dispose :

> *« Attendu que M. Mbéri a adressé au Président du Tribunal Arbitral uniquement une lettre en date du 14 février 2011 (sic) par laquelle il a indiqué ne pas avoir pu être présent à l'audience en qualité de témoin pour des raisons indépendantes de sa volonté et a confirmé la validité des termes de ses attestations ;*
>
> *Attendu que par courriel du 17 février 2012, le Président du Tribunal Arbitral a transmis copie de la lettre de M. Mbéri aux parties ainsi qu'à ses co-arbitres en invitant les parties à communiquer leurs commentaires relatifs à cette lettre pour le 24 février 2012 ;*

*Attendu que par lettre du 20 février 2012, la Défenderesse a indiqué que l'absence de crédit des attestations de M. Mbéri avait été établi à l'audience ajoutant qu'en cas de doute du Tribunal Arbitral à ce sujet, une audience pourrait être organisée pour entendre M. Mbéri, qui se trouvait peut être encore en France à cette date ;*

*Attendu que par courriel du 24 février 2012, la Demanderesse a demandé une extension de délai jusqu'au 27 février 2012 pour communiquer ses commentaires ;*

*Attendu que par courriel du même jour, le Tribunal Arbitral a accusé réception du courriel de la Demanderesse et lui a accordé l'extension de délai demandée ;*

*Attendu que le 27 février 2012, la Demanderesse a indiqué que M. Mbéri ne se trouvait plus en France et que si les circonstances avaient évolué quant à la possibilité de M. Mbéri de se rendre en France pour témoigner, elle ne s'opposerait pas à la tenue d'une telle audience. Elle a également ajouté que dans une telle hypothèse, elle considérait opportun d'entendre également le Président Sassou N'Guesso et a proposé, si le Tribunal Arbitral l'estimait utile, de confronter les points de vue de M. Mbéri, Hajaij, Mouamba, Boueno et du Président Sassou N'Guesso ;*

*Attendu que par courriel du 1 mars 2012, le Tribunal Arbitral a indiqué avoir pris connaissance des correspondances des parties. M. Yves Derains, en accord avec ses co-arbitres, a proposé de tenir une conférence téléphonique seul avec les parties ;*

*Attendu qu'une conférence téléphonique a eu lieu entre le Président du Tribunal Arbitral et les parties le 8 mars 2012 ;*

*Attendu qu'au cours de cette conférence téléphonique, les parties ont manifesté leur accord pour que la lettre du 14 février 2012 de M. Mbéri soit versée aux actes de la procédure ;*

*Attendu que la Défenderesse a réitéré sa demande d'entendre M. Mbéri en qualité de témoin, la Demanderesse confirmant sa demande d'entendre le Président Sassou N'Guesso dans le cas où M. Mbéri viendrait à être entendu ;*

*Attendu que le Président du Tribunal Arbitral a rapporté le contenu de cette conférence téléphonique à ses co-arbitres ;*

*Attendu que le Tribunal Arbitral considère qu'il n'est pas utile à ce stade d'entendre M. Mbéri dans la mesure où les parties doivent encore échanger des réponses aux mémoires après audience le 23 mars 2012 ;*

*Attendu que le Tribunal Arbitral estime qu'il sera donc mieux à même de décider si l'audition de M. Mbéri est nécessaire après cet échange ;*

### *LE TRIBUNAL ARBITRAL DECIDE :*

1. *Aucune décision sur l'organisation d'une nouvelle audience pour entendre M. Mbéri n'est prise à ce stade.*

2. *Le Tribunal Arbitral se réserve le droit de revenir vers les parties à ce sujet après avoir pris connaissance du dernier échange de mémoires des parties. »*

**120.** Le 13 mars 2012, le Secrétariat de la CCI a informé le Tribunal Arbitral et les parties que lors de session du 8 mars 2012, et conformément à l'article 24(2) du Règlement, la Cour

Internationale d'Arbitrage a prolongé le délai pour rendre la Sentence Finale jusqu'au 30 juin 2012.

**121.** Le 23 mars 2012, les parties ont adressé au Tribunal Arbitral leurs seconds mémoires après-audience.

**122.** Le 30 mars 2012, la Demanderesse a communiqué ses remarques quant au mode de calcul effectué par la Défenderesse dans son second mémoire après-audience pour actualiser de fin 1986 à 1997 les montants figurant dans la Fiche de calcul détaillée. Le 2 avril 2012, la Défenderesse a indiqué qu'une erreur matérielle s'était introduite dans son second mémoire après-audience et a communiqué de nouvelles pages 38 et 39 corrigées en ce sens. Elle a précisé que cela n'affectait pas son raisonnement quant au caractère incohérent et artificiel des calculs de la Demanderesse. Le 4 avril 2012, la Demanderesse a pris note de la correction effectuée par la Défenderesse et a souligné que ce changement, au contraire, affectait le raisonnement du Congo. Le 5 avril 2012, la Défenderesse a soumis de brèves observations complémentaires en réponse à la lettre de la Demanderesse du 4 avril. Le même jour, le Tribunal Arbitral a accusé réception de la lettre de la Défenderesse et a déclaré le débat clos sur ce sujet.

**123.** Le 14 juin 2012, le Secrétariat de la Cour a informé le Tribunal Arbitral et les parties que lors de sa session du 14 juin 2012, et conformément à l'article 24(2) du Règlement, la Cour a prolongé le délai pour rendre la Sentence Finale jusqu'au 28 septembre 2012.

**124.** Le 17 juillet 2012, la Défenderesse a communiqué au Tribunal Arbitral un arrêt de la Cour d'appel de Paris du 12 juin 2012 qui a rejeté le recours en annulation formé par elle à l'encontre de la sentence partielle en date du 20 août 2011.

**125.** Le 14 septembre 2012, le Secrétariat de la Cour a informé le Tribunal Arbitral et les parties que lors de sa session du 13 septembre 2012, et conformément à l'article 24(2) du Règlement, la Cour a prolongé le délai pour rendre la Sentence Finale jusqu'au 31 octobre 2012. Le Secrétariat de la Cour a également indiqué que Madame Marie-Camille Pitton était désormais la conseillère en charge du dossier.

**126.** Le 1er octobre 2012, la Demanderesse a présenté au Tribunal Arbitral une demande de mesure d'urgence relative à une requête déposée par la Caisse Nationale de Sécurité Sociale du Congo visant à ce que Commisimpex soit déclarée en cessation de paiements et mise en liquidation lors d'une audience du Tribunal de commerce de Brazzaville du 2 octobre 2012.

**127.** Le même jour, le Tribunal Arbitral a accusé réception de la lettre de la Demanderesse et a ordonné à la Défenderesse de prendre toutes dispositions pour maintenir le status quo entre les parties et de l'informer des dispositions prises par elle avant le lendemain matin 10h.

**128.** Le 2 octobre 2012, la Défenderesse a fourni ses commentaires au Tribunal Arbitral indiquant que l'audience prévue n'était qu'une première audience de procédure.

**129.** Le même jour, le Tribunal Arbitral a accusé réception de la lettre de la Défenderesse.

**130.** Le 4 octobre 2012, la Demanderesse a adressé au Tribunal Arbitral une demande de mesure provisoire.

**131.** Le même jour, le Tribunal Arbitral a accusé réception de la lettre de la Demanderesse et a invitée la Défenderesse à lui adresser ses commentaires pour le 8 octobre à 10h au plus tard.

**132.** Le 8 octobre 2012, le Tribunal Arbitral a adressé aux parties l'Ordonnance de Procédure no. 7 qui dispose :

> *« Attendu que par courriel en date du 1er octobre 2012, la Demanderesse a présenté au Tribunal Arbitral une demande de mesure d'urgence;*
>
> *Attendu que la Demanderesse a indiqué que par requête auprès du Tribunal de Commerce de Brazzaville du 26 septembre 2012, la Caisse Nationale de Sécurité Sociale du Congo a demandé que « Commisimpex soit déclarée en cessation de paiements, que ses biens soient liquidés et que le tribunal nomme les organes de liquidation » alléguant que celle-ci était débitrice de cotisations sociales depuis 1981 ;*
>
> *Attendu que la Demanderesse a encore expliqué que le Président du Tribunal de Commerce de Brazzaville avait, après avoir invoqué une vaine tentative de conciliation des parties, par ordonnance du 28 septembre 2012, fixé une audience le 2 octobre 2012 à 8h00 « aux fins de statuer sur les mérites de ladite requête » demandant à Commisimpex de « produire [ses] défenses huit jours au plus tard avant l'audience » ;*
>
> *Attendu que la Demanderesse a indiqué au Tribunal Arbitral qu'aucune tentative de conciliation n'avait été entreprise, que les délais fixés par le tribunal étaient en violation totale des droits de la défense et que cette procédure était destinée « à permettre aux autorités congolaises de prendre frauduleusement le contrôle de Commisimpex via le liquidateur qui sera nommé par le Tribunal de Commerce de Brazzaville, de manière à court-circuiter votre sentence à intervenir (…) » ;*
>
> *Attendu que la Demanderesse a demandé au Tribunal Arbitral « d'ordonner au Congo de donner les instructions nécessaires à sa Caisse Nationale de Sécurité Sociale, organisme public, d'accepter un renvoi de l'audience du 2 octobre 2012 à une audience ultérieure, le temps que Commisimpex puisse présenter sa défense et/ou demander d'autres mesures provisoires à votre Tribunal » ;*
>
> *Attendu que par courriel du 1 octobre 2012, le Tribunal Arbitral a accusé réception de la lettre de la Demanderesse et a ordonné à la Défenderesse « de prendre immédiatement toutes dispositions pour qu'aucune mesure qui pourrait modifier le status quo entre les parties et éventuellement affecter les effets de la sentence arbitrale à venir n'intervienne avant que le Tribunal Arbitral ait pu instruire, dans le respect du contradictoire, la demande de mesure d'urgence qui lui est soumise [ce soir] et prendre une décision à son égard » ;*
>
> *Attendu que le Tribunal Arbitral a également demandé à la Défenderesse de l'informer des dispositions prises par elle avant 10h le lendemain matin ;*
>
> *Attendu que le 2 octobre 2012, la Défenderesse a indiqué que l'audience prévue ce jour là n'était qu'une première audience de procédure et qu'en aucun cas une décision ne serait prise à cette audience sur la demande de la Caisse Nationale de Sécurité Sociale, précisant que cette affaire allait faire l'objet d'une instruction contradictoire et que Commisimpex aurait l'occasion de présenter sa défense ;*
>
> *Attendu que le même jour, le Tribunal Arbitral a accusé réception de la lettre de la Défenderesse et l'a remercié de sa réactivité ;*

*Attendu que le 4 octobre 2012, la Demanderesse a soumis au Tribunal Arbitral une demande de mesure provisoire, expliquant que la procédure intentée contre Commisimpex par la Caisse Nationale de Sécurité Sociale se fonde sur des prétendus arriérés de paiement de cotisations sociales de salariés de Commisimpex pour la période de 1981 à 2011 et que la Caisse avait demandé non pas le paiement de sa prétendue créance mais la liquidation de Commisimpex et la faillite personnelle de M. Hajaij ;*

*Attendu que la Demanderesse a précisé qu'au delà du fait que cette action était soudaine, les délais imposés dans cette procédure étaient surprenants et en violation du principe du contradictoire ;*

*Attendu que la Demanderesse a également souligné que les faits reprochés étaient dénués de fondement dans la mesure où Commisimpex a été mise en sommeil par résolution de son Assemblée Générale du 28 juin 1991, ainsi que le prouve également un certificat de non-imposition du Service des Contributions directes du Congo, qu'elle n'était débitrice d'aucune cotisation envers la Caisse Nationale de Sécurité Sociale du Congo et qu'aucune mise en demeure ne lui avait d'ailleurs été adressée ;*

*Attendu que la Demanderesse a demandé au Tribunal Arbitral « d'ordonner au Congo de donner les instructions nécessaires à sa Caisse Nationale de Sécurité Sociale, organisme public, de se désister de son action en constat de cessation de paiement et liquidation, sans préjudice de toute action au fond que la Caisse jugerait nécessaire d'intenter pour qu'il soit statué, dans le plein respect des droits de la défense, sur ses prétendues créances à l'égard de Commisimpex » et « [e]n toute hypothèse (...) de lui donner acte, dans le cadre de la sentence à intervenir, de ses protestations quant à la régularité et au bien fondé de la procédure intentée par la Caisse Nationale de Sécurité Sociale devant les juridictions congolaises » ;*

*Attendu que par courriel du 4 octobre 2012, le Tribunal Arbitral a accusé réception de la lettre de la Demanderesse et invitée la Défenderesse à commenter cette lettre pour le 8 octobre 2012 à 10h au plus tard ;*

*Attendu que la Défenderesse n'a pas fourni de commentaires dans les délais fixés par le Tribunal Arbitral ;*

*Attendu que la République du Congo ne peut invoquer aucun intérêt légitime à ce que la mise en liquidation de Commisimpex intervienne à bref délai et, en tout cas, avant la fin du présent arbitrage ;*

### *LE TRIBUNAL ARBITRAL DECIDE :*

*1. Les parties doivent prendre toutes mesures destinées à éviter que le status quo entre elles ne soit modifié jusqu'au prononcé de la sentence finale.*

*2. A cet égard, il est ordonné à la République du Congo de prendre toutes les dispositions qui s'imposent pour qu'aucune organisation de l'Etat congolais ne fasse mettre la société Commisimpex en liquidation avant que la sentence finale ne soit rendue dans le présent arbitrage ».*

**133.** Le même jour, après le prononcé de cette Ordonnance, la Défenderesse a fourni au Tribunal Arbitral ses commentaires sur la lettre de la Demanderesse du 4 octobre 2012. Le Tribunal Arbitral a accusé réception de cette lettre et a indiqué que son contenu n'était pas de nature à remettre en cause les décisions prises dans l'Ordonnance de Procédure no. 7.

**134.** Le 10 octobre 2012, le Tribunal Arbitral a informé les parties de la clôture des débats conformément à l'article 22 (2) du Règlement CCI, n'ayant pas estimé utile d'organiser une nouvelle audience pour entendre M. Mbéri après réception des Mémoires Après-Audience, comme envisagé dans l'Ordonnance de Procédure no. 6 du 9 mars 2012.

**135.** Le 11 octobre 2012, et conformément à l'article 24(2) du Règlement, la Cour Internationale d'Arbitrage a prolongé le délai pour rendre la Sentence Finale jusqu'au 31 décembre 2012.

**136.** Les parties ont remis au Tribunal Arbitral des lettres en date des 18, 19 et 25 octobre 2012 sur la procédure relative à la liquidation de Commisimpex.

**137.** Le 29 octobre 2012, Madame Carole Malinvaud a informé les parties que l'un de ses associés envisageait de répondre favorablement à la sollicitation de la République du Congo pour l'assister dans la finalisation des projets de nouveau code pétrolier et de modèle de contrat de partage de production préparés par l'administration congolaise et a précisé que cela n'avait pas de lien avec la présente affaire.

**138.** Le 30 octobre 2012, le Tribunal Arbitral a accusé réception des lettres des parties des 18, 19 et 25 octobre 2012 sur la procédure relative à la liquidation de Commisimpex et informé les parties que ces lettres n'étaient pas admises à la procédure, les débats ayant été déclarés clos par lettre du 10 octobre 2012.

Le même jour, la Demanderesse a informé le Tribunal Arbitral de la décision du Tribunal de Commerce de Brazzaville prononçant la liquidation et la dissolution de Commisimpex ainsi que la faillite personnelle de M. Hajaij, responsable de Commisimpex. A ce titre, elle demandait, entre autres, au Tribunal Arbitral de bien vouloir ré-ouvrir les débats.

**139.** Le 31 octobre 2012, le Tribunal Arbitral a accusé réception de la lettre de la Demanderesse du 30 octobre 2012 et a invité la Défenderesse à commenter cette lettre pour le 2 novembre à 19h au plus tard.

**140.** Le 2 novembre 2012, les parties ont remis au Tribunal Arbitral leurs demandes relatives aux frais de l'arbitrage. A la même date, la Défenderesse a indiqué que n'arrivant pas à joindre sa cliente, elle confirmait le contenu de ses lettres des 8 et 19 octobre 2012.

**141.** Le 7 novembre 2012, le Tribunal Arbitral a adressé aux parties l'Ordonnance de Procédure no. 8 qui dispose :

> « *Attendu que par lettre du 8 octobre 2012, la Défenderesse a adressé ses observations relatives à la lettre de Commisimpex en date du 4 octobre 2012 ;*
>
> *Attendu que le Tribunal Arbitral a accusé réception de ces observations, notant qu'elles avaient été communiquées après l'envoi de l'Ordonnance de Procédure no. 7, et a indiqué que le contenu de cette lettre n'était pas de nature à remettre en cause les décisions prises dans cette ordonnance ;*
>
> *Attendu que par lettre du 18 octobre 2012, dont une copie était adressée au Tribunal Arbitral, le conseil de la Demanderesse a demandé au conseil de la Défenderesse de bien vouloir*

*s'assurer que sa cliente respecte l'Ordonnance de Procédure no. 7 du Tribunal Arbitral, expliquant qu'au cours de l'audience de procédure du 16 octobre 2012 devant le Tribunal de Commerce de Brazzaville, celui-ci avait, sur demande de l'avocat de la Caisse Nationale de Sécurité Sociale (« CNSS ») et sans même que les disponibilités des avocats soit vérifiées, fixé une audience de plaidoirie au 23 octobre 2012 et qu'un délibéré devrait, dans ces circonstances, intervenir à bref délai;*

*Attendu que par lettre du 19 octobre 2012, dont une copie était également adressée au Tribunal Arbitral, le conseil de la Défenderesse a accusé réception de la lettre du conseil de la Demanderesse et a joint une lettre adressée le 11 octobre 2012 par le Directeur de Cabinet du Ministre d'Etat, Garde des Sceaux, Ministre de la Justice et des Droits Humains à Monsieur le Procureur de la République près le Tribunal de Grande Instance de Brazzaville par laquelle le Directeur du Cabinet du Ministre a transmis au Procureur « (…) pour qu'il soit accompli par vous ce qu'il appartiendra devant le Tribunal de Grande Instance de Brazzaville, l'ordonnance de procédure n°7 rendue le 8 octobre 2012 par le Tribunal arbitral de Paris dans l'affaire opposant la société Commisimpex à l'Etat Congolais mise en délibéré pour décision être rendue au plus tard le mois prochain. » Il était précisé que « Dans cette ordonnance le Tribunal arbitral fait injonction à l'Etat Congolais ou à ses démembrements de ne pas court-circuiter la sentence attendue par une décision de mise en faillite de commisimpex, allusion faite à l'action intentée à cet effet par la CNSS devant le Tribunal du Commerce de Brazzaville. » Par ailleurs, le conseil de la Défenderesse a également joint le « Soit-Transmis du Procureur de la République du 17 octobre 2012 » où il a recommandé « d'éviter de prendre une décision de mise en faillite de Commisimpex (Affaire CNSS c/Commisimpex) avant le prononcé de la sentence arbitrale. »*

*Attendu que le 25 octobre 2012, le conseil de la Demanderesse a informé le Tribunal Arbitral que la CNSS n'avait pas renoncé à sa procédure contrairement aux dispositions de l'Ordonnance de Procédure no.7 et qu'une audience de plaidoirie s'était donc tenue le 23 octobre 2012 au cours de laquelle Commisimpex, d'une part, avait demandé « qu'il soit sursis au jugement, notamment en raison de la plainte avec constitution de partie civile pour faux, usage de faux et escroquerie déposée la veille par Commisimpex auprès du doyen des juges d'instruction près le Tribunal de grande instance de Brazzaville » ainsi que l'absence au fond de créance de la CNSS, et, le Procureur de la République du Congo, d'autre part, demandé qu'il soit sursis à la procédure de liquidation du fait de la plainte déposée par Commisimpex. Le conseil de la Demanderesse a précisé que la décision du Président devait être rendue le 30 octobre 2012 ;*

*Attendu que le 30 octobre 2012, le Tribunal Arbitral a accusé réception des lettres des parties des 18, 19 et 25 octobre 2012 sur la procédure relative à la liquidation de Commisimpex et informé les parties que ces lettres n'étaient pas admises à la procédure, les débats ayant été déclarés clos par lettre du 10 octobre 2012 ;*

*Attendu que le même jour, le conseil de la Demanderesse a informé le Tribunal Arbitral que le Tribunal de Commerce de Brazzaville avait prononcé la liquidation et la dissolution de Commisimpex, nommé les organes de liquidation et prononcé la faillite personnelle de M. Hajaij, l'interdisant également d'exercer une activité commerciale ou de diriger une société commerciale pendant dix ans. Le conseil de la Demanderesse a précisé que celle-ci et M. Hajaij avaient interjeté appel mais qu'en droit congolais, celui-ci n'était pas suspensif. Par conséquent, le conseil de la Demanderesse a prié le Tribunal :*

*« -d'autoriser la réouverture des débats conformément à l'Article 22(1) in fine du Règlement CCI, afin de pouvoir considérer la présente demande ;*

*-de prendre acte de la violation par le Congo de l'Ordonnance ;*

*-de prendre acte du caractère intentionnel et abusif de cette violation ;*

*-de rendre une sentence (1) réitérant son Ordonnance, (2) ordonnant au Congo de prendre les mesures nécessaires pour que sa CNSS acquiesce à l'appel interjeté par Commisimpex et M. Hajaij, et/ou prenne toutes autres mesures permettant de rétablir le statu quo conformément aux termes de l'Ordonnance, (3) ordonnant au Congo de prendre les mesures nécessaires pour que la CNSS acquiesce à une demande de sursis à exécution de la décision du Tribunal de commerce dans l'attente de l'arrêt d'appel à intervenir et (4) ordonnant en tout état de cause au Congo de renoncer à faire exécuter la décision du Tribunal de Commerce de Brazzaville de ce jour devant toute juridiction, judiciaire ou arbitrale ; et d'en tirer toute autre conséquence qu'il estimera nécessaire ».*

*Attendu que le 31 octobre 2012, le Tribunal Arbitral a accusé réception de la lettre de la Demanderesse du 30 octobre 2012 et a invité la Défenderesse à commenter celle-ci pour le 2 novembre 2012 ;*

*Attendu que par lettre du 2 novembre 2012, le conseil de la Défenderesse a indiqué qu'il ne parvenait pas à contacter sa cliente pour obtenir des informations et prendre des instructions et n'avait donc pas d'éléments à ajouter à ceux figurant dans ses lettres des 8 et 19 octobre derniers ;*

*Attendu que le Tribunal Arbitral confirme son Ordonnance de Procédure no. 7 qui dispose que :*

*1. Les parties doivent prendre toutes mesures destinées à éviter que le status quo entre elles ne soit modifié jusqu'au prononcé de la sentence finale.*

*2. A cet égard, il est ordonné à la République du Congo de prendre toutes les dispositions qui s'imposent pour qu'aucune organisation de l'Etat congolais ne fasse mettre la société Commisimpex en liquidation avant que la sentence finale ne soit rendue dans le présent arbitrage.*

*Attendu que le Tribunal Arbitral considère qu'en l'état la réouverture des débats est nécessaire, comme le prévoit l'article 22 (1) du Règlement d'arbitrage, afin de pouvoir examiner la demande de Commisimpex ;*

***LE TRIBUNAL ARBITRAL DECIDE :***

*1. Les débats sont ré-ouverts comme le permet l'article 22 (1) du Règlement d'arbitrage de la CCI.*

*2. La Demanderesse précisera ses demandes pour le 14 novembre 2012.*

*3. La Défenderesse adressera ses commentaires pour le 21 novembre 2012.*

*4. Une conférence téléphonique entre les parties et le Tribunal Arbitral aura lieu fin novembre ou début décembre 2012 pour débattre de ces questions. »*

**142.** Le 12 Novembre 2012, le Tribunal Arbitral a indiqué aux parties que la conférence téléphonique prévue dans l'Ordonnance de Procédure no. 8 était fixée au 28 novembre à

17h30. Le même jour, les parties ont confirmé leurs disponibilités pour cette date. Le Tribunal Arbitral a alors confirmé la tenue de la conférence téléphonique le 28 novembre 2012.

**143.** Le 14 novembre 2012, la Demanderesse a précisé ses demandes conformément à l'Ordonnance de Procédure no.8, par une lettre accompagnée de pièces factuelles C-205 à C-217 et de pièces juridiques C-RJ142 à C-RJ 149.

**144.** Le 15 novembre 2012, le Secrétariat de la CCI a informé les parties qu'il avait reçu la visite de Monsieur Gaston Mossa qui se présentait comme liquidateur judiciaire de Commisimpex et demandait les coordonnées du conseil de celle-ci. Le Secrétariat a invité Commisimpex à indiquer pour le 16 novembre 2012 si elle autorisait le Secrétariat à communiquer ses informations à Monsieur Mossa.

**145.** Le 16 novembre 2012, le conseil Commisimpex a indiqué au Secrétariat qu'il ne s'opposait pas à ce que ces coordonnées soient transmises mais a précisé qu'aucune autre information ne devrait être communiquée. Commisimpex a également indiqué qu'elle pensait que Monsieur Mossa n'était pas le véritable liquidateur.

**146.** Le 19 novembre 2012, le Secrétariat a indiqué avoir pris note des indications de Commisimpex et a confirmé qu'il allait transmettre ses coordonnées à Monsieur Gaston Mossa, ce qu'il a fait le même jour.

**147.** Le 21 novembre 2012, la Défenderesse a sollicité une prorogation de délai jusqu'au 22 novembre, 14 heures, pour remettre ses observations en réponse, conformément à l'Ordonnance de Procédure no.8. Le même jour, le Tribunal Arbitral a accordé la prorogation demandée.

**148.** Le 22 novembre 2012, la Défenderesse a remis ses observations en réponse, par une lettre accompagnée de la pièce factuelle R-102 et de pièce juridique R-RJ 79.

**149.** Le 27 novembre 2012, le Secrétariat a transmis au Tribunal Arbitral une lettre de M. Gaston Mossa du 19 novembre 2012 adressée à son Président et signifiée par Huissier de Justice à la Cour Internationale d'Arbitrage le 26 novembre 2012. Cette lettre a été soumise aux parties le même jour pour discussion lors de la conférence téléphonique prévue le 28 novembre 2012.

**150.** Le 27 novembre 2012, la Demanderesse a communiqué au Tribunal Arbitral en vue de la conférence téléphonique prévue le 28 novembre 2012 les pièces C218, C219 et C220.

**151.** Le 28 novembre 2012, une conférence téléphonique a été tenue entre les parties et le Tribunal Arbitral.

**152.** Le 30 novembre 2012, le Tribunal Arbitral a adressé aux parties l'Ordonnance de Procédure no. 9 qui dispose :

> *« Attendu que par Ordonnance de Procédure no. 8 du 7 novembre 2012, les débats ont été réouverts sur demande de Commisimpex, à la suite de la décision du Tribunal de Commerce de Brazzaville prononçant la liquidation judiciaire de Commisimpex et la faillite personnelle de M. Hajaj ;*

*Attendu que conformément à l'Ordonnance de Procédure no. 8, Commisimpex a précisé ses demandes le 14 novembre 2012 ;*

*Attendu que ses demandes étaient les suivantes :*

*« Commisimpex prie le Tribunal, dans le cadre de sa sentence à venir :*

*(1) de prendre acte de la violation par le Congo de l'Ordonnance de procédure no.7 ;*

*(2) de prendre acte du caractère intentionnel et abusif de cette violation ;*

*(3) de constater le caractère abusif et frauduleux de la liquidation de Commisimpex ;*

*(4) de dire, en conséquence, que, pour les besoins du présent arbitrage, il ne reconnaît pas la mise en liquidation judiciaire de Commisimpex ;*

*(5) de constater, dans cet arbitrage, le défaut de qualité des liquidateurs nommés pour représenter Commisimpex ;*

*(6) d'ordonner en tout état de cause au Congo de renoncer à se prévaloir et/ou faire exécuter la décision du Tribunal de Commerce de Brazzaville en date du 30 octobre 2012, devant votre tribunal et/ou devant tout autre juridiction, judiciaire ou arbitrale ;*

*(7) d'ordonner au Congo de prendre les mesures nécessaires pour que la CNSS acquiesce à l'appel interjeté par Commisimpex et M. Hajaij, et/ou prenne toutes autres mesures permettant de rétablir le statu quo conformément aux termes de l'Ordonnance de procédure n° 7 ; et*

*(8) d'ordonner le remboursement par le Congo, au profit des demandeurs, de tous les frais engendrés dans le présent arbitrage par la procédure de liquidation. »*

*Attendu que conformément à l'Ordonnance de Procédure no. 8, la République du Congo a, le 21 novembre 2012, présenté ses commentaires sur la soumission de Commisimpex ;*

*Attendu que la République du Congo conclut à l'irrecevabilité des demandes de Commisimpex et demande au Tribunal Arbitral, en tout état de cause, de les rejeter comme mal fondées ;*

*Attendu que le 27 novembre 2012, le Secrétariat de la CCI a transmis au Tribunal Arbitral une lettre de M. Gaston Mossa, Président du Syndic de liquidation de Commisimpex, que le Secrétariat s'était vu signifié par huissier le 26 novembre 2012, que dans cette lettre, M. Gaston Mossa indiquait au Tribunal Arbitral que les actes accomplis par M. Hajaij au nom de Commisimpex étaient dorénavant nuls et de nul effet et que seul le syndic de liquidation était compétent à cet égard ;*

*Attendu que le même jour, le Tribunal Arbitral a transmis cette lettre aux parties pour discussion lors de la conférence téléphonique prévue le 28 novembre 2012 ;*

*Attendu qu'au cours de cette conférence téléphonique entre les parties et le Tribunal Arbitral, ont été débattues tant les questions soulevées par les écritures des parties que la lettre de M. Gaston Mossa ;*

*Attendu que le Tribunal Arbitral constate que l'Ordonnance de Procédure no.7 par laquelle il était ordonné « (...) à la République du Congo de prendre toutes les dispositions qui s'imposent pour qu'aucune organisation de l'Etat congolais ne fasse mettre la société Commisimpex en*

*liquidation avant que la sentence finale ne soit rendue dans le présent arbitrage » n'a pas empêché le prononcé de la liquidation judiciaire de Commisimpex, sans qu'il en découle nécessairement une violation par la République du Congo de cette ordonnance ;*

*Attendu en effet que le Tribunal Arbitral a constaté que le Directeur de cabinet du Ministre de la Justice avait transmis « (...) l'Ordonnance de Procédure no. 7 au Procureur de la République près le Tribunal de Grande Instance de Brazzaville en lui donnant instruction de faire le nécessaire pour éviter qu'une décision de mise en faillite ne soit prononcée avant la sentence à intervenir »;*

*Attendu que le Tribunal Arbitral estime que, la décision faisant l'objet d'un recours, la République du Congo est en mesure de rétablir le statu quo entre les parties qui a été rompu et qu'il y a donc lieu de lui ordonner de le faire ;*

*Attendu que pour le reste des demandes de Commisimpex, le Tribunal Arbitral se déterminera dans sa sentence finale ;*

*Attendu qu'il y a lieu, dans ces circonstances, à prononcer à nouveau la clôture des débats ;*

### LE TRIBUNAL ARBITRAL DECIDE :

1. *Les débats sont clos conformément à l'article 22 (1) du Règlement d'arbitrage de la CCI.*

2. *La République du Congo doit prendre toutes les mesures nécessaires pour que le statu quo entre les parties soit rétabli dans les plus brefs délais et en tout cas avant le prononcé de la sentence finale. »*

**153.** A la même date, le Tribunal Arbitral a adressé à M. Gaston Mossa, avec copie aux parties et au Secrétariat de la CCI la lettre suivante :

*« Monsieur,*

*Le Tribunal Arbitral accuse réception de votre lettre en date du 19 novembre 2012 qui lui a été transmise par le Secrétariat de la Cour internationale d'arbitrage de la CCI le 27 novembre 2012, lui-même l'ayant reçue le 26 novembre 2012.*

*Le Tribunal Arbitral a pris note de l'indication selon laquelle un jugement du Tribunal de Commerce de Brazzaville du 30 octobre dernier a déclaré la société Commisimpex en liquidation judiciaire ainsi que la faillite personnelle de M. Hajaij.*

*Il a également pris en considération le fait que vous estimiez que les actes accomplis par M. Hajaij étaient dorénavant nuls et de nul effet et que seul le syndic de liquidation était compétent pour accomplir des actes au nom de Commisimpex.*

*Cependant, la validité de la décision du Tribunal de Commerce de Brazzaville est contestée et son opposabilité au Tribunal Arbitral fait l'objet d'un débat devant celui-ci.*

*Dans ces conditions, le Tribunal Arbitral ne peut reconnaître comme représentants de Commisimpex que ceux déjà constitués dans la procédure arbitrale, dans laquelle la clôture des débats a été prononcée.*

*Veuillez agréer, Monsieur, l'expression de mes sentiments distingués.*

*Yves DERAINS*
*Président du Tribunal Arbitral »*

**154.** Le 13 décembre 2012, et conformément à l'article 24(2) du Règlement, la Cour Internationale d'Arbitrage a prolongé le délai pour rendre la Sentence Finale jusqu'au 28 février 2013.

## III.  POSITION DES PARTIES

### A.  Position de la Demanderesse

**155.** Commisimpex demande l'exécution par le Congo du Protocole de 2003 qui constitue un accord entre le Congo et Commisimpex, par lequel le Congo reconnaît sa dette envers Commisimpex et s'engage à la régler en sa totalité. Le montant de la dette globale, qui s'élève à 960.000.000 FRF (équivalent de 48 milliards FCFA), est rappelé dans ce Protocole. Par ailleurs, l'article 6 du Protocole de 2003 prévoit que les parties s'engageraient *« à conclure un protocole d'accord définitif »*, fixant les éléments accessoires des accords. Bien que le Congo n'ait pas donné suite à son engagement, la validité et la portée du Protocole de 2003 ne sont pas affectées dans la mesure où ce protocole d'accord définitif ne devait être conclu qu'en complément et non pour validation du Protocole de 2003. Cet article ne renvoie pas à des négociations ultérieures de la créance de Commisimpex qui rendraient le protocole caduc si elles n'étaient pas menées. Les négociations mentionnées par le point 4 ne sont que des négociations en exécution du Protocole.

**156.** En sus d'arrêter le montant total de la dette, le Protocole de 2003 détermine les modalités de son règlement. Ainsi, au titre du Protocole de 2003, les parties sont convenues de scinder la dette globale : d'une part le *« règlement de 440 millions FRF correspondant à la dette toujours due par la République du Congo »* en vertu du Protocole de 1992 et due, aux termes du Protocole de 2003, par Commisimpex à la Banque Saradar ; d'autre part, *« le paiement de 520 millions FRF, correspondant à la partie restante de la dette du Congo envers Commisimpex, que le Congo aurait dû régler par l'attribution d'entreprises à privatiser »* avec un taux d'intérêt de 10% par an. Aux termes de l'article 4 du Protocole de 2003, la deuxième partie de la dette devrait faire l'objet d'un *« règlement en trois temps : un paiement comptant, l'attribution de sociétés à privatiser et le paiement du reliquat en 84 mensualités, sous réserve de l'émission d'une garantie du Congo au profit de Commisimpex »*.

**157.** Le Congo tente de remettre en cause le montant de la dite créance. Or, la dette du Congo à l'égard de Commisimpex a fait l'objet de vérification, notamment par les *« plus hauts responsables congolais »*.Tel est le cas de la vérification effectuée par la commission interministérielle du 27 mars 1987, matérialisée par la Fiche de Calcul de 1991 qui évalue la créance de Commisimpex à 29.949.284.818 FCFA par la CCA. Les responsables congolais de l'époque ont d'ailleurs confirmé que le montant de la dette était proche de 29,9 milliards FCFA. Cette fiche de calcul comprend tous les marchés à l'origine de la créance de

Commisimpex et exclut les instruments non signés par Commisimpex en décembre 1986, les marchés annulés (le marché no. 043/86 du 20 mai 1986 qui n'a jamais été exécuté et le marché no. 185/84 escompté le 18 juin 1984 auprès de l'Equator Bank) et le paiement reçu par Commisimpex de 15 millions USD, effectué par le Congo le 28 avril 1987, seul paiement jamais reçu par Commisimpex.

**158.** Le Congo n'apporte pas la preuve que certains marchés aient été réglés comme il le soutient. Il a introduit au dossier une convention de refinancement de 1988 mais celle-ci n'a jamais été exécutée. Commisimpex n'a pas non plus reçu de paiement par le biais de l'escompte de billets à ordre, le seul ayant eu lieu étant auprès de l'Equator Bank dont les montants ne sont pas réclamés dans le présent arbitrage. Enfin, l'affirmation que Commisimpex aurait reçu des paiements « occultes » n'est pas non plus démontrée, M. Gossaki ayant même indiqué que si de tels paiements avaient eu lieu, le Congo aurait du pouvoir les retracer.

**159.** Le Congo, bien que contestant le montant de la créance de Commisimpex, n'a fourni aucun calcul. Il se fonde uniquement sur deux documents émis par la CCA en 1991 : une Fiche à l'attention de Monsieur le Ministre de l'Economie, des Finances et du Plan et la Note à l'attention de Monsieur le Ministre du Plan, des Finances et de l'Economie. Cependant le Congo a omis de fournir les annexes explicatives des calculs effectués. En tout état de cause, l'absence de crédibilité des montants dans ces documents est confirmée par la Fiche de calcul détaillée émise par la CCA en septembre 1991 qui donne le montant de la dette au 31 décembre 1986 (29.949.284.818 FCFA) et fournit le détail des marchés compris dans le calcul ainsi que le calcul des intérêts. Le montant calculé dans cette fiche a d'ailleurs été repris dans les actes de la Conférence nationale et du procès Lekoundzou en 1991-1992.

**160.** Puis, lors de réunions en septembre et octobre 1992, les parties sont convenues verbalement d'arrêter la dette globale du Congo envers Commisimpex à 48 milliards FCFA. La lettre du 7 octobre 1992 reflète d'ailleurs l'existence de ces réunions. La différence de montant s'explique par l'ajout des montants du procès-verbal du 13 février 1988 et du procès-verbal du 7 octobre 1988 et l'accumulation d'intérêts tout au long de cette période. Ce calcul a été confirmé par le cabinet Mazars.

**161.** Or, le Congo tente non seulement de contester l'existence de ces réunions, en faisant référence à un procès-verbal de délibération du conseil d'administration de Commisimpex datant de 1997, mais il conteste encore le caractère authentique de la lettre du 7 octobre 1992. Cependant, la CCA en a accusé réception en y apposant son tampon officiel. De plus, le Président de la République du Congo était en possession d'une copie de la lettre litigieuse, comme confirmé lors d'une entrevue avec M. Hajaij, le responsable de Commisimpex, en 2003.

**162.** Le Congo se fonde également sur le rapport d'expertise de M. Ricol, pour invoquer l'absence de cause du Protocole de 2003. « *Le Congo utilise aujourd'hui cette expertise et ces quelques documents, qui concluent, en raison des erreurs faites, à un montant de la dette totale du Congo envers Commisimpex significativement moins élevé qu'en réalité, pour prétendre que le Protocole de 2003 n'est pas causé* »[3]. Or, comme indiqué précédemment, les

---

[3]  Mémoire en Réplique, para 12, page 5.

parties sont, depuis septembre 1992, convenues que la dette du Congo envers Commisimpex ferait l'objet d'une scission, dont le Protocole de 2003 reflète le deuxième volet.

**163.** Quant au Protocole de 1992, il ne couvrait qu'une partie de la dette parce que la banque Saradar faisait pression sur M. Hajaij pour récupérer le montant qu'elle avait financé et menaçait d'exiger la mise en œuvre de la garantie de 1986. Le Protocole de 1992 avait en effet été signé dans une optique politique. Puis, contrairement à ce que prétend le Congo, Commisimpex n'a pas renoncé à une partie de sa créance et aucune preuve d'une telle renonciation n'existe.

L'annexe au protocole signée postérieurement à celui-ci et par le Congo uniquement, démontre que le protocole ne couvrait qu'une partie de la dette. Dès lors, l'article 8 du Protocole de 1992 sur la substitution de celui-ci à tous accords antérieurs doit être lu selon l'intention des parties qui entendaient régler une partie seulement de la dette. Par ailleurs, le Congo ne soutient pas que le Protocole de 1992 couvre l'ensemble des montants dus au titre des marchés d'origine car il indique que certains marchés avaient déjà été réglés, soit que le montant du Protocole de 1992 résulte de deux décotes, soit encore que le montant restant dû à Commisimpex n'a pas d'importance, le Congo semblant insinuer que le Protocole serait transactionnel. Ces arguments sont faux, le Congo n'étant pas parvenu à prouver un paiement autre que celui de 15 millions USD en 1987 et les décotes alléguées n'ayant jamais eu lieu. Par ailleurs, le Protocole de 1992 ne couvrant qu'une partie de la dette, la créance antérieure restait en vigueur.

**164.** En outre, les vérifications effectuées par Ernst & Young et la CCA confirment le montant de la créance de Commisimpex. Ernst & Young, intervenant dans le cadre de l'inscription de la dette dans les livres CCA par les tribunaux congolais, a d'abord évalué la créance à 48,5 milliards FCFA au 30 septembre 1992 mais l'a ensuite actualisé au 30 septembre 2001. Son rapport a été transmis à M. Gossaki, alors Directeur Général de la CCA. Ce rapport a été ensuite analysé et approuvé par le Tribunal de commerce et la Cour d'appel de Brazzaville. La Cour de cassation dans son arrêt de cassation du 27 juin 2003 ne l'a pas remis en cause. Puis le 24 janvier 2002, M. Gossaki a écrit à Ernst & Young et a indiqué dans une pièce jointe un montant de la créance de Commisimpex proche de celui calculé par Ernst & Young, montrant que la CCA avait vérifié ses calculs et procédé à certains ajustements. Le témoignage de M. Gossaki qui conteste l'estimation par la CCA de la créance de Commisimpex est donc dénué de crédibilité. En outre, Commisimpex fut ensuite convoquée et la fiche d'audition du 27 mars 2002 confirme que les travaux d'expertise effectués par Ernst & Young ont été vérifiés par la CCA et que la conclusion relative au montant avait reçu un avis favorable de la CCA et avait été signée par M. Ganféré, agent de la CCA qui a assuré le suivi du dossier Commisimpex. L'approbation du montant de la créance estimée fut confirmée par une fiche individuelle du 10 mai 2002. Ce document porte également la signature de M. Ganféré. MM. Gossaki et Ikemo, Directeur Général de la CCA, prétendent donc maintenant ne pas avoir suivi les actions de leur subordonné M. Ganféré.

**165.** Puis, contrairement à ce que soutient le Congo, le Protocole de 2003 a été valablement conclu sur délégation du Président de la République. Les signataires du Protocole de 2003 pour le Congo étaient MM. Longobé et Okemba qui agissaient « *sur délégation de Monsieur le Président de la République, son Excellence Monsieur Denis SASSOU NGUESSO et ayant pouvoir à cet effet* ». L'aval du Président avait été reçu. Ceci n'a d'ailleurs pas été démenti ultérieurement par ce dernier. En effet, suite à la non-exécution du Protocole de 2003,

Commisimpex a directement contacté le Président de la République par lettres du 29 décembre 2003 et du 1er août 2004 mais ce dernier n'a jamais remis en cause la validité du pouvoir des signataires du Protocole de 2003. Il en est de même de M. Okemba lors de son audition.

**166.** Au surplus, ainsi qu'expliqué par M. Longobé, la pratique était souvent celle d'une délégation présidentielle orale. Par un avis juridique du 7 juillet 2004, la Cour Suprême du Congo a d'ailleurs précisé que les signataires du Protocole de 2003 avaient reçu l'habilitation verbale par le Chef de l'Etat.

**167.** Puis, une lettre des signataires du Protocole, MM. Longobé et Okemba, au Ministère des Finances datée du 29 novembre 2003, donc postérieure au Protocole de 2003, a confirmé que le Protocole a été signé sur instructions du Président. M. Longobé a réitéré de tels propos dans le cadre de l'enquête de gendarmerie de 2003-2004. En outre, cette délégation a été confirmée par d'autres responsables congolais[4].

**168.** En tout état de cause, le comportement des diverses autorités congolaises a créé l'apparence d'une délégation présidentielle valide.

**169.** La jurisprudence française, en matière de conclusion des contrats internationaux, « *impose l'application du principe de l'apparence et de la croyance légitime aux questions de pouvoir et ce, au titre d'une règle matérielle du droit français* ».

**170.** Or, le jour de la conclusion du Protocole de 2003, la croyance de Commisimpex « *quant au pouvoir des signataires (...) d'engager valablement le Congo était légitime* », le Président de la République et le Ministre des Finances et du Budget ayant contribué à la conclusion du Protocole de 2003 et les signataires ayant agi, comme précédemment indiqué « *sur délégation de Monsieur le Président de la République* ».

**171.** Par ailleurs, la « *ratification peut résulter de tous actes, faits et circonstances qui manifestent, de la part du mandant, la volonté certaine de ratifier* ». A plusieurs reprises, les « *plus hautes autorités du Congo* » ont ratifié le Protocole de 2003 après sa signature. Tout d'abord, les signataires du Protocole ont insisté sur son exécution[5]. Par ailleurs, de nombreux représentants congolais ont également confirmé la validité du Protocole de 2003 et entamé des démarches en vue de l'exécuter[6]. Puis, le Congo a commencé à procéder à un début d'exécution du Protocole de 2003, d'abord en ce qui concerne le volet privatisation d'entreprises où le Ministre en charge des privatisations a, sur demande de M. Longobé, envoyé à Commisimpex une liste d'entreprises à privatiser le 4 mars 2004[7] puis, à travers le Ministre des Finances qui avait demandé au Directeur Général de la CCA, M. Nguekoumou, de « *commencer à payer la créance de COMMISIMPEX dont l'échéance du premier acompte de 6 milliards FCFA [était dépassé] à l'époque* »[8]. En outre, l'avis juridique rendu le 7 juillet 2004 par M. Lenga a confirmé la validité du Protocole de 2003.

---

[4]   Pièces C32 et C71, Audition de M. Andely, Audition de M. Lenga.
[5]   Pièces C163, C59, C167, C179 et C171.
[6]   Pièces C30, C31, C35, C36, C163, C32 et C71.
[7]   Pièces C69 et C172.
[8]   Pièces C34 et C70.

**172.** Il convient de noter également que, contrairement aux allégations du Congo, l'intervention du Ministre des Finances n'est requise « *qu'en l'absence d'une intervention du Président de la République* ». En effet, les textes produits par le Congo contredisent la pratique des dirigeants congolais. Ainsi, « *les nombreux marchés et avenants sous-jacents à la dette du Congo, accords qui engageaient les finances de l'Etat, ont été dans leur grande majorité signés par le Président de la République, et ne présentaient aucune trace d'une intervention du Ministre des Finances* ». De même, l'article 363 du décret n° 2000-187 du 10 août 2000, ainsi que l'article 43 de la loi n° 1-2000 du 1er février 2000 soulignent la subordination du Ministre des Finances aux décisions du Président de la République.

**173.** Enfin, le Protocole de 2003 est un contrat qui comporte des engagements contraignants. Les négociations qui ont duré 3 mois étaient réelles et ne visaient pas à être recommencées par le Ministre des Finances. Les termes même du Protocole de 2003 confirment la volonté de signer un acte contraignant, contrairement à ce qu'a prétendu M. Longobé à l'audience, qui n'a cessé d'affirmer qu'il n'avait pas le pouvoir d'engager et n'avait fait que suggérer que l'Etat « s'engage à ». Il convient de rappeler à ce titre que si le Protocole devait ne présenter que de simples propositions, il n'aurait pas pris la forme d'un contrat et il n'aurait pas été nécessaire de le faire signer par les deux parties.

**174.** Le Protocole de 2003 était final en dépit des affirmations contraires des témoins présentés par le Congo. M. Longobé a affirmé que le Protocole de 2003 était subordonné à la vérification ultérieure de la dette par le Ministère des Finances. Ceci n'est pas mentionné dans le Protocole. En outre, le Congo avait vérifié avant la conclusion du Protocole de 2003 sa dette vis-à-vis de Commisimpex : (i) en 2001-2003 par les juridictions congolaises et par le cabinet Ernst and Young, (ii) en 2002 par l'administration congolaise lors des travaux d'examen de la dette congolaise (iii) et par le Colonel Abia chargé de l'enquête de gendarmerie. Ceci était confirmé par une note de synthèse du 20 janvier 2004 rédigée par le conseiller juridique et administratif de la présidence Armand Ougoundou. La nécessité d'une vérification ultérieure de la dette paraît donc inutile et n'est pas justifiée par M. Andely, Ministre des Finances d'août 2002 à janvier 2005, qui s'est contenté d'affirmer son manque de confiance envers Ernst and Young.

**175.** Puis, contrairement à ce que soutient le Congo, le Protocole de 2003 n'est pas dépourvu de cause. Le Protocole de 2003 vaut reconnaissance de dette et prévoit les modalités de règlement de cette créance, notamment dans son Préambule qui prévoit la scission de la créance. En tout état de cause, la jurisprudence estime, en matière de reconnaissance de dette, que la cause de l'obligation est présumée et qu'il appartient au souscripteur d'en apporter la preuve contraire. Le Congo soutient que le Protocole de 1992 aurait un effet novatoire. Toutefois, un tel effet ne serait que partiel car « *la novation requiert l'extinction d'une obligation ancienne, la naissance d'une nouvelle et l'intention d'opérer novation de l'obligation* ». Or, « *Commisimpex n'a jamais voulu donner effet novatoire au Protocole de 1992 quant à la somme de 26 milliards correspondant aux entreprises à privatiser* ».

**176.** Par ailleurs, le Congo prétend que les demandes de Commisimpex seraient irrecevables en se fondant sur l'autorité de la chose jugée de la Sentence n° 9899. Or, le Protocole de 2003 constitue un contrat conclu postérieurement à la Sentence de 2000. Il ne fait donc aucun doute que cette sentence ne pouvait pas le couvrir. Puis, contrairement à ce que prétend le Congo, l'obligation de concentration de moyens n'est pas absolue. En effet, « *la portée de cette*

*obligation ne s'étend pas aux objets de demandes distinctes* ». Les demandes de Commisimpex fondées sur le Protocole de 2003 sont donc recevables.

**177.** En outre, la Sentence ne s'est prononcée que sur le Protocole de 1992 et ses billets à ordre, de sorte que l'autorité de la chose jugée qui s'y attache n'est « *limitée [qu'] à la partie de la dette couverte par le Protocole de 1992* ».

**178.** « *Considérant tout ce qui précède, Commisimpex demande respectueusement que le Tribunal arbitral :*

> *(i) condamne le Congo à payer les sommes dues au titre du Protocole de 2003, y compris (compte tenu de l'inexécution du Protocole de 2003 par le Congo) tous les intérêts dus sur ces sommes, après avoir tenu compte des montants accordés par la Sentence de 2000, soit, au 7 janvier 2011 :*

> > * *3.247.161.007 francs français, soit 495.026.504 euros ;*
> > * *65.634.875 livres sterling ;*
> > * *105.820.227 dollars US ;*
> > * *3.253.937.125 francs CFA, payables en euros, soit 4.960.595 euros ;*

> *(ii) condamne le Congo à payer des intérêts sur les montants dus à Commisimpex, de la date de la dernière actualisation de sa créance (le 7 janvier 2011) jusqu'à la date de la sentence, au taux de 10 ,5% par an, capitalisés annuellement ;*

> *(iii) condamne le Congo à payer tous les frais et dépens (y compris les frais payables à la CCI, les frais et dépens juridiques et les frais et dépens des experts, consultants et autres) contractés par Commisimpex pour la préparation et la poursuite de cette procédure d'arbitrage, dont le montant sera présenté au moment et dans la forme que le Tribunal arbitral voudra bien ordonner ;*

> *(iv) condamne le Congo à payer les intérêts post-sentence sur tous les montants ordonnés, de la date de la sentence jusqu'à réception du paiement par Commisimpex, au taux de 10,5% par an, capitalisés annuellement ; et*

> *(v) attache à sa décision toute autre conséquence de droit ».*[9]

**179.** De plus, à la suite du jugement du Tribunal de commerce de Brazzaville qui a prononcé sa mise en liquidation judiciaire, Commisimpex a formulé les demandes suivantes :

> « *Commisimpex prie le Tribunal, dans le cadre de sa sentence à venir :*

> > *(1) de prendre acte de la violation par le Congo de l'Ordonnance de procédure no.7 ;*

> > *(2) de prendre acte du caractère intentionnel et abusif de cette violation ;*

> > *(3) de constater le caractère abusif et frauduleux de la liquidation de Commisimpex ;*

---

[9] Mémoire Après-Audience de Commisimpex, 17 février 2012.

*(4) de dire, en conséquence, que, pour les besoins du présent arbitrage, il ne reconnaît pas la mise en liquidation judiciaire de Commisimpex ;*

*(5) de constater, dans cet arbitrage, le défaut de qualité des liquidateurs nommés pour représenter Commisimpex ;*

*(6) d'ordonner en tout état de cause au Congo de renoncer à se prévaloir et/ou faire exécuter la décision du Tribunal de Commerce de Brazzaville en date du 30 octobre 2012, devant votre tribunal et/ou devant tout autre juridiction, judiciaire ou arbitrale ;*

*(7) d'ordonner au Congo de prendre les mesures nécessaires pour que la CNSS acquiesce à l'appel interjeté par Commisimpex et M. Hajaij, et/ou prenne toutes autres mesures permettant de rétablir le statu quo conformément aux termes de l'Ordonnance de procédure n° 7 ; et*

*(8) d'ordonner le remboursement par le Congo, au profit des demandeurs, de tous les frais engendrés dans le présent arbitrage par la procédure de liquidation. »*

## B.   Position de la Défenderesse

**180.** Les parties ont conclu le 14 octobre 1992, un Protocole d'Accord, le Protocole de 1992, portant sur la consolidation et le règlement des créances restant dues à Commisimpex, au titre de marchés de travaux.

**181.** Le Protocole de 1992 ayant un caractère global, novatoire et forfaitaire, aboutissant dans la clôture du processus de détermination de la dette de la République du Congo, le tribunal arbitral no. 9899 a jugé le 3 décembre 2000, que la créance de Commisimpex s'élevait en octobre 1992, à un montant de 288.634.078 francs français en principal et a condamné la République du Congo au paiement d'environ 100 millions de dollars en principal et intérêts (montant actualisé au jour de la Sentence).

**182.** Dans la présente procédure, Commisimpex se fonde sur le Protocole de 2003 - fixant le montant de la dette du Congo, au 30 septembre 1992, à 960.000.000 francs français, en principal - pour demander la condamnation du Congo à payer plus de 650 millions d'euros.

**183.** Commisimpex prétend que les parties seraient convenues par un accord verbal d'arrêter la créance globale à 48 milliards FCFA (960.000.000 FRF) et de scinder la dette en deux parties. Ainsi, 22 milliards FCFA devaient être réglés dans le cadre du Protocole de 1992, qui faisait l'objet du précédent arbitrage n° 9899, et les 26 milliards FCFA restants, qui ne seraient pas couverts par le Protocole de 1992 et donc par la sentence n° 9899, devraient faire l'objet d'un paiement sous forme d'attribution d'entreprises à privatiser au profit de Commisimpex. En d'autres termes, Commisimpex prétend que le Protocole de 1992 ne couvre qu'une dette partielle, alors que le Protocole de 2003 couvre la totalité de la créance.

**184.** Or, le Protocole de 1992 avait pour « *objet d'arrêter le montant des sommes dues à Commisimpex et de fixer les modalités de leur règlement, étant précisé que, comme cela ressort de lettres de Commisimpex des 11 mars 1993 et 5 juin 1997 et comme le retiendra le*

*Tribunal n° 9899, les parties étaient convenues d'appliquer à cette créance une décote de 25% que le Protocole de 1992 devait intégrer. »*

**185.** Le préambule du Protocole de 1992 stipulait que « *les dettes restant dues sur travaux, après prise en compte des différents paiements effectués en faveur de la société Commisimpex et de l'escompte de certains billets à ordre, se montent à :*

A. *50.592.081,53 francs français (...)*

B. *21.201872,76 livres sterling (...)*

C. *34.521.293,24 dollars US (...)*

D. *1.426.623.801 francs CFA (...)*

*La République du Congo d'une part, et la société Commisimpex d'autre part, ont considéré de déterminer les termes et conditions de règlement de ladite <u>dette restante</u> au moyen du présent accord.»* (Soulignement ajouté par la Défenderesse).

**186.** Commisimpex prétend dans le présent arbitrage qu'en plus de sa créance de 22 milliards FCFA, constatée par le Protocole de 1992, elle détient une créance de 26 milliards FCFA qui résulterait d'un accord verbal donné par le Président Lissouba et ses ministres lors de réunions tenues les 7 septembre, 23 septembre et 5 octobre 1992. Cet accord, dont il n'a pas été fait mention pendant plus de dix ans, n'aurait pas fait l'objet d'un écrit avant que soit remise en juin 2003 par le Président de la République à M. Hajaij copie d'une lettre datée du 7 octobre 1992 qui aurait été volée en 1998 à l'occasion d'un cambriolage des locaux de Commisimpex. Cette absence d'écrit paraît invraisemblable au regard de la rédaction précise apportée au Protocole de 1992. M. Hajaij a été jusqu'à inventer à l'audience l'existence d'un procès-verbal de la réunion du 5 octobre 1992 au cours de laquelle le Congo aurait reconnu cette créance. En réalité, cette créance de 26 milliards n'existe pas et il n'existe pas en conséquence de dette de 48 milliards FCFA. Il n'existe pas d'autre dette que celle résultant du Protocole de 1992 et la sentence de 2000 a fixé le montant des sommes dues. Le Protocole de 2003 est donc une fraude.

**187.** Commisimpex n'est pas en mesure de justifier du montant de la créance qu'elle revendique. De plus, aucune justification n'est donnée quant à la révision du montant de la créance qui avait été pourtant arrêté par la sentence de 2000.

Commisimpex fonde en effet ses calculs sur des documents sans pertinence qui sont le procès pénal Lekoundzou et la conférence nationale de 1991. L'arrêt Lekoundzou avait pour objet de statuer sur des malversations éventuelles et détournements de fonds publics commis dans le cadre du crédit BCCI de 45 millions USD souscrit par le Congo mais pas de statuer sur une créance dont l'arrêt ne donne d'ailleurs aucun détail.

**188.** M. Hajaij s'est également référé à de nombreuses reprises à une fiche de calcul de la CCA de septembre 1991. Ce document ne fait que reprendre les montants en devise des marchés d'origine auxquels ont été ajoutés des intérêts de 10,5% jusqu'en 1987. Ce document ne présente donc pas le solde de la créance après vérifications comptables fin 1986 et à plus forte raison en 1991. M. Hajaij n'a d'ailleurs pas pu justifier le taux de 10,5% d'intérêts, ce

qui s'explique par le fait qu'un tel taux est absent des différentes conventions. Puis, M. Hajaij a été confus sur les conditions dans lesquelles ce document a été retrouvé et il est révélateur que Commisimpex, qui a toujours disposé de ce document, ait choisi de ne pas le produire dans la procédure CCI no. 9899. En outre, ce document, qui n'est pas signé et ne ressemble pas aux autres documents émanant de la CCA n'a été reconnu par aucune des personnes auxquelles il a été présenté à l'audience. Les éléments issus du procès pénal Lekoundzou ne justifient pas la créance de Commisimpex.

**189.** M. Hajaij s'est également appuyé dans son attestation du 4 août 2011 sur des travaux de la conférence nationale de 1991 et en particulier sur une note de mai 1991 établie par une commission « Questions économiques et finances publiques » faisant état d'un montant de 29.949.284.818 FCFA[10] et d'une note du 18 juin 1991 établie par une commission « Bien mal acquis » faisant état d'un montant de 28.339.795.515 FCFA[11]. La première note, qui est désormais la seule invoquée par Commisimpex, n'est pas probante dans la mesure où la conférence nationale n'avait que pour seul objet d'éclaircir les conditions dans lesquelles le crédit BCCI de 45 millions USD avait été mis en place et employé et la seule décision prise par cette conférence- l'acte 225- ne fait aucune mention du montant de sa créance.

**190.** Par ailleurs, en ce qui concerne les réunions de 1992, il convient de noter l'absence surprenante de procès-verbaux les relatant. Pourtant, M. Hajaij a précisé à l'audience garder des preuves de tout ce qui s'est passé. De plus, M. Ikounga, directeur de cabinet depuis le 1er septembre 1992 du Président Lissouba a indiqué que le 7 septembre 1992, date de la première réunion, les ministres n'étaient pas encore désignés et que celle-ci était matériellement impossible. Enfin, M. Hajaij a désigné M. Mouamba en tant que Ministre des Finances et M. Nguila Mongouanga Nkombo en tant que Ministre du Plan, de l'Economie et de la Prospective comme présents à la réunion mais ils n'ont obtenu ces titres que par un remaniement postérieur du 25 décembre 1992. Quant à la réunion du 5 octobre 1992, M. Hajaij a prétendu pour la première fois à l'audience que cette réunion avait fait l'objet d'un procès-verbal dont il n'a cependant pas la copie, celle-ci ayant été volée en 1998. Ceci est contraire aux allégations de Commisimpex qui a indiqué que le seul engagement écrit résultant de ces réunions était le Protocole de 1992 qui se trouvait entre ses mains. De plus si un tel exemplaire existait, M. Mbéri l'aurait sans doute évoqué. En dernier lieu, Commisimpex en aurait certainement retrouvé une trace.

**191.** La lettre du 7 octobre 1992, qui est censée justifier de l'existence des réunions des 7 septembre, 23 septembre et 5 octobre 1992, est inexacte et a été fabriquée pour les besoins de la présente procédure. Elle fait notamment mention d'un Ministre des Finances et d'un Ministre du Plan fonctions à l'époque réunies en la personne de M. Mouamba et qui n'ont été séparées que postérieurement, le 25 décembre 1992. Les explications de M. Hajaij à ce titre ne sont pas crédibles et le contenu de la lettre montre bien que son auteur s'adressait bien à deux ministères différents. Cette lettre a donc du être rédigée ex post facto par une personne ayant oublié la composition différente du premier gouvernement Lissouba. Il est en outre invraisemblable que Commisimpex n'ait pas conservé une copie de ce document dit indispensable et qu'aucun original ou aucune copie n'ait pu être retrouvée. Puis, si M. Mbéri avait reçu un exemplaire de cette lettre il en aurait fait mention dans sa déclaration du 31 juillet 2003. En réalité, il a seulement recopié dans son attestation le courrier du 7 octobre 1992 qui a été fabriqué a posteriori pour les besoins de Commisimpex.

---

[10]  Pièce C94.
[11]  Pièce C95.

**192.** Quant au montant de la créance, il convient de rappeler que Commisimpex avait dans la procédure CCI no. 9899 produit des documents faisant état d'une créance globale en 1992 de 29 milliards FCFA et qui montraient que le Protocole de 1992 couvrait l'intégralité des engagements conclus entre les parties. Tel est le cas notamment de sa lettre du 11 mars 1993 à la CCA, de sa lettre du 29 avril 1999 au Tribunal no. 9899 et de sa lettre du 5 juin 1997 au Ministre des Finances.

Par ailleurs, il est indéniable que le Protocole de 1992 avait un caractère global, forfaitaire et novatoire. Ceci ressort notamment de la Note du 16 janvier 1997[12] de la CCA au Ministre des Finances, communiquée par Commisimpex dans la procédure no. 9899, qui montre que le Protocole de 1992 couvrait bien l'ensemble des marchés.

**193.** Dans sa sentence no. 9899, le tribunal arbitral avait procédé à une analyse des documents fournis par Commisimpex et avait conclu ceci :

> « la différence entre le total précité de FCFA 28.339.795.515 (actualisé au 31 octobre 1992 par COMMISIMPEX à FCFA 29.269.598.989) et le total des dettes visées au protocole no. 566 (FCFA 22.235.587.294) constitue la (seconde) décote d'environ 25% maintes fois évoquée par les parties durant les débats et expliquée par COMMISIMPEX à la CAISSE dans sa lettre précitée du 11 mars 2003 relative à l'exécution du protocole no. 566 ».

> « iii) Tous les documents antérieurs au Protocole no. 566 émanant d'autorités congolaises et concernant les dettes envers COMMISIMPEX (supra, XI.B.1, 1°,b, pages 29-30) concordent pour fixer ces dettes, actualisées au 31 mai 1991, à FCFA 28.339.795.515 et au 31 octobre 1992, à FCFA 29.269.598.989, ce qui correspond globalement – après application d'une décote d'environ 25%- au total de FCFA 22.235.587.294 (ou 21.622.330.040) correspondant à la dette (composantes en FRF, GBP, USD et FCFA) arrêtée entre COMMISIMPEX et la REPUBLIQUE DU CONGO dans le Protocole no. 566. (...). »

Il est donc évident, au vu des conclusions du tribunal no. 9899, que le Protocole de 2003 est dépourvu de cause.

**194.** Par ailleurs, compte tenu de l'autorité de chose jugée attachée à la sentence no. 9899, les demandes de Commisimpex sont irrecevables et mal fondées. En effet, l'autorité de chose jugée attachée à une décision rendue sur le fondement d'une reconnaissance de dette interdit au plaideur de réintroduire une demande en paiement au titre de la créance sous-jacente.

De plus, Commisimpex soutient qu'il n'y aurait pas autorité de la chose jugée en présence d'un fait nouveau ou lorsqu'une demande n'avait pas été incluse dans la demande initiale. Or, la théorie du fait nouveau n'est retenue que pour « des événements postérieurs [qui] sont venus modifier la situation antérieurement reconnue en justice », ce qui le distingue des moyens ou éléments de preuve nouveaux, lesquels ne font pas obstacle à l'autorité de chose jugée. Selon Commisimpex, le Protocole de 2003 serait une reconnaissance de dette, qui d'après la doctrine s'analyse en « une simple révélation ou déclaration d'un droit préexistant

---

[12] Pièce R73.

*[qui] n'engendre aucune situation juridique nouvelle* »[13]. Les demandes de Commisimpex sont donc irrecevables.

**195.** En ce qui concerne les décotes, Commisimpex prétend à tort que celles mentionnées dans ses lettres des 11 mars 1993 et 5 juin 1997[14] auraient été postérieures au Protocole de 1992 et conditionnées au paiement de la créance par le Congo. En effet, comme l'ont indiqué M. Mouamba et M. Andély, les accords au Congo supposaient toujours une décote. D'autre part, M. Hajaij ne peut prétendre avoir consenti une décote d'1 milliard FRF en 2003 et avoir refusé toute décote en 1992. Concernant la lettre du 11 mars 1993, M. Hajaij s'est contredit à de nombreuses reprises concernant la date et les conditions dans lesquelles elle a été signée. Puis, il convient de noter que M. Mouamba n'a pas empêché M. Hajaij de négocier les nouvelles traites mais plus simplement demandé qu'aucune négociation n'ait lieu « sans son accord préalable ». En outre, M. Hajaij est revenu sur son attestation en affirmant en effet que cette lettre faisait suite à une demande du Ministère des Finances de lui accorder après la signature du Protocole de 1992 une décote qui, si elle avait été consentie, aurait été appliquée sur les 26 milliards FCFA. Ceci est cependant contraire aux termes de la lettre écrite par Commisimpex et contraire à ce qui avait été allégué dans le précédent arbitrage puisqu'il s'agissait alors d'une décote dans le Protocole. Concernant la lettre du 5 juin 1997, M. Hajaij a développé la même thèse de décotes conditionnelles mais ceci est également contraire à ce qui est écrit dans le courrier et à ce qu'il avait soutenu dans la procédure CCI no. 9899.

**196.** Enfin, les montants figurants dans le Protocole de 2003 n'ont pas été approuvés ou vérifiés par les autorités compétentes, Commisimpex ayant toujours refusé de se soumettre à la première étape qui est celle de la vérification de la dette. De plus, les documents qu'elle a présentés n'étaient pas pertinents. Tout d'abord ceux-ci ont été établis en 2002 pendant une période où la CCA s'opposait aux prétentions de Commisimpex devant les juridictions de Brazzaville, ce qui exclut toute idée d'accord de la CCA sur les chiffres avancés par Commisimpex. Le rapport d'expertise de M. Fylla Saint-Eudes, saisi à la demande de Commisimpex devant les juridictions congolaises, n'est pas fiable notamment car il a pris comme point de départ la fiche de calcul de 1991 et prétend avoir procédé à des vérifications profondes auprès de la CCA, souvenir que n'ont pas MM. Gossaki et Ikemo. M. Fylla Saint Eudes s'est en outre prononcé sur la base de documents fournis par Commisimpex et n'a pas tenté de les confronter à d'autres données. La fiche annexée au courrier de M. Gossaki du 24 janvier 2002[15] ne valide pas la créance contrairement à ce que prétend Commisimpex. En effet, M. Ganféré qui a signé cette fiche n'en avait pas le pouvoir. L'objet de l'audition n'était pas de faire valider une créance par la CCA et surtout la validation incombait en dernier ressort au Ministre des Finances qui ne l'a pas donnée. Ce document ne peut être une validation de sa créance par la CCA car M. Fylla Saint Eudes explique que le montant qui y est consigné est fondé sur son propre rapport d'expertise judiciaire qui était contesté en justice par la CCA. Enfin, ce document, dont l'intitulé même démontre que les montants sont "contentieux", ne présente pas de "code Lazard" pour la créance Commisimpex, ce qui démontre qu'elle n'avait pas été vérifiée par la banque Lazard, mandatée à cet effet par le Ministre des Finances. En outre, le Congo comme la CCA ont devant la Cour Suprême du Congo contesté cette fiche.

---

[13]  Mémoire en Défense sur le Fond, para 374, page 130.
[14]  Pièces R48 et R68.
[15]  Pièce C56.

**197.** En tout état de cause, le Protocole de 2003 n'est pas valide dans la mesure où il n'a pas reçu l'approbation du Ministère des Finances et qu'il n'a pas été signé par des personnes habilitées, aucune n'ayant reçu de délégation du Président de la République.

**198.** Commisimpex n'a pas suivi la procédure imposée par les autorités compétentes (vérification-réconciliation-décoté-échéancier) et s'est donc fait consentir une reconnaissance de dette par des personnes n'en ayant pas le pouvoir. Commisimpex n'a en effet pas versé au débat de pièces justifiant d'une délégation de pouvoirs par le Président de la République. En réalité, seule une des pièces produites a été portée à la connaissance de celui-ci : il s'agit d'une note interne du département juridique du Cabinet de la Présidence au Président du 30 avril 2004[16]. Mais ce document ne fait pas état d'une délégation, n'annexe pas le Protocole de 2003 et renvoie au Ministre des Finances. Par ailleurs, M. Longobé, qui était le soi-disant délégataire de pouvoirs, nie avoir reçu instruction de conclure le Protocole de 2003 et indique ne pas avoir informé ce dernier du contenu du Protocole.

**199.** M. Boukamany a remis deux consultations par lesquelles il démontre qu'une reconnaissance de dette ne saurait engager l'Etat sans approbation du Ministère des Finances. Commisimpex n'a pas remis d'avis juridique en sens contraire et a préféré mettre en cause l'indépendance de M. Boukamany tout en refusant de l'interroger.

**200.** Enfin, M. Andély a bien confirmé à l'audience que le Protocole de 2003 n'avait pas été approuvé par le Ministre des Finances et qu'il n'avait reçu aucune instruction en ce sens du Président de la République.

**201.** Commisimpex ne peut invoquer la théorie de l'apparence sur le seul fondement de la consultation de M. Lenga du 7 juillet 2004 car celle-ci a été réalisée sur commande et a été établie après le Protocole de 2003. M. Hajaij connaissait les rouages de l'administration congolaise et Commisimpex ne pouvait ignorer que le contreseing du Ministre des Finances était une condition de validité du Protocole de 2003. De même, l'avis juridique de M. Lenga ne corrobore pas l'existence de la délégation car il se borne à confirmer une référence faite à cette délégation qui ne résultait donc pas d'une connaissance personnelle de l'existence de ladite délégation. Puis, la note de service du 4 août 2003 ne constitue en rien une délégation du Président. Elle confirme à l'inverse que M. Longobé n'avait pas le pouvoir de signer le Protocole de 2003 car elle visait à instituer une commission dont l'objet était « la coordination et le suivi du contentieux de l'Etat ». D'ailleurs, cette commission n'a jamais fonctionné d'après M. Boukamany.

**202.** En ce qui concerne les arguments de Commisimpex sur le contenu de la créance, ils reposent sur une réécriture des faits et documents et ne tiennent pas compte des témoignages. Tout d'abord, le Congo rappelle que le montant de la créance est celui arrêté dans la sentence de 2000. En effet, avant 1992, la CCA ne disposait pas d'un décompte exhaustif des paiements reçus par Commisimpex[17]. Elle n'était pas avisée de tous les escomptes et il était souvent difficile de retracer les paiements provenant de l'étranger, comme expliqué par M. Gossaki.

**203.** Le Congo a communiqué des copies d'écran de la base de données de la CCA qui faisait ressortir au 13 octobre 1992 une créance de 14 milliards FCFA, M. Ikemo ayant précisé que

---

[16]     Pièce C35.
[17]     Pièces R48, R36, R37 et R52.

ce montant comprenait les échéances en intérêts mais excluait les intérêts de retard à compter de la date d'échéance. Commisimpex a déformé les propos de M. Ikemo en déduisant du fait qu'il n'était pas en mesure d'identifier tous les marchés que ce document ne comportait pas la totalité des marchés. M. Ikemo, en tant que responsable de la CCA, n'a pas une connaissance détaillée des marchés et, ainsi qu'il l'a expliqué, la base représente la créance de Commisimpex dans les livres de la CCA et donc ce qui n'y figurait pas n'était pas du.

**204.** En réalité, Commisimpex a reconstruit une créance a posteriori car aucun document datant de la période 1992/2001 ne mentionne un montant de 48 milliards FCFA ni l'existence d'une créance hors Protocole de 1992 de 26 milliards FCFA. Tous les documents de Commisimpex sont postérieurs à 2001 et ont donc été établis pour elle par le biais de M. Fylla Saint-Eudes, du colonel Abia et des fonctionnaires congolais reprenant les termes du protocole de 1992 pour tenter de revenir sur la sentence no. 9899. Il en est de même des attestations provenant de l'affaire BCCI/Lekoudzou qui datent de 2002 et 2003. Aucun document antérieur à 2001 n'évoque les 48 milliards FCFA sauf la lettre du 7 octobre 1992. Commisimpex se fonde donc sur une fiche de 1991 qui ne fait état d'une créance de 48 milliards FCFA ni d'aucun montant pour 1991-1992, une lettre du 15 juillet 1997 qui ne fait pas non plus état d'une telle créance et l'affaire Qwinzy qui ne porte pas sur la créance de Commisimpex. Il est invraisemblable qu'aucun document ne stipulait que Commisimpex était titulaire d'une créance de 48 milliards FCFA en 1992.

**205.** Le Protocole de 2003 est donc frauduleux en ce qu'il reconnait une créance inexistante. D'ailleurs M. Hajaij s'est révélé incapable de fournir spontanément une explication du montant de sa créance. Tel est notamment le cas de la fiche de calcul de 1991 pour laquelle M. Hajaij n'a pas spontanément indiqué qu'elle excluait du montant de 29.949.284.818 FCFA les deux procès-verbaux de 1988. En outre, M. Hajaij avait soutenu l'inverse en début d'audience. De même, M. Hajaij n'a pu expliquer l'augmentation du montant de la créance de 29 milliards à 48 milliards que par le biais de son conseil qui a indiqué qu'il s'agissait « d'une actualisation par application du taux d'intérêt ». Il en va de même des thèses relatives aux décotes où M. Hajaij s'est également contredit. Par exemple, Commisimpex soutient s'agissant de la lettre du 11 mars 1993 que la référence à une décote résultait d'une exigence de M. Mouamba visant à ce que Commisimpex écrive que le Protocole intégrait une telle décote. Or, ce n'est pas ce que dit M. Hajaij qui explique qu'il s'agissait d'une demande de M. Mouamba de lui accorder une décote après 1992 et non d'une demande visant à démontrer que le Protocole intégrait une décote. Concernant la lettre du 5 juin 1997, Commisimpex prétend que la référence à des décotes résultant de pressions et ajoute que ces décotes étaient inexistantes. Une fois encore, M. Hajaij n'a pas confirmé ceci et a indiqué que Commisimpex avait accordé des décotes prétendument conditionnelles. Enfin, les explications de Commisimpex quant à la décote mentionnée dans la lettre du 11 mars 1993 sont également incompatibles avec d'autres déclarations de M. Hajaij.

**206.** En définitive, le Protocole n'a pas été conclu avec l'approbation du Président et la signature de ce Protocole ne s'explique que par le réseau d'influence de M. Hajaij au sein de l'administration congolaise.

**207.** Sur ces fondements,

    *« La République du Congo demande au tribunal de :*

*A titre principal,*

> *- Dire et juger les demandes de Commisimpex irrecevables en raison de l'autorité de chose jugée attachée à la sentence arbitrale finale du 3 décembre 2000 rendue dans l'affaire CCI N° 9899/AC/DB ;*

*A titre subsidiaire,*

> *- Dire et juger que le protocole d'accord de négociations du 23 août 2003 est nul et de nul effet en raison du défaut de pouvoir des signataires ;*

> *- Dire et juger que le protocole d'accord de négociations du 23 août 2003 est nul et de nul effet en raison de l'absence d'approbation du Ministre de l'Economie, des Finances et du Budget ;*

> *- Dire et juger que le protocole d'accord de négociations du 23 août 2003 est nul et de nul effet pour défaut de cause ;*

> *- Dire et juger que le protocole d'accord de négociations du 23 août 2003 est nul et de nul effet en raison du caractère vicié du consentement de la République du Congo ;*

> *- En conséquence, rejeter l'intégralité des demandes de Commisimpex ;*

*En tout état de cause,*

> *- Condamner Commisimpex à payer tous les frais et dépens nés de la présente procédure arbitrale, en ce compris les honoraires, frais et débours du tribunal et de la CCI, ainsi que les honoraires, frais et débours des conseils de la République du Congo, ainsi que tous autres frais liés à la procédure arbitrale »*[18].

**208.** De plus, la République du Congo conclut à l'irrecevabilité des demandes de Commisimpex formées à la suite du jugement du Tribunal de commerce de Brazzaville qui a prononcé sa mise en liquidation judiciaire et demande au Tribunal Arbitral, en tout état de cause, de les rejeter comme mal fondées.

## IV. DISCUSSION

- ### QUESTIONS PRELIMINAIRES SOULEVEES PAR LA MISE EN LIQUIDATION JUDICIAIRE DE COMMISIMPEX

---

[18]     Mémoire en Duplique sur le Fond.

**209.** Avant d'aborder le litige qui oppose les parties, le Tribunal Arbitral doit tirer les conséquences qu'est susceptible d'avoir sur la procédure arbitrale le jugement du Tribunal de commerce de Brazzaville du 30 octobre 2012 qui a prononcé la mise en liquidation judiciaire de Commisimpex, à la lumière des positions et demandes des parties à cet égard, compte tenu de la prétention du liquidateur d'être depuis le 19 novembre 2012 le seul représentant de Commisimpex.

**210.** Commisimpex demande au Tribunal Arbitral de :

« 1. *Prendre acte de la violation par le Congo de l'Ordonnance de procédure no.7 ;*

2. *Prendre acte du caractère intentionnel et abusif de cette violation ;*

3. *Constater le caractère abusif et frauduleux de la liquidation de Commisimpex ;*

4. *Dire, en conséquence, que, pour les besoins du présent arbitrage, il ne reconnaît pas la mise en liquidation judiciaire de Commisimpex ;*

5. *Constater, dans cet arbitrage, le défaut de qualité des liquidateurs nommés pour représenter Commisimpex ;*

6. *Ordonner en tout état de cause au Congo de renoncer à se prévaloir et/ou faire exécuter la décision du Tribunal de Commerce de Brazzaville en date du 30 octobre 2012, devant le Tribunal Arbitral et/ou devant tout autre juridiction, judiciaire ou arbitrale ;*

7. *Ordonner au Congo de prendre les mesures nécessaires pour que la CNSS acquiesce à l'appel interjeté par Commisimpex et M. Hajaij, et/ou prenne toutes autres mesures permettant de rétablir le statu quo conformément aux termes de l'Ordonnance de procédure n° 7 ;*

8. *Ordonner le remboursement par le Congo, au profit des demandeurs, de tous les frais engendrés dans le présent arbitrage par la procédure de liquidation ».*

**211.** La République du Congo conclut à l'irrecevabilité de ces demandes et, en tout état de cause, demande au Tribunal Arbitral de les rejeter comme mal fondées.

**212.** L'Ordonnance de Procédure no. 9 du 30 novembre 2012 a déjà disposé des demandes 1 et 2 car le Tribunal Arbitral y a constaté que « *que l'Ordonnance de Procédure no.7 par laquelle il était ordonné « (...) à la République du Congo de prendre toutes les dispositions qui s'imposent pour qu'aucune organisation de l'Etat congolais ne fasse mettre la société Commisimpex en liquidation avant que la sentence finale ne soit rendue dans le présent arbitrage » n'a pas empêché le prononcé de la liquidation judiciaire de Commisimpex, sans qu'il en découle nécessairement une violation par la République du Congo de cette ordonnance »*. La même Ordonnance s'est également prononcée sur la demande 7 en ordonnant à la République du Congo de « *prendre toutes les mesures nécessaires pour que le statu quo entre les parties soit rétabli dans les plus brefs délais et en tout cas avant le prononcé de la sentence finale ».* La présente sentence ne peut que confirmer la première de ces décisions. Quant à la seconde, elle n'aura plus d'objet après le prononcé de la sentence.

**213.** A l'exception de la demande 8 de Commisimpex concernant le remboursement des frais engendrés dans le présent arbitrage par la procédure de liquidation, les autres (3, 4, 5, et 6) supposent que le Tribunal Arbitral ait le pouvoir de se prononcer sur la régularité d'un jugement de faillite d'une des parties à la procédure arbitrale. Pour conclure à l'irrecevabilité des demandes de Commisimpex relatives au jugement de liquidation judiciaire, la République du Congo nie l'existence d'un tel pouvoir, « *encore moins lorsqu'aucune partie ne s'en est prévalue pour demander la suspension de la procédure arbitrale ou tenter de lui faire porter des effets afin de perturber la procédure arbitrale en cours* »[19]. A cet égard, la République du Congo souligne qu'elle ne s'est pas prévalue du jugement de mise en liquidation, survenu après la clôture des débats. De son côté, Commisimpex invoque une jurisprudence arbitrale selon laquelle les arbitres ne seraient pas contraints de reconnaître des effets à un jugement de mise en liquidation, et, plus particulièrement auraient « *le pouvoir d'apprécier, à titre incident, les conditions de mise en liquidation d'une des parties à l'instance arbitrale, et de lui reconnaître ou non, en conséquence, des effets dans la procédure arbitrale.* »[20] A cet égard, elle se réfère également à un arrêt de la Cour d'appel de Paris du 12 janvier 1993[21] selon lequel il a été admis qu'un tribunal arbitral, « *sans méconnaître l'ordre public international, mais pour en assurer au contraire le respect* » avait pu à juste titre considérer que donner effet à un jugement de déclaration de faillite aurait eu notamment pour conséquence inéluctable de retarder, de manière déloyale le déroulement de l'instance arbitrale. Mais, la République du Congo objecte que si « *dans certaines circonstances, il a pu être admis que le tribunal arbitral puisse se prononcer sur la régularité du jugement de faillite, il s'agissait uniquement d'affaires dans lesquelles une partie (ou un liquidateur) cherchait à se prévaloir du jugement de faillite étranger pour obtenir la suspension de l'arbitrage, voire pour y mettre un terme* ».[22] Elle ajoute qu' « *il a simplement été admis que le tribunal arbitral puisse se prononcer de manière incidente sur la régularité d'un jugement de faillite étranger dans le cadre de la résolution du litige qui lui est soumis et, pour autant qu'une partie se prévale du jugement de faillite au cours de la procédure arbitrale et que l'autre s'y oppose, et uniquement dans les cas exceptionnels où le jugement invoqué méconnaitrait les exigences de l'ordre public international* ».[23] (soulignement ajouté)

**214.** Au-delà de l'exception d'irrecevabilité des demandes de Commisimpex relative au jugement de mise en liquidation judiciaire, motivée semble-t-il par le fait que ce jugement est intervenu après la clôture des débats et qu'elle ne s'en prévaut pas, la République du Congo conteste également la compétence du Tribunal Arbitral pour en décider, puisqu'elle lui dénie, dans les circonstances, le pouvoir de se prononcer sur la régularité du jugement du Tribunal de commerce de Brazzaville du 30 octobre 2012. Le Tribunal Arbitral ne peut accueillir ni l'exception d'irrecevabilité, ni l'exception d'incompétence dans son intégralité.

**215.** Que le jugement de mise en liquidation judiciaire de Commisimpex soit intervenu après la clôture des débats et que la République du Congo ne s'en prévale pas ne permet pas de conclure à l'irrecevabilité des demandes de Commisimpex. Même si la République du Congo n'entend pas se prévaloir du jugement, le liquidateur, par lettre du 19 novembre 2012, a signifié dénier, désormais, toute valeur aux actes de M. Hajaij, représentant légal de

---

[19]   Lettre de la République du Congo du 22 novembre 2012, page 7.
[20]   Lettre de Commisimpex du 14 novembre 2012, page 4.
[21]   Pièce C-RJ 142.
[22]   Lettre de la République du Congo du 22 novembre 2012, page 8.
[23]   Lettre de la République du Congo du 22 novembre 2012, page 8.

Commisimpex lors de l'introduction du la procédure arbitrale, et indiqué qu'un nouvel avocat serait constitué pour la défense des intérêts de Commisimpex dans la procédure arbitrale. Celle-ci ne s'est pas éteinte par la clôture des débats et se poursuit jusqu'à la notification de la sentence et éventuellement après, par application des dispositions de l'article 29 du Règlement d'arbitrage de la CCI. Commisimpex a un intérêt indiscutable à ce que les conséquences du jugement de mise en liquidation sur la procédure arbitrale soient déterminées et, en tout état de cause, le Tribunal Arbitral doit se prononcer sur la qualité des représentants de Commisimpex dans cette procédure depuis le 19 novembre 2012.

**216.** Quant à la compétence du Tribunal Arbitral, celui-ci estime qu'il a non seulement le pouvoir, mais aussi le devoir de se prononcer sur les effets du jugement de mise en liquidation judiciaire de Commisimpex sur la procédure arbitrale, sans que ceci signifie nécessairement qu'il soit compétent pour statuer sur toutes les demandes de Commisimpex.

**217.** Ainsi que l'a rappelé la Cour d'appel de Paris dans un arrêt du 7 avril 2011[24] « *si les principes de l'arrêt des poursuites individuelles, de dessaisissement du débiteur et d'interruption de l'instance en cas de faillite sont d'ordre public international et s'imposent même au cas où l'arbitrage se déroulant en France n'est pas soumis à la loi française, il n'en appartient pas moins à l'arbitre de vérifier, avant de faire application de ces principes, que la décision judiciaire qui ouvre la procédure d'insolvabilité et désigne un mandataire ne méconnait pas elle-même les exigences de l'ordre public international* ». Il en résulte qu'un Tribunal Arbitral, informé de la mise en liquidation judiciaire d'une des parties à l'instance arbitrale, fut-ce la partie demanderesse revendiquant une créance, est tenu de s'interroger d'office sur les conséquences qui en découlent sur la poursuite de la procédure, à la lumière des exigences de l'ordre public international. C'est *a fortiori* le cas lorsque, comme dans la présente espèce, le liquidateur prétend nommer un conseil pour remplacer les conseils jusque là constitués par la partie mise en liquidation et que cette dernière s'y oppose. La République du Congo ne semble pas d'ailleurs contester sérieusement la compétence du Tribunal Arbitral pour examiner ainsi, de manière incidente, la régularité d'un jugement prononçant la faillite d'une des parties au litige.[25]

**218.** Cependant, la compétence du Tribunal Arbitral est limitée par sa raison d'être qui est d'apprécier les effets de la décision de faillite sur la procédure arbitrale. Comme l'a souligné le commentateur de l'arrêt de la Cour d'appel de Paris du 7 avril 2011 précité « *Le contrôle qu'il exerce* [l'arbitre] *sur le jugement étranger est uniquement lié à la possibilité, pour l'arbitre, de l'utiliser ou non en tant qu'élément déterminant la solution du litige qui lui est soumis.* »[26] Les demandes de Commisimpex relatives au jugement de mise en liquidation judiciaire du 30 octobre 2012 sont donc recevables et le Tribunal Arbitral est compétent pour les examiner, pour autant qu'elles portent sur les effets de ce jugement sur la procédure arbitrale. D'ailleurs, si les demandes de Commisimpex ne s'inscrivent pas dans ce cadre, on pourrait alors s'interroger sur leur recevabilité au regard des dispositions de l'article 19 du Règlement d'arbitrage, encore que la République du Congo n'ait pas invoqué cet argument.

**219.** Dans sa lettre du 22 novembre 2012 et lors de la conférence téléphonique du 28 novembre 2012, la République du Congo a fait valoir que si le Tribunal Arbitral devait

---

[24]   Revue de l'arbitrage 2011, no.3, pages 747 et s, Pièce R-RJ 79.

[25]   Voir n°211, supra.

[26]   Note S. Bollée sous Paris, 11 avril 2011, Pièce R-RJ 79, page 757, note 13.

décider d'instruire ces nouvelles demandes, un nouveau calendrier procédural devrait être établi qui permette « *aux parties de présenter dans un délai raisonnable leur argumentation sur la recevabilité et le bien-fondé de ces demandes de manière contradictoire et dans le respect de l'égalité des armes.*» La République du Congo souligne à cet égard que « *Contrairement à Commisimpex, l'Etat n'est pas partie à la procédure judiciaire de Brazzaville et ne dispose pas de tous les éléments de ce dossier* ».[27] Le Tribunal Arbitral ne peut accepter cette demande dépourvue de toute justification en fait et qui aurait pour effet, après la clôture des débats de retarder indument le prononcé de la sentence arbitrale, ceci alors que la République du Congo a répété, à maintes reprises, qu'elle attendait la sentence et qu'elle n'entendait pas se prévaloir du jugement de mise en liquidation judiciaire de Commisimpex dans cette procédure et devrait donc être indifférente au sort des demandes de Commisimpex à son endroit, qui tendent à ce qu'il ne lui soit donné aucun effet dans cette procédure. Mais surtout, ces demandes ont été instruites de façon parfaitement contradictoire : à la suite de l'Ordonnance de Procédure no. 8 du 7 novembre 2012, Commisimpex a disposé d'un délai de 7 jours pour préciser ses demandes et les argumenter, ce qu'elle a fait par une lettre de 16 pages à laquelle la République du Congo a répondu le 22 novembre 2012 par une lettre de 18 pages, ayant bénéficié à sa demande d'une courte extension du délai fixé au 21 novembre 2012. Par la suite, les parties ont eu l'opportunité de développer et préciser leurs argumentations respectives lors de la conférence téléphonique du 28 novembre, à la lumière du contenu de la lettre du liquidateur du 19 novembre 2012, transmise au Tribunal Arbitral le 27 novembre. Quant à l'argument selon lequel la République du Congo connaîtrait moins bien que Commisimpex la procédure judiciaire de mise en liquidation, il n'est pas convaincant. Il n'est pas contesté que la CNSS est une organisation de l'Etat congolais, présidée de droit par le Ministre chargé de la Sécurité Sociale. Il n'est pas concevable que les plus hautes autorités de l'Etat n'aient pas été dûment tenues au courant d'une procédure visant à la liquidation judicaire de Commisimpex, qui, par diverses procédures contre l'Etat, s'efforce d'obtenir l'exécution de la sentence arbitrale de 2000 et qui réclame par ailleurs à l'Etat des sommes supérieures à 500 millions d'euros dans la présente procédure où le Président de la République a déposé une déclaration de témoin. De plus, en exécution de l'Ordonnance de Procédure no. 7, comme le relève la République du Congo, le Ministère de la Justice et des Droits Humains a donné « *instruction au Parquet, placé sous son autorité, d'intervenir dans la procédure initiée par la Caisse Nationale de Sécurité Sociale («CNSS ») à l'encontre de Commisimpex devant le Tribunal de Commerce de Brazzaville.*[28] » Le Tribunal Arbitral en conclut donc que les parties, dans le respect de l'égalité des armes ont pu, de façon contradictoire, débattre des demandes de Commisimpex relatives à sa mise en liquidation judiciaire, la brièveté relative des délais étant justifiée par l'urgence. Le Tribunal Arbitral est donc en mesure de se prononcer sur ces demandes, dans les limites de sa compétence.

**220.** Dans sa demande 3, qui constitue la clé de voûte de toutes celles dont l'Ordonnance de Procédure no. 9 n'a pas disposées, Commisimpex demande au Tribunal Arbitral de constater le caractère abusif et frauduleux de la liquidation de Commisimpex. Commisimpex fournit nombre d'éléments troublant pour justifier sa demande, non contestés par la République du Congo pour l'essentiel :

-       La créance alléguée de la CNSS remonte à 1981;

---

[27]     Lettre de la République du Congo du 22 novembre 2012, page 2.
[28]     Lettre de la République du Congo du 22 novembre 2012, page 3.

- Par ordonnance du 28 septembre 2012, le Président du Tribunal de commerce de Brazzaville a fixé au 2 octobre 2012 (2 jours ouvrables) l'audience pour statuer sur le fond de la Requête datée du 26 septembre 2012, ordonnant à Commisimpex de produire sa défense « *huit jours au plus tard avant l'audience* »[29] ;

- Les conseils de Commisimpex ayant demandé un renvoi à un mois, seuls 8 jours lui ont été accordés, encore que l'audience ait été renvoyée au 9 octobre 2012, puis au 16 octobre;

- L'affaire a été plaidée le 23 octobre 2012 et le jugement de liquidation a été rendu le 30 octobre 2012.

- Ainsi, 34 jours se seront écoulés entre le dépôt de la Requête de la CNSS et le jugement de mise en liquidation de Commisimpex.

**221.** La République du Congo explique l'initiation de cette procédure environ 30 ans après la date de la créance alléguée en invoquant le risque de la prescription. Elle explique la procédure accélérée par le fait qu'il s'agissait d'une créance de salaires.[30] Ces arguments paraissent contradictoires car s'il y avait véritablement urgence compte tenu de la nature de la créance, on voit mal pourquoi elle n'a pas été réclamée plus tôt. On peut se demander, au contraire, si tant les procédures d'exécution de la sentence arbitrale de 2000 que l'imminence du prononcé de la sentence ne sont pas des explications plus probables de ce qui apparait comme une précipitation. Cependant, cette décision n'est pas définitive car frappée d'appel et, comme le relève à juste titre la République du Congo[31], il appartiendra à la Cour d'appel de Brazzaville d'en apprécier la régularité. Le Tribunal Arbitral n'a pas compétence pour le faire.

**222.** En revanche, le Tribunal Arbitral n'a pas besoin de se prononcer sur le caractère prétendument abusif et frauduleux de la liquidation de Commisimpex, comme cette dernière le lui demande, pour constater que lui reconnaitre des effets dans la présente procédure arbitrale ne répondrait pas aux exigences de l'ordre public international, ce pour quoi il est compétent.

Quand bien même la créance alléguée de 6.323.79, 920 FCFA (circ. US\$12 millions) de la CNSS vis-à-vis de Commisimpex serait confirmée, l'Etat Congolais est débiteur de Commisimpex, à hauteur des montants auquel il a été condamné par la sentence de 2000 qui est définitive, le recours en annulation dont elle était l'objet ayant été rejeté par la Cour d'appel de Paris le 23 mai 2002. La République du Congo invoque l'autorité de la chose jugée de cette sentence dans la présente procédure. La créance certaine de Commisimpex à ce titre est de 165 416 012 millions d'Euros[32], soit plus de 10 fois supérieure à la créance alléguée par la CNSS. L'insolvabilité alléguée de Commisimpex n'a donc pour cause que le refus de la République du Congo d'exécuter une sentence arbitrale dont elle reconnait l'autorité de la chose jugée. Le Tribunal Arbitral ne peut accepter le cynisme dont elle fait preuve à cet égard lorsqu'elle écrit en note 29 de sa lettre du 22 novembre 2012 : « *Contrairement à ce que soutient Commisimpex, le fait qu'elle dispose d'une créance sur la République du Congo n'est pas de nature à remettre en cause sa cessation des paiements puisqu'une créance ne*

---

[29]  Pièce C-214.

[30]  Lettre de la République du Congo du 22 novembre 2012, page 14.

[31]  Lettre de la République du Congo du 22 novembre 2012, page 11.

[32]  Rapport Mazars du 7 janvier 2011, page 3, montants actualisés à cette date.

*peut être prise en compte dans l'actif disponible que dans des conditions strictes- en particulier des conditions de certitude et de perspectives réelle de recouvrement à cour terme – qui ne sont pas remplies ».* La République du Congo ne saurait être plus claire en reconnaissant que son refus de s'acquitter de ses obligations au titre de la sentence de 2000 suffit à expliquer la cessation de paiement alléguée de Commisimpex et la mise en liquidation judiciaire qui en découle. Il serait par conséquent contraire aux exigences de la bonne foi qui, comme l'a souligné la Cour d'appel de Paris dans son arrêt précité du 12 janvier 1993[33] participe de l'ordre public international, d'admettre que la mise en liquidation judiciaire de Commisimpex puisse avoir un effet dans la présente procédure arbitrale. La République du Congo semble d'ailleurs ne pas disconvenir de cette conclusion, sans pour autant en accepter les motifs, puisque le Ministère de la Justice a demandé au Parquet *« de faire le nécessaire pour éviter qu'une décision de mise en faillite ne soit prononcée avant la sentence à intervenir* [34]*».* Si ces efforts en exécution de l'Ordonnance de Procédure no. 7 n'ont pas abouti, le Tribunal Arbitral aime à croire que l'Ordonnance de Procédure no. 9 qui ordonne à la République du Congo de *« prendre toutes les mesures nécessaires pour que le statu quo entre les parties soit rétabli dans les plus brefs délais et en tout cas avant le prononcé de la sentence finale »* aura permis le rétablissement du status quo antérieur au jugement du 30octobre 2012 lorsque la présente sentence sera notifiée.

**223.** Sur la base de ce qui précède, le Tribunal Arbitral se déclare incompétent pour statuer sur la demande 3 de Commisimpex mais déclare que les exigences de l'ordre public international s'oppose à ce que la mise en liquidation de Commisimpex ait des effets dans la présente procédure, accueillant la demande 4 de Commisimpex. En conséquence de quoi, il constate, comme lui demande Commisimpex dans sa demande 5, le défaut de qualité des liquidateurs nommés pour représenter Commisimpex dans la présente procédure arbitrale.

**224.** Dans sa demande 6, Commisimpex demande que le Tribunal Arbitral ordonne à la République du Congo de renoncer à se prévaloir et/ou faire exécuter la décision du Tribunal de commerce de Brazzaville en date du 30 octobre 2012, devant le Tribunal Arbitral et/ou devant tout autre juridiction, judiciaire ou arbitrale. Cette prétention est superfétatoire en ce qui concerne le Tribunal Arbitral, en raison de la réponse donnée à la demande 4. Le Tribunal Arbitral doit se déclarer incompétent pour le surplus en ce qu'il ne lui appartient pas de se substituer aux autres juridictions qui pourraient être appelées à exécuter le jugement du Tribunal de commerce de Brazzaville du 30 octobre 2012.

**225.** Dans sa demande 8, Commisimpex requiert la condamnation de la République du Congo au remboursement de tous les frais engendrés dans le présent arbitrage par la procédure de liquidation. Le Tribunal Arbitral ne peut que rejeter cette demande car il n'a pas été établi que la procédure de liquidation ait été initiée par la Défenderesse à la présente procédure d'arbitrage.

**226.** Comme il a déjà été indiqué, l'Ordonnance de Procédure no. 9 du 30 novembre 2012 a déjà disposé des demandes 1, 2 et 7.

---

[33] Revue de l'arbitrage 1994, no. 4, pages 685 et s, Pièce C-RJ 142.
[34] Lettre de la République du Congo du 22 novembre 2012, page 3.

- ## LE LITIGE ENTRE LES PARTIES

**227.** A titre principal, la société Commisimpex demande que le Tribunal Arbitral condamne :

> « *Le Congo à payer les sommes dues au titre du Protocole de 2003, y compris (compte tenu de l'inexécution du Protocole de 2003 par le Congo) tous les intérêts dus sur ces sommes, après avoir tenu compte des montants accordés par la Sentence de 2000, soit au 7 janvier 2011 :*
>
> - *3.247.161.007 francs français, soit 495.026.504 euros ;*
> - *65.634.875 livres sterling ;*
> - *105.820.227 dollars US ;*
> - *3.253.937.125 francs CFA, payables en euros, soit 4.960.595 euros* »[35]*.*

**228.** La République du Congo conclut, à titre principal, à l'irrecevabilité des demandes de Commisimpex en raison de l'autorité de la chose jugée attachée à la sentence arbitrale du 3 décembre 2000 rendue dans l'affaire CCI no. 9899. Dans sa sentence partielle du 20 août 2010, le Tribunal Arbitral a renvoyé au fond cette exception de chose jugée. Il l'examinera en premier lieu (A). Ce n'est que dans la mesure où il déciderait de la rejeter qu'il se prononcera sur la validité du Protocole de 2003 et son caractère contraignant, contestés par la République du Congo pour divers motifs (B). Si le Tribunal Arbitral constate la validité du Protocole de 2003, il se prononcera alors sur les montants dus à ce titre par la République du Congo à Commisimpex (C). Enfin il décidera de la répartition de la charge des frais de l'arbitrage (D).

- ### A. Sur l'autorité de chose jugée de la Sentence CCI no. 9899 du 3 décembre 2000

**229.** La République du Congo à titre principal estime que :

> « *la présente procédure n'aurait [...] pour objet que de remettre en cause le quantum, tel que déterminé par le Tribunal ayant rendu la Sentence no. 9899, de la dette née de l'exécution de ces mêmes marchés. En d'autres termes, ce que Commisimpex qualifie ici* « *d'autre partie de la dette* » *consisterait plus exactement en une amplification du montant de la dette née de l'exécution des contrats de marchés telle qu'arrêtée par les premiers arbitres.* »[36]

La République du Congo ajoute que :

> « *les parties s'accordent sur le fait que l'intégralité des marchés conclus entre les parties et à l'origine de la créance de Commisimpex a été examinée dans le cadre de la Procédure CCI No. 9899* » *et que* « *(...) le Tribunal No. 9899, après avoir jugé que les montants en résultant avaient fait l'objet d'une consolidation et d'une novation aux termes du Protocole de 1992, a, au point 1 de son dispositif, fixé le montant de la créance litigieuse (soit 288.634.078 FRF en principal, en octobre 1992).* »

---

[35] Mémoire Après-Audience, 17 février 2012.
[36] Mémoire sur la Compétence, paragraphes 98 et 99, page 32.

Elle en conclut qu'en raison de l'identité de cause et d'objet :

> « (...) toute demande de Commisimpex, qui, comme en l'espèce, vise au paiement d'une dette née des mêmes contrats de marché se heurte à l'autorité de chose jugée attachée à la Sentence CCI No. 9899 et est irrecevable. »[37]

**230.** Selon la Demanderesse :

> « (...) ce débat sur l'autorité de la chose jugée de la Sentence CCI n°9899 est tout d'abord sans pertinence : le Protocole de 2003, nouveau contrat conclu entre les parties postérieurement à la Sentence de 2000, justifie la prise en compte, dans le présent arbitrage, de l'ensemble de la dette globale du Congo envers Commisimpex et, ainsi, la recevabilité de l'ensemble des demandes de Commisimpex, sans que l'autorité de chose jugée de la Sentence de 2000 puisse lui être opposée. »[38]

Commisimpex précise ensuite que si l'autorité de la chose jugée de la sentence du 3 décembre 2000 devait être prise en considération, elle n'aurait qu'une portée limitée car ses demandes dans l'arbitrage no. 9899 portaient sur les montants dus au titre du Protocole de 1992 et non sur l'ensemble de la dette due par le Congo à Commisimpex ni sur les marchés sous-jacents.

**231.** Contrairement aux affirmations de la Défenderesse, il n'y a pas d'identité de cause et d'objet des demandes tranchées par la sentence du 3 décembre 2000 et de celles soumises au Tribunal Arbitral. Ces dernières sont exclusivement fondées sur le Protocole prétendument conclu entre les parties en 2003 et non pas sur le Protocole de 1992, fondement de la sentence arbitrale de 2000. Il est vrai que le texte du Protocole de 2003, dans sa description de la dette de la République du Congo, reprend un montant de 22 milliards de FCFA, « objet du Protocole [de 1992] » auquel il ajoute une « deuxième partie » de 26 milliards de FCFA mais il n'en résulte pas que les demandes de Commisimpex soient fondées, même partiellement, sur le Protocole de 1992. Elles sont fondées sur le Protocole de 2003 qui, s'il était reconnu valide, se substituerait au Protocole de 1992..

A cet égard, l'argumentation selon laquelle le Protocole de 2003 serait insusceptible de créer une situation juridique nouvelle parce qu'il s'agit d'une reconnaissance de dette n'est pas pertinent. Cette observation, juste s'agissant d'un acte unilatéral, ne l'est pas concernant un accord dans lequel deux parties conviennent ensemble que l'une doit à l'autre des montants déterminés. Quand bien même la dette ainsi constatée par les deux parties n'aurait pas d'existence préalable à l'accord, ce dernier peut la faire naitre si sa validité est reconnue, ce qui est en partie l'objet de la présente procédure. En effet, les parties peuvent d'un commun accord en établir la cause et, comme on l'a justement relevé, dans les contrats synallagmatiques, la cause découle de la nature même du contrat[39].

De plus, et de façon significative pour comprendre la position des parties, bien que le recours en annulation formé par la République du Congo et la CCA devant la Cour d'appel de Paris le 2 janvier 2001 ait été rejeté le 23 mai 2002, la sentence du 3 décembre 2000 n'a jamais été exécutée. Il n'y aurait donc rien de surprenant à ce que, tenant compte de cette situation de

---

[37]  Mémoire en Duplique sur le Fond, para 325, pages 118 et 119.
[38]  Mémoire en Réplique sur le Fond, para 514, page 225.
[39]  Ph. Malaurie, L. Aynès, Droit Civil, Les obligations, 2eme Ed. 1990, n° 514, page 283.

fait, la République du Congo et Commisimpex, dans un nouveau protocole, aient réévalué la dette de la République et se soient accordées sur de nouvelles modalités de son règlement. L'autorité de la chose jugée de la sentence de 2000 ne saurait faire échec à la mise en œuvre par la voie arbitrale de ce nouvel accord. La Demanderesse tient d'ailleurs compte des sommes qui lui ont été allouées par la sentence de 2000 dans les calculs des sommes qu'elle prétend encaisser, reconnaissant par là-même l'autorité de la chose jugée de la sentence. Et si ce nouvel accord était inexistant ou dépourvu de validité, comme le prétend la République du Congo, pour, *inter alia,* défaut de cause ou toute autre raison, les demandes de Commisimpex ne seraient pas irrecevables mais devraient être rejetées. L'exception de chose jugée soulevée par la République du Congo ne peut donc prospérer et sera donc écartée par le Tribunal Arbitral.

### B. Sur la validité du Protocole de 2003 et son caractère contraignant

**232.** Pour contester la validité du Protocole de 2003, qu'elle qualifie de frauduleux, la Défenderesse se fonde sur divers arguments que l'on peut regrouper en quatre grandes catégories : les premiers concernent l'absence de pouvoirs alléguée des signataires du Protocole pour engager la République du Congo (a), les seconds concernent l'absence alléguée de caractère contraignant du Protocole (b), les troisièmes concernent l'ignorance du montant de la créance tel que formulée par le Protocole de 2003 (c), et les derniers reposent sur le défaut allégué de cause du Protocole de 2003 du fait du montant erroné de la dette qu'il constate (d).

### a. *Sur l'absence de pouvoirs alléguée des signataires du Protocole de 2003*

**233.** Selon la Défenderesse, les signataires du Protocole de 2003 n'avaient pas reçu d'habilitation du Président de la République, aucune délégation écrite n'ayant été versée au dossier.

**234.** Pour démontrer le contraire, la Demanderesse se fonde tout d'abord sur les termes mêmes du Protocole de 2003 qui mentionne l'existence d'une délégation de pouvoirs donnée à ses signataires par le Président de la République du Congo. Elle invoque également la théorie de l'apparence, renforcée par sa confirmation de la part de hautes autorités congolaises et le fait que le Protocole aurait reçu un début d'exécution de la part de l'administration congolaise.

**235.** Après un examen détaillé des positions respectives des parties ainsi que des pièces soumises par celles-ci au soutien de leurs prétentions respectives et des témoignages reçus, le Tribunal Arbitral conclut que quelles que soient les modalités de l'habilitation reçue par les signataires du Protocole de 2003 lors de sa signature, la République du Congo ne peut valablement invoquer l'absence de leurs pouvoirs pour en contester la validité.

**236.** S'il est vrai que la Demanderesse n'a pas produit de déclaration écrite du Président de la République qui autoriserait expressément les signataires du Protocole de 2003 à le signer pour lui et en son nom, le Tribunal Arbitral est convaincu que Messieurs Longobé et Okemba disposaient bien d'une telle habilitation, au vu d'un faisceau d'indices qui ne laisse aucune place au doute.

**237.** On constate tout d'abord que les deux signataires, MM. Longobé et Okemba, étaient des personnalités très proches du Président de la République. M. Longobé était le Secrétaire Général de la Présidence de la République et M. Okemba, Secrétaire d'Etat, Secrétaire Général du Conseil de Sécurité et de surcroit neveu du Président[40]. Or, ils n'ont pas hésité à déclarer expressément dans le Protocole de 2003 qu'ils agissaient « *sur délégation de Monsieur le Président de la République, son Excellence Monsieur Denis SASSOU NGUESSO et ayant pouvoir à cet effet* ». Il est peu crédible que de telles personnalités auraient fait, par écrit, une telle déclaration si elle avait été inexacte. D'ailleurs, dans son attestation du 6 mai 2011, M. Longobé ne dit nullement qu'il n'agissait pas sur délégation du Président de la République lorsqu'il a signé le Protocole de 2003. L'essence de son témoignage est qu'il ne s'agissait pas d'un protocole définitif mais d'un protocole de négociation et que « *seul un accord définitif conclu par le Ministre des Finances serait de nature à engager les deniers de l'Etat* [41]» car il n'avait pas autorité pour le faire. Il a confirmé, en la nuançant, cette affirmation à l'audience en déclarant qu'il n'avait pas excédé le pouvoir qui lui avait été donné mais que les solutions du Protocole de 2003 ne s'appliqueraient qu'à la condition qu'elles soient approuvées par les autorités compétentes, en l'espèce le Ministre des Finances[42].

**238.** L'habilitation de MM. Longobé et Okemba se trouve confirmée par de nombreux éléments. Il convient en premier lieu de rappeler que l'existence du Protocole n'a jamais été tenue secrète, bien au contraire. En effet, peu de temps après la date de conclusion de celui-ci (23 août 2003), M. Hajaij , par courriers des 29 décembre 2003 et 8 janvier 2004[43], s'adressant respectivement au Ministre d'Etat Secrétaire du Conseil Général de Sécurité et au Ministre de l'Economie, des Finances et du Budget, a rappelé la conclusion de celui-ci et demandé son exécution dans les termes suivants :

> « *Enfin, il nous échoit de rappeler qu'à la date du 31 décembre 2003, toutes les actions décrites à l'article 6 du protocole auraient dues être réalisées. Ce qui n'est pas le cas au 08/01/2004 (...). En désespoir de cause, nous nous sommes une fois de plus tourné vers Son Excellence Monsieur le Président de la République, qui nous a instruis verbalement le 6 janvier 2004, de vous relancer directement en vue de la mise en œuvre du protocole du 23 août 2003, objet de notre requête de ce jour* » se référant également à un souhait de « *concrétisation de l'accord conclu à l'amiable* »[44].

Par une lettre du 16 février 2004[45], M. Hajaij s'est également adressé au Ministre d'Etat, des transports et de la Privatisation afin de solliciter l'exécution de l'article 4 point 2 du Protocole

---

[40] Attestation de M. Hajaij du 4 août 2011, n°68 p. 17.
[41] Attestation de M. Longobé du 6 mai 2011, page 2.
[42] Transcript de l'audience du 21 décembre 2011, page 13.
[43] Pièces C28 et C29.
[44] Pièce C29.
[45] Pièce C33.

c'est-à-dire le remboursement de 20 milliards de FCFA sous forme de privatisation d'entreprises.

**239.** Par courrier du 30 janvier 2004[46], M. Mouko, Directeur de cabinet du Ministère à la Présidence, chargé du Contrôle d'Etat, répondant à une lettre de M. Hajaij du 6 janvier 2004, a accusé réception du Protocole de 2003 transmis par M. Hajaij, se félicitant :

> « *de la prise en compte de son travail* [celui du Ministère à la Présidence] *par la signature du protocole d'accord du 23 août 2003 qui a reconnu l'arrêt des comptes au 30 septembre 1992 à la somme de 960.000.000 Francs Français, soit un équivalent de 48.000.000.000 FCFA dont 26.000.000.000 FCFA au profit de COMMISIMPEX SA et 22.000.000.000 FCFA pour le compte de la banque SARADAR, d'une part, et d'autre part le protocole d'accord no. 566 du 14 octobre 1992 (...)* ».

Ainsi, en sus de confirmer l'existence du Protocole de 2003, cette lettre fait état de la créance de Commisimpex d'un montant de 48 millions FCFA arrêtée au 30 septembre 1992, sans la discuter en aucune façon.

De même, par lettre du 5 février 2004[47], M. Yoka, Ministre Directeur de Cabinet, a transmis au Ministre de l'Economie, des Finances et du Budget, « *pour compétence* » copie du Protocole de 2003 insistant sur le fait que :

> « *Le chef de l'Etat attache un intérêt particulier à l'exécution des clauses contenues dans ledit protocole d'accord afin, d'éviter à notre pays tout autre procédure judiciaire, et de geler aussi la garantie irrévocable donnée à cette société en date du 22 décembre 1986.* »

**240.** Il ne fait donc aucun doute que quelques mois après la signature du Protocole, les différents ministères concernés, Ministre d'Etat Secrétaire du Conseil Général de Sécurité, Ministre de l'Economie, des Finances et du Budget, Ministre d'Etat, des transports et de la Privatisation et le Directeur de cabinet du Ministère à la Présidence, chargé du Contrôle d'Etat, avaient été informés de l'existence et du contenu de ce Protocole et étaient invités à l'exécuter.

**241.** En outre, comme l'atteste une Note du département juridique et administratif du cabinet à la Présidence du 30 avril 2004[48], destiné au Président de la République directement, le Protocole avait, en réalité, été transmis au Ministre des Finances dès le 29 décembre 2003, celui-ci recevant du Ministre Directeur de Cabinet les 5 janvier et 15 mars 2004, des rappels de « *la nécessité et l'intérêt pour le pays d'exécuter ledit protocole d'accord* ». A cet instant précis, le Ministre des Finances n'a émis de réserves formelles ni sur la délégation de pouvoirs ni sur une quelconque obligation de sa part de valider le Protocole.

**242.** En tout état de cause, le Président de la République, M. Sassou N'Guesso avait été, si tel n'avait pas été le cas plus tôt, ce qui est très improbable, informé à ce stade de l'existence « *d'un protocole d'accord de règlement à l'amiable entre les deux parties* » et loin de s'indigner de l'existence d'un accord non signé par ses soins, s'était contenté de faire

---

[46] Pièce C30.
[47] Pièce C32.
[48] Pièce C35.

remarquer qu'il lui faudrait « *interroger le Ministre des Finances, ce dernier m'ayant une fois fait rapport des contacts directs qu'il a avec les responsables de COMMISIMPEX* ».

**243.** Ainsi, très peu de temps après la signature du Protocole de 2003, ni le Président de la République, ni le Ministre des Finances n'ont mis en doute la validité du Protocole de 2003 et n'ont émis aucune remarque formelle quant à la procédure suivie pour sa signature. Le Tribunal Arbitral est convaincu que si ces signatures n'avaient pas été valables et si le Président de la République ou le Ministre des Finances avait ignoré l'existence d'un tel accord au moment de sa conclusion, ils auraient manifesté formellement et publiquement leur surprise, voire leur mécontentement ou leur opposition au plus tôt, les enjeux de cet accord étant trop importants pour rester silencieux.

**244.** De surcroît, très rapidement après la conclusion du Protocole de 2003, il a été question de son exécution par la République du Congo ou ce soit par ses représentants ou par les signataires du Protocole. En effet, par courrier du 4 mars 2004[49], le Ministre d'Etat, Monsieur Isidore Mvouba, a accusé réception de la copie du Protocole et, se fondant sur la disposition relative à la privatisation d'entreprises prévue dans le Protocole, a fourni une liste d'entreprises au Président Directeur Général de Commisimpex, en mentionnant cependant que « *la loi cadre sur la privatisation exclut toute forme de compensation* ».

**245.** De même, par courrier du même jour[50], le Directeur Général de la CCA, Monsieur Georges Nguekoumou, après avoir rappelé les termes du Protocole et les modalités de remboursement de la dette, a souligné que « *la CCA n'a pas encore reçu les fonds nécessaires à la constitution du dépôt bancaire de 6 milliards de F CFA* » qui correspondait à une partie des 26 milliards que l'Etat devait rembourser par cette voie.

**246.** De façon encore plus significative, les signataires du Protocole ont eux-mêmes sollicité des diverses autorités étatiques l'exécution du Protocole. Monsieur Longobé, dès le 15 janvier 2004[51], a en effet insisté auprès du Ministre de l'Economie, des Finances et du Budget afin qu'il accepte :

« *(...) de (...) recevoir Monsieur HODJEIJ, Représentant de COMMISIMPEX et d'arrêter avec lui les principales modalités d'application du protocole d'accord de négociation du 23 août 2003* » et ce « *tenant compte des contraintes résultant des garanties données par l'Etat Congolais et, considérant la nécessité d'éviter d'autres complications notamment avec la Banque SARADAR* ».

Ces propos confirment bien que le Protocole de 2003 était connu des plus hautes autorités qui avaient l'intention de le mettre en œuvre.

**247.** Ceci est d'ailleurs rappelé par Monsieur Okemba par lettre du 29 novembre 2003[52] à l'attention du Ministre de l'Economie des Finances et du Budget indiquant :

« *(...) il vous est demandé d'organiser la mise en œuvre de cet accord en relation avec COMMISIMPEX ainsi qu'avec d'autres départements ministériels concernés.* »

---

[49] Pièce C69.
[50] Pièce C70.
[51] Pièce C59.
[52] Pièce C163.

**248.** De même, Monsieur Okemba a indiqué au Ministre d'Etat, chargé de la coordination gouvernementale, Ministre des Transports et des Privatisations que :

> « *dans le cadre de la mise en œuvre dudit protocole, avons-nous l'honneur de vous le transmettre, pour compétence, dans la mesure où un élément de celui-ci intéresse éventuellement la privatisation.»* [53]

**249.** Enfin, par une lettre commune de MM. Longobé et Okemba du 29 mars 2004[54], ceux-ci demandaient au Ministre de l'Economie, des Finances et du Budget *« de bien vouloir consolider les acquis du protocole d'accord du 23 août 2003 »*.

**250.** L'ensemble de ces correspondances prive de toute portée l'observation de la Défenderesse selon laquelle :

> « *(…) l'absence de réponse circonstanciée aux allégations contenues dans le flot de courriers intempestifs adressés par Commisimpex, aux fins de se ménager des preuves a posteriori, ne constitue pas une preuve de la véracité de ces allégations »*

Il en de même lorsqu'elle ajoute que :

> « *les allégations de Commisimpex ne permettent donc pas de remettre en cause l'affirmation du Président de la République lorsqu'il atteste n'avoir pas donné de délégation pour signer le Protocole de 2003 ».*[55]

**251.** Le Tribunal Arbitral constate en effet qu'il n'est pas nécessaire de se fonder sur des courriers de Commisimpex pour conclure que les plus hautes autorités congolaises s'estimaient liées par le Protocole de 2003, sans qu'il soit besoin de s'interroger sur la volonté de Commisimpex de se *« ménager des preuves a posteriori »*. Les lettres contemporaines de l'administration congolaises sont en effet suffisantes et rendent bien peu crédibles les affirmations du Président Sassou N' Guesso dans ses lettres des 6 mai et 27 octobre 2011[56], intervenant huit ans plus tard, selon lesquelles il n'aurait pas donné instruction d'exécuter le Protocole de 2003. Il est invraisemblable qu'autant de représentants de l'Etat Congolais aient pu agir à son insu et que, ayant nécessairement eu connaissance de leurs actions, il n'y ait pas immédiatement mis fin si le Protocole avait été signé sans autorisation de sa part. Il est à cet égard regrettable qu'il se soit abstenu de venir témoigner à l'audience, ce qui s'oppose à ce que le Tribunal Arbitral tire une quelconque conséquence de son attestation écrite.

**252.** A cet égard, l'argumentation de la République du Congo selon laquelle Commisimpex ne pourrait se prévaloir d'aucune ratification ultérieure d'une délégation inexistante est inopérante. La Défenderesse soutient en effet qu'une ratification « *ne peut être invoquée que dans deux hypothèses : (i) une ratification expresse par le mandant, qui reprend à son compte les engagements pris par le mandataire en dépassement de ses pouvoirs, ou (ii) une ratification implicite mais non équivoque »* ajoutant que la ratification doit « *émaner du*

---

[53]  Pièce C167.
[54]  Pièce C179.
[55]  Mémoire en Défense sur le Fond, paras 242 et 243, pages 80 et 81.
[56]  Pièces R 55 et R92.

*mandant lui-même* »[57]. Mais, comme indiqué, le Tribunal Arbitral est convaincu de la réalité de l'existence de la délégation contestée en raison du faisceau d'indices mentionnés ci-dessus. Aucune ratification n'est donc nécessaire. De plus, s'il est certain que le Président de la République n'a pas ratifié de façon expresse le Protocole de 2003, il apparait à la lumière des documents précédemment évoqués et notamment de la pièce C35 où était conseillé d'exécuter le dit protocole, que le Président de la République l'a ratifié puisqu'il n'a manifesté aucune surprise concernant l'existence du Protocole, n'a pas objecté à son contenu et s'est contenté d'indiquer qu'il fallait « *interroger le Ministre des Finances* » non pas sur le Protocole lui-même mais apparemment sur son exécution.

**253.** Compte tenu de ce qui précède, le Tribunal Arbitral rejette la demande de la République du Congo de juger nul le Protocole de 2003 pour défaut de pouvoir de ses signataires.

        *b.*    *Sur l'absence alléguée de caractère contraignant du Protocole de 2003*

**254.** Pour contester le caractère contraignant du Protocole de 2003, la République du Congo invoque deux types d'arguments qui se nourrissent mutuellement. Le premier, déjà évoqué à l'occasion du rappel du témoignage de l'un de ses signataires, M. Longobé, est que le Protocole ne reflétait pas un accord définitif mais un Protocole de négociations, dans lequel « *l'Etat s'engageait simplement à négocier pour rechercher un accord sur le montant de la dette à rembourser et le paiement échelonné* ».[58] Selon M. Longobé, on l'a vu, les pouvoirs délégués aux signataires du Protocole de 2003 ne les autorisaient qu'à rechercher des pistes de négociation destinées à être ensuite conduite par le Ministre des Finances qui pourrait éventuellement engager l'Etat dans un accord définitif.[59] Mais, la République du Congo prétend également que quand bien même les signataires auraient effectivement bénéficié d'une délégation de pouvoirs leur permettant d'aller au-delà de la définition d'éléments de négociation, le Protocole aurait du recevoir le contreseing du Ministre des Finances pour engager l'Etat, comme le prescrirait la loi n° 1-2000 du 1er février 2000 portant loi organique relative au régime financier en son article 74 qui dispose que :

> « *Tout décret, toute convention, et d'une manière générale, toute mesure, de quelque nature qu'elle soit, susceptible d'engager les finances publiques, est revêtu du contreseing du ministre des finances* ».

**255.** Ces arguments de la République du Congo, bien qu'étroitement liés, soulèvent deux problèmes distincts. La République du Congo a-t-elle, dans le Protocole de 2003 pris des engagements fermes qui vont au-delà d'un accord sur des bases de négociation ? Dans l'affirmative, ces engagements sont-ils définitifs et contraignants faute du contreseing du Ministre des Finances ?

**256.** Le Tribunal Arbitral note que bien que le Protocole de 2003 soit intitulé « PROTOCOLE D'ACCORD DE NEGOCIATIONS ENTRE L'ETAT DU CONGO ET LA SOCIETE COMMISIMPEX S.A. », il présente toutes les apparences d'un contrat créateur de droits et d'obligations pour les parties par les termes employés, qui tendent, principalement, à

---

[57]   Mémoire en Défense sur le Fond, para 305, page 97.
[58]   Attestation de M. Longobé du 6 mai 2011, page 2.
[59]   Attestation de M. Longobé du 6 mai 2011, page 2.

lui conférer force obligatoire. Il précise qu'il est le résultat de « *négociations engagées le 27 mai 2003 à Brazaville* » entre les parties « *à propos de la dette du Congo à l'égard de la société COMMISIMPEX* »[60] ce qui parait justifier son titre de Protocole d'accord de négociations. Les négociations ne sont pas à venir, elles sont passées et le Protocole acte leur résultat. Sur cette base, les deux parties « *conviennent* »[61] des caractéristiques et du montant de la dette du Congo, lequel « *reconnait que la dette de 960.000.000 FRF* » a été partagée aux termes de deux réunions des 7 et 23 septembre 1992[62]. Ensuite, il est indiqué que les parties « *ont* (sic) *convenu* » un certain nombre d'engagements fermes rédigés en termes contraignants :

> - « *Article 1-l'Etat du Congo <u>prend à sa charge</u>, la dette de la société COMMISIMPEX, et celle du groupe et famille Hojeij (...)* ;
>
> -*Article 2-l'Etat du Congo s'engage à négocier directement avec la banque SARADAR (...)* ;
>
> -*Article 3- l'Etat du Congo <u>s'engage à rembourser</u> à la société COMMISIMPEX, la somme en principal de 520 millions de FRF (...)* ;
>
> -*Article 4- l'Etat du <u>Congo s'engage à régler</u> à la société COMMISIMPEX, la somme de 520.000.000 FRF (...)*

**257.** Le Tribunal Arbitral ne peut donc que conclure que le Protocole de 2003 a un contenu obligatoire pour la République du Congo que son Article 6 ne suffit pas à supprimer. Cet article se lit comme suit :

> « *l'Etat du Congo s'engage, d'ici au 30 décembre 2003 :*
>
> - *A mettre en place la garantie du moratoire visée à l'alinéa 3 de l'Article 4 ci-dessus,*
> - *A signer les actes de cession des entreprises visées à § 4 alinéa 2*
> - *A finaliser les négociations avec la Banque SARADAR, visées à l'Article 2 ci-dessus,*
> - *Et à conclure avec la société COMMISIMPEX, un Protocole d'Accord Définitif en remplacement du présent Protocole, pour clore les négociations en cours* ».

**258.** En effet, cette référence à un protocole d'accord définitif ne remet pas en cause le caractère obligatoire et contraignant du Protocole de 2003. Il s'agit comme le précise d'ailleurs l'article 6 d'un document de « clôture » constatant la réalisation d'un certain nombre d'actions de mise en œuvre d'obligations contenues dans le Protocole de 2003.

**259.** En outre, ainsi qu'il a été noté ci-dessus, les hautes autorités congolaises ne s'y sont pas trompées lorsqu'elles ont indiquées que la Présidence de la République « *a reconnu l'arrêt des comptes au 30 septembre 1992 à la somme de 960.000.000 Francs Français*»[63], et que « *Le chef de l'Etat attache un intérêt particulier à l'exécution des clauses contenues dans*

---

[60]    Pièce C27 : Protocole de 2003, pages 1 et 2.
[61]    Pièce C27 : Protocole de 2003, page 2.
[62]    Pièce C27 : Protocole de 2003, page 2.
[63]    Pièce C30.

*ledit protocole d'accord* ».[64] Il en est de même lorsque le département juridique et administratif du cabinet de la Présidence, le 30 avril 2004[65] décrivait au Président de la République le Protocole de 2003 comme un « *protocole de règlement à l'amiable entre les deux parties* » et lui recommandait « *d'instruire le Ministre des finances afin qu'il exécute les engagements pris*». Que ce document fût signé par procuration ne change rien à la qualification qu'il donne au Protocole de 2003.

**260.** De même, la République du Congo ne peut opposer à la Demanderesse les dispositions de l'article 74 la loi n° 1-2000 du 1er février 2000 portant loi organique relative au régime financier. Ce texte, au contenu très général qui indique effectivement tout mesure, quelle qu'elle soit, « *susceptible d'engager les finances publiques* » doit être revêtue du contreseing du Ministre des Finances, apparait comme une règle administrative applicable à l'autorisation du paiement attaché à une décision et non pas comme une règle applicable à la validité de celle-ci. Le fait qu'elle concerne un décret aussi bien qu'une convention le confirme. S'il en allait autrement, le Ministre des Finances et non pas le Président de la République serait la plus haute autorité de l'Etat et le seul à disposer d'un pouvoir effectif. Ce n'est évidemment pas le cas. Le Ministre des Finances reçoit des instructions du Chef de l'Etat, comme l'illustre la note précitée du 30 avril 2004[66] du département juridique et administratif du cabinet de la Présidence recommandant au Président de la République « *d'instruire le Ministre des finances afin qu'il exécute les engagements pris*» dans le Protocole de 2003. D'ailleurs, le Protocole de 2003 ne contient aucune mention relative à la nécessité d'un contreseing du Ministre des Finances et aucun des représentants de la République du Congo n'a fait allusion à une telle nécessité à l'époque.

**261.** Enfin, quand bien même le Tribunal Arbitral n'aurait pas constaté sur la base des preuves contemporaines fournies tant l'existence des pouvoirs des signataires du Protocole de 2003 pour engager la République du Congo que le caractère contraignant de ce Protocole, il ne pourrait que suivre la Demanderesse lorsqu'elle souligne que :

> « *le comportement du Congo a créé chez Commisimpex une croyance légitime dans les pouvoirs et le champ de la mission des signataires du Protocole* » et que « *la légitimité de cette croyance fut ultérieurement confirmée par l'Avis Juridique signé par les deux plus hauts magistrats congolais et concluant à la validité du Protocole de 2003* ».[67]

**262.** En effet, l'argumentation de la République du Congo selon laquelle Commisimpex ne peut se fonder sur la théorie de l'apparence car elle n'aurait pas « *démontrer de manière cumulative, d'une part, qu'elle pouvait légitimement croire que les signataires du Protocole de 2003 avaient reçu pouvoir de signer ledit Protocole, d'autre part, qu'elle pouvait légitimement croire que l'intervention du Ministre des Finances- avec lequel Commisimpex a signé tous les actes portant sur le règlement de sa créance depuis vingt ans- n'était pas requise* »[68] n'est pas pertinente.

**263.** Tout d'abord, si comme le soutient la Défenderesse, l'apparence doit se vérifier au moment de la conclusion du Protocole, il est indéniable que le Protocole indiquait que MM.

---

[64]    Pièce C32.
[65]    Pièce C35.
[66]    Pièce C35.
[67]    Mémoire Après-Audience de Commisimpex du 17 février 2012, para 16, page 5.
[68]    Mémoire en Duplique de la République du Congo du 15 novembre 2011, para 544, page 49.

Longobé et Okemba agissaient sur « *délégation de Monsieur le Président de la République* ». C'est donc pourquoi la Défenderesse conteste la légitimité de la croyance de Commisimpex dans cette apparence. Mais, à moins d'admettre, que la fraude alléguée par la Défenderesse ne se soit pas limitée aux signataires du Protocole et à la Demanderesse, ce que la Défenderesse ne suggère pas, on ne peut douter de la légitimité de la croyance en la validité du Protocole manifestée par de nombreuses autorités congolaises et notamment celles qui lui ont donné un début d'exécution.

**264.** Le caractère légitime de la croyance de Commisimpex en la validité du Protocole de 2003 a trouvé une autre confirmation dans l'Avis Juridique du 7 juillet 2004, signé par M. Lenga, agissant en qualité de Premier Président de la Cour Suprême et, cosigné par Monsieur Henri Bouka, Vice-Président de la Cour Suprême, saisi sur demande du Secrétaire général de la Présidence de la République. Cet avis rapporte que :

> « *Monsieur LONGOBE et Monsieur Jean Dominique OKEMBA ont reçu de Monsieur le Président de la République la mission de négocier et de signer avec COMMISIMPEX S.A (...) le Protocole d'Accord de négociation* » et qu'en droit congolais « *l'habilitation même verbale donnée par le Chef de l'Etat lie irrévocablement l'Etat Congolais quant aux engagements pris par les Plénipotentiaires sauf si le Président de la République venait à contester le pouvoir prétendument donné, ce qui n'est pas le cas en l'espèce* ».

Il est donc ainsi confirmé qu'une habilitation orale des signataires du Protocole était suffisante et que les obligations découlant du Protocole de 2003 sont des engagements irrévocables de l'Etat congolais.

**265.** Il est vrai qu'en date du 25 février 2011, dans une lettre adressée aux conseils de la République du Congo dans la présente procédure[69], Monsieur Lenga n'a pas hésité à expliquer avoir établi un « *avis juridique de circonstance* », « *rendu par bienveillance* ». Il y indique que le Protocole de 2003 « *pour autant qu'il engage les finances publiques, aurait dû être conclu avec le contreseing du Ministère des Finances, comme cela avait d'ailleurs été le cas pour le protocole de 1992 sur lequel mon avis avait été sollicité à l'époque* ». Cette lettre est pour le moins étonnante car M. Lenga y affirme que c'est :« *(...) en tenant compte de la sociologie du milieu que j'ai rendu cet avis juridique, à titre personnel, la Cour Suprême ne pouvant pour sa part émettre des avis que dans des cas bien précis prévus par la loi portant organisation de la Cour suprême* ».

**266.** Ni la lettre de M. Lenga ni les conclusions qu'en tire la Défenderesse ne sont convaincantes. Dans sa lettre du 25 février 2011, M. Lenga précise avoir :

> « *(...) rédigé cet avis juridique allant dans le sens qui m'* [lui] *était demandé par le Secrétaire Général de la Présidence et Monsieur Hojeij, ami du Congo, pour leur rendre service* ».[70]

**267.** Ceci incite à apprécier la crédibilité qu'il faut attacher à ses déclarations avec la plus grande précaution. Par exemple, si l'approbation du Ministre des Finances était nécessaire, comme il l'affirme dans sa lettre de 2011, on voit mal pourquoi il ne l'a pas mentionné dans l'Avis Juridique et a préféré que le Protocole lie irrévocablement l'Etat congolais.

---

[69]   Pièce R54.
[70]   Pièce R54.

**268.** Sa justification selon laquelle :

> « *j'ai cependant considéré pouvoir soutenir que le protocole engageait l'Etat dans la mesure où il était un protocole de négociation et qu'il devait, comme me l'avait affirmé M. Longobé, faire l'objet d'actes définitifs ultérieurs conclus avec l'intervention du Ministre des Finances* »

ne convainc pas, en ce qu'elle se concilie mal avec la notion d'engagement irrévocable contenue dans l'Avis Juridique.

**269.** Le Tribunal Arbitral peut à juste titre s'interroger sur la date à laquelle M. Lenga s'est exprimé avec sincérité. Contrairement à la République du Congo qui estime que l'Avis Juridique: « (....) *ne peut toutefois fonder une quelconque apparence dans les pouvoirs des signataires du Protocole de 2003, d'une part, parce qu'elle a été réalisée sur commande comme l'a confirmé M. Lenga, d'autre part, parce qu'elle a été établie après le Protocole de 2003 (...)*»[71], le Tribunal Arbitral considère qu'un Avis Juridique établi moins d'un an après la signature du Protocole, à une époque où aucune autorité congolaise n'en contestait la validité et l'efficacité, est plus crédible qu'une lettre adressée environ sept ans après les faits, pour les besoins d'une procédure arbitrale. Quoi qu'il en soit, la République du Congo ne peut se soustraire à cet avis, après l'avoir sollicité, par l'intermédiaire du Secrétaire Général de la Présidence de la République, simplement parce que sept ans après, il lui serait défavorable.

**270.** Mais surtout, quel que soit la sincérité de l'Avis Juridique, le fait que le Président et le Vice-président de la Cour Suprême n'aient pas hésité à l'établir, alors de surcroit que ces deux hauts magistrats avaient participé au rendu de l'arrêt de la Cour suprême du 27 juin 2003[72] traitant de la créance de Commisimpex, ne peut que confirmer la légitimité de la croyance de Commisimpex en la validité du Protocole de 2003. Lorsque deux hautes autorités judiciaires congolaises confirment par écrit qu'un Protocole signé par le Secrétaire Général de la Présidence de la République et Secrétaire d'Etat, Secrétaire Général du Conseil de Sécurité, lie irrévocablement la République du Congo et que de hautes autorités se comportent comme si tel était bien le cas, on voit mal pourquoi Commisimpex aurait douté de la validité du Protocole.

**271.** En soulignant que «*le comportement du Congo a créé chez Commisimpex une croyance légitime dans les pouvoirs et le champ de la mission des signataires du Protocole*[73]» d'où résulterait aussi l'engagement de la République du Congo, Commisimpex vise en réalité dle principe bien connu de l'estoppel ou plus communément en droit français de l'interdiction de se contredire au détriment d'autrui. Sur la base de ce principe, la République du Congo ne pouvait donner l'apparence qu'elle avait conclu valablement le Protocole de 2003 et soudainement alléguer qu'il est invalide lorsqu'il s'agissait de l'exécuter. De même, l'article 1.8 des principes UNIDROIT dispose qu' « *une partie ne peut agir en contradiction avec une attente qu'elle a suscitée chez l'autre partie lorsque cette dernière a cru raisonnablement à cette attente et a agi en conséquence à son désavantage* ». En tout état de cause, c'est une

---

[71]   Mémoire Après-Audience de la République du Congo du 17 février 2012, para 139, pages 49 et 50.
[72]   Pièce C26.
[73]   Mémoire Après-Audience de Commisimpex du 17 février 2012, para 16, page 5.

position constante de la jurisprudence française[74] qui considère qu'une partie ne peut, sur le fondement du principe de la bonne foi, adopter successivement des positions contradictoires.

**272.** Ayant jugé que l'approbation du Ministère des Finances n'était pas nécessaire, le Tribunal Arbitral rejette la demande de la République du Congo que soit déclaré, sur ce fondement, nul le Protocole de 2003.

      *c.*   *Sur l'ignorance du montant de la créance tel que présenté dans le Protocole de 2003*

**273.** Au surplus, la République du Congo ne peut invoquer l'ignorance qu'auraient eu ses représentants de la créance de Commisimpex dans la mesure où celle-ci avait été discutée dans de nombreux documents dont notamment:

- la Fiche à la plus haute attention de Monsieur le Ministre de l'Economie, des Finances et du Plan par la CCA de juin 1991[75];

- la Note à l'attention de Monsieur le Ministre du Plan, des Finances et de l'Economie par la CCA de juin 1991[76] ;

- la Fiche de calcul détaillée de 1991[77] par la CCA qui a évalué la créance de Commisimpex en 1986 à 29.949.284.818 FCFA ;

- le Protocole de 1992 ;

- le rapport Ricol du 14 avril 2000 produit dans le cadre de l'arbitrage CCI no. 9899[78] ;

- le rapport du cabinet Mazars du 26 janvier 2000 ;

- la Sentence du 3 décembre 2000 ;

- le rapport de Ernst & Young du 25 septembre 2001 ;[79]

- les décisions du Président du Tribunal de Commerce de Brazzaville[80], l'arrêt de la Cour d'Appel de Brazzaville du 12 juillet 2002[81] et l'arrêt de la Cour Suprême du 27 juin 2003[82].

**274.** Il est vrai que ces différents documents n'évaluent pas tous le montant de la créance de Commisimpex de façon identique. Il n'en reste pas moins que l'existence de cette créance

---

[74]    Cass. Com., 8 mars 2005, RDC 2005, obs. D. Mazeaud ; Cass. Civ. 1ere , 6 juillet 2005, Rev. arb. 2005, page 993 , note Ph. Pinsolle.
[75]    Pièce R81.
[76]    Pièce R82.
[77]    Pièce C98.
[78]    Pièce R27.
[79]    Pièce C17.
[80]    Pièce C20.
[81]    Pièce C24.
[82]    Pièce C26.

était admise et connue de tous et que son montant avait été longuement débattu. Les plus récents mentionnent le montant qui sera retenu dans le Protocole de 2003. C'est donc en parfaite connaissance de cause que les représentants de la République du Congo ont signé en 2003 le Protocole et ont accepté le montant y figurant. En effet, la différence entre le montant figurant dans le Protocole de 2003 et les montants de la créance tels que mentionnés dans les divers documents antérieurs est significative : le Protocole de 2003 vise une créance supplémentaire de l'ordre de 26 milliards de FCFA. Il ne fait aucun doute que les représentants du Congo n'ont pu ignorer cette différence substantielle quant à l'expression du montant de la dette de Commisimpex. En tout état de cause, il n'existe aucune trace contemporaine de contestation par les autorités congolaises de ce montant après la conclusion du Protocole de 2003 bien que celles-ci, y compris le Président de la République, avaient bien été informées de la créance et de son montant, comme rappelé précédemment.

**275.** C'est pourquoi l'argumentation de la République du Congo selon laquelle le consentement des signataires du Protocole aurait été vicié car ceux-ci auraient été trompés sur le montant de la dette et la nature même du Protocole n'est pas convaincante. Comme indiqué ci-avant, la Défenderesse ne peut fonder son raisonnement sur une prétendue ignorance du montant de la dette dans la mesure où, comme on l'a vu, de nombreux documents antérieurs faisaient état de cette dette. Il apparaît dès lors très douteux que M. Longobé qui indique avoir participé à des « *discussions* » ait accepté de signer le Protocole de 2003 en ignorant « *les montants de la dette* » et sans procéder à aucune vérification du montant mentionné et ce alors qu'il indique que « *comme cela ressort du protocole d'accord de négociation lui-même, [que] l'Etat s'engageait simplement à négocier pour rechercher un accord sur le montant de la dette à rembourser et le paiement échelonné* »[83] (soulignement ajouté par le Tribunal Arbitral). En effet, si le but ultime des négociations était que les parties trouvent un accord sur le montant de la dette, le montant indiqué dans le Protocole de 2003 ne pouvait être sans importance. De plus, si le consentement de M. Longobé avait été surpris par l'erreur, il serait incompréhensible que lui-même et différentes autorités congolaises aient plaidé pour l'exécution du Protocole de 2003 pendant une longue période après la date de sa signature, alors que les uns et les autres avaient eu tout le temps de s'informer mieux sur l'existence de la créance et son montant.

**276.** Le Tribunal Arbitral conclut donc qu'en raison de l'information dont elle disposait la République du Congo ne peut avoir été trompée sur le montant de la dette, ce que confirme son absence de contestation après la signature du Protocole de 2003 et sa volonté de l'exécuter manifestée pendant une période suffisamment longue pour qu'elle ait eu le temps de se ressaisir si son consentement avait été surpris. De ce fait, le Tribunal Arbitral rejette la demande de la République du Congo que le Protocole de 2003 soit déclaré nul en raison du caractère vicié du consentement qu'elle a donné.

*d.    Sur l'absence alléguée de cause du Protocole de 2003*

**277.** La République du Congo soutient que le montant de la créance de Commisimpex a été fixé par le tribunal arbitral dans l'affaire no. 9899, que le Protocole de 1992 a un caractère « *négocié, novatoire, global et forfaitaire* » et que le montant de la dette de 26 milliards

---

[83]     Pièce R60 : Attestation de M. Longobé du 6 mai 2011.

FCFA ajouté dans le Protocole de 2003 aux 22 milliards FCFA du Protocole de 1992 est donc sans cause. Commisimpex ne serait pas créancière d'un montant de 48 milliards FCFA comme l'attestent les lettres des 11 mars 1993, 29 avril 1999 et 5 juin 1997.[84]

**278.** Elle souligne que le seul écrit évoquant ce montant avant la conclusion dudit Protocole de 1992 est une copie d'une lettre datée du 7 octobre 1992[85], prétendument remise en juin 2003 par le Président de la République à M. Hajaij, à qui elle aurait été volée en 1998. La République du Congo soutient que la lettre datée du 7 octobre 1992 aurait été fabriquée *a posteriori*, expliquant en ce sens certaines incohérences dans le corps de la lettre et soulignant qu'il est surprenant qu'une copie de cette lettre n'ait pas été gardée.

**279.** Commisimpex, pour sa part, a indiqué que le Protocole de 1992 ne couvrait qu'une partie de la dette, que les prétendues décotes évoquées par la Défenderesse n'ont jamais existé et que le tribunal CCI dans l'affaire n° 9899 n'a pas déterminé le montant total de la créance en 1992 sur la base des marchés, des paiements ou des décotes mais s'est contenté de constater que le Protocole de 1992 était causé.

**280.** Pour le Tribunal Arbitral, ce débat n'est pas pertinent même si le Tribunal Arbitral a relevé les incohérences du contenu de la lettre du 7 octobre 1992 et s'étonne qu'elle n'ait pas été mentionnée avant le Protocole de 2003, sans parler des circonstances rocambolesques de sa disparation et de sa réapparition. Comme le relève à juste titre Commisimpex, le Protocole de 2003 contient une reconnaissance de dette par le Congo à l'égard de Commisimpex. Il indique en effet :

> « (...)
> • *L'Etat du Congo, reconnaît définitivement, et sans objections ni réserves, l'exécution de l'intégralité des marchés et fournitures visées à l'alinéa 1 ci-dessus.*
> • *(...)*
> • *La validité de la dette, a été irrévocablement et officiellement reconnue par les Administrations concernées lors des deux réunions solennelles du 07 et du 23 septembre 1992. Elle a été, à l'issue et à la lumière des travaux de ces deux réunions, entérinée par la Présidence de la République, laquelle en a fixé le montant à l'équivalent de 48 milliards FCFA (Quarante huit milliards Francs CFA) représentant la contre valeur en FCFA des dettes reconnues et libellées en différentes devises au 30 septembre 1992, soit 96 milliards FCFA après dévaluation du Francs CFA en 1994. La société COMMISIMPEX a pris acte de cette reconnaissance de dette, par courriers du 7 octobre et 24 novembre 1992.*
> • *Le montant de la dette du Congo arrêtée le 30 septembre 1992, s'élève en principal à la somme de 960.000.000 FRF. (neuf cent soixante millions de Francs Français) qui représentait en 1992 la somme de 48 milliards de FCFA, l'équivalent (sic) de 96.000.000.000 FCFA (quatre vingt seize milliards FCFA), dont le remboursement final sera effectué en devises, puisqu'il s'agit au départ d'un financement étranger et en devises.*
> • *(...)*
> • *L'Etat du Congo, reconnaît que la dette de 960.000.000 FRF, valeur 30 septembre 1992, a été partagée comme suit, conformément à l'accord conclu au terme des*

---

[84]    Pièces R48, R36 et R36 annexe III.
[85]    Pièce C4.

*réunions du 07 et 23 septembre 1992 sus visées et confirmé par courrier de la société*
*COMMISIMPEX du 7 octobre 1992 :*
*- une première partie est fixée à 440.000.000 FRF (Quatre cent quarante millions de*
*Francs Français), soit l'équivalent de 22 milliards de FCFA, objet du Protocole*
*d'Accord no. 566 du 14 octobre 1992.*
*-une deuxième partie est fixée à 520.000.000 FRF (Cinq cent vingt millions de Francs*
*Français) soit l'équivalent de 26 milliards de FCFA. »*

**281.** L'affirmation du Congo selon laquelle « *la cause d'une reconnaissance de dette doit être*
*trouvée dans l'existence d'une dette préexistante* »[86] est exacte et non contestée, mais on ne
saurait en déduire qu'il appartient au créancier d'établir l'existence d'une telle cause.

**282.** La Demanderesse a en effet justement souligné en se fondant sur la jurisprudence et la
doctrine que « *lorsque la cause est exprimée, il existe une apparence de cause* » et que dans
un tel cas « *il revient à celui qui voudrait établir son absence de le démontrer* », citant un
exemple de doctrine[87] précisant que « *(...) lorsque la cause apparaît à la lecture de la*
*structure contractuelle ou lorsque, sans y apparaître, elle est révélée par une mention de*
*l'acte, il existe une apparence de cause....Il revient donc à celui qui voudrait établir son*
*absence, son caractère fictif, ou sa non-conformité à ce qu'elle aurait du être, de le*
*démontrer. La charge de la preuve pèse donc sur ce dernier* ».[88]

**283.** Le Tribunal Arbitral note en effet comme l'a relevé la doctrine, et souligné la
jurisprudence[89], que l'article 1132 du Code civil français institue une présomption d'existence
et de licéité de la cause[90] et que c'est au débiteur de prouver l'inexistence ou l'illicéité de la
cause qu'il entend invoquer[91]. La République du Congo ne le conteste d'ailleurs pas, en
indiquant à juste titre que la preuve peut être apportée par tous les moyens.

**284.** Le Tribunal Arbitral estime à la majorité que la République du Congo n'a pas rapporté la
preuve de l'inexistence ou de l'illicéité de la cause du Protocole de 2003 telle qu'exposée
dans le texte de ce document, à savoir que la dette du Congo à l'égard de Commisimpex
arrêtée au 30 septembre 1992 représentait la somme de 48 milliards de FCFA.

---

[86] Réponse à la Requête d'arbitrage, paras. 93-94.
[87] J. Rochfeld, Répertoire Civil Dalloz, janvier 2005, voir « Cause », para 107, Pièce CRJ 91.
[88] Mémoire en Demande sur le Fond, para 142, page 57.
[89] Voir par exemple, Cass. Civ. 1re, 7 avril 1992, Bull. civ I n° 114 « *la cause de l'obligation est présumée*
*exacte ; dès lors, il incombe aux signataires d'une reconnaissance de dette de prouver la réalité de*
*l'absence de remise des fonds* », ou encore Cass. Civ. 1re, 21 octobre 1997, pourvoi n°95-19.398 « *La*
*cause des obligations prévues dans une reconnaissance de dette étant présumée exacte, il appartient aux*
*débiteurs de prouver la réalité de l'absence de remise des fonds, sans que cette cause puisse être*
*recherchée dans des faits postérieurs à la reconnaissance.* »
[90] Article 1132 dispose que « *La convention n'est pas moins valable, quoique la cause n'en soit pas*
*exprimée* ».
[91] Voir Droit Civil, Les Obligations, Le Contrat, Tome III, 5e édition, Christian Larroumet, Economica, page
450 : « *Sur le fondement de l'article 1132 du Code civil la jurisprudence considère qu'il appartient au*
*débiteur de prouver que son engagement est dépourvu de cause et non pas au créancier de prouver que*
*l'obligation dont il réclame l'exécution est causée.* », Voir aussi Pièce C RJ91 : « *En conséquence, quand*
*bien même la cause n'est pas exprimée, le créancier peut demander l'exécution du contrat sans avoir à la*
*prouver (l'article 1132 pose ainsi une nuance à l'article 1315 selon lequel « celui qui réclame l'exécution*
*d'une obligation doit la prouver* », c'est-à-dire établir son existence et son objet ; V. pour cette
confrontation, Cass. 1re Civ., 2 mai 2011, préc.). La charge de la preuve revient donc au débiteur de
l'obligation qui prétendrait se délier de son engagement : il doit établir l'absence de cause ou sa fausseté
(par ex., Cass. 1re Civ. 1er oct. 1986, Bull. civ. I, n°230).

**285.** Pour ce faire, il lui appartenait d'établir qu'à cette date la dette vis-à-vis de Commisimpex était d'un montant différent. Or, elle a préféré se fonder sur le montant visé au Protocole de 1992 – 22 milliards de FCFA – en soulignant que ce Protocole était « *un accord de rééchelonnement de sa dette dont la cause, et donc la validité, est indissociable de son caractère global et novatoire* »[92], ainsi que sur la sentence arbitrale de 2000 rendue sur la base de ce Protocole.

**286.** Une référence au Protocole de 1992 et à la sentence de 2000 ne peut être utile à la démonstration de l'inexistence de la cause du Protocole de 2003, précisément en raison du caractère global, novatoire et forfaitaire du Protocole de 1992, relevé par la sentence de 2000 elle-même[93]. Comme l'ont alors souligné les arbitres « *le mobile déterminant de la REPUBLIQUE DU CONGO (mobile d'ailleurs commun à COMMISIMPEX) était d'obtenir – par la négociation et la signature du Protocole n°566[94] – une réduction substantielle de la dette globale et plus encore, le rééchelonnement du paiement de cette dette jusqu'en 2002 (c'est-à-dire jusqu'à presque 20 années à dater des premiers marchés publics concernés)[95]* ». Il est donc hors de doute que le Protocole de 1992 n'était pas représentatif du montant réel de la dette globale à la date à laquelle il a été signé. Les lettres de Commisimpex postérieures à cette signature ne le sont pas non plus, puisqu'elles interviennent à une période où elle s'efforçait d'obtenir par la République du Congo le respect de ses engagements selon le Protocole de 1992 ceci de façon d'ailleurs assez confuse.

**287.** Comme le Tribunal Arbitral l'a déjà souligné[96], il n'y a rien de surprenant à ce qu'en 2003, la République du Congo et Commisimpex aient réévalué la créance de cette dernière et se soient accordées sur de nouvelles modalités de son règlement. A l'époque, la République du Congo se refusant à donner effet au Protocole de 1992, dont elle avait contesté la validité dans la procédure arbitrale, s'abstenait d'exécuter la sentence de 2000, bien que le recours en annulation qu'elle avait introduit devant la Cour d'appel de Paris ait été rejeté le 23 mai 2002. La situation était bloquée et il était dans l'ordre des choses de remettre en question le forfait de 1992.

**288.** Le Tribunal Arbitral considère à la majorité que la République du Congo n'a fourni aucun élément convaincant établissant qu'en octobre 2003 sa dette vis-à-vis de Commisimpex était d'un montant autre que les 48 milliards FCFA visés au Protocole de 2003, alors que Commisimpex a expliqué de façon plausible l'origine de ce montant : une évaluation de la créance de Commisimpex au titre des marchés à 29.949.284.818 FCFA fin 1986. Par application d'un taux d'intérêt de 10,5% avec capitalisation annuelle et sur la base d'une conversion des montants en devises étrangères aux taux envisagés à la date de la signature des marchés, on obtient un montant d'environ FRF 960.000.000, soit les 48 milliards FCFA du Protocole de 2003[97].

---

[92]    Mémoire Après-Audience du 23 mars 2012, para 82, page 24.
[93]    Pièce C14, page 42.
[94]    Le Protocole de 1992.
[95]    Pièce C14, page 47.
[96]    N°197 supra.
[97]    Ce calcul figure à la page 15 du rapport Mazars du 2 août 2011 et son exactitude n'a pas été contestée par la République du Congo.

**289.** Cette évaluation de 29.949.284.818 FCFA fin 1986 est confirmée par plusieurs documents produits au cours de la procédure arbitrale. Il s'agit tout d'abord d'une « *Fiche de Calcul Détaillée* » intitulée « *Dette du Congo en 1987 due à COMMISIMPEX d'un montant de 29.949.284.818 francs CFA. Communiquée par le CCA et le Ministère des Finances au Procureur général et au Ministère de la Justice en septembre 1991* »[98]. Contrairement à ce que prétend la République du Congo[99], ce document indique clairement un montant de la dette de 29.949.284.818 FCFA. Ce même montant est repris plusieurs fois dans les actes du procès dont fut l'objet l'ancien Ministre des Finances, M. Lekoundzou. Ainsi, Joseph Hondjula Miokono déclare sous serment en 1991 qu'ayant été nommé à la Caisse Congolaise d'Amortissement en 1985 en qualité de Directeur général, il a *trouvé un dossier COMMISIMPEX selon lequel l'État congolais devait à cette société plus de 29 milliards de FCFA* »[100]. De même, dans des réquisitions d'octobre 1991, Madame le Procureur Général près la Cour d'Appel de Brazzaville écrit : « *En 1987, l'État Congolais qui connaissait d'énormes difficultés financières étant incapable d'honorer la dette de la société COMMISIMPEX qui s'élevait à 29.949.184.818 FCA* »[101]. De plus, dans une attestation du 16 avril 2003[102], M. Ernest Komko, ancien Président de la Conférence Nationale Souveraine de février à juin 1991 fait état de travaux de deux commissions qui, à l'époque, ont constaté une créance de Commisimpex sur la République du Congo « *qui oscillait autour de 30 milliards de FCFA* ».

**290.** Pour contester cette évaluation de la dette à 29.949.184.418 FCFA fin 1986, la République du Congo invoque deux documents de la CCA de juin 1991 qui évaluent la dette à 21 milliards au 31 décembre 1988[103]. Mais ces documents donnent l'impression que les montants indiqués sont le résultat de négociations et sont de toute façon antérieurs à la « *Fiche de Calcul Détaillée* » de la CCA de septembre 1991 qui déclare que la dette est de 29.949.184.418 FCFA. Le chiffre de 21 milliards fin 1988 ne sera repris dans aucun autre document par la suite. Seule l'évaluation de 29.949.184.418 FCFA est utilisée avec constance par des sources congolaises.

**291.** Ce même montant de 29.949.184.818 FCFA fin 1986 sera ultérieurement repris par un rapport d'expertise d'Ernst & Young du 25 septembre 2001[104], rendu sur ordonnance du Président du Tribunal de Commerce de Brazzaville. C'est sur cette base, qu'en procédant à l'actualisation décrite ci-dessus, Ernst & Young évalue la créance de Commisimpex à 48 milliards FCFA au 30 septembre 1992 (p. 41 du rapport d'expertise). Le Président du Tribunal de Commerce de Brazzaville se fondera sur ce rapport pour ordonner l'inscription de la dette par la Caisse Congolaise d'Amortissement le 9 novembre 2001[105]. Le Président du Tribunal de Commerce, se référant à la « *Fiche de Calcul Détaillée* » de la CCA de septembre 1991[106], déclare que « *le Tribunal a pu constater, comme l'expert, que la Caisse Congolaise d'Amortissement elle-même avait communiqué aux Autorités Judiciaires du pays à l'occasion du procès du Ministre Lekoundzou en 1991 que la dette des Défendeurs s'élevait à*

---

[98] Pièce C98.
[99] Mémoire après audience n°1, n°14, page 4.
[100] Pièce C96.
[101] Pièce C99.
[102] Pièce C152.
[103] Pièces R81 et R82. Cf. aussi R80, de 1989 qui utilise la même évaluation, sans la justifier.
[104] Pièce C17.
[105] Pièce C20.
[106] Pièce C98.

*29.948.284.818 Francs CFA à la fin de 1986* » (p.2). A partir de là, il n'est pas étonnant qu'il entérine le calcul d'Ernst & Young, qui part de la même constatation.

**292.** La République du Congo fait valoir à juste titre que la procédure devant le Président du Tribunal de Commerce de Brazzaville n'était pas contradictoire, et que la République du Congo a objecté aux constatations qui y étaient faites lorsqu'elle l'a pu, ce qui en réduit considérablement la portée. Mais on ne peut en dire autant de la procédure d'appel qui a suivi, initiée par la CCA et l'État congolais. La Fiche de Calcul Détaillée de la CCA de 1991, qui constate l'existence d'une créance de 29.949.284.818 FCFA fin 1986, est également reprise par la Cour d'appel dans sa décision du 12 juillet 2002[107] qui fait aussi état de l'évaluation à 48 milliards FCFA de la créance au 30 septembre 1992 par Ernst & Young. Et la Cour d'appel relève :

> « *Considérant qu'il ressort de cette note que l'évolution de la dette et son actualisation au 30 septembre 1992 a été calculée par l'expert au montant de 48.532.681.474 FCFA ;*
>
> *Considérant que le 14 octobre 1992 les parties avaient conclu le Protocole d'accord n.566, ayant comme objet la consolidation partielle de la dette à hauteur de 22.000.000.000 de FCFA ;*
>
> *Considérant qu'il ressort donc que le montant de 26.532.681.474 FCFA n'avait pas été compris dans ledit Protocole d'accord ;*
>
> *Considérant que la Caisse Congolaise d'Amortissement soutient que le Protocole d'Accord n.566 du 14 octobre 1992 serait une transaction et elle en découle que ce contrat aurait réglé toutes les créances dont la société COMMISIMPEX SA aurait été titulaire à l'encontre de la République et de la CCA* ».

**293.** Il est vrai que l'arrêt de la Cour d'appel a été cassé par la Cour Suprême le 27 juin 2003[108]. Mais, outre que, par hypothèse, la décision d'annulation ne porte en rien sur les constatations de fait relatées ci-dessus, l'ensemble des documents qui viennent d'être évoqués permettent au Tribunal Arbitral de constater deux points essentiels : 1) l'évaluation de la dette du Congo vis-à-vis de Commisimpex fin 1986 à 29.949.184.818 FCFA semblait largement admise tant en 1991 qu'en 2002-2003 ; 2) son actualisation à 48 milliards FCFA en octobre 1992 prête peu à discussion puisqu'il s'agit d'un calcul mathématique effectué par Ernst & Young et contrôlé par le Cabinet Mazars au cours de la présente procédure arbitrale[109]. Mais surtout, quelque soit le montant réel de la créance de Commisimpex en octobre 1992, il résulte de ce qui précède que les parties au Protocole de 2003 ont adopté une évaluation connue et débattue. Le montant de 48 milliards FCFA repose sur une évaluation des sommes dues à Commisimpex articulée dès 1991 et actualisée à fin septembre 1992. Il ne s'agit aucunement d'un montant sorti d'un chapeau par des négociateurs pour des raisons obscures et sans aucun fondement factuel.

**294.** On peut évidemment s'étonner qu'en signant le Protocole de 1992, précisément en octobre, Commisimpex ait accepté un montant de 22 milliards. S'agissait-il d'un accord aux

---

[107] Pièce C24.
[108] Pièce C26.
[109] Il est à noter à cet égard que la République du Congo n'a pas estimé nécessaire de soumettre le cabinet Mazars à contre-interrogatoire.

fins transactionnelles, comme l'a prétendu la CCA devant la Cour d'appel de Brazzaville et admis le Tribunal Arbitral qui a rendu la sentence de 2000 ? Le présent Tribunal Arbitral ne peut ignorer que les parties ont eu, en cours de procédure, des échanges assez confus sur l'existence de décotes qu'aurait consenties Commisimpex à la République du Congo, l'une de 30% en 1998 et puis de 25% en 1992[110] ou que la République du Congo lui aurait imposées. Les explications contradictoires des parties, surtout de Commisimpex sur ce point, n'ont pas permis au Tribunal Arbitral de se faire une opinion définitive sur l'existence et surtout l'origine de ces décotes. Mais une telle opinion n'est pas nécessaire puisque les parties font remonter ces décotes au plus tard à la signature du Protocole de 1992 qui, comme l'a indiqué la sentence de 2000 retient un montant global et forfaitaire, le détail des calculs qui ont permis de l'arrêter n'important pas pour la solution du présent litige. Simplement, le Tribunal Arbitral ne peut s'empêcher de relever que si la créance de Commisimpex en septembre 1992, hors décote, était effectivement de 48 milliards FCFA, l'application successive d'une décote de 30%, puis d'une décote de 25% avant la signature du Protocole de 1992 donne un chiffre de 25,2 milliards FCFA, bien proche des 26 milliards FCFA absents du Protocole de 1992 et présent dans le Protocole de 2003. Est-ce seulement une coïncidence ? Peut-être. Mais ces observations viennent renforcer le caractère plausible de la dette de 48 milliards FCFA présentés comme la cause du Protocole de 2003 par ses auteurs et dont l'existence est présumée.

**295.** Sur la base de ce qui précède, le Tribunal Arbitral conclut à la majorité que la République du Congo n'a pas démontré l'absence de cause du Protocole de 2003. Il constate au contraire que Commisimpex, bien qu'elle n'avait pas la charge de la preuve de l'existence de la cause, a fourni au Tribunal Arbitral un faisceau d'indices qui seraient suffisants pour déclarer que cette cause existe si elle n'était pas déjà présumée. Il ne s'agit pas ici pour le Tribunal Arbitral de se prononcer sur le montant de la dette en octobre 2003 dont aucune des Parties n'a établi le montant indiscutable. Il s'agit simplement de constater que l'évaluation à 48 milliards FCFA était la seule clairement retenue à l'époque et que, faute de preuve apportée par la République du Congo, la réalité de la cause présumée du Protocole de 2003 s'en trouve confirmée.

**296.** Cependant, le Tribunal Arbitral ne peut se contenter de cette conclusion qui concerne seulement la cause objective du Protocole de 2003. La République du Congo ayant allégué que la conclusion du Protocole de 2003 était le résultat d'une fraude, il convient alors de s'interroger sur la licéité de sa cause subjective. Les signataires du Protocole l'ont-ils conclu dans un but illégitime ou, plus précisément, est-ce le résultat d'une fraude dont ses signataires pour la République du Congo avaient été victimes, cette dernière n'ayant jamais suggéré qu'ils aient pu être complices de la fraude imputée à Commisimpex ? Elle explique que :

> « *La signature du Protocole de 2003 par des personnes influençables ou ignorantes du dossier de la créance de Commisimpex ne s'explique que par les pratiques peu orthodoxes de Commisimpex et le réseau d'influence de M. Hojeij au sein de l'administration congolaise dont il connaît les faiblesses et en a largement profité* »[111].

**297.** Les allégations de fraude articulées par la République du Congo sont particulièrement peu convaincantes. Il a été montré dans la section B c) ci-dessus que les signataires congolais du Protocole de 2003 ne pouvaient avoir donné leur accord sur le montant de la créance de

---

[110]    Pièce R61, lettre du Conseil de Commisimpex du 28 février 1998.
[111]    Mémoire Après-Audience du 23 mars 2012, para 147, page 49.

Commisimpex qu'en parfaite connaissance de cause. Cette observation est confirmée par la présente section où il apparaît que le montant de 48 milliards repris dans le Protocole de 2003 avait fait l'objet d'un débat public. On voit mal alors comment une fraude aurait pu intervenir sans qu'ils en soient complices, ce que, on l'a dit, ne prétend pas la République du Congo. D'ailleurs, si fraude il y avait, il faudrait qu'il s'agisse d'une fraude à très grande échelle puisqu'elle impliquerait un grand nombre de fonctionnaires congolais, pas seulement les signataires du Protocole. Il faudrait aussi que la fraude se fut étalée sur une longue période, puisqu'elle remonterait au moins à l'évaluation de la dette à 29.949.184.818 FCFA fin 1986, en 1991, fondement de l'évaluation à 48 milliards en septembre 1992. Le moteur de la fraude devrait être la corruption et le trafic d'influence, alors que la République du Congo n'a formulé aucune accusation précise à cet égard et que les protagonistes congolais de l'affaire ne paraissent pas avoir été inquiétés depuis 2003/2004.

**298.** Il est évidemment légitime de se demander pourquoi les représentants du Président de la République du Congo, avec l'aval de celui-ci, ont décidé de payer en 2003 une dette ancienne qu'ils s'étaient refusé à acquitter jusqu'ici. Mais on se demande de même pourquoi la République du Congo, après avoir signé le Protocole de 1992, avantageux pour elle, a décidé de renier ses engagements et a lutté avec âpreté pour ne pas l'exécuter, de même que la sentence qui en résultait. Le Tribunal Arbitral ne peut qu'être frappé de constater que pour se soustraire au Protocole de 1992 – qu'elle invoque aujourd'hui comme reprenant l'intégralité de sa dette- elle invoquait comme dans la présente procédure sa nullité et la fraude de Commisimpex. Un extrait d'une sentence intérimaire de 1999, rendue dans la procédure qui aboutit à la sentence de 2000, et cité par celle-ci, est éloquent[112] :

> « Dans son « mémoire en réponse et en demande de sursis à statuer » du 26 février 1999 » l'examen du « caractère mal fondé de la demande de Commisimpex (pages 13 à 18) et la « nullité du protocole 566 et des engagements souscrits en exécution du protocole 566 pour vice de consentement » (pages 19 à 21) comporte de manière répétée des allégations de « fraude procédurale », de « multiples fraudes constitutives de faux et d'escroquerie, que Commisimpex a commises et commet encore », de « manœuvres, intrigues et fraudes dont Commisimpex faisait son lot quotidien » et d'« erreur provoquée », pour conclure (page 21) que « des développements qui précèdent, il est patent que la REPUBLIQUE DU CONGO et la CAISSE CONGOLAISE D'AMORTISSEMENT ont été victimes d'escroquerie, laquelle est caractérisée par l'utilisation par Commisimpex à leur encontre de manœuvres frauduleuses pour se faire remettre des billets à ordre n'ayant pas de cause ». »

Le Tribunal Arbitral qui a rendu la sentence de 2000 n'a retenu aucune fraude et a constaté la validité du Protocole no.566 de 1992 que la République du Congo ne conteste plus aujourd'hui et dont au contraire, elle se prévaut. De même le présent Tribunal Arbitral constate que la République du Congo n'a pas prouvé que la cause du Protocole de 2003 était entachée d'illicéité en raison d'une fraude, pas plus qu'elle n'a établi l'inexistence de sa cause ou le vice dont son consentement serait entaché.

**299.** Le Tribunal Arbitral a constaté que la République du Congo ne pouvait valablement invoquer l'absence de pouvoirs des signataires du Protocole de 2003 pour en contester la validité et que ce dernier contenait des engagements de caractère contraignant. De plus, il a

---

[112]    Pièce C14, Sentence du 3 décembre 2000.

conclu que la République du Congo ne pouvait alléguer une ignorance du montant de sa dette lorsque le Protocole de 2003 a été signé. En l'absence de preuve de son défaut de cause ou du caractère illicite de celle-ci, le Protocole de 2003 lie donc bien les parties et la République du Congo doit exécuter les obligations qu'elle a contractées en le signant.

C.   Sur les montants dus par la République du Congo à Commisimpex

**300.** Dans le Protocole de 2003, la République du Congo prend les engagements financiers suivants :

- *« Article 1- l'Etat du Congo prend à sa charge, la dette de la société COMMISIMPEX, et celle du groupe et famille Hojeij, à l'égard de la banque libanaise SARADAR à hauteur de l'engagement du Protocole d'Accord n°566 du 14 octobre 1992, et les garanties correspondantes, dont la créance en principal, valeur du 30 septembre 1992 est libellée dans les devises suivantes :*

*A- 50.592.81, 53 FRF*
*B- 21.201.872, 76 Livres Sterling*
*C- 34.521.293, 24 Dollars US*
*D- 1.426.6253.801 F CFA*

*Le total représentant, à cette date, la contre valeur de 440.000.000 FRF, soit 22 Milliards FCFA à la parité de l'époque.*

*-Article 2- l'Etat du Congo s'engage à négocier directement avec la banque SARADAR et pourra déterminer les modalités de remboursement des montants ci-dessus mentionnés en principal et en intérêt, en dehors de tout engagement, ni responsabilité de la part de la société COMMISIMPEX, ni du groupe et famille Hojeij.*

*Les retombées directes et indirectes de ces négociations, ne concernent en aucun cas la société COMMISIMPEX ni le groupe et la famille Hojeij.*

*-Article 3- l'Etat du Congo s'engage à rembourser à la société COMMISIMPEX, la somme en principal de 520 millions de FRF, non compris les intérêts qui s'élèvent à 941.141.586 FRF, pour la période du 30 septembre 1992 au 30 juillet 2003 au taux de 10% l'an,*

*-Article 4- l'Etat du Congo s'engage à régler à la société COMMISIMPEX, la somme de 520.000.000 FRF (cinq cent vingt millions de francs français) selon les modalités suivantes :*

*1. Paiement comptant d'un montant de 60.000.000 de FRF (soixante millions de Francs Français), soit 6 milliards FCFA.*

*2. Une deuxième partie de ladite somme en principal, correspondant à 200.000.000 FRF (Deux cents millions de Francs Français), soit 20 milliards de FCFA, portera, à titre de compensation, sur l'acquisition par la société COMMISIMPEX, de certaines*

*entreprises appartenant à l'Etat du Congo dont la viabilité technique et financière, et dont la rentabilité et le prix d'évaluation, auront été positivement démontrés par un auditeur agréé et accepté par la société COMMISIMPEX.*

*3. Le reliquat, soit la somme en principal de 260.000.000 FRF (deux cent soixante millions de Francs Français), soit 26 milliards de FCFA, fera l'objet d'un moratoire que l'Etat du Congo s'engage à rembourser en 84 (quatre vingt quatre) mensualités constantes d'une valeur de 3.095.238 FRF par mois, soit une mensualité de 309.523.809 FCFA. Ce moratoire est subordonné à l'octroi, en faveur de COMMISIMPEX, d'une garantie ferme, inconditionnelle et irrévocable de 1er ordre, internationalement acceptée.*
*Cette garantie a pour objet, au-delà de l'aspect couverture du risque, de faciliter les conditions de refinancement aussi bien des entreprises relevant actuellement du groupe Hojej, dont les besoins en fonds de roulement dépassent largement les douze milliards de Francs CFA, que ceux des établissements publics visés au § 4 alinéa 2 »:*

**301.** Ces quatre articles couvrent les deux composantes de la dette de la République du Congo arrêtée au 30 septembre 1992, telle que confirmée dans le Préambule du Protocole : 440.000.000 FRF dits objets du Protocole de 1992 et 520.000.000 FRF.

   *a.   la dette de 440.000.000 FRF  (Article 1er du Protocole de 2003)*

**302.** Selon l'article 1er la République du Congo prend à sa charge la dette de Commisimpex et du groupe Hajaij envers la Banque Saradar à concurrence des 440.000.000 FRF découlant du Protocole de 1992 et s'engage à entrer en négociation avec la banque à cet égard d'ici le 31 décembre 2003 (Articles 2 et 6). Commisimpex explique en effet que c'est la banque Saradar qui a financé ce montant.

Selon une lettre de la Banque Audi Saradar, antérieurement Saradar, du 24 décembre 2010, la République du Congo ne s'est jamais rapprochée d'elle et c'est finalement Commisimpex qui aurait réglé elle-même sa dette vis-à-vis de la Banque.

**303.** La République du Congo ne conteste pas n'avoir jamais réglé la Banque Saradar. En revanche, elle soutient que Commisimpex n'est pas recevable à solliciter le paiement du montant de 440.000.000 FRF au 30 septembre 1992, porté à 360.515.125 euros au 7 janvier 2011 selon les calculs du cabinet Mazars,[113] qui selon le Protocole de 2003 est du à la Banque Saradar. La République du Congo prétend en effet que la délégation visée au Protocole serait une délégation parfaite, dont l'effet est de libérer le débiteur délégué, c'est-à-dire elle même, à l'égard du délégant, Commisimpex.

**304.** Commisimpex considère au contraire que le Protocole ne prévoyait qu'une délégation imparfaite et que :

   *« Du fait de l'inexécution du Congo, la délégation prévue au Protocole de 2003, envisagée à titre de simple modalité de règlement d'une partie de la dette du Congo*

---

[113]   Mémoire en Duplique sur le Fond, para 294, page 110.

*envers Commisimpex, n'a jamais pu être concrétisée et son inexécution par le Congo renvoie les parties à la situation contractuelle pré-existante. »*[114]

**305.** La République du Congo ajoute que quand bien même la délégation serait une délégation imparfaite, Commisimpex ne pourrait exiger le paiement de la somme qui en est l'objet car, tout en reconnaissant n'avoir pas procédé au règlement des sommes dues à la Banque Saradar elle estime qu'elle:

> *« (...) n'a pas été défaillante à l'égard de la Banque Saradar puisque cette dernière ne lui a jamais rien demandé au titre du Protocole de 2003 ».*[115]

**306.** Le Tribunal Arbitral ne peut suivre la République du Congo dans son argumentation pour deux raisons essentielles. Tout d'abord, la délégation au profit de la Banque Saradar prévue par le Protocole de 2003 ne saurait être une délégation parfaite faute de l'accord de cette dernière, en sa qualité de délégataire. C'est en effet l'accord du créancier à la substitution de débiteur qui caractérise la délégation parfaite. Tel est le sens de l'article 1275 du Code civil français.[116] Or, il n'est pas établi ni même prétendu que la Banque Saradar ait donné son accord à la substitution de débiteur. La délégation prévue par le Protocole de 2003 doit donc bien être qualifiée de délégation imparfaite.

**307.** Il est vrai que comme le relève la République du Congo, la Cour de cassation[117] a déclaré que « *... ni le délégant ni ses créanciers ne peuvent, avant la défaillance du délégué envers le délégataire, exiger paiement* ». Mais cette solution est difficilement transposable à la présente espèce où les conditions de règlement par la République du Congo à la Banque Saradar n'ont jamais été définies, ceci en raison de la carence de la République du Congo elle-même. Selon l'article 2 du Protocole de 2003, la République du Congo s'engageait à négocier directement avec la Banque Saradar les modalités de remboursement de la dette déléguée, au plus tard le 31 décembre 2003, ainsi que le précise l'article 6 du Protocole. La République du Congo ne l'a pas fait, indiquant seulement que la Banque Saradar ne lui a rien demandé au titre du Protocole de 2003, ce qui est la conséquence du non respect de son engagement de négocier avec cette dernière. La République du Congo ne peut se prévaloir de sa propre défaillance qui a rendu la délégation prévue dans le Protocole de 2003 sans effet.

**308.** La République du Congo souligne encore que Commisimpex n'apporte aucune preuve d'avoir réellement payé sa dette envers la Banque Saradar et encore moins de preuve de la date et du montant du paiement allégué, ni qu'il s'agisse du paiement de la dette qui devait être acquittée au moyen de la délégation.[118] Ce n'est que partiellement exact car la lettre de la Banque Audi Saradar du 24 décembre 2010 confirme que la dette de Commisimpex à son égard a été payée.[119] Quoi qu'il en soit, cette argumentation est sans pertinence. Ce qui importe n'est pas que Commisimpex ait ou n'ait pas réglé sa dette envers la Banque Saradar mais que la République du Congo ne l'ait pas fait à sa place, au mépris de l'engagement pris dans le Protocole de 2003. Il en résulte que la dette de 440.000.000 FRF, au 30 septembre 1992, reconnue par la République du Congo envers Commisimpex dans le Protocole de 2003

---

[114]   Mémoire en Réplique sur le Fond, para 508, page 223.
[115]   Mémoire en Duplique sur le Fond, para 303, page 113.
[116]   Voir en ce sens Ph. Malaurie et L. Aynès, Droit Civil, les Obligations, 1990, n° 1250, page 711.
[117]   Pièce CRJ 199 : Cass. Com, 16 avril 1996, n° 94-14618.
[118]   Mémoire en Réplique sur le Fond, paras 306-307, pages 113- 114
[119]   C75.

*« à hauteur de l'engagement du Protocole d'Accord n°566 du 14 octobre 1992 ... »*, dont le montant devait servir, par délégation, au paiement de la dette de Commisimpex à l'égard de la Banque Saradar ne s'est pas éteinte et que la République du Congo doit s'en acquitter.

**309.** Selon le rapport Mazars du 7 janvier 2011[120] sur lequel s'appuie Commisimpex, la dette de 440.000.000 FRF au 30 septembre 2011 s'élèverait à 360.515.125 euros au 7 janvier 2011. Pour obtenir ce montant, le cabinet Mazars procède au calcul suivant, à partir des différents montants en devises diverses qui, selon le Protocole de 2003, constituent la somme de 440.000.000 FRF: il ajoute aux montants mentionnés dans le Protocole de 2003 des intérêts composés au taux de 10,5% l'an à compter du 23 août 2003 jusqu'au 7 janvier 2011, date du rapport, puis ajoute également à ces montants des intérêts composés au taux de 10% l'an du 30 septembre 1992 au 30 juillet 2003 et cumule le tout.

**310.** Le Tribunal Arbitral estime que ce calcul, que conteste la République du Congo, n'est pas compatible avec les accords des parties et le texte du Protocole de 2003. Ainsi qu'il a déjà été relevé, la dette de 440.000.000 FRF de Commisimpex que prenait en charge la République du Congo à l'égard de la Banque Saradar en vertu du Protocole de 2003, était *« à hauteur de l'engagement du Protocole d'Accord n°566 du 14 octobre 1992 ... »*. L'engagement de la République du Congo selon le Protocole de 1992 en août 2003, ne pouvait être autre que celui résultant de la sentence du 3 décembre 2000, objet d'un recours en annulation qui avait été rejeté le 23 mai 2002 et qui était donc définitif. Commisimpex n'a pas renoncé au bénéfice de cette sentence en signant le Protocole de 2003, comme le confirme le fait qu'il déduise des montants qu'il réclame au titre du Protocole de 2003 ceux qui lui ont été alloués par la Sentence de 2000[121] dont les deux parties reconnaissent l'autorité de la chose jugée. Le Tribunal Arbitral constate donc d'une part que le montant global de la dette prise en charge par la République du Congo à hauteur de l'engagement du Protocole de 1992 est celui fixé par la Sentence de 2000 et d'autre part que Commisimpex lui demande de déduire ce montant global des condamnations que le Tribunal Arbitral prononcerait en sa faveur dans la présente procédure. Par conséquent, le Tribunal Arbitral constatera que les montants dus par la République du Congo au titre de l'article 1er du Protocole de 2003 sont ceux qui lui ont été alloués par la sentence de 2000, donnera acte à Commisimpex de sa demande de déduction de ces montants des condamnations que prononcerait le Tribunal Arbitral et, ayant effectué cette déduction, ne prononcera aucune condamnation au titre de l'article 1er du Protocole de 2003.

### b. *La dette de 520.000.000 FRF (Articles 3 et 4 du Protocole de 2003)*

**311.** Par ailleurs, la République du Congo devra rembourser Commisimpex le montant de 520.000.000 FRF visé à l'article 3 du Protocole de 2003, augmentés d'intérêts de 941.141.586 FRF soit 222.749.598, 82 euros, pour la période du 30 septembre 1992 au 30 juillet 2003 (appliquant un taux de 10% par an), comme prévu par les articles 3 et 5 du Protocole de 2003.

**312.** En ce qui concerne le calcul des intérêts pour la période postérieure au Protocole de 2003, Commisimpex se fonde sur le rapport du cabinet Mazars du 7 janvier 2011 qui retient un taux de 10,5%. Le Cabinet Mazars justifie ce taux par le fait qu'il était *« (...) également*

---

[120]  Rapport Mazars du 7 janvier 2011, page 11, n° 2.3.
[121]  Rapport Mazars du 7 janvier 2011, page 3.

*celui qui était stipulé dans la garantie émise par la République du Congo le 22 décembre 1986 et qui avait été retenu par la CCA dans son calcul de la dette de la République du Congo à Commisimpex au 31 décembre 1986 »*[122].

**313.** Le Tribunal Arbitral estime cette justification incompatible avec l'accord reflété par la méthode retenue dans le Protocole lorsqu'il s'agit d'arrêter le montant des intérêts sur 520 millions de FRF pour la période du 30 septembre 1992 au 30 juillet 2003.[123] Ceci est d'ailleurs expliqué par le rapport Mazars qui reprend à son compte cette méthode pour calculer les intérêts sur le montant de 440.000.000 FRF lorsqu'ils sont antérieurs au Protocole :

> *« Le montant I2 de 941 millions de FRF d'intérêts figurant au Protocole de 2003 est calculé selon les modalités suivantes :*
>
> *- Montant en base : 520 millions FRF,*
> *- Taux de 10% l'an, avec capitalisation annuelle au 30 septembre (année de 360 jours et mois de 30 jours),*
> *-Période du 30 septembre 1992 au 30 juillet 2003 »*[124].

**314.** Le Tribunal Arbitral ne voit aucune raison de ne pas retenir également cette méthode contractuelle pour calculer les intérêts de retard courant à compter de 2003, la justification apportée par le Cabinet Mazars et Commisimpex d'appliquer un taux de 10,5% n'étant pas satisfaisante.

**315.** En outre, le cabinet Mazars fait courir les intérêts à compter du 23 août 2003, date de signature du Protocole de 2003. Or, l'article 6 du Protocole prévoyant de façon plus générale que le Protocole d'Accord définitif devait être conclu le 31 décembre 2003, le Tribunal Arbitral considère que c'est à compter de cette date que tous les intérêts de retard doivent courir et non à compter de la date de signature du Protocole. C'est en effet au soir du 31 décembre 2003 que l'inexécution du Protocole est définitive. Le cabinet Mazars l'a d'ailleurs relevé dans son calcul des intérêts en ce qui concerne les 200 millions de FRF relatifs aux entreprises à privatiser pour lesquels il fait courir les intérêts à compter du 31 décembre 2003 du fait de l'absence de signature d'actes de cession d'entreprises à cette date tel que le prévoyait l'article 6. Une telle restriction est injustifiée car c'est au plus tard le 31 décembre qu'un document définitif devait être signé, susceptible de s'appliquer à l'ensemble des modalités d'exécution des engagements pris par la République du Congo. Les intérêts sur la somme de 520 millions FRF devront donc courir à compter du 31 décembre 2003 et jusqu'au parfait paiement de la dette par la République du Congo (la date du 7 janvier 2011 fixé par le cabinet Mazars n'ayant plus d'application dans la mesure où le Tribunal Arbitral ne retient pas la méthode utilisée par celui-ci) à un taux d'intérêt de 10% avec capitalisation annuelle au 31 décembre de chaque année.

**316.** La République du Congo doit donc payer à Commisimpex, en exécution du Protocole de 2003, un montant de 520.000.000 FRF soit 79.273.488,96 euros[125] + 941.141.586 FRF soit 143.476.109,86 euros = 222.749.598, 82 euros plus intérêts de 10% l'an avec capitalisation

---

[122]   Rapport Mazars du 7 janvier 2011, page 11, n° 2.2.3.
[123]   Pièce C27, Article 3 du Protocole de 2003.
[124]   Rapport Mazars du 7 janvier 2011, page 10.
[125]   Taux de conversion applicable : 6,55957 FRF= 1 euro.

annuelle au 31 décembre, sur la période entre le 31 décembre 2003 et jusqu'au parfait paiement ;

        D.    <u>La répartition de la charge des frais de l'arbitrage</u>

**317.** L'article 31 (3) du Règlement d'arbitrage laisse au Tribunal Arbitral la liberté de décider de la charge des frais de l'arbitrage.

**318.** Les frais de l'arbitrage tels que fixés par la Cour Internationale d'Arbitrage lors de sa session du 9 janvier 2013 s'élèvent à US$ 1,140,000. Commisimpex indique que ses propres frais (honoraires, frais de déplacement) s'élèvent, au 2 novembre 2012, à 4 282 791 Euros (5 163 998 Euros- 881 207 Euros) tandis que ceux de la République du Congo s'élèvent à 2 674 300 Euros. Chacune des parties demande que son adversaire supporte l'intégralité de ses frais.

**319.** Le Tribunal Arbitral relève que si la Demanderesse a succombé pour une partie de ses demandes, en raison de l'absence de condamnation relative à la part des 440.000.000 FRF, qui se confond avec les montants dus au titre de la sentence de 2000, et de la réduction des intérêts y relatifs, la République du Congo succombe pour l'essentiel : son exception d'incompétence a été rejetée par la Sentence Partielle du 20 août 2010; son exception d'autorité de la chose jugée l'a été par la présente sentence, qui a par ailleurs écarté ses objections à la validité du Protocole de 2003 et la condamne à l'exécuter.

**320.** Pour toutes ces raisons, le Tribunal Arbitral décide que la République du Congo doit supporter 75% des frais d'arbitrage fixés par la Cour Internationale d'Arbitrage à US$ 1,140,000. Commisimpex ayant avancé 100% de la provision d'arbitrage, la République du Congo doit donc lui verser US$ 855,000 au titre des frais de l'arbitrage.

**321.** En ce qui concerne les frais légaux supportés par les parties, le Tribunal Arbitral décide que la République du Congo doit être condamnée à rembourser 75% des frais raisonnables de Commisimpex et que Commisimpex doit être condamnée à rembourser à la République du Congo 25% de ses frais raisonnables. Le Tribunal Arbitral constate une disparité significative entre le montant des frais légaux exposés par Commisimpex- 4.282.791 Euros- et le montant de ceux exposés par la République du Congo-2.674.300 Euros. Il est certain que chaque partie est libre de consacrer à une procédure les moyens financiers qui lui paraissent nécessaires, mais il l'est tout autant que ceci ne justifie pas que la partie qui succombe en tout ou en partie soit tenue de supporter les conséquences des choix de l'autre partie à cet égard. En l'espèce, le Tribunal Arbitral estime que compte tenu des caractéristiques du litige, le montant des frais raisonnables de Commisimpex doit être arrêté à 3.500.000 Euros. Il en résulte que la République du Congo doit être condamnée à rembourser 75% des frais raisonnables de Commisimpex, soit 3.500.000 Euros X 75% = 2.625.000 Euros et que Commisimpex doit être condamnée à rembourser à la République du Congo 25% de ses frais, soit 2.674.300 Euros X 25% = 668.575 Euros. Par conséquent, la République du Congo sera condamnée à rembourser à Commisimpex la somme de 2.625.000 Euros – 668.575 Euros= 1.956.425 Euros au titre de ses frais légaux.

**PAR CES MOTIFS, LE TRIBUNAL ARBITRAL :**

1) Déclare que les demandes de Commisimpex relatives au jugement de mise en liquidation judiciaire du 30 octobre 2012 sont donc recevables et retient sa compétence pour en connaitre pour autant qu'elles portent sur les effets de ce jugement sur la procédure arbitrale ;

2) Déclare que les exigences de l'ordre public international s'oppose à ce que la mise en liquidation de Commisimpex ait des effets dans la présente procédure arbitrale ;

3) Constate, le défaut de qualité des liquidateurs nommés pour représenter Commisimpex dans la présente procédure arbitrale ;

4) Rejette la demande de Commisimpex de remboursement par la République du Congo des frais engendrés dans le présent arbitrage par la procédure de liquidation.

5) Déclare qu'il est incompétent pour connaître des autres demandes de Commisimpex relatives à sa mise en liquidation judiciaire ou qu'elles ont été rendues dépourvues d'objet par les Ordonnances de Procédure no 7 et 9.

6) Rejette l'exception de chose jugée de la Sentence arbitrale du 3 décembre 2000 rendue dans l'affaire CCI n°9899 opposée par la République du Congo ;

7) Constate, à la majorité, la validité du Protocole du 23 août 2003 et son caractère contraignant pour les parties ;

8) Constate que les montants dus par la République du Congo au titre de l'article 1$^{er}$ du Protocole du 23 août 2003 sont ceux qui lui ont été alloués par la Sentence arbitrale du 3 décembre 2000 ;

9) Donne acte à Commisimpex de sa demande de déduction de ces montants des condamnations que prononcerait le Tribunal Arbitral et, ayant effectué cette déduction ne prononce aucune condamnation au titre de l'article 1$^{er}$ du Protocole du 23 août 2003 ;

10) Condamne la République du Congo à payer à Commisimpex, au titre des articles 2 et 3 du Protocole du 23 août 2003, la somme de 222.749.598, 82 Euros plus intérêts de 10% l'an avec capitalisation annuelle au 31 décembre, sur la période entre le 31 décembre 2003 et jusqu'au parfait paiement ;

11) Décide que la République du Congo devra supporter 75% des frais de l'arbitrage fixés par la Cour Internationale d'Arbitrage de la CCI à US$ 1,140,000 et que Commisimpex devra supporter 25% de cette somme ;

12) En conséquence, condamne la République du Congo à verser US$ 855,000 ;

13) Condamne la République du Congo à rembourser à Commisimpex la somme de 1.956.425 Euros au titre de ses frais légaux ;

14) Rejette toutes les autres demandes des parties.


Lieu de l'arbitrage : Paris (France)
Date:  /  /2013
Signatures:


Yves DERAINS
Président


Bernard HANOTIAU

Arbitre


Carole MALINVAUD

Arbitre

# EXHIBIT 3B

# **Translation**



**International Chamber of Commerce**

*The world business organization*

**International Court of Arbitration ● Cour internationale d'arbitrage**

# AWARD

**ICC International Court of Arbitration ● Cour internationale d'arbitrage de la CCI**

38, Cours Albert 1er, 75008 Paris, France
Telephone +33 1 49 53 28 28   Fax +33 1 49 53 29 33
Web site www.iccarbitration.org    E-mail arb@iccwbo.org

# ICC INTERNATIONAL COURT OF ARBITRATION

## CASE No. 16257/EC/ND/MCP

COMMISSIONS IMPORT EXPORT S.A., USING THE BUSINESS NAME COMMISIMPEX

(Rep. of the Congo)

v.

REPUBLIC OF THE CONGO

(BRAZZAVILLE) (Republic of the Congo)

This document is an original version of the Final Award rendered pursuant to the ICC International Court of Arbitration's Rules of Arbitration.

INTERNATIONAL CHAMBER OF COMMERCE

FINAL AWARD

ICC Case No. 16257/EC/ND/MCP

**BETWEEN:**

**COMMISSIONS IMPORT EXPORT S.A.,** using the business name "Commisimpex" with its headquarters at 86, avenue Foch, Quartier Cathédrale, BP 1244 Brazzaville, **REPUBLIC OF THE CONGO;**

Represented by Mr. Michael Polkinghome, Mr. Charles Nairac, Mr. Christophe Seraglini and Mrs. Elizabeth Lefebvre-Gross, WHITE & CASE, 19 place Vendôme, 75001 Paris, **FRANCE**

Claimant,

Hereinafter "Commisimpex" or the "Claimant"

**AND:**

**THE REPUBLIC OF THE CONGO,** President of the Republic, Palais Présidentiel, Quartier Plateau, Brazzaville, **REPUBLIC OF THE CONGO;**

Represented by Mr. Jean-Pierre Vignaud, Mr. Jean-Yves Garaud and Mr. Charles de Taffin, CLEARY, GOTTLIEB, STEEN & HAMILTON LLP., 12 rue de Tilsitt, 75008 Paris, **France,**

Respondent,

Hereinafter "the Congo" or "Republic of the Congo" or "Respondent"

# **TABLE OF CONTENTS**

I.    FACTS ................................................................................................................... 3
II.   PROCEDURE .......................................................................................................... 4
III.  POSITION OF THE PARTIES ................................................................................ 32
      A.  Position of the Claimant ............................................................................... 32
      B.  Position of the Respondent ........................................................................... 38
IV.   DISCUSSION ........................................................................................................ 45
      •   PRELIMINARY MATTERS ARISING FROM THE COURT-ORDERED LIQUIDATION
          OF COMMISIMPEX ........................................................................................ 45
      •   THE DISPUTE BETWEEN THE PARTIES ......................................................... 52
          A.   Regarding the *res judicata* effect of ICC Award No. 9899 dated 3 December 2000 ...... 52
          B.   Regarding the validity of the 2003 Protocol and its binding nature ............................... 54
               a.  Regarding the alleged absence of authority of the signatories
                   of the 2003 Protocol ..................................................................... 54
               b.  Regarding the alleged non-binding nature of the 2003 Protocol ........................... 59
               c.  Regarding the ignorance of the amount of the debt-as presented
                   in the 2003 Protocol ..................................................................... 64
               d.  Regarding the alleged absence of *causa* of the 2003 Protocol ........................ 65
          C.   Regarding the amounts owed by the Republic of the Congo to Commisimpex ................. 73
               a.  The 440,000,000 FRF debt (Article 1 of the 2003 Protocol) ............................ 74
               b.  The 520,000,000 FRF debt (Articles 3 and 4 of the 2003 Protocol) ...................... 76
          D.   Allocation arbitration costs .......................................................................... 78

## I.    <u>FACTS</u>

**1.**   From 1984 to 1986, Commisimpex and the Republic of the Congo executed several contracts for public works and the supply of equipment and amendments to these contracts[1], financed by means of credit granted by Commisimpex in favor of the State, in the form of promissory notes issued by the *Caisse Congolaise d'Amortissement* (hereinafter "CCA") to be guaranteed by the State. The completion of such works was verified by means of completion certificates.

**2.**   On 22 December 1986, the Republic of the Congo, represented by its Ministry of Finance and Budget and the *Caisse Congolaise d'Amortissement*, issued to Commisimpex a guarantee for payment of certain contracts and addenda executed with this guarantee, subject to their complete performance (hereinafter the "1986 Guarantee").

**3.**   Commisimpex and the Republic of the Congo signed on 14 October 1992 Protocol No. 566 (hereinafter the "1992 Protocol," Exhibit C-5). The 1992 Protocol intended to establish the terms of settlement of the *"outstanding debts"* to repay the suppliers' credits granted by Commisimpex for the *"contracts and addenda attached as appendices to this protocol"*.[2] The *"outstanding debts"* were denominated in French francs, pounds sterling, US dollars and CFA francs; representing approximately 22 billion CFA francs.

**4.**   In its request for arbitration submitted to the International Court of Arbitration of the ICC (hereinafter the "International Court of Arbitration") on 13 March 1998 (Exhibit R-2), in case No. 9899, Commisimpex requested that the Republic of the Congo and CCA be ordered to pay amounts not settled pursuant to the 1992 Protocol. Pursuant to the final award rendered on 3 December 2000 (Exhibit C14), the then arbitral tribunal ordered the Republic of the Congo and the CCA to jointly and severally pay 107 million US Dollars, limiting the award to the amount corresponding to the former promissory notes returned by Commisimpex.

The award was held to be enforceable by the Paris *Tribunal de Grande Instance* on 12 December 2000. The Congo and CCA filed an appeal for nullity before the Court of Appeal of Paris on 2 January 2001, which was rejected on 23 May 2002.

**5.**   On 23 August 2003, Commisimpex, on the one hand and Mr. Gabriel Longobé, designated minister, Secretary General of the Office of the President of the Republic, and Mr. Jean-Dominique Okemba, Secretary of State, Secretary General of the Security Council, on the other, executed Protocol No. 706 (hereinafter the "2003 Protocol") (Exhibit C27). The 2003 Protocol established the procedures for the repayment of the debt of the Republic of the Congo, which was considerably higher than that set out in the 1992 Protocol and estimated at 48 billion CFA francs as of 30 September 1992. The 2003 Protocol described *"the debt of the*

---

[1]   Contract 353/83 was executed by the Congo and the company APV Hall International Limited on 10 November 1983 (Exhibit C-40). Commisimpex and the State then executed addenda Nos. 1, 3, 4 and 5 to Contract 353/83 (Exhibits R-23, R-24, R-21 and R-22); as well as Contract 185/84 dated 25 June 1984 (Exhibit R-6); Contract 83/85 dated 24 June 1985 and addendum No. 1 thereto (Exhibits R-25 and R-26); Contract 009/86/G dated 12 February 1986 (Exhibit R-19); contract 015/86 dated 26 March 1986 and addendum No. 1 thereto (Exhibits R-4 and R-20) and Contract 53/86 dated 1 July 1986 (Exhibit R-5).

[2]   The appendix to the 1992 Protocol, however, has not been communicated in these proceedings.

*Congolese State"* as comprising a *"first portion"* of 22 billion CFA francs, [that was] *"the subject of the [1992] Protocol,"* and a *"second portion"* of 26 billion CFA francs. The 2003 Protocol provided for the State to agree to *"execute with Commisimpex a Definitive Protocol replacing the present Protocol, to close out the negotiations in progress"* (Article 6).

**6.** This dispute relates to the effects of the 2003 Protocol, the enforcement of which is requested by Commisimpex, which argues that this Protocol amounts to the acknowledgement by the Republic of the Congo of its total debt to Commisimpex, while the Republic of the Congo claims that it is null and void. According to the Congo, the issue of its debt owed to Commisimpex was definitively settled by the 1992 Protocol and by the arbitral tribunal established in ICC case No. 9899, which led to an award carrying the *res judicata* effect.

## II. <u>PROCEDURE</u>

**7.** On 21 April 2009, the Secretariat of the International Court of Arbitration of the ICC (hereinafter the "ICC Secretariat") acknowledged receipt of the request for arbitration submitted by Commisimpex on 17 April 2009. The Claimant noted that it wished the matter to be submitted to a panel of three arbitrators and appointed Professor Bernard Hanotiau as arbitrator.

**8.** On 22 April 2009, the ICC Secretariat conveyed this request for arbitration to the Republic of the Congo.

**9.** On 4 and 5 May 2009, the Claimant forwarded to the ICC Secretariat a letter accompanied by a two page modification to its request for arbitration, receipt of which the Secretariat acknowledged on 6 May 2009.

**10.** On 26 May 2009, the firm Cleary Gottlieb informed the ICC Secretariat that it represented the Respondent in this matter and indicated that the Respondent, having agreed that the matter be submitted to a panel of three arbitrators, appointed Me. Carole Malinvaud as an arbitrator.

**11.** On 3 June 2009, the ICC Secretariat forwarded a copy of the statement of acceptance and independence of Me. Carole Malinvaud to the parties.

**12.** On 4 June 2009, the ICC Secretariat forwarded a copy of the statement of acceptance and independence of Professor Bernard Hanotiau to the parties.

**13.** On 8 June 2009, the Respondent informed the ICC Secretariat that it intended to challenge the existence, the scope and the validity of the arbitration clause invoked by the Claimant in its request. The Respondent added that it agreed that the place of arbitration would be Paris and that the arbitration would be conducted in French.

**14.** On the same day, the Claimant accepted the proposal of the Respondent regarding the joint appointment of the Chair of the Arbitral Tribunal by the co-arbitrators and suggested a deadline for this appointment of 30 June 2009.

**15.** On 11 June 2009, the ICC Secretariat requested whether the parties would, if the arbitration were to take place, agree to a special term to be granted to the co-arbitrators as of the date on which they receive notification of their confirmation in order to attempt to jointly appoint the Chairman of the Arbitral Tribunal.

**16.** On 18 June 2009, the parties stated by their respective letters to the ICC Secretariat that the co-arbitrators had a term of three weeks as of the date on which they received notification of their confirmation to jointly appoint the Chairman of the Arbitral Tribunal. The ICC Secretariat acknowledged receipt of these letters on 19 June 2009.

**17.** On 25 June 2009, the Responded requested an additional term of fifteen days, i.e. through 10 July 2009, to submit its response to the request for arbitration.

**18.** On 26 June 2009, the Claimant indicated its hope that the Respondent would submit its response to the request for arbitration as soon as possible.

**19.** On 29 June 2009, the ICC Secretariat extended the term granted to the Respondent to submit its response to the request for arbitrationuntil 6 July 2009.

**20.** On 8 July 2009, the ICC Secretariat acknowledged receipt of the response to the request for arbitration from the Respondent, dated 6 July 2009.

**21.** On 17 July 2009, the Claimant forwarded its comments regarding the objections to the jurisdiction of the Tribunal put forth by the Respondent. The ICC Secretariat acknowledged receipt of this letter on 20 July 2009.

**22.** On 30 July 2009, the ICC Secretariat informed the parties that the International Court of Arbitration of the ICC had decided that the arbitration would take place pursuant to Article 6 (2) of the Rules and confirmed Professor Bernard Hanotiau and Me. Carole Malinvaud as co-arbitrators.

**23.** On the same date, the ICC Secretariat informed the co-arbitrators that they had 21 days to jointly appoint the Chairman of the Arbitral Tribunal.

**24.** On 7 August 2009, Me. Carole Malinvaud informed the ICC Secretariat that she and Professor Hanotiau jointly proposed that Me. Yves Derains be Chairman of the Arbitral Tribunal.

**25.** On 10 August 2009, Professor Bernard Hanotiau confirmed to the ICC Secretariat that he and Me. Carole Malinvaud had jointly proposed that Me. Yves Derains be Chairman of the Arbitral Tribunal.

**26.** On 14 August 2009, the ICC Secretariat forwarded to the parties a copy of the statement of acceptance and independence of Me. Yves Derains.

**27.** On 28 August 2009, the Secretary General of the International Court of Arbitration of the ICC confirmed Me. Yves Derains as the Chairman of the Arbitral Tribunal, and the Tribunal was thus established as follows:

Professor Bernard Hanotiau
HANOTIAU & VAN DEN BERG
IT Tower, 9th Floor
480 Avenue Louise – Box 9
1050 Brussels
Belgium
Tel.:     +32 2 290 39 00
Fax:     +32 2 290 39 39
Email:  Bernard.hanotiau@hvdb.com
(Co-arbitrator)

Me. Carole Malinvaud
GIDE LOYRETTE NOUEL
26, Cours Albert 1[er]
75008 Paris
France
Tel.:     +33 (0) 1 40 75 36 66
Fax:     +33 (0) 1 40 75 69 36
Email:  malinvaud@gide.com
(Co-arbitrator)

Me. Yves Derains
DERAINS & GHARAVI
25 rue Balzac
75008 Paris
France
Tel.:     +33 (0) 1 40 55 51 00
Fax: +33 (0) 1 40 55 51 05
Email:  yvesderains@derainsgharavi.com
(Chairman of the Arbitral Tribunal)

**28.** On the same date, the case file was forwarded to the arbitrators.

**29.** On 11 September 2009, the Arbitral Tribunal forwarded the drafts of the Terms of Reference and Procedural Order No. 1 to the parties, in order to obtain their comments as well as a summary of their positions.

**30.**     On 21 September 2009, the parties forwarded their comments regarding the Terms of Reference as well as the summary of their positions to the Arbitral Tribunal.

**31.**     On 24 September 2009, the Arbitral Tribunal forwarded another draft of the Terms of Reference incorporating the positions of the parties as well as their comments.

**32.**     On 30 September 2009, the Claimant made a new request for reparation of non-pecuniary harm.

**33.**     On 1 October 2009, a meeting between the Arbitral Tribunal and the parties was held in Paris.

**34.**     On the same day, the Arbitral Tribunal forwarded to the International Court of Arbitration the Terms of Reference signed by the parties and the Tribunal.

**35.**     On the same day, the Arbitral Tribunal also forwarded to the parties Procedural Order No. 1, which read as follows:

> *"Whereas on 1 October, a meeting was held in Paris before the Arbitral Tribunal, the parties and their counsel;*
>
> *Whereas on the same date, the parties executed the Terms of Reference;*
>
> *Whereas Me. Catherine Schroeder was appointed as Secretary of the Arbitral Tribunal;*
>
> *Whereas by letter dated 30 October 2009 the Claimant reported that it was not at that time able to discuss the provisional calendar:*
>
> **The Arbitral Tribunal holds as follows:**
>
> **1.     Provisional Calendar**
>
> *1.1.1    The Parties will attempt to jointly establish a provisional calendar and will report on the status of their discussions to the Arbitral Tribunal by 16 October 2009.*
>
> *1.1.2    A conference call between the Parties and the Arbitral Tribunal will take place on 20 October in order to finalize the provisional calendar.*
>
> **2.     Exchange of Submissions**
>
> *2.1     The Parties may submit their arguments of fact and of law in two successive exchanges of briefs, according to the established calendar.*
>
> *2.2     The briefs must be submitted in A4 or A5 format and in electronic version (Word and PDF).*
>
> *2.3     The briefs of the parties must include all arguments of fact and all arguments of law justifying the conclusions reached, in the form of numbered paragraphs. The parties shall make separate submissions, specifically numbering each of their arguments.*
>
> *2.4     In their briefs, the parties shall indicate the nature of the evidence that they intend to submit to support their arguments of fact (exhibits, witness statements, expert opinions, etc.) or of law (extracts of case law or legal scholarship, with complete references). The briefs shall be accompanied by a table of contents.*
>
> *2.5     The exhibits submitted by the parties to the Arbitral Tribunal shall be numbered sequentially (for the Claimant, "C-..."; for the Respondent, "R-...") and attached to the briefs to which they correspond. They will furthermore be accompanied by a list indicating the date and the author of each of them; this list will be updated by the parties whenever a new exhibit is submitted. The appendices containing passages of case law or legal scholarship will be numbered sequentially (for the Claimant, "CL-..."; for the Respondent, "RL-...").*

2.6     Exhibits submitted to the Arbitral Tribunal must be submitted in their entirety and the specified passages must be identified.  Photocopies will be sufficient, unless the opposing party challenges the authenticity of the document, in which case the Arbitral Tribunal may request the production of the original document or of a certified copy of the original.

2.7     One party may request that the opposing party submit any document which it does not have if the same is in possession of it or, [if it is] under the control of the opposing party, if the document is sufficiently identified and relevant to the resolution of the dispute.

        If the party to whom such a request was submitted refuses to comply, the Arbitral Tribunal can order the production of the document(s) in question, upon request by the concerned  party.  The parties must make any claims to the Arbitral Tribunal jointly, on the date indicated in the provisional calendar above.  This joint request must identify the document(s) in a sufficiently clear manner and must indicate how the document(s) is (are) relevant ("Redfern Schedule").  The Arbitral Tribunal shall have full authority to rule and shall in particular take into consideration the legitimate interests of the party to which the production request was sent.  IF a document was considered confidential by the party receiving the request, it shall so inform the Arbitral Tribunal and the opposing party.  The Arbitral Tribunal shall then take all measures necessary to ensure that this document is protected while making an effort, to the extent possible, to authorize its production.

        The Arbitral Tribunal shall freely evaluate and determine the consequences of any refusal by a party to comply with the order to produce documents.

2.8     The Arbitral Tribunal may also at any time request that either of the parties submit a document that it deems relevant for resolution of the dispute.

2.9     The parties shall not be authorized to submit new exhibits after the exchange of submissions, subject to express authorization by the Arbitral Tribunal.

## 3.     Testimony by witnesses and experts

3.1     Any person may be heard, including the parties and their managers.

3.2     The parties shall submit written statements of the witnesses indicated in their submissions, as attachments thereto, except for witnesses that are under the control of the opposing party or those who refuse to testify.

3.3     Only the witnesses that are requested to be cross-examined by a party shall testify.  The appearance of others will be waived, unless the Arbitral Tribunal wishes to hear from them.  If one party does not require the cross-examination of a witness, it shall nonetheless not be considered to have accepted the contents of that witness' affidavit.  In this case, it will be at the sole discretion of the Arbitral Tribunal to attribute value to the affidavit.

3.4     Witnesses / experts shall in principle be summoned by the party from which they provided a written statement or a report.

3.5     When a summoned witness is subject to  the control of the opposing party, that party will use its best endeavors to have the witness appear.

3.6 If a duly summoned witness cannot appear for a valid reason, that witness' written statement may nevertheless be taken into consideration by the Arbitral Tribunal, according to the circumstances and inasmuch as it is not challenged.

3.7 The hearings for witnesses and experts shall in principle take place according to the following procedure:

a. The witnesses and experts shall first be invited by the Arbitral Tribunal to confirm their written statement. This shall take place under direct examination subject to a possible brief introduction.

b. Notwithstanding an order to the contrary by the Arbitral Tribunal, witnesses and experts whose statements were delivered in a written statement will be questioned only by the counsel for the opposing party ("cross examination").

c. The counsel for the opposing party shall, if it requests, have the opportunity to ask questions related to the answers given (re-examination); the opportunity will then be offered to the counsel of the other party to ask additional questions.

d. The Arbitral Tribunal may ask witnesses and experts questions at any time and may authorize additional questioning.

3.8 If it is deemed necessary, the experts may begin with an introduction, which must, however, be brief.

3.9 The Arbitral Tribunal reserves the right to hear from several witnesses or experts simultaneously, in order to be able to compare their points of view.

3.10 The representatives of the parties may attend all hearings; the witnesses and the experts may only attend after their hearing.

3.11 The costs related to hearing a witness or an expert shall be borne by the party that summoned that witness or expert, subject to the final award of the Arbitral Tribunal regarding the distribution of such expenses. If a witness is summoned by both parties, the party under whose control this witness is shall bear the costs related to his testimony. If a witness is not under the control of either party, the costs related to his testimony shall be divided evenly between the parties.

3.12 Testimony hearings shall have minutes drawn up in French, prepared by a stenographer, the costs of which shall be advanced in equal parts by the parties."

**36.** On 16 October 2009, the Claimant informed the Arbitral Tribunal of the status of the discussions between the parties regarding the provisional calendar, indicating that they would like the Arbitral Tribunal to rule, by way of a partial award, on the matter of its jurisdiction, before any substantive consideration of the merits of the parties' claims. The Claimant forwarded a provisional calendar prepared by the parties in the event that the Tribunal granted this request.

**37.** On the same day, the Respondent stated that, for its part, the matter of jurisdiction was tied to the merits, but that it would defer to the wisdom of the Tribunal. The Respondent added that in the event that the Arbitral Tribunal accepted the bifurcation of the proceedings, such bifurcation should cover all procedural pleas and that it was only in that case that it

would accept the calendar established by Commisimpex. Otherwise, it confirmed that it was in agreement to establish a provisional calendar with the Claimant.

**38.** On 19 October 2009, the Arbitral Tribunal acknowledged receipt of the respective letters of the parties and confirmed the conference call that was to take place between the parties and the Tribunal on 20 October 2009 in order for them to state their respective positions. On 20 October 2009, a conference call took place between the parties and the Arbitral Tribunal.

**39.** On the same day, the counsel for the Respondent forwarded to the Arbitral Tribunal its power of attorney to represent Republic of the Congo, signed by Ambassador Lopès.

**40.** On the same day, the Arbitral Tribunal forwarded Procedural Order No. 2 to the parties, which specified that:

> *"Whereas pursuant to Procedural Order No. 1, the parties have, by letters dated 16 October 2009, informed the Arbitral Tribunal of the status of their discussions regarding the establishment of a procedural calendar;*
>
> *Whereas the parties have reported their respective positions regarding the bifurcation of the proceedings during a conference call between them and the Arbitral Tribunal on 20 October 2009;*
>
> ***The Arbitral Tribunal holds as follows:***
>
> *1.1 The Arbitral Tribunal accepts the provisional calendar established by the parties, assuming that the bifurcation takes place, as follows:*
>
> > *- Memorial of the Respondent regarding jurisdiction and procedural pleas: 11 December 2009;*
> >
> > *- Counter-Memorial from the Claimant: 29 January 2010;Reply from*
> >
> > *- Reply from the Respondent: 26 February 2010;*
> >
> > *- Rejoinder from the Claimant: 26 March 2010.*
> >
> > *- A hearing is scheduled for 26 April 2010.*
>
> *1.1.1 The Arbitral Tribunal reserves the right, after these two exchanges of briefs, or upon completion of the scheduled hearing, to adjourn any plea as to jurisdiction and/or procedure on the merits if it believes that it has insufficient information to rule on these matters."*

**41.** On 29 October 2009, the Claimant requested that the Respondent provide a power of attorney signed before a notary as well as a copy of the documents demonstrating the authority of Ambassador Lopès to make commitments on behalf of the Congo.

**42.** On the same day, the Arbitral Tribunal invited the Respondent to submit its comments regarding the letter of the Claimant by 3 November 2009.

**43.**     On 3 November 2009, the Respondent challenged the submission of a power of attorney having to be signed by a notary, as such is not required by French law proposed instead, a presumption of an *ad litem* mandate in favor of the attorneys.

**44.**     On 5 November 2009, the Claimant stated that it was satisfied with the assurances provided by the Respondent as to its capacity to represent the Republic of the Congo.

**45.**     On the same date, the Respondent informed the ICC Secretariat that it considered this proceeding to be abusive and reported significant financial difficulties.

**46.**     On 6 November 2009, the Arbitral Tribunal acknowledged receipt of the respective letters from the parties and noted that the matter of the representation of the Respondent was now settled.

**47.**     On 12 December 2009, the Respondent its sent Memorial on Jurisdiction to the Arbitral Tribunal and to the Claimant.

**48.**     On 29 January 2010, the Claimant sent its Counter-Memorial Jurisdiction to the Arbitral Tribunal and to the Respondent.

**49.**     On 26 February 2010, the Responde sent
nt its Reply on Jurisdiction to the Arbitral Tribunal and to the Claimant.

**50.**     The International Court of Arbitration, during its session on 11 March 2010, pursuant to Article 24 (2) of the Rules, extended the term for issuing a Final Award through 30 June 2010.

**51.**     On 26 March 2010, the Claimant it sent
s Rejoinder on Jurisdiction to the Arbitral Tribunal and to the Respondent.

**52.**     On 8 April 2010, the Arbitral Tribunal confirmed to the parties that a hearing would take place on 26 April 2010.

**53.**     On 14 April 2010, the Arbitral Tribunal received a letter from the Claimant reporting that an agreement had been reached by the parties regarding the procedures for organizing the hearing, subject to the approval of the Arbitral Tribunal.

**54.**     On the same day the Arbitral Tribunal acknowledged receipt of the letter from the Claimant and approved the procedures for organizing the hearing.

**55.**     By letter dated 22 April 2010, the Arbitral Tribunal forwarded to the parties an email that read as follows:

> *"The Arbitral Tribunal would appreciate if the parties were willing to present their views at Monday's hearing regarding the notion and the legal consequences of the 'registration by CCA of the Commisimpex debt as a debt owed by the State which appears in the reasoning of two Congolese first instance decisions:*
> -         *'order that the* Caisse Congolaise d'Amortissement (CCA) *record all these amounts as a debt owed by the State etc....' (C 20 pp. 34 and 35).*

-       *'order the* Caisse Congolaise d'Amortissement (CCA) *to record the totality of the amounts owed confirmed by Commisimpex, acknowledged and ordered per the hearing sheet dated 27 March 2002 etc....' (C24, pp. 47-49)."*

**56.**     The hearing was held on 26 April as scheduled.  During the hearing, it was decided that the parties would inform the Arbitral Tribunal whether, and within what term, they would be prepared to submit the elements of Congolese law specifying the nature of recording a debt as a debt owed by the State.

**57.**     On 3 May 2010, the Arbitral Tribunal set a term ending on 7 May 2010 to the parties for providing such information.

**58.**     At the request of the Respondent, this term was extended to 19 May 2010 by letter from the Arbitral Tribunal dated 10 May 2010.  In the same letter, the Arbitral Tribunal ordered that the proceedings be closed, pursuant to Article 22 (1) of the ICC arbitration rules.

**59.**     By letter dated 11 May 2010, the Arbitral Tribunal specified that, in the event that the Claimant made a request after examination of any documents submitted by the Respondent, it would take appropriate measures.

**60.**     By letter dated 19 May 2010, the Respondent submitted the following texts of Congolese Law:

-       Law No. 1.2000 dated 1 February 2000, the institutional act relative to the State financial system;
-       Decree No. 2000-187 dated 10 August 2000, regarding the general regulation on public accounting.

**61.**     The Claimant did not make any request whatsoever after these texts were submitted.

**62.**     On 9 June 2010, the Arbitral Tribunal acknowledged receipt, as a matter of form, of the texts of Congolese law submitted by the Respondent on 19 May 2010.

**63.**     The International Court of Arbitration, during its session on 10 June 2010, pursuant to Article 24 (2) of the Rules, extended the term for rendering the Final Award to 31 August 2010.

**64.**     On 20 August 2010, the Arbitral Award rendered its Partial Award, which was notified to the parties by the Secretariat of the Court on 24 August 2010.  In this award, the Arbitral Tribunal held that:

*"1) The Arbitral Tribunal declares itself competent to settle this dispute;*

*2) The Arbitral Tribunal assigns the matter of the* res judicata *effect of the arbitration award dated 3 December 2000 rendered in ICC Case No. 9899 to the merits of this case;*

*3) The allocation of costs of the arbitration corresponding to this phase of the proceeding will be decided in the final award;*

> *4) All other claims of the parties are assigned for consideration during discussion of the merits."*

In order to issue this award, the Arbitral Tribunal based its decision on the following arbitration clause:

> *"In the event of a disagreement as to the interpretation, performance or any other difficulties of the parties relative to the present protocol, the parties agree to work together to reach an amicable settlement; absent the same, the dispute shall be resolved by one or several arbitrators appointed pursuant to the arbitration rules of the International Chamber of Commerce (Paris), ruling in the first and final instance."*

appearing in Article 10 of the Protocol dated 14 October 1992, the signatories of which are the Republic of the Congo and Commisimpex, and which is applicable in the case before us as stated by the Partial Award dated 20 August 2010. Since this clause is silent as to applicable law, it was decided, by agreement of the parties, that the applicable law was French law (Item VIII of the Terms of Reference).

**65.** On 2 September 2010, the Arbitral Tribunal informed the parties that the International Court of Arbitration, in its session dated 12 August 2010, had extended the term for rendering the Final Award through 30 November 2010.

**66.** On 7 September 2010, the Arbitral Tribunal requested that the parties forward their proposals regarding proceedings as to the merits by 17 September 2010, adding that after this submission a conference call would take place with the Arbitral Tribunal.

**67.** On 17 September 2010, the Claimant stated that the parties were in the process of preparing a joint calendar and that they would contact the Arbitral Tribunal within the next several days with a joint proposed calendar. They also requested that the conference call be postponed to a later date.

**68.** On 20 September 2010, the Arbitral Tribunal acknowledged receipt of the email from the Claimant dated 20 September 2010 and noted that the scheduled conference call would not take place. On the same day, the Arbitral Tribunal proposed other dates to the parties for holding this conference call.

**69.** After discussion with the parties, the Arbitral Tribunal stated on 23 September 2010 that the conference call would be held on 30 September 2010.

**70.** On 27 September 2010, the Claimant informed the Arbitral Tribunal that the parties had agreed on the procedural calendar. On the same date, the Arbitral Tribunal acknowledged receipt of this message.

**71.** On 30 September 2010, a conference call was held between the Arbitral Tribunal and the parties.

**72.** On 4 October 2010, the Arbitral Tribunal forwarded Procedural Order No. 3 to the parties, which read as follows:

> *"Whereas a conference call was held between the Arbitral Tribunal and the parties on 30 September 2010, in order to organize the proceedings as to the merits;*

*Whereas the parties indicated that they had agreed to the following dates for submission of their respective briefs:*

> *- Memorial, 10 January 2011;*
> *-Counter-Memorial, 10 May 2011;*
> *- Reply, 10 August, 2011;*
> *- Rejoinder, 10 November 2011.*

*Whereas it was scheduled that the parties would inform the Arbitral Tribunal on 18 November 2011 of the names of witnesses that they wished to be heard at the hearing;*
*Whereas a conference call was scheduled to prepare for the hearing between the Arbitral Tribunal, which could be represented by its Chairman, and the parties, on 23 November 2011 at 6 p.m.;*
*Whereas the dates of 19 December through 23 December 2011 were selected for holding the hearing as to the merits in Paris, with the understanding that it is possible that not all the days would be used.*

### *THE ARBITRAL TRIBUNAL HOLDS:*

1. *The following schedule is adopted:*

| Procedural Act | Date | Parties |
|---|---|---|
| *Memorial* | *10 January 2011* | *Claimant* |
| *Counter-Memorial* | *10 May 2011* | *Respondent* |
| *Reply* | *10 August 2011* | *Claimant* |
| *Rejoinder* | *10 November 2011* | *Respondent* |
| *Names of witnesses to be heard at the hearing* | *18 November 2011* | *Claimant / Respondent* |
| *Conference call* | *23 November 2011* | *Arbitral Tribunal (Chairman) / Parties* |
| *Hearing* | *19 to 23 December 2011* | *Arbitral Tribunal / Parties* |

2.      *The provisions of Procedural Order No. 1 remain applicable."*

**73.**     On 17 November 2010, the Arbitral Tribunal informed the parties that the International Court of Arbitration had, in its meeting on 10 November 2010, and pursuant to Article 24 (2) of the ICCRules, extended the term for the submission of the Final Award to 31 May 2011.

**74.**     On 10 January 2011, the Claimant submitted its Memorial.

**75.**     On 9 May 2011, the Respondent informed the Arbitral Tribunal that it was not able to submit its Counter-Memorial by 10 May and requested, by agreement with the Claimant, an extension to 15 May 2011.  On the same date, the Arbitral Tribunal acknowledged receipt of the letter from the Respondent and agreed to the extension of the term to 15 May 2011.

**76.**     On 10 May 2011, the Claimant acknowledged the extension, which it had approved of, emphasizing that the rest of the procedural calendar would be unchanged.  On the same date, the Arbitral Tribunal acknowledged receipt of the letter from the Claimant.

**77.**     On 16 May 2011, the Respondent sent its Counter-Memorial on the merits to the Arbitral Tribunal.

**78.**     On 17 May 2011, the ICC Secretariat informed the Arbitral Tribunal and the parties that, during its session on 12 May 2011, and pursuant to Article 24 (2) of theRules, the International Court of Arbitration had extended the term for rendering the Final Award to 31 March 2012.

**79.**     On 19 May 2011, the Arbitral Tribunal asked the parties whether they had taken the necessary steps regarding the booking of a room for the hearing.

**80.**     On 20 July 2011, the Claimant stated, on behalf of the parties, that they understood that the hearing would take place over a period of 4 days, from 19-22 December 2011, and that the hearing would take place in the offices of White and Case.  On the same day, the Arbitral Tribunal acknowledged receipt of the joint letter from the parties.

**81.**     On 11 August 2011, the Claimant sent its Reply on the merits to the Arbitral Tribunal.

**82.**     On 26 October 2011, the Arbitral Tribunal proposed changing the time of the conference call scheduled for 23 November 2011 and requested that the parties specify the items that they wished to deal with during the conference call no later than on 15 November.

**83.**     On 4 November 2011, the Arbitral Tribunal, in the absence of a response by one of the parties, confirmed the time change of the conference call.

**84.**     On 9 November 2011, the Respondent stated that it was not able to file its Rejoinder by 10 November 2011 and requested an extension to 20 November 2011.  On the same date, the Arbitral Tribunal acknowledged receipt of the letter from the Respondent and invited the Claimant to make any comments by 10 November 2011.  On the same date, the Claimant challenged this extension and requested that the

Arbitral Tribunal order the Respondent to submit its Rejoinder by 13 November 2011.  On 10 November 2011, the Arbitral Tribunal stated that it was aware of the request for an extension by the Respondent as well as the objections of the Respondent [sic] and extended the submission deadline for the Rejoinder to 15 November 2011, deeming the extension requested by the Respondent to be excessive.

**85.**    On 15 November 2011, the Claimant forwarded the points that it wished to cover during the conference call scheduled for 23 November 2011 to the Arbitral Tribunal.  On the same day, the Respondent also indicated the subjects that it thought should be covered.

**86.**    On 16 November 2011, the Respondent forwarded its Rejoinder to the Arbitral Tribunal.

**87.**    On the same day, the Arbitral Tribunal acknowledged receipt of the letters from the parties dated 15 November 2011 concerning the organization  of the hearing and indicated the agenda for the conference call to be held on 23 November 2011.

**88.**    On 18 November 2011, the parties informed the Arbitral Tribunal of the list of witnesses and experts that they wished to hear at the hearing.

**89.**    On 23 November 2011, the Claimant requested that the Arbitral Tribunal kindly accept the inclusion in the case of a new affidavit of Mr. Mbéri, witness, which was attached to his email.  On the same day, the Respondent made comments regarding the production of such an affidavit, stating that if the Arbitral Tribunal were to accept this submission, a term must be granted to the Respondent for it to submit an answer.

**90.**    On the same day, a conference call took place between the Arbitral Tribunal and the parties.

**91.**    On the same day, the Respondent stated that it had failed to mention during the conference call that the President of the Republic, Mr. Sassou N'Guesso, a witness, was not able to come to testify at the hearing due to his schedule. Further, the Respondent forwarded a complete copy of the affidavit of Mr. Ikemo, witness, of October 2011, which lacked an appendix.

**92.**    On 24 November 2011, the Arbitral Tribunal forwarded Procedural Order No. 4 which read as follows:

> *"Whereas a conference call was held between the Arbitral Tribunal and the parties on 23 November 2011 for the purpose of organizing the hearing to hear witnesses scheduled for 19-22 December 2011;*
> *Whereas by letter dated 23 November 2011, the Claimant forwarded to the Arbitral Tribunal and to the Respondent an additional affidavit of Mr. Mbéri, requesting that it be added to the case;*
> *Whereas by letter on the same day, the Respondent challenged this submission, stating that it would consequently request the right to submit documents and/or an affidavit in answer;*
>
> *Whereas the parties had the opportunity to clarify their position in this regard during the conference call:*

### THE ARBITRAL TRIBUNAL HOLDS:

1)    *Organization of the hearing*

-    *The hearing will begin every day at 9:30 a.m. and will end at 5:30 p.m. (reserving the possibility of extending the ending time, if necessary);*

-    *There will be two short breaks during the day, and a lunch break lasting one and one-half hours, during which each party is free to do what it wishes (the Arbitral Tribunal however accepts the offer of the parties relative to meal choices for the 1st day of the hearing);*

-    *The hearing of introductory statements from the Claimant and then the Respondent will last about one hour each;*

-    *Then the witnesses and experts will be heard, in an order that the parties will be invited to agree upon, knowing that in any event, the witnesses of the Claimant will be questioned first, followed by the witnesses and experts of the Respondent;*

-    *The statements by the Claimant's witnesses will take place through 20 December in the evening and will be followed by those of the Respondent through 22 December in the evening;*

-    *The parties may directly examine their witnesses/experts for a period of 10 minutes before they submit* [sic] *to cross-examination by the opposing party;*

-    *At the end of the hearing, it will be decided whether the Arbitral Tribunal wishes to hear concluding statements from the parties on a subsequent date or whether it prefers to receive post-hearing briefs in writing;*

-    *The parties must submit to the questioned witness/expert, to the opposing party and to each member of the Arbitral Tribunal, a copy of the documents that they wish to use during the examination of said witness, in the form deemed the most appropriate by each of the parties;*

-    *The parties must also make available to the Arbitral Tribunal a complete file of all the file components as well as a chronological file containing the initial references to the items.  The Claimant shall be responsible for preparing the latter.*

2)    *The affidavit of Mr. Mbéri is accepted for inclusion in the file;*

3)    *The Respondent is granted until 12 December 2011 to comment on this affidavit and/or to submit a new affidavit in reply, along with any exhibits;*

4)    *The parties are invited to forward to the Arbitral Tribunal the order of hearing of witnesses and experts agreed upon by the parties, no later than 12 December 2011."*

**93.**    On 25 November 2011, the Claimant commented on the letter of the Respondent relative to the inability of President Sassou N'Guesso to come to testify at the hearing

noting that it would invite the Arbitral Tribunal to draw all applicable conclusions from the refusal of President Sassou N'Guesso to testify.

**94.** On 12 December 2011, the Respondent stated that it was not submitting another affidavit in answer to that of Mr. Mbéri, forwarded by Commisimpex on 23 November 2011. On the same date, the Claimant forwarded the order in which it wished to question the witnesses presented by the Respondent and requested that four new documents be included in the case file.

**95.** On 15 December 2011, the Respondent requested that the Arbitral Tribunal authorize it to submit another affidavit from Mr. Boukamany, a witness, and indicated the order in which it wished to question the witnesses presented by Commisimpex. On the same day, the Arbitral Tribunal wrote to the parties regarding the order of examination of the witnesses and reminded them to make a complete file of all the case documents as well as a chronological file available to the Arbitral Tribunal.

**96.** On the same day, the Claimant informed the Arbitral Tribunal that Mr. Mbéri had still not arrived in Paris, although he was to arrive on 11 December, stating that he had been physically prevented, and requested that the Arbitral Tribunal order the Republic of the Congo to make every effort necessary to ensure the safety of Mr. Mbéri and allow him to depart from Brazzaville to participate in the hearing.

**97.** On 16 December 2011, the Arbitral Tribunal acknowledged receipt of the letter of the Respondent dated 15 December in which the latter indicated that it wished to include in the case file another affidavit from Mr. Boukamany and invited the Claimant to raise any comments by 17 December 2011. On the same day, the Claimant stated that it had no objection to the inclusion of the affidavit of Mr. Boukamany if Exhibits C200 through C203 were also accepted by the Arbitral Tribunal. It further requested that the order of hearing for witnesses from the Congo by Commisimpex be unchanged.

**98.** On the same day, the Respondent requested to be informed by the Claimant as to where Mr. Mbéri was and specify the measures expected of the Republic of the Congo to allow him to leave the country.

**99.** On the same day, the Arbitral Tribunal acknowledged receipt of the respective correspondence from the parties dated 15 and 16 December 2011, relative to Mr. Mbéri. The Arbitral Tribunal stated that it did not doubt that the Republic of the Congo would make every effort necessary to facilitate the witness' trip to Paris, that it wished to cross-examine, while stating that if Mr. Mbéri or any other witness could not appear at the hearing due to the actions or omissions of either of the parties, it would draw all necessary consequences with regard to the party in question.

**100.** On 17 December 2011, the Claimant reported where Mr. Mbéri was and specified that he was still being prevented from leaving. It then reiterated its request that the Respondent do all that is necessary to immediately grant Mr. Mbéri the freedom to travel.

**101.** On the same day, the Respondent confirmed that the witnesses could be heard in the order desired by the Claimant except for Mr. Andely. In addition, it requested authorization to forward as an exhibit R100 an affidavit from Mr. Mouamba.

**102.** In another letter on the same day, the Respondent also stated that it was not in any way restricting the freedom of movement of Mr. Mbéri and that he had stated that he chose to remain in Brazzaville for personal reasons and had planned to come to Paris on the evening flight next Monday or Wednesday.

**103.** On the same day, the Arbitral Tribunal acknowledged receipt of the correspondence from the parties relative to the status of Mr. Mbéri and invited the Claimant to comment on the statements made by the Respondent. In the evening, the Arbitral Tribunal again wrote to the parties, expressing its surprise that its email had not generated any response. The Claimant then stated that it had not been able to clarify the situation and noted that it would get back to the Arbitral Tribunal the next day.

In addition, the Arbitral Tribunal acknowledged receipt of the letter from the Respondent on the same day relative to the order of examination of witnesses and the request to include another affidavit, stating that any procedural problems resulting therefrom would be discussed at the hearing.

**104.** On 18 December, the Claimant informed the Arbitral Tribunal that, according to a relative of Mr. Mbéri, Mr. Mbéri had been pressured by the Congolese government, which had indicated that his witness testimony would not be welcome. He added that if a conference call were scheduled, Mr. Mbéri would not be speaking freely. The Claimant expressed its disapproval as to the steps taken by the Congo.

On the same day, the Claimant asked whether the Arbitral Tribunal wished it to express its position in writing regarding the request for acceptance of an affidavit from Mr. Mouamba by the Respondent.

The Arbitral Tribunal responded that it had no objection to the Claimant stating its position in writing before the hearing regarding the request for the inclusion of another affidavit, but it was not absolutely necessary. Furthermore, it noted that at this stage the Claimant did not expect any specific action regarding the testimony of Mr. Mbéri but stated that it eagerly wished that Mr. Mbéri could be heard at the hearing and that it trusted that the respondent would do everything in its power to facilitate his travel. Lastly, the Arbitral Tribunal stated that it was available to participate in a conference call with a representative of each of the parties and of Mr. Mbéri in order to clarify the situation.

The Respondent agreed to participate in such a conference call, specifying that the Claimant had stated that it would be able to organize it. The Chairman of the arbitral Tribunal stated that he would conduct this conference call alone, by agreement with his fellow arbitrators. The Claimant then stated that it was not able to organize this conference call, contrary to what the Respondent claimed, since it had not been able to speak to Mr. Mbéri directly. The Claimant then invited the Chairman of the Arbitral Tribunal to contact him directly, while saying that it was available for a conference call after the Chairman had spoken to Mr. Mbéri or his entourage. The Respondent reaffirmed that Mr. Mbéri had never been the subject of any measures preventing him from leaving the Congo and that he had stated to the Minister of State, the Coordinator of Sovereignty, the Minister of Justice and Human Rights, that he had not left Congo for personal reasons and that he intended to take a flight on 19 December. The

Arbitral Tribunal thus concluded that it was no longer necessary, given this information, to have a conversation with Mr. Mbéri before the hearing. The Claimant expressed its agreement and thanked the Respondent for this information.

**105.** A hearing took place in Paris on 19-22 December 2011. On 19 December 2011, the Claimant submitted in writing to the Arbitral Tribunal Exhibit R101 (Decree No. 92-978 dated 25 December 1992 regarding the nomination of members of the government), submitted by the Respondent for the purposes of the hearing.

**106.** On 26 December 2011, the Arbitral Tribunal forwarded Procedural Order No. 5 to the parties, as follows:

> *"Whereas a hearing as to the merits took place in Paris on 19-22 December 2011;*
> *Whereas Messers. Hajaij, Wehbe, Longobé, Lenga, Andely, Ikounga, Boueno, Ikémo, Gossaki and Mouamba were heard as witnesses;*
> *Whereas the parties had the opportunity to fully present their respective positions;*
> *Whereas the Arbitral Tribunal wishes to received post-hearing briefs;*
> *Whereas the Arbitral Tribunal stated that it would like these briefs to be limited in size (approximately fifty pages);*
> *Whereas these briefs must not be accompanied by new exhibits except with the prior authorization of the Arbitral Tribunal;*
> *Whereas these briefs should have the primary purposes of exploiting the witness statements made during the hearing;*
>
> *Whereas the arbitral tribunal wishes more specifically for the parties to state the following two matters: the scope of the 2003 Protocol and the content of the debt owed to Commisimpex, regarding which both parties are invited to make statements;*
>
> *Whereas, although the post-hearing briefs should not be strictly limited to these matters:*
>
> ### *THE ARBITRAL TRIBUNAL HOLDS:*
>
> *1. The parties shall simultaneously submit their post-hearing briefs on 17 February 2012.*
>
> *2. The parties shall have until 23 March 2012 to simultaneously submit their answers."*

**107.** On 27 January 2012, Mrs. Carole Malinvaud told the parties that one of the members of her firm had signed a contract for services with Quantic Finance Ltd. to perform a general study of Congolese regulations for the implementation of a regulatory framework for the creation of special economic zones and confirmed her impartiality in relation to the parties.

**108.** On 14 February 2012, the Claimant stated that it had no comments to make regarding the information provided by Mrs. Carole Malinvaud.

**109.** On 16 February 2012, Chair of the Arbitral Tribunal received a letter from Mr. Mbéri in which he apologized for his absence from the hearing and confirmed the validity of his affidavits. The Chairman of the Arbitral Tribunal forwarded this letter to the parties on 17 February 2012, and invited them to forward their comments on the same by 24 February 2012.

**110.**     On 17 February 2012, Mrs. Carole Malinvaud acknowledged receipt of the letter from the Claimant dated 14 February 2012 and stated she would inform the parties if the duties of her firm changed.

**111.**     On the same day, the parties forwarded to the Arbitral Tribunal their first post-hearing brief.

**112.**     On 18 February 2012, the Arbitral Tribunal acknowledged receipt of the post-hearing briefs of the parties.

**113.**     On 20 February 2012, the Respondent sent its comments on the letter sent by Mr. Mbéri to the Arbitral Tribunal, proposing a hearing date for cross-examination, suggesting his possible presence in Paris.  On the same day, the Arbitral Tribunal acknowledged receipt of this letter.

**114.**     On 24 February 2012, the Claimant requested from the Arbitral Tribunal that it be granted until 27 February 2012 to submit its comments regarding the letter from Mr. Mbéri, which term was granted by the Arbitral Tribunal on the same day.

**115.**     On 27 February 2012, the Claimant informed the Arbitral Tribunal that Mr. Mbéri was back in the Congo but stated that if he could come back to Paris, he would respond favorably to a hearing being held.  The Claimant added that in such a case, it would be timely to take the opportunity to also hear President Sassou N'Guesso and also proposed to confront the points of view of Messrs. Mbéri, Mouamba, Boueno and President Sassou N'Guesso, all of whom submitted affidavits relative to the meetings of September and October 1992.

**116.**     On 1 March 2012, the Arbitral Tribunal told the parties that it had received their correspondence from 20 and 27 February 2012, and proposed that the Chairman hold a conference call alone with the parties.

**117.**     On 8 March 2012, a conference call was held between the Chairman of the Arbitral Tribunal and the parties.

**118.**     On 9 March 2012, the Claimant forwarded the letter from Mr. Mbéri dated 14 February 2012 as Exhibit C204 as agreed during the conference call.

**119.**     On the same day, the Arbitral Tribunal forwarded to the parties Procedural Order No. 6, which read as follows:

> *"Whereas Mr. Mbéri contacted the Chairman of the Arbitral Tribunal alone in a letter dated 14 February 2011 (sic) in which he stated that he was not able to be present for the hearing as a witness for reasons beyond his control and confirmed the validity of his affidavits;*
>
> *Whereas in an email dated 17 February 2012, the Chairman of the Arbitral Tribunal forwarded a copy of the letter from Mr. Mbéri to the parties and to his fellow arbitrators, inviting the parties to forward their comments relative to this letter by 24 February 2012;*

*Whereas in a letter dated 20 February 2012, the Respondent stated that the absence of credibility of the affidavits of Mr. Mbéri had been established in the hearing, adding that if the Arbitral Tribunal had any doubt in this regard, a hearing could be organized to hear Mr. Mbéri, who perhaps would still be in France at that time;*

*Whereas in an email dated 24 February 2012, the Claimant requested an extension of the term for submitting its comments until 27 February 2012;*

*Whereas in an email on the same day, the Arbitral Tribunal acknowledged receipt of the email from the Claimant and granted it the requested extension;*

*Whereas on 27 February 2012 the Claimant stated that Mr. Mbéri was no longer in France and that if circumstances had changed as to the possibility of Mr. Mbéri returning to France to testify, it would not be opposed to holding such a hearing. The Claimant also added that in such an event, it believed that it would be opportune to also hear from President Sassou N'Guesso and proposed, if the Arbitral Tribunal deemed it helpful, to compare the points of view of Mr. Mbéri, Hajaij, Mouamba, Boueno and of President Sassou N'Guesso;*

*Whereas in an email dated 1 March 2012, the Arbitral Tribunal stated that it had been informed of the correspondence from the parties, Mr. Yves Derains, by agreement with his fellow arbitrators, proposed holding a conference call alone with the parties;*

*Whereas a conference call was held between the Chairman of the Arbitral Tribunal and the parties on 8 March 2012;*

*Whereas during this conference call, the parties stated their approval that the letter dated 14 February 2012 from Mr. Mbéri would be included in the case file;*

*Whereas the Respondent reiterated its request to hear Mr. Mbéri as a witness, the Claimant reiterated its request to hear from President Sassou N'Guesso in the event that Mr. Mbéri was to be heard.*

*Whereas the Chairman of the Arbitral Tribunal reported the content of this conference call to his fellow arbitrators;*

*Whereas the Arbitral Tribunal believes that it is not helpful at this stage to hear from Mr. Mbéri to the extent that the parties must still exchange answers to the post-hearing briefs on 23 March 2012;*

*Whereas the Arbitral Tribunal believes that it will be better placed to decide whether to hear Mr. Mbéri after these submissions;*

### *THE ARBITRAL TRIBUNAL HOLDS:*

*1.    No decision regarding scheduling a new hearing to examine Mr. Mbéri was made at this point.*
*2.    The Arbitral Tribunal reserves the right to revisit this subject with the parties after having seen the last submission of briefs by the parties."*

**120.**    On 13 March 2012, the ICC Secretariat informed the Arbitral Tribunal and the parties that during its session on 8 March 2012, and pursuant to Article 24(2) of the Rules, the

International Court of Arbitration extended the term for rendering the Final Award to 30 June 2012.

121.     On 23 March 2012, the parties forwarded to the Arbitral Tribunal their second post-hearing briefs.

122.     On 30 March 2012, the Claimant forwarded its comments as to the procedure for calculation carried out by the Respondent in its second post-hearing brief to update from late 1986 to 1997 the amounts appearing in the *Fiche de calcul détaillée*.  On 2 April 2012, the Respondent stated that a substantive error had been made in its second post-hearing brief and forwarded new pages 38 and39, including the corrections of said mistakes.  It stated that this did not affect its reasoning as to the incoherent and artificial nature of the calculations made by the Claimant.  On 4 April 2012, the Claimant acknowledged the correction made by the Respondent and emphasized that this change, on the contrary, affected the reasoning employed by the Republic of the Congo.  On 5 April 2012, the Respondent submitted additional brief comments in response to the letter from the Claimant dated 4 April.  On the same day, the Arbitral Tribunal acknowledged receipt of the letter from the Respondent and declared that the proceedings were closed regarding that matter.

123.     On 14 June 2012, the Court Secretariat informed the Arbitral Tribunal and the parties that during its session on 14 June 2012, and pursuant to Article 24(2) of the Rules, the Court extended the term for rendering the Final Award through 28 September 2012.

124.     On 17 July 2012, the Respondent informed the Arbitral Tribunal of a ruling of the Court of Appeal of Paris dated 12 June 2012 that rejected the annulment proceeding of filed by the Respondent against the partial award dated 20 August 2011.

125.     On 14 September 2012, the Court Secretariat informed the Arbitral Tribunal and the parties that during its session on 13 June 2012, and pursuant to Article 24(2) of the Rules, the Court extended the term for rendering the Final Award through 31 October 2012.  The Court Secretariat also stated that Mrs. Marie-Camille Pitton was now the member responsible for the case.

126.     On 1 October 2012, the Claimant submitted to the Arbitral Tribunal a request for emergency measures relative to a request filed by the Caisse Nationale de Sécurité Sociale of the Congo for Commisimpex to be declared in default of payments and to be liquidated at a hearing of the Commercial Court of Brazzaville on 2 October 2012.

127.     On the same day, the Arbitral Tribunal acknowledged receipt of the letter from the Claimant and ordered that the Respondent do everything necessary to maintain the status quo between the parties and to inform it of the actions that it had taken by 10:00 a.m. the next morning.

128.     On 2 October 2012, the Respondent provided its comments to the Arbitral Tribunal indicating that the scheduled hearing was only an initial procedural hearing.

129.     On the same day, the Arbitral Tribunal acknowledged receipt of the letter from the Respondent.

130.     On 4 October 2012, the Claimant sent a request for provisional measures to the Arbitral Tribunal.

131.    On the same day, the Arbitral Tribunal acknowledged receipt of the letter from the Claimant and invited the Respondent to send its comments by 8 October at 10:00 a.m.

132.    On 8 October 2012, the Arbitral Tribunal forwarded Procedural Order No. 7 to the parties, which read as follows:

*"Whereas in an email dated 1 October 2012, the Claimant submitted a request for emergency measures to the Arbitral Tribunal;*

*Whereas the Claimant stated that by petition to the Commercial Court of Brazzaville dated 26 September 2012, the* Caisse Nationale de Sécurité Sociale *of the Congo requested that 'Commisimpex be declared in default of payments, that its assets be liquidated and that the court appoint liquidation entities,' alleging that Commisimpex owed social security fees dating to 1981;*

*Whereas the Claimant again explained that the President of the Commercial Court of Brazzaville had, after having invoked a pointless attempt to reconcile the parties, by order dated 28 September 2012, scheduled a hearing for 2 October 2012 at 8:00 a.m. 'in order to rule on the merits of said petition,' requesting that Commisimpex 'produce [its] defense no later than eight days before the hearing';*

*Whereas the Claimant stated to the Arbitral Tribunal that no attempt at conciliation had been undertaken, the terms established by the court were in complete violation of the right to due process and these proceedings were intended to 'allow the Congolese authorities to fraudulently take control of Commisimpex via the liquidator that would be appointed by the Commercial Court of Brazzaville, so as to short-circuit your forthcoming award (…)';*

*Whereas the Claimant requested that the Arbitral Tribunal 'order the Congo to give the instructions necessary to its* Caisse Nationale de Sécurité Sociale, *a public entity, to agree to postponement of the hearing from 2 October 2012 to a later hearing, at which time Commisimpex could present its defense and/or request other provisional measures from your Court;*

*Whereas in an email dated 1 October 2012, the Arbitral Tribunal acknowledged receipt of the letter of the Claimant and ordered the Respondent 'to immediately make every effort so that no measure would change the status quo between the parties and possibly affect the order and the effects of the forthcoming arbitration award to not occur before the Arbitral Tribunal could investigate, respecting the adversarial process, the request for emergency measures that was submitted to it [this evening] and make a decision in this regard';*

*Whereas the Arbitral Tribunal also requested that the Respondent inform it of the actions that it had taken by 10 a.m. the next morning;*

*Whereas on 2 October 2012, the Respondent stated that the hearing scheduled for that date was only a preliminary procedural hearing and that in any event a ruling would not be made at that hearing at the request of* Caisse Nationale de Sécurité Sociale, *specifying that this matter would be the subject of an adversarial investigation and that Commisimpex would have the opportunity to present its defense.*

*Whereas on the same day, the Arbitral Tribunal acknowledged receipt of the letter from the Respondent and thanked the Respondent for its timely response;*

*Whereas on 4 October 2012, the Claimant submitted to the Arbitral Tribunal a request for provisional measures, explaining that the proceeding filed against Commisimpex by* Caisse Nationale de Sécurité Sociale *was based on alleged late payments of social security fees on salaries owed by Commisimpex for the period of 1981 through 2011 and that the* Caisse *had requested the liquidation of Commisimpex and the personal bankruptcy of Mr. Hajaij, and not the payment of the amount that was allegedly owed;*

*Whereas the Claimant specified that beyond the fact that this action was sudden, the terms imposed in this proceeding were surprising and in violation of the principle of the adversarial process;*

*Whereas the Claimant also asserted that the challenged facts were unjustified to the extent that operations of Commisimpex were suspended by resolution of its Meeting of Shareholders dated 28 June 1991, as is also demonstrated by a certificate of non-taxation by the Direct Revenue Service of the Congo, that it did not owe any contribution to the* Caisse Nationale de Sécurité Sociale *of the Congo and that no notification had otherwise been sent to it;*

*Whereas the Claimant requested that the Arbitral Tribunal 'order the Congo to give the necessary instructions to its* Caisse Nationale de Sécurité Sociale, *a public entity, to withdraw its action regarding cessation of payments and liquidation, without prejudice to any action on the merits that the* Caisse *may deem necessary to file in order for a ruling to be issued, in full respect of the rights of due process, regarding the alleged amounts owed by Commisimpex' and 'in any event (…) to acknowledge, in the context of the forthcoming award, of its declarations as to the regularity and justification of the case filed by* Caisse Nationale de Sécurité Sociale *in the courts of the Republic of the Congo';*

*Whereas in an email dated 4 October 2012, the Arbitral Tribunal acknowledged receipt of the letter from the Claimant and invited the Respondent to comment on this letter by 10 a.m. on 8 October 2012;*

*Whereas the Respondent did not make comments within the terms specified by the Arbitral Tribunal;*

*Whereas the Republic of the Congo cannot invoke any legitimate interest in the liquidation of Commisimpex occurring within a short time period and, in any event, before the end of this arbitration;*

### THE ARBITRAL TRIBUNAL HOLDS:

*1.     The parties must make every effort to avoid any change in the status quo between the parties until the final award is issued.*

*2.     In this regard, it is ordered that the Republic of the Congo make every effort required so that no State agency of the Congo would cause Commisimpex to be placed in liquidation before the final award is rendered in this arbitration proceeding."*

**133.**     On the same day, after this Order was issued, the Respondent provided the Arbitral Tribunal with its comments on the letter from the Claimant dated 4 October 2012.  The Arbitral Tribunal acknowledged receipt of this letter and noted that its contents were not of such a nature to challenge the resolutions made in Procedural Order No. 7.

**134.**     On 10 October 2012, the Arbitral Tribunal informed the parties that the proceedings were closed pursuant to Article 22 (2) of the ICC Rules, since it was not deemed useful to schedule another hearing to question Mr. Mbéri after the receipt of the Post-Hearing Briefs, as envisioned in Procedural Order No. 6 dated 9 March 2012.

**135.**     On October 11, 2012, and pursuant to Article 24(2) of the Rules, the International Court of Arbitration extended the term for rendering the Final Award to 31 December 2012.

**136.**     The parties submitted letters to the Arbitral Tribunal dated 18, 19 and 25 October 2012, regarding the proceedings relative to the liquidation of Commisimpex.

**137.**     On 29 October 2012, Mrs. Carole Malinvaud informed the parties that one of her firm's partners planned to grant the request by the Republic of the Congo to assist in the completion of drafts of the new oil code and the sample production sharing agreement prepared by the government of the Congo and stated that this would have no connection with the present matter.

**138.**     On 30 October 2012, the Arbitral Tribunal acknowledged receipt of the letters from the parties dated 18, 19 and 25 October 2012 regarding the proceedings for the liquidation of Commisimpex and informed the parties that these letters were not accepted into the case file, since the closure of proceedings had been declared in the letter dated 10 October 2012.

On the same day, the Claimant informed the Arbitral Tribunal of the ruling of the Commercial Court of Brazzaville declaring the liquidation and dissolution of Commisimpex as well as the personal bankruptcy of Mr. Hajaij, the head of Commisimpex.  In this regard, the Claimant requested, among other things, that the Arbitral Tribunal reopen the proceedings.

**139.**     On 31 October 2012, the Arbitral Tribunal acknowledged receipt of the letter from the Claimant dated 30 October 2012 and invited the Respondent to comment on this letter by 2 November at 7:00 p.m.

**140.**     On 2 November 2012, the parties submitted to the Arbitral Tribunal their claims relative to arbitration costs. On the same date, the Respondent indicated that since it was not able to contact its client, it confirmed the content of the letters dated 8 and 19 October 2012.

**141.**     On 7 November 2012, the Arbitral Tribunal forwarded Procedural Order No. 8 to the parties, which read as follows:

> *"Whereas by letter dated 8 October 2012, the Respondent forwarded comments relative to the letter from Commisimpex dated 4 October 2012;*
>
> *Whereas the Arbitral Tribunal acknowledged receipt of these comments, noting that they were forwarded after delivery of Procedural Order No. 7 and stated that the content of this letter was not of such a nature to challenge the resolutions made in that order;*
>
> *Whereas in a letter dated 18 October 2012, a copy of which was forwarded to the Arbitral Tribunal, the counsel for the Claimant requested that the counsel for the Respondent*

*ensure that its client respects Procedural Order No. 7 of the Arbitral Tribunal, explaining that during the procedural hearing on 16 October 2012 before the Commercial Court of Brazzaville, that Court had, at the request of the attorney for the* Caisse Nationale de Sécurité Sociale ("CNSS") *and without even verifying the availability of counsel, scheduled a motions hearing for 23 October 2012 and that a ruling should, therefore, be issued shortly;*

*Whereas by letter dated 19 October 2012, a copy of which was also forwarded to the Arbitral Tribunal, the counsel for the Respondent acknowledged receipt of the letter from the counsel for the Claimant and attached a letter sent on 11 October 2012 by the Director of the Office of the Minister of State, the Keeper of the Seals, the Minister of Justice and Human Rights to the Public Prosecutor at the* Tribunal de Grande Instance *of Brazzaville in which the Director of the Office of the Minister forwarded to the Public Prosecutor '(…) so that you may perform your duty before the* Tribunal de Grande Instance *of Brazzaville, Procedural Order No. 7 issued on 8 October 2012 by the Arbitral Tribunal of Paris in the matter of Commisimpex v. the Government of the Congo submitted for a ruling to be rendered no later than next month.' It was stated that 'In this order the Arbitral Tribunal orders the Congolese government and its agencies to not short-circuit the forthcoming award by a ruling of the liquidation of Commisimpex, referencing the action filed to this end by the CNSS before the Commercial Court of Brazzaville.' Furthermore, the counsel for the Respondent also attached the 'Submission of the Public Prosecutor dated 17 October 2012' in which it recommended 'avoiding a liquidation ruling declaring the liquidation of Commisimpex (in the matter of CNSS v. Commisimpex) before the pronouncement of the arbitration award.'*

*Whereas on 25 October 2012, the counsel for the Claimant informed the Arbitral Tribunal that CNSS had not halted its proceedings, in violation of the provisions of Procedural Order No. 7 and that a motions hearing was therefore held on 23 October 2012 during which Commisimpex, on the one hand, had requested 'that the ruling be deferred, in particular due to the complaint filed the previous day by Commisimpex as a civil party for forgery, use of forged documents, and fraud with the chief investigating judge of the* Tribunal de Grande Instance *of Brazzaville,' as well as the absence from the merits of a debt owed to CNSS and, the Public Prosecutor of the Republic of the Congo, and on the other hand had requested that the liquidation proceedings be deferred based on the complaint filed by Commisimpex. The counsel for the Claimant stated that the ruling of the President should be issued by 30 October 2012;*

*Whereas on 30 October 2012 the Arbitral Tribunal acknowledged receipt of the letters from the parties dated 18, 19 and 25 October 2012 regarding the proceedings in relation to the liquidation of Commisimpex and informed the parties that these letters were not accepted into the proceedings, since the proceedings had been declared closed by letter dated 10 October 2012;*

*Whereas on the same date, the counsel for the Claimant informed the Arbitral Tribunal that the Commercial Court of Brazzaville had ruled in favor of the liquidation and dissolution of Commisimpex, appointed the liquidation entities and declared the personal bankruptcy of Mr. Hajaij, also preventing him from conducting commercial activity or managing a business for ten years. The counsel for the Claimant stated that the Claimant and Mr. Hajaij had filed an appeal but that according to Congolese law, an appeal had no suspensive force. As a result, the counsel for the Claimant petitioned the Tribunal:*

> *'- to authorize the reopening of the proceedings pursuant to Article 22(1) in fine of the ICC Rules, in order to be able to consider this claim*

*- to acknowledge the violation of the Order by the Congo;*

*- to acknowledge the intentional and harmful nature of this violation;*

*- to issue an award (1) reiterating its Order; (2) ordering the Congo to take the measures necessary so that the CNSS would allow the appeal filed by Commisimpex and Mr. Hajaij, and/or take any other measures allowing the* status quo *to be reestablished pursuant to the provisions of the Order; (3) ordering the Congo to take the measures necessary so that the CNSS would allow a request for suspension of enforcement of the ruling of the Court of Commerce while awaiting the future decision in the appeal; and (4) ordering in any event that the Congo waive the enforcement of the ruling of the Court of Commerce of Brazzaville on this date before any judicial or arbitration jurisdiction; and to incur any other consequence that it may deem necessary'.*

*Whereas on 31 October 2012, the Arbitral Tribunal acknowledged receipt of the letter from the Claimant dated 30 October 2012 and invited the Respondent to comment on the same by 2 November 2012;*

*Whereas in a letter dated 2 November 2012, the counsel for the Respondent stated that it was not able to contact its client to obtain information and receive instructions and therefore had nothing to add to the items appearing in its letters dated 8 and 19 October 2012;*

*Whereas the Arbitral Tribunal confirms its Procedural Order No. 7 which specifies that:*

*1.    The parties must make every effort to avoid any change in the status quo between the parties until the final award is issued.*

*2.    In this regard, it is ordered that the Republic of the Congo make every effort required so that no State agency of the Congo would cause Commisimpex to be placed in liquidation before the final award is rendered in this arbitration proceeding."*

*Whereas the Arbitral Tribunal believes that in this case the reopening of the proceedings is necessary, as specified in Article 22 (1) of the Arbitration Rules, in order to be able to examine the claim of Commisimpex:*

### *THE ARBITRAL TRIBUNAL HOLDS:*

*1. The proceedings are reopened as provided for by Article 22 (1) of the ICC Arbitration Rules.*

*2. The Claimant will specify its claims by 14 November 2012.*

*3. The Respondent will submit its comments by 21 November 2012.*

*4. A conference call between the parties and the Arbitral Tribunal will take place in late November or early December 2012 to discuss these matters."*

**142.**    On 12 November 2012, the Arbitral Tribunal told the parties that the conference call referenced in Procedural Order No. 8 was scheduled for 28 November at

5:30 p.m. On the same day, the parties confirmed their availability for that date. The Arbitral Tribunal then confirmed that the conference call would take place on 28 November 2012.

**143.**     On 14 November 2012, the Claimant specified its claims pursuant to Procedural Order No. 8 in a letter accompanied by factual exhibits C-205 through C-217 and legal exhibits C-RJ 142 through C-RJ 149.

**144.**     On 15 November 2012, the ICC Secretariat informed the parties that it had been visited by Mr. Gaston Mossa, who introduced himself as the court-appointed liquidator of Commisimpex and requested the contact information for the counsel of Commisimpex. The Secretariat invited Commisimpex to indicate by 16 November 2012 whether it authorized the Secretariat to provide Mr. Mossa with this information.

**145.**     On 16 November 2012, the counsel [of] Commisimpex told the Secretariat that it was not opposed to its contact information being forwarded but it stated that no other information should be conveyed. Commisimpex also stated that it thought that Mr. Mossa was not the actual liquidator.

**146.**     On 19 November 2012, the Secretariat indicated that it had acknowledged the instructions of Commisimpex and confirmed that it would provide its contact information to Mr. Gaston Mossa, which it did the same day.

**147.**     On 21 November 2012, the Respondent requested an extension until 22 November, at 2:00 p.m. to submit its comments in answer, pursuant to Procedural Order No. 8. On the same day, the Arbitral Tribunal granted the requested extension.

**148.**     On 22 November 2012, the Respondent submitted its comments in answer, in a letter accompanied by factual exhibit R-102 and legal exhibit R-RJ 79.

**149.**     On 27 November 2012, the Secretariat forwarded to the Arbitral Tribunal a letter from Mr. Gaston Mossa dated 19 November 2012 addressed to its Chairman and acknowledged by the Clerk to the International Court of Arbitration on 26 November 2012. This letter was submitted to the parties on the same day for discussion during the conference call scheduled for 28 November 2012.

**150.**     On 27 November 2012, the Claimant forwarded exhibits C218, C219 and C220 to the Arbitral Tribunal for the conference call scheduled for 28 November 2012.

**151.**     On 28 November 2012, a conference call was held between the parties and the Arbitral Tribunal.

**152.**     On 30 November 2012, the Arbitral Tribunal forwarded Procedural Order No. 9 to the parties, which read as follows:

> *"Whereas by Procedural Order No. 8 dated 7 November 2012, the proceedings were reopened at the request of Commisimpex, following the ruling of the Commercial Court of Brazzaville declaring the court-ordered liquidation of Commisimpex and the personal bankruptcy of Mr. Hajaij;*

*Whereas pursuant to Procedural Order No. 8, Commisimpex specified its claims on 14 November 2012.*

*Whereas its petitions were as follows:*

> *'Commisimpex petitions the Tribunal, in the context of its forthcoming award:*
>
> *(1) to acknowledge the violation by the Congo of Procedural Order No. 7;*
>
> *(2) to acknowledge the intentional and harmful nature of that violation;*
>
> *(3) to acknowledge the harmful and fraudulent nature of the liquidation of Commisimpex;*
>
> *(4) to state, as a result, that, for the purposes of this arbitration, it does not recognize the court-ordered liquidation of Commisimpex;*
>
> *(5) to acknowledge, in this arbitration, the lack of standing of the liquidators appointed to represent Commisimpex;*
>
> *(6) to order in any case that the Congo waive asserting and/or enforcing the ruling of the Commercial Court of Brazzaville dated 30 October 2012, before your court and/or before any other judicial or arbitral jurisdiction;*
>
> *(7) to order the Congo to take the measures necessary so that the CNSS will grant the appeal filed by Commisimpex and Mr. Hajaij, and/or take any other measures allowing the reestablishment of the status quo pursuant to the provisions of Procedural Order No. 7; and*
>
> *(8) to order the reimbursement by the Congo, for the benefit of the claimants, of all the expenses incurred in this arbitration in relation to the liquidation proceedings.'*

*Whereas pursuant to Procedural Order No. 8 the Republic of the Congo on 21 November 2012, submitted its comments regarding the submission of Commisimpex;*

*Whereas the Republic of the Congo concluded that the claims by Commisimpex were inadmissible and requests from the Arbitral Tribunal in any event to reject them as unjustified;*

*Whereas on 27 November 2012, the ICC Secretariat forwarded to the Arbitral Tribunal a letter from Mr. Gaston Mossa, Chair of the Committee of Bankruptcy Trustees of Commisimpex, that the Secretariat was notified by the clerk on 26 November 2012, that in this letter, Mr. Gaston Mossa informed the Arbitral Tribunal that the actions taken by Mr. Hajaij on behalf of Commisimpex were hereafter null and void and that only the liquidation committee had competent authority in this regard;*

*Whereas on the same day the Arbitral Tribunal forwarded this letter to the parties for discussion during the conference call scheduled for 28 November 2012;*

*Whereas during the conference call between the parties and the Arbitral Tribunal, the matters raised by the submissions of the parties as well as the letter of Mr. Gaston Mossa were discussed;*

*Whereas the Arbitral Tribunal observed that Procedural Order No. 7, by means of which it was ordered that ' (…) the Republic of the Congo make every effort required so that no Congolese State entity cause Commisimpex to be placed into*

*liquidation before the final award is rendered in this arbitration' did not prevent the declaration of the court-ordered liquidation of Commisimpex, without it necessarily being considered a violation of this order by the Republic of the Congo;*

*Whereas the Arbitral Tribunal noted that the Director of the Office of the Minister of Justice had forwarded ' (…) Procedural Order No. 7 to the State Prosecutor of the Republic with the Court of Grande Instance of Brazzaville, giving him instruction to do what is necessary for a declaration of liquidation not be issued before the forthcoming award';*

*Whereas the Arbitral Tribunal believes that, since the court judgment is the subject of an appeal, the Republic of the Congo is able to reestablish the status quo between the parties that it breached and that it is therefore opportune to order it to do so;*

*Whereas the Arbitral Tribuanl will rule on the remaining claims of Commisimpex in its final award;*

*Whereas given the circumstances, it is relevant to again declare the closure of the proceedings;*

### THE ARBITRAL TRIBUNAL HOLDS:

1. *The proceedings are closed pursuant to Article 22 (1) of the Arbitration Rules of the ICC.*

2. *The Republic of the Congo must do whatever is necessary to reestablish the status quo between the parties as quickly as possible and in any event before the final award is issued."*

**153.** On the same date, the Arbitral Tribunal forwarded to Mr. Gaston Mossa, with a copy to the parties and the ICC Secretariat, the following letter:

*"Dear Sir,*

*The Arbitral Tribunal acknowledges receipt of your letter dated 19 November 2012 which was forwarded by the Secretariat of the International Court of Arbitration of the ICC on 27 November 2012, which itself had received it on 26 November 2012.*

*The Arbitral Tribunal has acknowledged the indication according to which a ruling of the Commercial Court of Brazzaville dated 30 October 2012 declared Commisimpex to be in court-ordered liquidation, as well as the personal bankruptcy of Mr. Hajaij.*

*It also took into consideration the fact that you believe that the actions taken by Mr. Hajaij were from that point forward null and void, and that only the liquidation committee had competent authority to carry out actions on behalf of Commisimpex.*

*However, the validity of the ruling of the Commercial Court of Brazzaville is contested and its opposability on the Arbitral Tribunal is the subject of discussion before it.*

*Given this situation, the Arbitral Tribunal can recognize as representatives of Commisimpex only those parties already established in the arbitration proceedings, which have been declared to be closed.*

*Very truly yours,*

*Yves Derains
Chairman, Arbitral Tribunal"*

**154.**     On 13 December 2012, and pursuant to Article 24(2) of the Rules, the International Court of Arbitration extended the term for issuing the Final Award to February 28, 2013.

## III.     POSITION OF THE PARTIES

### A.     Position of the Claimant

**155.**     Commisimpex requests the performance by Congo of the 2003 Protocol that constitutes an agreement between the Congo and Commisimpex, by means of which the Congo recognizes the debt it owed to Commisimpex and agrees to pay it in full.   The whole amount of the debt, totaling 960,000,000 FRF (equivalent to 48 billion CFA francs), is mentioned in this Protocol.   Furthermore, Article 6 of the 2003 Protocol provides that the parties agree *"to enter into a definitive protocol,"* establishing the necessary components of the agreements.   Although Congo did not follow up on its commitment, the validity and the scope of the 2003 Protocol are not affected to the extent that this definitive agreement would only be entered into as a supplement and not with a view to validating the 2003 Protocol.   This article does not refer to subsequent negotiations of the debt owed to Commisimpex that would render the protocol null and void if they were not carried out.   The negotiations referenced in Item 4 are only negotiations with a view to the performance of the Protocol.

**156.**     In addition to specifying the total amount of the debt, the 2003 Protocol determines the procedures for its settlement.   Therefore, pursuant to the 2003 Protocol, the parties agreed to divide the total debt: on the one hand, the *"settlement of 440 million FRF corresponding to the debt still owed by the Republic of the Congo"* in virtue of the 1992 Protocol and owed, pursuant to the 2003 Protocol, by Commisimpex to Banque Saradar; on the other hand, *"the payment of 520 million FRF, corresponding to the remaining portion of the debt of the Congo owed to Commisimpex, that the Congo reportedly had to pay by the attribution of companies to be privatized,"* with an interest rate of 10% per year.   Pursuant to Article 4 of the 2003 Protocol, the second portion of the debt was to be the subject of a *"payment in three installments: one payment in cash, the attribution of companies to be privatized and the payment of the remaining portion in 84 monthly installments, subject to the issuance of a guarantee by the Congo for the benefit of Commisimpex"*.

**157.**     The Congo attempts to question the amount of this debt.   Therefore, Congo's debt owed to Commisimpex was the subject of verification, in particular by the *"highest-ranking Congolese officials"*.   This is the case for the audit carried out by the inter-ministerial committee dated 27 March 1987, which is contained in the 1991 *Fiche de calcul* that evaluates the debt owed to Commisimpex at 29,949,284,818 CFA francs by the CCA.   Congolese officials at the time further confirmed that the amount of the debt was around 29.9 billion CFA francs.   This *Fiche de calcul* includes all the original contracts for the debt owed to

Commisimpex and excludes the instruments not signed by Commisimpex in December 1986, the cancelled contracts (Contract No. 043/86 dated 20 May 1986 which was never performed and Contract No. 185/84 which was discounted on 18 June 1984 from Equator Bank) and the payment received by Commisimpex in the amount of 15 million USD, made by Congo on 28 April 1987, the only payment ever received by Commisimpex.

158.     The Congo did not provide any proof that certain contracts were paid for, as it claims. It submitted in the proceedings a refinancing agreement from 1988 but it was never performed. Commisimpex also never received payment through the discounting of promissory notes, and the only one was made through Equator Bank, the amounts of which are not claimed in this arbitration. Lastly, the assertion that Commisimpex allegedly received "concealed" payments has not be proved. Mr. Gossaki even indicated that if such payments took place, the Congo would have been able to trace them.

159.     The Congo, despite contesting the amount of the debt owed to Commisimpex, did not provide any calculations. It relies solely on two documents issued by the CCA in 1991: a memo addressed to the Minister of the Economy, Finance and Planning and a note addressed to the Minister of Planning, Finance and the Economy. However, the Congo failed to provide the explanatory appendices for the calculations carried out. In any event, the lack of credibility of the amounts set forth in these documents is confirmed by the *Fiche de calcul détaillée* issued by the CCA in September 1991 which shows the amount of the debt as of 31 December 1986 (29,949,284,818 CFA francs) and provides a detail of the contracts included in the calculation as well as the calculation of interest. The amount calculated in this *Fiche* is also mentioned in the minutes of the Conference Council and the Lekoundzou proceedings in 1991-1992.

160.     Thus, during the meetings in September and October 1992, the parties verbally agreed to declare the total debt of the Congo owed to Commisimpex to be 48 billion CFA francs. The letter dated 7 October 1992 further reflects the existence of those meetings. The difference in amount is explained by the addition of the amounts from the report dated 13 February 1988, the report dated 7 October 1988, and the compounding of interest during that period. This calculation has been confirmed by Mazars.

161.     The Congo attempts not only to challenge the existence of these meetings, referring to the minutes of the resolutions of the Board of Directors of Commisimpex dating from 1997, but it further challenges the authenticity of the letter dated 7 October 1992. However, the CCA acknowledged receipt of it by affixing its official seal. Furthermore, the President of the Republic of the Congo was in possession of this disputed letter, as confirmed during a discussion with Mr. Hajaij, head of Commisimpex, in 2003.

162.     The Congo also bases its argument on the expert report of Mr. Ricol, citing the lack of *causa* for the 2003 Protocol. *"Congo today uses this expert opinion and those few documents, which, based on the errors made, lead to an amount of the total debt of the Congo owed to Commisimpex that is significantly lower than the actual figure, to claim that the 2003 Protocol lacks* causa".[3] However, as indicated above, the

---

[3]     Reply, Paragraph 12, page 5.

Parties have agreed since September 1992 that the debt of the Congo to Commisimpex would be split in two parts, the second part of which is covered by the 2003 Protocol.

**163.** With regards to the 1992 Protocol, it only covered a portion of the debt since Banque Saradar was pressuring Mr. Hajaij to recover the amount that it had financed and was threatening to call the 1986 guarantee. The 1992 Protocol had been signed for political purposes. Further, contrary to what the Congo claims, Commisimpex did not waive a portion of its debt and no proof of such a waiver exists.

The appendix to the protocol signed after the protocol by the Congo only, shows that the protocol covered just a portion of the debt. As such, Article 8 of the 1992 Protocol regarding the substitution of the protocol for all prior agreements must be read according to the intention of the parties who intended to settle only a portion of the debt. Furthermore, the Congo does not claim that the 1992 Protocol covered all of the amounts owed pursuant to the original contracts because it stated that certain contracts had already been settled, either because the amount of the 1992 Protocol results from two mark-downs or, as the amount still owed to Commisimpex was not significant, Congo seemed to insinuate that the Protocol was transactional. These arguments are false, since the Congo was not able to prove any payment other than the 15 million USD in 1987 and the claimed mark-downs never took place. Furthermore, as the 1992 Protocol covered only a portion of the debt, the prior debt was still in force.

**164.** Furthermore, the verifications carried out by Ernst & Young and the CCA confirmed the amount of the debt owed to Commisimpex. Ernst & Young, participating in the context of the recording of the debt in CCA's books by the courts of the Congo, first assessed the debt at 48.5 billion CFA francs as of 30 September 1992, but then updated it as of 30 September 2001. Its report was forwarded to Mr. Gossaki, then General Director of the CCA. This report was then analyzed and approved by the Commercial Court and the Court of Appeal of Brazzaville. The Court of Cassation in its cassation ruling of 27 June 2003 did not question it. Then on 24 January 2002, Mr. Gossaki wrote to Ernst & Young and stated in an attachment a debt owed to Commisimpex near that calculated by Ernst & Young, showing that CCA had verified its calculations and carried out certain adjustments. The witness statement of Mr. Gossaki that challenges the estimate by CCA of the debt owed to Commisimpex is therefore devoid of any credibility. In addition, Commisimpex was then summoned and the hearing sheet dated 27 March 2002 confirms that the expert report prepared by Ernst & Young had been verified by CCA and that the conclusion relative to the amount had received a favorable opinion on the part of CCA and had been signed by Mr. Ganféré, a CCA employee, who followed the Commisimpex case. The approval of the estimated amount of the debt was confirmed by an individual sheet dated 10 May 2002. This document also bears the signature of Mr. Ganféré. Messrs. Gossaki and Ikemo, General Director of CCA therefore now claim not to have followed the actions of their subordinate, Mr. Ganféré.

**165.** Further, contrary to the Congo's claims, the 2003 Protocol was validly executed following a delegation by the President of the Republic. The signatories of the 2003 Protocol for the Congo were Messrs. Longobé and Okemba who acted *"by delegation of the President of the Republic, his Excellency, Mr. Denis SASSOU NGUESSO and having authority to this end"*. The approval of the President had been received. This was not subsequently denied by the President. Following the failure to perform the 2003 Protocol,

Commisimpex directly contacted the President of the Republic in letters dated 29 December 2003 and 1 August 2004, but the latter never questioned the validity of the authority of the signatories of the 2003 Protocol. The same applied to Mr. Okemba during his hearing.

**166.** In addition, as Mr. Longobé explained, the practice was often to have a verbal presidential delegation. In a legal opinion dated 7 July 2004, the Supreme Court of the Congo furthermore specified that the Head of State had verbally authorized the signatories of the 2003 Protocol.

**167.** Further, a letter from the signatories of the Protocol, Messrs.Longobé and Okemba to the Ministry of Finance dated 29 November 2003, i.e., after the 2003 Protocol, confirmed that the Protocol had been signed following the instructions of the President. Mr. Longobé reiterated this statement in the context of a police investigation in 2003-2004. Furthermore, this delegation was confirmed by other Congolese officials.[4]

**168.** In any event, the behavior of the various Congolese officials created the appearance of a valid presidential delegation.

**169.** French case law, in regards to the execution of international contracts, *"imposes the application of the principle of the appearance and the legitimate belief in matters of authority, pursuant to a substantive rule of French law"*.

**170.** So, on the date of the execution of the 2003 Protocol, the belief of Commisimpex *"as to the authority of the signatories (…) to validly act to bind the Congo was legitimate,"* since the President of the Republic and the Minister of Finance and Budget had contributed to the execution of the 2003 Protocol and the signatories had acted, as previously indicated, *"by delegation of the President of the Republic"*.

**171.** Furthermore, *"ratification may result from all acts, facts and circumstances that manifest, on the part of the principal, a degree of willingness to ratify"*. On multiple occasions, the *"highest officials of the Congo"* ratified the 2003 Protocol after it was signed. First of all, the signatories of the Protocol emphasized its performance.[5] Furthermore, many Congolese representatives also confirmed the validity of the 2003 Protocol and undertook proceedings to enforce it.[6] Then the Congo began to proceed to the performance of the 2003 Protocol, first with regards to the privatization of companies in which the Minister responsible for privatizations , at the request of Mr. Longobé, sent to Commisimpex a list of companies to privatize on 4 March 2004[7] then, through the Minister of Finance who had requested that the General Director of CCA, Mr. Nguekoumou, *"start to pay the amount owed to Commisimpex, the due date for the first 6 billion CFA franc installment of which [had passed] at that time"*.[8] Furthermore, the legal opinion rendered on 7 July 2004 by Mr. Lenga confirmed the validity of the 2003 Protocol.

---

[4] Exhibits C32 and C71, Hearing of Mr. Andely, Hearing of Mr. Lenga.
[5] Exhibits C163, C59, C167 and C171.
[6] Exhibits C30, C31, C35, C36, C163, C32 and C71.
[7] Exhibits C69 and C172.
[8] Exhibits C34 and C70.

**172.** It is helpful to also note that, contrary to the claims made by the Congo, the participation of the Minister of Finance was required *"only in the absence of an intervention by the President of the Republic"*. The texts submitted by the Congo in fact contradict the practice of Congolese leaders. Thus, *"many contracts and addenda related to the debt owed by the Congo, which agreements committed State finances, were in their vast majority signed by the President of the Republic, and presented no sign of an intervention of the Minister of Finance"*. Similarly, Article 363 of Decree No. 2000-187 dated 10 August 2000, as well as Article 43 of Law No. 1-2000 dated 1 February 2000 emphasize the subordination of the Minister of Finance to the decisions of the President of the Republic.

**173.** Lastly, the 2003 Protocol is a contract that includes binding commitments. The negotiations, which lasted 3 months, were real and were not re-started by the Minister of Finance. The very provisions of the 2003 Protocol confirm the willingness to sign a binding instrument, contrary to Mr. Longobé's statements at the hearing, who still states that he did not have the authority to commit [the Congo] and only suggested that the State would "agree to". It is helpful to recall in this regard that if the Protocol had only presented simple recommendations, it would not have taken the form of a contract and it would not have been necessary to have it signed by both parties.

**174.** The 2003 Protocol was final in spite of the statements to the contrary by the witnesses presented by the Congo. Mr. Longobé stated that the 2003 Protocol was subjected to subsequent verification of the debt by the Ministry of Finance. This was not mentioned in the Protocol. In addition, the Congo before executing the 2003 Protocol had verified its debt owed to Commisimpex: (i) in 2001-2003 by Congolese jurisdictions and the firm Ernst & Young; (ii) in 2002 by the Congolese government during review of the debts of the Congo; and (iii) by Colonel Abia charged with the police investigation. This was confirmed by a summary report dated 20 January 2004 prepared by the administrative and legal advisor to the Office of the President, Armand Ougoundou. The need for subsequent verification of the debt therefore seems pointless and was not justified by Mr. Andely, the Minister of Finance from August 2002 through January 2005, who simply stated his lack of trust in Ernst & Young.

**175.** Then, contrary to what the Congo claims, the 2003 Protocol is not devoid of *causa*. The 2003 Protocol recognized the Congo's debt and provided for terms for the payment of that debt, in particular in its Preamble, which provided for the splitting up of the amount of the debt. In any event, case law considers, with regards to the acknowledgement of debt, that the justification of the obligation is presumed and that it is the responsibility of the subscriber to disprove it. The Congo claims that the 1992 Protocol had the effect of a novation. However such an effect would be only partial, because *"the novation requires elimination of a former obligation, the emergence of a new one and the intent to carry out the novation of the obligation"*. So, *"Commisimpex never intended to grant the effect of a novation to the 1992 Protocol, with regards to the sum of 26 billion corresponding to the companies to be privatized"*.

**176.** Furthermore, the Congo alleges that the claims of Commisimpex would be inadmissible based on the *res judicata* effect of Award No. 9899. However, the 2003 Protocol is a contract entered into after the 2000 Award. There is therefore no doubt that this award could not cover it. Furthermore, contrary to what the Congo claims, the obligation to concentrate please is not absolute. In fact *"the scope of this*

*obligation does not extend to the objects of distinct claims"*. The claims of Commisimpex founded on the 2003 Protocol are therefore admissible.

**177.** Furthermore, the Award was only handed down regarding the 1992 Protocol and its promissory notes, so that the *res judicata* effect related thereto is [only] *"limited to the portion of the debt covered by the 1992 Protocol"*.

**178.** *"Based on the foregoing, Commisimpex respectfully requests that the Arbitral Tribunal:*

*"(i)    order the Congo to pay the amounts owed in relation to the 2003 Protocol, including (considering the lack of enforcement of the 2003 Protocol by Congo) all interest owed on those amounts, after consideration of the amounts granted by the 2000 Ruling, i.e. as of 7 January 2011:*

- *3,247,161,007 French francs, i.e. 495,026,504 Euros;*
- *65,634,875 Pounds sterling;*
- *105,820,227 US Dollars;*
- *3,253,937,125 CFA francs, payable in Euros, i.e. 4,960,595 Euros*

*(ii)    order the Congo to pay interest on the amounts owed to Commisimpex, from the date of the last update of the amount owed (7 January 2011), through the date of the award, at a rate of 10.5% per year, compounded annually;*

*(iii)    order the Congo to pay all expenses and costs (including expenses payable to the ICC, legal expenses and costs, and expenses and costs of the expert, consultant and others), contracted by Commisimpex for the preparation and continuation of this arbitration proceeding, the amount of which shall be presented at the time and in the form that the Arbitral Tribunal will order;*

*(iv)    order the Congo to pay post-award interest on all amounts ordered, from the date of the award through the receipt of payment by Commisimpex, at the rate of 10.5% per year, compounded annually; and*

*(v)    attach any other consequence of law to its decision."*[9]

**179.** Furthermore, following the judgment of the Commercial Court of Brazzaville which ordered liquidation, Commisimpex made the following claims:

*"Commisimpex petitioned the Tribunal, in relation to its forthcoming award:*

*(1) to acknowledge the violation by the Congo of Procedural Order No. 7;*

*(2) to acknowledge the intentional and harmful nature of that violation;*

*(3) to acknowledge the harmful and fraudulent nature of the liquidation of Commisimpex;*

---

[9]    Post-hearing Brief of Commisimpex, 17 February 2012.

*(4) to state, as a result, that, for the purposes of this arbitration, it does not recognize the court-ordered liquidation of Commisimpex;*

*(5) to acknowledge, in this arbitration, the lack of standing of the liquidators appointed to represent Commisimpex;*

*(6) to order in any case that the Congo waive asserting and/or enforcing the ruling of the Commercial Court of Brazzaville dated 30 October 2012, before your court and/or before any other judicial or arbitral jurisdiction;*

*(7) to order the Congo to take the measures necessary so that the CNSS will grant the appeal filed by Commisimpex and Mr. Hajaij, and/or take any other measures allowing the reestablishment of the status quo pursuant to the provisions of Procedural Order No. 7; and*

*(8) to order the reimbursement by the Congo, for the benefit of the claimants, of all expenses incurred in this arbitration by the liquidation proceedings.'*

### B.     Position of the Respondent

**180.**     The parties on 14 October 1992 executed a Protocol, the 1992 Protocol, regarding the consolidation and the settlement of debts still owed to Commisimpex, in relation to contracts for works.

**181.**     Since the 1992 Protocol a global character, amounts to the novation of the debt and included an inclusive amount, resulting in the closing of the process for determination of the debt of the Republic of the Congo, Arbitral Tribunal No. 9899 on 3 December 2000 ruled that the debt owed to Commisimpex totaled in October 1992 a principal amount of 288,634,078 French francs, and ordered the Republic of the Congo to pay approximately 100 million dollars in principal and interest (amount updated as of the date of the Award).

**182.**     In this proceeding, Commisimpex bases its arguments on the 2003 Protocol, establishing the principal amount of the Congo's debt, as of 30 September 1992, at 960,000,000 French francs, to request that the Congo be ordered to pay more than 650 million Euros.

**183.**     Commisimpex claims that the parties were allegedly bound by a verbal agreement to set the total amount of the debt owed at 48 billion CFA francs (960,000,000 FRF) and to split the debt into two portions. Thus 22 billion CFA francs were settled in the context of the 1992 Protocol, which was the subject of the prior arbitration proceeding No. 9899, and the remaining 26 billion CFA francs, which were not covered by the 1992 Protocol, and therefore by Award No. 9899, should have been paid in the form of the attribution of companies to be privatized in favor of Commisimpex. In other words, Commisimpex claims that the 1992 Protocol covers only a partial debt, while the 2003 Protocol covers the entirety of the debt.

**184.**     So, the purpose of the 1992 Protocol was *"to draw up the amounts owed to Commisimpex and to determine the terms of their settlement, having specified that, as it arises from letters of Commisimpex dated 11 March 1993 and 5 June 1997, and as Tribunal No. 9899 noted,*

*the parties were agreed to apply to this debt a mark-down of 25% that the 1992 Protocol should have included".*

185.    The preamble of the 1992 Protocol specified that *"debts still owed for works, after consideration of the various payments made in favor of Commisimpex and the discounting of certain promissory notes totaled:*

*A – 50,592,081.53 FRF  (…)*

*B – 21,201,872.76 Pounds Sterling (…)*

*C – 34,521,293.24 U.S. Dollars (…)*

*D – 1,426,623,801 CFA francs (…)*

*The Republic of the Congo as one party, and Commisimpex as the other, agreed to determine the terms and conditions of the settlement of said <u>remaining debt</u> by means of this agreement."*  (Emphasis added by the Respondent).

186.    Commisimpex claims in this arbitration that in addition to its 22 billion CFA franc debt that it is owed, specified in the 1992 Protocol, it holds a debt of 26 billion CFA francs that allegedly is the result of a verbal agreement granted by President Lissouba and his ministers during meetings held on 7 September, 23 September and 5 October 1992.  This agreement, which was not mentioned for more than ten years, was allegedly not put in written form until June 2003 when the President of the Republic gave Mr. Hajaij a copy of a letter dated 7 October 1992 that was reportedly stolen in 1998 at the time the facilities of Commisimpex were burgled.  This lack of a written instrument seems unbelievable given the specific drafting of the 1992 Protocol.  Mr. Hajaij went so far as to invent in the hearing the existence of minutes of a meeting held on 5 October 1992 during which the Congo reportedly acknowledged this debt.  In reality, this debt of 26 billion did not exist and therefore the 48 billion CFA franc debt does not exist either. No debt other than that resulting from the 1992 Protocol exists and the 2000 award determined the amount of the debt owed.  The 2003 Protocol is therefore fraudulent.

187.    Commisimpex is not able to justify the amount of the debt that it claims.  Furthermore, no justification was given as to the adjustment of the amount of the debt that had been decreed by the 2000 award.

Commisimpex bases its calculations on irrelevant documents that include the Lekoundzou criminal proceedings and the 1991 national council. The purpose of the Lekoundzou ruling was to rule on possible embezzlement and misappropriations of public funds committed in the context of the BCCI loan for 45 million USD subscribed by the Congo, but not to rule on a debt, the determination of which provides no detail.

188.    Mr. Hajaij also referred multiple times to a CCA *Fiche de calcul* dated September 1991.  This document only summarizes the amounts in foreign currencies of the original contracts, to which 10.5% interest was added through 1987.  This document therefore does not present the balance of the amount of the debt after accounting audits in late 1986 and particularly in 1991.  Therefore Mr. Hajaij was not able to justify the 10.5% interest rate, which

is explained by the fact that such a rate is missing from the various agreements. Further, Mr. Hajaij was confused as to the terms under which this document was issued and it is revealing that Commisimpex, which has always had this document, chose not to produce it in ICC Case No. 9899. Furthermore, this document, which was not signed and does not resemble the other documents issued by the CCA, was not recognized by any of the persons to whom it was presented at the hearing. The elements from the Lekoundzou criminal proceedings do not justify the debt owed to Commisimpex.

189. Mr. Hajaij was also relying in his affidavit dated 4 August 2011 on the work of the 1991 national council and in particular on a note from May 1991 prepared by an "Economic and public finance matters" committee mentioning an amount of 29,949,284,818 CFA francs[10] and a note dated 18 June 1991 prepared by an "Improperly acquired asset" committee mentioninf an amount of 28,339,795,515 CFA francs[11]. The first memo, which henceforth is the only one cited by Commisimpex, is not probative to the extent that the national council had but a single purpose: to clarify the conditions under which the 45 million USD BCCI credit had been in put place and used, and the only decision made by that conference – Act 225 – makes no mention of the amount owed.

190. Furthermore, concerning the meetings in 1992, it is helpful to note the surprising lack of corresponding minutes. Yet, Mr. Hajaij mentioned at the hearing that he kept evidence of everything that had taken place. Furthermore, Mr. Ikounga, director of the cabinet of President Lissouba since 1 September 1992, stated that on 7 September 1992, the date of the first meeting, the ministers were not yet appointed and that such a meeting could not have taken place. Lastly, Mr. Hajaij mentioned Mr. Mouamba as Minister of Finance and Mr. Nguila Mongouanga Nkombo as Minister of Planning, Economy and Forecasting as being present at the meeting but they did not receive these titles until a reorganization that took place after 25 December 1992. As to the meeting on 5 October 1992, Mr. Hajaij claimed for the first time at the hearing, that the meeting was the subject of minutes, of which he nevertheless does not have a copy, since it was stolen in 1998. This is contrary to the claims of Commisimpex which indicated that the only written obligation arising from those meetings was the 1992 Protocol, which it held a copy of. Furthermore, if such a copy existed, Mr. Mbéri would undoubtedly have mentioned it. Lastly, Commisimpex would certainly have found a trace of it.

191. The letter dated 7 October 1992, which is deemed to justify the existence of the meetings on 7 September, 23 September and 5 October 1992, is inaccurate and was fabricated for the purposes of these proceedings. In particular it mentions a Minister of Finance and a Minister of Planning, which duties at the time were fulfilled by Mr. Mouamba and which were not separated until later, on 25 December 1992. The explanations by Mr. Hajaij in this regard are not credible, and the contents of the letter reliably show that its author was writing to two separate ministers. This letter therefore must have been drafted ex post facto by a person who forgot the different composition of the first Lissouba government. It is therefore not credible that Commisimpex would not have kept a copy of this document referred to as indispensable, and that no original or copy could be found. So, if Mr. Mbéri had received a copy of this letter, he would have mentioned it in his statement on 31 July 2003. In reality, he only copied in his affidavit the message dated 7 October 1992, which was fabricated a posteriori to suit the needs of Commisimpex.

---

[10] Exhibit C94.

[11] Exhibit C95.

**192.**     As for the amount of the debt, it is helpful to recall that Commisimpex had, in ICC Proceeding No. 9899, submitted documents summarizing a total debt in 1992 of 29 billion CFA francs, which reportedly showed that the 1992 Protocol covered the entirety of the commitments concluded between the parties.  This is particularly the case of its letter dated 11 March 1993 to the CCA, its letter dated 29 April 1999 to Tribunal No. 9899 and of its letter dated 5 June 1997 to the Minister of Finance.

Furthermore, it is undeniable that the 1992 Protocol had a global character, included in an inclusive amount and amounted to a novation of the debt. This is demonstrated in particular by the Note dated 16 January 1997[12] from the CCA to the Minister of Finance, produced by Commisimpex in Case No. 9899, which shows that the 1992 Protocol covered all the contracts.

**193.**     In Award No. 9899, the Arbitral Tribunal analyzed documents supplied by Commisimpex and concluded that:

> *"the difference between the aforementioned total of 28,339,795,515 CFA francs (updated as of 31 October 1992 by COMMISIMPEX to 29,269,98,989 CFA francs) and the total debts specified in Protocol No. 566 (22,235,587,294 CFA francs) is the (second) mark-down of approximately 25% that has been frequently cited by the parties during the proceedings, and explained by COMMISIMPEX to the  CCA in its aforementioned letter of 11 March 2003, relative to the implementation of Protocol No. 566."*

> *"iii)  All documents prior to Protocol No. 566 come from Congolese agencies and related to debts owed to COMMISIMPEX (XI.B.1, 1, h, pp. 29-30 above) and are in agreement as to determining these debt amounts, updated as of 31 May 1991, in the amount of 28,339,795,515 CFA francs and as of 31 October 1992 in the amount of 29,269,598,989, which in total corresponds, after applying a mark-down of approximately 25%, to the total of 22, 235,587,294 (or 21,622,330,040) CFA francs corresponding to the debt (components in FRF, GBP, USD and CFA francs) decreed between Commisimpex and the REPUBLIC OF THE CONGO in Protocol No. 566 (…)."*

It is therefore apparent, in view of the conclusions of the tribunal [in case] No. 9899, that the 2003 Protocol lack *causa*.

**194.**     Furthermore, considering the *res judicata* effect attached to Award No. 9899, the claims of Commisimpex are inadmissible and baseless. The *res judicata* effect attached to a decision rendered on the basis of the recognition of a debt prohibits the party from reintroducing a claim for payment based on the underlying debt.

Furthermore, Commisimpex claims that there is no *res judicata* effect in the presence of a new fact or when a claim was not included in the initial claim.  Such that the theory of the new fact is only considered for *"subsequent events [that] change the situation previously acknowledged in court,"* which distinguishes new elements or means of proof, which are not an obstacle to the *res judicata* effect.  According to Commisimpex, the 2003 Protocol is reportedly the acknowledgement of debt, which, according to legal scholarship, can be analyzed as *"a simple revelation or declaration of a preexisting right*

---

12       Exhibit R73.

*[that] does not engender any new legal situation".[13]* The claims of Commisimpex are therefore inadmissible.

**195.** Concerning the mark-downs, Commisimpex erroneously claims that those mentioned in its letters of 11 March 1993 and 5 June 1997[14] reportedly came after the 1992 Protocol and wassubject to the payment of the debt by the Congo. As was indicated by Mr. Mouamba and Mr. Andely, the Congo agreements however presumed a mark-down. Furthermore, Mr. Hajaij cannot claim that he agreed to a mark-down of 1 billion FRF in 2003 and refused any mark-down in 1992. Regarding the letter dated 11 March 1993, Mr. Hajaij contradicted himself multiple times regarding the date and the terms under which it was signed. So, it is helpful to note that Mr. Mouamba did not prevent Mr. Hajaij from negotiating new terms, but more simply requested that no negotiation would take place "without his prior approval". In addition, Mr. Hajaij corrected his affidavit, confirming that this letter followed a request by the Ministry of Finance to grant a mark-down after the execution of the 1992 Protocol that, if it had been granted, would have been applied to the 26 billion CFA francs. This, however, is contrary to the provisions of the letter written by Commisimpex and contrary to what had been claimed in the previous arbitration, since at that time it involved a mark-down in the Protocol. Regarding the letter of 5 June 1997, Mr. Hajaij developed the same idea of conditional mark-downs, but that is also contrary to what is written in the letter and what he had claimed in ICC case No. 9899.

**196.** Lastly, the amounts appearing in the 2003 Protocol were not approved or verified by the competent authorities, since Commisimpex has always refused to submit to the first stage, i.e. verification of the debt. Furthermore, the documents that it presented were not relevant. First of all, they were prepared in 2002 during a period when the CCA was challenging the claims of Commisimpex in court in Brazzaville, which excludes any idea of agreement by the CCA regarding the figures put forth by Commisimpex. The expert report of Mr. Fylla Saint-Eudes, filed at the request of Commisimpex with Congolese courts, is not reliable, in particular because it takes as its starting point the 1991 *fiche de calcul* and claims to have carried out in-depth verifications with the CCA, which Mr. Gossaki and Mr. Ikemo do not remember. Mr. Fylla Saint Eudes further reached a determination based on documents supplied by Commisimpex and did not attempt to compare those documents with other data. The spreadsheet attached to Mr. Gossaki's letter dated 24 January 2002[15] does not validate the debt, contrary to what is claimed by Commisimpex. Mr. Ganféré who signed that spreadsheet did not have the authority to do so. The purpose of the hearing was not to validate a debt owed by CCA the and in particular the validation was the ultimate responsibility of the Minister of Finance who did not do so. This document cannot be a validation of what is owed by the CCA because Mr. Fylla Saint Eudes explains that the amount shown therein is based on his own court-ordered expert report which was challenged in court by the CCA. Lastly, this document, the very title of which shows that the amounts are "in dispute," does not bear the "Lazard code" for the Commisimpex debt, which shows that it was not verified by Lazard Bank, required for this purpose by the Ministry of Finance. In addition, Congo as well as the CCA challenged this spreadsheet before the Supreme Court of the Congo.

---

[13]      Counter-Memorial on the Merits, para. 374, page 130.

[14]      Exhibits R48 and R68.

[15]      Exhibit C56.

**197.** In any event, the 2003 Protocol is not valid to the extent that it was not approved by the Ministry of Finance, and it was not signed by authorized persons, since none of them had received a delegation by the President of the Republic.

**198.** Commisimpex did not follow the procedure imposed by the competent authorities (verification-reconciliation-mark-down-payment schedule) and therefore the debt was acknowledged by persons who did not have the authority to do so. Commisimpex did not bring any evidence as to the existence of the delegation of authority by the President of the Republic. In reality, only one of the exhibits produced was made known to the latter : an internal note from the legal department of the Office of the President to the President dated 30 April 2004.[16] However this document does not mention a delegation of authority, it does not have the 2003 Protocol attached and it refers back to the Minister of Finance. Furthermore Mr. Longobé, who received the so-called delegation of authority, denies having received instructions to execute the 2003 Protocol and states that he did not inform the latter of the content of the Protocol.

**199.** Mr. Boukamany submitted two consultations in which he shows that a the acknowledgement of a debt is not binding on the State without the approval of the Ministry of Finance. Commisimpex did not submit any legal opinion to the contrary and preferred to question the impartiality of Mr. Boukamany while refusing to question him.

**200.** Lastly, Mr. Andely confirmed in the hearing that the 2003 Protocol had not been approved by the Minister of Finance and that he did not receive any instructions in this regard from the President of the Republic.

**201.** Commisimpex cannot invoke the theory of appearance on the sole basis of the consultation of Mr. Lenga dated 7 July 2004 because it was made upon request and was established after the 2003 Protocol. Mr. Hajaij knew how the Congolese government worked and Commisimpex could not be unaware that the approval of the Minister of Finance was a prerequisite for the 2003 Protocol to be valid. Likewise, the legal opinion of Mr. Lenga does not corroborate the existence of the delegation of authority because it is limited to confirming a reference made to that delegation that therefore does not result from personal knowledge of the existence of the said delegation. So, the *note de service* dated 4 August 2003 does not in any way constitute a delegation of authority by the President. On the contrary, it confirms that Mr. Longobé did not have the authority to execute the 2003 Protocol because it was intended to establish a commission the purpose of which was to "coordinate and follow the Government's dispute". Furthermore, that commission never was in operation, according to Mr. Boukamany.

**202.** With regards to the arguments of Commisimpex concerning the amount of the debt, they rely on a rewriting of the facts and documents and do not consider witness testimony. First of all, the Congo reiterated that the amount of the debt is that specified in the 2000 award. Before 1992, the CCA did not have a complete breakdown of the payments received by Commisimpex.[17] It was not informed of all the discounts and it was often difficult to trace payments coming from abroad, as Mr. Gossaki explained.

**203.** The Congo forwarded copies of the CCA database screen shots that showed as of 13 October 1992 an amount owed of 14 billion CFA francs, and Mr. Ikemo stated that

---

[16]     Exhibit C35.

[17]     Exhibits R48, R36, R37 and R52.

this amount included interest but excluded penalty interests as of the due date. Commisimpex twisted the words of Mr. Ikemo in deducing from the fact that he was not able to identify all the contracts, that this document did not include all the contracts. Mr. Ikemo, as an officer of the CCA, did not have detailed knowledge of the contracts and, as he explained, the base amount represents the amount owed to Commisimpex in the books of CCA and therefore anything that was not included therein was not owed.

204.    In reality, Commisimpex reconstructed a debt after the fact, because no document dating from the 1992-2001 period mentions an amount of 48 billion CFA francs or the existence of a debt beyond the 1992 Protocol amount of 26 billion CFA francs. All the documents from Commisimpex post-date 2001 and therefore were established by Mr. Fylla Saint-Eudes, since Colonel Abia and Congolese officials went back over the terms of the 1992 Protocol to attempt to review Award No. 9899. The same applies to the affidavits from the BCCI/Lekoudzou matter, dating from 2002 and 2003. No document predating 2001 mentions the 48 billion CFA francs, except the letter dated 7 October 1992. Commisimpex relies therefore on a spreadsheet from 1991 that does not mention a 48 billion CFA franc debt or any amount for 1991-1992, a letter dated 15 July 1997 that also does not mention such a debt and the Qwinzy case that does not relate to the Commisimpex debt. It is implausible that no document specified that Commisimpex held a debt in the amount of 48 billion CFA francs in 1992.

205.    The 2003 Protocol is therefore fraudulent in that it acknowledges a debt that does not exist. Furthermore, Mr. Hajaij was incapable of spontaneously providing an explanation for the amount of the debt owed to him. This is in particular the case for the 1991 *Fiche de calcul*, for which Mr. Hajaij did not spontaneously state that it excluded the two 1988 reports from the amount of 29,949,284,818 CFA francs. Furthermore, Mr. Hajaij had claimed the opposite at the beginning of the hearing. Likewise, Mr. Hajaij was not able to explain the increase in the amount of the debt from 29 billion to 48 billion, except by means of his counsel who stated that it was related to "an adjustment by application of the interest rate". The same applies to the theories concerning the mark-downs, where Mr. Hajaij also contradicted himself. For example, Commisimpex claims in regards to the letter of 11 March 1993, that the reference to a mark-down resulted from a demanded by Mr. Mouamba, which was willing that Commisimpex write that the Protocol included such a mark-down. However this is not what Mr. Hajaij stated, when he explained that it related to a request by Mr. Mouamba to grant a mark-down after 1992 and not a request aiming to show that the Protocol included a mark-down. Regarding the letter dated 5 June 1997, Commisimpex claims that the reference to mark-downs resulted from pressure and adds that those mark-downs did not exist. Once again, Mr. Hajaij did not confirm this and stated that Commisimpex had granted mark-downs that allegedly were conditional. Lastly, the explanations from Commisimpex as to the mark-down mentioned in the letter of 11 March 1993 are also incompatible with other statements by Mr. Hajaij.

206.    Ultimately, the Protocol was not executed with the approval of the President and the signature of this Protocol can only be explained by the network of influence of Mr. Hajaij within the Congolese government.

207.    Based on the foregoing,

    *"The Republic of the Congo petitions that the Tribunal:*

*Principal claim:*

    *- Hold and determine the petitions of Commisimpex to be inadmissible due to the* res judicata *effect attached to the final arbitration award of 3 December 2000 in ICC Case No. 9899/AC/DB;*

*Subsidiary claims:*

    *- Hold and determine that the protocol for negotiations dated 23 August 2003 is null and void due to the lack of authority of the signatories;*

    *- Hold and determine that the protocol for negotiations dated 23 August 2003 is null and void due to the lack of approval of the Minister of the Economy, Finance and Budget;*

    *- Hold and determine that the protocol for negotiations dated 23 August 2003 is null and void due to lack of* causa*;*

-    *Hold and determine that the protocol for negotiations dated 23 August 2003 is null and void due to the defective nature of the consent of the Republic of the Congo;*

    *-Therefore, reject the claims of Commisimpex in their entirety;*

*In any event:*

    *- Order Commisimpex to pay all expenses and costs arising from this arbitral proceeding, including fees, expenses and costs for the court and the ICC, as well as the fees, expenses and costs of counsel for the Republic of the Congo, and any other expenses related to the arbitral proceeding."*[18]

**208.**    Furthermore, the Republic of the Congo considers as inadmissable Commisimpex's claims made following the ruling of the Commercial Court of Brazzaville ordering its liquidation and petitions the Arbitral Tribunal to reject them as unfounded

## IV.   **DISCUSSION**

- **PRELIMINARY MATTERS ARISING FROM BY THE COURT-ORDERED LIQUIDATION OF COMMISIMPEX**

---

[18]    Rejoinder on the Merits.

209. Before getting to the dispute between the parties, the Arbitral Tribunal must determine the consequences on the arbitral proceedings of the ruling of the Court of Commerce of Brazzaville dated 30 October 2012 which ordered the liquidation of Commisimpex, in light of the positions and requests of the parties in this regard, considering the liquidator' s contention that he is  the sole representative of Commisimpex since 19 November 2012.

210. Commisimpex has requested that the Arbitral Tribunal to:

> "1. *Acknowledge the violation by the Congo of Procedural Order No. 7;*
>
> 2. *Acknowledge the intentional and improper nature of that violation;*
>
> 3. *Acknowledge the improper and fraudulent nature of the liquidation of Commisimpex;*
>
> 4. *State, as a result, that, for the purposes of this arbitration proceeding, it does not recognize the court-ordered liquidation of Commisimpex;*
>
> 5. *Acknowledge, in this arbitration proceeding, the lack of standing of the liquidators appointed to represent Commisimpex;*
>
> 6. *Order the Congo in any event to waive asserting and/or enforcing the ruling of the Court of Commerce of Brazzaville dated 30 October 2012 before the Arbitral Tribunal and/or before any other judicial or arbitral jurisdiction;*
>
> 7. *Order the Congo to take the measures necessary so that the CNSS will comply with the appeal filed by Commisimpex and Mr. Hajaij, and/or take any other measures to restore the status quo pursuant to the provisions of Procedural Order No. 7;*
>
> 8. *Order the reimbursement by the Congo, to the claimants, of all expenses incurred in this arbitration proceeding by the liquidation proceedings."*

211. The Republic of the Congo concluded that these demands were inadmissible and, in any event, asked the Arbitral Tribunal to reject them as unfounded.

212. Procedural Order No. 9 dated 30 November 2012 has already disposed of Petitions 1 and 2 because the Arbitral Tribunal noted *"that Procedural Order No. 7 which ordered ' (…) the Republic of the Congo to take all measures required so that no Congolese State entity would place Commisimpex in liquidation before the final award is handed down in this arbitration proceeding' did not prevent the declaration of the court-ordered liquidation of Commisimpex, without it necessarily resulting in a violation by the Republic of the Congo of this order"*. The same Order was also made in respect of Petition 7 ordering the Republic of the Congo to *"take all measures necessary to restore the status quo between the parties as quickly as possible and in any event before the pronouncement of the final award"*.  This award can only confirm the first of these decisions.  As for the second, it will be irrelevant after the award is issued.

213.    With the exception of Petition 8 by Commisimpex regarding the reimbursement of expenses incurred during this arbitration by the liquidation proceedings; the others (3, 4, 5 and 6) assume that the Arbitral Tribunal has the authority to rule as to whether a bankruptcy judgment by one of the parties to the arbitration is valid. In order to determine whether the complaints by Commisimpex regarding the court-ordered liquidation ruling are admissible, the Republic of the Congo denies the existence of such authority, *"all the more so since no party asserted them to request the suspension of the arbitration proceeding or attempt to enforce them in order to disrupt the arbitration proceeding that is in progress".[19]* In this regard, the Republic of the Congo emphasizes that it did not assert the liquidation ruling, which was issued after the closure of the proceedings. For its part, Commisimpex invokes arbitration case law according to which the arbitrators are not constrained to acknowledge the effects of a liquidation order, and more specifically, have *"the authority to evaluate, as applicable, the terms and conditions of the liquidation of one of the parties to the arbitration proceedings, and whether or not to apply its effects in the arbitration proceedings".[20]* In this regard, it refers also to a ruling by the Court of Appeal of Paris dated 12 January 1993[21] according to which it was accepted that an Arbitral Tribunal, *"without disregarding international public policy, but, in contrast, to ensure compliance therewith"* was properly able to consider that enforcing a bankruptcy declaration ruling would have, in particular, inevitably resulted in unfairly delaying the conduct of the arbitration proceedings. However the Republic of the Congo objected that although *"in certain circumstances, it has been held that the Arbitral Tribunal could rule on the legality of the bankruptcy declaration, this only involved matters in which one party (or a liquidator) was seeking to assert a foreign bankruptcy ruling to suspend the arbitration, or even to terminate it".[22]* The Republic of the Congo adds that *"it was simply agreed that the Arbitral Tribunal could rule <u>incidentally on</u> the legality of a foreign bankruptcy declaration in the context of the resolution of the dispute submitted to it and, <u>where one party invoked</u> the bankruptcy declaration during the arbitral proceeding and the other opposed it, and only in extraordinary cases where the declaration breached the requirements of international public policy".[23]* (Emphasis added)

214.    Beyond the challenge as to admissibility of the complaints of Commisimpex on the court-ordered liquidation, seemingly justified by the fact that this ruling occurred after the closure of proceedings and that the Congo did notinvoke such liquidation, the Republic of the Congo also challenged the jurisdiction of the Arbitral Tribunal to decideon such matters, since the Congo denies that the Tribunal, in these circumstances, has any authority to rule on the validity of the ruling of the Court of Commerce of Brazzaville dated 30 October 2012. The Arbitral Tribunal can admit neither the challenge on inadmissibility nor the challenge on jurisdiction in its entirety.

215.    The fact that the ruling for the court-ordered liquidation of Commisimpex occurred after the closure of the proceedings and that the Republic of the Congo did not invoke it does not lead to the conclusion that the complaints of Commisimpex are inadmissible. Even if did not intend to invoke the ruling, the liquidator, by letter dated 19 November 2012 nevertheless denied the validity of the actions of Mr. Hajaij, the legal representative of

---

[19]    Letter from Republic of the Congo, dated 22 November 2012, Page 7.
[20]    Letter from Commisimpex dated 14 November 2012, Page 4.
[21]    Exhibit C-RJ 142.
[22]    Letter from Republic of the Congo dated 22 November 2012, Page 8.
[23]    Letter from Republic of the Congo dated 22 November 2012, Page 8.

Commisimpex during the filing of the arbitral proceedings, and indicated that a new attorney would be designated to defend the interests of Commisimpex in the arbitral proceedings. Those proceedings are not terminated by the completion of the parties' submissions, and continue until notification of the award and possibly afterwards, pursuant to the provisions of Article 29 of the ICC Arbitration Rules. Commisimpex has an indisputable interest in the determination of the consequences of the liquidation ruling on the arbitral proceedings and, in any event, the Arbitral Tribunal must rule on the standing of the representatives of Commisimpex in this proceeding after 19 November 2012.

**216.** As to the jurisdiction of the Arbitral Tribunal, the Tribunal believes that it has not only the authority, but also the duty to rule on the effects of the ruling for court-ordered liquidation of Commisimpex on the arbitral proceeding, without this necessarily signifying that it has jurisdiction to rule on all of Commisimpex's claims.

**217.** As was recalled by the Court of Appeal of Paris in a ruling dated 7 April 2011[24] *"although the principles of halting individual cases, relinquishment of the debtor and interruption of the proceedings in the event of bankruptcy are part of international public policy and are applicable even where the arbitration taking place in France is not subject to French law, the arbitrator is simply responsible for verifying, before applying these principles, that the judicial decision that opens the bankruptcy proceedings and appoints a representative is itself compliant with the requirements of international public policy"*. And so an Arbitral Tribunal, informed of the court-ordered liquidation of one of the parties to the arbitral proceedings, even if it is a claimant recovering a debt, must automatically question the consequences that would arise if the proceedings were to continue, in light of the requirements of international public policy. This is *a fortiori* the case when, as here, the liquidator intends to appoint counsel to replace the counsel established previously by the party ordered into liquidation and the latter opposes this. The Republic of the Congo furthermore does not seem to seriously challenge the jurisdiction of the Arbitral Tribunal to thus examine, incidentally, the legality of a ruling declaring the liquidation of one of the parties in the case.[25]

**218.** Nevertheless the jurisdiction of the Arbitral Tribunal is limited by its *raison d'être*, which is to evaluate the effects of the bankruptcy ruling on the arbitration proceedings. As emphasized by the commentator on the judgment of the Court of Appeal of Paris dated 7 April 2011 cited above, *"The control exercised* [by the arbitrator] *over the foreign ruling is only related to the possibility, for the arbitrator, to use or not use it as a determining factor in the resolution of the dispute that is submitted to it"*.[26] The complaints by Commisimpex relative to the ruling of court-ordered liquidation dated 30 October 2012 are therefore admissible and the Arbitral Tribunal has jurisdiction to examine them, inasmuch as they relate to the effects of the ruling on the arbitral proceedings. Furthermore, although the complaints of Commisimpex are not within this framework, one could question their admissibility vis-à-vis the provisions of Article 19 of the ICC Arbitration Rules, although the Republic of the Congo has not invoked this argument.

**219.** In its letter dated 22 November 2012, and during the conference call on 28 November 2012, the Republic of the Congo asserted that if the Arbitral Tribunal should

---

[24]     2011 Arbitration Review, No. 3, Pages 747 ff., Exhibit R-RJ 79.

[25]     See No. 211 above.

[26]     Note S. Bollée under Paris, 11 April 2011, Exhibit R-RJ 79, Page 757, Note 13.

decide to investigate these new complaints, a new procedural calendar must be established to allow *"the parties to present their arguments regarding admissibility and the justification of those complaints in adversarial proceedings within a reasonable time, and in compliance with the equality of arms principle"*. The Republic of the Congo in this respect emphasized that *"Unlike Commisimpex, the State is not a party to the judicial proceedings in Brazzaville and does not have all the components of that case file"*.[27]  The Arbitral Tribunal cannot accept this complaint in the absence of any justification in fact, as such complaint would have the effect, after the closure of the proceedings, of unduly delaying the pronouncement of the arbitral award, while the Republic of the Congo many times reiterated that it expected the ruling and that it did not intend to assert the ruling for the court-ordered liquidation of Commisimpex in this proceeding and should therefore be indifferent to the outcome of the complaints by Commisimpex in this respect, which are aiming to obtain a declaration that the court-ordered liquidation be devoid of any effect in this proceeding.  Particularly, these complaints were investigated in a perfectly adversarial manner: following Procedural Order No. 8 dated 7 November 2012, Commisimpex had 7 days to state its complaints and argue them, which it did in a 16-page letter to which the Republic of the Congo responded on 22 November 2012 with a letter of 18 pages, having received upon request a short extension of the deadline on 21 November 2012.  Thereafter, the parties had the opportunity to prepare and state their respective arguments during the conference call on 28 November, in light of the contents of the letter from the liquidator dated 19 November 2012, forwarded to the Arbitral Tribunal on 27 November.  As for the argument according to which the Republic of the Congo was allegedly less familiar than Commisimpex with the judicial proceedings for liquidation, it is not convincing.  It is not challenged that the CNSS is a Congolese State entity, led by law by the Minister responsible for Social Security.  It is not conceivable that the highest State authorities wouldn't have been properly kept informed of a proceeding related to the court-ordered liquidation of Commisimpex which had, through various cases against the State, attempted to obtain the enforcement of the 2000 Award and that also claimed amounts in excess of 500 million Euros from the State in this proceeding, in which the President of the Republic filed a witness statement.  Furthermore, for the enforcement of Procedural Order No. 7, as is noted by the Republic of the Congo, the Ministry of Justice and Human Rights gave *"instructions to the Public Prosecutor's Office, placed under its authority, to participate in the case filed by the* Caisse Nationale de Sécurité Sociale *("CNSS") against Commisimpex before the Court of Commerce of Brazzaville"*.[28] The Arbitral Tribunal therefore concluded that the parties, in accordance with the principle of equality of resources, were able, in adversarial proceedings, to debate the complaints of Commisimpex relative to its court-ordered liquidation, given the short time periods justified by urgency.  The Arbitral Tribunal therefore was able to rule on these complaints, within the limits of it jurisdiction.

**220.**    In its Petition 3, which is the keystone of all the complaints that were not settled by Procedural Order No. 9, Commisimpex asked the Arbitral Tribunal to acknowledge the harmful and fraudulent nature of the liquidation of Commisimpex.  Commisimpex provided a number of disturbing items to support its claim. These were not, for the most part, challenged by the Republic of the Congo:

•    The debt claimed by CNSS dates back to 1981;

---

[27]        Letter from Republic of the Congo dated 22 November 2012, Page 2.
[87]        Letter from Republic of the Congo dated 22 November 2012, Page 3.

- By order dated 28 September 2012, the President of the Court of Commerce of Brazzaville scheduled for 2 October 2012 (2 business days) the hearing for ruling on the legal grounds of the Request dated 26 September 2012, ordering Commisimpex to present its defense *"within eight days before the hearing"*[29];

- Counsel for Commisimpex requested a one-month continuation, but only 8 days were granted, even though the hearing was postponed to 9 October 2012, then to 16 October;

- The matter was argued on 23 October 2012 and the ruling for liquidation was handed down on 30 October 2012;

- Thus, 34 days passed between the filing of the Request by CNSS and the ruling ordering liquidation of Commisimpex.

221.    The Republic of the Congo explains the filing of this proceeding about 30 years after the date of the alleged debt by citing the risk of expiration of the statute of limitations.  The Republic explained the accelerated proceeding by the fact that it involved a debt related to salaries.[30]  These arguments seem contradictory because if it really was a truly urgent matter considering the nature of the receivable, it was difficult to tell why it was not claimed earlier. One could ask, on the other hand, whether the proceedings for enforcement of the arbitral award of 2000 and the imminence of the pronouncement of the ruling were not more probable explanations for what appeared to be haste. However, this ruling was not definitive because it was appealed and, as the Republic of the Congo properly demonstrated[31], it was for the Court of Appeal of Brazzaville to evaluate the validity of the same.  The Arbitral Tribunal did not have jurisdiction to do so.

222.    In contrast, the Arbitral Tribunal does not need to rule on the allegedly harmful and fraudulent nature of the liquidation of Commisimpex, as the latter requested, to note that recognizing its effects in this arbitration proceeding would not comply with the requirements of international public policy, with regards to which it has jurisdiction.

Even if the claimed debt of 6,323,79. 920 CFA francs (approximately USD 12 million) allegedly owed to CNSS by Commisimpex was confirmed, the Congolese Government owes Commisimpex the amounts that it was ordered to pay in the 2000 Award which is final, since the appeal to quash that award was rejected by the Court of Appeal of Paris on 23 May 2002.  The Republic of the Congo invokes the authority of *res judicata* of that ruling in this proceeding.  The certain debt of Commisimpex in this regard totals 165,416,012 million Euros[32], i.e. more than 10 times greater than the debt claimed by CNSS.  The alleged insolvency of Commisimpex therefore was caused only by the refusal of Republic of the Congo to comply with an arbitral award the authority of which it recognized as *res judicata.*  The Arbitral Tribunal cannot accept the Congo's cynicism that it revealed in this regard, when writing in Note 29 of its letter dated 22 November 2012: *"Contrary to what Commisimpex claims, the fact that it has a debt vis-à-vis the Republic of the Congo is not likely to challenge its cessation of payments since a debt*

---

[29]    Exhibit C-214.

[30]    Letter from Republic of the Congo dated 22 November 2012, Page 14.

[31]    Letter from Republic of the Congo dated 22 November 2012, Page 11.

[32]    Mazars report dated 7 January 2011, Page 3, amounts adjusted as of that date.

*cannot be considered to be part of the liquid assets except under strict conditions – in particular the conditions of certainty and actual prospects for recovery in the short term – which is not fulfilled"*.  The Republic of the Congo could not be clearer in recognizing that its refusal to fulfill its obligations with regard to the 2000 award was sufficient to explain the alleged cessation of payment of Commisimpex and the court-ordered liquidation that resulted therefrom.  As a result it would therefore be contrary to the requirements of good faith that, as was emphasized by the Court of Appeal of Paris in its aforementioned ruling of 12 January 1993[33], is a part of international public policy, to admit that the court-ordered liquidation of Commisimpex could have an effect in this arbitration proceeding.  The Republic of the Congo further seems not to disagree with this conclusion, without however accepting the reasons for the same, since the Ministry of Justice requested that the Government Prosecutor's Office *"do what is necessary to avoid a ruling of bankruptcy being handed down before the award to come"*.[34]  Although these efforts for enforcement of Procedural Order No. 7 were not carried out, the Arbitral Tribunal trusts that Procedural Order No. 9, which orders the Republic of the Congo to *"take all measures necessary to restore the status quo between the parties as quickly as possible and in any event before the pronouncement of the final award"* will have permitted the reestablishment of the status quo prior to the ruling of 30 October 2012 upon notification of this award.

223.     Based on the above, the Arbitral Tribunal declares to have jurisdiction to rule on Petition 3 of Commisimpex but declares that the requirements of international public policy oppose the liquidation of Commisimpex having any effects in this proceeding, thereby admitting Petition 4 of Commisimpex.  As a result of which, and as is requested by Commisimpex in Petition 5, the Arbitral Tribunal notes the lack of standing of the liquidators appointed to represent Commisimpex in this arbitral proceeding.

224.     In Petition 6, Commisimpex requests that the Arbitral Tribunal order the Republic of the Congo to waive asserting and/or enforcing the ruling of the Court of Commerce of Brazzaville dated 30 October 2012, before the Arbitral Tribunal and/or before any other jurisdiction, whether judicial or arbitral.  This claim is superfluous with regard to the Arbitral Tribunal, due to the response given to Petition 4.  The Arbitral Tribunal must declare itself not to have jurisdiction otherwise, in that it does not have standing to replace the other jurisdictions that could be called upon to enforce the ruling of the Court of Commerce of Brazzaville dated 30 October 2012.

225.     In its Petition 8, Commisimpex requests that the Republic of the Congo be ordered to reimburse all expenses incurred in this arbitration by the liquidation proceeding.  The Arbitral Tribunal can only dismiss this request because it did not establish that the liquidation proceeding was initiated by the respondent in the present arbitration proceeding.

226.     As was already stated, Procedural Order No. 9 dated 30 November 2012 has already disposed of Petitions 1, 2 and 7.

---

[33]     1994 Arbitration Review, No. 4, Pages 685 ff., Exhibit C-RH 142.

[34]     Letter from Republic of the Congo dated 22 November 2012, Page 3.

- **THE DISPUTE BETWEEN THE PARTIES**

**227.** Primarily, Commisimpex petitions the Arbitral Tribunal to order:

> *"The Congo to pay the amounts owed in relation to the 2003 Protocol, including (considering the lack of enforcement of the 2003 Protocol by Congo) all interest owed on those amounts, after consideration of the amounts granted by the 2000 Ruling, i.e. as of 7 January 2011:*
>
> - *3,247,161,007 French francs, i.e. 495,026,504 Euros;*
> - *65,634,875 Pounds sterling;*
> - *105,820,227 US Dollars;*
> - *3,253,937,125 CFA francs, payable in Euros, i.e. 4,960,595 Euros."[35]*

**228.** The Republic of the Congo concludes, primarily, that these petitions by Commisimpex were inadmissible due to the *res judicata* effect attached to the arbitral award of 3 December 2000 rendered in ICC case No. 9899. In its partial award dated 20 August 2010, the Arbitral Tribunal postponed consideration of this *res judicata* defense to the merits stage. It will examine it first (A). It is only to the extent that it would decide to reject such defense that it would rule on the validity of the 2003 Protocol and its binding nature, both challenged by the Republic of the Congo on various grounds (B). If the Arbitral Tribunal confirms the validity of the 2003 Protocol, it will then rule on the amounts owed in application thereto by the Republic of the Congo to Commisimpex (C). Lastly, it will rule on the allocation of the burden of the arbitration costs (D).

A.     Regarding the *res judicata* effect of ICC Award No. 9899 dated 3 December 2000.

**229.** The Republic of the Congo considers primarily that:

> *"this proceeding would[…] only be intended to question th equantum, as determined by the Tribunal that rendered Award No. 9899, of the debt arising out of the enforcement of the same contracts. In other words, what Commisimpex qualifies here as 'another part of the debt' consists more precisely of an amplification of the amount of the debt arising from the enforcement of the contracts as held by the first arbitrators."[36]*

The Republic of the Congo adds that:

> *"the parties agree on the fact that the entirety of the contracts entered into between the parties and that serve as the basis of the debt to Commisimpex was examined in the context of ICC Proceeding No. 9899"* and that *" (…) Tribunal No. 9899, after having determined that the resulting amounts had been the subject of consolidation and novation of the terms of the 1992 Protocol, in Item I of its order, established the amount of the debt in dispute (i.e. 288,634,078 FRF in principal, in October 1992)."*

---

[35]     Post-hearing Brief, 17 February 2012.

[36]     Brief regarding Jurisdiction, Paragraphs 98 and 99, Page 32.

It concludes that, based on the shared identity of *causa* and object:

> " (…) any petition by Commisimpex that, as in this case, targets the payment of a debt arising out of the same contracts conflicts with the res judicata *effect attached to ICC Award No. 9899 and is inadmissible.*"[37]

**230.** According to the Claimant :

> " (…) this debate regarding the res judicata *effect of ICC Award No. 9899 is first of all irrelevant: the 2003 Protocol, a new contract entered into by the parties subsequent to the 2000 Award, justifies the consideration, in this arbitration, of the entirety of the total debt of the Congo to Commisimpex and, thus, the admissibility of all the petitions of Commisimpex. As such, the* res judicata *effect of the 2000 Award cannot be invoked against Commisimpex.*"[38]

Commisimpex then specifies that if the *res judicata* effect of the 2000 Award was taken into consideration, it only has a limited scope because these petitions in Arbitration Proceeding No. 9899 involved the amounts owed under the 1992 Protocol and not the entirety of the debt owed by Congo to Commisimpex or the related contracts.

**231.** Contrary to the statements of the Respondent, there is no shared identity of *causa* and object of the petitions decided by the 2000 Award and those submitted to the Arbitral Tribunal. The latter were solely based on the Protocol supposedly concluded between the parties in 2003 and not by the 1992 Protocol, the basis of the 2000 Award. It is true that the text of the 2003 Protocol, in its description of the debt of the Republic of the Congo, represents an amount of 22 billion CFA francs, *"the subject of the [1992] Protocol"* to which it adds a *"second portion"* of 26 billion CFA francs, but it does not follow that the petitions of Commisimpex are founded, even partially, on the 1992 Protocol. They are founded on the 2003 Protocol which, if it is considered to be valid, would replace the 1992 Protocol.

In this regard, the argument according to which the 2003 Protocol is unlikely to create a new legal situation because it involves the acknowledgement of a debt is not relevant. This observation, simply regarding a unilateral act, does not relate to an agreement in which two parties agree together that one owes specific amounts to the other. Although such a debt acknowledged by both parties would not have any existence prior to the agreement, the latter could cause it to be created if its validity was recognized, which is in part the subject of this proceeding. The parties may, by mutual agreement, establish the *causa* and, as has properly been seen, in bilateral contracts, the *causa* flows from the nature of the contract itself.[39]

Furthermore, and as an important aspect allowing the comprehension of the position of the parties, although the annulment proceedings filed by the Republic of the Congo and the CCA before the Court of Appeal of Paris on 2 January 2001 was rejected on 23 May 2002, the 2000 Award was never enforced. Therefore it is not surprising that, taking into account such

---

[37] Rejoinder on the Merits, Para. 325, Pages 118 and 119.

[38] Reply on the Merits, Para. 514, Page 225.

[39] Ph. Mallaurie, L. Aynés, Civil Law, Obligations, 2nd Ed., 1990, No. 514, Page 283.

facts, the Republic of the Congo and Commisimpex, in a new protocol, reevaluated the debt of the Republic and came to an agreement regarding new settlement terms. The *res judicata* effect of the 2000 ruling could not fail to be implemented by the arbitral provisions of this new agreement. The Claimant further takes into account amounts that were allocated to it by the 2000 Award in the calculations of the amounts that it seeks, recognizing itself the *res judicata* effect of the award. And if this new agreement was non-existent or invalid, as the Republic of the Congo contends, *inter alia*, by absence of *causa* or for any other reason, the petitions of Commisimpex would not be inadmissible but would be rejected. The defense of *res judicata* raised by the Republic of the Congo cannot therefore be successful and will be rejected by the Arbitral Tribunal.

B.    Regarding the validity of the 2003 Protocol and its binding nature

**232.**    In order to challenge the validity of the 2003 Protocol, which it claims to be fraudulent, the Respondent relies on various arguments that can be grouped into four major categories: the first concerns the alleged lack of authority of the signatories of the Protocol to bind the Republic of the Congo (a), the second relates to the alleged absence of a binding nature of the Protocol (b), the third concerns the ignorance of the amount of the debt as formulated by the 2003 Protocol (c), and the final arguments are based on the alleged absence of *causa* of the 2003 Protocol due to the erroneous amount of the debt that it states(d).

a.    *Regarding the alleged absence of authority of the signatories of the 2003 Protocol*

**233.**    According to the Respondent, the signatories of the 2003 Protocol had not received the authorization from the President of the Republic, since no written delegation had been provided in the file.

**234.**    In order to show otherwise, the Claimant bases its argument first on the terms of the 2003 Protocol itself, which mentions the existence of a delegation of authority given to its signatories by the President of the Republic of the Congo. The Claimant also invokes the theory of apparent authority, strengthened by its confirmation on the part of high-ranking Congolese officials and its allegation that the Congolese government had begun to enforce the Protocol.

**235.**    After a detailed examination of the respective positions of the parties as well as the exhibits submitted by them in support of their respective claims and the witness statements received, the Arbitral Tribunal concludes that regardless of the procedures for authorization received by the signatories of the 2003 Protocol during its signature, the Republic of the Congo cannot validly claim lack of authority in order to challenge its validity.

**236.** Although it is true that the Claimant did not submit a written statement from the President of the Republic that expressly authorized the signatories of the 2003 Protocol to sign it for him and on his behalf, the Arbitral Tribunal is convinced that Messrs. Longobé and Okemba had such authority, in light of many signs that leave no room for doubt.

**237.** First and foremost it is noted that the two signatories, Messrs. Longobé and Okemba, were very close to the President of the Republic. Mr. Longobé was the General Secretary of the Office of the President of the Republic and Mr. Okemba was the Secretary of State, Secretary General of the Security Council and furthermore the nephew of the President.[40] Further, they did not hesitate to expressly state in the 2003 Protocol that they were acting *"further to a delegation by the President of the Republic, his Excellency Mr. Denis SASSOU NGUESSO and having authority to this end"*. It is hardly credible that the said persons would have made such a statement in writing if it had been inaccurate. Furthermore, in the affidavit dated 6 May 2011, Mr. Longobé does not in any way state that he was not acting by delegation of the President of the Republic when he signed the 2003 Protocol. The essence of his statement is that it was not a final protocol but a negotiation protocol and that *"only a final agreement concluded by the Minister of Finance would be binding on the State officials"*[41] because he did not have the authority to do so. He confirmed, with qualification, this statement at the hearing by stating that he did not exceed the authority that he had been given but that the solutions of the 2003 Protocol would only be applicable if they were approved by the competent authorities, in this case the Minister of Finance.[42]

**238.** The authorization of Messrs. Longobé and Okemba is confirmed by multiple elements. It is helpful first to recall that the existence of the Protocol was never kept secret—quite the contrary. Shortly after the signature date (23 August 2003), Mr. Hajaij, in letters dated 29 December 2003 and 8 January 2004[43], addressing the Minister of State, Secretary of the General Security Council and the Minister of the Economy, Finance and Budget, respectively, recalled the conclusion of the same and petitioned for its enforcement, as follows:

> *"Lastly, we must recall that as of 31 December 2003, all the actions described in Article 6 of the protocol should have been carried out. This is not the case as of 08/01/2004 (…). Out of desperation, we once again turned to His Excellency, the President of the Republic, who verbally instructed us on 6 January 2004 to directly contact you again in order to implement the protocol of 23 August 2003, the purpose of our request today"* referring also to a desire to *"make concrete the amicable agreement that was entered into."*[44]

In a letter dated 16 February 2004[45], Mr. Hajaij also addressed the Minister of State, Transport and Privatization in order to request the enforcement of Article 4, Item 2 of the Protocol,

---

[40]    Affidavit of Mr. Hajaij dated 4 August 2011, No. 68, p. 17.

[41]    Affidavit of Mr. Longobé dated 6 May 2011, Page 2.

[42]    Transcript of the hearing of 21 December 2011, Page 13.

[43]    Exhibits C28 and C29.

[44]    Exhibit C29.

[45]    Exhibit C33.

i.e. the reimbursement of 20 billion CFA francs in the form of the privatization of companies.

**239.** In a letter dated 30 January 2004[46], Mr. Mouko, Director of the Cabinet of the Office of the President, charged with Government Auditing, in response to a letter from Mr. Hajaij dated 6 January 2004, acknowledged receipt of the 2003 Protocol forwarded by Mr. Hajaij, congratulating himself:

> *"for the consideration of his work* (that of the Office of the President) *by the execution of the protocol dated 23 August 2003, which recognized the closing of accounts of 30 September 1992 in the amount of 960,000,000 French Francs, i.e. the equivalent of 48,000,000,000 CFA francs, including 26,000,000,000 CFA Francs for COMMISIMPEX S.A. and 22,000,000,000 CFA francs for the account of Banque SARADAR, on the one hand, and on protocol No. 566 dated 14 October 1992, on the other hand (…)."*

So, beyond confirming the existence of the 2003 Protocol, this letter summarizes the debt to Commisimpex in the amount of 48 million CFA francs decreed as of 30 September 1992, without discussing it in any way.

Likewise, by letter dated 5 February 2004[47], Mr. Yoka, Minister Director of the Cabinet, forwarded to the Minister of the Economy, Finance and Budget, *"for competence,"* a copy of the 2003 Protocol, insisting on the fact that:

> *"The Head of State attaches particular interest to the enforcement of the clauses set forth in said protocol, in order to avoid any judicial proceeding against our country, and also to freeze the irrevocable guarantee granted to this company on 22 December 1986."*

**240.** There is therefore no doubt that several months after the signature of the Protocol, the various ministries involved, the Minister of State, Secretary of the General Security Council, the Minister of Economy, Finance and Budget, the Minister of State, Transport and Privatization and the Director of the Cabinet of the Office of the Presidency, charged with Government Auditing, had been informed of the existence and the content of this Protocol and had been invited to enforce it.

**241.** In addition, as is attested to by a Note from the legal and administrative department of the Office of the President dated 30 April 2004[48], addressed to the President of the Republic directly, the Protocol had, in reality, been forwarded to the Minister of Finance on 29 December 2003, who received reminders from the Director of the Cabinet on 5 January and 15 March 2004 *"of the need and interest of the country in enforcing said protocol"*. At that specific moment, the Minister of Finance did not issue any formal reservations either regarding the delegation of authority or regarding any obligation on its part to validate the Protocol.

**242.** In any event, the President of the Republic, Mr. Sassou N'Guesso had been, even if it wasn't the case earlier, which is very improbable, informed at this stage of the existence *"of a protocol of agreement for the amicable settlement between the two parties"* and far from being outraged at the existence of an agreement not signed by his office, he merely

---

46    Exhibit C30.
47    Exhibit C32.
48    Exhibit C35.

Noted that he would have to *"ask the Minister of Finance, since the latter had once reported to me that he has direct contacts with COMMISIMPEX officials"*.

**243.** So, very briefly after the signature of the 2003 Protocol, neither the President of the Republic nor the Minister of Finance, questioned the validity of the 2003 Protocol nor made any formal remark regarding the procedure leading to its signature. The Arbitral Tribunal is convinced that if these signatures had not been valid and if the President of the Republic or the Minister of Finance were unaware of the existence of such an agreement when it was executed, they would have formally and publicly stated their surprise, even their displeasure or their opposition as early as possible, since the stakes at play in this agreement were too significant to be kept silent.

**244.** Furthermore, soon after the execution of the 2003 Protocol, the question of its enforcement by the Republic of the Congo either by its representatives or by the signatories of the Protocol arose. In a letter dated 4 March 2004[49], the Minister of State, Mr. Isidore Mvouba, acknowledged receipt of the copy of the Protocol and, basing himself on the provision relative to the privatization of companies specified in the Protocol, provided a list of companies to the Chairman and CEO of Commisimpex, mentioning however that *"the framework law regarding privatization excludes any form of compensation"*.

*245.* Similarly, in a letter dated the same day[50], the General Director of CCA, Mr. Georges Nguekoumou, after having recalled the terms of the Protocol and the procedures for repayment of the debt, emphasized that the *"CCA still has not received the funds necessary to establish the bank deposit of 6 billion CFA francs"* that corresponded to a portion of the 26 billion that the State had to repay in this way.

**246.** Even more meaningfully, the signatories of the Protocol themselves requested that the various State authorities enforce the Protocol. Mr. Longobé, as of 15 January 2004[51], in effect stressed to the Minister of the Economy, Finance and Budget, for him to agree:

> *"(…) to (…) receive Mr. HODJEIJ, Representative of COMMISIMPEX and to determine with him the procedures for application of the negotiation protocol dated 23 August 2003"* and *"considering the procedures the constraints arising from the warranties given by the Congolese Government and, considering the need to avoid other complications, particularly with Banque SARADAR."*

These words confirm that the 2003 Protocol was known to the highest ranking officials, who intended to implement it.

**247.** This is further recalled by Mr. Okemba in a letter dated 29 November 2003[52], to the attention of the Minister of the Economy, Finance and Budget, indicating:

> *" (…) you are requested to organize the implementation of this agreement in relation to COMMISIMPEX and with the other ministerial departments involved."*

---

[49] Exhibit C69.
[50] Exhibit C70.
[51] Exhibit C59.
[52] Exhibit C163.

**248.** Likewise, Mr. Okemba stated to the Minister of State, charged with government coordination, the Minister of Transport and Privatization, that:

> *"in the context of the implementation of the said protocol, we are pleased to forward this to you, for your review, to the extent that a component of this matter may relate to privatization."[53]*

**249.** Lastly, in a letter from the Longobé and Okemba dated 29 March 2004[54], they requested that the Minister of the Economy, Finance and budget *"kindly consolidate the achievments of the protocole dated 23 August2003".*

**250.** All of this correspondence deprives the comment of the Respondent of any impact when it states:

> *"(...) the absence of a detailed response to the allegations set forth in the flood of untimely letters by Commisimpex, in order to maintain* a posteriori *evidence, is not proof of the veracity of those allegations"*

And the same goes for when the Respondent adds that:

> *"the allegations of Commisimpex therefore cannot lead to the challenge of the statement of the President of the Republic according to which he attests to not having given any delegation to sign the 2003 Protocol."[55]*

**251.** The Arbitral Tribunal notes that it is not necessary to use as a basis the letters of Commisimpex to conclude that the highest Congolese authorities considered themselves to be bound by the 2003 Protocol, without the need to question Commisimpex's willingness to *"establish* a posteriori *evidence"*. Contemporary letters from the Congolese administration are sufficient and make the statements of President Sassou N'Guesso in his letters dated 6 May and 27 October 2011, occurring eight years later, according to which he allegedly did not give any instruction to sign the 2003 Protocol, not very credible. It is unlikely that so many agents of the Congolese State could have acted, without him knowing, and that, having necessarily learned about their actions, he would not have immediately taken action for termination if the Protocol had been signed without his authorization. In this regard it is regrettable that he refrained from coming to testify at the hearing, preventing the Arbitral Tribunal from considering his written statement.

**252.** In this regard, the argument of the Republic of the Congo according to which Commisimpex could not claim a subsequent ratification by a non-existent delegation is meaningless. The Respondent claims that a ratification *"can only be cited in two cases: (i) an express ratification by the principal, who assumes for its own account the commitments made by the agent beyond its authority; or (ii) an implicit yet unequivocal ratification"* adding that the ratification must *"emanate from the*

---

[53]    Exhibit C167.

[54]    Exhibit C179.

[55]    Counter-Memorial on the Merits, Paras. 242 and 243, Pages 80 and 81.

[56]    Exhibits R 55 and R92

*principal itself*".[57]   However, as indicated, the Arbitral Tribunal is convinced of the reality of the existence of the contested delegation due to the many signs mentioned above.  No ratification is therefore necessary.  Furthermore, although it is true that the President of the Republic did not expressly ratify the 2003 Protocol, it appears in light of the previously mentioned documents and in particular Exhibit C35 in which he was advised to enforce said Protocol, that the President of the Republic ratified it, since he did not state any surprise regarding its existence, did not object to its content and merely stated that it was necessary to *"ask the Minister of Finance"* not about the Protocol itself but apparently about its enforcement.

**253.**   Considering the foregoing, the Arbitral Tribunal rejects the Republic of the Congo's claim that the 2003 Protocol is null and void due to a lack of authority on the part of its signatories.

   *b.*  <u>Regarding the alleged non-binding nature of the 2003 Protocol</u>

**254.**   In order to challenge the binding nature of the 2003 Protocol, the Republic of the Congo invokes two types of arguments which feed off each other.  The first, already invoked when the testimony of one of its signatories, Mr. Longobé, was mentioned, is that the Protocol did not reflect a firm agreement but rather a Protocol for negotiations, according to which *"the State agreed simply to negotiate to seek an agreement regarding the amount of the debt to be repaid and the staggering of payments".*[58]   According to Mr. Longobé, as was observed, the authority delegated to the signatories of the 2003 Protocol only authorized them to seek out avenues of negotiation intended to then be conducted by the Minister of Finance, who could then commit on behalf of the State in a final agreement.[59]   However the Republic of the Congo also claims that even if the signatories actually had a delegation of authority allowing them to go beyond the determination of elements for negotiation, the Protocol would require the countersignature of the Minister of Finance in order to be binding on the State, as was required by Law No. 1-2000 dated 1 February 2000 regarding the institutional act on the financial system, in Article 74, which provides that:

> *"Any decree, convention and in general any measure, of any type whatsoever, likely to commit public finances, shall have the countersignature of the Minister of Finance."*

**255.**   These arguments on the part of the Republic of the Congo, although closely related, bring up two distinct problems.  Did the Republic of the Congo, in the 2003 Protocol, assume firm commitments that went beyond an agreement setting out the grounds for negotiations? If so, are these commitments firm and binding, in the absence of the countersignature of the Minister of Finance?

**256.**   The Arbitral Tribunal notes that although the 2003 Protocol is entitled "PROTOCOL FOR NEGOTIATIONS BETWEEN THE GOVERNMENT OF THE CONGO AND COMMISIMPEX S.A.," it closely resembles an agreement creating rights and obligations for the parties due to the terms used, which aim, primarily, to

---

[57]  Counter-Memorial on the Merits, Para. 305, Page 97.
[58]  Affidavit of Mr. Longobé dated 6 May 2011, Page 2.
[59]  Affidavit of Mr. Longobé dated 6 May 2011, Page 2.

give it mandatory force. It specifies that it is the result of *"negotiations undertaken on 27 May 2003 at Brazzaville"* between the parties *"in regards to the debt of the Congo vis-à-vis COMMISIMPEX,"*[60] which seems to justify its title as Protocol for negotiations. The negotiations are not to come, they have already taken place, and the Protocol embodies their result. On this basis, both parties *"agree"*[61] to the features and the amount of the debt owed by the Congo, which *"recognized that the debt of 960,000,000 FRF"* was shared as a result of the meetings held on 7 and 23 September 1992.[62] Then, it was stated that the parties *"have* (sic) *agreed to"* a number of firm commitments drafted in binding terms:

> - *"Article 1 – The Government of Congo <u>assumes responsibility for</u> the debt of COMMISIMPEX and that of the Hojeij group and family (…);*
>
> - *Article 2 – The Government of Congo agrees to negotiate directly with Banque SARADAR (…);*
>
> - *Article 3 – The Government of Congo <u>agrees to reimburse</u> COMMISIMPEX the amount in principal of 520 million FRF (…);*
>
> - *Article 4 – The Government of <u>Congo agrees to pay</u> COMMISIMPEX the amount of 520,000,000 FRF (…)"*

**257.**     The Arbitral Tribunal can therefore only conclude that the 2003 Protocol has binding contents vis-à-vis the Republic of the Congo, that Article 6 thereof is not sufficient to suppress. That article reads as follows:

> *"the Government of Congo agrees, by 30 December 2003:*
>
> - *To put in place the moratorium specified in Article 3 above,*
> - *To execute the transfer instruments for the companies specified in §4-2,*
> - *To finalize negotiations with Banque SARADAR, specified in Article 2 above,*
> - *And to conclude a Definitive Protocol with COMMISIMPEX to replace the present Protocol, in order to close out the negotiations in progress."*

**258.**     This reference to a definitive protocol does not call into question the binding and mandatory nature of the 2003 Protocol. It serves, as is stated in Article 6, as a "closing" document setting forth the accomplishment of certain actions for the implementation of the obligations contained in the 2003 Protocol.

**259.**     In addition, as was noted above, the high authorities of the Congo were not mistaken when they stated that the Office of the President of the Republic *"acknowledged the declaration of accounts as of 30 September 1992 in the amount of 960,000,000 French Francs,"*[63] and that *"The Head of State has particular interest in the enforcement of the clauses set forth in*

---

[60]     Exhibit C27: 2003 Protocol, Pages 1 and 2.

[61]     Exhibit C27: 2003 Protocol, Page 2.

[62]     Exhibit C27: 2003 Protocol, Page 2.

[63]     Exhibit C30.

*The said protocol"*[64]  The same can be said of when the legal and administrative unit of the Office of the President, on 30 April 2004, [65] described the 2003 Protocol the President of the Republic as a *"protocol for amicable settlement between the parties"* and recommended that he *"instruct the Minister of Finance to carry out the commitments that were made"*.  That this document was signed by proxy in no way changes the description given to the 2003 Protocol.

260.    Likewise, the Republic of the Congo cannot enforce on the Claimant the provisions of Article 74, of Law No. 1-2000 dated 1 February 2000 regarding the institutional act on the financial system.  This text, with very general content indicating effectively that any measure which is *"likely to commit public finances,"* should bear the countersignature of the Minister of Finance, as a rule, appears to be an administrative rule applicable to the authorization of a payment related to a decision, and not a rule applicable to the validity of that decision.  The fact that it relates to a decree as well as a convention confirms this.  If it were otherwise, the Minister of Finance and not the President of the Republic would be the highest State authority and the only one to have actual authority.  That is obviously not the case.  The Minister of Finance receives instructions from the Head of State, as is illustrated by the aforementioned note dated 30 April 2004[66] from the legal and administrative unit of the Office of the President recommending that the President of the Republic *"instruct the Minister of Finance to carry out the commitments that were made"* in the 2003 Protocol.  Furthermore, the 2003 Protocol contains no mention of the requirement of the countersignature of the Minister of Finance and none of the representatives of the Republic of the Congo referred to such a requirement at that time.

261.    Finally, even if the Arbitral Tribunal would not find, on the on the basis of contemporary evidence provided, the existence of the authority of the signatories of the 2003 Protocol to commit the Republic of the Congo or the binding nature of that Protocol, one can only agree with the argument of the Claimant when it emphasizes that:

> *"the behavior of Congo created on the part of Commisimpex a legitimate belief in the authority and the charge given to the signatories of the Protocol"* and that *"the legitimacy of that belief was subsequently confirmed by the Legal Opinion signed by the two highest judges of the Congo concluding to the validity of the 2003 Protocol."*[67]

262.    The argument of the Republic of the Congo according to which Commisimpex cannot use the theory of apparent authority because it allegedly did not *"cumulatively demonstrate, on the one hand, that it could legitimately believe that the signatories of the 2003 Protocol had received authority to execute said Protocol, and on the other, that it could legitimately believe that the intervention of the Minister of Finance, with whom Commisimpex signed all the instruments regarding the settlement of its debt for twenty years, was not required"*[68] is not relevant.

263.    First of all, if, as the Respondent claims, the appearance had to be verified at the time the Protocol was concluded, it is undeniable that the Protocol stated that

---

[64]     Exhibit C32.

[66]     Exhibit C35.

[67]     Post-hearing Brief of Commisimpex dated 17 February 2012, Para. 16, Page 5.

[68]     Republic of the Congo's Rejoinder dated 15 November 2011, Para. 544, Page 49.

Messrs. Longobé and Okemba were acting upon *"the delegation of the President of the Republic"*. That, therefore, was why the Respondent challenged the legitimacy of Commisipex's belief in thisapparent authority. However, unless the fraud alleged by the Respondent wasnot limited to the signatories of the Protocol and theClaimant, which the Respondent does not suggest, one cannot doubt the legitimacy of the belief in the validity of the Protocol shown by multiple Congolese authorities and in particular those that started to carry it out.

264.    The legitimate nature of the belief of Commisimpex in the validity of the 2003 Protocol was also confirmed in the Legal Opinion dated 7 July 2004, signed by Mr. Lenga, acting as the First Chief Justice of the Supreme Court and, co-signed by Mr. Henri Bouka, Associate Chief Justice of the Supreme Court, ruling at the request of the Secretary General of the Office of the President of the Republic. This opinion states that:

> *"Mr. LONGOBE and Mr. Jean Dominique OKEMBA received from the President of the Republic the task of negotiating and signing with COMMISIMPEX S.A. (…)the Protocol for Negotiations"* and that according to Congolese law *"authorization, even if verbal, given by the Head of State is irrevocably binding on the Congolese State in regards to the commitments made by the Plenipotentiaries unless the President of the Republic challenges the authority previously granted, which is not the case here."*

It is thus confirmed that a verbal authorization for the signatories of the Protocol was sufficient and that the obligations arising from the 2003 Protocol are irrevocable commitments of the Congolese State.

265.    It is true that on 25 February 2011, in a letter addressed to the counsel of the Republic of the Congo in this case[69], Mr. Lenga did not hesitate to explain having an *"ad hoc legal opinion," "delivered favorably"*. He states that the 2003 Protocol, *"inasmuch as it commits public finances, should have been entered into with the countersignature of the Minister of Finance, as had in other cases been done for the 1992 protocol, regarding which my opinion had been requested at the time"*. This letter is, to say the least, surprising, because Mr. Lenga confirms that it was: *" (…) in consideration of the sociology of the context that I rendered this legal opinion, acting personally, and the Supreme Court for its part can only issue opinions in very specific cases specified by the law regarding the establishment of the Supreme Court"*.

266.    Neither the letter of Mr. Lenga nor the conclusions drawn therefrom by the Respondent are convincing. In his letter dated 25 February 2011, Mr. Lenga states that he:

> *" (…) drafted that legal opinion going in the direction that was asked* [of me] *by the Secretary General of the Office of the President and Mr. Hojeij, a friend of the Congo, as a favor."*[70]

267.    This leads one to assess the credibility to be attached to his statements with the greatest caution. For example, if the approval of the Minister of Finance was necessary, as he states in his 2011 letter, it is difficult to see why he did not mention it in the Legal Opinion and rather stated that the Protocol was irrevocably binding on the Congolese State.

---

[69]    Exhibit R54.
[70]    Exhibit R54.

268.    His justification, according to which:

> "*I nevertheless considered being able to claim that the protocol was binding on the State to the extent that it was a negotiation protocol and that it should be, as had been stated to me by Mr. Longobé, the subject of subsequent definitive instruments entered into with the participation of the Minister of Finance*"

is not convincing, inasmuch as it is difficult to reconcile with the notion of the irrevocable commitment contained in the Legal Opinion.

269.    The Arbitral Tribunal may rightly wonder when Mr. Lenga expressed himself with sincerity. Contrary to the Republic of the Congo which believes that the Legal Opinion: "*(…) cannot however give any appearance of authority tothe signatories of the 2003 Protocol, on the one hand, because it was made to order, as Mr. Lenga confirmed, and furthermore, because it was prepared after the 2003 Protocol (…),*"[71] the Arbitral Tribunal believed that a Legal Opinion given less than one year after the execution of the Protocol, at a time when no Congolese authority challenged the validity and efficacy of that Protocol, is more credible than a letter sent about seven years later, for the purposes of an arbitration proceeding. Regardless, the Republic of the Congo cannot retreat from that opinion, after having requested it, through the Secretary General of the Office of the President of the Republic, simply because seven years later, it is unfavorable to its interests.

270.    But more specifically, regardless of the sincerity of the Legal Opinion, the fact that the Chief Justice and the Associate Chief Justice of the Supreme Court did not hesitate to give it, moreover since these two top judges had also participated in delivering the Supreme Court ruling, dated 27 June 2003[72] regarding the debt owed to Commisimpex, can only confirm the legitimacy of the belief on the part of Commisimpex in the validity of the 2003 Protocol. When two high judicial authorities of the Congo confirm in writing that a Protocol signed by the Secretary General of the Office of the President of the Republic and the Secretary of State, Secretary General of the Security Council, is irrevocably binding on the Republic of the Congo, and when those two authorities behave as if this were the case, it is difficult to believe that Commisimpex could have questioned the validity of the Protocol.

271.    In emphasizing that "*the behavior of the Congo created on the part of Commisimpex a legitimate belief in the authority and the scope of the authority granted to the signatories of the Protocol,*"[73] from which the commitment of the Republic of the Congo also allegedly arises, Commisimpex in reality refers to the well-known principle of estoppel or, more commonly in French law, the prohibition against contradicting oneself to the detriment of another party. Based on this principle, the Republic of the Congo cannot give the appearance that it validly entered into the 2003 Protocol and then suddenly allege that it is invalid when the time comes to perform the obligations. Similarly, Article 1.8 of the UNIDROIT principles states that "*one party cannot act in contraction of an expectation that it created on the part of the other party when the other party reasonably believed said expectation and acted correspondingly to its own detriment*". In any event, this is a

---

[71]    Post-hearing Brief of the Republic of the Congo dated 17 February 2012, Para. 139, Pages 49 and 50.

[72]    Exhibit C26.

[73]    Post-hearing Brief of Commisimpex dated 17 February 2012, Para. 16, Page 5.

consistent position of French case law[74] that considers that one party cannot, based on the principle of good faith, successively adopt contradictory positions.

**272.**     Having held that the approval of the Minister of Finance was not necessary, the Arbitral Tribunal rejects the petition by the Republic of the Congo that the 2003 Protocol be declared null and void on this basis.

> c.     *Regarding the ignorance of the amount of the debt as presented in the 2003 Protocol*

**273.**     Moreover, the Republic of the Congo cannot invoke the alleged ignorance of its representatives regarding the debt owed to Commisimpex to the extent that it had been discussed in many documents, including:

-     the Note to the attention of the Minister of the Economy, Finance and Planning by the CCA dated June 1991[75];

-     the Note to the attention of the Minister of Planning, Finance and the Economy by the CCA dated June 1991[76];

-     the *Fiche de calcul détaillée* of 1991[77] by the CCA that estimated the debt owed to Commisimpex in 1986 at 29,949,284,818 CFA francs;

-     the 1992 Protocol;

-     the Ricol report dated 14 April 2000 produced in the context of ICC Arbitration No. 9899[78];

-     the Mazars report dated 26 January 2000;

-     the Award dated 3 December 2000;

-     the Ernst & Young report dated 25 September 2001[79];

-     the rulings of the President of the Court of Commerce of Brazzaville[80], the order of the Court of Appeal of Brazzaville dated 12 July 2002[81] and the order of the Supreme Court dated 27 June 2003.[82]

**274.**     It is true that these various documents do not all estimate the amount of the debt owed to Commisimpex in an identical manner.  Nevertheless, the existence of this debt

---

[74]     Cass. Com., 8 March 2005, RDC 2005, Note D. Mazeaud; Cass. Civ. 1st, 6 July 2005, 2005 Arbitration Review, Page 993, note Ph. Pinsolle.
[75]     Exhibit R81.
[76]     Exhibit R82.
[77]     Exhibit C98.
[78]     Exhibit R27.
[79]     Exhibit C17.
[80]     Exhibit C20.
[81]     Exhibit C24.
[82]     Exhibit C26.

was accepted and known to all and its amount had long been discussed. The more recent documents mention the amount that will be used in the 2003 Protocol. Therefore it was with perfect knowledge that the representatives of the Republic of the Congo in 2003 signed the Protocol and agreed to the amount appearing therein. The difference between the amount appearing in the 2003 Protocol and the amounts of the debt as mentioned in the various prior documents is significant: the 2003 Protocol specifies an additional amount in the order of 26 billion CFA francs. There is no doubt that the representatives of the Congo were not unaware of this substantial difference in the statement of the amount of the debt owed to Commisimpex. In any event, there is no contemporaneous sign of a challenge by the Congolese authorities of this amount after the conclusion of the 2003 Protocol, although these authorities, which include the President of the Republic, had been well informed of the debt and the amount thereof, as was stated previously.

275.    This is why the argument of the Republic of Congo, according to which the consent of the signatories of the Protocol was rendered defective because they were allegedly mistaken regarding the amount of the debt and the very nature of the Protocol, is not convincing. As indicated above, the Respondent cannot base its reasoning on the alleged ignorance of the amount of the debt because, as was shown, many prior documents reported the debt. It therefore seems very doubtful that Mr. Longobé, who indicated having participated in *"discussions"*, agreed to sign the 2003 Protocol while being unaware of *"the amount of the debt"* and without verifying the amount, whilst also stating that *"as shown in the protocol for negotiations itself, [that] the State <u>agreed simply to negotiate to seek an agreement regarding the amount of the debt to be repaid and the staggering of payments</u>"*[83] ( Emphasis added by the Arbitral Tribunal). If the ultimate goal of the negotiations was for the parties to reach an agreement regarding the amount of the debt, the amount indicated in the 2003 Protocol could not be irrelevant. Furthermore, if the consent of Mr. Longobé was vitiated by mistake, it would be incomprehensible for him and various Congolese authorities to have lobbied for the implementation of the 2003 Protocol for a long time after its execution, while they all had sufficient time to become better informed of the existence of the debt owed and the amount thereof.

276.    The Arbitral Tribunal concludes therefore that based on the information that it had at its disposal, the Republic of the Congo cannot have been mistaken regarding the amount of the debt owed. This is confirmed by the fact that it did not challenge this amount after the execution of the 2003 Protocol and that it manifested the willingness to perform this Protocol during a period of time long enough for it to realize that its consent had been tainted by mistake. Therefore the Arbitral Tribunal rejects the petition of the Republic of the Congo that the 2003 Protocol be declared null and void based on the defective nature of the consent that it gave.

   *d.*   *Regarding the alleged absence of* causa *of the 2003 Protocol*

277.    The Republic of the Congo claims that the amount of the debt owed to Commisimpex was determined by the Arbitral Tribunal in Case No. 9899, that the 1992 Protocol was *"negotiated, amounted to a novation of the debt, had a global character and included an inclusive amount"*, and that the amount of the debt of 26 billion

---

[83]    Exhibit R60: Affidavit of Mr. Longobé dated 6 May 2011.

CFA francs added in the 2003 Protocol to the 22 billion CFA francs of the 1992 Protocol was therefore unjustified. Commisimpex would not be owed 48 billion CFA francs as was claimed in the letters dated 11 March 1993, 29 April 1999 and 5 June 1997.[84]

**278.** The Republic of the Congo emphasizes that the sole document citing this amount before the execution of the 1992 Protocol is a copy of a letter dated 7 October 1992[85], allegedly sent in June 2003 by the President of the Republic to Mr. Hajaij, from whom it was stolen in 1998. The Republic of the Congo claims that the letter dated 7 October 1992 was fabricated *a posteriori,* explaining in this regard certain inconsistencies in the body of the letter and emphasizing that it is surprising that a copy of this letter was not kept.

**279.** Commisimpex, for its part, stated that the 1992 Protocol only covered a portion of the debt, that the alleged mark-downs of the debt invoked by the Respondent never occurred and that the ICC tribunal in Case No. 9899 did not determine the total amount of the debt in 1992 based on the contracts, payments or mark-downs, but rather limited itself to noting that the 1992 Protocol had a valid *causa.*

**280.** For the Arbitral Tribunal, this debate is not relevant, even though the Arbitral Tribunal notes the inconsistencies within the contents of the letter dated 7 October 1992, and expresses its surprise that it had not been mentioned before the 2003 Protocol, also notes the extravagant circumstances of its disappearance and reappearance. As is rightly noted by Commisimpex, the 2003 Protocol contains an acknowledgement of debt by Congo to Commisimpex. It states:

> *" (…)*
> * *The State of the Congo definitively and without objection or reservation acknowledges the enforcement of the entirety of the contracts and supplies specified in Paragraph 1 below.*
> * *(…)*
> * *The validity of the debt has been irrevocably and officially acknowledged by the Entities in question during formal meetings held on 7 and 23 September 1992. It was, upon the conclusion and in light of the work conducted at these two meetings, confirmed by the Office of the President of the Republic, which determined the amount to be equivalent to 48 billion CFA francs (Forty-eight billion CFA Francs), representing the counter-value in CFA francs of the acknowledged debts denominated in various currencies as of 30 September 1992, i.e. 96 billion CFA francs after the devaluation of the CFA franc in 1994. COMMISIMPEX has acknowledged this recognition of the debt, in letters dated 7 October and 24 November 1992.*
> * *The amount of the debt owed by Congo determined as of 30 September 1992 totals a principal amount of 960,000,000 FRF (nine hundred sixty million French francs), which in 1992 represented 48 billion CFA francs, the equivalent of 96,000,000,000 CFA francs (ninety-six billion CFA francs) the final repayment of which shall be made in foreign currencies, since from the start it consisted of foreign financing in foreign currencies.*
> * *(…)*
> * *The State of the Congo acknowledged that the debt of 960,000,000 FRF, valued as of 30 September 1992, was broken down as follows, pursuant to the agreement entered into upon completion of the*

---

[84]      Exhibits R48, R36 and R36 Appendix III.

[85]      Exhibit C4.

> *meetings held on 7 and 23 September 1992 referenced above, and confirmed by a letter from COMMISIMPEX dated 7 October 1992:*
> *- a first installment is set at 440,000,000 FRF (four hundred forty million French francs), i.e. the equivalent of 22 billion CFA francs, the subject of Protocol No. 566 dated 14 October 1992.*
> *- a second installment is set at 520,000,000 FRF (Five hundred twenty million French francs), i.e. the equivalent of 26 billion CFA francs."*

**281.** The statement by the Congo that *"the causa for an acknowledgement of a debt must be found in the existence of a preexisting debt"*[86] is accurate and not challenged, but one cannot deduce therefrom it is the creditor that must determine the existence of such a *causa*.

**282.** The Claimant in fact correctly emphasized, based on the case law and legal scholarship, that *"when the causa is expressed, there is an appearance of causa"* and that in such a case *"it is up to the party that wants to establish the absence of causa to so demonstrate,"* citing an example of legal scholarship[87] stating that *" (…) when the causa appears from reading the contractual structure or when, without appearing therein, it is demonstrated by a mention of the instrument, there exists an appearance of* causa *. . . It therefore is incumbent upon the party that wishes to prove its absence, its fictitious nature or its non-compliance with what it should have been, to demonstrate it. The burden of proof, is therefore on the latter party"*.[8]

**283.** The Arbitral Tribunal notes, as is shown by legal scholarship and emphasized by case law,[89] that Article 1132 of the French Civil Code establishes a presumption of the existence and lawfulness of the *causa*[90] and that it is the responsibility of the debtor to prove that the *causa* does not exist or is not lawful.[91] In fact, the Republic of the Congo did not challenge this, and correctly indicated that the proof must be provided by all means.

**284.** The Arbitral Tribunal believes in the majority that the Republic of the Congo did not bring evidence as to the absence or unlawfulness of the *causa* of the 2003 Protocol as was stated in the text of this document, i.e. that the debt owed by Congo to Commisimpex decreed as of 30 September 1992 represented an amount of 48 billion CFA francs.

---

[86] Reply to the Request for Arbitration, Paras. 93-94.

[87] J. Rochfield, Repertoire Civil Dalloz, January 2005, See "Cause"

[88] Memorial on the Merits, Para. 142, Page 57.

[89] See for example, Cass. Civ., 1st, 7 April 1992, Civ. Bull. I No. 114 *"the cause of the obligation is presumed to be accurate; thereafter, it is the responsibility of the signatories of an acknowledgement of debt to prove the actual absence of delivery of funds,"* of Cass. Civ. 1st, 21 October 1997, Appeal No. 95-19,398 *"Since the cause of obligations provided for in an acknowledgement of debt is presumed to be accurate, it is the responsibility of the debtors to prove the actual absence of delivery of funds, without this cause being able to be researched in facts subsequent to the acknowledgement."*

[90] Article 1132 specifies that *"The convention is no less valid, if the cause is not stated."*

[91] See Civil Law, Obligations, Contracts, Vol. III, 5th Edition, Christian Larroumet, Economica, Page 450: *"Regarding the foundation of Article 1132 of the Civil Code, case law considers that the debtor must prove that its obligation is unjustified and not that the creditor must prove that the obligation it is enforcing is justified."* Also see Exhibit C RJ91: *"As a result, although the cause is not stated, the creditor may request the enforcement of the agreement without having to prove it (Article 1132 thus presents a slight difference to Article 1315, according to which 'the party that claims the enforcement of an obligation must prove it,'* i.e. to establish its existence and its purpose; For this comparison, see Cass. 1st Civ., 2 May 2011, above). The burden of proof therefore falls to the party owing the obligation that was attempting to become released from its commitment; it must establish the absence of cause or that it is false (for example, Cass 1st Civ., 1 Oct. 1986, Bull. Civ. 1, No. 230).

**285.**     In order to do this, the Congo has to show that as of that date the amount of the debt owed to Commisimpex was different.   Thus, it preferred to base its argumentation on the amount specified in the 1992 Protocol of  22 billion CFA francs as a basis, while stressing that that Protocol was *"an agreement to restructure its debt, the* causa *of which, and therefore the validity of which, is inseparable from its global character and the fact that it amounted to a novation of the debt",*[92] as well as on the 2000 Award which was rendered on the basis of that Protocol.

**286.**     A reference to the 1992 Protocol and to the 2000 Award cannot be useful for demonstrating the absence of *causa* for the 2003 Protocol, specifically due to the fact that the 1992 Protocol had a global character, amounted to a novation of the debt and included an inclusive amount, as stated by the 2000 Award itself.[93]   As the arbitrators then stressed: *"the determining cause for the REPUBLIC OF THE CONGO (which also was a cause shared by COMMISIMPEX) was to obtain, by negotiating and signing Protocol No. 566*[94]*, a substantial reduction in the overall debt, and what's more, a restructuring of the payment of that debt through 2002 (i.e. to nearly 20 years following the first public contracts concerned)".*[95]   There is therefore no doubt that the 1992 Protocol was not representative of the actual amount of the overall debt as of the date on which it was executed. Letters from Commisimpex following that signature are not representative either, since they were issued during a period when it was attempting to obtain from the Republic of the Congo in fulfillment of its commitments based on the 1992 Protocol, in, by the way, a rather confused manner.

**287.**     As the Arbitral Tribunal has already stressed[96], there is no surprise that in 2003 the Republic of the Congo and Commisimpex reevaluated the debt owed to the latter and agreed to new terms for its settlement.   At the time, the Republic of the Congo, while refusing to honor the 1992 Protocol, the validity of which it had challenged in the arbitration proceedings, was refraining from complying with the 2000, even though the annulment proceedings which it had filed before the Court of Appeal of Paris was rejected on 23 May 2002.   The situation was at a stalemate and it was appropriate to question the inclusive amount set out in 1992.

**288.**     The Arbitral Tribunal believes in the majority that the Republic of the Congo did not provide any convincing fact establishing that in October 2003 its debt owed to Commisimpex totaled any amount other than the 48 billion CFA francs specified in the 2003 Protocol, while Commisimpex provided a plausible explanation as to the origin of this amount: an evaluation of the debt held by Commisimpex for contracts totaling 29,949,284,818 CFA francs at the end of 1986.   By applying an interest rate of 10.5% compounded annually and on the basis of conversion of the amounts in foreign currencies at the rates in force on the date of execution of the contracts, an approximate amount of FRF 960,000,000 is reached, i.e. the 48 billion CFA francs specified in the 2003 Protocol.[97]

---

[92]     Post-hearing Brief dated 23 March 2012, Para. 82, Page 24.

[93]     Exhibit C14, Page 42.

[94]     The 1992 Protocol.

[95]     Exhibit C14, Page 47.

[96]     No. 197 above.

[97]     This calculation appears on Page 15 of the Mazars report dated 2 August 2011, and its accuracy is not challenged by the Republic of the Congo.

**289.**     This evaluation of 29,949,284,818 CFA francs as of the end of 1986 is confirmed by several documents produced during the arbitration proceedings.  First of all there is a *"Fiche de Calcul Détaillée"* entitled *"Debt of the Congo in 1987 owed to COMMISIMPEX in the amount of 29,949,284,818 CFA francs.  Sent by the CCA and the Minister of Finance to the Public Prosecutor and to the Ministry of Justice in September 1991."*[98]   Contrary to what the Republic of the Congo claims,[99] this document clearly indicates a debt amounting to 29,949,284,818 CFA francs.  This same amount is mentioned several times in the documents from the trial of the former Minister of Finance, Mr. Lekoundzou.  Thus, Joseph Hondjulla Miokono stated under oath in 1991 that having been appointed to the *Caisse Congolaise d'Amortissement* in 1985 as the General Director, he *"found a COMMISIMPEX file according to which the Congolese Government owed that company in excess of 29 billion CFA francs".*[100]   Similarly, in summonses from October 1991, Madam the Public Prosecutor to the Court of Appeal of Brazzaville wrote:  *"In 1987, the Congolese Government which was having tremendous financial difficulties was unable to pay the debt owed to COMMISIMPEX which totaled 29,949,184,818 CFA francs".*[101]   Furthermore, in an affidavit dated 16 April 2003[102], Mr. Ernest Komko, the former Chair of the National Sovereign Council from February to June 1991, summarized the work of the two committees that, at the time, had verified a debt owed to Commisimpex by the Republic of the Congo *"that ranged around 30 billion CFA francs."*

**290.**     In order to challenge this assessment of the debt at 29,949,184,418 CFA francs as of the end of 1986, the Republic of the Congo invokes two CCA documents from June 1991 that evaluate the debt at 21 billion as of 31 December 1988.[103]   However, these documents give the impression that the amounts indicated were the result of negotiations and are in any event prior to the *"Fiche de calcul Détaillée"* of the CCA from September 1991 that states that the debt is 29,949,184,418 CFA francs.  The figure of 21 billion as of the end of 1988 is not used in any subsequent document.  Only the evaluation of 29,949,184,418 CFA francs is used consistently by Congolese sources.

**291.**     This same amount of 29,949,184,818 CFA francs as of the end of 1986 will subsequently be mentioned by an expert report of Ernst & Young dated 25 September 2001[104], rendered at the request of the President of the Court of Commerce of Brazzaville.  It was on this basis that, when updating the amount as described above, Ernst & Young evaluated the debt owed to Commisimpex at 48 billion CFA francs as of 30 September 1992 (p. 41 of the expert report).  The President of the Court of Commerce of Brazzaville later used this report as a basis to order the recording of the debt by the *Caisse Congolaise d'Amortissement* on 9 November 2001.[105]   The President of the Court of Commerce, referring to the *"Fiche de calcul Détaillée"* of the CCA from September 1991[106], states that *"the Court was able to note, as did the expert, that the* Caisse Congolaise d'Amortissement *itself before communicating to the Judicial Authorities of the country in relation to the trial of Minister Lekoundzou in 1991, that the debt of the Respondents totaled*

---

[98]     Exhibit C98.

[99]     Post-hearing Brief No. 1, No. 14, Page 4.

[100]     Exhibit C96

[101]     Exhibit C99.

[102]     Exhibit C152.

[103]     Exhibits R81 and R82.  Cf. also R80, from 1989 that uses the same assessment, without justifying it.

[104]     Exhibit C17.

[105]     Exhibit C20.

[106]     Exhibit C98.

*29,948,284,818 CFA francs as of the end of 1986"* (p. 2). Thereafter, it was not surprising that it confirmed the calculation of Ernst & Young, which started with the same acknowledgement.

**292.**     The Republic of the Congo rightly asserts that the trial before the President of the Court of Commerce of Brazzaville was not adversarial, and that the Republic of the Congo objected to the acknowledgements made therein when it could, which considerably reduced its scope. But the same could not be said of the appeal proceedings that followed, filed by the CCA and the Congolese Government. The *Fiche de calcul Détaillée* of the CCA of 1991, which demonstrated the existence of a debt in the amount of 29,949,284,818 CFA francs as of the end of 1986, is also mentioned by the Court of Appeal in its ruling dated 12 July 2002[107] which also summarizes the assessment of 48 billion CFA francs for the debt amount as of 30 September 1992 by Ernst & Young. And the Court of Appeal states:

> *"Whereas it is shown by this note that the progression of the debt and its updating through 30 September 1992 was calculated by the expert to total 48,532,681,474 CFA Francs;*

> *"Whereas as of 14 October 1992 the parties had concluded Protocol No. 566, the purpose of which was the partial consolidation of the debt totaling 22,000,000,000 CFA francs;*

> *Whereas it is shown therefore that the amount of 26,532,681,474 CFA francs had not been included in said Protocol;*

> *Whereas the* Caisse Congolaise d'Amortissement *claims that Protocol No. 566 dated 14 October 1992 is a transaction and it results therefrom that that contract allegedly settled all debts owed to COMMISIMPEX S.A. by the Republic and the CCA."*

**293.**     It is true that the ruling of the Court of Appeal was quashed by the Supreme Court on 27 June 2003.[108] However, notwithstanding the possibility that the Supreme Court's decision had no links with the observations of facts related above, all the documents that were just cited allow the Arbitral Tribunal to note two essential points: 1) the evaluation of the debt of Congo to Commisimpex as of the end of 1986 at 29,949,184,818 CFA Francs seemed to be widely accepted in 1991 as well as in 2002-2003; 2) its updated amount of 48 billion CFA francs as of October 1992 warrants little debate since it is a calculation was performed by Ernst & Young and verified by Mazars during this arbitration proceeding.[109] However most significantly, regardless of the actual amount of the debt owed to Commisimpex in October 1992, it results from the foregoing that the parties to the 2003 Protocol adopted a well-known and much-discussed assessment. The amount of 48 billion CFA francs rests on an assessment of the amounts owed to Commisimpex in 1991 and updated through the end of September 1992. It does not in any way involve an amount randomly picked by negotiators for obscure reasons and with no factual basis.

**294.**     One may of course be surprised that when executing the 1992 Protocol, precisely in October, Commisimpex agreed to the amount of 22 billion. Was it an agreement

---

[107]     Exhibit C24.

[108]     Exhibit C26.

[109]     It should be noted in this regard that the Republic of the Congo did not deem it necessary to subject Mazars to cross examination.

For transactional purposes, as the CCA claimed before the Court of Appeal of Brazzaville and as admitted by the Arbitral Tribunal that rendered the 2000Award? This Arbitral Tribunal cannot ignore that the parties had, during proceedings, rather confusing exchanges regarding the existence of mark-downs that may have been granted by Commisimpex to the Republic of the Congo, one of 30% in 1998 and then 25% in 1992,[110] or that the Republic of the Congo may have imposed. The contradictory explanations of the parties, in particular of Commisimpex, regarding this point, did not allow the Arbitral Tribunal to reach definitive opinion regarding the existence and especially the origin of these mark-downs. However forming such an opinion is not necessary since the parties trace these mark-downs back to the execution of the 1992 Protocol at the latest, which as indicated in the 2000 Award, mentions a global and inclusive amount, and since the detail of the calculations leading to this amount arenot relevant to the resolution of the present dispute. Simply, the Arbitral Tribunal is forced to note that if the debt owed to Commisimpex in September 1992, excluding any relief of the same, was effectively 48 billion CFA francs, the subsequent application of partial relief of 30%, then of 25% before the execution of the 1992 Protocol, results in a figure of 25.2 billion CFA francs, which is very close to the 26 billion CFA francs missing from the 1992 Protocol and present in the 2003 Protocol. Is this simply a coincidence? Perhaps. Yet these observations strengthen the plausibility of the debt of 48 billion CFA francs presented as the *causa* for the 2003 Protocol by its authors, the existence of which is presumed.

295. Based on the foregoing, the Arbitral Tribunal concludes in the majority that the Republic of the Congo did not establish the absence of *causa* for the 2003 Protocol. On the contrary, it has noted that Commisimpex, although it did not carry the burden of proving the existence of *causa*, provided the Arbitral Tribunal with a set of evidence that would allow a ruling to effect such *causa* exists, if such *causa* was not already presumed. The issue here is not for the Arbitral Tribunal to rule on the amount of the debt as of October 2003, which neither of the Parties candetermine in undisputed fashion. It is simply to observe that the assessment at 48 billion CFA francs was the only one clearly used at the time and that, in the absence of evidence presented by the Republic of the Congo, the reality of the presumed *causa* of the 2003 Protocol is confirmed.

296. However, the Arbitral Tribunal cannot be content with this conclusion, which involves only the objective *causa* of the 2003 Protocol. Since the Republic of the Congo alleged that the execution of the 2003 Protocol was the result of fraud, it is helpful, then, to wonder about the lawfulness of its subjective *causa*. Did the signatories of the Protocol execute it for an unlawful purpose or, more specifically, is it the result of a fraud of which the signatories for the Republic of the Congo were the victims, since the Republic of the Congo never suggested that such signatories could have been complicit in the fraud attributed to Commisimpex? The Congo explains that:

> *"The signature of the 2003 Protocol by persons who were impressionable or unaware of the file related to the debt to Commisimpex is only explained by the unorthodox practices of Commisimpex and the sphere of influence of Mr. Hojeij within the Congolese government, since he was familiar with its weaknesses and extensively profited from them."*[111]

297. The allegations of fraud made by the Republic of the Congo are particularly unconvincing. It was shown in Section B c) above that the Congolese signatories of the 2003 Protocol could not have given their approval of the amount of the debt

---

[110] Exhibit R61, letter from the Counsel of Commisimpex dated 28 February 1998.
[111] Post-hearing Brief dated 23 March 2012, Para. 147, Page 49.

due to Commisimpex without perfect knowledge of the same. This observation was confirmed by the present section, in which it is shown that the amount of 48 billion mentioned in the 2003 Protocol was the subject of public debate. It is difficult, then, to see how a fraud could have occurred without them being complicit in the same, which, as we have stated, the Republic of the Congo has not claimed. Furthermore, if there was a fraud, it would necessarily be a very large-scale fraud, since it would involve a large number of Congolese officials, and not only the signatories of the Protocol. It would also have been necessary for the fraud to have been spread out over a long period of time, since it dated back at least to the evaluation of the debt at 29,949,184,818 CFA francs as of the end of 1986, in 1991, which was the basis for the evaluation of 48 billion in September 1992. What could have driven such a fraud would have been corruption and influence peddling, but the Republic of the Congo did not make any specific accusation in this regard and the Congolese protagonists in the matter do not seem to have been targeted by any such accusation since 2003/2004.

**298.**     It is clearly legitimate to ask why the representatives of the President of the Republic of the Congo, with the assurance of the President, decided in 2003 to pay an old debt that they had refused to pay up until that point. But one could even ask why the Republic of the Congo, after having executed the 1992 Protocol, which was beneficial for it, decided to deny its obligations and fought hard not to comply with its enforcement, or the award resulting therefrom. The Arbitral Tribunal can only be stunned to note that in order to avoid the performance of the 1992 Protocol, which it invokes today as the agreement containing the entirety of its debt, it invoked, as it does in this proceeding, its nullity and the fraud committed by Commisimpex. An extract of the interim award dated 1999 delivered in the proceedings that led to the 2000 Award, and cited by it, is eloquent[112]:

> *"In its 'Brief in reply and petition for a stay of proceedings' dated 26 February 1999" the examination of the 'unjustified nature of the petition by Commisimpex' (Pages 13 through 18) and the "nullity of Protocol 566 and the obligations assumed for the enforcement of Protocol 566 for lack of consent" (Pages 19 through 21) repeatedly includes allegations of "procedural fraud," of "multiple frauds comprising lies and suspected fraud, that Commisimpex committed and is still committing," "manoeuvers, schemes and fraud that Commisimpex committed daily," and "induced errors," to conclude (Page 21) that "based on previous developments , it is obvious that the REPUBLIC OF THE CONGO and the* CAISSE CONGOLAISE D'AMORTISSEMENT *were victims of suspected fraud, which was characterized by the use of fraudulent manoeuvers against them by Commisimpex to obtain from the same promissory notes that had no basis."*

The Arbitral Tribunal that rendered the 2000 Award did not detect any fraud and noted the validity of Protocol No. 566 of 1992, which the Republic of the Congo no longer challenges today and which, by contrast, it asserts. Likewise this Arbitral Tribunal notes that the Republic of the Congo did not prove that the *causa* for the 2003 Protocol was unlawful due to fraud, and that it did not establish the absence of its *causa* or that its consent was defective.

**299.**     The Arbitral Tribunal has noted that the Republic of the Congo could not validly invoke the lack of authority of the signatories of the 2003 Protocol to challenge its validity, and that the latter contained commitments of a binding nature. Furthermore, it

---

[112]     Exhibit C14, Award dated 3 December 2000.

concluded that the Republic of the Congo could not invoke ignorance of the amount of its debt since the 2003 Protocol was executed. In the absence of proof of its lack of *causa* or the unlawful nature thereof, the 2003 Protocol is therefore binding on the parties and the Republic of the Congo must perform the obligations that it assumed by signing it.

      C.    <u>Regarding the amounts owed by the Republic of the Congo to Commisimpex</u>

**300.**    In the 2003 Protocol, the Republic of the Congo assumes the following financial commitments:

> - *"Article 1 – The Government of the Congo <u>assumes responsibility</u> for the debt of COMMISIMPEX and that of the Hojeij group and family, vis-à-vis the Lebanese Banque SARADAR, up to the amount of the commitment of Protocol No. 566 dated 14 October 1992, and the corresponding guarantees, the principal amount of which, as of 30 September 1992, is denominated in the following currencies:*

> *A – 50,592,81.53 FRF*
> *B – 21,201,872.76 Pounds Sterling*
> *C – 34,521,293.24 U.S. Dollars*
> *D – 1,426,6253,801 CFA francs*

> *The total of which represents, at this date, the counter-value of 440,000,000 FRF, i.e. 22 billion CFA francs, according to the exchange rates at the time.*

> - *Article 2 – The Government of Congo agrees to negotiate directly with Banque SARADAR and may determine the procedures for reimbursement of the principal and interest amounts specified above, outside of any obligation or liability on the part of COMMISIMPEX or the Hojeij family and group.*

> *The direct and indirect consequences of these negotiations shall not under any circumstances relate to COMMISIMPEX or the Hojeij family and group.*

> - *Article 3 – The Government of Congo <u>agrees to reimburse</u> COMMISIMPEX the principal amount of 520 million FRF, not including interest totaling 941,141,586 FRF, for the period of 30 September 1992 through 30 July 2003 at the rate of 10% per year;*

> - *Article 4 – The Government of <u>Congo agrees to pay</u> to COMMISIMPEX the amount of 520,000,000 FRF (five hundred twenty million French francs) according to the following terms:*

> *1. Cash payment in the amount of 60,000,000 FRF (sixty million French francs), i.e. 6 billion CFA francs.*

> *2. A second portion of said principal amount, corresponding to 200,000,000 FRF (two hundred million French francs), i.e. 20 billion CFA francs shall be considered as consideration for the acquisition by COMMISIMPEX of certain*

*companies belonging to the Congolese State, the technical and financial viability of which and the profitability and price assessment of which will have been confirmed by an auditor approved by and acceptable to COMMISIMPEX.*

*3. The remainder, i.e. the principal amount of 260,000,000 FRF (two hundred sixty million French francs), i.e. 26 billion CFA francs, will be the subject of a moratorium that the Government of Congo agrees to repay in 84 (eighty-four) monthly installments consisting of 3,095,238 FRF per month, i.e. a monthly installment of 309,523,809 CFA francs. This moratorium is subject to the granting of a firm, unconditional and irrevocable, 1st order, and internationally accepted guarantee to COMMISIMPEX.*
*The purpose of this guarantee, beyond the aspect of risk coverage, is to facilitate the terms and conditions for refinancing the companies that are currently part of the Hojeij group, the needs for operating capita of which far exceed twelve billion CFA francs, as well as those of the public entities specified in §4-2."*

**301.**  These four articles cover the two components of the debt of the Republic of the Congo decreed as of 30 September 1992, as it was confirmed in the Preamble of the Protocol:  440,000,000 FRF related to the purpose of the 1992 Protocol and 520,000,000 FRF.

   *a.*   <u>the 440,000,000 FRF debt (Article 1 of the 2003 Protocol)</u>

**302.**  According to Article 1, the Republic of the Congo assumes responsibility for the debt of Commisimpex and the Hajaij group to Banque Saradar in the amount of 440,000,000 FRF arising from the 1992 Protocol and agrees to negotiate with the bank in this regard by 31 December 2003 (Articles 2 and 6).  Commisimpex explains that it is Banque Saradar that financed this amount.

According to a letter from Banque Audi Saradar, formerly Saradar, dated 24 December 2010, the Republic of the Congo never approached it and in the end it was Commisimpex that itself settled its debt with the Bank.

**303.**  The Republic of the Congo does not dispute never having paid Banque Saradar. In contrast, it claims that Commisimpex was not entitled to request payment of the amount of 440,000,000 FRF as of 30 September 1992, converted to 360,515,125 Euros as of 7 January 2011, according to the calculations by Mazars,[113] which was owed to BanqueSaradar under the 2003 Protocol.  The Republic of the Congo intended for the assignment specified in the Protocol to be aperfect assignment, which would release the designated debtor, i.e. itself, vis-à-visthe assignor, Commisimpex.

**304.**  Commisimpex believes, in contrast, that the Protocol only provided for animperfect assignment, and that:

   *"Based on the failure of the Congo to fulfill its obligation, the assignment specified in the 2003 Protocol, envisioned as a simple means of settling a part of the debt of the Republic of the Congo*

---

[113]    Rejoinder on the Merits, Para. 294, Page 110.

> *To Commisimpex, was never carried out and the failure of the Congo to do so brings the parties back to the preexisting contractual situation."[114]*

**305.**     The Republic of the Congo adds that if the assignment was imperfect, Commisimpex could not request payment of the amount in question because, while acknowledging not having settled the amounts owed to Banque Saradar, it believed that:

> *" (…) it was not in default vis-à-vis Banque Saradar since the latter had never requested anything from the Congo in relation to the 2003 Protocol."[115]*

**306.**     The Arbitral Tribunal cannot follow the argument of the Republic of the Congo for two essential reasons. First of all, the assignment to Banque Saradar specified by the 2003 Protocol cannot be a perfect assignment without the approval of the latter, in its capacityas creditor.  The approval of the creditor as to the replacement of the debtor is a characteristic of aperfect assignment.  This is the meaning of Article 1275 of the French Civil Code.[116]  It is not established or even claimed that Banque Saradar granted its approval of the replacement of the debtor.  The assignment specified by the 2003 Protocol must therefore be characterized as animperfect assignment.

**307.**     It is true that as is stated by the Republic of the Congo, the Court of Cassation[117] has stated that *"… neither the assignor nor its creditors can, before the default of the assignee vis-à-visthe creditor, require payment"*.  Yet this solution is difficult to transpose to this case, where the terms for payment by the Republic of the Congo to Banque Saradar were never defined, due to the default of the Republic of the Congo itself.  According to Article 2 of the 2003 Protocol, the Republic of the Congo agreed to negotiate directly with Banque Saradar as to the terms of repayment of the assigned debt, no later than on 31 December 2003, as stated by Article 6 of the Protocol.  The Republic of the Congo did not do this, stating only that Banque Saradar never asked it for anything on the basis of the 2003 Protocol, which is the result of the Congo's failure to perform its commitment to negotiate with the latter. The Republic of the Congo cannot rely on its own failure which rendered the assignment specified in the 2003 Protocol null and void.

**308.**     The Republic of the Congo stresses that Commisimpex did not provide any proof of having actually paid its debt to Banque Saradar. It also did not provide any proof of the date and amount of the alleged payment, or that such payment was made to settle the debt that should have been paid by the assignment.[118]  This is true only in part because the letter from Banque Audi Saradar dated 24 December 2010 confirms that the debt that Commisimpex owed to it was paid.[119]  Regardless, this argument is irrelevant.  What is important is not that Commisimpex did or did not settle its debt with Banque Saradar, but rather that the Republic of the Congo did not do so in its place, in default of the commitment made in the 2003 Protocol. As a result, the debt of 440,000,000 FRF as of 30 September 1992, acknowledged by the Republic of the Congo as owing to Commisimpex in the 2003 Protocol

---

[114]     Reply on the Merits, Para. 508, Page 223.
[115]     Rejoinder on the Merits, Para.. 303, Page 113.
[116]     See in this regard Ph. Malaurie and L. Aynès, Civil Law, Obligations, 1990, No. 1250, Page 711.
[117]     Exhibit CRJ 199:  Comm. Cass, 16 April 1996, No. 94-14618.
[118]     Reply on the Merits, Paras. 306-307, Pages 113-114.
[119]     C 75.

*"up to the amount of the commitment of Protocol No. 566 dated 14 October 1992…,"* the amount of which should, by assignment, pay off the debt of Commisimpex vis-à-vis Banque Saradar, is not extinguished, and the Republic of the Congo must pay such debt.

**309.**     According to the Mazars report dated 7 January 2011[120] which Commisimpex relies on, the debt of 440,000,000 FRF as of 30 September 2011 totaled 360,515,125 Euros as of 7 January 2011.  In order to reach amount, Mazars carried out the following calculation, based on the various amounts in several foreign currencies that, according to the 2003 Protocol, total 440,000,000 FRF:  it added to the amounts specified in the 2003 Protocol compound interest at a rate of 10.5% per year from 23 August 2003 through 7 January 2011, the date of the report, then also added to those amounts compound interest at the rate of 10% per year from 30 September 1992 through 30 July 2003 and added up the figures.

**310.**     The Arbitral Tribunal believes that this calculation, which the Republic of the Congo challenges, is not compatible with the agreements between the parties and the text of the 2003 Protocol.  As it has already stated, the debt of 440,000,000 FRF of Commisimpex that the Republic of the Congo assumed responsibility for vis-à-vis Banque Saradar in virtue of the 2003 Protocol *"corresponded to the amount of Protocol No. 566 dated 14 October 1992 … ".*  The commitment of the Republic of the Congo based on the 1992 Protocol in August 2003, could only result from the 2000 Award, which, as the annulment proceeding related thereto had been  rejected on 23 May 2002, was final.  Commisimpex did not waive the benefit of this award upon signing the 2003 Protocol, as is confirmed by the fact that it deducts from the amounts that it claims in regards to the 2003 Protocol those that were awarded to it by the 2000 Award[121] which both parties acknowledge as having *res judicata* effect.   The Arbitral Tribunal therefore noted on the one hand that the total amount of the debt assumed by the Republic of the Congo up to the commitment specified in the 1992 Protocol is that specified by the 2000 Award and also that which Commisimpex requests be deducted from this total amount awarded by to it by the Arbitral Tribunal in this proceeding.  As a result, the Arbitral Tribunal will note that the amounts owed by the Republic of the Congo under Article 1 of the 2003 Protocol are those that were allocated by the 2000 Award, will acknowledge Commisimpex's petition that the Arbitral Tribunal should deduct these amounts from what the amounts awarded by the Arbitral Tribunal, and, after having deducted that amount, will order no amount to be paid under Article 1 of the 2003 Protocol.

        *b.     The 520,000,000 FRF debt (Articles 3 and 4 of the 2003 Protocol)*

**311.**     Furthermore, the Republic of the Congo must reimburse Commisimpex the amount of 520,000,000 FRF specified in Article 3 of the 2003 Protocol, plus interest of 941,141,586 FRF, i.e. 222,749,598.82 Euros, for the period of 30 September 1992 through 30 July 2003 (applying a rate of 10% per year), as specified by Articles 3 and 5 of the 2003 Protocol.

**312.**     With regards to the calculation of interest for the period following the 2003 Protocol, Commisimpex based its argument on the Mazars report dated 7 January 2011 which uses a rate of 10.5%.  Mazars justifies this rate by the fact that the same rate was *" (…) also*

---

[120]     Mazars Report dated 7 January 2011, Page 11, No. 2.3.

[121]     Mazars Report dated 7 January 2011, Page 3.

Case 1:13-cv-00713-RLW  Document 23-5  Filed 09/23/13  Page 167 of 170

*specified in the guarantee issued by the Republic of the Congo on 22 December 1986 and was also used by the CCA in its calculation of the debt owed by the Republic of the Congo to Commisimpex as of 31 December 1986".[122]*

**313.** The Arbitral Tribunal believes this justification to be incompatible with the agreement reflected by the method selected in the Protocol, when computing the interest amount on 520 million FRF for the period of 30 September 1992 through 30 July 2003.[123] This is explained by the Mazars report which uses this method for calculating the interest on the amount of 440,000,000 FRF incurred prior to the Protocol:

> *"Amount I2 of 941 million FRF of interest appearing in the 2003 Protocol is calculated as follows:*
>
> *- Base amount: 520 million FRF.*
> *    - Rate of 10% per year, compounded annually on September 30 (360-day year and 30-day months).*
> *- Period of 30 September 1992 through 30 July 2003."[124]*

**314.** The Arbitral Tribunal sees no reason not to also use this contractual method to calculate the late interest subsequent to 2003, since the justification provided by Mazars and Commisimpex for using a rate of 10.5% is not satisfactory.

**315.** In addition, Mazars calculated interest as of 23 August 2003, the date of execution of the 2003Protocol. However, since Article 6 of the Protocol anticipates more generally that the final Protocolwould be concluded on 31 December 2003, the Arbitral Tribunal believes that it was as of that date that all late interest should accrue, and not the date of execution of the Protocol. It was at the end of 31 December 2003 that the non-performance of the Protocol became final. Mazars so concluded in its calculation of interest regarding the 200 million FRF relating to the companies to be privatized, for which Mazars computed that the interest accrued as of 31 December 2003, due to the failure to into agreements providing for the attribution of companies to Commisimpex by that date, as was provided for by Article 6. Such a restriction is unjustified because it was by 31 December that a final document had to be signed, to be applied to all the terms for performance of the commitments assumed by the Republic of the Congo. The interest on the amount of 520 million FRF must therefore accrue as of 31 December 2003, and until the payment in full of the debt by the Republic of the Congo (the date of 7 January 2011 determined by Mazars is no longer applicable to the extent that the Arbitral Tribunal does not use themethod used by Mazars) at an interest rate of 10%, compounded annually as of 31 December of each year.

**316.** The Republic of the Congo must therefore pay to Commisimpex, in performance of the 2003 Protocol, the amount of 520,000,000 FRF, i.e. 79,273,488.96 Euros[125] + 941,141,586 FRF i.e. 143,476,109.86 Euros = 222,749,598.82 Euros plus interest of 10% per year, compounded

---

[122]     Mazars Report dated 7 January 2011, Page 11, No. 2.2.3.
[123]     Exhibit C27, Article 3 of the 2003 Protocol.
[124]     Mazars Report dated 7 January 2011, Page 10.
[125]     Applicable exchange rate: 6.55957 FRF = 1 Euro.

annually on 31 December, from 31 December 2003 until payment in full;

D.      Allocation of arbitration costs

**317.**    Article 31 (3) of the ICC Arbitration Rules grants the Arbitral Tribunal the discretion to determine the allocation of arbitration costs.

**318.**    The arbitration costs determined by the International Court of Arbitration in its session dated 9 January 2013 amount to USD 1,140,000.  Commisimpex stated that its own costs (travel expenses, fees) totaled, as of 2 November 2012, 4,282,791 Euros (5,163,998 Euros – 881,207 Euros) while those of the Republic of the Congo totaled 2,674,300 Euros.  Each of the parties has requested payment of their expenses in full from the opposing party.

**319.**    The Arbitral Tribunal stated that although the Claimant was not successful on all its claims, based on the absence of a ruling relative to the 440,000,000 FRF share that is equivalent to the amounts owed under the 2000 Award, and the corresponding reduction of interest, the Republic of the Congo was primarily the unsuccessful party: its defense as to lack of jurisdiction was rejected by the Partial Award of 20 August 2010; its defense as to *res judicata* was rejected by this ruling, which also rejected its objections as to the validity of the 2003 Protocol and ordered it to perform the corresponding obligations.

**320.**    For all these reasons, the Arbitral Tribunal holds that the Republic of the Congo must bear 75% of the arbitration costs, determined by the International Court of Arbitration to be US$ 1,140,000.  Since Commisimpex advanced 100% of the funds , the Republic of the Congo therefore must pay Commisimpex US$ 855,000 as arbitration costs.

**321.**    With regards to the legal fees incurred by the parties, the Arbitral Tribunal holds that the Republic of the Congo be ordered to reimburse 75% of the reasonable expenses of Commisimpex and that Commisimpex must be ordered to reimburse to the Republic of the Congo 25% of its reasonable expenses.  The Arbitral Tribunal notes a significant disparity between the amount of legal fees incurred by Commisimpex (4,282,791 Euros) and those incurred by the Republic of the Congo (2,674,300 Euros).  It is true that each party is free to dedicate to a proceeding the financial resources that seem necessary in its own opinion, however it is all the more true that this does not justify that the party that loses in whole or in part would be required to bear the consequences of the choices of the other party in this regard.  In this case, the Arbitral Tribunal believes that given the characteristics of the dispute, the reasonable amount of the Commisimpex fees must be reduced to 3,500,000 Euros.  Therefore the Republic of the Congo must be ordered to reimburse 75% of the reasonable amount of the Commisimpex fees, i.e. 3,500,000 Euros x 75% = 2,625,000 Euros, and Commisimpex must be ordered to reimburse the Republic of the Congo for 25% of its expenses, i.e. 2,674,300 Euros x 25% = 668,575 Euros.  As a result, the Republic of the Congo shall be ordered to reimburse Commisimpex the amount of 2,625,000 Euros – 668,575 Euros = 1,956,425 Euros as legal fees.

**NOW THEREFORE, THE ARBITRAL TRIBUNAL:**

1) Declares that the petitions of Commisimpex relative to the judgment of the court-ordered liquidation dated 30 October 2012 are admissible and that it has jurisdiction to hear them, inasmuch as they relate to the effects of that judgment on the arbitration proceeding;

2) Declares that the requirements of international public policy prevent that the liquidation of Commisimpex should have any effects on this arbitration proceeding;

3) Acknowledges the lack of standing of the liquidators appointed to represent Commisimpex in this arbitration proceeding;

4) Rejects the petition of Commisimpex for reimbursement by the Republic of the Congo of the expenses incurred in this arbitration by the liquidation proceeding;

5) Declares that it lacks jurisdiction to hear other petitions by Commisimpex relating to its court-ordered liquidation or that they were rendered irrelevant by Procedural Orders Nos. 7 and 9;

6) Rejects the arguments based on the *res judicata* effect of the arbitral award dated 3 December 2000 rendered in ICC Matter No. 9899, brought forward by the Republic of the Congo;

7) Holds, in the majority, that the Protocol dated 23 August 2003 is valid and binding on the parties;

8) Holds that the amounts owed by the Republic of the Congo pursuant to Article 1 of the Protocol dated 23 August 2003 are those that were granted by the arbitral Award dated 3 December 2000;

9) Acknowledges and agrees with the petition by Commisimpex to deduct the same amounts from the amounts that the Arbitral Tribunal would order the Republic of the Congo to pay and, after having deducted such amounts, the Tribunal does not order any payment pursuant to Article 1 of the Protocol of 23 August 2003;

10) Orders the Republic of the Congo to pay to Commisimpex, pursuant to Articles 2 and 3 of the Protocol dated 23 August 2003, the amount of 222,749,598.82 Euros plus interest of 10% per year compounded annually on 31 December, from 31 December 2003 until such time as payment in full is made;

11) Holds that the Republic of the Congo must bear 75% of the arbitration costs determined by the International Court of Arbitration of the ICC in the amount of USD 1,140,000 and that Commisimpex must bear 25% of the same;

12)     In consequence, orders the Republic of the Congo to pay USD 855,000;

13)     Orders the Republic of the Congo to pay Commisimpex's legal fees in the amount of  1,965,425 Euros;

14)     Rejects all the other petitions of the parties.


Place of the Arbitration:  Paris (France)
Date: 01/21/2013
Signatures:


[signature]
Yves DERAINS
Chair


[signature]                                                    [signature]
Bertrand HANOTIAU                              Carole MALINVAUD
Arbitrator                                                      Arbitrator