# EXHIBIT 4

# EXHIBIT 4A



**International Chamber of Commerce**
*The world business organization*

**International Court of Arbitration** ○ **Cour internationale d'arbitrage**

# SENTENCE

**ICC International Court of Arbitration** ● **Cour internationale d'arbitrage de la CCI**
38 Cours Albert 1er, 75008 Paris, France
Tel +33 (0)1 49 53 28 28  Faxes +33 (0)1 49 53 29 29 / +33 (0)1 49 53 29 33
E-mail arb@iccwbo.org  Website www.iccarbitration.org

COUR INTERNATIONALE D'ARBITRAGE DE LA CCI

AFFAIRE No. 16257/EC/ND

COMMISSIONS IMPORT EXPORT S.A., AYANT POUR DENOMINATION
COMMERCIALE COMMISIMPEX

(République du Congo)

vs/

LA REPUBLIQUE DU CONGO (BRAZZAVILLE)

(République du Congo)

Ce document est un original de la Sentence Partielle rendue conformément au
Règlement d'arbitrage de la Cour internationale d'arbitrage de la CCI.

## CHAMBRE DE COMMERCE INTERNATIONALE

### SENTENCE PARTIELLE

### Affaire CCI n° 16 257/EC/ND

**ENTRE:**

**COMMISSIONS IMPORT EXPORT S.A.,** ayant pour dénomination commerciale « Commisimpex » et son siège social 86, avenue Foch, Quartier Cathédrale, BP 1244 BRAZZAVILLE, **REPUBLIQUE DU CONGO**

Représentée par M. Michael Polkinghorne, M. Charles Nairac, M. Christophe Seraglini et Mme Elizabeth Lefebvre-Gross, WHITE & CASE, 19 place Vendôme, 75001 Paris, FRANCE

Demanderesse,

Ci-après "Commisimpex " ou "la Demanderesse"

**ET :**

**LA REPUBLIQUE DU CONGO,** Président de la République, Palais Présidentiel, Quartier Plateau, BRAZZAVILLE, **REPUBLIQUE DU CONGO ;**

Représentée par M. Jean-Pierre Vignaud, M. Jean-Yves Garaud, M. Olivier Loizon et Mme Carine Dupeyron, CLEARY, GOTTLIEB, STEEN & HAMILTON LLP, 12 rue de Tilsitt, 75008 Paris, France

Défenderesse

Ci-après "Le Congo" ou "la Défenderesse"

## I-   FAITS

**1.** De 1984 à 1986, Commisimpex et la République du Congo ont conclu divers marchés de travaux publics et de fournitures de matériels et avenants à ces contrats[1], financés au moyen de crédits consentis par Commisimpex au profit de l'État, matérialisés par des billets à ordre émis par la Caisse Congolaise d'Amortissement (ci-après la « CCA ») et devant être avalisés par l'État. Ces contrats de marchés contiennent les clauses attributives de juridiction ou d'arbitrage variées.

**2.** Le 22 décembre 1986, la République du Congo, représenté par le Ministère des Finances et du Budget et la Caisse Congolaise d'Amortissement, a émis au profit de Commisimpex une garantie de paiement de certains des marchés et avenants conclus avec celle-ci, sous réserve de leur parfaite exécution (ci-après la « Garantie de 1986 », Pièce C-3).

**3.** En 1987, la République du Congo a effectué un paiement partiel à Commisimpex, à hauteur de 15 millions de dollars US.

**4.** Le 27 juin 1987, l'État, représenté par le Ministre des Finances et du Budget, et Commisimpex ont conclu le Protocole d'accord n°461 (le « Protocole de 1987 », Pièce R-7). Le Protocole de 1987 prévoit le remboursement de 12.818.000 Livres sterling à Commisimpex, cette dernière ayant garanti le crédit fourni par la société APV Hall International Limited (ci-après « APV Hall ») à l'État, dans le cadre du marché 353/83 pour des travaux de plantation à Etoumbi-Kunda. Le Protocole de 1987 désigne les tribunaux congolais.

**5.** Dans une lettre du 7 octobre 1992, Commisimpex a fait état de réunions présidées par le Président de la République du Congo, M. Pascal Lissouba, les 7 et 23 septembre 1992 et a indiqué que le montant de sa créance, actualisé au 30 septembre 1992, est de 48 milliards de FCFA (Pièce C-4). Cette lettre de Commisimpex détaille les modalités prévues pour le règlement de la dette, à savoir la conclusion d'un protocole pour le paiement de 22 milliards de FCFA et le versement de 26 milliards de FCFA *par compensation d'entreprises à privatiser et [par] versement d'une somme à déterminer* ». L'existence de ces réunions et la teneur de cet accord sont vivement contestés par le Congo[2].

**6.** Commisimpex n'ayant pas reçu paiement complet de sa créance, la société Commisimpex et la République du Congo ont conclu le 14 octobre 1992 le Protocole n°566 (ci-après « le Protocole de 1992 », Pièce C-5). Le Protocole de 1992 visait à établir les modalités de règlement des « *dettes restant dues* » pour rembourser les crédits fournisseurs consentis par Commisimpex pour les « *marchés et avenants joints en annexe au présent protocole* »[3]. Les « *dettes restant dues* » étaient libellées en Francs français, Livres sterling, dollars US et FCFA et représentaient environ 22 milliards de FCFA. L'article 5 de ce Protocole prévoyait que les

---

[1]   Le marché 353/83 a été conclu entre le Congo et la société APV Hall International Limited le 10 novembre 1983 (Pièce C-40). Commisimpex et l'État ont ensuite conclu les avenants n°1, 3, 4 et 5 au marché 353/83 (Pièces R-23, R-24, R-21 et R-22) ; ainsi que le marché 185/84 du 25 juin 1984 (Pièce R-6) ; le marché 83/85 du 24 juin 1985 et son avenant n°1 (Pièces R-25 et R-26) ; le marché 009/86/G du 12 février 1986 (Pièce R-19) ; le marché 015/86 du 26 mars 1986 et son avenant n°1 (Pièces R-4 et R-20) et le marché 53/86 du 1er juillet 1986 (Pièce R-5).

[2]   Mémoire en réplique sur la compétence, 26 février 2010, paragraphes 7 et suivants, page 4.

[3]   L'annexe au Protocole de 1992 n'a cependant pas été communiquée dans la présente procédure.

montants dus en vertu de cet accord seraient représentés par de nouveaux billets à ordre souscrits par la CCA à l'ordre de Commisimpex et avalisés par le Ministère de l'Économie, des Finances et du Plan de la République du Congo. L'article 7 indiquait que l'exécution du Protocole de 1992 était subordonnée, d'une part, à la réception par la République du Congo de tous les billets à ordre souscrits par la CCA au profit de Commisimpex en application des marchés à l'origine de la créance de cette dernière (les « anciens billets à ordre ») et, d'autre part, par la réception par Commisimpex des nouveaux billets à ordre souscrits par la CCA en application de l'article 5 du Protocole de 1992 (les « nouveaux billets à ordre »). Le Protocole de 1992 contenait une clause prévoyant un arbitrage sous l'égide de la CCI (article 10).

**7.** En application du Protocole de 1992, par une lettre du 24 novembre 1992, Commisimpex a indiqué restituer « *tous les anciens billets à ordre qui étaient encore en notre possession* » (Pièce R-1). Cette lettre contenait une liste des billets restitués.

**8.** Le 3 mars 1993, en application du Protocole de 1992, le Ministre des Finances et du Budget a émis les lettres d'engagement n° 75, 85, 95 et 105, selon lesquelles des nouveaux billets à ordre (émis le 20 novembre 1992 et listés dans ces lettres) pouvaient faire l'objet d'un endossement sans qu'il soit nécessaire de procéder à des formalités particulières (les « Lettres d'Engagement du 3 mars 1993 », Pièces C-6, C-7, C-8 et C-9). Le Ministre des Finances et du Budget a par ailleurs émis, le même jour, une lettre de gage n°115, garantissant le paiement des nouveaux billets à ordre listés dans la lettre d'engagement n°75 (Pièce C-50). Les Lettres d'Engagement du 3 mars 1993 et la lettre de gage n°115 contiennent toutes une clause prévoyant un arbitrage sous l'égide de la CCI, avec un siège à Paris.

**9.** Par requête d'arbitrage à la CCI en date du 13 mars 1998 (Pièce R-2), dans l'affaire n°9899, Commisimpex a sollicité la condamnation de la République du Congo et de la CCA au paiement de montants non honorés en exécution du Protocole de 1992. Par une sentence intérimaire du 28 juin 1999, le tribunal arbitral dans l'affaire n°9899 a condamné la République du Congo et la CCA à payer à Commisimpex une somme provisionnelle de 15 millions de dollars US et a désigné un expert pour déterminer le montant total dû par la République du Congo et la CCA (Pièce C-12). Aux termes d'une sentence finale rendue le 3 décembre 2000 (Pièce C-14), ce tribunal arbitral condamnait solidairement la République du Congo et la CCA au paiement de 107 millions de dollars US, limitant la condamnation au montant correspondant aux anciens billets à ordre restitués par Commisimpex (ci-après, les « Sommes Accordées »). Le Tribunal Arbitral dans l'affaire n°9899 a rejeté une partie des demandes de Commisimpex (les « Sommes Rejetées »). Dans la présente procédure d'arbitrage, au fond, Commisimpex demande la condamnation du Congo à payer les Sommes Rejetées par le Tribunal Arbitral n°9899, mais aussi « *une autre partie de la dette qui n'a pas été réclamée lors de la Procédure CCI [n°9899]* »[4] (les « Nouvelles Demandes »).

**10.** Le 3 septembre 2001, Commisimpex a formé une demande d'expertise *ex parte*, auprès du Président du Tribunal de commerce de Brazzaville, afin notamment de : vérifier le montant de la créance de Commisimpex à la fin de 1986, calculer le montant au 30 septembre 2001 des créances de Commisimpex « *sans tenir compte du Protocole [de 1992]* » et de calculer le montant actualisé de la condamnation prononcée par le Tribunal Arbitral dans l'affaire n°9899 (Pièce C-52). Le rapport d'expertise rendu par l'expert M. Nicéphore Fylla de Saint Eudes (domicilié au cabinet Ernst and Young à Brazzaville) le 25 septembre 2001 évaluait le

---

[4]   Note de bas de page n°5, Requête d'arbitrage de Commisimpex.

montant de la dette de l'Etat, actualisé au 30 septembre 2001, entre 305 et 311 millions de dollars US (correspondant, à hauteur de 109 millions de dollars US aux Sommes Accordées dans l'arbitrage n°9899 et, selon une première méthode de calcul, 196 millions de dollars US pour le « *solde* » de la créance ou, selon une deuxième méthode, 202 millions de dollars US) (Pièce C-17).

**11.** Le 9 novembre 2001, le Président du Tribunal de Commerce de Brazzaville a entériné ce rapport (faisant la moyenne arithmétique des deux évaluations proposées par l'expert M. Fylla de Saint Eudes) et ordonné à la CCA « *d'inscrire la totalité de ces sommes au titre de dette de l'État* » (Pièce C-20). Le 19 décembre 2001, le Président du Tribunal de Commerce de Brazzaville a rejeté la demande de la CCA de voir rétracter l'ordonnance du 9 novembre 2001 (Pièce C-55).

**12.** Le 27 mars 2002, « *dans le cadre des travaux de recensement, d'examen et de validation de la dette intérieure au 31 décembre 2000* », le Cabinet Ernst & Young réalisa une « fiche d'audition » reprenant l'évaluation de la créance de Commisimpex obtenue selon la première méthode de calcul proposée dans le rapport d'expertise du 25 septembre 2001 (Pièce C-22).

**13.** Par un arrêt du 18 juillet 2002, la Cour d'appel de Brazzaville a annulé l'ordonnance du 9 novembre 2001 pour un motif de forme. La Cour d'appel a néanmoins considéré que la fiche d'audition du 27 mars 2002 constituait « *une véritable transaction* » et confirmé la décision rendue en première instance, en ordonnant à la CCA « *d'inscrire la totalité des créances confirmées par la société Commisimpex, reconnues et arrêtées sur la fiche d'audition du 27 mars 2002* » (Pièce C-24). Cet arrêt a ensuite été cassé sans renvoi par la Cour suprême du Congo par un arrêt du 27 juin 2003. En effet, la Cour Suprême a considéré que la Cour d'appel avait violé le principe du contradictoire, dans la mesure où la fiche d'audition du 27 mars 2002 n'avait pas été communiquée à toutes les parties au procès ; la Cour Suprême a aussi considéré que la Cour d'appel avait violé l'article 219 du Code de Procédure Civile « *en prononçant en référé de véritables condamnations déguisées* », et ce faisant avait violé la clause d'arbitrage du Protocole de 1992. La Cour Suprême a donc renvoyé les parties à l'exécution de la sentence arbitrale n°9899 (Pièce C-26).

**14.** Le 23 août 2003, la société Commisimpex, d'une part, et Monsieur Gabriel Longobé, Ministre délégué, Secrétaire Général de la Présidence de la République, et Monsieur Jean-Dominique Okemba, Secrétaire d'État, Secrétaire Général du Conseil de Sécurité, d'autre part, ont signé le Protocole d'accord n°706 (ci-après « le Protocole de 2003 ») (Pièce C-27). Le Protocole de 2003 fixait les modalités de remboursement de la dette de la République du Congo, considérablement augmentée par rapport au Protocole de 1992 et évaluée à 48 milliards de FCFA au 30 septembre 1992. Le Protocole de 2003 décrivait « *la dette de l'Etat du Congo* » comme étant composée d'une « *première partie* » de 22 milliards de FCFA, « *objet du Protocole [de 1992]* », et d'une « *deuxième partie* » de 26 milliards de FCFA. Le Protocole de 2003 prévoyait que l'État s'engageait « *à conclure avec la société Commisimpex un Protocole d'Accord Définitif en remplacement du présent Protocole, pour clore les négociations en cours* » (article 6) et ne contenait pas de clause de règlement des litiges. Le Protocole d'Accord Définitif envisagé par le Protocole de 2003 n'a pas été conclu.

**15.** En 2008, l'État indique avoir invité Commisimpex à prendre en considération l'offre de restructuration de la dette du Congo à son égard, dans le cadre défini par le Fonds Monétaire International (Pièces R-13 à R-15). Commisimpex, qui déclare n'avoir pas reçu cette

proposition, a engagé le présent arbitrage le 17 avril 2009 sur la base de la clause d'arbitrage contenue à l'article 10 du Protocole de 1992 conclu entre elle et la République du Congo qui est libellée comme suit :

> « *En cas de différend portant sur l'interprétation, l'exécution ou toutes autres difficultés entre les parties relativement au présent protocole d'accord, les parties conviennent de se concerter pour aboutir à un règlement amiable ; à défaut, le différend sera résolu par un ou plusieurs arbitres désignés conformément au règlement d'arbitrage de la Chambre de Commerce Internationale (Paris) statuant en premier et dernier ressort.* »

**16.** Au fond, Commisimpex demande d'une part, que le Tribunal Arbitral constate la reconnaissance par le Congo de sa dette dans le Protocole de 2003 ainsi que son engagement à la régler puis, d'autre part, le condamne à régler les sommes dues à ce titre.

**17.** Les parties s'opposent sur la compétence du Tribunal Arbitral. D'un côté, la République du Congo considère que le Tribunal Arbitral est incompétent pour statuer sur ce litige dans la mesure où le Protocole de 2003 ne contient pas de clause compromissoire et que les parties n'avaient pas l'intention d'étendre celle incluse dans le Protocole de 1992 au Protocole de 2003. Elle ajoute que, quand bien même une telle extension serait intervenue, Commisimpex aurait renoncé à la clause d'arbitrage en saisissant les juridictions congolaises en 2001 et qu'en tout état de cause, les demandes de Commisimpex se heurtent à l'autorité de la chose jugée de la sentence CCI dans l'affaire n°9899 du 3 décembre 2000. La République du Congo invoque enfin le principe de l'*estoppel* qui empêcherait Commisimpex de se prévaloir du bénéfice de la clause d'arbitrage du Protocole de 1992.

**18.** Se fondant sur le concept de groupe de contrats qui justifierait l'extension de la clause compromissoire dans le cadre de groupes de contrats, Commisimpex considère le Tribunal Arbitral compétent, et conteste avoir renoncé au bénéfice de la clause d'arbitrage. Commisimpex estime en outre que l'autorité de la chose jugée est une fin de non-recevoir qui doit être traitée en même temps que le fond, et soutient que l'argument de l'*estoppel* ne peut être accueilli par ce Tribunal.

## II-  PROCÉDURE

**19.** Le 21 avril 2009, le Secrétariat de la Cour internationale d'arbitrage de la CCI (ci-après « le Secrétariat de la CCI ») a accusé réception de la requête d'arbitrage soumise par Commisimpex le 17 avril 2009. La Demanderesse a indiqué souhaiter que le litige soit soumis à un collège de trois arbitres et a nommé comme arbitre M. le Professeur Bernard Hanotiau.

**20.** Le 22 avril 2009, le Secrétariat de la CCI a transmis cette requête d'arbitrage à la République du Congo.

**21.** Les 4 et 5 mai 2009, la Demanderesse a adressé au Secrétariat de la CCI une lettre accompagnée de deux pages modifiant sa requête d'arbitrage, dont le Secrétariat a accusé réception le 6 mai 2009.

**22.** Le 26 mai 2009, le cabinet Cleary Gottlieb a informé le Secrétariat de la CCI qu'il représentait la Défenderesse dans ce litige et a indiqué que celle-ci, ayant accepté que le litige soit soumis à un collège de trois arbitres, nommait Me Carole Malinvaud en qualité d'arbitre.

**23.** Le 3 juin 2009, le Secrétariat de la CCI a adressé aux parties copie de la déclaration d'acceptation et d'indépendance de Me Carole Malinvaud.

**24.** Le 4 juin 2009, le Secrétariat de la CCI a adressé aux parties copie de la déclaration d'acceptation et d'indépendance de M. Le Professeur Bernard Hanotiau.

**25.** Le 8 juin 2009, la Défenderesse a indiqué au Secrétariat de la CCI qu'elle entendait contester l'existence, la portée et la validité de la clause compromissoire invoquée par la Demanderesse dans sa requête. Elle a ajouté qu'elle consentait à ce que le lieu de l'arbitrage soit Paris et que l'arbitrage soit conduit en langue française.

**26.** Le même jour, la Demanderesse a accepté la proposition de la Défenderesse quant à la désignation conjointe du Président du Tribunal Arbitral par les co-arbitres et a suggéré le 30 juin 2009 comme date limite pour cette désignation.

**27.** Le 11 juin 2009, le Secrétariat de la CCI a demandé aux parties si, dans l'hypothèse où l'arbitrage avait lieu, elles s'accorderaient sur un délai exprès à accorder aux co-arbitres à compter de la date à laquelle ils recevraient notification de leur confirmation pour tenter de désigner conjointement le Président du Tribunal Arbitral.

**28.** Le 18 juin 2009, les parties ont indiqué par lettres respectives au Secrétariat de la CCI que les co-arbitres disposaient, pour nommer conjointement le Président du Tribunal Arbitral, d'un délai de trois semaines à compter de la date à laquelle ils avaient reçu notification de leur confirmation. Le Secrétariat de la CCI a accusé réception de ces lettres le 19 juin 2009.

**29.** Le 25 juin 2009, la Défenderesse a sollicité un délai supplémentaire de quinze jours, soit jusqu'au 10 juillet 2009, pour soumettre sa réponse à la requête d'arbitrage.

**30.** Le 26 juin 2009, la Demanderesse a indiqué espérer que la Défenderesse soumette sa réponse à la requête d'arbitrage dans les meilleurs délais.

**31.** Le 29 juin 2009, le Secrétariat de la CCI a étendu au 6 juillet 2009 le délai accordé à la Défenderesse pour soumettre sa réponse à la requête d'arbitrage.

**32.** Le 8 juillet 2009, le Secrétariat de la CCI a accusé réception de la réponse à la requête d'arbitrage de la Défenderesse datée du 6 juillet 2009.

**33.** Le 17 juillet 2009, la Demanderesse a adressé ses commentaires sur les objections à la compétence du Tribunal soulevées par la Défenderesse. Le Secrétariat de la CCI a accusé réception de cette lettre le 20 juillet 2009.

**34.** Le 30 juillet 2009, le Secrétariat de la CCI a informé les parties que la Cour internationale d'arbitrage de la CCI avait décidé que l'arbitrage aurait lieu conformément à l'article 6 (2) du Règlement et avait confirmé le Professeur Bernard Hanotiau et Me Carole Malinvaud en qualité de co-arbitres.

**35.** Le même jour, le Secrétariat de la CCI a indiqué aux co-arbitres qu'ils disposaient de 21 jours pour désigner conjointement le Président du Tribunal Arbitral.

**36.** Le 7 août 2009, Me Carole Malinvaud a indiqué au Secrétariat de la CCI que le Professeur Hanotiau et elle-même proposaient conjointement Me Yves Derains comme Président du Tribunal Arbitral.

**37.** Le 10 août 2009, le Professeur Bernard Hanotiau a confirmé au Secrétariat de la CCI que Me Carole Malinvaud et lui-même proposaient conjointement Me Yves Derains comme Président du Tribunal Arbitral.

**38.** Le 14 août 2009, le Secrétariat de la CCI a adressé aux parties une copie de la déclaration d'acceptation et d'indépendance de Me Yves Derains.

**39.** Le 28 août 2009, le Secrétaire Général de la Cour internationale d'arbitrage de la CCI a confirmé Me Yves Derains en qualité de Président du Tribunal Arbitral, le Tribunal étant donc constitué comme suit :

Monsieur le Professeur Bernard HANOTIAU
HANOTIAU & VAN DEN BERG
IT Tower, 9th Floor
480 Avenue Louise- Box 9
1050 Bruxelles
Belgique
Tel: +32  2 290 39 00
Fax: +32 2 290 39 39
E-mail: bernard.hanotiau@hvdb.com
(Co-arbitre)

Maître Carole MALINVAUD
GIDE LOYRETTE NOUEL
26, Cours Albert 1er
75008 Paris
France
Tel : + 33 (0) 1 40 75 36 66
Fax : + 33 (0) 1 40 75 69 36
E-mail : malinvaud@gide.com
(Co-arbitre)

Maître Yves DERAINS
DERAINS & GHARAVI
25 rue Balzac
75008 Paris
France
Tel : +33 (0) 1 40 55 51 00
Fax : +33 (0) 1 40 55 51 05
E-mail : yvesderains@dglarbitrage.com
(Président du Tribunal Arbitral)

**40.** Le même jour, le dossier de l'affaire a été transmis aux arbitres.

**41.** Le 11 septembre 2009, le Tribunal Arbitral a adressé aux parties des projets d'Acte de Mission et d'Ordonnance de Procédure n°1 afin d'obtenir leurs commentaires ainsi que le résumé de leurs positions.

**42.** Le 21 septembre 2009, les parties ont adressé au Tribunal Arbitral leurs commentaires sur l'Acte de Mission ainsi que le résumé de leurs positions.

**43.** Le 24 septembre 2009, le Tribunal Arbitral a adressé aux parties un nouveau projet d'Acte de Mission intégrant les positions des parties ainsi que leurs commentaires.

**44.** Le 30 septembre 2009, la Demanderesse a formulé une nouvelle demande de réparation de son préjudice moral.

**45.** Le 1er Octobre 2009, une réunion s'est tenue à Paris entre le Tribunal Arbitral et les parties.

**46.** Le même jour, le Tribunal Arbitral a communiqué à la Cour Internationale d'Arbitrage l'Acte de Mission signé par les parties et le Tribunal.

**47.** Le même jour, le Tribunal Arbitral a également adressé aux parties l'Ordonnance de Procédure n° 1 dont la teneur est la suivante:

> *« Attendu que le 1er octobre, une réunion s'est tenue à Paris en présence du Tribunal Arbitral, des parties et de leurs conseils;*
>
> *Attendu qu'à la même date, les parties ont signé l'Acte de Mission ;*
>
> *Attendu que Me. Catherine Schroeder a été désignée comme Secrétaire du Tribunal Arbitral ;*
>
> *Attendu que par lettre du 30 octobre 2009, la partie demanderesse a indiqué qu'elle n'était pas en état de discuter dès à présent du calendrier prévisionnel ;*
>
> *Le Tribunal Arbitral décide ce qui suit :*
>
> *1.       Calendrier Prévisionnel*
>
> *1.1.1    Les Parties tenteront d'établir conjointement un calendrier prévisionnel et indiqueront, pour le 16 octobre 2009, au Tribunal Arbitral l'état de leur discussion.*
>
> *1.1.2    Une conférence téléphonique entre les Parties et le Tribunal Arbitral aura lieu le 20 octobre afin de finaliser le calendrier prévisionnel.*
>
> *2.       Echange d'écritures*
>
> *2.1      Les Parties pourront présenter leurs arguments de fait et de droit dans deux échanges successifs de mémoires, selon le calendrier établi.*

2.2   *Les mémoires devront être soumis sous format A4 et A5 et en version électronique (word et pdf).*

2.3   *Les mémoires des parties doivent comprendre tous les arguments de fait et tous les arguments de droit justifiant les conclusions prises, sous la forme de paragraphes numérotés. Les parties présenteront séparément, en les numérotant spécialement, chacun de leurs arguments.*

2.4   *Dans leurs mémoires, les parties indiqueront la nature des moyens de preuve qu'elles entendent soumettre à l'appui de leurs arguments de fait (pièces, témoignages, expertises, etc.) ou de droit (extraits de doctrine ou de jurisprudence, avec références complètes). Les mémoires seront accompagnés d'une table des matières.*

2.5   *Les pièces soumises par les parties au Tribunal Arbitral seront numérotées de façon continue (pour la Demanderesse « C- ... » ; pour la Défenderesse « R-... ») et annexées aux mémoires auxquels elles se réfèrent. Elles seront de plus accompagnées d'une liste indiquant la date et l'auteur de chacune d'elles; cette liste sera mise à jour par les parties chaque fois qu'une nouvelle pièce sera soumise. Les annexes reproduisant des passages de doctrine ou de jurisprudence seront numérotées de façon continue (pour la Demanderesse « CL-... » ; pour la Défenderesse « RL-... »).*

2.6   *Les pièces soumises au Tribunal Arbitral doivent l'être dans leur intégralité et les passages visés devront être identifiés. Les photocopies seront suffisantes, à moins que la partie adverse conteste l'authenticité du document, auquel cas le Tribunal Arbitral pourra demander la production du document original ou d'une copie certifiée conforme de l'original.*

2.7   *Une partie pourra demander à la partie adverse de soumettre tout document dont elle ne dispose pas si celui-ci en a la possession ou, sous le contrôle de la partie adverse, si le document est suffisamment identifié et pertinent pour la résolution du litige.*

   *Si la partie à qui une telle requête a été soumise refuse de s'exécuter, le Tribunal Arbitral pourra ordonner la production du (des) document(s) en question, sur requête de la partie concernée. Les parties devront former leurs éventuelles requêtes au Tribunal Arbitral de manière conjointe, à la date indiquée dans le calendrier prévisionnel ci-dessus. Cette requête conjointe devra identifier le(s) document(s) avec suffisamment de précision et devra indiquer en quoi le(s) document(s) est (sont) pertinent(s) (« Redfern Schedule »). Le Tribunal Arbitral aura tout pouvoir de statuer et tiendra en particulier compte des intérêts légitimes de la partie à qui la requête de production a été adressée. Si un document était considéré comme confidentiel par la partie à qui la requête est adressée, elle devra en informer le Tribunal Arbitral et la partie adverse. Le Tribunal Arbitral prendra alors toutes les mesures nécessaires pour assurer la protection de ce document tout en s'efforçant, dans la mesure du possible, à en autoriser la production.*

   *Le Tribunal Arbitral appréciera librement et tirera toutes conséquences du refus d'une partie d'obtempérer à son ordre de production.*

2.8   *Le Tribunal Arbitral pourra également à tout moment demander à l'une des parties de soumettre un document qu'il considère pertinent pour la résolution du litige.*

2.9   *Les parties ne seront pas autorisées à présenter des pièces nouvelles après l'échange d'écritures, sous réserve d'une autorisation expresse du Tribunal Arbitral.*

**3.   *Auditions des témoins et experts***

*3.1      Toute personne peut être entendue, y compris les parties et leurs dirigeants.*

*3.2      Les parties soumettront en annexe à leurs écritures les déclarations écrites des témoins indiqués dans leurs écritures, sauf pour les témoins qui sont sous contrôle de la partie adverse ou refusent de témoigner.*

*3.3      Seuls seront entendus les témoins dont une partie requiert le contre-examen. Les autres seront dispensés de comparaître, sauf si le Tribunal Arbitral souhaite les entendre. Dans l'hypothèse où une partie ne requiert pas le contre-examen d'un témoin, elle n'est pas pour autant réputée avoir accepté le contenu de son attestation. Dans ce cas, le Tribunal Arbitral juge de la valeur à accorder à l'attestation dans son entière discrétion.*

*3.4      Les témoins/experts seront en principe cités par la partie pour laquelle ils ont fourni une déclaration écrite ou un rapport.*

*3.5      Lorsqu'un témoin cité est sous le contrôle de la partie adverse, celle-ci engagera tous ses efforts pour que ce témoin paraisse.*

*3.6      Si un témoin dûment cité ne devait pas comparaître pour une raison valable, sa déclaration écrite pourra néanmoins être prise en compte par le Tribunal Arbitral, selon les circonstances et pour autant qu'elle ne soit pas contestée.*

*3.7      Les auditions de témoins et experts se dérouleront en principe selon la procédure suivante :*

> *a. Les témoins et les experts seront d'abord invités par le Tribunal Arbitral à confirmer leur déclaration écrite. Celle-ci tiendra lieu d'examen direct sous réserve d'une éventuelle brève présentation.*

> *b. Sauf ordre contraire du Tribunal Arbitral, les témoins et les experts dont le témoignage a été consigné dans une déclaration écrite seront interrogés uniquement par le conseil de la partie adverse (« contre-examen »).*

> *c. Le conseil de l'autre partie aura s'il le souhaite l'occasion de poser des questions en relation avec les réponses données (« ré-examen ») ; l'occasion sera ensuite également offerte au conseil de l'autre partie de poser des questions complémentaires.*

> *d. Le Tribunal Arbitral peut interroger les témoins et les experts en tout temps et autoriser des interrogatoires complémentaires.*

*3.8      S'ils le jugent nécessaire, les experts peuvent commencer par une introduction, qui devra toutefois être brève.*

*3.9      Le Tribunal Arbitral se réserve le droit de faire entendre plusieurs témoins ou experts simultanément afin de pouvoir confronter leurs points de vue.*

*3.10    Les représentants des parties peuvent assister à toutes les audiences ; les témoins et les experts ne peuvent y assister qu'après leur audition.*

*3.11    Les coûts liés à l'audition d'un témoin ou d'un expert seront supportés par la partie qui l'a cité, sous réserve de la décision finale du Tribunal Arbitral sur la répartition de tels frais. Si un témoin est cité par les deux parties, la partie sous le contrôle de laquelle se trouve ce témoin supportera les coûts liés à son audition. Si un témoin ne se trouve pas sous le contrôle de l'une ou l'autre partie, les coûts liés à son audition seront partagés par moitié entre les parties.*

*3.12    Les audiences d'audition feront l'objet d'un procès-verbal en français, établi par un(e) sténotypiste dont les coûts seront avancés par parts égales par les parties. »*

**48.** Le 16 octobre 2009, la Demanderesse a fait connaître au Tribunal Arbitral l'état des discussions des parties quant au calendrier prévisionnel, indiquant qu'elle souhaiterait que le Tribunal Arbitral se prononce, par une sentence partielle, sur la question de sa compétence, et ce avant tout examen au fond des demandes des parties. Elle adressait un calendrier prévisionnel établi par les parties dans l'hypothèse où le Tribunal ferait droit à cette demande.

**49.** Le même jour, la Défenderesse a indiqué que, pour sa part, la question de la compétence se mélangeait au fond mais qu'elle s'en remettait à la sagesse du Tribunal. Elle a ajouté que dans l'hypothèse où le Tribunal Arbitral accepterait la bifurcation de la procédure, celle-ci devrait porter sur toutes les exceptions de procédure et que c'est dans ce cas seulement qu'elle accepterait le calendrier fixé par Commisimpex. Dans le cas inverse, elle a confirmé qu'elle était d'accord pour fixer avec la Demanderesse un calendrier prévisionnel.

**50.** Le 19 octobre 2009, le Tribunal Arbitral a accusé réception des lettres respectives des parties et a confirmé la conférence téléphonique devant avoir lieu entre les parties et le Tribunal le 20 octobre 2009 afin que celles-ci puissent développer leurs positions respectives. Le 20 octobre 2009, une conférence téléphonique a eu lieu entre les parties et le Tribunal Arbitral.

**51.** Le même jour, le conseil de la Défenderesse a adressé au Tribunal Arbitral son pouvoir pour représenter la République du Congo, signé par M. l'Ambassadeur Lopès.

**52.** Le même jour, le Tribunal Arbitral a adressé aux parties l'Ordonnance de procédure n°2 qui dispose que :

*« Attendu que conformément à l'Ordonnance de Procédure no.1, les parties ont, par lettres du 16 octobre 2009, fait part au Tribunal Arbitral de l'état de leurs discussions quant à l'établissement d'un calendrier de procédure ;*

*Attendu que les parties ont fait part de leurs positions respectives quant à la bifurcation de la procédure lors d'une conférence téléphonique entre elles et le Tribunal Arbitral le 20 octobre 2009 ;*

***Le Tribunal Arbitral décide ce qui suit :***

*1.1.    Le Tribunal Arbitral accepte le calendrier prévisionnel établi par les parties, dans l'hypothèse d'une bifurcation, comme suit :*

*- Mémoire de la Défenderesse sur la compétence et ses exceptions de procédure : 11 décembre 2009 ;*

*- Mémoire en réponse de la Demanderesse : 29 janvier 2010 ;*

*- Mémoire en réplique de la Défenderesse : 26 février 2010 ;*

*- Mémoire en duplique de la Demanderesse : 26 mars 2010.*

*- Une audience est prévue le 26 avril 2010.*

*1.1.1.   Le Tribunal Arbitral se réserve le droit, à l'issue de ces deux échanges de mémoires, ou à l'issue de l'audience prévue de renvoyer les exceptions de compétence et/ou de procédure au fond s'il s'estimait insuffisamment informé pour trancher ces questions. »*

**53.** Le 29 octobre 2009, la Demanderesse a demandé que la Défenderesse fournisse un pouvoir signé devant notaire ainsi qu'une copie des documents attestant des pouvoirs de l'Ambassadeur Lopès pour engager le Congo.

**54.** Le même jour, le Tribunal Arbitral a invité la Défenderesse à soumettre ses commentaires sur la lettre de la Demanderesse pour le 3 novembre 2009.

**55.** Le 3 novembre 2009, la Défenderesse s'est opposée à la fourniture d'un pouvoir de représentation devant être signé par notaire, le droit français ne l'exigeant pas et posant, au contraire, une présomption de mandat *ad litem* au profit des avocats.

**56.** Le 5 novembre 2009, la Demanderesse a indiqué qu'elle était satisfaite des assurances données par la Défenderesse quant à sa qualité de représentant de la République du Congo.

**57.** Le 6 novembre 2009, le Tribunal Arbitral a accusé réception des lettres respectives des parties et a noté que la question de la représentation de la Défenderesse était maintenant réglée.

**58.** Le 12 décembre 2009, la Défenderesse a adressé au Tribunal Arbitral et à la Demanderesse son Mémoire sur la Compétence.

**59.** Le 29 janvier 2010, la Demanderesse a adressé au Tribunal Arbitral et à la Défenderesse son Mémoire en Réponse sur la Compétence.

**60.** Le 26 février 2010, la Défenderesse a adressé au Tribunal Arbitral et à la Demanderesse son Mémoire en Réplique sur la Compétence.

**61.** La Cour internationale d'arbitrage, lors de sa session du 11 mars 2010, conformément à l'Article 24 (2) du Règlement, a prolongé le délai pour rendre la Sentence Finale jusqu'au 30 juin 2010.

**62.** Le 26 mars 2010, la Demanderesse a adressé au Tribunal Arbitral et à la Défenderesse son Mémoire en Duplique sur la Compétence.

**63.** Le 08 avril 2010, le Tribunal Arbitral a confirmé aux parties qu'une audience se tiendrait le 26 avril 2010.

**64.** Le 14 avril 2010, le Tribunal Arbitral a reçu une lettre de la Demanderesse faisant part de l'accord des parties sur les modalités d'organisation de l'audience, sous réserve de son propre accord.

**65.** Le même jour, le Tribunal Arbitral a accusé réception de la lettre de la Demanderesse et a donné son accord sur les modalités d'organisation de l'audience.

**66.** Par lettre du 22 avril 2010, le Tribunal Arbitral a adressé aux parties un courriel rédigé dans les termes suivants :

> *« Le Tribunal Arbitral serait reconnaissant si les parties voulaient bien s'exprimer lors de l'audience de lundi sur la notion et les conséquences juridiques de « l'inscription par la CCA de la créance de Commisimpex au titre de la dette de l'Etat » qui apparaît dans le par ces motifs des deux décisions congolaises de première instance :*
> - *« ordonne à la caisse congolaise d'amortissement d'inscrire la totalité de ces sommes au titre de la dette de l'Etat etc... » (C 20 p34 et 35)*
> - *« ordonne à la Caisse Congolaise d'amortissement (CCA) d'inscrire la totalité des créances confirmées par la société Commisimpex, reconnues et arrêtées sur la fiche d'audition du 27 mars 2002 etc.. » (C24 p 47- 49) ».*

**67.** L'audience s'est tenue le 26 avril comme prévu. À l'occasion de cette audience, il a été décidé que les parties indiqueraient au Tribunal Arbitral si, et dans quel délai, elles seraient en mesure de lui remettre des éléments de droit congolais précisant la nature de l'inscription de créance au titre de la dette de l'État.

**68.** En date du 3 mai 2010, le Tribunal arbitral fixa aux parties un délai expirant au **7 mai** 2010 pour fournir ces informations.

**69.** À la demande de la défenderesse, ce délai fut prorogé jusqu'au 19 mai 2010 par lettre du Tribunal Arbitral du 10 mai 2010. Par le même courrier, le Tribunal Arbitral prononçait la clôture des débats, conformément à l'article 22 (1) du Règlement d'arbitrage de la CCI.

**70.** Par communication du 11 mai 2010, le Tribunal Arbitral précisait que, dans l'hypothèse où la Demanderesse formulerait une demande après examen des documents éventuellement remis par la défenderesse, il prendrait les mesures appropriées.

**71.** Par courrier du 19 mai 2010, la Défenderesse communiqua les textes de droit congolais suivants :

- Loi n°1.2000 du 1er février 2000, portant loi organique relative au régime financier de l'État ;
- Décret n°2000-187 du 10 août 2000, portant règlement général sur la comptabilité publique.

**72.** La Demanderesse n'a pas formulé de demande quelconque après la communication de ces textes.

**73.** La Cour internationale d'arbitrage, lors de sa session du 10 juin 2010, conformément à l'Article 24 (2) du Règlement, a prolongé le délai pour rendre la Sentence Finale jusqu'au 31 août 2010.

## III- POSITION DES PARTIES

### A-    Position de la Défenderesse

**74.** Commisimpex invoque l'extension de la clause compromissoire insérée dans le Protocole de 1992 pour justifier la compétence du Tribunal Arbitral dans la mesure où le Protocole de 2003, sur lequel elle se fonde pour solliciter du Tribunal Arbitral la condamnation de la République du Congo, ne contient pas de clause compromissoire. Selon l'État, une telle demande ne saurait être accueillie.

**75.** La République du Congo expose que, parmi les marchés conclus entre 1984 et 1986, un seul contrat de marché contient une clause d'arbitrage, les autres contrats contenant des clauses attributives de juridiction renvoyant au règlement de conciliation et d'arbitrage du Tribunal de Brazzaville ou au profit du Tribunal Populaire de Poto-Poto, et un contrat de marché ne contenant pas de clause attributive de juridiction.

**76.** De même :

-   La Garantie de 1986 contient une clause attributive de compétence au profit de « *tout tribunal relevant de toute juridiction où les actifs de tout Garant peuvent être localisés, et aussi (...) [de] tout autre tribunal fédéral ou cantonal en Suisse* » ;

-   Le Protocole de 1987 donne compétence aux tribunaux congolais.

**77.** Seul le Protocole de 1992 prévoit le recours à un arbitrage CCI (article 10), tout comme les Lettres d'Engagement du 3 mars 1993, signées par le Ministre des Finances et du Budget en exécution du Protocole de 1992.

**78.** Commisimpex a introduit une demande d'arbitrage le 13 mars 1998 dans l'affaire CCI n°9899, dans lequel devait être évaluée sa créance réelle et totale, telle qu'elle résultait de l'ensemble des marchés. Aussi bien l'expert, M. Ricol, désigné dans le cadre de la procédure arbitrale, que le tribunal arbitral dans l'affaire n°9899 se sont d'ailleurs basés sur les marchés afin de déterminer les créances dues à Commisimpex. Ce tribunal arbitral a ainsi condamné la République du Congo ainsi que la CCA au paiement d'une somme représentant la contre valeur, chiffrée par Commisimpex, de 107 millions de dollars US, ne prenant en compte que les créances représentées par les anciens billets à ordre restitués par Commisimpex à l'État.

**79.** Selon l'État, le 3 septembre 2001, Commisimpex a cependant choisi de faire réévaluer le quantum de la dette et a donc saisi sur requête le Président du Tribunal de commerce de Brazzaville aux fins de désignation d'un expert. L'expert désigné dans cette procédure devant le Tribunal de Commerce de Brazzaville a estimé que le montant de la dette s'élevait entre 305 et 311 millions de dollars US. Le Président du Tribunal de commerce de Brazzaville a

fait droit aux demandes de Commisimpex, à savoir, selon l'État, « *la condamnation de la Caisse Congolaise d'Amortissement et de la République du Congo à lui payer les sommes ainsi valorisées par le tribunal* »[5], et a entériné les conclusions de l'expert, ordonnant à la CCA « *d'inscrire la totalité de ces sommes au titre de la dette de l'État* »[6].

**80.** Puis la Cour d'appel de Brazzaville, par un arrêt du 18 juillet 2002, a condamné la République du Congo « *au paiement de la somme de 305 millions de dollars* »[7]. Par un arrêt du 27 juin 2003, la Cour Suprême du Congo, sur pourvoi formé par la République du Congo et la CCA, a cassé sans renvoi cet arrêt et a renvoyé les parties « *à l'exécution de la sentence arbitrale* » dans l'affaire n°9899 rendue le 3 décembre 2000, précisant « *qu'il ne rest[ait] rien à juger* ». L'État souligne les motifs retenus par la Cour Suprême, à savoir que les juridictions inférieures avaient ordonné « *de véritables condamnations* »[8].

**81.** L'État relève que le Protocole de 2003 a été signé par M. Longobé et M. Jean-Dominique Okemba « *prétendant agir sur délégation de la République du Congo* »[9]. Au fond, l'État allègue que le Protocole de 2003 est nul.

**82.** En 2008, la République du Congo a proposé à Commisimpex de régler sa créance selon le programme établi par le FMI pour les Pays Pauvres Très Endettés, ce que Commisimpex a refusé. Par ailleurs, Commisimpex a nié avoir reçu une telle proposition de la part de la République du Congo et alléguait que sa créance s'élevait désormais à 750 millions d'euros. Parallèlement, Commisimpex engageait le présent arbitrage.

    **1.**   **Sur l'extension au Protocole de 2003 de la clause compromissoire incluse dans le Protocole de 1992**

**83.** Selon l'État, le Tribunal Arbitral ne peut être compétent car les parties ne sont pas convenues de soumettre ce litige à l'arbitrage.

**84.** Tout d'abord, contrairement à ce qu'invoque Commisimpex, la clause compromissoire insérée dans le Protocole de 1992 ne peut être étendue au Protocole de 2003, ces deux contrats ne constituant pas « *une opération économique unique* » définie par Commisimpex comme « *le règlement de la dette* » de la République du Congo.

En effet, selon l'État, l'« *ensemble contractuel unique* » devant être pris en considération pour l'extension d'une clause compromissoire est défini comme l'« *opération économique unique que veulent réaliser les parties au moyen d'une pluralité d'instruments (...) chacun des accords particuliers n'[ayant] sa **raison** d'être que dans l'existence des autres* »[10]. L'État ajoute que « *bien plus que la notion d'objet, la cause et la nature des liens (dits « de complémentarité (...) c'est-à-dire (...) d'implication logique ou nécessaire »)* unissant les contrats en question, sont les critères les plus fréquemment dégagés par la jurisprudence et la doctrine pour caractériser un groupe de contrats* »[11].

---

[5]   Ordonnance de la Cour d'appel de Brazzaville du 9 novembre 2001, Pièce C-20, p.20.
[6]   Pièce C-20, page 35.
[7]   Mémoire sur la compétence, paragraphe 40, page 14.
[8]   Mémoire sur la compétence, paragraphe 43, page 15.
[9]   Mémoire sur la compétence, paragraphe 44, page 15.
[10]  Mémoire sur la compétence, paragraphe 66, page 21, citant le Professeur Aynès.
[11]  Mémoire en réplique sur la compétence, 26 février 2010, paragraphe 26, page 8.

Ainsi, s'il y a une « *opération économique unique* », celle-ci doit être « *l'exécution et le financement des marchés de travaux confiés à Commisimpex par la République du Congo* »[12]. L'ensemble contractuel ne serait pas composé des seuls Protocoles de 1992 et de 2003, mais doit inclure les marchés, leurs avenants, la Garantie de 1986 et le Protocole de 1987. En effet, la dette est née de l'exécution et du financement entre 1983 et 1986 de différents marchés de travaux publics, et par la suite a fait l'objet d'une garantie et de protocoles qui font tous expressément référence aux marchés de travaux et à leur exécution.

Sans ces marchés et leurs avenants, la Garantie de 1986 et les Protocoles n'auraient aucune « *raison d'être* ». D'ailleurs, les experts désignés dans la procédure n°9899 et devant les juridictions congolaises se sont reportés aux contrats fondateurs pour déterminer le montant de la dette de la République du Congo. Ainsi, « *il ne peut y avoir d'opération économique unique limitée au règlement de la Dette issue de contrats de marchés de travaux publics, qui exclurait précisément lesdits contrats* »[13].

Il ressort en outre de l'article 7 du Protocole de 2003 que la Garantie de 1986 a un lien avec l'opération de règlement de la dette.

Par ailleurs, le Protocole de 1987 avait pour objectif de « *résoudre une partie de la dette de la République du Congo* », ce qui est un objet « *identique à celui attribué par Commisimpex au Protocole de 1992* »[14].

À ce titre, la Garantie de 1986 ainsi que les Protocoles de 1987, 1992 et 2003 devraient au minimum constituer l'ensemble contractuel.

**85.** De plus, dans le cadre de cet ensemble contractuel, les parties n'ont pas exprimé la volonté de voir leurs différends relatifs à l'exécution et au financement de la dette soumis à l'arbitrage. En effet, l'existence de clauses attributives de juridiction incompatibles avec une clause compromissoire caractérise la volonté des parties de ne pas étendre la clause compromissoire. La compétence des tribunaux congolais visée dans la majorité des contrats apparaît donc comme la règle, et l'insertion de la clause compromissoire dans le Protocole de 1992 était exceptionnelle, ainsi que l'atteste le besoin d'insérer la même clause dans les Lettres d'Engagement du 3 mars 1993 signées par la même personne que le Protocole de 1992, en application de ce Protocole et quelques mois après sa signature. Or, une telle volonté n'était pas exprimée dans le Protocole de 2003, signé onze ans après le Protocole de 1992, par d'autres personnes, et alors qu'il pouvait faire l'objet d'un traitement autonome par rapport au Protocole de 1992.

En outre, cette analyse est pertinente que l'on retienne un « ensemble contractuel » regroupant tous les marchés et avenants ainsi que les garanties et protocoles, ou un « ensemble contractuel » limité à la Garantie de 1986 et aux Protocoles de 1987, 1992 et 2003. En effet, la Garantie de 1986 et les Protocoles de 1987, 1992 et 2003 contiennent, pour les trois premiers, des clauses attributives de juridiction incompatibles les unes avec les autres et le quatrième n'en contient aucune.

---

[12]  Mémoire sur la compétence, paragraphe 73, page 23.
[13]  Mémoire sur la Compétence, 11 décembre 2009, paragraphe 72, page 23.
[14]  Mémoire sur la Compétence, 11 décembre 2009, paragraphe 77, page 24.

**86.** L'État insiste en outre sur l'insuffisance des liens d'interdépendance et de causalité entre les Protocoles de 1992 et de 2003, estimant que le second n'est ni la suite, ni le complément du premier, et qu'il n'en assure pas non plus la mise en œuvre[15]. Dès lors, les deux Protocoles ne présentent pas de liens justifiant la création d'un ensemble contractuel réduit à ces deux seuls instruments[16].

### 2.   Sur l'autorité de la chose jugée de la sentence CCI n°9899 de 2000

**87.** Si le Tribunal Arbitral devait néanmoins ne prendre en considération dans son analyse de l'ensemble contractuel que les Protocoles de 1992 et de 2003, l'État allègue que l'association de ces deux Protocoles « *relève d'un artifice de la part de Commisimpex* ». En effet, selon l'État, d'une part, « *une clause compromissoire ne saurait être étendue sur le fondement de la théorie dite du groupe de contrats si le litige que le tribunal est amené à juger ne relève que du contrat qui ne contient pas la clause compromissoire dont l'extension est envisagée* »[17]. D'autre part, l'extension d'une clause compromissoire n'est envisageable qu'en cas d'interdépendance des contrats. Or, Commisimpex se contredit, arguant, d'une part que les deux Protocoles ont un objet unique et la même cause, et d'autre part que le Protocole de 2003 couvre une dette globale composée de la dette partielle du Protocole de 1992 et de nouvelles dettes, les « Sommes Rejetées » par le tribunal arbitral dans l'affaire n°9899 ainsi que de « Nouvelles Demandes ». Or, ce que Commisimpex qualifie « *d'autre partie de la Dette* » est en réalité « *une amplification* » du montant de la dette déjà fixée par le Tribunal Arbitral dans l'affaire n°9899. En raison de l'autorité de chose jugée attachée à la sentence rendue dans cette affaire, les demandes de Commisimpex devraient être déclarées irrecevables.

### 3.   Sur la renonciation de Commisimpex à l'arbitrage des litiges liés au règlement de la dette du Congo

**88.** Enfin, si le Tribunal Arbitral venait à considérer que la clause compromissoire contenue dans le Protocole de 1992 pourrait être applicable au présent litige, en acceptant l'argument de Commisimpex que le Protocole de 2003 participe d'une opération économique unique consistant dans le « *règlement total de la dette* », le Tribunal Arbitral devrait cependant constater que Commisimpex a renoncé à soumettre à un tribunal arbitral la question du « *règlement de la dette totale* », en saisissant les juridictions congolaises de cette question en 2001.

Commisimpex, après avoir obtenu la désignation d'un expert, a en effet obtenu la condamnation de la République du Congo au paiement des sommes ainsi déterminées. La demande présentée devant les juridictions congolaises constituait donc une demande au fond, ainsi qu'en atteste l'ordonnance rendue par le président du Tribunal de Commerce de Brazzaville qui indique que Commisimpex a, lors de ses conclusions orales, demandé la condamnation du Congo à lui payer les sommes évaluées par le Tribunal[18]. Cela a été confirmé par la Cour Suprême de la République du Congo dans son arrêt du 27 juin 2003

---

[15]   Réponse à la requête d'arbitrage, 6 juillet 2009, paragraphe 62, page 22.

[16]   Mémoire en réplique sur la compétence, 26 février 2010, paragraphes 49-51, page 15.

[17]   Mémoire sur la compétence, 11 décembre 2009, paragraphe 93, page 30.

[18]   Mémoire sur la compétence, paragraphe 112, page 35 ; Mémoire en réplique sur la compétence, paragraphe 71, page 20.

selon lequel les demandes de Commisimpex visaient à l'obtention de « *véritables condamnations* » (Pièce C-26).

### 4.   Sur l'estoppel

**89.** L'État soutient en outre que Commisimpex a d'abord porté ses prétentions relatives à la « dette totale » du Congo devant les juridictions congolaises, contraignant l'État à assurer sa défense. Au nom du principe de l'*estoppel*, Commisimpex ne pourrait donc aujourd'hui se contredire au détriment de l'État et se prévaloir du bénéfice de la clause compromissoire insérée dans le Protocole de 1992.

**90.** Sur ces fondements,

« *La République du Congo sollicite du Tribunal arbitral qu'il :*

(i)     *Se déclare incompétent ;*

        *A titre subsidiaire :*

(ii)    *Déclare que la question de la compétence du Tribunal de céans sera jointe avec le fond du litige ;*

        *En tout état de cause :*

(ii)    *Condamne Commisimpex à payer tous les frais et dépens nés de la présente procédure arbitrale, en ce compris les honoraires, frais et débours du Tribunal arbitral et de la CCI, et les honoraires, frais et débours des conseils de la Défenderesse, ainsi que tout autre frais lié à la procédure arbitrale. »*

**B-     Position de la Demanderesse**

**91.** Selon Commisimpex, les parties ont conclu différents accords : d'une part les marchés et autres instruments relatifs à des travaux publics qui ont été conclus dans les années 80 et qui ont donné lieu à une accumulation de dettes du Congo à l'égard de Commisimpex, et d'autre part, les actes tendant à la consolidation de cette dette et aux modalités de son règlement, c'est-à-dire les Protocoles de 1992 et de 2003. Seuls les Protocoles de 1992 et de 2003, qui constituent l'ensemble contractuel à prendre en considération selon Commisimpex, servent de fondement à l'extension de la clause compromissoire, contrairement à ce que soutient la Défenderesse.

**92.** Commisimpex expose qu'un certain nombre d'instruments relatifs aux marchés sont à l'origine des dettes du Congo envers Commisimpex. Commisimpex a en effet signé avec l'État, entre 1984 et 1986, de nombreux marchés de travaux publics et de fournitures de matériels. Commisimpex et la famille Hajaij ont même été jusqu'à consentir des crédits au Congo. Tous ces marchés ont été exécutés ainsi que l'attestent différentes autorités congolaises. Ces marchés prévoyaient différents modes de règlement des litiges : soit en faveur de tribunaux judiciaires soit en faveur de tribunaux arbitraux. Sur la base de ces marchés, la CCA a souscrit des billets à ordre, avalisés par le Ministère des Finances et du

Budget, qui a ensuite signé des lettres d'engagement donnant son accord pour que les billets à ordre soient endossés. Ces lettres contenaient une clause compromissoire en faveur d'un arbitrage CCI (Pièce C-41).

**93.** Puis, différents avenants ont été conclus afin de réviser les prix des marchés mais ceux-ci ne modifiaient aucunement les clauses de règlement prévues dans les marchés. De même, des billets à ordre étaient souscrits par la CCA sur la base de chaque Avenant et le Ministre des Finances et du Budget a ensuite signé des lettres d'engagement donnant son accord pour que les billets à ordre soient endossés. En outre, la clause compromissoire comprise dans chacune des lettres comprenaient la même référence à l'arbitrage CCI (Pièce C-42). Le recours à l'arbitrage n'était donc pas une stipulation exceptionnelle entre les parties.

**94.** Le Protocole de 1987 fixait les modalités de remboursement par le Congo d'une garantie de crédit mise en place par Commisimpex afin de permettre à la société APV Hall d'acquérir du matériel dans le cadre d'un projet de réaménagement, objet du contrat 353/83. Le Protocole de 1987 prévoyait que tout litige serait tranché par « *les tribunaux congolais* ». Cet acte donnait également lieu à l'émission de billets à ordre émis par la CCA et avalisés par le Ministère des Finances et du Budget.

**95.** Des procès-verbaux datant des 13 février 1988 (Pièce C-47) et 7 octobre 1988 (Pièce C-48) attestent, selon Commisimpex, de dettes du Congo qui viennent s'ajouter à celles résultant des marchés d'origine et de leurs avenants pour le projet Etoumbi-Kunda.

**96.** Par ailleurs, la Garantie de 1986, octroyée par le Congo, représenté par le Ministère des Finances et du Budget ainsi que par la CCA, à Commisimpex visait à garantir le paiement des marchés et des avenants listés dans cet acte, « *afin de permettre à Commisimpex (...) d'assurer le financement nécessaire à la réalisation et à l'exécution des marchés* » (Pièce C-3). Cette garantie contient une clause attributive de juridiction au profit de différentes juridictions non congolaises. Selon Commisimpex, la Garantie de 1986 ne participe pas du processus de consolidation de la dette du Congo qui a démarré en 1992. Elle ne vise qu'à garantir le paiement des marchés par le Congo à Commisimpex, autorisant celle-ci à saisir les revenus de certaines parties tierces désignées. Contrairement aux allégations de la Défenderesse, cette garantie ne doit donc pas être incluse dans l'ensemble contractuel.

**97.** Commisimpex expose que, bien que les marchés aient été exécutés, les billets à ordre émis et les lettres d'engagement signées, Commisimpex n'a reçu qu'un paiement partiel de 15 millions de dollars US en 1987. Ainsi, Commisimpex expose qu' « *en septembre 1992, les relations contractuelles entre les parties prennent une tout autre nature. Il ne s'agit plus de réaliser des prestations contre paiement mais de trouver une solution au non-paiement des multiples dettes accumulées au fil des années par le Congo à l'égard de Commisimpex, en les consolidant en une dette globale et en arrêtant les modalités de règlement de cette dette globale* »[19]. Des négociations ont alors été entreprises en 1992 avec les plus hautes autorités congolaises pour trouver une solution. Au cours de ces réunions, Commisimpex estime qu'il a été entériné que la dette du Congo s'élevait à 48 milliards de FCFA et serait réglée en deux parties : une partie de 22 milliards de FCFA au titre d'un protocole à intervenir et une autre, de 26 milliards de FCFA, par attribution par compensation d'entreprises à privatiser (lettre de Commisimpex du 7 octobre 1992, Pièce C-4).

---

[19] Mémoire en duplique sur la compétence, 26 mars 2010, paragraphe 48, page 17.

**98.** Les parties ont donc signé le Protocole de 1992 qui prévoyait les modalités de règlement d'une partie de la dette du Congo, soit 22 milliards de FCFA. Le Congo devait donc recevoir et accepter tous les anciens billets à ordre antérieurement souscrits par la CCA en application des marchés et Commisimpex devait recevoir et accepter tous les nouveaux billets à ordre souscrits en application de l'article 5 du Protocole, ce qui a été fait par les deux parties. Le Protocole de 1992 ainsi que les Lettres d'Engagement du 3 mars 1993, émises par le Ministère des Finances et du Budget en application du Protocole de 1992, contenaient une clause d'arbitrage CCI. Par ailleurs, la lettre de gage n°115 émise par le Ministre des Finances et du Budget le même jour comprenait elle aussi une clause d'arbitrage CCI (Pièce C-50).

**99.** Quant à la privatisation d'entreprises, si elle a bien été confirmée par la CCA et par le Ministère de l'Intérieur du Congo[20], aucun accord écrit n'a été réalisé entre les parties sur ce point, et aucune clause attributive de compétence n'a donc pu être stipulée.

**100.** Commisimpex n'ayant reçu aucun paiement supplémentaire au titre du Protocole de 1992 et aucune privatisation n'ayant eu lieu, après avoir mis en demeure le Congo et la CCA d'honorer leurs engagements en 1996, des pourparlers ont été engagés en vain. Commisimpex a alors introduit le 13 mars 1998 une requête d'arbitrage, donnant lieu à la procédure arbitrale CCI n°9899 qui n'a porté que sur le seul protocole de 1992. Une sentence intérimaire en date du 28 juin 1999 a rejeté les arguments soulevés par le Congo et la CCA tendant à échapper à leurs obligations contractuelles. Le tribunal dans l'affaire n°9899 désignait également un expert, M. Ricol, qui remettait un rapport le 14 avril 2000 (Pièce R-3). Bien qu'un recours en annulation contre cette sentence ait été rejeté, la sentence n'a jamais été exécutée. La sentence finale a été rendue le 3 décembre 2000. Là encore, les défenderesses avaient tenté d'échapper à leurs obligations, notamment en indiquant que Commisimpex n'avait pas rapporté la preuve qu'elle avait restitué tous les anciens billets à ordre, ce qu'elle a pourtant fait par lettres des 7 octobre et 24 novembre 1992. Cependant, le tribunal arbitral qui aurait été « *trompé* » par les allégations des défenderesses, a limité la condamnation du Congo au montant des anciens billets à ordre dont la restitution avait pu être établie c'est-à-dire au montant de 107 millions de dollars US. Le recours en annulation contre cette sentence a été rejeté par la Cour d'appel de Paris le 23 mai 2002 (Pièce C-23). Le Congo n'a cependant pas non plus exécuté cette sentence.

**101.** Commisimpex a alors sollicité par requête au Président du Tribunal de commerce de Brazzaville la désignation d'un expert afin qu'il établisse le montant des créances de Commisimpex au 30 septembre 2001. Cette demande a été accueillie et un rapport a été remis par un expert, M. Fylla de Saint Eudes, le 25 septembre 2001, évaluant la dette totale entre 305 millions US$ et 311 millions de dollars US. À la suite d'un rapport d'une commission nommée par le Ministre à la Présidence de la République, recommandant de s'en remettre aux conclusions de l'expert (Pièce C-19), une ordonnance a été rendue par le Président du Tribunal de commerce de Brazzaville ordonnant à la CCA d'inscrire la totalité de cette somme au titre de la dette de l'État. Cette ordonnance a été contestée par les défenderesses. Devant la Cour d'appel de Brazzaville, Commisimpex a précisé que ses demandes

---

[20] Commisimpex s'appuie à cet égard sur le fait que sa lettre du 7 octobre 1992 faisant état de la décision de procéder à des privatisations d'entreprises pour rembourser la « deuxième partie » de la dette du Congo a été tamponnée et signée par la CCA (Pièce C-4). Commisimpex renvoie en outre à l'attestation de M. Félix Boueno du 23 juillet 2003 qui atteste avoir reçu la lettre de Commisimpex du 7 octobre 1992 (Pièce C-57), et à l'attestation de M. le Ministre Martin Mbéri du 31 juillet 2003 (Pièce C-58).

constituaient des « *mesures conservatoires de sauvegarde* » de sa créance (Pièce C-24, page 20). La Cour d'appel de Brazzaville a ordonné à la CCA « *d'inscrire la totalité des créances* » évaluées dans la fiche d'audition du 27 mars 2002 (Pièce C-24). La Cour suprême du Congo a finalement cassé l'arrêt rendu par la Cour d'appel, considérant qu'elle s'était méprise « *sur l'étendue de sa propre compétence* » et renvoyait les parties à l'exécution de la sentence CCI dans l'affaire n°9899 de 2000.

**102.** C'est dans ce contexte, selon Commisimpex, que les parties ont tenté une nouvelle fois de trouver une solution amiable et ont signé le Protocole de 2003 le 23 août 2003. Celui-ci énonçait entre autres que le Congo reconnaissait l'intégralité des marchés et fournitures. Plus particulièrement, il visait à couvrir l'ensemble de la dette du Congo à l'égard de Commisimpex, prenant acte de l'échec du Protocole de 1992 ainsi que des promesses de privatisation d'entreprises. Ce Protocole prenait en considération l'équivalent des 22 milliards de FCFA ainsi que la somme arrêtée lors des réunions de 1992, soit 26 milliards de FCFA, devant être réglée par compensation d'entreprises publiques à privatiser. Le Protocole de 2003 a arrêté les éléments essentiels de l'accord entre les parties mais les autres points plus accessoires devaient être précisés par un « Protocole d'Accord Définitif » qui devait être signé ultérieurement mais qui ne l'a jamais été. Ceci explique l'absence de clause de règlement des conflits dans le Protocole de 2003. Or, selon Commisimpex, au vu du contexte et des relations entre les parties, seule une clause d'arbitrage aurait pu être conclue. En effet, une telle clause avait déjà été insérée dans le Protocole de 1992, dans les Lettres d'Engagement du 3 mars 1993 émises en application du Protocole de 1992 et enfin dans les lettres de gage émises en application de cet accord.

**103.** Malgré les nombreux rappels de Commisimpex, le Congo ne s'est toujours pas acquitté de sa dette. À ce titre, le Premier Président de la Cour suprême du Congo indiquait lui-même dans son avis juridique que le Protocole de 2003 lie irrévocablement l'État congolais et qu'il constitue « *un engagement irrévocable de l'Etat Congolais à régler ses dettes vis-à-vis de la société Commisimpex, conformément à la commune volonté des parties.* »

**104.** De façon étonnante, le Congo se repose largement sur le Protocole de 1992 alors qu'il en niait la validité dans le premier arbitrage et invoque également la sentence rendue dans l'affaire CCI no. 9899 alors qu'il refuse toujours de l'exécuter.

     **1.**    **Sur l'extension au Protocole de 2003 de la clause compromissoire incluse dans le Protocole de 1992**

**105.** Selon Commisimpex, il n'y a pas de doute que le Tribunal Arbitral est compétent sur le fondement de la clause compromissoire figurant au Protocole de 1992, et ce dans la mesure où le Protocole de 2003 n'est « *que le prolongement du Protocole de 1992 (..)* », « *rendu nécessaire du fait de l'inexécution des engagements pris par le Congo en 1992 relativement au règlement de sa dette consolidée envers Commisimpex* »[21]. Les deux protocoles « *ont le même objet* » et « *participent, tant objectivement que dans l'esprit des Parties, à la réalisation d'une même opération économique, à savoir la consolidation et le règlement de la dette cumulée du Congo à l'égard de Commisimpex* »[22].

---

[21]  Mémoire en réponse sur la compétence, 29 janvier 2010, paragraphe 113, page 37.
[22]  Mémoire en réponse sur la compétence, 29 janvier 2010, paragraphe 113, page 37.

**106.** Commisimpex soutient que l'extension de la clause compromissoire du Protocole de 1992 au Protocole de 2003 est confortée par la jurisprudence arbitrale qui permet d'étendre à un contrat une clause figurant dans un autre contrat lorsque ces deux contrats sont signés par les mêmes parties. Pour ce faire, il est rappelé que le Tribunal Arbitral doit analyser la volonté des parties, et ce, en interprétant les contrats les uns par rapport aux autres ainsi que l'ensemble contractuel dans lequel ils s'inscrivent. Notamment, pour caractériser les liens unissant les contrats, la jurisprudence arbitrale retient un critère économique, tiré de la participation des différents contrats à une même opération économique. Sont citées au support de ces arguments des sentences arbitrales ayant adopté de tels raisonnements. Ainsi, selon Commisimpex qui cite à cet égard M. F.-X. Train[23], « *du constat que les contrats sont, soit complémentaires, soit liés par leur objet à une même opération économique, soit encore interdépendants dans le cadre d'une même opération économique, les arbitres déduisent la volonté tacite des parties d'étendre la clause compromissoire figurant dans l'un des contrats à l'autre contrat n'en contenant pas. L'étude de la volonté des parties proprement dite se limite alors en effet au constat de « l'absence de volonté expresse contraire à la volonté tacite déduite des liens entre les contrats* » »[24]. Ce n'est donc qu'en cas de volonté contraire et expresse des parties, à savoir par exemple lorsque les contrats comprennent des clauses de règlement des litiges différentes et inconciliables, que l'extension sera refusée.

Commisimpex considère que le Congo présente une vision déformée de l'approche économique en soutenant que « *la distinction opérée par Commisimpex est mal fondée, en ce qu'elle se réfère exclusivement à l'objet et à la nature des actes qui intéressent Commisimpex pour les besoins de sa démonstration, au mépris des relations de cause, d'interdépendance et de connexité économique qui existent avec les instruments qu'elle écarte arbitrairement* »[25]. Or, selon Commisimpex, dans le cadre de l'extension de la clause compromissoire, tant la jurisprudence que la doctrine utilisent les termes « objet », « objectif », « cause » ou « but commun » indifféremment pour désigner l'approche économique globale, ce qu'admettent d'ailleurs les auteurs cités par le Congo. Le débat que tente d'instaurer le Congo à cet égard est donc non pertinent, et ce d'autant plus au regard des difficultés à définir en droit civil français les notions de cause et d'objet. Quoiqu'il en soit, les Protocoles de 1992 et 2003 ont bien le même objet, au sens de but ou d'objectif tel que défini par les jurisprudences arbitrales et françaises.

**107.** La jurisprudence française, qui applique en ce domaine une règle matérielle française sans s'interroger sur la loi applicable au contrat ou à la clause compromissoire selon les règles de conflit de lois, analyse les différents contrats en cause en recherchant les liens entre eux et leur participation à une même opération économique, pour ensuite identifier la « *volonté présumée des parties* »[26]. Pour établir l'ensemble contractuel unique et étendre la clause compromissoire, la jurisprudence française retient souvent la complémentarité des contrats. Ainsi, dès lors que la jurisprudence française a « *retenu que les contrats ont le même objet, concourent à la réalisation d'une même opération économique ou sont complémentaires* », elle « *ne refuse d'étendre la clause compromissoire stipulée dans l'un des contrats à l'autre*

---

[23] *Les contrats liés devant l'arbitre du commerce international – Etude de jurisprudence arbitrale*, 2003, paragraphe 45, Pièce C-RJ 33.

[24] Mémoire en réponse sur la compétence, 29 janvier 2010, page 44, paragraphe 135.

[25] Mémoire en duplique sur la compétence, 26 mars 2010, page 5, paragraphe 12.

[26] Mémoire en réponse sur la compétence, 29 janvier 2010, page 45, paragraphe 138.

23

*que si ce dernier contient une clause de règlement des litiges inconciliable avec cette clause compromissoire »*[27].

**108.** Le Congo ne conteste pas la notion d'ensemble contractuel. Il ne fait que contester le fait que le Tribunal Arbitral soit compétent selon le droit positif. Pourtant, le Protocole de 1992 et le Protocole de 2003 ont tous deux pour objet la consolidation et le règlement de la dette du Congo. Cela résulte du préambule et de l'article 2 du Protocole de 1992 qui rappelle l'engagement du Congo à s'acquitter de sa dette vis-à-vis de Commisimpex. De même, le préambule du Protocole de 2003 rappelle la dette du Congo, *« objet du Protocole no. 566 du 14 octobre 1992 »*. Le Protocole de 2003 n'est que la continuation du Protocole de 1992 : il ne vise qu'à déterminer les modalités de règlement de la dette, ainsi que l'attestent notamment les articles 1 et 3 et ce parce que le Congo n'avait exécuté ni le Protocole de 1992, ni la sentence CCI dans l'affaire n°9899 de 2000. Les deux protocoles concernent donc *« une opération économique unique qui concourt au même objet »*[28]. Par ailleurs, selon Commisimpex, la jurisprudence montre que le fait que le Protocole de 2003 ait été conclu onze ans après celui de 1992 ne s'oppose pas à l'extension de la clause compromissoire.

**109.** En tout état de cause, l'extension de la clause compromissoire du Protocole de 1992 à celui de 2003 est effectivement conforme à la volonté des parties. Or, c'est la volonté des parties que les arbitres recherchent au travers des liens entre les contrats, pour déterminer si une clause compromissoire peut et/ou doit être étendue à un autre contrat et *« ce n'est qu'en présence d'une manifestation expresse de volonté, contraire à cette volonté tacite déduite des liens existant entre les contrats, que l'extension sera refusée malgré l'existence du groupe de contrats »*[29].

En l'espèce, les parties n'ont pas exprimé de volonté contraire, le Protocole de 2003 ne prévoyant aucune clause de règlement des litiges inconciliable avec la clause compromissoire figurant au Protocole de 1992 et des références expresses au Protocole de 1992 étant faites dans celui de 2003. Le Protocole de 2003 reproduit l'intention des parties manifestée depuis 1992 : consolider et fixer les modalités de règlement de la dette globale du Congo envers Commisimpex. En outre, si le Protocole de 2003 ne contient pas de clause compromissoire, c'est uniquement parce qu'il devait être suivi d'un protocole définitif plus détaillé

**110.** La vision extensive du groupe de contrats proposée par le Congo doit ainsi être écartée. L'ensemble contractuel ne peut en effet être composé de *« tous les contrats économiquement liés à la Dette »*[30]. En alléguant qu' *« [i]l n'est pas contestable que les marchés et avenants sont la cause de l'opération économique dont Commisimpex se prévaut »*[31], le Congo fait en réalité référence à l'origine de la dette. Commisimpex ne nie pas que les Protocoles de 1992 et 2003 aient été engendrés par le non-règlement des marchés qui sont, en ce sens, à l'origine des dettes du Congo. Cependant, ces marchés ne poursuivent pas la même cause, soit le même but, au sens de la jurisprudence relative à l'extension des clauses compromissoires. L'ensemble contractuel à prendre en considération ne saurait être étendu aux divers marchés et avenants et il ne peut donc exister de contradiction entre les clauses de règlement des litiges du Protocole de 1992 et de ces marchés et avenants.

---

[27]   Mémoire en réponse sur la compétence, 29 janvier 2010, page 50, paragraphe 152.
[28]   Mémoire en réponse sur la compétence, 29 janvier 2010, page 54, paragraphe 168.
[29]   Mémoire en duplique sur la compétence, 26 mars 2010, page 15, paragraphe 43.
[30]   Mémoire en réponse sur la compétence, 29 janvier 2010, page 57, paragraphe 180.
[31]   Mémoire en duplique sur la compétence, 26 mars 2010, page 13, paragraphe 37.

Par ailleurs, la Garantie de 1986, conférée par le Congo, qui est un acte unilatéral, n'est pas constitutive d'une dette. Commisimpex considère que l'« *on ne peut donc en tirer aucune conclusion quant à la volonté des parties en ce qui concerne le règlement des litiges relatifs à la consolidation et au règlement de la dette globale du Congo envers Commisimpex.* »[32]

De même, le Protocole de 1987, à la différence des Protocoles de 1992 et de 2003, ne visait pas à consolider et à fixer les modalités du règlement de la dette cumulée et ancienne du Congo à l'égard de Commisimpex. Il ne concernait que le règlement d'une dette du Congo dans le cadre du contrat 353/83. Ainsi, si l'on s'attache à l'identité d'objet, au sens de « but » ou d' « objectif » commun, « *les Protocoles de 1992 et de 2003 se distinguent pleinement des marchés et de leurs avenants, ainsi que du Protocole n° 461 de 1987* »[33].

Dans la mesure où l'ensemble contractuel n'est constitué que des Protocoles de 1992 et de 2003, seule la clause compromissoire du Protocole de 1992 doit être prise en compte.

## 2.   Sur l'autorité de la chose jugée de la sentence CCI n°9899

**111.** L'argument du Congo sur l'irrecevabilité des demandes de Commisimpex en raison de l'autorité de la chose jugée de la sentence CCI dans l'affaire n°9899 de 2000 doit être écarté dans la mesure où il est prématuré à ce stade de la procédure. L'autorité de la chose jugée n'est en effet pas une exception de procédure qui doit être soulevée *in limine litis*. Or, dans son ordonnance de procédure n°2, le Tribunal Arbitral a précisé que cette phase de l'arbitrage serait réservée aux questions de compétence et de procédure. Les éventuelles fins de non-recevoir ne doivent donc pas être examinées. Par ailleurs, les demandes présentées par Commisimpex impliquent l'étude du fond de l'affaire qui n'a pas à être étudiée à ce stade. En tout état de cause, Commisimpex montrera lors de l'examen du fond que l'autorité de la chose jugée de la sentence CCI rendue dans l'affaire n°9899 de 2000 n'est pas remise en cause par ses demandes. Commisimpex souligne néanmoins que le Protocole de 1992 ne couvre pas l'intégralité de la dette du Congo, couverte par le Protocole de 2003, si bien que le Tribunal Arbitral de l'affaire n°9899 n'aurait pu se prononcer sur la totalité de la dette[34].

## 3.   Sur la renonciation de Commisimpex à l'arbitrage des litiges liés au règlement de la dette du Congo

**112.** Enfin, contrairement aux allégations du Congo, Commisimpex n'a pas renoncé au bénéfice d'une convention d'arbitrage. Selon la jurisprudence arbitrale et française, une telle renonciation nécessite la manifestation non équivoque d'une volonté de renoncer, aucune présomption n'étant admise.

Ainsi faut-il examiner les demandes des parties. À cet égard ne peut être considéré comme une renonciation à l'arbitrage le fait pour une partie de saisir le juge des référés de mesures provisoires ou conservatoires. Or, Commisimpex s'est bornée entre 2001 et 2003 à demander aux juridictions congolaises des mesures provisoires et conservatoires. Elle n'a pas renoncé à soumettre à l'arbitrage « la question du règlement de la dette de la République du Congo en

---

[32]  Mémoire en réponse sur la compétence, 29 janvier 2010, page 59, paragraphe 184.
[33]  Mémoire en duplique sur la compétence, 26 mars 2010, paragraphe 35, page 13.
[34]  Mémoire en réponse sur la compétence, 29 janvier 2010, page 66, paragraphe 207.

saisissant les juridictions congolaises de cette question »[35]. En effet, dans sa requête du 3 septembre 2001, Commisimpex a demandé la simple nomination d'un expert, et a rappelé qu'elle ne demandait que des mesures d'instruction *in futurum* dans ses écritures en défense soumises devant la Cour d'appel de Brazzaville.

En outre, Commisimpex rappelle que la jurisprudence, tant arbitrale que française, ne s'attache pas aux termes des décisions rendues par les tribunaux étatiques pour savoir s'il y a eu volonté des parties de renoncer à l'arbitrage. Ce qui compte c'est bien le comportement des parties. Peu importe donc que la Cour Suprême du Congo ait jugé que « *la Cour d'appel de Brazzaville, à la suite du président du tribunal de commerce s'est mépris sur l'étendue de sa propre compétence* »[36].

**113.** En tout état de cause, le Congo n'a pas démontré la volonté de Commisimpex de renoncer de façon non équivoque à l'arbitrage. Le Congo se fonde en effet sur une ordonnance du 9 novembre 2001 rendue par le Président du Tribunal de commerce de Brazzaville indiquant que Commisimpex aurait lors de ses « *conclu[sions]  orale[s]* » « *demand[é] la condamnation de la Caisse Congolaise d'Amortissement et de la République du Congo à lui payer les sommes ainsi valorisées par le Tribunal* »[37]. Or, cette demande, mentionnée une seule fois, n'a pas fait l'objet d'un examen par le Président du Tribunal de commerce de Brazzaville qui s'est contenté de fixer le montant de la créance que la CCA devait inscrire au titre de la dette du Congo sans en ordonner le paiement. Il ne peut donc être conclu à une renonciation de la part de Commisimpex à l'arbitrage sur ce fondement.

### 4.   Sur l'estoppel

**114.** Enfin, Commisimpex n'ayant jamais porté ses demandes au fond devant les juridictions congolaises, elle n'a pas renoncé à l'arbitrage et l'argument de l'*estoppel* invoqué par le Congo doit être écarté.

**115.** Se fondant sur ses deux mémoires sur la compétence, Commisimpex demande au Tribunal Arbitral qu'il :

(i)   *décide de sa compétence à l'issue de cette phase sur la compétence du Tribunal, sans joindre cette question à l'étude au fond du litige ;*

(ii)   *se reconnaisse compétent au titre du Protocole de 2003 sur le fondement de la clause compromissoire figurant au Protocole de 1992 ;*

(iii)   *condamne le Congo à payer tous les frais et dépends (y compris les frais payables à la CCI, les frais et dépens juridiques et les frais et dépens des experts, consultants et autres) contractés par Commisimpex pour la préparation et la poursuite de cette procédure d'arbitrage ; et*

(iv)   *attache à sa décision toute autre conséquence de droit. »*

---

[35]   Mémoire en réponse sur la compétence, 29 janvier 2010, page 71, paragraphe 225.
[36]   Mémoire en réponse sur la compétence, 29 janvier 2010, page 74, paragraphe 233.
[37]   Mémoire en duplique sur la compétence, 26 mars 2010, page 25, paragraphe 70.

## IV-  **DISCUSSION**

### A-  **Sur l'extension au Protocole de 2003 de la clause compromissoire incluse dans le Protocole de 1992**

**116.** Le Congo s'oppose à la compétence du Tribunal Arbitral pour trancher le litige entre les parties. Il considère que le Protocole de 1992 et le Protocole de 2003 ne forment pas un « *ensemble contractuel unique* » et est d'avis que ces Protocoles ne participent pas non plus « *à la même opération économique unique soit le règlement de la dette du Congo à l'égard de Commisimpex* ». Le Protocole de 2003 étant selon lui autonome et ayant une existence propre, l'extension de la clause compromissoire du Protocole de 1992 à son profit est exclue. En outre, le Congo soutient que si le Tribunal devait reconnaître l'existence d'une opération économique globale, celle-ci ne pourrait se limiter qu'aux seuls Protocoles de 1992 et de 2003 mais devrait s'étendre à l'exécution et au paiement des marchés conclus entre les parties depuis le début des années 1980, si bien que l'ensemble contractuel à prendre en considération serait constitué des contrats sous-jacents, de la Garantie de 1986 et protocoles liant les parties. En effet, selon l'État « *il ne peut y avoir d'opération économique limitée au règlement de la Dette issue de contrats de marchés de travaux publics, qui exclurait précisément lesdits contrats* »[38]. Or, dans le cadre ainsi défini, l'extension de la clause compromissoire du Protocole de 1992 ne pourrait être acceptée, dans la mesure où les différents contrats de l'ensemble contractuel contiennent des clauses de règlements des litiges inconciliables.

**117.** Commisimpex, pour sa part, considère que le « *Protocole de 2003 est le résultat direct de la non-exécution par le Congo du Protocole de 1992 et en est donc la suite ; il participe à la réalisation de la même opération économique unique, c'est-à-dire le règlement de la dette du Congo à l'égard de Commisimpex* »[39]. Le lien existant entre les deux Protocoles permet ainsi selon elle de justifier l'extension de la clause compromissoire en application de la jurisprudence française et arbitrale et de la doctrine.

**118.** Pour justifier de l'extension d'une clause compromissoire d'un contrat à un autre, les juridictions françaises se fondent sur différents critères. Ainsi que souligné par M. Train[40], celles-ci « *font référence, tantôt à des ensembles de conventions, parfois « indivisibles », ou composés d'éléments « indissociables », ou bien constitués de contrats « complémentaires ou à tout le moins connexes » et, en tout cas, unis par des « liens économiques étroits », ou encore constitués de conventions s'inscrivant dans « une opération économique unique qui concourt au même objet », tantôt à des accords inspirés « l'un et l'autre par la même pensée », « liés entre eux » et devant « s'apprécier comme faisant un tout », tantôt à un contrat qui constitue le « complément » du contrat contenant la clause compromissoire, soit qu'il trouve « son origine dans l'inobservation » de ce dernier, soit qu'il s'inscrive dans « un même ensemble contractuel » ; ou encore, la portée de la clause arbitrale est étendue à la « convention destinée à concrétiser » un accord antérieur entre les parties renvoyant à l'arbitrage, accord dont cette convention ne constitue ainsi « que la suite » ; ou bien encore,*

---

[38]  Mémoire sur la compétence, paragraphe 72, page 23.
[39]  Requête d'arbitrage, paragraphe 83, page 25.
[40]  Voir pièce C-RJ 33, page 23 « *Les contrats liés devant l'arbitre du commerce international* », par François-Xavier Train.

*la clause est étendue aux contrats dits « accessoires », comme étant « nés dans le cadre de relations contractuelles établies entre les parties. » ».*

Parmi ces différents critères, c'est celui de « *l'ensemble contractuel unique* » qui fait l'objet du débat entre les Parties.

En effet, elles s'opposent tant sur le sens de ce concept en droit français que sur les éléments constitutifs d'un éventuel ensemble contractuel en l'espèce.

**119.** Commisimpex expose que « *la jurisprudence française retient différents types de liens susceptibles d'établir l'existence d'un « ensemble contractuel unique » et de révéler la volonté tacite des parties d'étendre la clause compromissoire. Plus précisément, elle admet l'extension lorsqu'il existe un lien « nécessaire » entre les contrats. Ce lien existe notamment, soit lorsque les contrats sont complémentaires ou lorsque l'un est la suite de l'autre, soit lorsqu'ils ont le même objet ou participent à la même opération économique* »[41] (souligné par le Tribunal). La terminologie de la jurisprudence ou de la doctrine serait indifférente car les différentes expressions utilisées « *tendent vers la satisfaction d'un même but, d'un même objectif, la réalisation d'une même opération économique* »[42]. Les termes « *d'objet* », de « *cause* », de « *but* » ou encore « *d'objectif commun* » ont donc tous la même signification et « *il convient tout simplement, pour envisager l'extension de la clause compromissoire dans un groupe de contrats, de déterminer si les contrats en question concourent à une même opération économique, tendant vers un but ou un objectif commun* »[43].

Selon le Congo en revanche « *il ressort que, bien plus que la notion d'objet, la cause et la nature des liens (dits « de complémentarité (...) c'est-à-dire (...) d'implication logique ou nécessaire ») unissant les contrats en question, sont les critères les plus fréquemment dégagés par la jurisprudence et la doctrine pour caractériser un groupe de contrats* »[44] (souligné par le Tribunal).

Le Congo considère que « *les critères retenus par la jurisprudence et la doctrine renvoient ainsi à la théorie de la cause et à la vigueur des liens unissant les contrats, la nature ou l'objet intrinsèque des contrats en cause, n'étant en revanche, pas perçus comme déterminants* »[45]. Elle en conclut que « *non seulement l'identité de nature et d'objet n'est pas pertinente, mais, comme le souligne encore la doctrine invoquée par Commisimpex, la conclusion de contrats identiques successifs (sauf s'ils font partie d'un contrat cadre) est rarement révélatrice de l'existence d'un ensemble contractuel* »[46].

**120.** Cependant, l'opposition conceptuelle affichée par les Parties paraît largement formelle, voire artificielle, au Tribunal Arbitral. En effet, elles se fondent sur les mêmes décisions jurisprudentielles et, en réalité, s'entendent sur les critères d'un objet ou d'un but commun entre les contrats pour justifier la constitution d'un ensemble contractuel. La référence du Congo à la notion de cause est inefficace à dissimuler cette entente. En effet, Commisimpex ne rejette pas la notion de cause, mais se refuse à en enfermer la portée à celle de l'article

---

[41]   Mémoire en réponse sur la compétence, paragraphe 140, page 46.
[42]   Mémoire en duplique sur la compétence, paragraphe 13, page 6.
[43]   Mémoire en duplique sur la compétence, paragraphe 23, page 9.
[44]   Mémoire en réplique sur la compétence, paragraphe 26, page 8.
[45]   Mémoire en réplique sur la compétence, paragraphe 38, page 11.
[46]   Mémoire en réplique sur la compétence, paragraphe 39, page 11.

1131 du Code Civil pour lui donner la signification d'objet ou de but commun. Mais tel est également le point de vue de la doctrine sur laquelle s'appuie le Congo. Ainsi les Professeurs François Terré, Philippe Simler et Yves Lequette, dans leur traité sur les obligations, soulignent que : « *[l]'ensemble contractuel désigne des contrats qui, concourant à la réalisation d'une même opération économique, sont unis par une identité de cause, au sens de but commun* »[47].

De même, un autre auteur, invoqué par le Congo, considère que « *[l]a seule solution nous paraît être alors de ne plus parler de « cause », et d'utiliser une autre notion lorsqu'il s'agit d'exprimer la caractéristique des ensembles contractuels. Celle-ci se manifeste davantage dans le but commun poursuivi par les différents contrats conclus « en vue de la même opération économique* »[48] (souligné par le Tribunal).

Telle est également la position du Professeur Train qui explique très clairement le sens des termes « *contrats liés* ». Celui-ci précise en effet que « *dans un premier cas, les contrats sont liés parce qu'ils coexistent et tendent à la réalisation d'un but commun (indépendamment du fait que chaque contrat a un objet qui lui est propre). Dans le second cas, les contrats sont liés parce que l'un d'eux a pour objet ou pour effet d'en éteindre ou d'en modifier un autre. Autrement dit, le lien entre contrats provient soit de leur conjonction en vue d'un but commun, soit du rapport de substitution qui les unit* »[49] (souligné par le Tribunal). Il apparaît donc très clairement, une fois encore, que le but, l'objectif commun, tel que le définit également Commisimpex, est un critère déterminant pour qualifier les liens existant entre les contrats, et qu'il n'est pas nécessaire dans cette optique qu'il existe un contrat cadre ou de base pour que ce but existe.[50]

**121.** Cependant, l'existence d'un ensemble contractuel unique ne suffit pas à justifier l'extension d'une clause d'arbitrage contenue dans un des éléments de l'ensemble à un autre de ses éléments. Encore faut-il que les Parties n'aient pas exprimé une volonté contraire en incluant dans ce dernier une clause relative à la solution du litige incompatible avec la clause d'arbitrage. Ce ne serait évidemment pas le cas en l'espèce si l'ensemble contractuel unique était constitué, comme le prétend Commisimpex des seuls Protocoles de 1992 et de 2003, puisque ce dernier est muet quant à la solution des litiges pouvant en découler. C'est pourquoi le fond du débat entre les parties porte sur l'existence d'un ensemble contractuel unique constitué par les Protocoles de 1992 et de 2003, et sur les conséquences qui devraient en être tirées si cette existence était établie. Le Tribunal Arbitral doit donc examiner si les Protocoles de 1992 et de 2003 poursuivaient un but commun, justifiant l'extension de la clause compromissoire du Protocole de 1992 au Protocole de 2003, comme le prétend Commisimpex, ou si, au contraire, cet ensemble contractuel doit inclure l'ensemble des marchés et avenants conclus entre les parties ainsi que la Garantie de 1986 et le Protocole de 1987, contenant d'autres stipulations quant à la solution des litiges, comme le prétend le Congo, mais toujours sur ce fondement de « *but commun* ».

---

[47]   Voir en ce sens Pièce R RJ-16 « *Les obligations* » de F. Terré, P. Simler et Y. Lequette, page 94.

[48]   Voir en ce sens Pièce R RJ-18, C. Aubert de Vincelles, « *Réflexions sur les ensembles contractuels : un droit en devenir* », page 3.

[49]   Voir Pièce C RJ-33, page 10, paragraphe 17, « *Les contrats liés devant l'arbitre du commerce international* » par François-Xavier Train.

[50]   « *Doivent être assimilés à ces ensembles ceux dans lesquels les différents contrats tendent à la réalisation d'une opération unique sans qu'il soit possible d'identifier un contrat de base, c'est-à-dire un contrat exprimant l'opération dans sa globalité (...)* », Pièce C RJ-33, page 11, paragraphe 18.

**122.** Le Congo estime que les Protocoles de 1992 et de 2003 ne peuvent être liés dans la mesure où « (...) *ils ne tendent pas à la réalisation d'un objet commun - chacun représente au contraire une opération autonome dont la réalisation ne nécessite pas la conclusion ou l'exécution des autres contrats - et d'autre part, ces contrats se succèdent dans le temps mais ils n'ont pas vocation à se substituer les uns aux autres* »[51]. Pour le Congo, l'extension de la clause compromissoire n'est pas justifiée car les Protocoles de 1992 et de 2003 n'exercent pas d'influence l'un sur l'autre et ne sont pas interdépendants[52].

**123.** Le Tribunal Arbitral ne partage pas cette analyse. Il y a lieu de distinguer selon lui entre la série de marchés et d'avenants conclus entre 1984 et 1986, d'une part, qui constitue un ensemble d'opérations contractuelles variées tendant à la conclusion et la réalisation de marchés et d'autre part, les deux Protocoles de 1992 et de 2003, dont le but commun est la consolidation et le règlement de la dette du Congo relativement à ces marchés et avenants. De même, la Garantie de 1986 et le Protocole de 1987 n'avaient pas pour but le règlement de cette dette consolidée. En outre, si la substitution d'un contrat à un autre n'est pas un critère indispensable pour qualifier un ensemble contractuel, contrairement à ce que semble prétendre le Congo, il y a une continuité entre les deux Protocoles.

**124.** En effet, on constate que jusqu'en 1986, les parties ont conclu des marchés confiés à Commisimpex, moyennant rémunération par le Congo. Ces marchés avaient tous des objets différents et comportaient tous des fonctions et modalités différentes telles que l'exécution de travaux de construction (construction de deux villages pour travailleurs à Mokéko pour le marché 185/84, travaux sur les ravins pour le marché 83/85/AO/PR-DCM-DMCE) ou de réfection (marché n°009/86, travaux de réfection et d'assainissement, marché n°53/86, travaux d'assainissement). Les avenants à ces marchés visaient, quant à eux, à préciser certaines dispositions des marchés, à les adapter (Avenants n°1 et 3 au marché 353/83 qui avaient pour but de confier à Commisimpex les travaux nécessaires à la bonne exécution du marché, Avenant n°1 56/86 au marché n°83/85 qui consistait en travaux de remblaiement et d'assainissement) ou encore à établir les modalités de paiement de ces marchés (Avenant n°4 54/86 et Avenant n°5 57/86 au marché 353/83 qui fixaient les révisions de prix applicables aux travaux). Aucun de ces marchés ou de leurs avenants n'avait par conséquent de but commun. Surtout, aucun d'entre eux n'avait pour but la consolidation et le règlement de la dette du Congo comme ce sera le cas des deux Protocoles de 1992 et de 2003. S'il est vrai que cette dette est le résultat de la réalisation de ces marchés et de leurs avenants, elle n'est ni leur objet, ni un objectif poursuivi par les Parties. La dette découlant de chaque marché constitue un élément de fait qui n'a pas été recherché par les Parties en le concluant. Les Protocoles de 1992 et de 2003 visent à la consolidation de ces éléments de fait et à définir les conditions d'un règlement.

**125.** Durant cette période a été également établie la Garantie de 1986, en date du 22 décembre 1986 par le Congo et la CCA au profit de Commisimpex afin qu'elle puisse assurer « *le financement nécessaire à la réalisation et à l'exécution des marchés et avenants de travaux et fournitures qui lui sont attribués* ». Cette Garantie de 1986 se rapportait donc indiscutablement à l'exécution des marchés et ne pouvait, comme le soutient le Congo, avoir un « *lien économique étroit avec l'opération de « règlement de la dette » telle que conçue par*

---

[51]   Voir Mémoire en réplique sur la compétence, page 15, paragraphe 50, citant Pièce C RJ-33, page 12, paragraphe 21.
[52]   Voir Mémoire en réplique sur la compétence, page 14, paragraphes 46, 47.

*Commisimpex* »[53]. En effet, cette Garantie de 1986 visait à permettre à Commisimpex de financer les différents marchés, antérieurs à 1986. En outre, il s'agit d'un acte unilatéral du Congo, qui ne peut, dès lors, manifester la volonté commune des parties. Enfin, le Protocole de 2003 atteste de la finalité spécifique de la Garantie de 1986, lorsqu'il précise qu'il « *ne constitue pas novation aux garanties détenues, notamment celle du 22 décembre 1986* » (article 7).

**126.** Que les deux Protocoles de 1992 et de 2003 tendaient vers le même but, la consolidation et le règlement de la dette, ressort clairement des termes mêmes de ces Protocoles.

En effet, après avoir rappelé que « *le gouvernement de la République du Congo avait attribué à la société Commisimpex plusieurs marchés de travaux et de fournitures (...)* » que « *ces différents marchés de travaux et de fournitures ont été financés exclusivement par les crédits fournisseurs consentis par la société Commisimpex* » et qu'il apparaît des « *dettes restant dues sur travaux* »[54], l'article 2 du Protocole de 1992 précise que « *la République s'engage irrévocablement* à payer la dette *à Commisimpex ou, à tout autre organisme financier désigné par Commisimpex, sur une durée totale de (10) ans, en 120 mensualités (...)* » (souligné par le Tribunal), l'article 4 prévoit des intérêts de retard et l'article 5 indique que les montants dus seront représentés par des billets à ordre. Ainsi, l'objet de ce Protocole porte uniquement sur la consolidation et le règlement de la dette du Congo à l'égard de Commisimpex relativement à différents marchés et ne concerne pas l'exécution de ceux-ci.

Tel est également le cas du Protocole de 2003. En effet, il est tout d'abord précisé que « *les diverses Commissions du Contrôle d'Etat, de la Présidence et des Ministères (...)* reconnaissent *l'exécution des travaux et fournitures par la société Commisimpex s.a.,* et confirment le non paiement des sommes dues par l'Etat du Congo* » (point 2 du préambule) (souligné par le Tribunal), puis que « *la validité de la dette, a été irrévocablement et officiellement reconnue par les Administrations concernées lors des deux réunions solennelles du 07 et du 23 septembre 1992* » et que « *la société Commisimpex a pris acte de cette reconnaissance de dette, par courriers du 07 octobre et 24 novembre 1992* ». Il est ensuite expliqué que le Congo a reconnu une dette de 48 milliards de FCFA et que par le présent Protocole « *l'Etat du Congo* s'engage à rembourser *à la société Commisimpex, la somme en principal de 520 millions de FRF (...)* »[55] (souligné par le Tribunal) selon des modalités particulières (articles 3 et 4). Il n'est donc pas contestable que l'objet de ce Protocole porte également sur la consolidation et le règlement de la dette du Congo.

**127.** En outre, ce Protocole de 2003 ne peut que constituer la suite du Protocole de 1992 et ne peut exister que du fait de la non-exécution du Protocole de 1992, tel que l'attestent les termes mêmes du Protocole de 2003 qui confirme « *le non paiement des sommes dues* ». De façon significative, il est également fait référence à deux reprises, au sein du Protocole de 2003, au Protocole de 1992. Dans son préambule, le Protocole de 2003 rappelle d'abord que « *l'Etat du Congo, reconnaît que la dette...a été partagée comme suit... :- une première partie est fixée à 440.000.000 FRF...objet du Protocole d'Accord no. 566 du 14 octobre 1992* » mais surtout l'article 1 indique que « *l'Etat du Congo prend à sa charge, la dette de la société Commisimpex (...) à hauteur de l'engagement du Protocole d'Accord no. 566 du 14 octobre*

---

[53] Mémoire en réponse sur la compétence, paragraphe 75, page 23.
[54] Préambule du Protocole de 1992, pièce C5.
[55] Protocole de 2003, pièce C27.

*1992.* » C'est donc bien parce que le Congo n'a pas respecté ses engagements conformément au Protocole de 1992 que ce Protocole de 2003 a été conclu par les parties.

De plus, la jurisprudence[56] a accepté d'étendre les effets d'une clause d'arbitrage d'un premier contrat à un second, même si ce dernier n'était pas « *une suite nécessaire qui pouvait être prévue dès la signature du premier* »[57] (souligné par le Tribunal).

Dès lors, le débat relatif au fait que les objets respectifs des Protocoles seraient différents dans la mesure où le Protocole de 1992 ne porterait que sur une partie de la dette, l'autre partie de la dette s'élevant à 26 milliards de FCFA devant donner lieu à l'attribution par compensation d'entreprises à privatiser[58] (mais n'étant pas réglé par le Protocole de 1992 lui-même) alors que le Protocole de 2003 réglerait ces deux volets, est dénué de pertinence. Ces deux Protocoles tendaient vers le même but final : la consolidation et le règlement de la dette du Congo, née de la conclusion d'un ensemble de marchés et avenants entre 1984 et 1986. Peu importe dès lors que l'objet du Protocole de 2003 ait prétendument été plus large que celui de 1992. De même est indifférent, dans le cadre de l'examen de la compétence du Tribunal, le fait de savoir si un accord oral sur la dette globale du Congo aurait été conclu entre les parties en 1992.

Le seul élément à prendre en considération au-delà du but commun des deux Protocoles est celui de leur complémentarité : le Protocole de 2003 n'existe que parce que le Protocole de 1992 n'a pas été respecté[59]. Ceci suffirait d'ailleurs à justifier l'extension au Protocole de 2003 de la clause d'arbitrage contenue dans le Protocole de 1992, ainsi que l'ont relevé les parties, et notamment le Congo : « *la Cour de cassation française a admis l'existence d'une clause compromissoire entre des contrats visant « des opérations par essence totalement différentes » mais dont l'un trouvait son « origine dans l'inobservation » de l'autre, dont il devenait le complément* »[60]. Ainsi, sur le fondement de la jurisprudence invoquée par les deux parties, dans l'hypothèse où les objets des Protocoles auraient été totalement différents, ce qui n'est pas le cas en l'espèce, l'extension de la clause compromissoire résulterait du simple fait que le Protocole de 2003 constitue le complément du Protocole de 1992.

Mais le but de ces Protocoles était le même, bien que chacun ait eu un objet précis. Il différait entièrement du but de tous les contrats de marchés et avenants précédemment conclus entre les parties, ainsi que du but de la Garantie de 1986. Ces Protocoles visaient à régler la dette du Congo qui s'était construite au fur et à mesure de l'exécution des marchés. Ceci est d'ailleurs confirmé par le fait que les parties n'ont fait état de la signature d'aucun marché depuis 1992 et que leurs relations semblent s'être cantonnées, depuis lors, à organiser le règlement de leur différend relatif au paiement d'une dette consolidée.

---

[56]   Arrêt de la Cour de Cassation du 14 mai 1996, C-RJ 6.

[57]   Réponse à la requête d'arbitrage, 6 juillet 2009, paragraphe 59, page 21.

[58]   Lettre de Commisimpex du 7 octobre 1992, pièce C4.

[59]   De toute évidence, la solution serait similaire si le Tribunal considérait que les compensations d'entreprises ont été prévues par accord oral des parties en 1992. En effet, ce serait alors du fait de l'inexécution combinée du Protocole et de cet accord verbal que le Protocole de 2003 serait devenu indispensable. Il n'est donc pas nécessaire que le Tribunal se prononce sur l'existence de cet accord verbal. En tout état de cause, l'intention des parties en 1992 était de négocier le règlement et la consolidation de la dette

[60]   Mémoire en réponse sur la compétence, paragraphe 141, page 46, et Mémoire en réplique sur la compétence, para 33, page 10, se référant à l'arrêt de la Cour de Cassation du 14 mai 1996, C-RJ 6.

**128.** Une question subsiste néanmoins : celle de savoir si le Protocole de 1987 peut être exclu de l'ensemble contractuel constitué par les Protocoles de 1992 et de 2003 comme le prétend Commisimpex et le conteste le Congo. Le point est important car le Protocole de 1987 contient une clause attribuant compétence aux tribunaux congolais. Si le Protocole de 1987 faisait partie de l'ensemble contractuel, on pourrait alors s'interroger sur la conséquence de l'incompatibilité de cette clause avec la clause d'arbitrage.

Pour Commisimpex, *« chaque marché avait pour « but » un échange : la réalisation de travaux contre le paiement des prestations. De son côté, le protocole no. 461 de 1987 concernait le règlement d'une dette du Congo envers Commisimpex, résultant d'un seul de ces marchés. Ces actes ne visaient aucunement à consolider et à fixer les modalités du règlement de la dette cumulée et ancienne du Congo à l'égard de Commisimpex. En revanche, les Protocoles de 1992 et de 2003 ont bien eu pour « but » ou objectif commun de consolider et de fixer les modalités du règlement de la dette globale du Congo »*[61].

Pour le Congo, Commisimpex ne peut prétendre que le Protocole de 1987 ne concernerait *« qu'un seul marché (...) à l'origine d'une dette distincte de celles résultant des autres marchés signés entre le Congo et Commisimpex »*[62] car pour lui, il vise au règlement *« d'une partie de la dette globale »* du Congo.

**129.** S'il est vrai que le Protocole de 1987 concerne le remboursement d'une créance de Commisimpex sur le Congo, ce n'est qu'au titre d'un seul marché. Le préambule du Protocole s'en explique clairement en ces termes :

> *« -   le contrat commercial signé le 10/11/83 sous le n°353/83/CT/PR entre la Direction Centrale des Marchés et Contrats de l'Etat (D.C.M.E.) et la société adjudicataire des travaux de plantations de 5.000 hectares à Ctoumbi-Kunda, comportait un certain nombre d'obligation à la charge de l'acheteur (DCME agissant pour le compte de la R.N.P.C. entre autre celle relative à la fourniture du matériel de défrichage.*
>
> *-   l'acheteur n'a pas pu, faute de ressources propres remplir cette obligation.*
>
> *-   la société A.P.V. Hall International Ltd, sur crédit garanti par Commisimpex a fourni en lieu et place de l'acheteur le matériel précité.*
>
> *-   les participants à la réunion du 26 juin 1987, dont compte rendu a été approuvé par eux, ont reconnu que la société Commisimpex, fournisseur du crédit détient par ce fait sur l'Etat une créance à concurrence du montant des sommes débitées du compte Commisimpex domicilié à la B.C.C.I. soit £ 12.818.000 (douze millions huit cent dix-huit mille livres Sterlings).*
>
> *En suite de quoi, la R.P.C. et la société Commisimpex conviennent d'un protocole d'accord pour déterminer les modalités de remboursement par la R .P.C. des sommes dues à Commisimpex en titre de cette garantie. »*

---

[61]   Mémoire en duplique sur la compétence, paragraphe 36, page 13.
[62]   Mémoire en réplique sur la compétence, paragraphe 52, pages 15 et 16.

Ceci est d'ailleurs rappelé par le Congo qui se réfère lui aussi à cette garantie particulière[63].

**130.** Le Protocole de 1987 n'adopte donc pas l'approche globalisante de la dette du Congo qui est celle des Protocoles de 1992 et de 2003. Là encore, le texte du préambule des Protocoles de 1992 et 2003 est éclairant :

Protocole de 1992 :

« *1.   Le gouvernement de la République du Congo avait attribué à la société COMMISIMPEX plusieurs marchés de travaux et de fournitures dont le détail apparaît dans le tableau récapitulatif des marchés et avenants joints en annexe au présent protocole.*

*2.   Ces différents marchés de travaux et de fournitures ont été financés exclusivement par les crédits fournisseurs consentis par la société COMMISIMPEX, matérialisés par des billets à ordre souscrits par la CAISSE CONGOLAISE D'AMORTISSEMENT et avalisés par la République.*

*3.   Les dettes restant dues sur travaux, après prise en compte des différents paiements effectués en faveur de la société COMMISIMPEX et de l'escompte de certains billets à ordre, se montent à : ... selon le détail joint en annexe au présent protocole d'accord.*

*4.   Dans l'hypothèse où la société COMMISIMPEX parviendrait à négocier un financement extérieur en faveur de la République du Congo, une partie de ce prêt consenti servirait à rembourser en priorité la dette de la République du Congo à l'égard de la société COMMISIMPEX dès la mise à disposition des fonds Cette procédure restera d'application jusqu'à extinction complète de la dette due.*

*5.   La République du Congo d'une part, et les sociétés COMMISIMPEX d'autre part, ont considéré de déterminer les termes et conditions de règlement de ladite dette restante au moyen du présent accord* ».

Protocole de 2003 :

« *1.   La société COMMISIMPEX s.a., ayant financé, par des fonds en devises étrangères, notamment en Francs Français, en Dollars US et Livres Sterling, des travaux et fournitures au profit de l'Etat du Congo, et que ce financement reste impayé à ce jour.*

*2.   Les diverses Commissions du Contrôle d'Etat, de la Présidence et des Ministères qui ont procédé à la vérification et à l'audit des créances COMMISIMPEX s.a., reconnaissent l'exécution des travaux et fournitures par la société COMMISIMPEX s.a., et confirment le non paiement des sommes dues par l'Etat du Congo.*

---

[63]  « *Le 27 juin 1987, la République du Congo (...) et Commisimpex ont signé le protocole no. 461 afin de convenir des modalités de remboursement par la République du Congo des sommes dues à Commisimpex au titre d'une garantie référencée « No. CORP 5166-85 » donnée par Commisimpex à l'Etat Congolais.* », mémoire sur la compétence, paragraphe 13, page 7.

> 3.    Suite à des négociations engagées depuis le 27 mai 2003, à Brazzaville, entre les
>       deux parties sus-visées, à propos de la dette de l'Etat du Congo à l'égard de la
>       société COMMISIMPEX, les deux parties conviennent que la dette objet du
>       présent protocole de négociation se présente comme suit : ...
>
> Ceci étant rappelé, les deux parties ont convenu ce qui suit : ... »

En 1992 et en 2003, il s'agit du règlement d'une dette consolidée, née de la conclusion de plus d'une dizaine de contrats de marchés et avenants conclus entre Commisimpex et le Congo entre 1984 et 1986. En 1987, il s'agissait du remboursement du crédit fourni par Commisimpex à la société APV Hall dans le cadre d'un marché déterminé (le marché 353/83), conclu entre l'Etat et APV Hall en 1983. Le Protocole de 1987 n'a donc pas de place dans l'ensemble contractuel unique constitué par les Protocoles de 1992 et de 2003.

**131.** Les parties n'ont apporté aucun élément tendant à démontrer qu'un instrument juridique a tenté de régler et de consolider la dette née de la conclusion de l'ensemble des marchés et avenants avant 1992.

**132.** Le Protocole de 1992 visait à régler la dette résultant d'une série de marchés qui comportaient tous des clauses de règlement de litiges différentes. En tant qu'instrument de consolidation, le Protocole de 1992 se devait donc de prévoir une clause de règlement des litiges unique, ce que les parties ont réalisé en insérant une clause d'arbitrage désignant le règlement d'arbitrage de la CCI à son article 10. Par ailleurs, les Lettres d'Engagement du 3 mars 1993, émises en application de ce Protocole, ainsi que la lettre de gage du même jour (Pièce C-50), comportaient une clause d'arbitrage faisant référence au règlement CCI. La volonté des parties était donc bien de soumettre leur litige relatif au règlement de la dette consolidée à l'arbitrage.

La conclusion de clauses de règlement des litiges différentes dans les divers marchés, Garantie de 1986 et Protocole de 1987 est indifférente, dans la mesure où ces instruments et les Protocoles de 1992 et 2003 ne constituent pas un ensemble contractuel unique.

**133.** De même, le Protocole de 2003 visait à la consolidation et au règlement de la dette globale du Congo et était la continuation du Protocole de 1992, ainsi qu'il a été précédemment démontré. Il est par conséquent logique de penser que la volonté des parties était en l'espèce d'avoir une clause d'arbitrage unique et similaire à celle de 1992. La référence à deux reprises au Protocole de 1992 dans le Protocole de 2003 vient le confirmer.

**134.** En outre, ainsi qu'en atteste la jurisprudence, le fait que les Protocoles de 1992 et de 2003 aient été conclus à onze ans d'intervalle n'est pas un obstacle à l'extension de la clause d'arbitrage du premier vers le second[64].

**135.** Sur le fondement de la jurisprudence et de la doctrine française, il suffit que les Protocoles de 1992 et de 2003 aient constitué un ensemble contractuel unique, distinct de celui composé des marchés et de leurs avenants ainsi que de la Garantie de 1986 et du

---

[64]   Arrêt de la Cour de Cassation du 14 mai 1996, C-RJ 6.

Protocole de 1987, pour déduire, en l'absence de stipulation contraire, la volonté des parties d'étendre la clause compromissoire incluse dans le Protocole de 1992 au Protocole de 2003.

**B-   Sur la renonciation de Commisimpex à l'arbitrage des litiges liés au règlement de la dette du Congo**

**136.** Subsidiairement, la République du Congo allègue que Commisimpex aurait renoncé au bénéfice de la clause d'arbitrage du Protocole de 1992 en soumettant son litige relatif au règlement de la « dette totale » (soit la dette alléguée de 48 milliards de FCFA) aux juridictions congolaises, ce que conteste Commisimpex.

**137.** La renonciation à une clause d'arbitrage est une cause d'extinction de celle-ci et doit par conséquent résulter d'une manifestation de volonté non équivoque. Cette renonciation peut être expresse mais aussi implicite, ce qui est le cas notamment lorsqu'une des parties porte un litige devant une juridiction étatique. Les parties ne s'opposent d'ailleurs pas sur ce point.

Cependant, ainsi que l'a précisé la jurisprudence, « *la renonciation par les parties à une convention d'arbitrage « peut se déduire de la saisine des juridictions étatiques par l'une des parties à la condition qu'il s'agisse d'une demande au fond qui aurait dû être soumise à l'arbitrage* » », précisant notamment que « *tel n'est pas le cas cependant lorsque la saisine des juridictions étatiques a pour seul objet l'obtention de mesures provisoires qui ne sont pas exclusives de l'exécution de la convention d'arbitrage* »[65]. Ainsi, une simple demande de mesures provisoires devant des juridictions étatiques ne conduit pas à une renonciation de la clause d'arbitrage. Ceci est d'ailleurs rappelé par le Congo[66]. Il en est *a fortiori* ainsi s'agissant d'une clause d'arbitrage CCI. Les dispositions de l'article 23(2) du Règlement d'Arbitrage de cette institution indiquent : « ... *La saisine d'une autorité judiciaire pour obtenir de telles mesures* [des mesures provisoires ou conservatoires] *ou pour faire exécuter des mesures semblables prises par un tribunal arbitral ne contrevient pas à la convention d'arbitrage, ne constitue pas une renonciation à celle-ci, et ne préjudicie pas à la compétence du tribunal arbitral à ce titre* ».

C'est pourquoi les parties s'opposent sur la nature des demandes soumises aux juridictions congolaises, le Congo prétendant que Commisimpex a présenté une demande au fond et celle-ci prétendant s'être limitée à de simples demandes de mesures provisoires.

**138.** Le Congo prétend en effet que « *Commisimpex a, à la suite du prononcé de la Sentence no. 9899, saisi les juridictions du ressort de Brazzaville aux fins de condamnation de la République du Congo au règlement de la prétendue dette totale de cette dernière* »[67] (souligné par le Tribunal). Il ajoute que même si dans un premier temps Commisimpex avait sollicité et obtenu la désignation d'un expert chargé d'évaluer la dette du Congo à son égard,

---

[65]   Arrêt CA Paris du 7 juillet 1994, Uzinexportimport, cité dans Traité de l'arbitrage commercial international, Fouchard, Gaillard, Goldman, page 457.

[66]   « *Commisimpex rappelle, en second lieu, ce qui n'est guère contesté, que la saisine d'un juge des référés en vue de l'obtention de mesures provisoires ou conservatoires, telles que des mesures d'expertise in futurum, n'emporte pas renonciation à la clause d'arbitrage.* », mémoire en réplique sur la compétence, paragraphe 68, page 19.

[67]   Mémoire sur la compétence, paragraphe 109, page 34.

Commisimpex aurait obtenu par la suite la condamnation du Congo au paiement de ces sommes. Il se fonde pour se faire sur l'extrait suivant de l'ordonnance du Président du Tribunal de Commerce de Brazzaville en date du 9 novembre 2001 :

> « *La société Commisimpex a conclu oralement à l'entérinement pur et simple du rapport dont elle accepte et fait siennes les conclusions, s'en remettant également à la sagesse du tribunal pour se prononcer sur la valeur au 30 septembre 2001 de sa créance sur la République du Congo et la Caisse Congolaise d'Amortissement.*
>
> *De plus, elle demande la condamnation de la Caisse Congolaise d'Amortissement et de la République du Congo à lui payer les sommes ainsi valorisées par le Tribunal. Elle demande également l'exécution provisoire de l'ordonnance à intervenir et la condamnation de la République du Congo et de la Caisse Congolaise d'Amortissement à tous les dépens y compris les frais d'expertise.* »[68]

Or, pour le Congo, il a été fait droit à cette demande lorsque le Président du Tribunal de Commerce a ordonné « *(...) à la Caisse Congolaise d'Amortissement d'inscrire la totalité de ces sommes au titre de la dette de l'Etat* ». En outre, il considère que la Cour Suprême de la République du Congo a confirmé que tel était le véritable objet des demandes de Commisimpex en constatant que ces demandes constituaient « *en réalité de vraies condamnations à savoir la fixation de la créance de Commisimpex à l'égard de l'Etat congolais à la somme de deux cent dix neuf milliards six cent soixante sept millions neuf cent cinquante un mille huit cent francs (219.667.951.800 francs)* »[69].

De ce fait, Commisimpex aurait donc renoncé au bénéfice de la clause d'arbitrage insérée dans le Protocole de 1992.

**139.** Commisimpex s'oppose entièrement à cette analyse. Elle explique que ses demandes étaient limitées à la désignation d'un expert afin de calculer le montant actualisé de sa créance et qu'en outre le Congo ne se fonde que sur une simple observation du Président du Tribunal de commerce de Brazzaville, n'ayant fait l'objet d'aucun examen ultérieur par celui-ci, qui indiquait que Commisimpex aurait lors « *de ses conclusions orales* » « *demand[é] la condamnation de la Caisse Congolaise d'Amortissement et de la République du Congo à lui payer les sommes ainsi valorisées par le Tribunal* »[70]. Commisimpex soutient que le Président du Tribunal de commerce aurait dans son ordonnance du 9 novembre 2001 s'est contenté « *d'ordonner à la Caisse Congolaise d'Amortissement d'inscrire la totalité de ces sommes au titre de la dette de l'Etat* » sans pour autant écarter, ni recevoir cette prétendue demande »[71], tout comme la Cour d'appel de Brazzaville. Elle considère donc que le Congo n'a pas établi que cette « *inscription* » consistait en réalité en une condamnation au paiement et que la preuve d'une renonciation non équivoque à l'arbitrage n'était ainsi pas rapportée.

**140.** Le Tribunal Arbitral note que dans la requête modificative aux fins de nomination d'un expert[72], Commisimpex se contente de solliciter la désignation d'un expert comptable :

---

[68] Pièce C-20, page 20.
[69] Mémoire en réplique sur la compétence, paragraphe 76, page 21.
[70] Mémoire en duplique sur la compétence, paragraphe 70, page 25.
[71] Mémoire en duplique sur la compétence, paragraphe 72, page 25.
[72] Pièce C 52.

« (...) *en dehors des difficultés pour la requérante à recouvrer ces créances auprès de l'Etat, il importe de désigner un expert comptable à l'effet :* »

- *de vérifier l'information selon laquelle d'après la Caisse Congolaise d'Amortissement les créances de la requérante sur la République du Congo et la Caisse Congolaise d'Amortissement s'élevaient à 29.949.284.818 Francs cfa à la fin de 1986 ;*

- *de calculer le montant au 30 septembre 2001 des créances de la requérante sur la République du Congo et la Caisse Congolaise d'Amortissement en tenant compte des paiements reçus et en procédant à une actualisation, comme l'avait fait la Caisse Congolaise d'Amortissement en 1991, avec un taux d'intérêt de retard de 10,5% l'an et capitalisation annuelle, mais sans tenir compte du Protocole d'Accord no. 566 du 14 octobre 1992 ;*

- *de calculer le montant actualisé de la condamnation au 30 septembre 2001 prononcée par la Chambre de Commerce Internationale de Paris à l'encontre du Congo le 3 décembre 2000 résultant du Protocole d'Accord no. 566 du 14 octobre 1992, étant entendu que ce montant devra être payé par le Congo à part car cette condamnation fait partie des engagements extérieurs du Congo et en cas de paiement viendra en déduction du montant global de la créance de la requérante ci-dessus calculée ;*

- *de se faire communiquer par la Caisse Congolaise d'Amortissement ainsi que par toutes les institutions de la République concernées, tous documents et pièces qu'il estimera utiles à l'accomplissement de sa mission* »[73] (souligné par le Tribunal).

Ainsi, cette requête ne contient aucune demande de condamnation au paiement de la « dette totale » alléguée du Congo. Il s'en est suivi une ordonnance rendue par le Président du Tribunal de commerce de Brazzaville en date du 3 septembre 2001 qui s'est contenté de nommer un expert « *à l'effet d'évaluer la créance exacte de la COMMISIMPEX S.A. auprès de la République du Congo* »[74]. L'expert a remis son rapport le 25 septembre 2001.

**141.** Il est vrai que le Président du Tribunal de commerce de Brazzaville, saisi en référé par Commisimpex, a, dans son ordonnance du 9 novembre 2001, relevé une demande orale de condamnation[75] et, après avoir fixé le montant de la créance globale de Commisimpex, a ordonné à la CCA « *d'inscrire la totalité de ces sommes au titre de la dette de l'Etat* ». Il est cependant difficile d'en conclure comme le soutient le Congo que « *Commisimpex a sollicité du juge qu'il entérine les montants y figurant et a « demand[é] la condamnation de la Caisse Congolaise d'Amortissement et de la République du Congo à lui payer les sommes ainsi valorisées par le Tribunal* »[76].

**142.** De plus, dans le cadre de l'appel formé devant la Cour d'appel de Brazzaville contre cette ordonnance, Commisimpex, dans ses écritures en défense, a précisé que les mesures prises par ordonnance étaient "*toutes des mesures conservatoires de sauvegarde de la créance de Commisimpex*" (Pièce C-24, page 18). À cet égard dans son arrêt du 18 juillet 2002, la Cour d'appel de Brazzaville a souligné de façon significative que les demandes présentées devant le

---

[73]  Pièce C 52, page 5.
[74]  Pièce C 53.
[75]  Pièce C 20, page 20.
[76]  Mémoire sur la compétence, paragraphe 37, page 14.

Président du Tribunal de commerce de Brazzaville ne constituaient que de simples mesures provisoires, estimant que la demande d'inscription de la dette ne constituait pas une condamnation à payer. La Cour d'appel de Brazzaville, dans l'exposé de son raisonnement, indique que :

-   « (…) *la juridiction commerciale et notamment celle du Tribunal de commerce de Brazzaville était bien compétente pour ordonner une mesure d'instruction in futurum* » (point 2 page 21) (souligné par le Tribunal) ;

-   « *Que le fait pour le président du Tribunal de commerce d'ordonner à la CCA d'inscrire la créance issue de l'expertise comptable, ne peut être qualifiée de « condamnation déguisée »* » (point 3, page 24) (souligné par le Tribunal) ;

-   « (…) *que l'inscription au titre de la dette intérieure du Congo, d'une créance à la CCA organe gestionnaire du service de la dette du Congo qui la contrôle, vérifie, homologue et valide par expert agréé, constitue par excellence une mesure conservatoire ou d'instruction relevant de la compétence du juge des requêtes, provisoire pour le juge des référés.* » (point 4, page 24) (souligné par le Tribunal) ;

-   « *Qu'en l'espèce la mesure sollicitée par la société COMMISIMPEX tendait essentiellement à cette inscription à la CCA au titre de dette intérieure du Congo, sans laquelle inscription aucune charge ne sera pris en compte par l'Etat ;* » (point 4, page 24) ;

-   « *Que contrairement aux affirmations manifestement de mauvaise foi des appelants la mesure décriée, inscription de créance, ne constitue pas une nouvelle condamnation du Congo ou de la CCA à payer les diverses créances à COMMISIMPEX, on ne parlerait d'injonction de payer que l'ayant ordonné au bénéfice de la créance COMMISIMPEX* » (point 4, page 24) (souligné par le Tribunal).

Il apparaît donc clairement que la Cour d'Appel de Brazzaville qualifie les mesures sollicitées par Commisimpex de mesures provisoires et que la demande d'inscription de la dette ne constituait pas une condamnation à payer.

**143.** La Cour Suprême annule l'arrêt de la Cour d'appel, considérant que cette dernière avait ordonné des mesures que la Cour Suprême a considérées comme de véritables condamnations. Ainsi, la Cour Suprême a-t-elle souligné que la Cour d'appel s'était « *mépris sur l'étendue de sa propre compétence* » « *en prononçant (...) les mesures critiquées qui sont en réalité de véritables condamnations à savoir la fixation de la créance de la société Commisimpex à l'égard de l'Etat congolais à la somme de deux cent dix neuf milliards six cent soixante sept millions neuf cent cinquante un mille huit cent francs (219.667.951.800 francs) et en ordonnant à la Caisse Congolaise d'Amortissement d'inscrire la totalité de cette créance (....)* »[77]. Elle a ajouté que la Cour d'Appel « *a ignoré les stipulations de l'article 10 du protocole d'accord n°566 du 14 octobre 1992 qui renvoyait la connaissance de tout litige né de son interprétation, de son exécution et de toute autre difficultés y relatives à un*

---

[77]   Pièce C 26, page 9.

*règlement amiable et à défaut à l'arbitrage de la Chambre de Commerce internationale de Paris... ».* Aussi a-t-elle renvoyé les parties à l'exécution de la sentence arbitrale du 3 décembre 2000.

**144.** Les décisions congolaises ci-dessus ne permettent pas de constater une renonciation de Commisimpex à la clause d'arbitrage incluse dans le Protocole de 1992, ni à soumettre à l'arbitrage les litiges liés au règlement de la « dette totale » de l'État. D'une part, la Cour d'Appel de Brazzaville estime que Commisimpex a sollicité des mesures conservatoires ; d'autre part, bien que la Cour Suprême ait considéré que la cour d'Appel avait en fait, par usage de son pouvoir d'évocation, ordonné des condamnations excédant sa compétence, on ne peut en déduire une manifestation de volonté non équivoque de Commisimpex de renoncer à l'arbitrage lorsqu'elle a formé ses demandes devant les juridictions congolaises. En effet, ce sont les demandes des parties qui sont déterminantes dans l'appréciation de l'existence de la renonciation, et non les condamnations éventuellement prononcées par les tribunaux saisis de ces demandes.

**145.** La renonciation de Commisimpex à la clause compromissoire incluse dans le Protocole de 1992 et à soumettre à l'arbitrage les litiges liés au règlement de la « dette totale » de l'État n'est donc pas établie. Le Tribunal Arbitral se déclare par conséquent compétent pour trancher le présent litige.

### C-   Sur l'autorité de la chose jugée de la sentence CCI n°9899 de 2000 s'agissant de la compétence arbitrale

**146.** Le Congo invoque l'autorité de la chose jugée de la sentence CCI dans l'affaire n°9899 de 2000 pour demander que le Tribunal déclare irrecevables les demandes de Commisimpex. Il prétend que « *la présente procédure n'aurait [...] pour objet que de remettre en cause le quantum, tel que déterminé par le Tribunal ayant rendu la Sentence no. 9899, de la dette née de l'exécution de ces mêmes marchés. En d'autres termes, ce que Commisimpex qualifie ici « d'autre partie de la dette » consisterait plus exactement en une amplification du montant de la dette née de l'exécution des contrats de marchés telle qu'arrêtée par les premiers arbitres ».* Il en conclut que « *l'identité de cause et d'objet invoquée par Commisimpex conduit alors à l'irrecevabilité de ses demandes en raison de l'autorité de chose jugée attachée à la première sentence »*[78].

**147.** Le Tribunal Arbitral estime que l'autorité de la chose jugée, invoquée par la Défenderesse, soulève des questions de fond qui ne peuvent être examinées à ce stade de la procédure.

**148.** Le Tribunal Arbitral renvoie donc dès lors cette question au fond.

---

[78] Mémoire sur la compétence, paragraphes 98 et 99, page 32.

**D-    Sur l'estoppel**

**149.** Le Congo soutient que Commisimpex ayant porté ses prétentions relatives à la « dette totale » du Congo devant les juridictions congolaises en 2001, contraignant l'État à assurer sa défense, elle ne peut aujourd'hui, en application du principe de l'*estoppel*, se contredire au détriment de l'État et prévaloir du bénéfice de la clause compromissoire insérée dans le Protocole de 1992.

**150.** Commisimpex rejette cette allégation, soutenant qu'elle n'a pas porté ses demandes au fond devant les juridictions congolaises.

**151.** Il n'est pas contestable que sous la forme de l'interdiction de se contredire au détriment d'autrui, le concept d'*estoppel* est aujourd'hui une composante du droit français, notamment en matière d'arbitrage international (voir, entre autres Cass. Civ. I, 6 juillet 2005, Rev. Arb. 2005,993, note Pinsolle). Cependant ce concept ne trouve pas à s'appliquer en l'espèce puisque la contradiction qui justifierait l'interdiction n'a pas été établie. En effet, il n'a pas été établi que Commisimpex ait soumis aux juridictions congolaises une demande au fond relative à la « dette totale » du Congo. La saisine du Tribunal Arbitral pour qu'il tranche un litige relatif à cette dette ne peut donc être qualifiée de démarche contradictoire et l'argument de l'*estoppel* invoqué par le Congo est par conséquent rejeté.

**E-    Sur les coûts de l'arbitrage**

**152.** Chacune des parties a demandé que les coûts de l'arbitrage soient mis à la charge de l'autre. Cependant, le Tribunal Arbitral estime prématuré de le faire à ce stade de la procédure et tranchera cette question dans sa sentence finale.

**PAR CES MOTIFS :**

1)    Le Tribunal Arbitral se déclare compétent pour trancher le présent litige ;

2)    Le Tribunal Arbitral renvoie au fond la question de l'autorité de la chose jugée de la sentence arbitrale du 3 décembre 2000 rendue dans l'affaire CCI n°9899 ;

3)    L'allocation des coûts de l'arbitrage propres à cette phase de la procédure sera décidée dans la sentence finale;

4)    Toutes autres demandes des parties sont renvoyées au fond.

Lieu de l'arbitrage : Paris
Le ......août 2010

Yves DERAINS
Président

Bernard HANOTIAU
Arbitre

Carole MALINVAUD
Arbitre

# EXHIBIT 4B

[Translation of page 1]

[ICC logo]
International Chamber of Commerce
*The world business organization*

**International Court of Arbitration • Cour internationale d'arbitrage**

# AWARD

**ICC International Court of Arbitration • Cour internationale d'arbitrage de la CCI**

38 Cours Albert 1er, 75008 Paris, France

Tel+33 (0) 1 49 53 28 28  Faxes +33 (0)1 49 53 29 29 / +33 (0)1 49 53 29 33

E-mail arb@iccwbo.org  Website www.iccarbitration.org

[translation of page 2]

# ICC INTERNATIONAL COURT OF ARBITRATION

## CASE No. 16257/EC/ND

### COMMISSIONS IMPORT EXPORT S.A. KNOWN

### COMMERCIALLY AS COMMISIMPEX

**(Republic of the Congo)**

**vs/**

### LA RÉPUBLIQUE DU CONGO (BRAZZAVILLE)

**(Republic of the Congo)**

**This document is an original of the Partial Award rendered in compliance with the Rules of the International Court of Arbitration of the ICC.**

**17.** The parties are opposed to the jurisdiction of the Arbitration Tribunal. On one hand, the Republic of the Congo considers that the Arbitration Tribunal has no jurisdiction to rule on this dispute insofar as the 2003 Protocol contains no arbitration clause and that the parties did not intend to extend the one included in the 1992 Protocol to the 2003 Protocol. It adds that, even if such an extension did occur, Commisimpex has waived the arbitration clause by referring the matter to the Congolese courts in 2001 and that in any event, the applications of Commisimpex conflict with the authority of res judicata in the ICC award in Case No. 9899 of December 3, 2000. The Republic of the Congo finally invokes the principle of estoppels that would prevent Commisimpex from claiming the benefit of the arbitration clause in the 1992 Protocol.

**18.** Being based on the concept of a group of contracts that would justify the extension of the arbitration clause to the context of groups of contracts, Commisimpex deems the Arbitration Court competent, and disputes having waived the benefit of an arbitration clause. Commisimpex further deems that the force of *res judicata* is a total refusal which should be processed at the same time as the grounds, and maintains that the *estoppel* argument cannot be received by this Court.

**117.** For its part, Commisimpex deems that the "*Protocol of 2003 is the direct result of the non-execution by the Congo of the Protocol of 1992 and is therefore the result of it; it governs the same unique economic transaction, namely settling the Congo's debt to Commisimpex.*"[39] The connection that exists between the two Protocols thus enables, according to it, justifying the extension of the arbitration clause in application of French and arbitration case law and of doctrine.

**135.** Based on French case law and doctrine, it is enough that the Protocols of 1992 and 2003 constituted a single contractual framework, distinct from those composed by the contracts and their amendments as well as from the Guarantee of 1986 and from the Protocol of 1987, to deduce, in the absence of any stipulation to the contrary, the will of the parties to extend the arbitration clause included in the Protocol of 1992 to the Protocol of 2003.

**145.** Commisimpex's waiving of the arbitration clause included in the Protocol of 1992, and of the submission to arbitration of the disputes connected to the settlement of the State's "entire debt," has therefore not been proven. As a result, the Arbitration Court declares itself competent to settle this dispute.

[translation of page 41]


**FOR THESE REASONS:**


1) The Arbitral Tribunal states that it has jurisdiction to rule on this dispute;

2) The Arbitral Tribunal will decide  the question of the *res juridica* effect of the arbitral award of 3 December 2000 rendered in ICC Case No. 9899 during the merits phase of these proceedings;

3) The distribution of the costs of the arbitration itself up to this point will be decided in the final award;

4) All other requests of the parties will be decided on the merits.


Place of arbitration: Paris

On. . .20. . August 2010



Yves DERAINS

[signature]

President


[signature]                                                                        [signature]

Bernard HANOTIAU                                                    Carole MALINVAUD

Arbitrator                                                                        Arbitrator

# TRANSLATOR CERTIFICATION

450 7th Ave
6th Floor
New York, NY 10123
Tel 212.643.8800
Fax 212.643.0005
www.morningtrans.com

**County of New York**
**State of New York**

Date: September 23, 2014

To whom it may concern:

This is to certify that the attached translation from French into English is an accurate representation of the documents received by this office.

The documents are designated as:
- Partial Award - 20 August 2010 (FR) – paragraphs 17, 18, 117, 135 & 145

Belinda Lai attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

Signature of Belinda Lai