## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMISSIONS IMPORT EXPORT S.A.,     ) | |
|                        ) | |
| *Petitioner*,            ) | |
|                        ) | Civil Action No. 1:13-cv-713-RJL |
| *v.*                ) | |
|                        ) | |
| REPUBLIC OF THE CONGO,     ) | |
|                        ) | |
| *Respondent.*          ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO RESPONDENT'S MOTION TO VACATE THE AMENDED ORDER & JUDGMENT

**WHITE & CASE** LLP

Francis A. Vasquez, Jr. (D.C. Bar No. 442161)
Nicolle Kownacki (D.C. Bar No. 1005627)
701 Thirteenth Street, N.W.
Washington, D.C. 20005
(202) 626-3600

*Counsel for Commissions Import Export, S.A.*

November 24, 2014

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ......................................................................... iii

INTRODUCTION ..................................................................................... 1

COUNTER-STATEMENT OF FACTS ........................................................ 2

I.   The Amended Judgment Confirmed a Valid Arbitral Award Following Proper
     Service of Process and the Court's Consideration of the Evidence in this Case ................ 2

     A.   Origins of the Dispute .......................................................... 2

     B.   The 2013 ICC Arbitration Award ............................................ 4

     C.   Enforcement of the 2013 Award .............................................. 5

II.  On Numerous Other Occasions in Connection with the Parties' Long-Running
     Disputes, the Congo Has Accepted Service of Process at its Ministry of Foreign
     Affairs ........................................................................................ 7

III. The Congo Has Had Ample Notice of This Action, But Has Not Acted in Good
     Faith ........................................................................................... 8

IV.  The Congo Illegitimately Manufactured "Liquidation Proceedings" and Tax
     Assessments to Interfere with the Arbitration and Pending Enforcement Actions .......... 10

ARGUMENT .......................................................................................... 12

I.   Courts Routinely Uphold Default Judgments, Including Judgments Rendered
     Against Foreign Sovereigns and Judgments Confirming Foreign Arbitral Awards .......... 13

II.  The Court Properly Exercised Personal Jurisdiction Over the Congo, Because the
     Congo Was Served as Required Under the Foreign Sovereign Immunities Act ............... 14

     A.   There Is No Special Arrangement for Service Between Commisimpex and
          the Congo ........................................................................ 16

     B.   The Congo Is Legally Estopped from Asserting the Existence of an
          Alleged Special Arrangement for Service .................................. 20

     C.   Commisimpex's Service Upon the Congo's Ministry of Foreign Affairs
          Was Proper and Effective Under the Specific Requirements of 28 U.S.C.
          § 1608(a)(3) ..................................................................... 22

III. The Court Properly Exercised Subject Matter Jurisdiction in Recognizing the
     Award ......................................................................................... 24

A.  Standing Is a Prudential Question and There Is No Question that Commisimpex Has Been Injured in Fact ................................................. 24

B.  Commisimpex Was the Proper Party to Bring This Action .................................. 26

    1.  The Orders of the Brazzaville Courts Are Illegitimate Because They Were Irregular and Did Not Afford Commisimpex Due Process and an Adequate Opportunity to Defend Itself ........................... 27

    2.  This Court Should Not Afford Comity to Judgments of the Congolese Courts Because the Congolese Judicial System Is Not Impartial ................................................................................................... 31

IV.  The Court Properly Exercised Subject Matter Jurisdiction, Because the Question of a Written Agreement to Arbitrate Is Not Jurisdictional, There Was an Agreement, and the Merits Issue Was Resolved in the Primary Jurisdiction ................... 32

V.  The Congo's Neglect in Bringing This Action Was Neither Inadvertent Nor Excusable, and in Any Event Does Not Justify Vacating the Amended Judgment .......... 35

A.  The Congo Has No Potentially Meritorious Defense ........................................... 36

    1.  The Congo Cannot Prevail on any New York Convention Defense ......... 37

    2.  The Congo's Jurisdictional and Other Procedural Defenses Do Not Justify Vacatur ........................................................................................... 38

B.  The Congo's Default Was Within Its Control ..................................................... 38

C.  Commisimpex Will Be Prejudiced by Vacating the Amended Judgment ............. 41

D.  The Congo's History of Acting in Bad Faith Excuses Any Alleged Lack of Professional Courtesy ......................................................................................... 42

CONCLUSION ...................................................................................................................... 44

**<u>TABLE OF AUTHORITIES</u>**

<u>Federal Cases</u>                                                                                              <u>Page(s)</u>

*Abur v. Republic of Sudan*, 437 F. Supp. 2d 166 (D.D.C. 2006)....................................23

*Amoco Overseas Oil Co. v. Compagnie Nationale Algerienne de Navigation*,
    605 F.2d 648 (2d Cir. 1979)........................................................................ 39-40

*Angellino v. Al-Saud*, 681 F.3d 463 (D.C. Cir. 2012)....................................................15

*Bautista v. Star Cruises*, 396 F.3d 1289 (11th Cir. 2005) .............................................33

*Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724 (D.C. Cir. 2012)................................14, 42

*Bridgeway Corp. v. Citibank*, 45 F. Supp. 2d 276 (S.D.N.Y. 1999) .............................31

*Budejovicky Budvar, N.P. v. Czech Beer Imps., Inc.*, Case No. 3:05cv1246 (JBA),
    2006 WL 1980308 (D. Conn. July 10, 2006) ...........................................................14

*Corporacion Salvadorena Calzado, S.A. (Corsal, S.A.) v. Injection Footwear
    Corp.*, 533 F. Supp. 290 (S.D. Fla. 1982) ................................................................30

*Czarina, L.L.C. v. W.F. Poe Syndicate*, 358 F.3d 1286 (11th Cir. 2004) .....................33

*FG Hemisphere Assocs. v. Democratic Republic of Congo*, 447 F.3d 835
    (D.C. Cir. 2006) .........................................................................................13, 35, 39

*Films By Jove, Inc. v. Berov*, 250 F. Supp. 2d 156 (E.D.N.Y. 2003) ...........................30

*Fitzpatrick Int'l Ltd. v. Republic of Equatorial Guinea*, Civil Action No. H-12-
    1300, 2013 WL 5964560 (S.D. Tex. Nov. 7, 2013) .......................................25, 26

*G.E. Transp. S.P.A. v. Republic of Albania*, 693 F. Supp. 2d 132 (D.D.C. 2010)........................37

*Gates v. Syrian Arab Republic*, 646 F.3d 1 (D.C. Cir. 2011)...........................1, 12, 13, 16, 22, 36

*Gates v. Syrian Arab Republic*, 646 F. Supp. 2d 79 (D.D.C. 2009) .................................16, 22, 23

*Grayson v. Hsin*, 413 F. App'x 596 (4th Cir. 2011) ......................................................25

*Hilton v. Guyot*, 159 U.S. 113 (1895) ...........................................................................27

*Int'l Ins. Co. v. Caja Nacional de Ahorro y Seguro*, No. 00 C 6703,
    2001 WL 1516730 (N.D. Ill. Nov. 28, 2001) ........................................................14

\* indicates authority on which counsel chiefly relies

*Int'l Trading & Indus. Inv. Co. v. DynCorp Aerospace Tech.*,
  763 F. Supp. 2d 12 (D.D.C. 2011) ........................................................13, 14, 26, 36

*\*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi*
  *Negara*, 364 F.3d 274 (5th Cir. 2004) ....................................13, 14, 21, 22, 26, 34

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi*
  *Negara*, 264 F. Supp. 2d 490 (S.D. Tex. 2003) ............................................... 12-13

*Kensington Int'l Ltd. v. Republic of Congo*, No. 03 Civ. 4578(LAP),
  2007 WL 2456993 (S.D.N.Y. Aug. 24, 2007)...................................................10, 42

*Konstantinidis v. Chen*, 626 F.2d 933 (D.C. Cir. 1980) .........................................20, 21

*Lepkowski v. United States Dep't of the Treasury,* 804 F.2d 1310 (D.C. Cir. 1986) ...................36

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014) .........................25

*LG Display Co. v. Obayashi Seikou Co.*, 919 F. Supp. 2d 17 (D.D.C. 2013) ..................29, 30, 31

*Mayfair Extension, Inc. v. Magee*, 241 F.2d 453 (D.C. Cir. 1957)....................................39

*Meadows v. Dominican Republic,* 817 F.2d 517 (9th Cir. 1987) ..................................... 13, 38-39

*Merit Ins. Co. v. Leatherby Ins. Co.*, 714 F.2d 673 (7th Cir. 1983) ................................12

*Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*,
  473 U.S. 614 (1985)........................................................................................14, 42

*Moore v. Blue Cross & Blue Shield of Nat'l Capital Area*, 70 F. Supp. 2d 9
  (D.D.C. 1999) ...............................................................................................20, 21

*Murray v. District of Columbia*, 52 F.3d 353 (D.C. Cir. 1995)........................................36, 37, 38

*Niemi v. Lasshofer*, No. 13-1256, 2014 WL 5579479 (10th Cir. Nov. 4, 2014) .........................25

*Osorio v. Dole Food Co.*, 665 F. Supp. 2d 1307 (S.D. Fla. 2009) ..................................31

*Osorio v. Dow Chem. Co.*, 635 F.3d 1277 (11th Cir. 2011) .........................................31

*Ottley v. Schwartzberg*, 819 F.2d 373 (2d Cir. 1987) ..................................................36

*Permapost Prods. v. McHugh*, No. 13–1736(ESH), 2014 WL 3056506
  (D.D.C. July 7, 2014)......................................................................................25

*Pioneer Inv. Servs. Co. v. Brunswick Assocs.*, 507 U.S. 380 (1993) ........................................35, 43

*Regent Seven Seas Cruises, Inc. v. Rolls Royce, PLC*, Nos. 06–22347–CIV,
  06–22539–CIV, 2007 WL 601992 (S.D. Fla. Feb. 21, 2007)............................................33, 34

*Sarhank Grp. v. Oracle Corp.*, 404 F.3d 657 (2d Cir. 2005)..............................................32, 33, 34

*Smith v. District of Columbia*, 430 F. 3d 450 (D.C. Cir. 2005)....................................................42

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998).......................................................33

*Tahan v. Hodgson*, 662 F.2d 862 (D.C. Cir. 1981)..........................................................27, 30, 37

*\*TermoRio S.A.E.S.P. v. Electranta S.P.*, 487 F.3d 928 (D.C. Cir. 2007) ...................34, 35, 36, 37

*Textile Banking Co. v. Rentschler*, 657 F.2d 844 (7th Cir.1981)...................................................39

*TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296 (D.C. Cir. 2005)......................15

*Transportes Aereos Pegaso, S.A. de C.V. v. Bell Helicopter Textron Inc.*,
    623 F. Supp. 2d 518 (D. Del. 2009)......................................................................................30

*United States v. Nippon Paper Inds.*, 109 F.3d 1 (1st Cir. 1997) .................................................26

*Warth v. Seldin*, 422 U.S. 490 (1975) .............................................................................................24

*Whelan v. Abell*, 953 F.2d 663 (D.C. Cir. 1992)............................................................................24

*Yusuf Ahmed Alghanim & Sons v. Toys "R"Us, Inc.,* 126 F.3d 15 (2d Cir.1997)........................34

*Zeiler v. Deitsch*, 500 F.3d 157 (2d Cir. 2007) ..............................................................................14

## Statutes & Rules

9 U.S.C. § 201 *et seq*.................................................................................................................6

9 U.S.C. § 207........................................................................................................................36

28 U.S.C. § 1330.....................................................................................................................16

28 U.S.C. § 1605(a).................................................................................................................16

28 U.S.C. § 1608(a) ....................................................2, 6, 7, 8, 15, 18, 22, 23, 24, 40

28 U.S.C. § 1608(c).................................................................................................................23

28 U.S.C. § 1608(e) ..................................................................................................................7

Fed. R. Civ. P. 5(a) .................................................................................................................42

Fed. R. Civ. P. 17....................................................................................................................24, 38

Fed. R. Civ. P. 60(b) ...................................................................................................... *passim*

Other Authorities

*2014 Investment Climate Statement – Republic of the Congo*, U.S. Dep't of State
(June 2014)......................................................................................................32

3 *Pomeroy's Equity Jurisprudence* § 802 (5th ed. 1941) ...........................................21

*Convention on the Recognition and Enforcement of Foreign Arbitral Awards,
June 10, 1958, 21 U.S.T. 2517, T.I.A.S. No. 6997 ("New York Convention") ............. *passim*

*Country Reports on Human Rights Practices for 2013 (Republic of the Congo)*,
U.S. Dep't of State (2013) .......................................................................31

Rep. of the Working Grp. on the Universal Periodic Rev., 17th sess., Oct. 21-
Nov. 1, 2014, U.N. Doc. A/HRC/25/16 (Jan. 6, 2014)..........................................32

*Restatement (Third) of Foreign Relations Law* § 482(2) (1987) ..................................30

## INTRODUCTION

Petitioner Commissions Import Export S.A. ("Commisimpex") respectfully submits this Memorandum in opposition to the Republic of the Congo ("the Congo")'s Motion to Vacate the Amended Default Judgment ("Mot.") (ECF No. 23).[1]

This matter arises from a longstanding dispute due to the Congo's failure to meet its debt obligations. In an attempt to recover the payments it is owed, Petitioner Commisimpex has arbitrated and litigated against the Congo in multiple fora around the world. The Congo, at every step, has sought to evade the consequences of its wrongdoing.

This proceeding involves the summary confirmation of a valid foreign arbitral Award under the New York Convention. Commisimpex is the rightful Award holder and enforcer of the Award. In support of its petition to confirm the award, Commisimpex properly served process on the Congo, who failed to appear in this action. Accordingly, this Court (Wilkins, J.) found the Congo in default. Upon consideration of Commisimpex's petition to confirm the Award and motion for an entry of judgment, this Court correctly entered judgment against the Congo (the "Amended Judgment"). No further action is warranted.

In its latest attempt to avoid its payment obligations to Commisimpex, the Congo has now belatedly filed a motion to vacate this Court's Amended Judgment. A Rule 60(b) movant bears a "heavy" burden. *Gates v. Syrian Arab Republic*, 646 F.3d 1, 5 (D.C. Cir. 2011)

---

[1] Commisimpex's Opposition to the Congo's Motion to Vacate is supported by the following documents being filed concurrently with this memorandum: (1) the Declaration of Francis A. Vasquez, Jr., executed November 24, 2014, and the exhibits attached thereto ("Vasquez Decl."); (2) the Declaration of Mohsen Hojeij, executed November 17, 2014, and the exhibits attached thereto ("Hojeij Decl."); (3) the Declaration of Jacques-Alexandre Genet, executed November 18, 2014, and the exhibits attached thereto ("Genet Decl."); and (4) the Second Declaration of Michael A. Polkinghorne, executed November 24, 2014, and the exhibits attached thereto ("Polkinghorne Decl. II"). Commisimpex also refers to the first declaration of Michael A. Polkinghorne, executed May 15, 2013 (ECF No. 1-3), and the exhibits attached thereto ("Polkinghorne Decl. I").

(declining to vacate a judgment against Syria).  As explained herein, the Congo has not met its

burden for the following reasons:

- Service of process on the Congo's Ministry of Foreign Affairs was proper under 28 U.S.C. § 1608(a); there is no "special agreement for service;" and the procedures Commisimpex followed were consistent with how Commisimpex has served the Congo *numerous* times in the past, which the Congo has always accepted and should be estopped from contesting here;

- Commisimpex is the valid holder of the 2013 Award and was the proper party to bring the petition to confirm the Award.  This Court should not afford comity to the illegitimate judgments of the corrupt Congolese courts, as the Congo urges;

- There is no doubt that this case arose out of the written agreement to arbitrate that was submitted with the Petition, as confirmed by both the arbitral tribunal and the highest court of France (the primary jurisdiction for this dispute); further consideration by this Court of the scope of the agreement or the parties' intentions would exceed the Court's limited jurisdictional review;

- The Congo's year-long delay in bringing this action cannot be excused, as its explanations for delay, including the dishonest claim that its Ministry of Foreign Affairs is ill-equipped to process receipt of legal documents, are simply not plausible; and

- In any event, vacatur would be an exercise in futility, because the Congo has no potentially meritorious defense for this Court to consider under the limited scope of review available in a secondary jurisdiction under the New York Convention.

Accordingly, this Court should deny the Congo's motion and uphold the Amended

Judgment.

## COUNTER-STATEMENT OF FACTS

### I.    THE AMENDED JUDGMENT CONFIRMED A VALID ARBITRAL AWARD FOLLOWING PROPER SERVICE OF PROCESS AND THE COURT'S CONSIDERATION OF THE EVIDENCE IN THIS CASE

#### A.    Origins of the Dispute[2]

The present proceeding to confirm a valid foreign arbitral award is but the latest

extension of a longstanding dispute regarding the Congo's failure to meet significant payment

---

[2] The French Court of Appeal of Paris, the primary jurisdiction for this dispute, also recently summarized this history in its Judgment dated October 14, 2014 affirming the 2013 Award.  Polkinghorne Decl. II, Ex. 9 (Judgment of October 14, 2014 (Court of Appeal of Paris) (the "French Judgment") at 2).

obligations to Commisimpex.  Commisimpex is a company owned by the Hojeij Group, which has been doing business in the Congo since 1973.  Hojeij Decl. ¶ 1.  Over the years, Commisimpex has invested hundreds of millions of dollars in the Congo.  *Id*.; French Judgment at 5.  As part of its investments in the Congo, in the 1980s, Commisimpex entered into a number of contracts with the Congo, pursuant to which the company agreed to perform certain public works and to supply certain materials to the Congo.  Hojeij Decl. ¶ 2; French Judgment at 5.  In 1992, Commisimpex and the Congo concluded an agreement, Protocole d'Accord No. 566 (the "1992 Protocol"), for the repayment of part of the outstanding debts owed to Commisimpex under the contracts.  Hojeij Decl. ¶ 2; French Judgment at 3.

The Congo failed to meet its obligations under the 1992 Protocol.  Hojeij Decl. ¶ 2; French Judgment at 3.  In 1998, Commisimpex brought an international arbitration against Congo under the arbitration rules of the International Chamber of Commerce ("ICC").  Hojeij Decl. ¶ 2.  The ICC tribunal issued an award against the Congo in December 2000 (the "2000 Award").  The Congo has not paid that Award.  Accordingly, Commisimpex initiated numerous legal proceedings all over the world in an attempt to enforce the 2000 Award.  Those efforts are ongoing.

On August 23, 2003, Commisimpex and the Congo signed another agreement, Protocol No. 706 (the "2003 Protocol"), providing for the payment by the Congo of the totality of its debt still owed to Commisimpex, which included but was not limited to the debts owed by the Congo under the 1992 Protocol.  Polkinghorne Decl. I ¶ 4.  The Congo also failed to meet its obligations under the 2003 Protocol, prompting Commisimpex to file a second ICC arbitration against the Congo.

**B.     The 2013 ICC Arbitration Award**

In 2009, Commisimpex initiated an ICC arbitration against the Congo based on the 2003 protocol.  In 2010, the ICC tribunal ruled that it had jurisdiction over the dispute.  Polkinghorne Decl. I ¶ 6.  The tribunal held that an arbitration clause in the 1992 Protocol was a valid basis to arbitrate the dispute regarding the 2003 Protocol.  Polkinghorne Decl. II ¶ 3.  The highest court in France, the seat of the arbitration, confirmed the Award on Jurisdiction.  *Id.* ¶ 18.

After submissions by the parties and a hearing on the merits, the tribunal issued its final Award in Commisimpex's favor in January 2013 (the "2013 Award").  Polkinghorne Decl. I ¶ 7.  The 2013 Award, which ordered the Congo to pay Commisimpex over €222 million plus costs and interest, is the subject of the confirmation petition in the present case.  *Id.*; Pet. to Confirm Arbitral Award, May 15, 2013, ECF No. 1.  In the 2013 Award, the tribunal rejected the Congo's attempt to invoke the 1992 Protocol with respect to certain of its defenses, confirming that Commisimpex's claims solely arose from the 2003 Protocol.  Polkinghorne Decl. II ¶ 4.  As summarized by the Paris Court of Appeal in its decision of October 14, 2014 (the "French Judgment") (Polkinghorne Decl. II, Ex. 9):

> By an award rendered in Paris on January 21 2013, the arbitral tribunal made up of, under the aegis of the International Chamber of Commerce, Mr. Hanotiau and Ms. Malinvaud, arbitrators, and of Mr. Derains, president:
>
> ▪ Found that it had jurisdiction over the claims of COMMISINPEX [sic] in connection with the effects of the judgment of compulsory liquidation on the arbitration proceeding,
> ▪ Said that the requirements of international public policy prevented the liquidation of COMMISINPEX [sic] from having effects on the arbitration proceeding, and noted, as a result, the lack of capacity of the liquidators to represent COMMISINPEX [sic],
> ▪ Rejected the request of COMMISINPEX [sic] for refunding of the expenses generated in the arbitration by the liquidation proceeding and declined jurisdiction to hear the other requests of COMMISINPEX [sic] in connection with its judicial liquidation,
> ▪ Rejected the plea of res judicata via the award of December 3, 2000,

- Noted the validity of the 2003 Protocol and its binding character for the parties,
- Noted that the amounts owed by CONGO in accordance with Article 1 of the 2003 Protocol were those which had been granted by the award of December 3, 2000, and deducted them from the award that it rendered,
- Held that the CONGO was to pay to COMMISINPEX [sic] in accordance with articles 2 and 3 of the 2003 Protocol the sum of 222,749,598 Euros, in addition to interest at the rate of 10% per year, starting from December 31, 2003 with capitalization,
- Determined the litigation costs.

The Congo has not complied with the 2013 Award, which has been confirmed by the Paris Court of Appeal in the French Judgment. Polkinghorne Decl. II ¶ 19. In confirming the Award, the Paris Court of Appeal rejected all of the Congo's arguments, including, as the Congo has baselessly alleged again (Mot. at 34), that the 2003 Protocol was the product of corruption. Polkinghorne Decl. II ¶¶ 20-21. Regarding the Congo's argument that the 1992 Protocol encompassed all debts owed by the Congo and that the 2003 Protocol was procured by fraud, the Paris Court of Appeal ruled (French Judgment at 5-6):

> When it is alleged that an award gives effect to a contract obtained by corruption, it is up to the judge deciding on the action to set it aside, addressing an action based on Article 1520(5) of the Code of Civil Procedure, to examine in law and in fact all the evidence making it possible to come to a conclusion about the alleged illegality of the agreement and to assess whether the recognition or enforcement of the award violates international public policy in an effective and concrete manner; . . . It has not been shown that the award gives effect to an agreement obtained by corruption; . . . The argument based on a violation of international public policy must thus be rejected[.]

The Paris Court of Appeal rejected all of the Congo's objections and defenses, upheld the 2013 Award *in toto*, and awarded Commisimpex €100,000 in fees and costs. French Judgment at 8.

## C.     Enforcement of the 2013 Award

As part of its global enforcement efforts, on May 15, 2013, Commisimpex filed this action to confirm the 2013 Award under the New York Convention and Chapter 2 of the Federal

Arbitration Act ("FAA").   9 U.S.C. § 201 *et seq*.; Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, T.I.A.S. No. 6997 ("New York Convention"); *see also* Pet. to Confirm Arbitral Award, May 15, 2013, ECF No. 1.

As addressed in detail below, Commisimpex and the Congo have no "special arrangement" for service, and it is undisputed that there is no convention governing the terms of service in this case.  *See* 28 U.S.C. § 1608(a)(1)-(2).  Accordingly, Commisimpex served process on the Congo pursuant to the applicable requirements of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1608(a)(3), by:

- Filing with the Court Affidavits Requesting Foreign Mailing (May 28, 2013, ECF Nos. 5, 6), which the Court duly authorized (*see* Certificate of Mailing, May 30, 2013, ECF No. 8; Certificate of Mailing, June 3, 2013, ECF No. 10);

- Sending the required service documents in English and French—via DHL mail service as well as registered mail—to the head of the Ministry of Foreign Affairs of the Congo, with signature confirmation of receipt (*see* Status Report, Sept. 4, 2013, ECF No. 13).

Notwithstanding the Ministry of Foreign Affairs' confirmation and undisputed receipt of the required service materials, the Congo failed to appear in the action.  Commisimpex filed an Affidavit in Support of Default (Sept. 10, 2013, ECF No. 14), and on September 11, 2013, the Clerk entered a finding that the Congo was in default (ECF No. 15).  Upon consideration of Commisimpex's Petition to Confirm an Arbitral Award and Motion for a Default Judgment, on September 30, 2013, this Court (Wilkins, J.) entered a Judgment in a Civil Action granting Commisimpex's petition to confirm the 2013 Award (ECF No. 16).  Commisimpex subsequently filed a Proposed Order (Oct. 8, 2013, ECF No. 17) to amend the Judgment to include a calculation of interest up to the present date, as that figure had not been calculated at the time the petition was filed.  Upon further consideration of Commisimpex's submissions, the Court entered the Amended Judgment (*see* Amended Order and Judgment, Oct. 9, 2013, ECF No. 18), which Commisimpex served on the Congo, along with the Clerk's Entry of Default, pursuant to

the FSIA, 28 U.S.C. § 1608(a)(3) and (e).  *See* Aff. of Foreign Mailing, Nov. 4, 2013, ECF Nos.

19 and 20; Vasquez Decl. ¶ 12, Ex. 10.

## II.    ON NUMEROUS OTHER OCCASIONS IN CONNECTION WITH THE PARTIES' LONG-RUNNING DISPUTES, THE CONGO HAS ACCEPTED SERVICE OF PROCESS AT ITS MINISTRY OF FOREIGN AFFAIRS

As noted, these proceedings are part of Commisimpex's longstanding, global efforts to

hold the Congo accountable for its breaches of hundreds of millions of dollars in payment

obligations.  In addition to its efforts to enforce the 2013 Award, Commisimpex also has pursued

numerous confirmation and enforcement actions in connection with the earlier 2000 Award.

Polkinghorne Decl. II ¶ 21; Vasquez Decl. ¶¶ 4, 6; Genet Decl. ¶ 2.  In ***each and every one*** of

these proceedings, Commisimpex served process on the Congo in compliance with the relevant

rules of the jurisdiction, through delivery of documents to the Congolese Ministry of Foreign

Affairs.

- In 2009, Commisimpex sought recognition of the 2000 Award in the High Court of Justice in London, England.  Vasquez Decl. ¶ 3, Ex. 1 (Higham Decl. ¶ 2). Commisimpex served the Congo by delivering documents to the Congolese Ministry of Foreign Affairs.  Vasquez Decl. ¶ 4, Ex. 1 (Higham Decl. ¶ 11). The Congo did not contest this action, and the English court entered a judgment confirming and enforcing the 2000 Award in England.

- In 2012, Commisimpex petitioned to recognize the English Judgment in the United States.  That action was filed in the U.S. District Court for the Southern District of New York and later transferred to the District Court for the District of Columbia.  Vasquez Decl. ¶¶ 6, 7.  Commisimpex served the Congo in that action ***in the same manner as in this case***—*i.e.* by delivery of documents to the Congo's Ministry of Foreign Affairs in accordance with the FSIA, 28 U.S.C. § 1608(a)(3).  Vasquez Decl. ¶ 6, Ex. 2.  The Congo raised several objections to enforcement of the English judgment, but did not contest the method of service of process.  Vasquez Decl. ¶ 7.  That action remains pending.

- Commisimpex also obtained recognition of the 2000 Award in Belgium in 2009-2010 and in Sweden in 2012.  Polkinghorne Decl. II ¶ 21.  In the Swedish action, the Congo was served process via delivery of documents to its Ministry of Foreign Affairs and did not contest the method of service.  *Id.*  In the Belgian action, the Congolese Ministry of Foreign Affairs, in fact, confirmed via diplomatic note that it was in receipt of service from a Belgian bailiff in the matter against Commisimpex.  *Id.*, Ex.10.  In the diplomatic

note, the Ministry provided an assurance that "the competent authorities have already been notified" of the dispute with Commisimpex and "further action on this matter will be conveyed in a timely manner." *Id.*, Ex. 10.

▪ In 2011, following recognition of the 2000 Award in France, Commisimpex initiated a series of third-party enforcement actions in France. Genet Decl. ¶ 2. In each of those actions, the Congo was served with the deed of attachment by delivery of documents to the Congolese Ministry of Foreign Affairs. *Id.* ¶ 5. In the first action, the Congo appeared, including to contest that service had not been effected through diplomatic channels to its Ministry of Foreign Affairs. *Id.* ¶ 6, Ex. 2. After Commisimpex provided evidence of service on the Ministry of Foreign Affairs, the Congo dropped this objection, and did not object to service in any of the subsequent enforcement actions.

The Congo has never contested service in any of these actions on the basis that the documents were to be delivered to the Ministry of Finance or *Caisse Congolaise d'Amortissement* ("CCA"), part of the Ministry of Finance, under any alleged "special arrangement" for service. Polkinghorne Decl. II ¶ 22; Vasquez Decl. ¶¶ 6, 7; Genet Decl. ¶ 7. The Congo also has never informed Commisimpex or its counsel that there was a special arrangement for service or a need to serve documents on the Congo by sending them to CCA, rather than the Ministry of Foreign Affairs. Polkinghorne Decl. II ¶ 22; Vasquez Decl. ¶ 8; Genet Decl. ¶ 11. Indeed, after receiving documents at its Ministry of Foreign Affairs, the Congo has never had any difficulty in making an appearance to contest these actions. In fact, this is the sole action in any U.S., English, French or other court where the Congo has claimed that there was a "special arrangement" for service of process.

## III. THE CONGO HAS HAD AMPLE NOTICE OF THIS ACTION, BUT HAS NOT ACTED IN GOOD FAITH

In addition to effecting service of process in compliance with the requirements of 28 U.S.C. § 1608(a), Commisimpex also dispatched—on five different occasions—copies of subsequent documents filed in the present case to the Congolese Ministry of Foreign Affairs. Vasquez Decl. ¶ 12. In each instance, Commisimpex sent the documents via DHL mailing requiring a signed receipt. *Id.* Each of these mailings was received and signed for at the

Ministry of Foreign Affairs.  *Id.*, Exs. 6-10.  Nonetheless, the Congo failed to acknowledge any of them, and instead now contends that its Ministry of Foreign Affairs is unable to process receipt of legal documents (Mot. at 25; Ondongo Decl. at 1, ECF No. 23-21)—contrary to the Ministry's proven ability to do exactly that on numerous other occasions.

In addition to the numerous notices received directly by the Congo, the Congo also has been on notice of this proceeding—and the Amended Judgment—because the Amended Judgment is the subject of a separate enforcement action initiated in June 2014 in the Southern District of New York.  Vasquez Decl. ¶ 13.  The Congo's then-counsel Cleary Gottlieb Steen & Hamilton LLP has been actively participating in that New York Action, and indeed, responded with objections to a subpoena related to the Amended Judgment on July 17, 2014.[3]  *Id.* ¶ 14, Ex. 12.  Over several months, the Congo's attorneys from Cleary Gottlieb also corresponded with attorneys for Commisimpex directly about this action pertaining to the Amended Judgment. Vasquez Decl. ¶¶ 14-16, Exs. 12-14.

There should be no doubt that—following Commisimpex's service of process and courtesy delivery of additional materials to the Congo, as well as the Congo's active defense of the related New York action and attendant correspondence with counsel—the Congo has received ample notice of this proceeding.  Nevertheless, the Congo waited 15 months from initial service, and 11 months and 15 days from entry of the Amended Judgment to bring its motion to vacate.  Ironically, the Congo argues as part of its belated motion that Commisimpex's actions somehow lacked "professional courtesy."  Mot. at 31.

---

[3] In the New York enforcement action, Cleary Gottlieb is representing BNP Paribas-New York Branch, a third-party bank that may be holding Congolese funds.  Vasquez Decl. ¶ 14.  Notwithstanding Cleary Gottlieb's recent withdrawal in proceedings to enforce the English judgment (Morag Decl. ¶ 5, n.1), Cleary Gottlieb's dual-representation of both the Congo and BNP gives rise to an apparent conflict of interest.  Though Commisimpex requested that Cleary Gottlieb withdraw as BNP's counsel in the enforcement action due to a "potential, if not an actual conflict of interest," Cleary Gottlieb has refused.  Vasquez Decl. ¶¶ 15-16, Exs. 13, 14.

In reality, the Congo and its counsel have repeatedly failed to extend professional courtesy to Commisimpex, including by failing to notify Commisimpex's counsel, White & Case, of both the Congo's action to set aside the 2013 Award in France and its appeal to the French Court of Cassation in the set-aside action regarding the Award on Jurisdiction. Polkinghorne Decl. II ¶ 23. In both instances, Commisimpex's counsel learned of the filings at least a month after they were filed. *Id.*

Indeed, the Congo's conduct in attempting to avoid its debts in U.S. courts has resulted in sanctions in the past. In *Kensington Int'l Ltd. v. Republic of Congo*, No. 03 Civ. 4578(LAP), 2007 WL 2456993 (S.D.N.Y. Aug. 24, 2007), an enforcement proceeding, the Congo's longstanding counsel, including the same attorney that represented the Congo in the ICC arbitrations and other actions to enforce the 2000 and 2013 Awards, was sanctioned by a U.S. federal court for inappropriately contacting a witness and attempting to persuade him not to attend a deposition. The court found that "the record is clear that, in forgoing the legal means at its disposal for postponing or defining the terms of the deposition, Cleary made a choice to achieve its goals through illegitimate means." *Id.* at *7. Although the Congo has recently switched counsel for this action, the Congo's longstanding counsel continues to represent the Congo in other actions relating to the 2013 Award. Polkinghorne Decl. II ¶ 23; *see also supra* note 3.

## IV. THE CONGO ILLEGITIMATELY MANUFACTURED "LIQUIDATION PROCEEDINGS" AND TAX ASSESSMENTS TO INTERFERE WITH THE ARBITRATION AND PENDING ENFORCEMENT ACTIONS

In addition to the foregoing indicia of bad faith, on September 26, 2012, while Commisimpex was involved in multiple proceedings in France to enforce the 2000 Award and the second arbitration was pending, the Congo's *Caisse Nationale de Sécurité Sociale du Congo* (the Social Security Administration, "CNSS") initiated illegitimate liquidation proceedings

–10–

against Commisimpex in an action in the Brazzaville Commercial Court in the Congo. In support of its accusation, CNSS submitted a one-page document alleging that Commisimpex owed millions of Euros in social payments allegedly due since 1981. Hojeij Decl. ¶¶ 4-5.

Commisimpex had never previously received notice of these allegedly owed payments. *Id.* ¶ 6. The document contained numerous misrepresentations and fabrications, and Commisimpex, though given an extremely limited time to appear and contest the charges, submitted extensive evidence in rebuttal, showing that any payments actually owed had been timely paid. *Id.* ¶¶ 7-8, Ex. 2.

The Brazzaville court ignored due process and moved forward with the proceedings within a matter of days. The Brazzaville court ignored Commisimpex's evidence and issued a judgment declaring Commisimpex insolvent. *Id.* ¶¶ 10-11, Ex. 4. Though Commisimpex brought criminal charges alleging that these proceedings were fraudulent, the Brazzaville court also ignored those pending allegations; normal procedure would have required a stay of the commercial proceedings while the criminal proceedings were resolved. *Id.* ¶¶ 9-10. Instead, the Brazzaville court ordered the liquidation of Commisimpex and appointed three liquidators with known connections to Congolese officials. On appeal, the judgment was upheld and an oversight liquidator was appointed, who shortly thereafter received a prestigious promotion by the Congolese government. *Id.* ¶ 13.

Commisimpex immediately brought this illegitimate insolvency action to the attention of the arbitral tribunal, but the Congo did not act to maintain the status quo, despite the tribunal's orders to do so. Polkinghorne Decl. II ¶¶ 7-11. After the parties were given the opportunity to comment, the tribunal held in its 2013 Award that recognizing the consequences of the liquidation would "not comply with the requirements of international public policy." *Id.* ¶ 16

(quoting 2013 Award ¶ 222). The tribunal held that it would not recognize the liquidation of Commisimpex, and further noted "the lack of standing of the liquidators appointed to represent Commisimpex in this arbitral proceeding." *Id.* (quoting 2013 Award ¶ 223). The Paris Court of Appeal agreed with the tribunal.

Meanwhile, in an enforcement proceeding in France, the Congo joined the liquidators, who took the side of the Congo objecting to the attachment. Genet Decl. ¶ 14. Notably, the French enforcement court held that the liquidators did not have the power to represent Commisimpex in France. *Id.* ¶ 17.

The Congo has also baselessly attacked Commisimpex by lodging an illegitimate tax claim against it for over $1.7 *billion*—a sum that, incredibly, is based largely on Commisimpex's holding of the arbitral awards that the Congo refuses to pay, and for tax years before the 2013 Award was even rendered. Hojeij Decl. ¶ 17. Commisimpex is also fighting these baseless charges in the Congo.

## ARGUMENT

The Congo seeks to vacate the Amended Judgment under Rule 60(b) on the alleged bases that the Judgment is "void" for lack of jurisdiction, and that the Congo's lengthy delay in appearing in this case constitutes "excusable neglect." Mot. at 10-11. A "motion under Rule 60(b) seeks an extraordinary remedy," as "[t]he framers of Rule 60(b) set a higher value on the social interest in the finality of litigation." *Merit Ins. Co. v. Leatherby Ins. Co*., 714 F.2d 673, 682 (7th Cir. 1983) (Posner, J.). Further, "the party seeking to invoke [Rule 60(b)] bears the burden of establishing that its prerequisites are satisfied." *Gates v. Syrian Arab Republic*, 646 F.3d 1, 5 (D.C. Cir. 2011) (internal quotation marks omitted) (also noting that the Rule 60(b) burden is a "heavy" one). Vacating judgments confirming arbitral awards under Rule 60(b) disturbs unnecessarily the finality of such proceedings. *See, e.g. Karaha Bodas Co. v.*

*Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 264 F. Supp. 2d 490, 501 (S.D. Tex. 2003) (where an award had been confirmed in the primary jurisdiction, "[t]he interests of finality and comity are best served by enforcing this Court's Final Judgment confirming the Arbitral Award"), *aff'd*, 364 F.3d 274, 310 (5th Cir. 2004).  For the reasons discussed below, this Court should not disrupt the finality of the Amended Judgment and should deny the Congo's motion.

## I. COURTS ROUTINELY UPHOLD DEFAULT JUDGMENTS, INCLUDING JUDGMENTS RENDERED AGAINST FOREIGN SOVEREIGNS AND JUDGMENTS CONFIRMING FOREIGN ARBITRAL AWARDS

The Congo argues that default judgments, particularly against foreign sovereigns, are disfavored because sovereigns have a unique interest in asserting defenses under the FSIA, and because "a resolution on the merits is preferable."  Mot. at 11-12 (quoting *FG Hemisphere Assocs. v. Democratic Republic of Congo*, 447 F.3d 835, 839 (D.C. Cir. 2006)).  The Congo is wrong, however, to suggest that its status as a sovereign entitles it to special favor with respect to default judgments.  As the D.C. Circuit has ruled, foreign sovereigns bear the same "heavy" burden as any other movant under Rule 60(b).  *See Gates v. Syrian Arab Republic*, 646 F.3d 1, 5 (D.C. Cir. 2011) (holding that, because Syria was not immune under the FSIA, "no principle of sovereign immunity law upsets the parties' respective burdens under Rule 60(b)").  Accordingly, courts repeatedly have upheld default judgments against sovereign states on Rule 60(b) motions. *See, e.g.*, *Gates*, 646 F.3d at 5 (D.C. Cir. 2011); *Meadows v. Dominican Republic,* 817 F.2d 517, 522 (9th Cir. 1987).

The Congo's arguments with respect to "a resolution on the merits" are equally unavailing.  The Congo's Motion almost entirely ignores the nature of this particular proceeding—namely, that the Amended Judgment arose from a routine action to confirm a valid foreign arbitral award under the New York Convention.  Because "the New York Convention provides only several narrow circumstances when a court may deny confirmation of an arbitral

award, ***confirmation proceedings are generally summary in nature***." *Int'l Trading & Indus. Inv. Co. v. DynCorp Aerospace Tech.*, 763 F. Supp. 2d 12, 20 (D.D.C. 2011) (emphasis added) (citing *Zeiler v. Deitsch*, 500 F.3d 157, 169 (2d Cir. 2007)).  In fact, "[c]onsistent with the 'emphatic federal policy in favor of arbitral dispute resolution' recognized by the Supreme Court," the district court has "little discretion in refusing or deferring enforcement of foreign arbitral awards" before entering judgment.  *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 727 (D.C. Cir. 2012) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 631 (1985)).  There is thus little meaningful difference between the summary proceedings to confirm arbitral awards when a respondent appears in a timely manner and when it does not.

Accordingly, courts routinely uphold judgments based on foreign arbitral awards, including judgments against foreign sovereigns.  *See, e.g.*, *Budejovicky Budvar, N.P. v. Czech Beer Imps., Inc.*, Case No. 3:05cv1246 (JBA), 2006 WL 1980308 (D. Conn. July 10, 2006) (upholding default judgment confirming New York Convention award); *Int'l Ins. Co. v. Caja Nacional de Ahorro y Seguro*, No. 00 C 6703, 2001 WL 1516730 (N.D. Ill. Nov. 28, 2001) (same); *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 310 (5th Cir. 2004) (upholding judgment confirming New York Convention award against foreign sovereign).  In any event, it would be futile in this case to vacate the Amended Judgment merely to conduct summary proceedings involving limited defenses to confirmation of the Award that the Congo cannot satisfy.  *See infra* Section V.A.

## II. THE COURT PROPERLY EXERCISED PERSONAL JURISDICTION OVER THE CONGO, BECAUSE THE CONGO WAS SERVED AS REQUIRED UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT

Where a plaintiff has satisfied the service of process requirements of the FSIA and the court has subject-matter jurisdiction, it is proper for a court to exercise personal jurisdiction over

a foreign sovereign.  *See, e.g., TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 303 (D.C. Cir. 2005).  To satisfy the FSIA service requirements under 28 U.S.C. § 1608, a plaintiff must first "attempt service by the first method" listed under 28 U.S.C. § 1608(a) or "determine that [the method] is unavailable" before proceeding to the subsequent methods of service.  *Angellino v. Al-Saud*, 681 F.3d 463, 465 (D.C. Cir. 2012) (internal quotation marks omitted).

Here, Commisimpex did exactly that.  Following the requirements of § 1608(a), Commisimpex first determined (1) that there was no applicable special arrangement for service between the parties, and (2) that there was no applicable international convention on service of judicial documents.  *See* Vasquez Decl. ¶ 10.  In accordance with the FSIA's third method of service, Commisimpex then sent a copy of the summons and the petition and a notice of suit, together with a translation of each into French, the official language of the Congo, to Basile Ikouébé, head of the Congo's Ministry of Foreign Affairs.  *Id.*  Commisimpex directed the clerk of the Court to send the documents via international commercial carrier DHL, by a form of delivery requiring a signed receipt.  *Id.* Commisimpex also directed the clerk of the Court to send the documents by registered mail requiring a signed return receipt.  *Id.*  After the documents were sent, Commisimpex tracked their delivery on the DHL tracking website and obtained the digital records confirming that the documents were received and signed for.  *Id.* ¶ 11.  Commisimpex filed the DHL tracking log, which indicated that the documents were received at the Ministry of Foreign Affairs and signed for by "MPIO J Paul," thereby completing the FSIA requirements for service.  *Id.* ¶ 11; Return of Service, August 28, 2013, ECF No. 11; *see also* Vasquez Decl., Ex. 5 (DHL proof of delivery dated June 3, 2013).

The Congo has not disputed that the required service documents were delivered to the Congolese Ministry of Foreign Affairs or that it had actual notice of the Petition or the Amended Judgment. *See* Mot. at 17; Ondongo Decl. at 1, ECF No. 23-21. The Congo only contends that the *Ministry of Finance and CCA* never received notice of the package (*see* Ondongo Decl. at 1), even though the Ministry of Foreign Affairs certainly could have forwarded it to these departments quite easily. The Congo also has not disputed that the required service documents were sent via the clerk of the court by DHL and were signed for by an employee at the Ministry of Foreign Affairs, as is evident by the DHL delivery log filed by Commisimpex. *See* Return of Service, ECF No. 11; *see also* Vasquez Decl., Ex. 5.

Accordingly, this Court—which also has subject matter jurisdiction over this matter under 28 U.S.C. §§ 1330 and 1605(a)(6) (providing an exception to sovereign immunity for the enforcement of arbitral awards)—properly exercised personal jurisdiction over the Congo, and should not vacate the Amended Judgment as 'void.' *See Gates v. Syrian Arab Republic*, 646 F. Supp. 2d 79, 91 (D.D.C. 2009) (denying Rule 60(b) motion to vacate a default judgment where service of process had been effected and the court, therefore, had personal jurisdiction over a sovereign defendant), *aff'd*, 646 F.3d 1 (D.C. Cir. 2011).

### A.    There Is No Special Arrangement for Service Between Commisimpex and the Congo

The Congo contends that, instead of delivery to the Ministry of Foreign Affairs under the FSIA's third method of service, Commisimpex was required to serve Defendant pursuant to an alleged special arrangement for service outlined in the 1992 Protocol. Mot. at 15-17. Specifically, according to the Congo, Commisimpex was required to mail the service documents not to the Ministry of Foreign Affairs but to the address for CCA, a party to the 2000 Award. Mot. at 16.

–16–

The Congo's contention that there was a "special arrangement" is incorrect—and specious—for several reasons.  First, there is no basis for extending a service provision of the 1992 Protocol to the present dispute.  In its Award on Jurisdiction in the underlying arbitration, the arbitral tribunal held that the agreement to arbitrate found in the 1992 Protocol extended to the current dispute because, it reasoned, the 1992 Protocol and the 2003 Protocol formed one "group of contracts" for the purposes of analyzing the jurisdiction of the tribunal.  *See* Polkinghorne Decl. II ¶ 3.  The tribunal did not find, however, that other aspects of the 1992 Protocol applied to Commisimpex's claims.  Rather, the tribunal found that Commisimpex's claims against the Congo arose under the 2003 Protocol between Commisimpex and the Congo, to which CCA was not a party.  *Id*. ¶ 4.  Thus, the tribunal rejected the Congo's res judicata arguments related to the 2000 Award (based on the 1992 Protocol), which sought to equate the two Protocols as one.  *Id.*; *see also* French Judgment at 3.  The 2003 Protocol was the basis for the tribunal's Final Award that was confirmed by this Court in the judgment the Congo now seeks to vacate.  *See* Pet. to Confirm Arbitral Award, ECF No. 1; Polkinghorne Decl. I ¶ 4. There is nothing in the 2003 Protocol that suggests a special arrangement for service of process in this matter.  Nor is CCA a party to this action.

Second, the Congo's newly minted position is belied by the fact that it has never contended that the 1992 Protocol should be construed as a special arrangement for service in an enforcement action, and that no court has ever construed it that way.  For over a decade, Commisimpex and the Congo have been parties to numerous legal proceedings in several countries as Commisimpex has attempted to collect on the enormous debts that the Congo refuses to pay.  In several of these proceedings, the Congo has advanced various objections, largely unsuccessful, to Commisimpex's attempts at service of process.  If the clause in the 1992

Protocol was to be construed as a special arrangement for service, surely the Congo, in its "extensive history" of contested litigation with Commisimpex (Mot. at 26) would have made Commisimpex aware of it by asserting it as a defense, or otherwise.  But never once prior to its filing of the Motion to Vacate had the Congo contended, or even mentioned, a special arrangement for service requiring the transmission of all service documents to CCA.  *See* Genet Decl. ¶ 11; Polkinghorne Decl. II ¶ 22; Vasquez Decl. ¶¶ 6, 8.

Most notably, in the U.S. proceedings to recognize the English Judgment (connected with the 2000 Award) that are currently pending before this court (Lamberth, J.), service on the Congo was effected ***exactly*** as it was in the present case, pursuant to 28 U.S.C. §1608(a)(3) with delivery of documents to the Congo's Ministry of Foreign Affairs.  The Congo did not contest that method of service on the Congo in that case.  Vasquez Decl. ¶ 6.  In an attempt to avoid this reality, the Congo flatly misrepresents how that service was made.  Contrary to Congo's assertion (*see* Mot. at 17 n.14), Commisimpex was not following a special arrangement for service when it mailed service documents to CCA in the U.S. proceedings to recognize the English judgment.  And, unlike this action, CCA was a ***named party*** in the English Judgment action, as well as a party to the 2000 Award.  Therefore, in that proceeding, the Congo was served by delivery of documents to its Ministry of Foreign Affairs under § 1608(a)(3), while CCA was served ***separately*** with documents at its respective address.  *See* Vasquez Decl. ¶ 6, Exs. 2, 3.  Thus, the Congo was ***not*** served, as it now contends, "via the Caisse Congolaise in accordance with this 'special arrangement.'"  Mot. at 16-17.

In fact, the Congo has always been served through its Ministry of Foreign Affairs, and has always accepted that method of service.  Mr. Jacques-Alexandre Genet, counsel for Commisimpex in actions in France to enforce the 2000 arbitral award, has served process on the

Congo on behalf of Commisimpex dozens of times. *See* Genet Decl. ¶¶ 2, 9. As Mr. Genet describes, on numerous occasions, he caused documents to be served on the Congo's Ministry of Foreign Affairs, because service under French law "is considered effective once it reaches the Ministry of Foreign Affairs of the foreign State." *Id.* ¶ 4. In the only proceeding Mr. Genet initiated in which the Congo objected to the service of process, the Congo's *only* argument as to service was that Commisimpex had not completed service of process "pursuant to the diplomatic channels, *i.e.* delivery of the relevant documents to their Ministry of Foreign Affairs." *Id.* ¶ 6. The Congo then dropped its objection after Commisimpex provided evidence that service had been effected on the Ministry of Foreign Affairs. *Id.* ¶ 8. As explained in Section II.B, *infra*, the Congo is therefore estopped from denying its *own* legal argument that service *must* be made on the Ministry of Foreign Affairs; hiring new counsel to make the opposite argument cannot change that outcome.

Moreover, Mr. Genet has properly continued to serve the Congo in third-party enforcement actions by diplomatic channels resulting in delivery of documents to the Congo's Ministry of Foreign Affairs. *Id.* ¶ 9. Significantly, the Congo has appeared to contest each of those enforcement actions (on non-service-related bases), as the Congo readily admits (*see* Mot. at 26), but it has never once referenced a special arrangement for service or a need to deliver the service documents to CCA. As Mr. Genet describes, it is simply implausible for the Congo to now suggest that its Ministry of Foreign Affairs is not aware of what to do with legal documents it receives, particularly with respect to documents involving Commisimpex, when the Congo regularly appears in legal proceedings after receiving documents there. *See* Genet Decl. ¶ 12.

The Congo has also failed to assert the existence of a special arrangement for service in other proceedings involving Commisimpex:

- In English proceedings to enforce the 2000 arbitral award, service on *both* CCA and the Congo itself was accomplished through diplomatic channels by delivery of documents to the Congolese Ministry of Foreign Affairs. Vasquez Decl. ¶ 4, Ex. 1 (Higham Decl. ¶ 11). When the Congo later argued that the English Court lacked personal jurisdiction over the Congo, *see* Vasquez Decl. ¶ 7, Ex. 4 (Congo's Opp. to Summ. J. at 35-38), the Congo did not contend that the service of process had been defective, or that there was a "special arrangement" for service.

- In proceedings in Sweden to enforce the 2000 arbitral award, the Congo was served process through transmission of documents to its Ministry of Foreign Affairs. *See* Polkinghorne Decl. II ¶ 21. In a Belgian action to enforce the award, the Congolese Ministry of Foreign Affairs, in fact, confirmed receipt of service documents via diplomatic note, in which the Ministry provided an assurance that "the competent authorities have already been notified" of the dispute with Commisimpex and "further action on this matter will be conveyed in a timely manner." *Id.*, Ex. 10. The Congo did not contest the method of service in either of those actions. *Id.* ¶ 21.

### B.    The Congo Is Legally Estopped from Asserting the Existence of an Alleged Special Arrangement for Service

Raising the allegation of a "special arrangement" at this late date is consistent with the Congo's history of deploying delay tactics to avoid paying its debts. *See* Polkinghorne Decl. II ¶ 22. But even if the clause that the Congo points to in the 1992 Protocol could be construed as a special arrangement for service—when it never has been applied as such—principles of equitable estoppel require the Court to find that Commisimpex need not deviate from its established practice of transmitting service documents against the Congo to the Congo's Ministry of Foreign Affairs.

The doctrine of equitable estoppel is "applied to preclude a party from contradicting testimony or pleadings successfully maintained in a prior judicial proceeding." *Konstantinidis v. Chen*, 626 F.2d 933, 937 (D.C. Cir. 1980). The party invoking estoppel "must have been an adverse party in the prior proceeding, must have acted in reliance upon his opponent's prior position, and must now face injury if a court were to permit his opponent to change positions." *Id.*; *see also Moore v. Blue Cross & Blue Shield of Nat'l Capital Area*, 70 F. Supp. 2d 9, 31 (D.D.C. 1999) (outlining five elements of a successful estoppel claim). The point of the estoppel

–20–

doctrine "is to prevent the unconscientious and inequitable assertion or enforcement of claims or rights which might have existed or been enforceable by other rules of law, unless prevented by the estoppel." *Konstantinidis*, 626 F.2d at 937 (quoting 3 *Pomeroy's Equity Jurisprudence* § 802 (5th ed. 1941)); *see also Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 294 (5th Cir. 2004) ("The policies underlying the doctrine [of estoppel] include preventing internal inconsistency, precluding litigants from 'playing fast and loose' with the courts, and prohibiting parties from deliberately changing positions according to the exigencies of the moment."). Notably, "it is not essential . . . that the party sought to be estopped should have had an actual intent to deceive, defraud, or mislead. Nor is it essential that the representation or conduct relied upon be motivated by actual malice." *Moore,* 70 F. Supp. 2d at 31.

As noted, the Congo for years contended that the "only" effective way for it to be served was via its Ministry of Foreign Affairs. *See* Genet Decl. ¶ 7. The Congo never once argued that there was a special arrangement requiring Commisimpex to transmit documents to CCA. In reliance upon that understanding, Commisimpex served the Congo as it had numerous times in the past—by transmitting the required documents by the statutorily required methods to the Congo's Ministry of Foreign Affairs. *See* Vasquez Decl. ¶¶ 6, 10. To hold now that there was a special arrangement—that Commisimpex and its counsel should have somehow known about after years of the Congo making arguments explicitly to the contrary—would significantly prejudice Commisimpex in this action. The Congo's shifting arguments highlight the vast inconsistency between its past practice and the arguments of its past counsel, and what it claims, manufactured of whole cloth, through new counsel. The Congo cannot justly be allowed to argue that it must be served via a special arrangement when it has never done so before. The

–21–

Congo is playing "fast and loose" with this Court, *Karaha Bodas*, 364 F.3d at 294, and therefore should be estopped from arguing that a special arrangement governed service in this case.

### C.    Commisimpex's Service Upon the Congo's Ministry of Foreign Affairs Was Proper and Effective Under the Specific Requirements of 28 U.S.C. § 1608(a)(3)

Commisimpex properly served the Congo by transmitting the required documents, translated into French, from the Clerk of Court to the head of the Congo's Ministry of Foreign Affairs by DHL service requiring a signed return receipt. As indicated by the DHL tracking log, the documents were received and signed for at the Ministry of Foreign Affairs, providing the Congo with notice of the petition and completing the requirements for service under 28 U.S.C. §1608(a)(3).

Aside from claims of a "special arrangement" for service, the Congo's sole argument against the efficacy of this service is that the ***method*** of mailing service selected by Commisimpex was not a "'form of mail requiring a signed receipt' as the [FSIA] requires" and Commisimpex "failed to use a 'form of mail requiring a signed receipt' of delivery as §1608(a)(3) requires." Mot. at 18. Specifically, the Congo contends that Commisimpex should have to supply a digital image of the signature in order to demonstrate that the form of mail service selected by Commisimpex was a form of mail requiring a signed receipt. *Id.*

The Congo is simply incorrect. First, on a Rule 60(b) motion, it is the defendant's burden to demonstrate that any of the statutory requirements for service were not satisfied. *See Gates v. Syrian Arab Republic*, 646 F. Supp. 2d 79, 86 (D.D.C. 2009) (holding that "affidavits or testimony to the Court" would be required from defendant on a Rule 60(b) motion to show that service was never completed), *aff'd*, 646 F.3d 1 (D.C. Cir. 2011). "Speculation and lawyer's argument" will not be sufficient. *Id.* Therefore, to sustain its assertion of imperfect service, the

Congo must provide actual evidence showing that Commisimpex failed to use a form of mail requiring a signature. This, the Congo has not done and cannot do.

Second, Commisimpex already provided evidence that it used a DHL mail service requiring signature for delivery in the form of the DHL tracking log indicating the name of the person at the Ministry of Foreign Affairs who signed for receipt. *See* Return of Service, Aug. 28, 2013, ECF No. 11; Status Report, Sept. 4, 2013, ECF No. 13. Such tracking logs are regularly accepted by this Court as proof of service on foreign sovereign defendants. *See, e.g.*, *Gates*, 646 F. Supp. 2d at 86-87. The DHL "proof of delivery" document referred to by the Congo (*see* Mot. at 18) includes no information additional to what was available on the DHL tracking log (*see* Vasquez Decl., Ex. 5), and, in any event, the tracking log was sufficient to show both completion of delivery and that a signature was required and obtained.

Contrary to the Congo's argument, there is nothing in the statute or the case law indicating that an ***image*** of the signature is required to show that the chosen form of mail delivery service complied with the FSIA. The statute only requires a returned postal receipt, "or other proof of service applicable to the method employed." 28 U.S.C. § 1608(c)(2). In an attempt to support its contention, the Congo relies on the case *Abur v. Republic of Sudan*, 437 F. Supp. 2d 166 (D.D.C. 2006) (*see* Mot. at 18), in which the plaintiff's submission of copies of actual signatures was found to be "of equal or greater significance" to establishing that service had been *completed*, *i.e.*, received and signed for at the relevant particular Ministries of Foreign Affairs. In that case, the court recognized that the signatures constituted sufficient evidence that defendants Sudan and Iran had received service by mail delivery under §1608(a)(3). 437 F. Supp. 2d at 173. The court in *Abur* did not hold, however, that images of signatures are necessary to demonstrate that service by mail has been completed. More to the point, the court

–23–

certainly did not hold that images of signatures are required for demonstrating that the form of mail selected satisfies §1608(a)(3).

The Congo provides no plausible basis for suggesting that the form of mail selected by Commisimpex was not a form of mail requiring a signed receipt. Commisimpex properly served the Congo following the requirements of §1608(a)(3), and consequently, the Court properly exercised personal jurisdiction over Defendant.

## III.    THE COURT PROPERLY EXERCISED SUBJECT MATTER JURISDICTION IN RECOGNIZING THE AWARD

The Congo contends that Commisimpex lacks standing to enforce Commisimpex's arbitral award. As discussed above (*see supra* Counter-Statement of Facts), the Congo's argument is based on a cynical ploy of "liquidation proceedings" in the Congo to substitute "liquidators" for Commisimpex's rightful owners, and thereby avoid all of its liabilities to Commisimpex. *See* Mot. at 19-22. This tactic is legally improper and cannot be allowed for the reasons discussed below.

### A.    Standing Is a Prudential Question and There Is No Question that Commisimpex Has Been Injured in Fact

The Congo's argument must fail at the outset because it misapprehends the "standing" necessary to sustain a lawsuit. The Congo inappropriately conflates Article III standing—an issue that uncontroversially implicates subject-matter jurisdiction—and the "real party in interest" or prudential standing. *See Warth v. Seldin*, 422 U.S. 490, 498-500 (1975) (distinguishing the two); *Whelan v. Abell*, 953 F.2d 663, 672 (D.C. Cir. 1992) (same). As the Congo itself recognized, identifying the real party in interest is a "procedural issue," implicating Federal Rule of Civil Procedure 17(a)(3). *See* Mot. at 32.

Contrary to the Congo's contention (Mot. at 19), prudential standing does not implicate the Court's subject matter jurisdiction. As the D.C. District Court recently noted, "[the D.C.]

–24–

Circuit historically treated prudential standing as a 'jurisdictional concept.' . . . The Supreme Court recently abrogated that Circuit precedent by clarifying that the zone of interest [non-Article III standing] inquiry 'does not implicate subject matter jurisdiction.'" *Permapost Prods. v. McHugh*, No. 13–1736(ESH), 2014 WL 3056506, at *7 n.4 (D.D.C. July 7, 2014) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 n. 4 (2014)); *see also Niemi v. Lasshofer*, No. 13-1256, 2014 WL 5579479, at *8 (10th Cir. Nov. 4, 2014) ("[Defendants] are incorrect when they contend that lack of [non-Article III] standing implicates subject-matter jurisdiction.") (citing *Lexmark*, 134 S. Ct. at 1387 n. 4).  Thus, a default judgment is not 'void' for the plaintiff's lack of prudential standing; indeed, courts have upheld default judgments in the face of prudential standing challenges.  *See, e.g.*, *Grayson v. Hsin*, 413 F. App'x 596, 598 (4th Cir. 2011) (per curiam) (noting that defendant's "argument relates to the doctrine of prudential standing, not Article III standing [and a]ccordingly, we do not consider the merits of this argument in deciding whether to set aside the default judgment").

There is no doubt that Commisimpex suffered an injury in fact—*i.e.* a valid arbitral award confirmed by a French court that has not been satisfied—and therefore satisfies Article III standing.  *See, e.g.*, *Fitzpatrick Int'l Ltd. v. Republic of Equatorial Guinea*, Civil Action No. H-12-1300, 2013 WL 5964560, at *4-7 (S.D. Tex. Nov. 7, 2013) (indicating that the owner of a New York Convention award has standing to bring an action to confirm it).  Thus, the Court properly had subject-matter jurisdiction to enter the Amended Judgment on Commisimpex's petition to confirm the arbitral award.  This in turn means the Court need not even address the Congo's attempts to avoid liability through an illegitimate and unenforceable "liquidation" proceeding.

**B.    Commisimpex Was the Proper Party to Bring This Action**

In any event, whether viewed as a procedural question or one of actual standing, Commisimpex was the real party in interest for this action to confirm Commisimpex's arbitral award.  The burden of demonstrating the real party in interest lies on the party asserting that a different party was the proper party to bring the case.  *See, e.g.*, *Fitzpatrick Int'l*, 2013 WL 5964560, at *6 (citing *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 288 (5th Cir. 2004) (finding that, on a motion to dismiss an action confirming an arbitral award for an alleged lack of standing, the burden of proof lies with the movant challenging enforcement of the award); *see also* 364 F.3d at 288 ("The party defending against enforcement of the arbitral award bears the burden of proof.").  Here, the Congo has failed to demonstrate that the liquidators are the real party in interest—or that Commisimpex is not—because the Congo has relied exclusively on the fraudulent, illegitimate orders and decrees of the Brazzaville Commercial Court and Brazzaville Court of Appeal.  Given the specious nature of these orders, they cannot carry the Congo's burden of demonstrating that Commisimpex was not the proper party.  Moreover, accepting the Congo's argument here requires this Court to recognize these fraudulently-procured Congolese orders—***none of which has been recognized by any court or tribunal outside of the Congo***—and to afford comity to the Congolese judicial system, which is unprecedented in any U.S. court.

Comity is a matter of judicial discretion.  *See Int'l Trading & Indus. Inv. Co. v. DynCorp. Aerospace Tech.*, 763 F. Supp. 2d 12, 20 (D.D.C. 2011) ("[A]ffording comity to foreign judgments is not mandatory[.]"); *see also United States v. Nippon Paper Inds.*, 109 F.3d 1, 8 (1st Cir. 1997) ("Comity is more an aspiration than a fixed rule, more a matter of grace than a matter of obligation.").  Courts will not grant comity to the judgment of a foreign country's court unless:

there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect . . . .

*Tahan v. Hodgson*, 662 F.2d 862, 864 (D.C. Cir. 1981) (quoting *Hilton v. Guyot*, 159 U.S. 113, 202 (1895)).  The Congolese court orders at issue clearly fail to satisfy this standard and should not be recognized by this Court.

1.    **The Orders of the Brazzaville Courts Are Illegitimate Because They Were Irregular and Did Not Afford Commisimpex Due Process and an Adequate Opportunity to Defend Itself**

The Congo, through its social security administration, *Caisse Nationale de Sécurité Sociale du Congo* ("CNSS"), initiated liquidation proceedings against Commisimpex suddenly and without warning in September 2012, while several actions to enforce the 2000 Award were pending and the parties were awaiting a final award from the arbitral tribunal in the second arbitration.  *See* Polkinghorne Decl. II ¶¶ 5-6; Hojeij Decl. ¶ 4.  The ostensible basis for the action was the alleged failure of Commisimpex to make social tax payments on employees, dating back to 1981.  This was likely the first time a Congolese agency had ever initiated an involuntary liquidation of a private company doing business in the Congo.  Hojeij Decl. ¶ 16.

The baselessness of CNSS's petition was apparent on its face—CNSS submitted a one-page document with no supporting evidence, and the allegations covered time periods in which Commisimpex did not even have employees operating in the Congo.  *See* Polkinghorne Decl. II ¶ 5; Hojeij Decl. ¶¶ 5-7.  Moreover, CNSS had never, in over *30 years* during which payments were allegedly owed, previously sent any notices to Commisimpex regarding outstanding

payments, electing instead to initiate legal proceedings conveniently timed to potentially thwart the arbitration when an award was imminent.  Hojeij Decl. ¶ 6.

The liquidation proceedings moved forward with a speed unusual for any judicial system, let alone the Congo, creating undue obstacles for Commisimpex to appear at the hearings and procure evidence in support of its case.  Hojeij Decl. ¶ 12; Polkinghorne Decl. II ¶¶ 6, 11. Furthermore, although the arbitral tribunal had ordered the parties to maintain the status quo while the award was pending, the Congo failed to require CNSS to delay or slow the proceedings.  Polkinghorne Decl. II ¶¶ 9-10.  Nevertheless, Commisimpex produced extensive evidence including bank statements, checks, and payment slips dating back 30 years and covering each year of the relevant period, all of which demonstrated that it did not owe any outstanding social security payments.  Hojeij Decl. ¶ 8.

Disregarding the evidence, the Brazzaville court issued a judgment just a month after the proceedings were initiated.  The court found that Commisimpex's evidence was unpersuasive, even though CNSS had produced no evidence beyond the one-page document signed by its own employee in support of its own position.  Hojeij Decl. ¶ 10.  The court ignored Commisimpex's request for a stay based on a criminal complaint Commisimpex had filed in a separate Brazzaville court alleging fraud by CNSS.  *Id.*  Such a stay would typically have been granted under Congolese procedural rules.  *Id.* ¶ 9.  The court also appointed liquidators with known connections to senior Congolese officials, including one who had been disbarred.  Hojeij Decl. ¶ 11.  The Brazzaville Court of Appeals confirmed the decision of the lower court in May 2013 and appointed an oversight liquidator, who, shortly thereafter, received a prestigious promotion by the Congolese government.  *Id.* ¶ 13.

The arbitral tribunal in Paris—composed of highly sophisticated and experienced international lawyers—quickly recognized the transparently illegitimate nature of the liquidation proceedings.  *See* Polkinghorne Decl. II ¶¶ 14-16.  In the 2013 Award issued shortly thereafter, the tribunal took note of many of the procedural irregularities as well as the suspicious timing of the liquidation action.  It found that "recognizing [the consequences of the liquidation] in this arbitration proceeding would ***not comply with the requirements of international public policy***."  2013 Award, Docket No. 1-4, ¶ 222 (emphasis added).  The tribunal thus held that it would ***not*** recognize the liquidation of Commisimpex, and it further noted "the lack of standing of the liquidators appointed to represent Commisimpex in this arbitral proceeding."  *Id.* ¶ 223.  This 2013 Award just recently has been confirmed by the Paris Court of Appeal.  *See* French Judgment; *see also* Polkinghorne Decl. II ¶ 19.  Indeed, the Court of Appeal's condemnation of the liquidation proceedings is telling (French Judgment at 6):

> By deciding that the compulsory liquidation of COMMISINPEX [sic], the judgment of which was entered, following an expedited procedure, by the commercial court of Brazzaville on October 30, 2012 due to insolvency characterized by a social debt dating from 1981 and a lack of liquid assets resulting from the CONGO's own refusal to execute the award of December 3, 2000, violated the principle of good faith so that the judgment of liquidation had to be regarded as without effect on the arbitration proceeding, and the liquidators without capacity to represent COMMISINPEX [sic], the arbitral tribunal did not incorrectly rule on its jurisdiction[.]

Notably, even in the French court proceedings that have confirmed the award, the liquidator-trustees have not sought to have any court recognize the Congolese judgment, and no French courts have found the liquidators to be eligible to stand in on behalf of Commisimpex.  *See* Polkinghorne Decl. II ¶ 19; Genet Decl. ¶¶ 14-18.

Accordingly, the Congolese orders should not be recognized here either.  *See LG Display Co. v. Obayashi Seikou Co.*, 919 F. Supp. 2d 17, 30-31 (D.D.C. 2013) (noting that a foreign

judgment should be denied comity if it was obtained by fraud or was repugnant to the public

policy of the United States) (citing *Restatement (Third) of Foreign Relations Law* § 482(2)); *see*

*also Transportes Aereos Pegaso, S.A. de C.V. v. Bell Helicopter Textron Inc.,* 623 F. Supp. 2d

518, 538 (D. Del. 2009) (denying recognition to a Mexican judgment on grounds of fraud); *Films*

*By Jove, Inc. v. Berov*, 250 F. Supp. 2d 156, 209, 216 (E.D.N.Y. 2003) (declining to grant comity

to a Russian judgment where the Russian court had been influenced by high-level meetings

"between the executive and judicial branches of the Russian government"); *Corporacion*

*Salvadorena Calzado, S.A. (Corsal, S.A.) v. Injection Footwear Corp.,* 533 F. Supp. 290, 298

(S.D. Fla. 1982) (declining to grant comity to El Salvadoran judgment because the proceedings

and method to notify defendant afforded defendant limited opportunity to be heard).

The Congolese "liquidation proceedings" were rife with classic indicia of fraud: the

suspicious timing of the unusual insolvency action, the lack of evidence provided by CNSS, the

court's failure to acknowledge evidence from Commisimpex, the speed at which proceedings

progressed, and the ultimate appointments of liquidators with known connections to the

government all indicate that the proceedings were merely manufactured to interfere with the

arbitration. Moreover, because of the accelerated pace of the proceedings, Commisimpex was

denied due process in several respects. *See* Polkinghorne Decl. II ¶ 11, Ex. 3 (Brudey Decl.).

Accordingly, recognizing the Congolese court orders in these circumstances would clearly

violate fundamental U.S. public policy. *See Tahan*, 662 F.2d at 864 (internal quotation marks

omitted) (noting that the foreign claim should "not be repugnant to fundamental notions of what

is decent and just" in the United States); *LG Display Co.*, 919 F. Supp. 2d at 31 (internal

quotation marks omitted) ("[A] U.S. [court] *may not* recognize a foreign judgment if the foreign

jurisdiction does not provide impartial tribunals or procedures compatible with due process of law.").

**2.    This Court Should Not Afford Comity to Judgments of the Congolese Courts Because the Congolese Judicial System Is Not Impartial**

Putting aside the specific illegitimate nature of the Congolese liquidation proceedings, United States courts also routinely deny comity to courts in countries where the judicial system is well-recognized to be corrupt and lack impartiality.  *See, e.g.*, *Bridgeway Corp. v. Citibank*, 45 F. Supp. 2d 276, 287 (S.D.N.Y. 1999) (denying recognition to Liberian judgment because the country's judicial system was "barely functioning" and did not provide for "impartial tribunals"); *Osorio v. Dole Food Co.*, 665 F. Supp. 2d 1307, 1347 (S.D. Fla. 2009) (denying recognition to a Nicaraguan judgment where the court found, after looking to State Department Country Reports, that "the evidence is compelling that Nicaragua lacks impartial tribunals"), *aff'd sub nom, Osorio v. Dow Chem. Co.*, 635 F.3d 1277 (11th Cir. 2011).  Here, the Congolese judgments at issue come from a system of jurisprudence widely recognized to be unlikely to afford the impartial administration of justice, especially to citizens of another country, such as the shareholders of Commisimpex.  Both the United States and international organizations have stressed the widespread prevalence of corruption in the Congo and the systemic weaknesses undermining due process in the Congolese courts.

The U.S. State Department has found that the Congolese judiciary "continue[s] to be overburdened, underfunded, poorly organized, and subject to political influence and corruption." *Country Reports on Human Rights Practices for 2013 (Republic of the Congo)*, U.S. Dep't of State, 8 (2013), http://www.state.gov/documents/organization/220314.pdf (Vasquez Decl., Ex. 15).  It noted that government officials at all levels "engaged in corrupt practices with impunity." *Id*. at 17.  In another report, the State Department found that litigants have limited

–31–

recourse in the Congo "as court cases are themselves subject to corruption and political influence." *2014 Investment Climate Statement – Republic of the Congo*, U.S. Dep't of State, 9 (June 2014), http://www.state.gov/documents/organization/227342.pdf (Vasquez Decl., Ex. 16).

Indeed, the United Nations has recently called upon the Congo to work to ensure the independence of its judiciary and step up efforts to align its dom. *See* Rep. of the Working Grp. on the Universal Periodic Rev., 17th sess., Oct. 21-Nov. 1, 2014, ¶¶ 56, 111.68, 111.111, 111.112, 111.115, U.N. Doc. A/HRC/25/16 (Jan. 6, 2014) (Vasquez Decl., Ex. 18).

Consistent with these assessments, counsel for Commisimpex has been unable to locate any federal or state case in the United States where comity was granted to a Congolese order or judgment.   Particularly given the egregious circumstances related to the issuance of the judgments at issue here, this Court should not be the first U.S. court to do so.  Accordingly, the judgments of the Brazzaville courts should not be given any effect, and this Court should find that Commisimpex, not the liquidators, is the real party in interest.

## IV.    THE COURT PROPERLY EXERCISED SUBJECT MATTER JURISDICTION, BECAUSE THE QUESTION OF A WRITTEN AGREEMENT TO ARBITRATE IS NOT JURISDICTIONAL, THERE WAS AN AGREEMENT, AND THE MERITS ISSUE WAS RESOLVED IN THE PRIMARY JURISDICTION

The Congo has further argued that this Court lacked subject matter jurisdiction to confirm the 2013 Award because the Congo allegedly never agreed "in writing" to arbitrate disputes arising from the 2003 Protocol, as required by the New York Convention.  Mot. at 22.  Just as with its standing argument, the Congo mistakenly characterizes the agreement in writing requirement as a question of this Court's subject matter jurisdiction.  *See* Mot. at 23.  It is not. *See Sarhank Grp. v. Oracle Corp.*, 404 F.3d 657, 660 (2d Cir. 2005) (confirming that the question of an agreement in writing under the New York Convention is a "merits question[], not subject matter jurisdiction question[]").  This Court had and properly "assume[d] subject matter

jurisdiction" when it "hear[d] the merits of the case." *Id.* (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998)).

As the Eleventh Circuit has recognized, the *Czarina* case that the Congo relies on for this argument (*see* Mot. at 23 (citing *Czarina, L.L.C. v. W.F. Poe Syndicate*, 358 F.3d 1286 (11th Cir. 2004)) is not sound, because the question of a written agreement to arbitrate is undoubtedly one of merits. *See Bautista v. Star Cruises*, 396 F.3d 1289, 1301 (11th Cir. 2005) (holding that district courts need not "review the putative arbitration agreement . . . before assuming jurisdiction"); *Regent Seven Seas Cruises, Inc. v. Rolls Royce, PLC*, Nos. 06–22347–CIV, 06–22539–CIV, 2007 WL 601992, at *4 (S.D. Fla. Feb. 21, 2007) (holding that, after *Bautista*, the Eleventh Circuit would likely "endorse the Second Circuit's view in *Sarhank* that questions over the existence or validity of the requisite written arbitration agreement go to the merits and do not implicate jurisdictional concerns").

Because the question of a written agreement to arbitrate is not jurisdictional, the Amended Judgment is not "void" due to an alleged lack of a written agreement, and the Court need not vacate the Amended Judgment.

Even if the court were to consider the question, however, the Congo's assertion of a lack of an agreement to arbitrate is unavailing, because Commisimpex has submitted the agreement to this Court. The 1992 Protocol contained a clear, written, agreement to arbitrate, which Commisimpex submitted with its Petition to Confirm the Arbitral Award. *See* Polkinghorne Decl. I ¶ 4 and Ex. 2, ECF No. 1-5. As the arbitral tribunal found, the 2003 Protocol, a subsequent agreement between the parties that shared the same goal, did not contain any substitute or supplemental dispute resolution clause, thereby indicating the parties' intent for the original agreement to arbitrate to govern the form for dispute resolution. Polkinghorne Decl. II

–33–

¶ 3, Ex. 1.  Notably, the Congo does not dispute that it executed the 1992 Protocol, but only that it applies to the claims under the 2003 Protocol.  But the scope of the arbitration clause is clearly a merits issue that is outside the purview of any jurisdictional analysis.  *See Regent Seven Seas Cruises*, 2007 WL 601992 (S.D. Fla. Feb. 21, 2007) (explaining the extremely limited nature of the jurisdictional inquiry and applying *Sarhank*).

Moreover, the Congo is not legally entitled to re-litigate this issue before this Court.  It is well-established that courts in countries of secondary jurisdiction "may refuse to enforce the award only on the grounds explicitly set forth in Article V."  *TermoRio S.A.E.S.P. v. Electranta S.P.*, 487 F.3d 928, 937 (D.C. Cir. 2007) (quoting *Yusuf Ahmed Alghanim & Sons v. Toys "R"Us, Inc.,* 126 F.3d 15, 23 (2d Cir.1997)); *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 288 (5th Cir. 2004) (same).  The "[d]efenses to enforcement under the New York Convention are construed narrowly to encourage the recognition and enforcement of commercial arbitration agreements in international contracts."  *Karaha Bodas*, 364 F.3d at 288 (internal quotation marks omitted).  As the Congo admits, its "defense" that there was no written agreement to arbitrate stems from Article IV, not Article V, of the Convention.  Mot. at 22.

While Article VI of the Convention permits a court of secondary jurisdiction to "refuse to enforce an arbitral award if it has been set aside or suspended by" a court of the primary jurisdiction, *Karaha Bodas*, 364 F.3d at 289, here, the highest court in France—the primary jurisdiction for this dispute—has already affirmed that the parties had a written agreement to arbitrate this dispute when it confirmed the 2010 Award on Jurisdiction.  *See* Polkinghorne Decl. II ¶¶ 17-18.  As the D.C. Circuit has held, the New York Convention "does not endorse a regime in which secondary States (in determining whether to enforce an award) routinely second-guess

the judgment of a court in a primary State." *TermoRio S.A.E.S.P. v. Electranta S.P.*, 487 F.3d 928, 937 (D.C. Cir. 2007). As the secondary jurisdiction, this Court only has limited bases on which it may refuse to enforce an international arbitral award. This Court therefore has no need to disrupt the conclusion of the French court, nor of the arbitral tribunal, beyond confirming the existence of the written agreement that Commisimpex has duly submitted with its petition.

## V.    THE CONGO'S NEGLECT IN BRINGING THIS ACTION WAS NEITHER INADVERTENT NOR EXCUSABLE, AND IN ANY EVENT DOES NOT JUSTIFY VACATING THE AMENDED JUDGMENT

The Congo argues that, should its other bases for vacating the Amended Judgment fail, this Court nonetheless should exercise its discretion to vacate, because the Congo's actions leading to default were "inadverten[t]" and "constituted excusable neglect." Mot. at 24. But the Congo's alleged cause for delay—the apparent inability of its Ministry of Foreign Affairs to forward the service documents to the appropriate department in a timely manner—is hardly plausible, let alone excusable. The Congo's arguments on the other factors relevant to the inquiry are similarly strained and unavailing.

The inquiry for vacatur under Rule 60(b)(1) is an equitable one, "taking account of all relevant circumstances surrounding the party's omission." *Pioneer Inv. Servs. Co. v. Brunswick Assocs.*, 507 U.S. 380, 395 (1993). Specifically, courts will consider (i) whether the party seeking to vacate the judgment has a potentially meritorious defense; (ii) whether the reason for the delay was beyond the movant's control and the length of the movant's delay in seeking to vacate; (iii) whether vacating will prejudice the non-moving party; and (iv) whether the movant acted in good faith. *See FG Hemisphere Assocs. v. Democratic Republic of Congo*, 447 F.3d 835, 838 (D.C. Cir. 2006) (applying the Rule 60(b)(1) factors outlined in *Pioneer Inv. Servs.*, 507 U.S. at 395).

–35–

Significantly, the Congo's status as a sovereign is immaterial to this inquiry.  Where an exception to immunity under the FSIA is plainly applicable (here, the exception to confirm international arbitration awards, which has not been disputed), "no principle of sovereign immunity law upsets the parties' respective burdens under Rule 60(b)[.]"  *Gates v. Syrian Arab Republic*, 646 F.3d 1, 5 (D.C. Cir. 2011) (citations omitted) (noting that the burden is a "heavy" one).  Here, each of the discretionary factors favors denying the Congo's motion.

### A.    The Congo Has No Potentially Meritorious Defense

Courts will deny motions to vacate under Rule 60(b)(1) where the party seeking to vacate cannot show that it has a potentially meritorious defense.  *See, e.g.*, *Lepkowski v. United States Dep't of the Treasury,* 804 F.2d 1310, 1314 (D.C. Cir. 1986).  Unlike the other factors, the requirement of a meritorious defense cannot be balanced away.  "It has long been established that as a precondition to relief under Rule 60(b), the movant *must* provide the district court with reason to believe that vacating the judgment will not be an empty exercise or a futile gesture." *Murray v. District of Columbia*, 52 F.3d 353, 355 (D.C. Cir. 1995) (emphasis added).

Making a showing of a potentially meritorious defense in this case is no small hurdle. "'The showing required to avoid summary confirmation [under the New York Convention] is high.'"  *Int'l Trading & Indus. Inv. Co. v. DynCorp. Aerospace Tech.*, 763 F. Supp. 2d 12, 20 (D.D.C. 2011) (quoting *Ottley v. Schwartzberg*, 819 F.2d 373, 376 (2d Cir. 1987)).  Article V of the New York Convention provides the *exclusive* grounds for a court sitting in a secondary jurisdiction, such as this Court, to refuse to enforce a foreign arbitral award.  *TermoRio S.A.E.S.P. v. Electranta S.P.*, 487 F.3d 928, 935 (D.C. Cir. 2007) (citing 9 U.S.C. § 207).  The Congo has not made a plausible showing that it can satisfy any one of those grounds, and its other procedural and jurisdictional defenses offer it no support here.

–36–

### 1.    The Congo Cannot Prevail on any New York Convention Defense

The only Article V defense raised by the Congo is its contention that the 2003 Protocol is unenforceable because it "arose out of political corruption" and thus contravenes public policy. Mot. at 34. As the Congo notes, it has made this exact argument in French proceedings to set aside the award. *Id*. The standard for denying enforcement of awards on public policy grounds "is high, and infrequently met." *TermoRio*, 487 F.3d at 938. Indeed, public policy as a defense is "rarely relied upon" and will avail the defendant "[o]nly in clear-cut cases." *Tahan v. Hodgson*, 662 F.2d 862, 866 n.17 (D.C. Cir. 1981) (citations omitted). Here, the French courts have already rejected the Congo's contention that the 2003 Protocol arose out of political corruption, both before and after the Congo filed its motion. *See* Polkinghorne Decl. II ¶ 20. Even if such a finding could rise to the level of a violation of public policy, the Congo is similarly unlikely to prevail on this issue here; indeed, it offers no evidence before this Court to even sustain the claim. *See Murray*, 52 F.3d at 355 ("[T]he claim or defense proffered by the Rule 60(b) movant must be more than an unsubstantiated boast.") (internal quotation marks omitted). Raising such baseless allegations is merely another bad faith tactic by the Congo as it attempts to skirt its obligations under the arbitral award and cannot constitute a potentially meritorious defense.

The Congo also argues that, because the set-aside proceedings initiated by the Congo itself continue in France, this Court "may, if it considers proper, adjourn the decision on the enforcement of the award." Mot. at 34 (citing New York Convention, Art. VI). First, this point is moot, because subsequent to the Congo's motion, the Paris Court of Appeal rejected the Congo's attempt to set aside the award and affirmed it. Second, this Court disfavors exercising discretion to adjourn in such circumstances "lest it encourage abusive tactics by the party that lost in arbitration." *G.E. Transp. S.P.A. v. Republic of Albania*, 693 F. Supp. 2d 132, 138

(D.D.C. 2010).  Third, this suggestion by the Congo does not constitute an Article V "defense"
warranting vacatur of the Amended Judgment.  Thus, there is no basis for this Court to adjourn
its decision.

### 2.    The Congo's Jurisdictional and Other Procedural Defenses Do Not Justify Vacatur

Without any plausible defense under the Convention, the Congo also recites the familiar
unsupported contentions it makes elsewhere in its motion.  *See* Mot. at 31-33.

As discussed above, the Congo's jurisdictional defenses lack merit (*see supra* Sections II,
III, and IV) and warrant little further discussion.  The Congo's procedural arguments under Fed.
R. Civ. P. 17 that Commisimpex is not the real party in interest and lacks "capacity to bring this
suit" (Mot. at 32-33) also do not warrant vacating the Amended Judgment.  As noted, these
procedural issues do not implicate the court's jurisdiction, thus leaving it wholly to the court's
discretion as to whether to vacate the judgment to address them.  *See infra* Section V.B-D.
Moreover, the Congo is unlikely to prevail on these issues, because its entire argument is based
on a fraudulently-procured order of the Congolese courts, which has never been recognized
outside the Congo and should not be granted comity in this Court.  *See supra* Section II.

Because the Congo has not advanced and supported a single potentially meritorious
defense justifying vacatur, it has not satisfied the "threshold requirement for obtaining relief"
under Rule 60(b)(1) and its Motion to Vacate should be denied.  *See Murray*, 52 F.3d at 355.

### B.    The Congo's Default Was Within Its Control

Even were this Court to find any merit in the Congo's alleged defenses, the Court should
still deny the Congo's request to vacate the Amended Judgment because the Congo's default was
within its control and thus does not constitute excusable neglect.  *See Meadows v. Dominican*

–38–

*Republic*, 817 F.2d 517, 521 (9th Cir. 1987) (denying vacatur where foreign government possessed notice of action and refused to timely respond).

As this Circuit has recognized, "rule 60(b) is applied liberally in the default judgment context *only* in the exceptional circumstance where default was not in the meaningful control of the moving party." *FG Hemisphere Assocs. v. Democratic Republic of Congo*, 447 F.3d 835, 839 (D.C. Cir. 2006) (emphasis added) (internal quotation marks omitted).  Any alleged "liberal attitude toward vacating [default] judgments is sharply modified when the defaulting party's actions appear to be willful." *Textile Banking Co. v. Rentschler*, 657 F.2d 844, 854 (7th Cir. 1981).  Courts have interpreted a defendant's conduct as culpable "if he has received actual or constructive notice of the filing of the action and failed to answer." *Meadows*, 817 F.2d at 521 (9th Cir. 1987).

Though the Congo had actual notice of the default judgment on June 3, 2013—when an employee of its Ministry of Foreign Affairs signed for receipt of the documents, as the Congo *has not disputed*—it declined to respond until the Rule 60 one-year window was about to close, 11 months and 15 days after the Amended Judgment was entered (*see* Amended Order and Judgment, October 9, 2013, ECF No. 18) and, notably, over *fifteen* months after first receiving the service documents.  *See* Return of Service, Aug. 28, 2013, ECF No. 11; Vasquez Decl. ¶¶ 10-11, Ex. 5.  Such intentional indifference disqualifies the Congo from seeking vacatur.  *See Mayfair Extension, Inc. v. Magee*, 241 F.2d 453, 453-54 (D.C. Cir. 1957) (refusing to grant motion to vacate default judgment because movant knew about judgment two weeks after entry and waited more than eleven months to file); *see also Amoco Overseas Oil Co. v. Compagnie Nationale Algerienne de Navigation*, 605 F.2d 648, 656 (2d Cir. 1979) ("[A]s the delay in

making the [60(b)] motion approaches one year there should be a corresponding increase in the burden that must be carried to show that the delay was reasonable.").

The Congo's reasons for delay are unpersuasive. It again argues that certain officials in CCA, the Congolese department "responsible for the management of the public debt," did not receive the service papers, thereby preventing the Congo from "prepar[ing] and present[ing] its defense." Mot. at 24-25. This apparent mismanagement of documents should not be conflated with a lack of "actual notice" to the Congo, as CCA is ***not*** a party to this action. The Congo itself had actual notice of this action when service was received at the Ministry of Foreign Affairs.

Furthermore, as discussed above (*see supra* Section II), it is simply not plausible that this apparent mismanagement of documents would require over a year of delay in response. The Ministry of Foreign Affairs is clearly accustomed to receiving legal documents, including in numerous matters between these particular parties, and forwarding them to the relevant officials in a timely manner. Genet Decl. ¶ 12; Polkinghorne Decl. II ¶ 21. The "non-English-speaking Congo" (Mot. at 26) also cannot deny that its officials could understand the French translations of documents sent by Commisimpex, as required under 28 U.S.C. §1608(a)(3). Even if it were somewhat plausible that the first set of service documents were "lost [in the] mail," as the Congo insinuates (Mot. at 25), Commisimpex sent *five* additional filings from this case by DHL to the Ministry of Foreign Affairs, all of which were signed for and received between September 2 and November 8, 2013. Vasquez Decl. ¶ 12, Exs. 6-10; *see also* ECF Nos. 11, 12, 13, 17, and 18 and corresponding Certificates of Service. It is not plausible that each of those documents, clearly bearing the name of a party that, given the circumstances, must be on the radar of most, if not all,

Congolese officials, could also be "lost" before reaching officials with responsibility for acting in the case.

The Congo further argues that the linguistic and procedural complexities of this case prevented it from timely replying.  Mot. at 28-29.  However, any litigant involved in transnational litigation must perform these tasks on a daily basis; their complexity cannot excuse a year of silence.  Here, until October 31, 2014, the Congo has been represented by the same law firm, Cleary, Gottlieb, Steen & Hamilton LLP, for decades both in arbitrations and in enforcement actions in various jurisdictions.  *See* Polkinghorne Decl. II ¶ 23; Vasquez Decl. ¶ 7. Through its long-time counsel, who as a sophisticated law firm undoubtedly monitors the docket, the Congo has been well aware of all publicly filed legal actions against it.  Indeed, the Congo's counsel had no trouble responding swiftly to enforcement proceedings on the Amended Judgment in the Southern District of New York that were initiated months before the Congo filed its motion.  *See* Vasquez Decl. ¶¶ 13-16.  Incredulously, despite the Congo's counsel's participation in the New York enforcement proceedings months earlier in 2014, the Congo still inexcusably delayed its filing here.

Neglect of this degree by any party is simply not excusable and cannot be rewarded with vacatur.  It would be inequitable to punish Commisimpex on account of the Congo's intentional and inexcusable neglect.

### C.    Commisimpex Will Be Prejudiced by Vacating the Amended Judgment

Contrary to the Congo's contention (Mot. at 27-28), Commisimpex will suffer prejudice if this court vacates the Amended Judgment.  Commisimpex has sought satisfaction of debts owed by the Congo for decades.  Hojeij Decl. at ¶¶ 2-3.  The damage is real and substantial: interest alone on the Congo's delinquency amounts to hundreds of millions of dollars.  *Id*. at ¶ 3.

Moreover, the Congo's continued resistance to payment makes such compensation essentially meaningless. Significantly, enforcement proceedings are already underway in the Southern District of New York, and substantial briefing has already taken place. Any re-adjudication of the Petition in this case needlessly allows the Congo to resist and delay Commisimpex's attempts to collect what it is owed. *See Smith v. District of Columbia*, 430 F. 3d 450, 456 n.5 (D.C. Cir. 2005) (noting that the unnecessary accumulation of litigation costs and attorney's fees qualifies as prejudice). Another adjudication of the merits here will only serve to upset Commisimpex's contractual expectations and undermine "the 'emphatic federal policy in favor of arbitral dispute resolution' recognized by the Supreme Court." *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 727 (D.C. Cir. 2012) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 631 (1985)).

### D.    The Congo's History of Acting in Bad Faith Excuses Any Alleged Lack of Professional Courtesy

The Congo suggests that any finding of prejudice "must necessarily be balanced against the fact that Commisimpex could have avoided prejudice simply by notifying longstanding opposing counsel of the existence of the lawsuit." Mot. at 28. Given the long-running history between these parties, this suggestion cannot be taken seriously. Commisimpex followed all required procedures for notifying the Congo, and, though the Congo has on many occasions failed to extend professional courtesy to Commisimpex (Polkinghorne Decl. II ¶ 23), counsel for Commisimpex continued to send additional notices of the litigation to the Congo, though it was not required. Vasquez Decl. ¶ 12, Exs. 6-9; Fed. R. Civ. P. 5(a). Moreover, it is the bad faith actions of the Congo's "longstanding counsel" that have long been a problem in U.S. courts. *See Kensington Int'l Ltd. v. Republic of Congo*, No. 03 Civ. 4578(LAP), 2007 WL 2456993 (S.D.N.Y. Aug. 24, 2007). Commisimpex should not be punished here for declining to also

–42–

notify the Congo's counsel, who already knew of the Amended Judgment many months ago at the latest.

The Congo argues, finally, that vacatur for excusable neglect is justified because "it would make no sense for the Congo intentionally to avoid appearing in this case when it is currently participating in various other actions" involving Commisimpex.   Mot. at 29. Commisimpex cannot begin to speculate what motivated the Congo's delay in responding until months after Commisimpex initiated enforcement proceedings, other than its possible hope to create further costs and delays by moving to vacate a judgment to which it has no possible defenses.  But following the Congo's history of unfair, dishonest, and bad faith tactics to avoid payment—including the fraudulent "liquidation proceedings" in the Congo that were rife with due process violations (Polkinghorne Decl. II ¶ 11 and Exs. 7, 8), as well as its dishonest implication in this action that the Congolese Ministry of Foreign Affairs does not have responsibility for processing judicial documents—the Congo is not owed the benefit of the doubt in this regard.

As this inquiry is an equitable one, *Pioneer Inv. Servs. Co.*, 507 U.S. at 395, it would be fundamentally unfair that the Congo reap the benefit of any more delay on account of its inconsistent and misleading arguments.  This Court should therefore deny the Congo's motion to vacate and uphold the Amended Judgment.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny the Congo's motion and confirm the

judgment against the Congo as already entered.

Dated: Washington, D.C.                    Respectfully submitted,
       November 24, 2014


                                           **W H I T E & C A S E** LLP

                                           /s/ Francis A. Vasquez, Jr.
                                           Francis A. Vasquez, Jr. (D.C. Bar No. 442161)
                                           Nicolle E. Kownacki (D.C. Bar No. 1005627)
                                           701 Thirteenth Street, N.W.
                                           Washington, D.C. 20005
                                           (202) 626-3600

                                           *Counsel for Commissions Import Export S.A.*