# Exhibit 4

A Madame le Juge de l'exécution
du Tribunal de Grande Instance de Paris
_____

Audience du 28 février 2013 à 09h00
RG n°13/80130 & 12/84003
Communiquées le 15 février 2013

# CONCLUSIONS EN REPONSE N°2

POUR

**La société COMMISSIONS IMPORT EXPORT (COMMISIMPEX)**
société anonyme de droit congolais immatriculée au RCCM de Brazzaville sous le
numéro RCCM CG/BZV/07 B413, dont le siège social est sis 86 avenue Foch, BP 1244,
Brazzaville, République du Congo, agissant poursuites et diligences de son Président
Directeur Général, Monsieur Mohsin Mohamad HAJAIJ

*DEFENDEUR A LA MAINLEVEE*

*Ayant pour avocat*

**La SELAS GENET COLBOC GOUBAULT**
[Maîtres Jacques-Alexandre GENET & Gabriel COLBOC]
*Avocats au Barreau de Paris*
92, rue Jouffroy d'Abbans - 75017 PARIS
Tél. 01 40 54 51 00 - Fax 01 40 54 51 01 - Toque P0122

*Chez qui elle élit domicile pour les seuls besoins de la présente procédure*

CONTRE

1.    **La REPUBLIQUE DU CONGO**
      Représentée par son Ministre de l'Economie, des Finances et du Budget
      Domicilié à Brazzaville - République du Congo

      *DEMANDEUR A LA MAINLEVEE*

      *Ayant pour avocat*

      **Le cabinet CLEARY GOTTLIEB STEEN & HAMILTON**
      [Maître Jean-Yves GARAUD]
      *Avocat au Barreau de Paris*
      12, rue de Tilsitt - 75008 PARIS

Tél. 01 40 74 68 00 - Fax 01 40 74 68 88 - Toque J21

*Chez qui elle a élu domicile dans le cadre de la présente procédure*

**2.**    **AGENCE FRANCAISE DE DEVELOPPEMENT**
Etablissement public de l'Etat à caractère industriel et commercial, dont le siège est situé 5 rue Roland Barthes 75598 PARIS CEDEX 12, identifiée sous le numéro 775 665 599 RCS PARIS, représenté par ses représentants légaux, domiciliés en cette qualité audit siège

*DEMANDEUR A LA MAINLEVEE*

*Ayant pour avocat*

**Le cabinet WILKIE FARR & GALLAGHER**
[Maître Dominique MONDOLONI]
*Avocat au Barreau de Paris*
21-23, rue de la Ville-l'Evêque - 75008 PARIS
Tél. 01 53 42 45 00 - Fax 01 40 06 96 06 - Toque J003

**3.**    « *LIQUIDATION JUDICIAIRE COMMISIMPEX* (*syndic liquidateur de la société COMMISSIONS IMPORT EXPORT), ayant son siège Rue de la Tours en diagonale du Palais de justice, Immeuble Eolis ODF, Brazzaville, République du Congo, pris en la personne de son représentant légal* »

**4.**    **MM. Gaston MOSSA, Aimery Patrick TATI et Emile NZONDO**

*Ayant tous pour avocat*

**La SELARL GRAMOND KERVERSAU**
[Maître François de KERVERSAU]
*Avocat au Barreau de Paris*
12, rue du Quatre-Septembre - 75002 PARIS
Tél. 01 45 55 90 45 - Fax 01 45 55 94 04 - Toque P16

*INTERVENANTS VOLONTAIRES*

# PLAISE AU JUGE DE L'EXECUTION

**I**    FAITS ET PROCEDURE

**A**    <u>Présentation des parties</u>

**1°/**    *<u>La société COMMISIMPEX, une entreprise de travaux publics qui a réalisé et financé des projets d'infrastructure au Congo</u>*

**1.**    La société COMMISSIONS IMPORT EXPORT (COMMISIMPEX) (ci-après, "**COMMISIMPEX**"), est une société anonyme de droit congolais ayant pour objet social la commission, l'importation, l'exportation et la distribution de toutes marchandises et matières premières conditionnées ou en vrac, la création de points de vente de gros et détail, et la participation sous quelque forme que ce soit dans d'autres entreprises se rapportant directement ou indirectement à l'objet social de la société.

*Pièce n°1 : Extrait RCCM de COMMISIMPEX*

**2.**    COMMISIMPEX a exécuté différents marchés de travaux publics et de fournitures de matériels de 1984 à 1986 pour le compte de la REPUBLIQUE DU CONGO, qui sont demeurés, pour l'essentiel, impayés.

**3.**    Du fait de cette absence de paiement par la REPUBLIQUE DU CONGO (cf. *infra*) et de l'annulation du projet dit Etoumbi-Kunda, COMMISIMPEX a été contrainte de procéder au licenciement de la quasi-totalité de son personnel en 1988, puis de cesser pour ainsi dire toute activité économique à partir de 1991, date depuis laquelle elle se consacre au recouvrement de ses créances sur la REPUBLIQUE DU CONGO, en espérant pouvoir un jour redémarrer ses activités au Congo.

*Pièce n°2 : Lettre adressée par COMMISIMPEX au Directeur régional du Travail le 4 mai 1988*

**2°/**    *<u>La REPUBLIQUE DU CONGO, un Etat "voyou"</u>*

**4.**    La REPUBLIQUE DU CONGO est un Etat d'Afrique subsaharienne peuplé de trois millions d'habitants. Gouvernée depuis 1979 par le général Denis SASSOU-NGUESSO, elle présente cette particularité d'être un Etat regorgeant de ressources pétrolières (qui lui procurent l'essentiel de ses recettes budgétaires, dont les niveaux sont tels que le budget de l'Etat, excédentaire de 1,8 milliards d'euros en 2011[1], devrait être pareillement excédentaire de 1,5 milliards d'euros en 2012[2] et de 1,6 milliards d'euros[3] en 2013), mais qui n'acquitte jamais spontanément ses dettes reconnues en justice et qui est très défavorablement connu des juridictions françaises, anglaises ou américaines, notamment, pour s'être engagé il y a

---

[1] 1 196 987 534 854 FCFA, soit 1 824 795 733 EUR (1 EUR = 655,957 FCFA)

[2] 1 000 000 000 000 FCFA, soit 1 525 000 000 EUR

[3] 1 056 197 000 000 FCFA, soit 1 610 000 000 EUR

quelques années dans des mécanismes de fraude internationale à très grande échelle.

*Pièce n°3 : Article paru sur « lasemaineafricaine.com » le 2 novembre 2011*
*Pièce n°44.1 : Compte-rendu du Conseil des ministres du 28 septembre 2012 (source : www.congo-site.com)*
*Pièce n°44.2 : Article paru dans « Les Dépêches de Brazzaville » le 13 décembre 2012*

**5.**     Ainsi, afin de tenter d'échapper à des créanciers particulièrement tenaces qui mettaient en lumière des détournements massifs de fonds publics opérés par certains dirigeants congolais au détriment du Trésor public congolais et de ses créanciers, l'Etat congolais et ses dirigeants ont eu recours à partir des années 2000 à des procédés qui, s'ils avaient été le fait de personnes privées, auraient très certainement été sanctionnés pénalement (en particulier au titre de l'organisation frauduleuse d'insolvabilité).

*Pièce n°4 : Article paru dans « La Tribune », Les millions envolés du pétrole congolais, le 13 décembre 2005*
*Pièce n°5 : Article paru dans « La Tribune », Les fonds vautours au secours des pauvres, le 14 mars 2006*

Dans cette veine, la REPUBLIQUE DU CONGO a mis en place de nombreuses sociétés-écrans afin de dissimuler ses actifs et ceux privatisés par ses dirigeants aux yeux de ses créanciers et des tribunaux, s'engageant dans l'élaboration de montages douteux, produisant de faux documents en justice, présentant de faux témoignages au soutien de leur argumentation, etc.

**6.**     Si les juridictions françaises ont sobrement constaté que certaines entités en apparence distinctes de l'Etat congolais étaient en réalité fictives et constituaient de simples émanations de l'Etat congolais devant répondre de ses dettes (voir par exemple *Pièces n°6 & 7*), les juridictions anglaises, en revanche, ont été conduites à porter une appréciation particulièrement sévère sur le comportement de la REPUBLIQUE DU CONGO et de ses dirigeants.

**7.**     Ainsi deux décisions de justice rendues au Royaume-Uni dans deux affaires différentes par la *High Court of Justice* de Londres, respectivement les 28 novembre 2005 (Juge COOKE) et 6 décembre 2005 (Juge MORISON), qui ont jeté une lumière particulièrement crue sur les pratiques des parties congolaises et des représentants de l'Etat congolais dans le cadre de ces différentes procédures.

**8.**     Dans une première affaire, la *High Court of Justice* a, pour valider une saisie pratiquée par un créancier commercial de la République du Congo, retenu que **l'interposition de sociétés prétendument distinctes de cette dernière était purement factice** ; elle a estimé également que la Société Nationale des Pétroles du Congo ("SNPC") était un simple organe de l'Etat congolais ; **elle a surtout établi, de la part de M. Denis GOKANA, le P.-D.G. de la SNPC et conseiller spécial du Président Denis SASSOU-NGUESSO, différents mensonges et faux témoignages, différentes fabrications de documents faux et/ou antidatés, diverses tentatives délibérées de contourner des décisions de justice** (voir par exemple §17, 18, 25 & 26 du jugement).

*Pièce n°8 : Jugement de la High Court of Justice de Londres du 28 novembre 2005*

**9.**    Dans une seconde affaire, la *High Court of Justice* de Londres, après avoir établi, là encore – cette fois de la part de M. Jean-Jacques IKAMA, le Directeur Général de Fininco SA – **différents mensonges et faux témoignages, différentes fabrications de documents faux et/ou antidatés, soulignant à plusieurs reprises combien l'apparence résultant des pièces présentées était trompeuse et éloignée de la réalité des faits**, a validé une saisie pratiquée par un autre créancier, essentiellement aux motifs que FININCO SA, bien qu'étant « *en la forme une société indépendante* » était en réalité « *un simple tuyau à travers lequel les fonds du Gouvernement étaient dirigés pour un usage approuvé par le Gouvernement.* » et que la SNPC, « *bien qu'ayant la forme d'une société, était simplement utilisée comme un organe du Gouvernement* » (§39 du jugement).

Surtout, le juge MORISON a ajouté à la fin de son jugement un *addendum* qui constitue semble-t-il une première dans la longue histoire judiciaire anglaise, et mérite d'être ici reproduit et considéré *in extenso* :

> « *Depuis que j'ai rédigé et envoyé mon jugement aux parties pour correction, j'ai eu la possibilité de prendre connaissance du jugement rendu par M. Cooke J dans l'affaire* Kensington International Limited v Republic of Congo & as third parties Glencore Energy UK Limited, Sphynx (BDA) limited, Africa oil & Gas Corporation and Cotrade SA *(Folio 2002 Nos 1088, 1281,1282 & 1357, jugement rendu le 28 novembre 2005). Dans son jugement, comme dans le mien, le juge Cooke a conclu que le Congo :*
>
> > (a) *a présenté des témoignages oraux malhonnêtes ;*
> > (b) *s'est abstenu de communiquer des documents pertinents ;*
> > (c) *s'est appuyé sur des documents qui ne constituaient pas des éléments de preuve de la situation réelle et étaient antidatés.*
>
> *Ce sont des faits très graves. Des témoins qui mentent délibérément au Tribunal sont passibles de poursuites pour parjure. La fabrication de faux ou de documents trompeurs pour être utilisés devant le Tribunal expose ceux qui y participent à des poursuites pour faux et usage de faux. La tentative délibérée de tromper le Tribunal peut aussi entraîner l'ouverture d'une procédure d'outrage au Tribunal. J'exprime simplement le souhait que ceux qui conseillent le Congo/la SNPC en prennent bonne note pour le futur.* »

*Pièce n°9 : Jugement de la High Court of Justice de Londres du 6 décembre 2005*

**10.**    Si l'on ajoute à cela que le Premier ministre congolais d'alors, M. Isidore MVOUBA, avait lui-même reconnu publiquement le 22 janvier 2006 que la REPUBLIQUE DU CONGO, afin de se protéger des saisies, avait recours à des mécanismes « *peu orthodoxes* », selon sa propre expression, alors il faut bien convenir que la plus grande prudence s'impose à toute juridiction amenée à considérer l'argumentation et les éléments de « preuve » qui lui seraient présentés par la REPUBLIQUE DU CONGO et ses représentants ou alliés : en la matière, l'apparence juridique est souvent fort éloignée de la réalité des faits…

*Pièce n°10 : Dépêche AFP du 22 janvier 2006*

*3°/*    *L'Agence Française de Développement*

**11.**    Etablissement public à caractère industriel et commercial, dont le capital est entièrement détenu par l'Etat français, l'Agence Française de Développement (ci-après, l'"**AFD**") est une institution financière spécialisée du secteur bancaire, régie par les articles R. 516-3 à R. 516-20 du Code monétaire et financier.

En dépit de son nom, tant au regard de ses statuts que de son résultat comptable, l'AFD est une banque spécialisée dans le financement de projets de développement, soumise, pour celles de ses activités qui en relèvent, aux dispositions relatives aux établissements de crédit (article R. 516-3 du CMF, dernier alinéa).

**12.**    Les missions de l'AFD consistent pour l'essentiel à contribuer à la mise en œuvre de l'aide au développement à l'étranger et en outre-mer. Pour ce faire, les opérations que l'AFD est autorisée à réaliser sont de trois ordres :

- **accorder des concours financiers «** *pour son propre compte* **» (articles R. 516-5 et R. 516-6 du Code monétaire et financier) :**

    Il en est ainsi lorsque l'AFD conclut des conventions de financement avec un Etat étranger, comme elle l'a fait à plusieurs reprises au bénéfice de la REPUBLIQUE DU CONGO, convention par lesquelles elle accorde des **concours** financiers (tels que des subventions ou des prêts, par exemple) ;

*Pièces Congo n°13 et pièces AFD n°11 à 16 : Conventions de financement AFD / REPUBLIQUE DU CONGO*

- **gérer «** *pour le compte de l'Etat et aux risques de celui-ci des opérations financées sur le budget de l'Etat. Les termes de ces opérations font l'objet de conventions spécifiques signées au nom de l'Etat par le ou les ministres compétents.* **» (article R. 516-7 du Code monétaire et financier) :**

    Il en est ainsi notamment lorsque l'Etat français conclut une convention dite *de désendettement et de développement* avec un Etat étranger.

    Lorsqu'une convention de ce type est conclue, **c'est l'Etat français seul qui accorde et finance une subvention** et les conditions de l'intervention de l'AFD  sont régies par une convention-cadre signée entre l'AFD et l'Etat français le 29 décembre 2003 aux termes de laquelle l'AFD conclut avec le pays bénéficiaire un « *accord-cadre qui précise les modalités de versement, **pour le compte de l'Etat [français]**, de la subvention.* »

    **L'AFD agit dans ce cadre en sa qualité d'établissement bancaire dépositaire des fonds** appartenant à l'Etat français et comme **mandataire** de celui-ci, lequel verse d'ailleurs une rémunération à l'AFD pour le service qu'elle fournit.

    Les sommes dues par l'Etat français au titre de ces conventions de désendettement et de développement sont affectées au programme 209 « *solidarité à l'égard des pays en développement* » du budget de l'Etat français, lequel est mis en œuvre par le Ministère

des affaires étrangères.

*Pièce n°11 : Convention conclue entre l'Etat français et l'AFD du 29 décembre 2003 (articles 2, 3 et 8)*
*Pièce n°12 : Extraits de l'annexe au Projet de loi de finances pour 2013 – Aide publique au développements*

- d'autres opérations, parmi lesquelles assurer la représentation de diverses organisations, telles que l'Union européenne, ou gérer des opérations financées par ceux-ci (article R. 516-8 du Code monétaire et financier).

**13.**    Le rôle de l'AFD consiste donc tantôt à accorder des concours financiers à des Etats étrangers pour son propre compte, tantôt à gérer pour le compte de l'Etat français (ou d'autres organismes), et aux risques de celui-ci, des opérations par lesquelles l'Etat français accorde des subventions, dans le cadre, notamment, des conventions de désendettement et de développement conclues par celui-ci avec des Etats étrangers.

**14.**    L'AFD peut donc être amenée à verser des subventions à des Etats étrangers soit qu'elle a elle-même accordées, lorsqu'elle agit pour son compte propre, soit qui ont été accordées par des tiers, notamment lorsqu'elle gère, en sa qualité d'établissement de crédit, pour le compte de l'Etat français et aux risques de celui-ci, des opérations financées par ce dernier.

**B**    **La créance de COMMISIMPEX à l'encontre de la REPUBLIQUE DU CONGO**

***1°/***    ***Le protocole du 14 octobre 1992 par lequel la REPUBLIQUE DU CONGO a, notamment, renoncé à toute immunité d'exécution***

**15.**    Les sommes dues par la REPUBLIQUE DU CONGO à COMMISIMPEX au titre des projets d'infrastructure réalisés par cette dernière n'ont pas été réglées, à l'exception d'un paiement partiel de 15 millions de US$, et les parties ont finalement conclu le 14 octobre 1992 un protocole d'accord n°566 portant sur une partie de la dette cumulée, lequel prévoyait en son article 5 que « *les montants dus en vertu du présent accord au titre de la dette seront représentés par des billets à ordre libellés dans leur monnaie d'origine souscrits par la Caisse congolaise d'amortissement à l'ordre de COMMISIMPEX et avalisés par le ministre de l'économie, des Finances et du Plan de la République.* »

*Pièce n°13 : Protocole d'accord n°566 du 14 octobre 1992*

Par ailleurs, conformément audit protocole, le 3 mars 1993, la REPUBLIQUE DU CONGO a remis à COMMISIMPEX des lettres d'engagement, adossées aux billets à ordre, par lesquelles **la REPUBLIQUE DU CONGO a** « *renonc***[é]** *définitivement et irrévocablement à invoquer dans le cadre du règlement d'un litige en relation avec les engagements objet de la présente toute immunité de juridiction ainsi que toute immunité d'exécution.* »

*Pièce n°14 : Exemple de lettre d'engagement du 3 mars 1993*

2°/    _La Sentence du 3 décembre 2000 est exécutoire en France_

**16.**    La REPUBLIQUE DU CONGO n'ayant pas davantage honoré ses engagements, un tribunal arbitral constitué sous l'égide de la Cour internationale d'arbitrage de la Chambre de commerce internationale, par sentence rendue le 3 décembre 2000, a condamné la REPUBLIQUE DU CONGO au paiement, au titre du principal et des intérêts calculés dans la sentence, de :

-    26 858 360 FRF (soit 4 094 530 EUR)

-    18 903 708 GBP

-    31 184 835 USD

-    1 731 267 415 FCFA

ainsi qu'au paiement des intérêts moratoires et des frais d'arbitrage, **soit un total au 28 août 2012 de 191 182 927 €** (ci-après, la "Sentence du 3 décembre 2000").

_Pièce n°15 : Sentence arbitrale CCI du 3 décembre 2000_

**17.**    **Par arrêt rendu le 23 mai 2002** (régulièrement signifié à Parquet le 4 juillet 2002), la Cour d'appel de Paris a rejeté le recours en annulation formé par la REPUBLIQUE DU CONGO contre la Sentence du 3 décembre 2000, **lui conférant ainsi l'exequatur** conformément à l'ancien article 1490 du nouveau Code de procédure civile alors applicable (devenu depuis article 1498 du Code de procédure civile).

_Pièce n°16 : Arrêt rendu le 23 mai 2002 par la Cour d'appel de Paris_
_Pièce n°17 : Signification remise à Parquet le 4 juillet 2002_

3°/    _Le protocole du 23 août 2003 et la nouvelle sentence du 21 janvier 2013_

**18.**    Le 23 août 2003, COMMISIMPEX et la REPUBLIQUE DU CONGO ont conclu un nouveau protocole d'accord portant sur la dette globale de la REPUBLIQUE DU CONGO envers COMMISIMPEX.

_Pièce n°18 : Protocole d'accord de négociations n°706 du 23 août 2003_

**19.**    Celui-ci n'a pas davantage été exécuté par l'Etat congolais que celui de 1992, si bien que COMMISIMPEX a dû introduire, le 17 avril 2009, une seconde demande d'arbitrage auprès de la CCI, portant cette fois sur les sommes visées au protocole de 2003 qui n'étaient pas déjà comprises dans la sentence du 3 décembre 2000.

**20.**    Contrairement aux affirmations outrancières, mais parfaitement infondées, de la REPUBLIQUE DU CONGO, qui n'hésitait pas à qualifier de "frauduleux" le protocole du 23 août 2003 et de "manœuvres" les actions en justice intentées par COMMISIMPEX pour voir reconnaître sa créance (Assignation, §24 à 26), le tribunal arbitral, par sentence rendue le 21

janvier 2013, a non seulement reconnu la validité dudit protocole, mais a encore condamné la RÉPUBLIQUE DU CONGO à payer à COMMISIMPEX la somme de 222 749 598,82 €[4] en principal, somme qui s'ajoute à celles prononcées par la Sentence du 3 décembre 2000.

*Pièce n°19 : Sentence arbitrale CCI du 21 janvier 2013*

**21.**     **La RÉPUBLIQUE DU CONGO persistant à violer ses engagements contractuels et à refuser d'exécuter spontanément la Sentence du 3 décembre 2000** (tout comme la totalité des décisions de justice prononcées contre elle depuis près d'une quinzaine d'années), COMMISIMPEX est contrainte d'avoir recours à des mesures d'exécution forcée.

**4°/**     *Les mesures d'exécution préalablement pratiquées par COMMISIMPEX*

**22.**     Contrairement à ce qu'avance la RÉPUBLIQUE DU CONGO (coutumière il est vrai, on l'a vu, des affirmations mensongères), COMMISIMPEX n'a pas « *attendu 2011 pour tenter de recouvrer sa créance* », puisqu'elle a, par exemple, pratiqué divers saisies conservatoires à l'encontre de la RÉPUBLIQUE DU CONGO en 1998, qui se sont avérées en partie fructueuses, qu'elle a consenti un protocole d'accord en 2003, faisant suite à celui conclu en 1992, et pratiqué une saisie-attribution en 2010.

Il n'est pas inintéressant de relever que la RÉPUBLIQUE DU CONGO invoquait, déjà, pour s'opposer aux saisies pratiquées alors, son immunité d'exécution, à laquelle elle renonçait pourtant à l'occasion de chaque protocole, raison pour laquelle le Juge de l'exécution de céans (déjà !) l'avait écartée.

*Pièce n°20 : Jugement rendu le 30 juillet 1998 par le Juge de l'exécution de Paris*
*Pièce n°21 : Jugement rendu le 23 février 1999 par le Juge de l'exécution de Paris*

**23.**     De nouvelles saisies ont ensuite été pratiquées par COMMISIMPEX en 2011 et 2012, pour la plupart infructueuses ou portant sur des créances fiscales, dont il était argué qu'elles seraient "localisées" en RÉPUBLIQUE DU CONGO et n'auraient donc pas été atteintes par les saisies pratiquées en France ; COMMISIMPEX a donc été contrainte, compte tenu de la jurisprudence actuelle en la matière, de ne pas en poursuivre le recouvrement à ce stade.

*Pièces Congo n°11 et 12*

**24.**     Par ailleurs, COMMISIMPEX a également pratiqué une saisie le 12 octobre 2011 à l'encontre de la RÉPUBLIQUE DU CONGO entre les mains de la Société générale, portant sur des comptes dont la RÉPUBLIQUE DU CONGO affirmait, sans le prouver, qu'ils seraient ceux de sa mission diplomatique en France, dont mainlevée a pourtant été donnée par la Cour d'appel de Versailles, par arrêt du 15 novembre 2012, aux motifs que « *les missions diplomatiques des Etats étrangers bénéficient, pour le fonctionnement de la représentation de l'Etat*

---

[4] Soit environ 525 000 000 € à ce jour si l'on inclut les intérêts moratoires, qui viennent s'ajouter aux 200 000 000 € résultant de la Sentence du 3 décembre 2000 ; COMMISIMPEX est ainsi, à ce jour, créancière de la RÉPUBLIQUE DU CONGO, d'environ **725 000 000 €** en principal et intérêts.

*accréditaire et les besoins de sa mission de souveraineté, d'une immunité d'exécution autonome, à laquelle il ne peut être renoncé que de façon expresse et spéciale »*, et plus étonnant, qu'il ne revenait pas à la REPUBLIQUE DU CONGO de prouver que les comptes saisis étaient bien ouverts pour le compte de sa mission diplomatique.

*Pièce Congo n°10*

C    **Le contrat de désendettement et de développement conclu entre la République française et la REPUBLIQUE DU CONGO**

25.    Le 29 septembre 2010, les gouvernements respectifs de la République française et de la REPUBLIQUE DU CONGO ont conclu un contrat de désendettement et de développement (ci-après, le "**C2D**") aux termes duquel **la <u>République française</u> s'est engagée à verser à la REPUBLIQUE DU CONGO, dans les 15 jours suivant chaque échéance, une subvention** (ci-après, la "**Subvention**") égale au montant des sommes remboursées par cette dernière au titre de ses dettes à l'égard, respectivement, de l'AFD et de la Banque de France[5], à savoir :

| Echéance | Montant dû |
|---|---|
| 01/12/2010 | 15 978 764,85 € |
| 01/04/2011 | 8 018 611,75 € |
| 01/10/2011 | 8 018 611,75 € |
| 01/04/2012 | 8 018 611,75 € |
| 01/10/2012 | 8 018 611,75 € |
| 01/04/2013 | 8 018 611,75 € |
| 01/10/2013 | 8 018 611,75 € |
| 01/04/2014 | 8 018 611,75 € |
| 01/10/2014 | 8 018 611,75 € |

*Pièce n°22 : C2D France-Congo, 29 septembre 2010*

Cette Subvention est accordée et financée par l'Etat français ; elle figure au budget du Ministère des affaires étrangères sous le Programme 209 intitulé « *solidarité à l'égard des pays en développement.* »

*Pièce n°12 : Extraits de l'annexe au Projet de Loi de Finances pour 2013 - Aide publique au développement*

26.    Le 22 décembre 2010, en application du C2D, et conformément à la Convention conclue entre la France et l'AFD le 29 décembre 2003, la REPUBLIQUE DU CONGO et l'AFD

---

[5] Contrairement à ce qu'affirme de manière erronée la REPUBLIQUE DU CONGO (Assignation, §94), l'opération n'est donc pas neutre sur un plan financier : ce sont l'**AFD** et la **Banque de France**, toutes deux dotées d'une personnalité morale et d'un patrimoine propres, qui perçoivent de leur débiteur, la REPUBLIQUE DU CONGO, les échéances de remboursement d'emprunt qui leur reviennent ; c'est en revanche l'**Etat français** qui accorde la Subvention équivalente sur ses lignes budgétaires propres (l'AFD n'agissant à ce stade qu'en tant que simple mandataire de l'Etat français pour le versement des fonds et le contrôle de leur affectation une fois qu'ils sont entre les mains de la REPUBLIQUE DU CONGO).

– laquelle, selon le préambule, est « *chargée par les autorités publiques françaises d'agir pour le compte de la France* » – ont conclu un accord-cadre, dont l'objet « *est de déterminer globalement les modalités de versement de la Subvention et de son affectation au Programme* » (article 1er) (ci-après, l'"**Accord-Cadre**").

Il prévoit que **la Subvention est versée par l'AFD, <u>pour le compte de la France</u>**, sur un compte ouvert **au nom de la REPUBLIQUE DU CONGO** à la Banque des Etats d'Afrique Centrale (ci-après, la "**BEAC**"), sans autre condition que le remboursement préalable par la REPUBLIQUE DU CONGO de ses dettes à l'égard de l'AFD et de la Banque de France (article 2 (b)).

Une fois les fonds versés par l'AFD sur ledit compte, l'AFD doit également contrôler l'utilisation de la Subvention ainsi accordée par l'Etat français (mission de contrôle <u>distincte</u> de celle qui consiste pour elle à verser les fonds sur le compte ouvert à la BEAC).

*Pièce n°23 : Accord-cadre AFD-Congo, 22 décembre 2010*
*Pièce n°11 : Convention conclue entre l'Etat français et l'AFD du 29 décembre 2003 (articles 2 et 3)*

Ce document, par lequel l'AFD est désignée mandataire de l'Etat français pour l'utilisation de la Subvention, n'a été porté à la connaissance de COMMISIMPEX que le 1er juin 2012[6].

1°/     <u>*La réquisition auprès du Ministre de l'Economie, des Finances et de l'Industrie du 19 octobre 2011*</u>

**27.**     Le 19 octobre 2011, COMMISIMPEX a requis le Ministre de l'Economie, des Finances et de l'Industrie, conformément à l'article L. 143-1 du Code des procédures civiles d'exécution (anciennement article 25 de la loi du 9 juillet 1991), de bien vouloir lui indiquer le comptable assignataire des dépenses engagées au titre du C2D.

*Pièce n°24 : Réquisition auprès du Ministre de l'Economie, des Finances et de l'Industrie du 19 octobre 2011*

**28.**     Le 24 octobre 2011, M. Olivier THOUVENIN, Chef du Bureau Dépenses et Rémunérations, a indiqué par courriel à l'huissier instrumentaire :

« *Suite à la réquisition du 19 octobre 2011 par laquelle vous signifiez de bien vouloir vous indiquer le comptable public assignataire des dépenses engagées au titre du contrat de désendettement et de développement, je vous informe que les aides sont versées pour le compte de l'agence française pour le développement par le Contrôleur budgétaire et comptable ministériel des finances situé au 3ème étage du bâtiment Necker de Bercy, 75012 Paris.*
*Ainsi, **la saisie-attribution doit donc être notifiée au CBCM Finances.** »*
(gras ajouté)

*Pièce n°25 : Courriel du Chef du bureau CE-2A à l'huissier instrumentaire du 24 octobre 2011*

---

[6] Par le CBCM en pièce jointe à ses conclusions du même jour (voir *infra* §31).

2°/    *La saisie-attribution de créances du 28 octobre 2011*

**29.    Le 28 octobre 2011, l'huissier instrumentaire a signifié au CBCM Finances une saisie-attribution de créances au titre du C2D,** conformément à l'article R. 143-2 du Code des procédures civiles d'exécution (anciennement article 3 du décret du 31 juillet 1993 relatif aux saisies et cessions notifiées aux comptables publics). Cette saisie a été régulièrement dénoncée à la REPUBLIQUE DU CONGO le 4 novembre 2011.

*Pièce n°26 : Procès-verbal de saisie-attribution du 28 octobre 2011*

**30.**    N'ayant jamais reçu de réponse à la saisie pratiquée le 28 octobre 2011, COMMISIMPEX a assigné le CBCM Finances et l'Agent judiciaire de l'Etat en paiement des causes de la saisie par actes des 10 avril et 22 août 2012.

*Pièce n°27 : Assignations délivrées par COMMISIMPEX les 10 avril 2012 et 22 août 2012*

**31.**    Pour s'opposer à la demande de COMMISIMPEX, le CBCM Finances et l'Agent judiciaire de l'Etat ont notamment déclaré, par conclusions communiquées respectivement les 1er juin et 3 septembre 2012, que :

*« contrairement à ce qui a été indiqué par erreur par Monsieur TOUVENIN, chef du bureau CE-2A, dans un courrier en date du 24 octobre 2011 adressé à Maître FARRUCH, huissier de justice à Paris,* ***le* [CBCM Finances] *n'est pas le comptable assignataire des versements opérés en vertu du* [C2D],** *ses services ne détenant et n'ayant jamais détenu, en exécution de ce contrat, le moindre flux financier en faveur de la République du Congo, puisque seule l'*[AFD], *établissement public industriel et commercial, ayant une personnalité morale distincte de celle de l'Etat français, effectue de tels versements au titre du contrat précité »* ; (gras ajouté)

*Pièce n°28 : Conclusions du CBCM Finances et de l'Agent judiciaire de l'Etat des 1er juin et 3 septembre 2012*

**32.**    Compte tenu de ces déclarations tardives, COMMISIMPEX s'est désistée de l'instance, ce qui a été constaté par le Juge de l'exécution par jugement du 19 septembre 2012.

*Pièce n°29 : Jugement rendu le 19 septembre 2012 par le Juge de l'exécution de Paris*

3°/    *La saisie-attribution de créances du 10 avril 2012*

**33.**    Parallèlement, **le 10 avril 2012,** l'huissier instrumentaire a signifié au CBCM Finances une nouvelle saisie-attribution de créances au titre du C2D, conformément à l'article R. 143-2 du Code des procédures civiles d'exécution (anciennement article 3 du décret du 31 juillet 1993). Cette saisie a été régulièrement dénoncée à la REPUBLIQUE DU CONGO le 18 avril 2012.

*Pièce n°30 : Procès-verbal de saisie-attribution du 10 avril 2012*

**34.**    Par courrier du 11 avril 2012, le CBCM Finances a déclaré que, dans le cadre de la mise en œuvre du C2D, « *32 015 961,35 € de subventions ont été versés sur le compte ouvert au nom du Trésor congolais à la Banque des Etats de l'Afrique centrale (BEAC)* », soit l'intégralité des échéances dues jusqu'en octobre 2011 inclus.

**35.**    En outre, le CBCM Finances a indiqué que les « *versements des subventions ont été effectués selon le calendrier semestriel prévu par le C2D hors* [sa] *comptabilité* » et « ***qu'aucun flux financier concernant ce C2D n'est retracé dans les comptes de l'Etat français*** *et que les services du (…) CBCM placé auprès des ministères financiers ne détiennent et n'ont jamais détenu, dans le cadre de ce dispositif, aucun flux financier en faveur de la République du Congo.* » (gras ajouté)

*Pièce n°31 : Courrier adressé le 11 avril 2012 par le CBCM Finances à l'huissier instrumentaire*

**36.**    Curieusement pourtant, par assignation du 10 juillet 2012, et alors qu'elle n'a jamais contesté la saisie identique pratiquée le 28 octobre 2011, la REPUBLIQUE DU CONGO a cru devoir saisir le juge de céans d'une demande de mainlevée de la saisie infructueuse pratiquée le 10 avril 2012, demande dont elle s'est finalement désistée le 4 octobre 2012, au motif, pour le moins curieux, qu'elle aurait découvert à l'occasion de l'instance que les saisies pratiquées à son encontre n'auraient pas été fructueuses.[7] **Par jugement du 5 octobre 2012, le Juge de l'exécution de céans a constaté le désistement d'instance et d'action de la REPUBLIQUE DU CONGO.**

*Pièce n°32 : Assignation délivrée par la REPUBLIQUE DU CONGO le 10 juillet 2012 et*
*Conclusions en réponse de COMMISIMEPX du 1er octobre 2012*
*Pièce n°33 : Conclusions en désistement de la REPUBLIQUE DU CONGO du 4 octobre 2012 et*
*Conclusions en réponse aux conclusions de désistement du 5 octobre 2012*
*Pièce n°34 : Jugement rendu le 5 octobre 2012 par le Juge de l'exécution de Paris*

**4°/    *La saisie-attribution de créances du 28 août 2012***

**37.**    Dans ces conditions, **le 28 août 2012,** l'huissier instrumentaire a signifié à l'AFD une saisie-attribution de créances. Cette saisie a été régulièrement dénoncée à la REPUBLIQUE DU CONGO le **4 septembre 2012**.

*Pièce n°35 : Procès-verbal de saisie-attribution du 28 août 2012 et Dénonciation du 4 sept. 2012*

**38.**    Après différents échanges avec l'huissier instrumentaire, l'AFD lui a finalement déclaré, par courriers des 5 septembre et 4 octobre 2012, que :

« ***L'Agence Française de Développement est en revanche tenue <u>au titre des concours accordés par celle-ci à</u> la REPUBLIQUE DU CONGO***, *à hauteur des sommes suivantes :*

---

[7] La REPUBLIQUE DU CONGO tentait abusivement, à l'occasion de ses conclusions en désistement du 4 octobre 2012, de faire dire au Juge de l'exécution que la saisie du 10 avril 2012 « *n'*[aurait] *pas été pratiquée entre les bonnes mains et n'*[aurait] *donc produit aucun effet attributif sur de quelconques sommes d'argent* », piège dans lequel le Juge de l'exécution n'est pas tombé.

- *5 826 328 euros, au titre d'un concours n° CCG 1077 01 G*
- *674 506,70 euros, au titre d'un concours n° CCG 1078 01 H*
- *758 407,90 euros, au titre d'un concours n° CCG 1091 01 C*
- *5 018 596,65 euros au titre d'un concours n° CCG 3006 01 A*
- *2 293 026,52 euros au titre d'un concours n° CCG 3011 01 W*
- *5 342,20 euros au titre d'un concours n° CCG 3012 01 X*

*L'Agence Française de Développement est également tenue <u>au titre d'un concours accordé à</u> la REPUBLIQUE DU CONGO, conformément à la Convention de désendettement et de développement du Congo signé à Brazzaville le 29 septembre 2010, à hauteur, au jour de la saisie, d'une somme de 48 111 670, 50 euros, lequel concours est toutefois conditionnel puisque subordonné au paiement préalable, par la République du Congo, des sommes de 34 736 091,25 euros à la Banque de France et 5 356 967,50 euros à l'AFD. »*

Elle a également déclaré être débitrice de :

- 888 541 FCFA (soit 1 354,57 €) à l'égard de la Société Nationale d'Electricité (ci-après "SNE") au titre d'un contrat de fourniture d'électricité ;
- 60 400 FCFA (soit 92,08 €) à l'égard de la Société Nationale de Distribution d'Eau (ci-après "SNDE") ;
- 16 520 FCFA (soit 25,18 €) à l'égard de Congo Télécom.

*Pièce n°36 : Courrier adressé le 4 septembre 2012 par l'huissier instrumentaire à l'AFD*
*Pièce n°37 : Courrier adressé le 5 septembre 2012 par l'AFD à l'huissier instrumentaire*
*Pièce n°38 : Courrier adressé le 11 septembre 2012 par l'huissier instrumentaire à l'AFD*
*Pièce n°39 : Courrier adressé le 26 septembre 2012 par le conseil de l'AFD à l'huissier instrumentaire*
*Pièce n°40 : Courrier adressé le 4 octobre 2012 par le conseil de l'AFD à l'huissier instrumentaire*

**39.** Après avoir obtenu copie des différentes conventions de financement par lesquelles **l'AFD** a accordé à la REPUBLIQUE DU CONGO divers concours financiers, COMMISIMPEX a spontanément donné mainlevée partielle sur les sommes dues au titre de ces seuls concours, qui sont insaisissables de par la loi dès lors qu'ils ont été accordés **par l'AFD** (et non par l'Etat français), et sur les sommes dues à la SNE, la SNDE et Congo Télécom, en raison de leur modicité, par actes des 28 septembre, 10 et 22 octobre 2012.

*Pièce n°41 : Mainlevée partielle du 28 septembre 2012*
*Pièce n°42 : Mainlevée partielle du 10 octobre 2012*
*Pièce n°43 : Mainlevée partielle du 22 octobre 2012*

**40.    Les seules sommes dont l'AFD a reconnu être débitrice et qui demeurent saisies à ce jour sont donc celles dues par l'AFD agissant pour le compte de l'Etat français, au titre du C2D, à savoir 48 111 670, 50 €.**

- 14 -

5°/    *Les manœuvres frauduleuses imaginées par la REPUBLIQUE DU CONGO pour tenter de se débarrasser de COMMISIMPEX*

**41.**    Déjà en 1998, à l'occasion des premières saisies pratiquées par COMMISIMPEX (cf. *supra*), la REPUBLIQUE DU CONGO avait tenté de se débarrasser de COMMISIMPEX en la faisant radier d'office du registre du commerce de Brazzaville. Une telle manœuvre avait lamentablement échoué d'abord devant le Juge de l'exécution de céans (déjà !) qui, avait relevé que les documents produits par la REPUBLIQUE DU CONGO étaient faux, antidatés et contradictoires, puis devant le tribunal arbitral CCI qui n'en avait pas davantage tenu compte.

*Pièce n°25 : Jugement rendu le 30 juillet 1998 par le Juge de l'exécution de Paris*
*Pièce n°25 : Jugement rendu le 23 février 1999 par le Juge de l'exécution de Paris*
*Pièce n°11 : Sentence arbitrale CCI du 3 décembre 2000, p.14 et s.*

**42.**    Par une fraude grossière, la REPUBLIQUE DU CONGO a ensuite imaginé, le 26 septembre 2012 – soit moins d'un mois après la saisie pratiquée entre les mains de l'AFD et alors que le tribunal arbitral CCI devait rendre une seconde sentence – de faire liquider par ses tribunaux, par le biais de sa Caisse Nationale de Sécurité Sociale (ci-après, la "CNSS"), présidée par le Ministre congolais du Travail, prétextant d'un défaut de paiement de cotisations sociales de COMMISIMPEX depuis… 1981 !

*Pièce n°45.1 : Requête déposée par la CNSS le 26 septembre 2012*

**43.**    Alors que la CNSS ne disposait d'aucun titre exécutoire, qu'elle n'avait jamais réclamé le paiement de sa prétendue créance, qu'elle ne produisait au soutien de sa demande fantaisiste qu'un document établi par elle-même, intitulé « *Situation de la cotisante au 31 décembre 2011* », à l'encontre duquel une plainte pour faux et usage de faux a été déposée, et alors que COMMISIMPEX produisait de nombreuses preuves de paiement de ses cotisations sociales depuis 1981, le Tribunal de commerce de Brazzaville, à l'issu d'une procédure bâclée et expéditive, a rendu un jugement le 30 octobre 2012, soit à peine un mois après sa saisine (!), prononçant la liquidation des biens de COMMISIMPEX.

*Pièce n°45.2: Attestation produite par la CNSSPièce n°45.3 : Conclusions en réponse de COMMISIMPEX du 8 octobre 2012*
*Pièce n°45.4 : Plainte contre X avec constitution de partie civile déposée par COMMISIMPEX le 22 oct. 2012*
*Pièce n°45.5 : Conclusions afin de sursis à statuer déposées par COMMISIMPEX le 23 oct. 2012*
*Pièce n°46 : Compte-rendu de contrôle CNPS du 15 février 1989*
*Pièce n°47 : Attestation de Maître Joseph BRUDEY*

**44.**    La simple lecture de ce jugement, dont l'apparente motivation n'est en réalité qu'une compilation d'arguments absurdes et/ou contradictoires, suffit à démontrer la partialité des juges congolais qui ont manifestement rendu un jugement sur commande du pouvoir exécutif.

*Pièce n°48 : Jugement du Tribunal de commerce de Brazzaville du 30 octobre 2012 et déclaration d'appel*

**45.**     La fraude de la REPUBLIQUE DU CONGO est si manifeste que le tribunal arbitral CCI, dans sa sentence du 21 janvier 2013, a déclaré « *que les exigences de l'ordre public international s'opposent à ce que la liquidation de COMMISIMPEX ait des effets dans la présente procédure arbitrale* » et a constaté « *le défaut de qualité des liquidateurs nommés pour représenter COMMSIMPEX dans la présente procédure arbitrale.* »

*Pièce n°49 : Sentence rendue par la Cour internationale d'arbitrage de la CCI le 21 janvier 2013*

**46.**     COMMISIMPEX a interjeté appel du jugement du 30 octobre 2012 le jour même où il a été rendu. Alors que les textes applicables imposent à la Cour d'appel de statuer dans un délai d'un mois à compter de l'appel, la procédure est toujours pendante devant la Cour d'appel de Brazzaville…

*Pièce n°48 : Jugement du Tribunal de commerce de Brazzaville du 30 octobre 2012 et déclaration d'appel*

**6°/**     *La demande de mainlevée de la REPUBLIQUE DU CONGO et de l'AFD*

**47.**     Par acte du 28 novembre 2012, la REPUBLIQUE DU CONGO a assigné COMMISIMPEX, l'AFD et une entité inexistante dénommée « *Liquidation judiciaire Commisimpex* […] *prise en la personne de son représentant légal* », en mainlevée de la saisie pratiquée par COMMISIMPEX le 28 août 2012.

**48.**     Par acte du 30 novembre 2012, dont COMMISIMPEX n'a reçu copie que le 5 février 2013 par l'entremise du conseil de l'AFD, cette dernière a également assigné COMMISIMPEX en mainlevée de ladite saisie.

## II    DISCUSSION

**49.**    Au soutien de sa demande de mainlevée, la REPUBLIQUE DU CONGO prétend que la saisie pratiquée le 28 août 2012 serait nulle aux motifs que :

-    les sommes dues par l'AFD seraient insaisissables (Assignation, §58 et s.) ;

-    « *l'immunité d'exécution dont bénéficie la République du Congo f[er]ait obstacle à la validité de la saisie litigieuse* » (Assignation, §127 et s.).

**50.**    Par son assignation du 30 novembre 2012 et par conclusions communiquées le 23 janvier 2013, l'AFD sollicite également la mainlevée de la saisie pratiquée entre ses mains le 28 août 2012, au motif que les sommes saisies seraient insaisissables.

**51.**    Très succinctement, la REPUBLIQUE DU CONGO (Assignation, §57) et l'AFD ajoutent que serait nulle « *la saisie en ce qu'elle a été pratiquée au préjudice d'entités qui ne sont pas débitrices du créancier saisissant.* » (Conclusions AFD, § 66 à71)

**52.**    Par intervention à l'audience du 31 janvier 2013, les « *liquidateurs* » de COMMISIMPEX se sont présentés, par leur avocat, François de KERVERSAU. Ils n'ont aucunement pris la défense des intérêts de COMMISIMPEX et après avoir exposé qu'ils avaient « *le droit de faire entendre l'avis de la COMMISIMPEX* », ils ont simplement indiqué n'avoir « *pas conclu* » et n'avoir « *aucune demande à faire* », déclarant simplement « *s'en rapporter à la sagesse de la Présidente* » s'agissant du sort à réserver à la saisie-attribution contestée, qui porte sur pas moins de 48 000 000 €…

**53.**    Aucun de ces arguments ne saurait prospérer. COMMISIMPEX démontrera en effet que :

-    l'intervention des « *liquidateurs* » est irrecevable dès lors qu'ils n'ont pas été assignés à comparaître, que leur intervention volontaire n'est pas régulière et que le Jugement qu'ils excipent est inopposable en France (A) ;

-    l'AFD est irrecevable en ses demandes faute d'intérêt à agir et ni l'AFD ni la REPUBLIQUE DU CONGO n'ont qualité pour demander la nullité des saisies pratiquées à l'encontre des émanations de cette dernière (B) ;

-    les sommes dues par l'AFD sont parfaitement saisissables dès lors qu'il s'agit de subventions accordées par l'Etat français, et non par l'AFD (C) ;

-    la REPUBLIQUE DU CONGO ayant contractuellement renoncé « *à toute immunité d'exécution* », celle-ci ne peut invoquer utilement son immunité d'exécution dans la présente procédure (D).

**A      L'intervention des « *liquidateurs* » n'est pas régulière**

*1°/     Les « liquidateurs » n'ont pas été assignés à comparaître devant le Juge de l'exécution*

**54.**    Il ressort du plumitif de l'audience du 31 janvier 2013 que sont intervenus à la présente procédure « *les liquidateurs* » de COMMISIMPEX, à savoir, si l'on en croit le jugement du 30 octobre 2012 – « *frappé d'appel et non exéquaturé en France* » comme ils l'indiquent eux-mêmes au Juge de céans – ainsi que l'extrait RCCM qu'ils excipent, MM. Gaston MOSSA, Aimery Patrick TATI et Emile NZONDO.

*Pièce n° 52 : Plumitif de l'audience du 31 janvier 2013*
*Pièce n°48 : Jugement du Tribunal de commerce de Brazzaville du 30 octobre 2012 et déclaration d'appel*

**55.**    Force est pourtant de constater que ni M. Gaston MOSSA, ni M. Aimery Patrick TATI, ni M. Emile NZONDO n'ont été rendus destinataires de l'assignation délivrée par la REPUBLIQUE DU CONGO le 28 novembre 2012.

**56.**    Aucun des « *liquidateurs* » n'est donc partie à la présente instance.

**57.**    Ils ne sont pas davantage présents à l'instance sous couvert de   « *LIQUIDATION JUDICIAIRE DE COMMISIMPEX (syndic liquidateur de la société Commission Import Export)* ».

Et pour cause, une telle entité n'existe pas !

**58.**    En effet, aux termes des articles 35 et 43 de l'Acte Uniforme OHADA du 10 avril 1998 portant organisation des procédures collectives d'apurement du passif (ci-après, l'"**AUPC**") :

« [La décision d'ouverture d'une procédure collective] *désigne le ou les syndics sans que le nombre de ceux-ci puisse excéder trois.* »

« *Le ou les syndics sont chargés de représenter les créanciers* […]. »

« *Ils ont qualité de mandataires rémunérés et sont civilement responsables de leurs fautes dans les termes du droit commun, sans préjudice de leur responsabilité pénale.* »

« *S'il a été nommé plusieurs syndics, ils agissent collectivement.* »

**59.**    Ainsi, un jugement de faillite ne crée pas une personne morale nouvelle mais confère simplement une qualité à une ou plusieurs personne(s) morale(s) ou physique(s) qui engage(nt) sa (leur) responsabilité civile et pénale personnelle.

**60.**    En l'espèce, ce qui est désigné sous le nom de « *LIQUIDATION JUDICIAIRE DE COMMISIMPEX* » n'a aucune existence juridique et n'a pas pu être créé par le Tribunal de commerce de Brazzaville.

**61.**    Or, la Cour de cassation, sur le fondement de l'article 117 du Code de procédure civile, rappelle de façon constante que « *l'irrégularité d'une procédure tenant à l'inexistence de la*

*personne morale qui déclare agir en justice doit être retenue même en l'absence de grief et ne peut être couverte ».*

> Pièce n° 53.1: Cass. Com., 3 octobre 2006, n° 05-12410
> Pièce n° 53.2: Cass. Civ. 2, 11 septembre 2003, n° 01-14493
> Pièce n° 53.3 : Cass. Com., 7 décembre 1993, n° 91-19339

**62.**     Cette entité, inexistante, ne peut donc pas être partie à l'instance et les « *liquidateurs* » qui sont intervenus à l'audience du 31 janvier 2013 ne peuvent pas valablement la représenter.

**63.**     Quant à la mention de « *syndic liquidateur de la société COMMISISSIONS IMPORT EXPORT* » qui y est accolée, elle est purement et simplement fausse puisque les syndics liquidateurs désignés par le Jugement sont MM. MOSSA, TATI et NZONDO.

**64.**     Si l'on avait voulu assigner les syndics liquidateurs de COMMISIMPEX, il aurait fallu délivrer une assignation à chacun des trois syndics en personne.[8]

**65.**     Dans ces conditions, le Juge de céans de pourra que constater que MM. Gaston MOSSA, Aimery Patrick TATI et M. Emile NZONDO n'ont pas été assignés à la présente instance et que « *Liquidation judiciaire COMMISIMPEX* » est une entité qui ne dispose pas de la personnalité juridique.

**66.**     Faute d'avoir été assignés à comparaître, l'intervention à l'audience du 31 janvier 2012 des prétendus « *liquidateurs* » ne peut s'analyser qu'en une intervention volontaire

**2°/     _L'intervention des « liquidateurs » est irrecevable_**

**67.**     Conformément à l'article 328 du Code de procédure civile :

*« L'intervention volontaire est principale ou accessoire. »*

**68.**     Elle est principale « *lorsqu'elle élève une prétention au profit de celui qui la forme* » (article 329 du Code de procédure civile) et est accessoire « *lorsqu'elle appuie les prétentions d'une partie* » (article 330 du Code de procédure civile).

**69.**     En l'espèce, les « *liquidateurs* » se sont contentés d'indiquer qu'ils n'avaient « *aucune demande à faire* ».

> Pièce n° 52 : Plumitif de l'audience du 31 janvier 2013

---

[8] C'est d'ailleurs toujours sous leur nom patronymique, ès-qualité, qu'apparaissent ou interviennent les syndics liquidateurs désignés dans des Etats de l'espace OHADA devant les juridictions françaises. Voir par exemple : *CA Versailles (14ème Ch.), 19 septembre 2012, RG n° 11/09165 (Pièce n° 53.4) ; CA Paris (Pôle 1 Ch. 1), 14 octobre 2010, RG n° 09/18451 (Pièce n° 53.5) ; CA Paris (18ème Ch. A), 24 avril 2007, RG n° 05/08022 (Pièce n° 53.6).*

**70.**     N'émettant donc aucune prétention et n'appuyant pas celles des parties à l'instance, l'intervention de ces « *liquidateurs* » ne peut dès lors être qualifiée ni de principale ni d'accessoire.

**71.**     Le Juge de céans déclarera donc irrecevable l'intervention volontaire des « *liquidateurs.* »

**3°/     *La désignation des* « liquidateurs » *ne saurait être reconnue sur le territoire français*

**72.**     Pour justifier de leur prétendue qualité, les « *liquidateurs* » excipent d'un jugement rendu par le Tribunal de commerce de Brazzaville le 30 octobre 2012 dont il est constant qu'il est « *frappé d'appel et non exequaturé en France.* »

*Pièce n° 52 : Plumitif de l'audience du 31 janvier 2013*
*Pièce n°48 : Jugement du Tribunal de commerce de Brazzaville du 30 octobre 2012 et déclaration d'appel*

**73.**     S'il est vrai qu'indépendamment de l'exequatur, un jugement étranger prononçant la liquidation d'une société peut produire des effets *de plano*, sans pour autant « *produire en France aucun effet de dessaisissement du débiteur, ni de suspension des poursuites individuelles* »[9], encore faut-il vérifier qu'il remplisse les conditions de régularité en France.

**74.**     Il appartient donc au Juge de céans de vérifier la régularité du jugement congolais invoqué par les « *liquidateurs* » avant de lui reconnaitre l'effet demandé[10].

**75.**     Conformément à l'article 49 de la Convention de coopération en matière judiciaire entre la République française et la République populaire du Congo du 1er janvier 1974 (ci-après, la "**Convention**"), relatif à la reconnaissance et à l'exécution des décisions en matière civile, sociale et commerciale :

> « *En matière civile, sociale ou commerciale, les décisions contentieuses et gracieuses rendues par toutes les juridictions siégeant sur le territoire de la République française et sur le territoire de la République populaire du Congo sont reconnues de plein droit sur le territoire de l'autre Etat si elles réunissent les conditions suivantes :*
> *(…)*
> *c)     les parties ont été régulièrement citées, représentées ou déclarées défaillantes* » ;
> *d)     la décision ne contient rien de contraire à l'ordre public de l'Etat où elle est invoquée (…).* »

**76.**     Or, en l'espèce, ces deux conditions ne sont pas remplies.

---

[9]  Cass. Civ. 1, 24 mars 1998, n° 96-10171 (*Pièce n° 53.7*)
[10] Dominique BUREAU et Horatia MUIR WATT, *Droit international privé*, PUF 2007, Tome 1, n°290 (*Pièce n° 54.1*) ; Bernard AUDIT, *Droit international privé*, Economica 2006, n°494 (*Pièce n° 54.2*).

77.    En effet, opportunément saisi par la CNSS, émanation de la République du Congo, au mois de septembre 2012 prétexte pris d'un défaut prétendu de règlement par COMMISIMPEX de ses cotisations sociales depuis… 1981, le Tribunal de commerce de Brazzaville s'est associé à une fraude grossière organisée par la REPUBLIQUE DU CONGO pour échapper au paiement des sommes mises à sa charge par la sentence de 2000 (puis par la sentence arbitrale finalement rendue en janvier 2013, qui l'a condamnée au paiement, cette fois, d'environ 525 millions d'euros en principal et intérêts à ce jour).

78.    La simple lecture de ce jugement permettra au juge de céans de constater l'atteinte aux droits procéduraux fondamentaux de COMMISIMPEX : non seulement elle n'a pas été régulièrement citée à comparaître, mais encore le juge congolais a fait montre d'une partialité flagrante en ne respectant pas le principe du contradictoire et en fondant sa décision sur un faux manifeste, en rejetant l'argumentation de COMMISIMPEX par une apparence de motivation qui n'est en réalité qu'une compilation d'arguments absurdes et/ou contradictoires et en désignant des syndics liquidateurs dont la proximité avec le pouvoir exécutif de République du Congo est avérée – tous griefs révélateurs de la fraude commise, et qui constituent autant de violations de l'ordre public international français.

79.    Le Jugement du 30 octobre 2012 est donc irrégulier et le Juge de céans fera échec à cette fraude, en jugeant irrecevable l'intervention des prétendus « *liquidateurs* » devant lui.

**B    L'AFD est irrecevable en ses demandes faute d'intérêt à agir et l'AFD et la REPUBLIQUE DU CONGO n'ont pas qualité pour solliciter la nullité de saisies pratiquées à l'encontre des émanations de cette dernière**

80.    Aux termes de l'article 31 du Code de procédure civile :

« *L'action est ouverte à tous ceux qui ont un **intérêt légitime au succès ou au rejet d'une prétention**, sous réserve des cas dans lesquels la loi attribue le droit d'agir aux seules personnes qu'elle qualifie pour élever ou combattre une prétention, ou pour défendre un intérêt déterminé.* »

81.    Une partie qui agit en justice doit donc démontrer qu'elle a un intérêt au succès ou au rejet de sa demande, c'est-à-dire que celle-ci doit être susceptible de modifier en l'améliorant la condition juridique du demandeur. Comme le dit l'adage : "pas d'intérêt, pas d'action."

82.    Selon la jurisprudence constante de la Cour de cassation, l'intérêt à agir doit non seulement être légitime mais aussi **personnel**, **né** et **actuel** ; **les actions déclaratoires ou préventives sont en revanche prohibées**, n'ayant pour but que de consulter les juges sur une question de droit sans effet immédiat sur leur situation juridique.

*Pièce n°50 : Arrêt de la Cour de cassation (3ème ch. civ.) du 31 octobre 2006, pourvoi n°05-11929*
*Pièce n°51 : Arrêt de la Cour de cassation (1ère ch. civ) du 13 mai 1997, pourvoi n°95-16303*

83.    En l'espèce, l'AFD pense pouvoir justifier d'un intérêt à contester la saisie-attribution pratiquée entre ses mains le 28 août 2012 en affirmant que « *l'indisponibilité qui s'y attache*

*porte atteinte à sa mission même et aux relations internationales que la France entretient, à travers l'Agence, avec la République du Congo »* dès lors que cela empêcherait l'Agence d'honorer ses engagements au titre du C2D.

84.     Une telle argumentation n'est pas convaincante.

85.     En effet, aux termes du C2D et de l'Accord-Cadre, ce n'est pas l'AFD qui s'est engagée personnellement au versement de la Subvention mais le seul Etat français, l'AFD n'intervenant que pour le compte de l'Etat français, aux risques de celui-ci, et ce conformément à l'article R. 516-7 du Code monétaire et financier. Le rôle de l'AFD se limite au versement de la Subvention et au contrôle de son affectation.

86.     On ne voit d'ailleurs pas en quoi la saisie pratiquée entre ses mains le 28 août 2012 porterait une quelconque atteinte aux missions de l'AFD.

         Si tel était le cas, il faudrait admettre qu'aucune saisie ne serait possible entre les mains de toutes les entités françaises exerçant une mission de service public, ce que la loi ne prévoit pas, et pour cause – le Code des procédures civiles d'exécution envisage même expressément les saisies susceptibles d'être pratiquées entre les mains des comptables publics assignataires des dépenses des collectivités publiques (dont l'Etat français), dont il n'est pas contestable qu'elle remplissent toutes pourtant une mission de service public…

87.     La saisie n'empêche pas non plus l'AFD d'honorer ses engagements puisque ce n'est pas l'AFD qui a pris l'engagement de régler la Subvention à la REPUBLIQUE DU CONGO, mais bien l'Etat français dont l'AFD n'est que le mandataire (Etat français qui ne pourrait d'ailleurs pas davantage prétendre que son patrimoine et ses obligations seraient affectés par la saisie, du fait de l'effet libératoire de paiement attaché à toute saisie).

88.     L'AFD reconnaît d'ailleurs implicitement n'avoir point d'intérêt personnel à agir puisqu'elle invoque, en désespoir de cause, une prétendue atteinte aux « *relations internationales de la France* », ce qu'elle n'a pas qualité à invoquer.

89.     En réalité, la saisie pratiquée le 28 août 2012 ne préjudicie ni ne modifie en rien les droits ou le patrimoine de l'AFD.

90.     Par ailleurs, s'agissant de la demande de la REPUBLIQUE DU CONGO et de l'AFD de voir annuler la saisie « *en ce qu'elle a été pratiquée au préjudice d'entités qui ne sont pas débitrices du créancier saisissant* », ni l'une ni l'autre n'a davantage qualité ni intérêt à agir.

91.     En effet, d'après les déclarations de l'AFD elle-même, la saisie s'est avérée infructueuse en tant qu'elle a atteint les émanations de la REPUBLIQUE DU CONGO, à l'exception de la SNE, la SNDE et Congotel, pour lesquelles mainlevée partielle a déjà été consentie par COMMISIMPEX en raison de la modicité des créances saisies.

         Il y aurait là un non-sens caractérisé : comment admettre un tiers saisi en sa contestation de la qualité de débitrice d'une société visée sur le procès-verbal de saisie lors même que le tiers saisi déclare que la saisie a été infructueuse (sans être, à ce stade, poursuivi

pour déclaration mensongère ou inexacte) ?

**92.** En tout état de cause, il n'est pas acceptable que l'AFD ou la REPUBLIQUE DU CONGO puisse valablement soutenir que les entités visées par la saisie ne seraient pas des émanations de la REPUBLIQUE DU CONGO alors que celles-ci ne sont même pas présentes à l'instance pour faire valoir leurs arguments.

S'il devait en être autrement, cela voudrait dire, en raisonnant par l'absurde, que le Juge de l'exécution pourrait juger que ces entités sont des émanations de la REPUBLIQUE DU CONGO sans même que ces dernières ne participent aux débats !

**93.** Dès lors qu'il n'existe aucune somme à saisir, l'AFD et la REPUBLIQUE DU CONGO n'ont aucun intérêt à demander la mainlevée d'une saisie infructueuse.

**94. Si par extraordinaire**, le Juge de l'exécution devait dire l'AFD et la REPUBLIQUE DU CONGO recevables à contester la qualité d'émanation des entités visées par la saisie pratiquée le 28 août 2012, il enjoindrait à l'AFD et à la REPUBLIQUE DU CONGO de les appeler dans la cause et inviterait COMMISIMPEX à justifier de leur qualité d'émanation au 28 août 2012, jour où la saisie a été pratiquée.

**95.** Pour conclure, la demande de mainlevée formée par l'AFD n'est pas susceptible de modifier sa condition juridique en l'améliorant ; l'AFD, qui ne cherche qu'à obtenir un jugement déclaratoire, ne justifie d'aucun intérêt né et actuel, ni surtout légitime, à agir en mainlevée de la saisie pratiquée le 28 août 2012 et n'a pas qualité, pas plus que la REPUBLIQUE DU CONGO, pour demander la nullité de la saisie en ce qu'elle a été pratiquée à l'encontre des émanations de cette dernière.

**96.** Les demandes de l'AFD seront donc jugées irrecevables.

**97.** En tout état de cause, elles sont infondées.

**C** **Les sommes versées par l'AFD, agissant pour le compte de l'Etat français, à la REPUBLIQUE DU CONGO au titre du C2D sont parfaitement saisissables**

**98.** La REPUBLIQUE DU CONGO et l'AFD prétendent que les sommes saisies le 28 août 2012 entre les mains de l'AFD seraient insaisissables en vertu de l'article 87 de la loi du 30 décembre 2003 (Assignation, §60 à 85 et Conclusions AFD, §58 et s.).

**99.** En outre, par une argumentation particulièrement téméraire, la REPUBLIQUE DU CONGO affirme que l'insaisissabilité serait « *renforcée par les principes qui ont conduit à l'adoption de l'article 87 de la loi du 30 décembre 2003* » (Assignation, §86 et suivants). Au soutien de cette affirmation, la REPUBLIQUE DU CONGO tente, en réalité, de faire admettre qu'il existerait d'autres causes d'insaisissabilité de sa créance, non légales, telles que « *la nature même de l'aide au développement* » (Assignation §86 à 100) et l'entrave aux « *services publics de la République française et de la République du Congo* » (Assignation, §101 à 114).

Ce n'est donc plus le texte lui-même qu'il faudrait analyser, mais les principes supposés ayant conduit à son adoption, qui seraient eux-mêmes source d'insaisissabilité !

**100.**   Aucun de ces arguments ne saurait prospérer : la loi du 30 décembre 2003, d'interprétation stricte, ne porte que sur les seuls concours financiers accordés **par l'AFD** et non sur ceux accordés par l'Etat français (1°/). En outre, il n'existe aucun texte prévoyant l'insaisissabilité de créances en vertu de leur « *nature même* » (2°/) ou en raison des prétendus effets de leur saisie sur les services publics français et étrangers ou sur les relations internationales de la France (3°/).

**1°/**   <ins>**Les créances objet de la saisie ne sont pas couvertes par l'insaisissabilité édictée à l'article 87 de la loi du 30 décembre 2003**</ins>

   a)   <ins>A titre liminaire, les lois d'insaisissabilité, en ce qu'elles portent atteinte au droit de propriété et au droit à l'exécution des décisions de justice, sont d'interprétation stricte</ins>

**101.**   Par principe, l'ensemble des biens d'un débiteur sont saisissables.

En effet, aux termes de l'article 2284 du Code civil, « *quiconque s'est engagé personnellement est tenu de remplir son engagement **sur tous ses biens** mobiliers et immobiliers présents et à venir* ».

De même, l'article L. 112-1 du Code des procédures civiles d'exécution, reprenant le droit de gage général édicté à l'article 2284 du Code civil, prévoit que « *les saisies peuvent porter **sur tous les biens** appartenant au débiteur alors même qu'ils seraient détenus par des tiers* ».

**102.**   Néanmoins, par exception, sont insaisissables les biens limitativement énumérés à l'article L. 112-2 du Code des procédures civiles d'exécution au nombre desquels figurent « *les biens que la loi déclare insaisissables* […] » (article L. 112-2 1° du même Code).

**103.**   Or, en raison de l'atteinte au droit de propriété des créanciers portée par ce texte, et davantage encore de la limitation qu'il apporte au droit des créanciers titrés à l'exécution de la décision de justice[11] qu'ils ont obtenue, les dispositions prévoyant une mesure d'insaisissabilité ne sauraient être interprétées de façon extensive.

La meilleure doctrine rappelle en effet que « *dans la mesure où la loi prévoit un principe de saisissabilité des biens du débiteur,* **les dispositions qui envisagent une mesure d'insaisissabilité sont d'interprétation restrictive.** »

*Pièce n°56 : S. Guinchard et T. Moussa, Droit et pratique des voies d'exécution, p. 122, §150.13*

**104.**   En l'espèce, l'article 87 de la loi du 30 décembre 2003 déclare insaisissables les seuls concours accordés par l'AFD (b). Or, en l'espèce, la Subvention appréhendée par la saisie du

---

[11] Droit reconnu et consacré par la CEDH dans son célèbre arrêt Hornsby c. Grèce du 19 mars 1997 sur le fondement de l'article 6§1 de la CESDH. (Pièce n°55)

28 août 2012, n'est pas accordée par l'AFD mais par l'Etat français ; elle est donc parfaitement saisissable (c).

b) L'article 87 de la loi du 30 décembre 2003 déclare insaisissables les seuls concours accordés par l'AFD

**105.** Aux termes de l'article 87 de la loi de finances rectificative n°2003-1312 du 30 décembre 2003 :

> « Les créances nées des concours accordés par l'Agence française de développement ne peuvent faire l'objet de saisies entre ses mains ».

Il s'agit donc d'une exception légale au droit de gage général et au droit à l'exécution des décisions de justice qui doit être interprétée strictement.

Aux termes de cette disposition législative, **ce n'est pas l'aide au développement de manière générale qui bénéficie de l'insaisissabilité, ni même les créances détenues par l'AFD, mais uniquement les concours que l'AFD accorde**, et encore, à condition que la saisie soit pratiquée entre ses mains.

**106.** **Sont donc parfaitement saisissables les subventions accordées par l'Etat français à quelque titre que ce soit, fussent-elles *versées* par l'AFD, agissant pour le compte de l'Etat français.**

**107.** En effet, comme cela a été analysé *supra* (§11 à 14), l'AFD peut être amenée à verser des subventions à des tiers aussi bien au titre de concours qu'elle a elle-même accordés, qu'au titre de concours accordés par d'autres entités, dont l'Etat français notamment, l'AFD agissant alors au nom et aux risques de l'Etat français.

**108.** L'étude des rapports parlementaires confirme que cette analyse est conforme en tout point à l'intention du législateur puisque le rapport de la Commission des finances du Sénat conclut à la nécessité de prévoir « *une disposition législative spécifique tendant à garantir l'absence de saisie entre les mains de l'Agence, **pour les créances nées des concours financiers qu'elle accorde et qui constituent la 'substance' de sa mission** de service public.* »

*Pièces Congo n°25 et 26*

**109.** En conséquence, contrairement à ce que voudraient faire accroire la REPUBLIQUE DU CONGO et l'AFD, le législateur a intentionnellement restreint le champ d'application de l'insaisissabilité à ce qui constitue la « *substance* » de sa mission de l'AFD, c'est-à-dire aux seuls concours **accordés par l'AFD**, à l'exclusion de ses autres activités, notamment lorsqu'elle verse (puis *a posteriori*, contrôle) l'utilisation de subventions pour le compte de l'Etat français.

**110.** Ces dispositions sont à comparer avec celles, beaucoup plus larges, introduites par le Parlement belge en 2008 dans la loi du 25 mai 1999 relative à la coopération internationale

belge, aux termes desquelles « *les sommes et les biens destinés à la coopération internationale belge ainsi que les sommes et les biens destinés à l'aide publique belge au développement* […] *sont insaisissables et incessibles* ».

<em>Pièce n°57 : Loi belge du 25 mai 1999 relative à la coopération internationale belge – art. 11 bis</em>

**111.**    Ce n'est pas le choix qui a été fait par le législateur français.

**112.**    Dans ces conditions, dès lors que, comme en l'espèce, une saisie est pratiquée entre les mains de l'AFD, la seule question à laquelle le juge doit répondre pour déterminer si la créance saisie est saisissable porte sur l'identité de l'entité qui a <u>accordé</u> le concours saisi.

**113.**    Si les concours ont été accordés par l'AFD, les créances sont insaisissables par l'effet de la loi de 2003 ; si, en revanche, les concours sont accordés par l'Etat français, les créances sont parfaitement saisissables.

c) <u>La Subvention appréhendée par la saisie du 28 août 2012 a été accordée par l'Etat français : elle est donc parfaitement saisissable</u>

**114.**    Il ressort de la déclaration de l'AFD à l'huissier instrumentaire du 5 septembre 2012, que les sommes qui demeurent appréhendées par la saisie du 28 août 2012 portent sur les sommes dues par l'AFD au titre du C2D.

<em>Pièce n°37 : Courrier adressé le 5 septembre 2012 par l'AFD à l'huissier instrumentaire</em>

(i)    <u>L'Etat français s'est engagé seul à verser une Subvention à l'AFD au titre du C2D</u>

**115.**    Il est constant que le C2D a été conclu entre la République française et la REPUBLIQUE DU CONGO. Aux termes de l'article 2 du C2D :

« *Dès le versement à bonne date de l'échéance due par le Gouvernement du Congo, **la France s'engage** à verser, sur le Compte, dans un délai de 15 (quinze) jours ouvrables, une Subvention* ».

<em>Pièce n°22 : C2D conclu le 29 septembre 2010</em>

**116.    Conformément au C2D, c'est donc l'Etat français seul qui s'est engagé à verser la Subvention à la REPUBLIQUE DU CONGO.**

**117.**    Cet engagement existe indépendamment de toute intervention de l'AFD, qui n'est pas partie au C2D ; la seule condition de l'engagement de la France tient au remboursement, par la REPUBLIQUE DU CONGO, de sa dette à l'égard de l'AFD et de la Banque de France.

*(ii)* <u>L'AFD est chargée de verser la Subvention pour le compte de l'Etat français</u>

**118.** Aux termes de l'Accord-Cadre conclu le 22 décembre 2010 entre l'AFD et la REPUBLIQUE DU CONGO, il est stipulé que :

- l'AFD est « *chargée par les autorités publiques françaises d'agir, dans ce cadre, **pour le compte de la France*** » (Préambule, p.3 §4) ;

 *« La Subvention désigne le refinancement accordé* [à la REPUBLIQUE DU CONGO] ***par la France*** *» ;* (Glossaire, p.4)

- « *L'objet du présent accord est de déterminer globalement les modalités de versement de la Subvention et de son affectation au Programme* » (article 1er, al. 1er)

**119.** S'agissant du versement de la Subvention accordée par la France, la seule disposition de l'Accord-Cadre pertinente figure à l'article 2 (a) qui stipule que :

 « *Dans les conditions prévues à l'article 2 du* [C2D], *l'Agence versera la Subvention en euros sur le Compte ouvert par* [la REPUBLIQUE DU CONGO] *dans les livres de la* [BEAC] *» (article 2 (a))*

 *Pièce n°23 : Accord Cadre du 22 décembre 2010 – Préambule § 4, Glossaire, art. 1 et art. 2.a*

 L'Accord-Cadre ne prévoit donc aucune autre condition que celle prévue à l'article 2 du C2D pour le versement de la Subvention et spécifie expressément que cette Subvention est versée pour le compte de l'Etat français.

 **A ce stade, l'AFD n'intervient donc que pour procéder au seul <u>versement</u> des sommes dues par l'Etat français, au nom et pour le compte de ce dernier, à la REPUBLIQUE DU CONGO (sur le compte ouvert à la BEAC au nom de cette dernière) et il ne peut être sérieusement prétendu que ce serait l'AFD qui accorderait ladite Subvention.**

**120.** Pour une parfaite compréhension du schéma mis en place au titre du C2D et de l'Accord-Cadre, il faut préciser que l'AFD est également chargée de contrôler l'utilisation de la Subvention par la REPUBLIQUE DU CONGO *après* son versement sur le compte ouvert au nom de la REPUBLIQUE DU CONGO à la BEAC.

 Ainsi, il est prévu que « *l'instruction des Programmes est réalisée par l'Agence, en partenariat avec le Congo* » et que « *l'Agence soumet à ses instances, pour décision, la proposition de financement du Programme concerné. L'affectation de la part de la Subvention pour chaque Programme sera formalisée par une Convention d'affectation spécifique entre le Congo et l'Agence.* »

**121.** Le contrôle réalisé par l'AFD sur l'affectation des fonds ne s'effectue donc pas *avant* le versement de la Subvention sur le compte ouvert au nom de la REPUBLIQUE DU CONGO, mais bien *après* son versement, pour s'assurer que les fonds sont effectivement employés par la REPUBLIQUE DU CONGO à des programmes de développement (et éviter, incidemment, que les fonds en question soient détournées à des fins personnelles par les dirigeants

congolais).

Les pièces n°26 à 28 produites par l'AFD correspondent précisément aux autorisations conditionnelles consenties par l'AFD à l'utilisation par la REPUBLIQUE DU CONGO des fonds qu'elle a déjà reçus sur son compte ouvert à la BEAC à un Programme spécifique autorisé par l'AFD.

**122.    En l'espèce, la saisie querellée a bien porté sur les créances <u>conditionnelles</u> (qui se matérialisent sous condition de remboursement préalable par la REPUBLIQUE DU CONGO des sommes qu'elle doit à la Banque de France et à l'AFD) et <u>à terme</u> (au rythme de deux échéances par an, en avril et en octobre) de versement de sommes dues par l'AFD pour le compte de l'Etat français sur le compte ouvert par la REPUBLIQUE DU CONGO à la BEAC.**

**Elle n'a pas porté sur les sommes entrées en compte à la BEAC (et dont l'AFD contrôle effectivement l'utilisation) – car alors, les sommes appartiennent à la REPUBLIQUE DU CONGO, et ne sont plus dues par l'AFD (pour le compte de l'Etat français).**

> (iii)    <u>La Subvention est financée par le seul Etat français et l'AFD est rémunéré pour son rôle d'intermédiaire</u>

**123.**    Aux termes de l'article 5 de la Convention conclue entre l'Etat français et l'AFD du 23 décembre 2003, tel que modifié par avenant n°1 du 30 octobre 2007 :

- Le rôle de l'AFD est défini comme celui « *d'agent-payeur du C2D (*Préambule, § 3 *in fine*) ;

- « *L'AFD appelle auprès de l'Etat le versement des ressources budgétaires nécessaires, en trois tranches annuelles (*Article 5-1, nouvelle rédaction) ;

- « *Par exception, la Banque de France et Natixis reversent directement à l'AFD dans les cinq jours ouvrés de leur encaissement, les échéances reçues notamment au titre des prêts refinancés par l'Etat et des prêts su protocole du Trésor (…) qui font l'objet d'une annulation dans les livres de l'Etat dans le cadre des C2D.* » (Article 5-2, *in fine*, nouvelle rédaction,

- « *les fonds reçus par l'AFD sont logés dans un compte ouvert à cet effet dans ses livres et portent intérêt qui viennent en déduction de la rémunération visée à l'article 8* » (Article 5-3, *in fine*, nouvelle rédaction) ;

- « *L'AFD ne peut effectuer de versement au titre de la Subvention que dans la limite des ressources budgétaires et des reversements de la Banque de France et de Natixis qu'elle a préalablement reçues (…)* » (Article 6, dernier paragraphe, nouvelle rédaction) ;

-    « *L'AFD reçoit en contrepartie de son activité au titre de la présente convention, une rémunération annuelle* (…) »

*Pièce n°11 : Convention conclue entre l'Etat français et l'AFD du 29 décembre 2003*
*Pièce n°12 : Extraits de l'annexe au Projet de Loi de Finances pour 2013 - Aide publique au développement*

**124.**     On le comprend, les Subventions versées par l'AFD à la RÉPUBLIQUE DU CONGO proviennent des fonds que l'AFD a reçus préalablement de l'Etat français – lesquels figurent au programme 209 du budget du Ministère des affaires étrangères – et l'AFD est rémunérée par l'Etat français en qualité d'agent-payeur du C2D.

**125.**     En conclusion des points qui précèdent, dès lors que l'Etat français s'engage seul au versement de la Subvention, que l'AFD verse la Subvention pour le compte de l'Etat français, et que la Subvention est financée par le seul Etat français, il ne peut être sérieusement contesté que **la Subvention a été accordée par l'Etat français**.

**126.**     L'AFD elle-même procédait à cette analyse lorsqu'elle a déclaré à l'huissier saisissant, le 5 septembre 2012, être d'une part, « *tenue au titre des concours accordés par celle-ci à la RÉPUBLIQUE DU CONGO* » de diverses sommes **et** être d'autre part « *tenue au titre d'un concours accordé à la RÉPUBLIQUE DU CONGO conformément* [au C2D]. » L'AFD savait alors pertinemment faire la différence entre les concours qu'elle accorde et ceux accordés par l'Etat français.

*Pièce n°37 : Courrier adressé le 5 septembre 2012 par l'AFD à l'huissier instrumentaire*

**127.     En conséquence, les sommes saisies au titre du C2D sont parfaitement saisissables et la loi du 30 décembre 2003 est sans application en l'espèce.**

**2°/     *L'affectation de la créance n'est pas de nature à faire obstacle à la saisie***

**128.**     La RÉPUBLIQUE DU CONGO prétend – sans toutefois se fonder sur aucun texte, aucune doctrine, ni aucune jurisprudence – que « *la nature même de l'aide au développement fait obstacle à ce qu'elle puisse faire l'objet d'une saisie au profit d'intérêts privés* » (Assignation, §86).

**129.**     Au soutien de cette affirmation, elle prétend ainsi que :

-    « *les concours de l'AFD* (…) *n'existent que par leur affectation qui en constitue tout à la fois la cause, l'objet et l'unique contrepartie* » et que « *l'affectation est l'essence même de l'engagement de verser la subvention d'aide au développement en sorte qu'elle n'en est pas dissociable* » (§86 et 87) ;

-    « *le strict respect de l'affectation constitue la seule et unique contrepartie de la subvention accordée par l'AFD* » (§90) ;

-    « *l'engagement de verser la subvention supporté par l'AFD ne saurait être dissocié des conditions qui le régissent* » (§92).

**130.** Bien que la REPUBLIQUE DU CONGO n'en tire aucune conclusion, si l'on en croit le titre figurant en tête de ses développements, l'argumentation de la REPUBLIQUE DU CONGO consisterait à prétendre que « *la nature même de l'aide au développement* » ferait obstacle aux mesures de saisie.

**131.** En somme, la REPUBLIQUE DU CONGO voudrait faire accroire que les sommes dues au titre du C2D seraient insaisissables du simple fait qu'elles seraient affectées contractuellement à des programmes d'aide au développement.

**132.** Cette argumentation de circonstance ne résiste pas à l'analyse.

**133.** Tout d'abord, il convient de relever que, contrairement à ce que semble laisser entendre la REPUBLIQUE DU CONGO, l'affectation des sommes n'est en aucun cas une condition de l'engagement de verser la Subvention conclu par l'Etat français (a). En outre, l'affectation conventionnelle d'une créance n'est pas une cause légale d'insaisissabilité (b).

    a) <u>L'existence de la créance de la REPUBLIQUE DU CONGO au titre du C2D n'est pas conditionnée à son affectation</u>

**134.** Après avoir défini le terme "Subvention" comme désignant « *le refinancement accordé au Congo par la France conformément aux termes du Contrat en contrepartie du versement par le Congo des Echéances de la Dette* », le C2D stipule en son article 2§2 que :

> « **Dès le versement** *à bonne date de l'échéance due par le Gouvernement du Congo, la France* **s'engage à** *verser sur le Compte dans un délai de 15 (quinze) jours une subvention d'un même montant.*
>
> *Les modalités détaillées de versement et d'affectation de la subvention à partir du compte* [ouvert au nom de la REPUBLIQUE DU CONGO à la BEAC] *(…) font l'objet d'un accord cadre et d'une convention de compte.* »

*Pièce n°22 : C2D France-Congo, 29 septembre 2010*

Quant à l'Accord-Cadre, il stipule en son article 2 a) – relatif au versement de la Subvention à la REPUBLIQUE DU CONGO – que :

> « *Dans les conditions définies à l'article 2 du Contrat* [le C2D]*, l'Agence* [l'AFD] *versera la subvention en euros sur le compte ouvert par le bénéficiaire* [la REPUBLIQUE DU CONGO] *dans les livres de la Banque* [la BEAC] ».

*Pièce n°23 : Accord-Cadre AFD-Congo, 22 décembre 2010*

Aucune autre stipulation du C2D ou de l'Accord-Cadre n'impose une quelconque condition supplémentaire au versement des Subventions à la REPUBLIQUE DU CONGO.

**135.** S'agissant des dispositions contractuelles relatives à l'affectation de la Subvention, l'article 2§3 du C2D renvoie à l'Accord-Cadre, lequel stipule en son l'article 2 b) – relatif aux « *versements à partir du compte* » ouvert à la BEAC au nom de la REPUBLIQUE DU CONGO – que « *les fonds correspondant à la Subvention ne pourront être affectés à aucune autre dépense que celles prévues par le Contrat* [le C2D] *et les Conventions d'Affectation.* »

*Pièce n°23 : Accord-Cadre AFD-Congo, 22 décembre 2010*

**136.** Les parties ont donc prévu contractuellement que la Subvention versée sur le compte ouvert à la BEAC au nom de la REPUBLIQUE DU CONGO devra être affectée à des programmes définis d'un commun accord entre les parties.

**137.** De telles dispositions relatives à l'affectation de la Subvention ne peuvent sérieusement s'analyser comme une quelconque **condition** à l'existence de l'engagement de la République française de verser ladite Subvention à la REPUBLIQUE DU CONGO ; il ne s'agit que d'une simple **obligation contractuelle** relative à l'utilisation des Subventions perçues par la REPUBLIQUE DU CONGO.

**138.** Ainsi, **la seule condition contractuelle au versement de la Subvention est le paiement préalable par la REPUBLIQUE DU CONGO, à échéance, de sommes qu'elle doit à l'AFD et à la Banque de France au titre de contrats distincts** ; à compter de ce paiement, la REPUBLIQUE DU CONGO est créancière d'une subvention d'un même montant.

**On le comprend, contrairement à ce qu'affirme la REPUBLIQUE DU CONGO, l'existence de la créance objet de la mesure pratiquée n'est pas conditionnée à son affectation.**

**Rien n'empêche donc les créanciers de la REPUBLIQUE DU CONGO de pratiquer des saisies sur ces sommes.**

b) L'affectation de la créance n'est pas de nature à faire obstacle à la saisie

 (i) *L'affectation conventionnelle de la créance n'est pas une cause légale d'insaisissabilité*

**139.** Aux termes des articles 2284 du Code civil, L. 112-1 et L.112-2 1° du Code des procédures civiles d'exécution, les créanciers peuvent saisir tous les biens appartenant au débiteur, à l'exception de ceux que la loi déclare insaisissables[12].

**140.** Il est constant qu'aucune disposition légale ne déclare insaisissables les biens qui sont affectés à un usage contractuellement déterminé.

**141.** L'affectation prétendue de la créance au "développement" d'un Etat étranger tel que la REPUBLIQUE DU CONGO n'est donc pas une cause d'insaisissabilité de celle-ci.

---

[12] Ce point de droit est étudié plus en détail *supra*, *§101 à 104.*

*(ii)    L'affectation conventionnelle de la créance est inopposable au créancier*

**142.**    Aux termes de l'article 1165 du Code civil :

*« Les conventions n'ont d'effet qu'entre les parties contractantes ; elles ne nuisent point au tiers, et elles ne lui profitent que dans le cas prévu par l'article 1121 ».*

**143.**    Sur le fondement de ce texte, la Cour de cassation avait déjà jugé en 1991 que les clauses contractuelles d'affectation de sommes sont inopposables aux tiers.

Ainsi, dans l'hypothèse d'un prêt consenti par une banque, destiné à financer la construction d'une maison individuelle mais dont les fonds prêtés avaient été utilisés par l'emprunteur pour acquérir une voiture, la Cour de cassation a estimé, en réponse à la banque qui tentait de s'opposer à cette acquisition au motif que *« la provision était affectée au financement des travaux et n'était pas disponible pour l'acquisition d'un véhicule automobile »*, que *« l'accord* [d'affectation des fonds au financement des travaux] *qui serait intervenu entre* [le prêteur et l'emprunteur] *n'était pas opposable à un tiers bénéficiaire ».*

> *Pièce n°58 : Arrêt de la Cour de cassation (ch. com.) du 25 mars 1991, pourvoi n°89-12584*

Logiquement, dans une affaire où un créancier avait fait pratiquer une saisie sur un compte bancaire affecté à la garantie d'un autre compte, la Cour de cassation, par un arrêt du 28 novembre 2006, a réitéré sa jurisprudence en l'appliquant aux créanciers saisissants :

*« une convention d'affectation n'étant ni opposable aux tiers ni propre à elle seule à modifier les droits de ces derniers, la Cour d'appel qui a décidé que les sommes réservées avaient été utilement appréhendées par la saisie litigieuse a statué à bon droit. »*

> *Pièce n°59 : Arrêt de la Cour de cassation (ch. com.) du 28 novembre 2006, pourvoi n°05-12147*

**144.**    Il ressort donc de la jurisprudence de la Cour de cassation que **l'affectation** contractuelle **de sommes d'argent est inopposable aux tiers, dont les créanciers saisissants.**

**145.**    Dans ces conditions, les dispositions du C2D et de l'Accord-Cadre prévoyant que la Subvention versée par la République française devra être affectée à des programmes de développement sont radicalement inopposables à COMMISIMPEX ; rien ne s'oppose donc à la saisie de la Subvention par COMMISIMPEX.

**146.**    Dans ces conditions, le Juge de l'exécution jugera que COMMISIMPEX a valablement saisi la créance de la REPUBLIQUE DU CONGO entre les mains de l'AFD, agissant pour le compte de l'Etat français – l'affectation contractuelle à des programmes de "développement" des sommes d'argent en résultant, une fois qu'elles ont été versées à la REPUBLIQUE DU CONGO, étant indifférente.

***3°/    La prétendue entrave au service public français de l'aide au développement et aux***

***relations internationales de la France n'est pas de nature à faire obstacle à la saisie***

**147.**    La REPUBLIQUE DU CONGO affirme que « *les créances nées des concours accordés à la République du Congo ne* [serait] *pas saisissables dans la mesure où le maintien de leur saisie affecterait les services publics français et congolais* » et porterait « *plus généralement atteinte à leurs relations internationales.* »

**148.**    Ainsi, elle prétend que :

- la Subvention serait insaisissable dès lors qu'elle résulterait « *de la nature de service public de l'activité en question* », à savoir la politique de coopération et d'aide au développement (Assignation §102 et s.) ;

- « *la saisie des subventions porterait atteinte aux services publics de la République du Congo* » (Assignation §109 et s.) ;

- la saisie « *compromettrait les relations internationales entre la République du Congo et la République française* » (Assignation §113 et 114).

Il n'en est rien.

**149.**    Non seulement la REPUBLIQUE DU CONGO n'a pas qualité pour invoquer un argument propre à l'Etat français (a), mais l'entrave prétendue n'est pas une cause d'insaisissabilité (b).

   a) <u>La REPUBLIQUE DU CONGO n'a pas qualité à se prévaloir d'une quelconque entrave au service public français de l'aide au développement ou aux relations internationales de la France</u>

**150.**    En vertu de l'adage « *nul ne plaide par procureur* », une partie n'est recevable à faire valoir que les moyens de droit qui lui sont propres.

**151.**    Pourtant, la REPUBLIQUE DU CONGO n'hésite pas à prétendre que la saisie serait nulle au motif qu'elle « *constituerait un obstacle à la mise en œuvre de cette **mission de service public** [de l'AFD]* » (Assignation §108), porterait « *non seulement **atteinte à la politique publique française** mais également à la politique publique congolaise* » et son maintien porterait « *atteinte à la coopération économique entre la République du Congo et **la République française*** » (gras ajouté).

**152.**    Or, en se prévalant de ce moyen, la REPUBLIQUE DU CONGO plaide pour le compte de la République française, puisque ce moyen est en réalité propre à cette dernière, la REPUBLIQUE DU CONGO n'ayant aucune qualité propre, et donc aucun intérêt, pour invoquer une entrave au service public *français* de l'aide au développement ou à la politique publique aux relations internationales *de la France*.

**153.**    La REPUBLIQUE DU CONGO est donc irrecevable à invoquer ce moyen, et le Juge de l'exécution le dira.

   b) **L'atteinte prétendue au service public français et congolais de l'aide au développement et aux relations internationales n'est pas une cause d'insaisissabilité prévue par la loi**

   (i)    *Sur les dispositions législatives relatives à l'insaisissabilité*

**154.**    Comme il a déjà été rappelé *supra*, aux termes des articles 2284 du Code civil, L. 112-1 et L.112-2 1° du Code des procédures civiles d'exécution, les créanciers peuvent saisir tous les biens appartenant au débiteur, à l'exception de ceux que la loi déclare insaisissable[13].

**155.**    Ainsi, l'ensemble des biens d'un débiteur sont saisissables, à l'exception de ceux que la **loi**[14] déclare insaisissables.

**156.**    En l'espèce, la REPUBLIQUE DU CONGO prétend que les Subventions saisies ne seraient « *pas saisissables dans la mesure où le maintien de leur saisie affecterait les services publics français et congolais* » et risqueraient de porter « *atteinte à leurs relations internationales.* »

**157.**    Or, force est de constater qu'il n'existe aucune disposition légale prévoyant une insaisissabilité pour de tels motifs.

   Au contraire, les articles R. 143-1 et suivants du Code des procédures civiles d'exécution (anciennement décret du 31 juillet 1993) envisagent expressément les saisies entre les mains des comptables publics, donc entre les mains d'entité exerçant par définition des missions de service public, y compris l'Etat lui-même.

   Il n'existe d'ailleurs pas non plus de loi d'insaisissabilité des subventions accordées par l'Etat français, qu'elles soient accordées ou non dans le cadre d'un quelconque service public de coopération et d'aide au développement. La seule loi existante est celle du 30 décembre 2003 qui est strictement limitée aux concours financiers accordées par l'AFD.

**158.**    De ce seul fait, les sommes dues à la REPUBLIQUE DU CONGO au titre du C2D sont saisissables.

**159.**    La REPUBLIQUE DU CONGO croit également, à tort, pouvoir se raccrocher à un simple avis du Conseil d'Etat du 30 janvier 1992 et à une ordonnance de la Cour de justice des Communautés européennes du 29 mai 2001, sans rapport avec la présente espèce.

---

[13] Ce point de droit est étudié plus en détail *supra, §101 à 104s.*

[14] La loi seule, à l'exclusion de toute mesure réglementaire : l'insaisissabilité d'un bien portant atteinte au droit de propriété du créancier et modifiant les droits réels, seule la loi, en vertu de l'article 34 de la Constitution, peut l'édicter.

*(ii)      Sur l'avis du Conseil d'Etat du 30 janvier 1992*

**160.**   Par son avis du 30 janvier 1992, le Conseil d'Etat a estimé que :

« *Lorsque les créances dont bénéficient les co-contractants de la Caisse centrale de coopération économique* [devenue l'AFD] *sont devenues liquides et exigibles,* **les fonds correspondants peuvent**, *quelle que soit leur origine,* **être saisis-arrêtés** *entre les mains de la Caisse par les créanciers des contractants de celle-ci* (…) ;

*Lorsque les conditions sont remplies, la caisse reste cependant fondée à se prévaloir devant les juridictions de ce que – si tel est le cas – la validation de la saisie-arrêt serait – notamment* **tant que n'est pas en vigueur la règle du cantonnement instituée par la loi n° 91-650 du 9 juillet 1991** *– de nature à compromettre la régularité ou la continuité du service public dont elle est chargée ou compromettrait les relations internationales de la France avec les Etats éventuellement concernés* » (gras ajouté).

**161.**   **En premier lieu**, on observera que cet avis prévoit expressément que les fonds dus par la Caisse centrale de coopération économique (ci-après, la "**Caisse**"), ancêtre de l'AFD, à ses cocontractants, peuvent parfaitement être saisis entre ses mains et qu'il n'existe donc pas de régime d'insaisissabilité attaché à ces fonds.

**162.**   **En deuxième lieu**, si le Conseil d'Etat a pu estimer le 30 janvier 1992, par un simple avis, que la Caisse pouvait se prévaloir du fait que la saisie-arrêt serait de nature à compromettre la continuité du service public dont elle est chargée ou compromettrait les relations internationales de la France, il n'en a tiré aucune conséquence pratique, et pour cause…

Au surplus, le Conseil d'Etat a pris soin de préciser que son avis ne valait que « *tant que n'[était] pas en vigueur la règle du cantonnement instaurée par la loi n°01-650 du 9 juillet 1991* », passage que la REPUBLIQUE DU CONGO a soigneusement omis de citer dans ses écritures.

Or, la règle du cantonnement des sommes saisies prévue par la loi du 9 juillet 1991 et son décret d'application du 31 juillet 1992 sont désormais en vigueur, rendant de ce fait caduc un avis portant sur le régime de la saisie-arrêt, qui n'a plus aujourd'hui qu'un intérêt historique.

**163.**   **En troisième et dernier lieu**, il convient de rappeler que le Conseil d'Etat n'est bien entendu pas compétent pour statuer en matière de voies d'exécution et que les juges *judiciaires* de l'exécution, seuls compétents en la matière, n'hésitent pas à s'écarter des avis qu'il peut rendre en la matière lorsqu'ils ne sont pas pertinents. C'est notamment ce qu'a fait le Juge de l'exécution de Lyon le 21 septembre 1999 en jugeant, à propos de ce même avis, que si le « *Conseil d'Etat a estimé que les fonds ne peuvent être saisis-arrêtés que lorsque les créances sont devenues liquides et exigibles, la loi du 9 juillet 1991* [elle] *n'exige pas que la créance saisie soit liquide et exigible, il suffit que la créance soit certaine.* »

*Pièce n°60 : Jugement du Juge de l'exécution de Lyon du 21 septembre 1999, n°99/04705*

Le législateur a d'ailleurs lui-même considéré que cet avis était sans portée puisqu'il a estimé utile d'adopter une loi déclarant insaisissables entre les mains de l'AFD les créances nées des concours financiers accordés par l'AFD (étudiée *supra* §105 à 113).

**164.**   L'avis du Conseil d'Etat du 30 janvier 1992 n'est donc d'aucun secours à la REPUBLIQUE DU CONGO.

> *(iii)    Sur l'ordonnance de la CJCE du 29 mai 2001*

**165.**   De manière tout aussi peu convaincante, la REPUBLIQUE DU CONGO se prévaut d'une ordonnance rendue le 29 mai 2001 par la CJCE aux termes de laquelle celle-ci a refusé d'autoriser un créancier de la République de Djibouti à pratiquer une saisie-arrêt entre les mains de la Commission des Communautés européennes.

**166.**   Lorsque l'on analyse les textes applicables, on s'aperçoit que la CJCE détient ce pouvoir des traités alors en vigueur, puisque c'est l'article 1er, troisième phrase, du Protocole sur les privilèges et immunités des Communautés européennes, alors en vigueur, qui prévoit que « *les biens et avoirs des Communautés ne peuvent faire l'objet d'aucune mesure de contrainte administrative ou judiciaire **sans une autorisation de la Cour de justice**,* » laquelle ne peut se prononcer que sur le seul critère du bon fonctionnement et de l'indépendance des Communautés européennes.

La CJCE disposait donc d'un pouvoir spécifique, reconnu par les traités européens alors en vigueur, d'autoriser ou non un créancier à pratiquer une saisie entre les mains de la Commission européenne sur des critères subjectifs.

**167.**   Or, il n'existe aucune disposition similaire en droit français puisque, contrairement au droit communautaire, les saisies entre les mains de l'Etat français ou de ses administrations sont parfaitement possibles, sans aucune autorisation préalable de quiconque, et qu'aucune disposition légale ne vient en limiter la portée.

L'argument, qui n'est pas transposable en droit français, est radicalement inopérant.

**D**      **La REPUBLIQUE DU CONGO a renoncé à toute immunité d'exécution**

*1°/    Sur le régime de l'immunité d'exécution en droit français*

**168.**   Il est un principe ancien qui veut qu'un Etat souverain jouisse à la fois d'une immunité de juridiction – qui interdit qu'il soit traduit devant les juridictions internes d'un autre Etat – et d'une immunité d'exécution – qui interdit que ses biens soit saisis.

**169.**   Néanmoins, le droit français ne comporte aucune définition légale du champ des immunités accordées aux Etats étrangers.

**Il est donc revenu à la jurisprudence de définir le champ de ces immunités** et en particulier de l'immunité d'exécution.

**170.** Depuis le célèbre arrêt *Eurodif* du 14 mars 1984, la Cour de cassation rend ses arrêts en la matière en énonçant avec constance le principe suivant :

> « *Attendu que les Etats étrangers bénéficient, par principe, de l'immunité d'exécution ; qu'il en est autrement lorsque le bien concerné se rattache, non à l'exercice d'une activité de souveraineté, mais à une opération économique, commerciale ou civile relevant du droit privé qui donne lieu à la demande en justice.* »

> *Pièce n°65 : Arrêt de la Cour de cassation (1ère ch. civ.) du 14 mars 1984, pourvoi n°82-12462*

**171.** Ainsi, selon les règles fixées par la Cour de cassation, en l'absence même de renonciation de la part de l'Etat étranger à son immunité d'exécution, tout créancier de ce dernier peut saisir un bien de cet Etat qui se rattache à une activité relevant du droit privé à la condition que sa créance ait un lien avec le bien saisi.

**172.** Si les Etats étrangers bénéficient sur le territoire français d'une immunité d'exécution, il est constant qu'ils peuvent parfaitement renoncer à cette immunité, que ce soit explicitement ou implicitement.

**173.** Comme le relèvent les Professeurs NIBOYET et de LA PRADELLE dans leur manuel de *Droit international privé*, « *il a toujours été admis que le bénéficiaire d'une immunité, quelle qu'en soit sa nature, pouvait y renoncer à la condition que la renonciation soit certaine.* »

> *Pièce n°66 : L'inhibition du pouvoir de juger : les immunités de juridiction et d'exécution, in M.-L. Niboyet & G. de Geouffre de La Pradelle, Droit international privé, 3ème éd. 2011, LGDJ (pp. 515-526), p. 520, §597*

**174.** Qui dit **certaine** (ou non équivoque) ne dit pas nécessairement **expresse**, et **la Cour de cassation admet que l'Etat étranger puisse renoncer implicitement à son immunité d'exécution** – c'est le fameux arrêt *Creighton* du 6 juillet 2000, par lequel la Cour de cassation a estimé que la souscription par un Etat d'une clause d'arbitrage renvoyant au règlement d'arbitrage de la CCI qui prévoit en son article 24 que la partie à l'arbitrage s'engage à exécuter sans délai la sentence à intervenir emportait de la part de l'Etat renonciation (implicite) à son immunité d'exécution.

> *Pièce n°67 : Arrêt de la Cour de cassation (1ère ch. civ.) du 6 juillet 2000, pourvoi n°98-19068*

**175.** Mais parfois, comme en l'espèce, l'Etat étranger renonce *contractuellement* à son immunité d'exécution.

L'Etat s'engage alors, dès la conclusion du contrat avec son partenaire financier ou commercial, à renoncer à faire valoir contre toute condamnation qui viendrait à être prononcée contre lui au titre du contrat, son immunité d'exécution.

2°/    *Sur la portée de la renonciation à immunité d'exécution*

a) La renonciation générale à immunité d'exécution porte sur tous les biens qui bénéficient de ladite immunité…

**176.**    La clause de renonciation à immunité d'exécution, tout comme sa portée, sont des éléments fondamentaux du contrat conclu, absolument déterminants du consentement de la partie privée qui s'engage dans une relation d'affaires avec un Etat – puisqu'elle détermine pour beaucoup l'effectivité des droits du cocontractant contre l'Etat en cas d'inexécution contractuelle de la part de ce dernier. C'est une question d'équilibre entre les parties (et d'élémentaire bonne foi de la part de l'Etat qui s'engage).

**177.**    Pour qu'une clause générale de renonciation à immunité d'exécution ait une portée, un effet utile, il faut considérer qu'elle s'étend à tous les biens qui, en l'état du droit des immunités appliqué par les juridictions françaises, bénéficient d'une immunité, c'est-à-dire

-    les biens relevant de l'activité souveraine de l'Etat étranger ; et

-    les biens qui, tout en relevant de l'activité de droit privé de l'Etat étranger, n'ont pas de lien avec la demande en justice et ne pourraient donc en principe pas être appréhendés par le créancier en l'état de la jurisprudence française.

En clair, lorsqu'un Etat renonce contractuellement, donc de manière non équivoque, à toute immunité d'exécution sans autre précision ou limitation, sauf à aller ouvertement à l'encontre de la volonté des parties et de leurs attentes légitimes lors de la conclusion du contrat, il faut considérer que l'ensemble des biens de l'Etat qui renonce, sans aucune distinction ni limitation, sont saisissables par son cocontractant – à défaut de quoi, la renonciation n'a tout simplement aucun sens, aucune utilité, puisqu'elle n'a aucune portée (ce qui ne peut pas avoir été l'intention des parties qui l'ont stipulée).

b) … à l'exception de l'immunité diplomatique d'exécution, à laquelle il faut renoncer expressément

**178.**    La seule exception à ce principe concerne l'immunité *diplomatique* des Etats étrangers. Ainsi, la Cour de cassation – précisant pour la première et unique fois à ce jour les contours du régime de la renonciation à immunité d'exécution des Etats – considère, depuis un arrêt du 28 septembre 2011 rendu sur le fondement de la coutume internationale, que les Etats, dans le cadre particulier de l'exercice de leur mission diplomatique, bénéficient *« d'une* ***immunité d'exécution autonome*** *à laquelle il ne peut être renoncé que de façon expresse et spéciale ; que cette immunité s'étend, notamment, aux fonds déposés sur les comptes bancaires de l'ambassade ou de la mission diplomatique »* (gras ajouté).

*Pièce n°68 : Cass. Civ.1, 28 septembre 2011, pourvoi n°09-72057*

En clair :

- **l'immunité d'exécution** *diplomatique* **constitue une immunité d'exécution** *autonome* **;**

- **il ne peut être renoncé à cette immunité** *autonome* **que par une clause visant expressément les biens** *diplomatiques.*

c) <u>La renonciation générale à immunité d'exécution porte donc également sur les actifs d'un Etat étranger relevant d'une activité de service public ou d'une activité souveraine</u>

**179.**   La REPUBLIQUE DU CONGO, qui voudrait étendre les effets de l'immunité *autonome* réservée aux biens diplomatiques des Etats étrangers, consacrée par l'arrêt du 28 septembre 2011, aux « *biens qui ne seraient pas affectés à une activité de droit privé* », voudrait faire accroire que les biens des Etats étrangers qui relèvent d'une activité de service public ou d'une activité souveraine ne seraient pas saisissables et qu'*a minima*, serait nécessaire une renonciation « *spécifique* » à une immunité (spéciale ou autonome, donc, si l'on comprend bien) qui viserait les biens relevant de la souveraineté de l'Etat pour autoriser la saisie desdits biens (Assignation, §132, 133 & 138).

**180.**   Compte tenu de la spécificité de la matière, COMMISIMPEX a demandé au Professeur Mathias AUDIT de bien vouloir rendre un avis court (16 pages) à destination du Juge de l'exécution afin de déterminer si la saisie par le créancier d'un Etat de biens appartenant à ce dernier et qui relèvent d'une activité de service public ou d'une activité souveraine nécessite l'existence d'une renonciation expresse et spécifique à l'immunité d'exécution attachée auxdits biens.

Cette consultation vise à éviter tout à la fois que le travail du Juge de l'exécution soit rendu inutilement complexe et que son raisonnement soit détourné par les trop nombreux raccourcis et assimilations développés à dessein par la demanderesse – auxquels COMMISIMPEX n'a d'autre choix que de répondre dans le détail.

Le résultat du travail effectué par le Professeur AUDIT est produit sous *Pièce n°69* par COMMISIMPEX, qui prie respectueusement le Juge de l'exécution d'en prendre connaissance en son entier, tant il est synthétique et éclairant.

*Pièce n°69 : Consultation du Professeur Mathias AUDIT du 24 janvier 2013*

Il en ressort clairement que les thèses de la REPUBLIQUE DU CONGO ne sont pas fondées en droit.

(i)     *Un Etat étranger peut renoncer à son immunité d'exécution pour les actifs relevant d'une activité de service public ou d'une activité souveraine*

**181.**     Il n'est pas nécessaire de s'attarder longuement sur cette question.

**182.**     Aucun auteur ne conteste qu'un Etat puisse renoncer à son immunité d'exécution, et lorsque la Cour de cassation a reconnu l'existence d'une immunité autonome d'exécution portant sur les biens attachés à la mission diplomatique d'un Etat étranger dans son arrêt du 28 septembre 2011, elle a également reconnu qu'il pouvait y être renoncé (à condition, s'agissant de la seule immunité diplomatique, que cette renonciation soit expresse).

*Pièce n°68 : Arrêt de la Cour de cassation (1ère ch. civ.) du 28 septembre 2011, pourvoi n°09-72057*

**183.**     On ne voit donc pas pourquoi un Etat étranger pourrait renoncer à son immunité *diplomatique* d'exécution, qui est le cœur même de l'exercice de la souveraineté d'un Etat à l'étranger, et ne pourrait pas renoncer à son immunité s'agissant de biens affectés à une mission de service public ou à une activité souveraine.

**184.**     Les auteurs mêmes cités – certes de manière tronquée – par la REPUBLIQUE DU CONGO ne disent pas autre chose, qui reconnaissent que « *des biens qui ne sont pas affectés à une activité économique ou commerciale peuvent faire l'objet d'une exécution si l'Etat a renoncé à son immunité d'exécution* »[15] ou encore que « *la renonciation sera efficiente dès lors que seront seules intéressées les activités de l'Etat en cause relevant des règles **ordinaires** du droit international public ou celles ayant un caractère privé d'ordre économique ou commercial* »[16] - l'adjectif « *ordinaires* » étant manifestement utilisé par l'auteur pour les distinguer des règles **spécifiques** qui gouvernent les activités de l'Etat dans le cadre de l'exercice de sa mission diplomatique.

**185.**     Les Etats étrangers peuvent donc renoncer à leur immunité d'exécution, y compris sur leurs biens affectés à des activités de service public ou des activités souveraines.

(ii)     *Le droit français n'impose nullement une renonciation à immunité d'exécution portant spécialement sur les activités souveraines de l'Etat étranger*

**186.**     La REPUBLIQUE DU CONGO soutient comme une évidence que la nécessité d'une renonciation expresse à l'immunité d'exécution relative aux biens affectés à un usage *diplomatique* s'imposerait non pas en raison de leur seul rattachement aux fonctions *diplomatiques* de l'Etat, mais en raison de leur rattachement aux activités *souveraines* de l'Etat, dont les fonctions diplomatiques font partie.

La REPUBLIQUE DU CONGO avance ainsi au soutien de son argumentaire (Assignation, §134 & 135), que l'un n'irait pas sans l'autre du fait de la nature « *éminemment souveraine que constitue l'activité diplomatique de l'Etat* ».

---

[15] C. KESSEDJIAN, « Immunités », *Rep. Dalloz Dr. Int.*, 2011, n°129 (spéc.).
[16] J.-M. DELLECI, Note sous CA Paris, 26 septembre 2001, *Rev. Dr. Banc. et Fin.* 2001 n°6, nov/déc. 2001, p. 357.

**187.** Autrement dit, les biens *diplomatiques* bénéficieraient d'une immunité d'exécution autonome, non pas parce qu'ils sont diplomatiques mais parce qu'ils sont *souverains* et qu'en conséquence, l'ensemble des biens relevant de la souveraineté de l'Etat bénéficierait de la même immunité autonome. L'exception *diplomatique* devrait donc s'interpréter comme une exception de *souveraineté*.

**188.** A l'en croire, sa position aurait même le soutien de la doctrine.

### La théorie développée par la REPUBLIQUE DU CONGO est contredite par l'analyse de l'arrêt de la Cour de cassation du 28 septembre 2011

**189.** Mais la théorie imaginée par la REPUBLIQUE DU CONGO est en totale contradiction avec la jurisprudence de la Cour de cassation. A l'opposé, la Cour retient en effet dans son arrêt du 28 septembre 2011, qui confirme sur le principe la jurisprudence de la Cour d'appel de Paris (notamment CA Paris, 25 janvier 2001), l'existence d'une « *immunité d'exécution autonome* » (gras ajoutés) **en matière diplomatique** à laquelle, de par sa nature particulière, « *il ne peut être renoncé que de façon expresse et spéciale* ».

*Pièce n°68 : Cass. Civ.1, 28 septembre 2011, pourvoi n°09-72057*

**190.** On comprend alors pourquoi la REPUBLIQUE DU CONGO ne mentionne que très succinctement, en note de bas de page (Assignation, note n°32), cet arrêt de la Cour de cassation pourtant fondateur (et jusqu'à présent unique) en matière d'exception aux clauses de renonciation à immunité d'exécution. Elle entend en effet déformer le droit applicable, en proposant un raisonnement qui, sans le dire aussi clairement, opère ni plus ni moins qu'un glissement du droit applicable aux activités diplomatiques vers celui qui encadre les activités souveraines, voire les activités de service public des Etats étrangers.

Mais ce lien de cause à effet qui structure l'intégralité du raisonnement de la REPUBLIQUE DU CONGO – et que l'on pourrait résumer dans la phrase ˝puisque les activités diplomatiques relèvent des activités souveraines de l'Etat et que les activités souveraines incluent les activités de service public, le régime spécifique de renonciation à l'immunité diplomatique s'applique également à l'immunité qui protège les activités souveraines et les activités de service public˝ -, pour astucieusement présenté qu'il soit, n'en demeure pas moins contraire au droit applicable.

**191.** En effet, ainsi que le souligne le Professeur Mathias AUDIT (§26 de sa consultation), « *pour la Cour de cassation, c'est l'existence d'une* immunité d'exécution autonome*, fondée sur des règles spécifiques de droit international public, qui impose pour les biens qui en relèvent une renonciation expresse et spéciale* » (gras et soulignement dans le texte). Car, cette exception au droit de renonciation, identifiée par la Cour de cassation, doit nécessairement s'interpréter à la lumière de la volonté de l'Etat qui a renoncé.

On ne peut que suivre le Professeur Mathias AUDIT lorsqu'il ajoute que la logique de la Cour repose ici sur « *une interprétation de la volonté exprimée par l'Etat étranger à la faveur de*

*son acte de renonciation [selon laquelle]* :

-   *Lorsque l'Etat renonce en termes généraux à son immunité d'exécution, ce serait finalement son immunité de droit commun qui serait en quelque sorte visée ;*

-   *En revanche, lorsqu'il renonce à une immunité d'exécution autonome, il devrait l'indiquer en termes exprès ».*

**192.**    C'est donc uniquement à la stricte condition d'être en présence d'une *« immunité d'exécution autonome »* que peut être exigée une clause de renonciation mentionnant spécifiquement les biens entrant dans le champ de cette immunité très particulière. Pour prendre les choses en sens inverse, et en reprenant les termes du Professeur Mathias AUDIT (§28 de sa consultation), **« tous les biens appartenant à l'Etat étranger, même attachés à un service public ou affectés à la souveraineté, ne nécessitent pas une renonciation expresse et spéciale »** (gras dans le texte)**.**

**193.**    Car ce n'est pas parce que les biens affectés à l'exercice des missions diplomatiques relèvent d'une activité souveraine que la Cour de cassation a identifié ce régime restrictif, mais uniquement parce qu'elle a estimé qu'ils relèvent du droit international coutumier des relations diplomatiques, qu'elle a interprété comme étant tout à fait spécifique, au point que l'immunité d'exécution à laquelle il donne naissance constitue une immunité d'exécution autonome, reposant sur des normes de nature coutumière.

**194.**    C'est d'ailleurs également l'opinion de la doctrine citée par la REPUBLIQUE DU CONGO qui rappelle dans des termes pourtant clairs – pour qui veut bien se donner la peine de les lire – que « *la renonciation* [générale à immunité d'exécution] *sera efficiente dès lors que seront seules intéressées les activités de l'Etat en cause relevant des règles ordinaires du droit international public ou celles ayant un caractère privé d'ordre économique ou commercial.* »[17]

En outre, comme le relèvent deux éminents auteurs, ignorés par la REPUBLIQUE DU CONGO, il importe de « *distinguer l'immunité d'exécution diplomatique pour laquelle seule une renonciation spéciale permet d'écarter l'immunité et l'immunité d'exécution de l'Etat étranger lui-même qui peut être écartée par une renonciation générale ».*

*Pièce n°70 : J. Béguin, M. Menjucq, Ch. Seraglini et alii (dirs.),* Droit du commerce international, *Litec, 2005, p. 729, n°2074*

**195.**    D'ailleurs, si la sphère diplomatique était considérée par la Cour de cassation uniquement comme une sous-catégorie de la sphère souveraine, ou un exemple parmi d'autres dont les particularités seraient transposables à l'ensemble des activités souveraines, alors nul doute que la Cour de cassation l'aurait indiqué expressément. Si le critère de distinction de la Cour avait été non pas la nature diplomatique des activités visées, mais leur nature souveraine (donc ″un cran plus haut″, selon le raisonnement par cercles concentriques tenu par la REPUBLIQUE DU CONGO), alors elle se serait appuyée sur sa distinction

---

[17] J.-M. Delleci, Note sous CA Paris, 26 septembre 2001, *Rev. Dr. Banc. et Fin.* 2001 n°6, nov/déc. 2001, p. 357.

désormais classique entre les activités *de jure imperii* (souveraines) / *de jure gestionis* (relevant du droit privé).

**196.**    Mais la Cour de cassation n'a pas jugé en ce sens, et pour cause : cela aurait d'abord empêché d'identifier tout régime coutumier spécifique pour les activités diplomatiques ; cela aurait également impliqué pour la Haute Cour d'identifier une norme coutumière internationale reconnaissant une immunité d'exécution spécifique aux activités souveraines et aux biens y relatifs (et qui nécessiteraient donc une renonciation spéciale), ce qui était simplement impossible, en l'absence d'une telle norme en droit positif.

**Il n'existe pas de norme coutumière internationale reconnaissant une immunité d'exécution spécifique aux biens attachés à la souveraineté des Etats étrangers**

**197.**    Tout d'abord, il convient de rappeler que l'existence d'une immunité d'exécution autonome accordée aux biens des missions *diplomatiques* reconnue par la Cour de cassation, à laquelle il ne peut être renoncé que de façon expresse et spéciale, est fondée sur le droit international coutumier.

En conséquence, si l'on voulait suivre le raisonnement de la REPUBLIQUE DU CONGO, faute de texte spécifique en ce sens, il faudrait démontrer que les biens rattachés à la souveraineté des Etats étrangers sont également protégés par le droit international coutumier.

Or, il n'existe aucun fondement coutumier permettant d'identifier une immunité d'exécution autonome pour l'ensemble des activités souveraines et des activités de service public, comparable aux activités diplomatiques, au sens que lui donne la Cour de cassation.

**198.**    Rappelons à cet égard qu'une norme coutumière ne se limite pas à une simple pratique. Elle se construit à la suite d'un processus dit de *cristallisation coutumière*, qui nécessite le rassemblement de deux éléments cumulatifs :

-   **un élément objectif, matériel**, constitué par la répétition de comportements face à une situation donnée qui constituent une *« pratique constante et uniforme »*, selon la Cour internationale de Justice dans son arrêt de 1960 rendu dans l'affaire du *Droit de passage en territoire indien*, la sentence arbitrale rendue en 1948 dans l'affaire de l'*Interprétation de l'accord aérien du 6 février 1948* ayant en outre déjà souligné que *« [s]eule une pratique constante, effectivement suivie et sans changement, peut devenir génératrice d'une règle de droit international coutumier »* ;

    *Pièce n°71 : CIJ, 12 avril 1960, Affaire du Droit de passage en territoire indien, Rec. 1960 (extraits), p. 40*
    *Pièce n°72 : SA, 17 juil. 1965, Interprétation de l'accord aérien du 6 fév. 1948, RSA vol. XVI (extraits), p. 100*

-   **un élément subjectif dit *opinio juris sive necessitatis*,** selon lequel l'Etat adopte un comportement particulier du fait de la conscience d'être lié par une obligation juridique ; c'est d'ailleurs par cette caractéristique, pour reprendre les termes des Professeurs Patrick DAILLIER, Mathias FORTEAU et Alain PELLET, *« que la règle*

*coutumière se distingue de l'usage et de la courtoisie internationale »*, ce que la Cour internationale de Justice avait particulièrement clairement souligné dans son arrêt central en matière de norme et de source coutumières, rendu en 1969 dans l'affaire du *Plateau continental de la Mer du Nord*, en indiquant que *« [l]es Etats intéressés doivent donc avoir le sentiment de se conformer à ce qui équivaut à une obligation juridique. Ni la fréquence, ni même le caractère habituel des actes ne suffisent. Il existe nombre d'actes internationaux, dans le domaine du protocole par exemple, qui sont accomplis presque invariablement mais qui sont motivés par de simples considérations de courtoisie, d'opportunité ou de tradition et non par le sentiment d'une obligation juridique. »*

*Pièce n°73 : P. Daillier, M. Forteau, A. Pellet, Droit international public, L.G.D.J., 8ème éd., 2009, p. 361, §212*
*Pièce n°74 : CIJ, 20 février 1969, Affaire du Plateau continental de la Mer du Nord, Rec. 1969 (extraits), p. 44*

**199.**    On retrouve ces deux éléments rassemblés dans la définition de la coutume que donne l'article 38 des Statuts de la Cour internationale de Justice, selon lequel il faut y voir *« la preuve d'une pratique généralisée acceptée comme étant le droit »*.

*Pièce n°75 : Statuts de la Cour internationale de Justice*

**200.**    Or, en matière de renonciation à l'immunité d'exécution d'un Etat pour les biens attachés à ses activités souveraines ou à ses activités de service public, il n'existe ni pratique concordante, ni *opinio juris* permettant de considérer que la renonciation doive faire l'objet d'une mention spécifique, en dehors donc de l'immunité d'exécution générale.

Comme le souligne le Professeur Mathias AUDIT (§41 à 48 de sa consultation), la pratique des Etats est au contraire nourrie d'exemples inverses : *« non seulement le principe de la renonciation est bien évidemment acquis, mais en outre il s'agit pour lui conférer sa pleine signification de s'en remettre aux termes retenus par l'Etat dans son acte de renonciation »* (§42). A cet égard, citant à l'appui de son analyse les exemples britannique, canadien et russe, il ne peut qu'observer qu'aucun de ces droits étrangers ne fait apparaître l'obligation d'une *« mention spécifique dans la renonciation pour les biens attachés à un service public ou à l'exercice de la souveraineté »* (§43).

Il n'existe donc pas de norme coutumière internationale en la matière.

**La jurisprudence récente des cours d'appel de Paris et de Versailles n'est d'aucun secours à la théorie développée par la REPUBLIQUE DU CONGO**

**201.**    La REPUBLIQUE DU CONGO voudrait pourtant voir dans certains arrêts des Cours d'appel de Paris et Versailles une extension jurisprudentielle de l'exigence d'une renonciation spécifique à l'immunité d'exécution en matière diplomatique à l'ensemble des activités souveraines et des activités de service public de l'Etat renonçant. Ainsi, la REPUBLIQUE DU CONGO prétend que *« les biens relevant de la souveraineté de l'Etat suivent le sort réservé par les juridictions françaises aux autres biens de cette nature, biens pour lesquels une renonciation à l'immunité expresse, univoque et s'appliquant spécialement à ces biens est requise »* (Assignation, §133).

**202.**     Au soutien de son argumentation, la REPUBLIQUE DU CONGO cite deux arrêts rendus dans l'affaire opposant le créancier NML à la République argentine, dans laquelle la Cour d'appel de Paris a jugé que « *faute pour les contrats de prévoir une renonciation expresse de la République argentine à l'insaisissabilité de ses ressources de nature fiscale et sociale, les saisies litigieuses ne peuvent être validées* » et un arrêt de la Cour d'appel de Versailles.

*Pièce Congo n°27 : CA Paris, 27 janvier 2011 (NML c. République argentine & SA Air France)*
*Pièce Congo n°28 : CA Paris, 9 décembre 2010 (NML c. République argentine)*
*Pièce Congo n°30 : CA Versailles, 9 septembre 2010 (NML c. République argentine & SA Total Austral)*

**203.**     La REPUBLIQUE DU CONGO en conclut trop hâtivement que l'exigence d'une renonciation spécifique dans ces domaines serait nécessaire pour l'application de la clause, et qu'elle serait *par voie de conséquence* également nécessaire pour l'ensemble des biens affectés aux activités de service public ou de souveraineté de l'Etat étranger.

**204.**     Mais c'est oublier que l'arrêt de la Cour de cassation du 28 septembre 2011, qui est **postérieur** aux arrêts d'appel sur lesquels se fonde la REPUBLIQUE DU CONGO, a justement précisé le régime des clauses de renonciation à l'immunité d'exécution, en posant l'existence d'une immunité d'exécution autonome dans un domaine spécifique comme condition **nécessaire** à l'exigence d'une clause de renonciation spéciale pour les biens rattachés au domaine en question.

**205.**     Or, les arrêts d'appel sur lesquels se fonde la REPUBLIQUE DU CONGO, dont elle omet de préciser qu'ils font tous l'objet de pourvois pendants devant la Cour de cassation, ne relèvent nullement – et pour cause – l'existence d'une telle immunité d'exécution autonome en matière fiscale et parafiscale ni même un quelconque fondement, coutumier ou autre, sur lequel pourrait s'appuyer une telle immunité d'exécution spécifique.

Ils ne relèvent pas davantage – et pour cause là encore – l'existence d'une immunité qu'il aurait alors fallu qualifier, sans craindre le pléonasme, d'immunité *souveraine*, les immunités des Etats constituant par essence le mécanisme juridique de protection de la souveraineté.

**206.**     Dès lors, les arrêts d'appel précités sur lesquels s'appuie la REPUBLIQUE DU CONGO ne sauraient justifier l'exigence d'une immunité d'exécution spécifique pour les biens attachés à l'ensemble des activités de service public ou de souveraineté d'un Etat, en contradiction patente avec la jurisprudence postérieure de la Cour de cassation.

**207.**     Ainsi, le droit des immunités tel qu'il existe à ce jour en France, c'est-à-dire suivant les contours et les conditions posés par la Cour de cassation, implique que, dès lors que l'Etat étranger a renoncé à son immunité d'exécution de manière expresse, ses biens affectés à des activités souveraines ou des activités de service public ne sont plus couverts par ladite immunité et sont donc saisissables.

**208.**     A cet égard, on ne saurait mieux dire que le Tribunal fédéral suisse qui, ayant eu à trancher la question de savoir si une renonciation à immunité d'exécution, rédigée en des

termes très généraux, permettait la saisie de biens appartenant à l'Etat russe et relevant d'une activité souveraine, a jugé par un arrêt du 15 août 2007 que :

> « la recourante [i.e. l'Etat russe] ne peut donc échapper à l'alternative suivante : soit les biens saisis relèvent de l'activité iure gestionis de l'Etat russe et la clause de renonciation est superflue faute d'immunité ; soit il s'agit de biens de l'Etat affectés à l'exercice de la puissance publique, qui tombent sous le coup de la renonciation expresse du 31 juillet 2002. (…) **Elle ne saurait en particulier prétendre que la renonciation ne vise que des actes iure gestionis pour lesquels précisément aucune immunité n'existe. Cela reviendrait à priver la clause de renonciation de toute portée.** Or, aux termes de celle-ci, la Fédération de Russie a 'renoncé expressément' et 'sans réserve' à 'toutes immunités de juridiction et/ou d'exécution'. **Le cumul de ces expressions manifeste la volonté de donner à la clause de renonciation la plus large portée possible ; partant, elle ne peut que viser les biens affectés à une activité iure imperii** » (gras ajouté).

> *Pièce n°76 : Arrêt du Tribunal fédéral suisse du 15 août 2007(Moscow Center for Automated Air Traffic Control c. Commission de surveillance des offices des poursuites et des faillites du canton de Genève), B.2/2007*

### (iii)    La REPUBLIQUE DU CONGO a irrévocablement renoncé à toute immunité d'exécution

**209.**    En l'espèce, par différentes lettres d'engagement du 3 mars 1993, la REPUBLIQUE DU CONGO a « *renonc*[*é*] *définitivement et irrévocablement à invoquer dans le cadre du règlement d'un litige en relation avec les engagements objet de la présente toute immunité de juridiction ainsi que toute immunité d'exécution.* »

> *Pièce n°14 : Exemple de lettre d'engagement du 3 mars 1993*

**210.**    En outre, la REPUBLIQUE DU CONGO a également renoncé à invoquer son immunité d'exécution en vertu de l'article 28, 6° du règlement d'arbitrage de la CCI, dans sa rédaction en vigueur à compter du 1er janvier 1998, et donc applicable au jour de la sentence arbitrale du 3 décembre 2000. Aux termes de cette stipulation :

> « Toute sentence arbitrale revêt un caractère obligatoire pour les parties. Par la soumission de leur différend au présent Règlement, les parties s'engagent à exécuter sans délai la sentence à intervenir, et sont réputées avoir renoncé à toutes voies de recours auxquelles elles peuvent valablement renoncer ».

> *Pièce n°77 : Règlement d'arbitrage de la CCI, tel qu'en vigueur le 3 décembre 2000*

**211.    Il convient donc de donner plein et entier effet à la renonciation à immunité d'exécution à laquelle la REPUBLIQUE DU CONGO a consenti en contrepartie de l'engagement de COMMISIMPEX de lui accorder d'importants délais de paiement.**

**212.**    Le Juge de l'exécution jugera donc que la REPUBLIQUE DU CONGO ne peut opposer son immunité d'exécution pour faire obstacle à la saisie pratiquée par COMMISIMPEX le 28 août 2012.

**213.**    En tout état de cause, si l'on devait admettre, pour les seuls besoins de la discussion, qu'une renonciation expresse et spécifique serait nécessaire pour les biens attachés à la souveraineté des Etats étrangers, il ne peut être sérieusement affirmé que le simple fait de percevoir une subvention accordée par la France serait une activité de service public relevant de la souveraineté de la REPUBLIQUE DU CONGO. De quelque point de vue que l'on se place, la saisie doit être confirmée.

**214.**    En conséquence, le Juge de l'exécution ne fera pas droit aux demandes de mainlevée de la REPUBLIQUE DU CONGO et de l'AFD et constatera qu'en droit, la créance litigieuse n'est ni insaisissable ni couverte par une quelconque immunité.

**215.**    La saisie pratiquée par COMMISIMPEX entre les mains de l'AFD devra dès lors être confirmée.

D        *Sur les frais irrépétibles*

**216.**    L'équité ne commande pas que la REPUBLIQUE DU CONGO, qui fuit ses obligations de paiement constatées en justice depuis de trop longues années, bénéficie d'une quelconque indemnité de procédure.

**217.**    L'équité ne commande pas davantage que COMMISIMPEX verse à l'AFD une quelconque indemnité de procédure dans la mesure où l'AFD a été assignée par la REPUBLIQUE DU CONGO – pour des raisons d'ailleurs obscures puisque que cette dernière ne formule aucune demande à son encontre – et qu'elle a néanmoins choisi d'assigner à son tour COMMISIMPEX alors même qu'elle n'a aucun intérêt à contester une saisie dont la mainlevée a déjà été demandée par le débiteur, et qu'elle aurait pu se contenter de s'en rapporter à la justice.

**218.**    Au contraire, COMMISIMPEX, qui est contrainte d'engager des frais importants pour éviter que les décisions de justice dont elle est bénéficiaire demeurent inexécutées indéfiniment, est fondée à se voir allouer une indemnité à hauteur de 10 000 € tant par la REPUBLIQUE DU CONGO que par l'AFD, en application de l'article 700 du Code de procédure civile.

# PAR CES MOTIFS

*Vu les articles 31 et 328 et suivants du Code de procédure civile,*
*Vu l'article 49 de la Convention de coopération en matière judiciaire entre la République française et la République populaire du Congo du 1ᵉʳ janvier 1974,*
**CONSTATER** que MM. Gaston MOSSA, Aimery Patrick TATI et Emile NZONDO n'ont pas été assignés à comparaître dans la présente instance ;

**CONSTATER** que « *Liquidation judiciaire COMMISIMPEX* » ne dispose pas de la personnalité juridique et qu'elle ne peut donc être représentée à la présente instance ;

**CONSTATER** que le jugement rendu par le Tribunal de commerce de Brazzaville le 30 octobre 2012 est le produit d'une fraude ;

**CONSTATER** que le jugement rendu par le Tribunal de commerce de Brazzaville le 30 octobre 2012 est contraire à l'ordre public ;

En conséquence,

**DECLARER** irrecevables les interventions volontaires de MM. Gaston MOSSA, Aimery Patrick TATI et Emile NZONDO ;

**DECLARER** inopposable en France le jugement rendu par le Tribunal de commerce de Brazzaville le 30 octobre 2012 ;

*Vu l'article 31 du Code de procédure civile,*

**DECLARER** irrecevable en sa contestation l'AFD, faute d'intérêt à agir ;

**DECLARER** irrecevable en leur contestation l'AFD et la REPUBLIQUE DU CONGO en ce qu'elle porte sur les émanations de la REPUBLIQUE DU CONGO, faute de qualité pour agir.

*Vu les articles 1165 et 2284 du Code civil,*
*Vu les articles L. 112-1 et L. 112-2 1° du Code des procédures civiles d'exécution,*

**DIRE** valable et régulière la saisie-attribution de créances pratiquée le 28 août 2012 à la requête de COMMISIMPEX à l'encontre de la REPUBLIQUE DU CONGO entre les mains de l'AFD.

En conséquence,

**DEBOUTER** la REPUBLIQUE DU CONGO et l'AFD de l'ensemble de leurs demandes, fins et conclusions.

- 48 -

*Vu l'article 700 du Code de procédure civile,*

**CONDAMNER** la REPUBLIQUE DU CONGO et l'AFD, chacune, au paiement d'une somme de 10 000 € à la société COMMISIMPEX ;

**CONDAMNER** la REPUBLIQUE DU CONGO et l'AFD aux entiers dépens, en ce compris, pour la seule REPUBLIQUE DU CONGO, les frais d'huissier occasionnés par la saisie querellée.

_____

# BORDEREAU DE PIECES N°2

JEX Paris
COMMISIMPEX c. REPUBLIQUE DU CONGO et autres
RG n°13/80130 & 12/84003
Audience du 28 février 2013 à 09h00

## FAITS ET PROCEDURE

*Pièces communiquées le 29 janvier 2013*

Pièce n°1    –    Extrait RCCM de COMMISIMPEX ;

Pièce n°2    –    Lettre adressée par COMMISIMPEX au Directeur régional du Travail congolais le 4 mai 1988 ;

Pièce n°3    –    Article paru sur *lasemaineafricaine.com* le 2 novembre 2011 ;

Pièce n°4    –    Article paru dans *La Tribune* du 13 décembre 2005 (*Les millions envolés du pétrole congolais*) ;

Pièce n°5    –    Article paru dans *La Tribune* du 14 mars 2006  (*Les fonds vautours au secours des pauvres*) ;

Pièce n°6 –    Arrêt de la Première Chambre civile de la Cour de cassation en date du 6 février 2007, *République du Congo & SNPC c. Af-Cap* (pourvois n°04-13108 et 04-16889) ;

Pièce n°7    –    Jugement du Juge de l'exécution de Paris du 11 avril 2006 ;

Pièce n°8    –    Jugement de la *High Court of Justice* de Londres en date du 28 novembre 2005 (et traduction d'extraits en langue française) ;

Pièce n°9    –    Jugement de la *High Court of Justice* de Londres en date du 6 décembre 2005 (et traduction d'extraits en langue française) ;

Pièce n°10   –    Dépêche AFP en date du 22 janvier 2006 ;

Pièce n°11   –    Convention conclue entre l'Etat français et l'AFD le 29 décembre 2003 (et avenant du 30 octobre 2007) ;

Pièce n°12   –    Extrait de l'annexe au Projet de loi de finances pour 2013 – Aide publique au développement ;

Pièce n°13  –  Protocole d'accord n°566 du 14 octobre 1992 ;

Pièce n°14  –  Exemple de lettre d'engagement du 3 mars 1993 ;

Pièce n°15  –  Sentence arbitrale CCI du 3 décembre 2000 ;

Pièce n°16  –  Arrêt de la Cour d'appel de Paris du 23 mai 2002 ;

Pièce n°17  –  Signification remise à Parquet le 4 juillet 2002 ;

Pièce n°18  –  Protocole d'accord de négociations n°706 du 23 août 2003 ;

Pièce n°19  –  Sentence arbitrale CCI du 21 janvier 2013 ;

Pièce n°20  –  Jugement du Juge de l'exécution de Paris du 30 juillet 1998 ;

Pièce n°21  –  Jugement du Juge de l'exécution de Paris du 23 février 1999 ;

Pièce n°22  –  Contrat de désendettement et de développement France-Congo, 29 septembre 2010 ;

Pièce n°23  –  Accord cadre AFD-Congo 22 décembre 2010 ;

Pièce n°24  –  Réquisition auprès du Ministre de l'Economie, des Finances et de l'Industrie du 19 octobre 2011 ;

Pièce n°25  –  Courriel du Chef du bureau CE-2A à l'huissier instrumentaire du 24 octobre 2011 ;

Pièce n°26  –  Procès-verbal de saisie-attribution entre les mains du CBCM du 28 octobre 2011 ;

Pièce n°27  –  Assignations délivrées par COMMISIMPEX les 10 avril et 22 août 2012 ;

Pièce n°28  –  Conclusions du CBCM et de l'Agent judiciaire de l'Etat des 1er juin et 3 septembre 2012 ;

Pièce n°29  –  Jugement du Juge de l'exécution de Paris du 19 septembre 2012 ;

Pièce n°30  –  Procès-verbal de saisie-attribution entre les mains du CBCM du 10 avril 2012 ;

Pièce n°31  –  Courrier adressé le 11 avril 2012 par le CBCM à l'huissier instrumentaire ;

Pièce n°32  –  Assignation délivrée par la REPUBLIQUE DU CONGO le 10 juillet 2012 et conclusions en réponse de COMMISIMPEX du 1er octobre 2012 ;

Pièce n°33 – Conclusions en désistement de la REPUBLIQUE DU CONGO du 4 octobre 2012 et conclusions en réponse de COMMISIMPEX du 5 octobre 2012 ;

Pièce n°34 – Jugement du Juge de l'exécution de Paris du 5 octobre 2012 ;

Pièce n°35 – Procès-verbal de saisie-attribution entre les mains de l'AFD du 28 août 2012 et dénonciation du 4 septembre 2012 ;

Pièce n°36 – Courrier adressé le 4 septembre 2012 par l'huissier instrumentaire à l'AFD ;

Pièce n°37 – Courrier adressé le 5 septembre 2012 par l'AFD à l'huissier instrumentaire ;

Pièce n°38 – Courrier adressé le 11 septembre 2012 par l'huissier instrumentaire à l'AFD ;

Pièce n°39 – Courrier adressé le 26 septembre 2012 par le conseil de l'AFD à l'huissier instrumentaire ;

Pièce n°40 – Courrier adressé le 4 octobre 2012 par le conseil de l'AFD à l'huissier instrumentaire ;

Pièce n°41 – Mainlevée partielle du 28 septembre 2012 ;

Pièce n°42 – Mainlevée partielle du 10 octobre 2012 ;

Pièce n°43 – Mainlevée partielle du 22 octobre 2012 ;

*Pièces communiquées le 15 février 2013*

Pièce n°44 – **Articles de presse**

    **44.1 Compte-rendu du Conseil des ministres du 28 septembre 2012 (source : www.congo-site.com)**

    **44.2 Article paru dans « Les Dépêches de Brazzaville » le 13 décembre 2012**

Pièce n°45 – **Procédure devant le Tribunal de commerce de Brazzaville**

    **45.1 Requête déposée par la CNSS le 26 septembre 2012**

    **45.2 Attestation produite par la CNSS**

    **45.3 Conclusions en réponse de COMMISIMPEX du 8 octobre 2012**

    **45.4 Plainte contre X avec constitution de partie civile déposée le 22 oct. 2012**

    **45.5 Conclusions afin de sursis à statuer déposées le 23 oct. 2012**

Pièce n°46  –  **Compte-rendu de contrôle CNPS du 15 février 1989**

Pièce n°47  –  **Attestation de Maître Joseph BRUDEY**

Pièce n°48  –  **Jugement du Tribunal de commerce de Brazzaville du 30 octobre 2012 et déclaration d'appel du même jour**

Pièce n°49  –  **Sentence rendue par la Cour internationale d'arbitrage de la CCI  le 21 janvier 2013**

DISCUSSION

*Sur les irrecevabilités*

*Pièces communiquées le 29 janvier 2013*

Pièce n°50  –  Arrêt de la Troisième Chambre civile de la Cour de cassation du 31 octobre 2006 (pourvoi n°05-11929) ;

Pièce n°51  –  Arrêt de la Première Chambre civile de la Cour de cassation du 13 mai 1997 (pourvoi n°95-16303) ;

*Pièces communiquées le 15 février 2013*

Pièce n° 52  –  **Plumitif de l'audience du Juge de l'exécution de Paris du 31 janvier 2013**

Pièce n° 53  –  **Jurisprudence**

    **53.1  Arrêt de la Chambre commerciale de la Cour de cassation du 3 octobre 2006, n° 05-12410**

    **53.2  Arrêt de la Deuxième chambre civile de la Cour de cassation du 11 septembre 2003, n° 01-14493**

    **53.3  Arrêt de la Chambre commerciale de la Cour de cassation du 7 décembre 1993, n° 91-19339**

    **53.4  Arrêt de la 14ème Chambre de la Cour d'appel de Versailles du 19 septembre 2012, RG n° 11/09165**

    **53.5  Arrêt de la Première chambre du Pôle un de la Cour d'appel de Paris du 14 octobre 2010, RG n° 09/18451**

53.6   Arrêt de la 18ème chambre A de la Cour d'appel de Paris du 24 avril 2007, RG n° 05/08022

53.7   Arrêt de la Première chambre civile de la Cour de cassation du 24 mars 1998, n° 96-10171

Pièce n° 54 –   Doctrine

54.1   Dominique BUREAU et Horatia MUIR WATT, *Droit international privé*, PUF 2007, Tome 1, n°290

54.2   Bernard AUDIT, *Droit international privé*, Economica 2006, n°494


*Sur la saisissabilité des créances appréhendées*

*Pièces communiquées le 29 janvier 2013*

Pièce n°55 –   Arrêt de la Cour européenne des droits de l'homme du 19 mars 1997, *Hornsby c. Grèce* ;

Pièce n°56 –   S. Guinchard et T. Moussa, *Droit et pratique des voies d'exécution 2010-2011*, 6ème éd. 2009, Dalloz Action, p. 122, §150.13 ;

Pièce n°57 –   Loi belge du 25 mai 1999 relative à la coopération internationale belge ;

Pièce n°58 –   Arrêt de la Chambre commerciale de la Cour de cassation du 25 mars 1991 (pourvoi n°89-12584) ;

Pièce n°59 –   Arrêt de la Chambre commerciale de la Cour de cassation du 28 novembre 2006 (pourvoi n°05-12147) ;

Pièce n°60 –   Jugement du Juge de l'exécution de Lyon du 21 septembre 1999 (n°99/0475) ;

*[n°61 à 64 réservés]*


*Sur la renonciation de la REPUBLIQUE DU CONGO à toute immunité d'exécution*

*Pièces communiquées le 29 janvier 2013*

Pièce n°65 –   Arrêt de la Première Chambre civile de la Cour de cassation du 14 mars 1984 (pourvoi n°82-12462) ;

Pièce n°66 –   L'inhibition du pouvoir de juger : les immunités de juridictions et d'exécution, in M.-L. Niboyet & G. de Geouffre de La Pradelle, *Droit international privé*, 3ème éd. 2011, LGDJ (pp. 521-526), p. 520, §597 ;

Pièce n°67 – Arrêt de la Première Chambre civile de la Cour de cassation du 6 juillet 2000, *Creighton c. Qatar* (pourvoi n°98-19068) ;

Pièce n°68 – Arrêt de la Première Chambre civile de la Cour de cassation du 28 septembre 2011, *NML c. République argentine* (pourvoi n°09-72057) ;

Pièce n°69 – Consultation du Professeur Mathias Audit du 24 janvier 2013 (y compris doctrine et jurisprudence citées) ;

Pièce n°70 – J. Béguin, M. Menjucq, Ch. Seraglini *et alii (dirs.)*, *Droit du commerce international*, Litec, 2005, p. 729, n°20743ème éd. 2011, LGDJ (pp. 521-526), p. 520, §597 ;

Pièce n°71 – Arrêt de la Cour internationale de justice du 12 avril 1960, *Affaire du Droit de passage en territoire indien*, Rec. 1960 (extraits), p. 40 ;

Pièce n°72 – Sentence arbitrale de la Cour internationale de justice du 17 juillet 1965 *Interprétation de l'accord aérien du 6 février 1948*, RSA vol. XVI (extraits), p.100 ;

Pièce n°73 – P. Daillier, M. Forteau, A. Pellet, *Droit international public*, L.G.D.J., 2009, p. 361, §212 ;

Pièce n°74 – Arrêt de la Cour internationale de justice du 20 février 1969, *Affaire du Plateau continental de la Mer du Nord*, Rec. 1969 (extraits), p. 44 ;

Pièce n°75 – Statuts de la Cour internationale de justice ;

Pièce n°76 – Arrêt du Tribunal fédéral suisse du 15 août 2007, *Moscow Center for Automated Air Traffic Control c. Commission de surveillance des offices des poursuites et des faillites du canton de Genève*, B.2/2007 ;

Pièce n°77 – Règlement d'arbitrage de la CCI, tel qu'en vigueur le 3 décembre 2000.

———