**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMISSIONS IMPORT EXPORT S.A.,

$\qquad\qquad\qquad\qquad$ *Petitioner*,

$\qquad\qquad\qquad\qquad\qquad$ v.$\qquad$ Civil Action No. 1:13-cv-713-RJL

REPUBLIC OF THE CONGO,

$\qquad\qquad\qquad\qquad$ *Respondent.*

**RESPONDENT'S REPLY MEMORANDUM OF LAW IN FURTHER**
**SUPPORT OF ITS MOTION TO VACATE AMENDED DEFAULT JUDGMENT**

$\qquad\qquad\qquad\qquad\qquad\qquad\qquad$ CHADBOURNE & PARKE LLP
$\qquad\qquad\qquad\qquad\qquad\qquad\qquad$ Attorneys for Respondent
$\qquad\qquad\qquad\qquad\qquad\qquad\qquad\quad$ Republic of the Congo
$\qquad\qquad\qquad\qquad\qquad\qquad\qquad$ 1301 Avenue of the Americas
$\qquad\qquad\qquad\qquad\qquad\qquad\qquad$ New York, NY  10019
$\qquad\qquad\qquad\qquad\qquad\qquad\qquad$ (212) 408-5100

Dana Frix
CHADBOURNE & PARKE LLP
1200 New Hampshire Avenue, N.W.
Washington, DC  20036
Tel. (202) 974-5600

$\qquad\qquad\qquad$ Of Counsel

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ......................................................................................1

ARGUMENT ...............................................................................................................4

I      THE AMENDED DEFAULT JUDGMENT SHOULD BE
VACATED AS VOID UNDER RULE 60(b)(4) BECAUSE THE
CONGO WAS NOT SERVED IN ACCORDANCE WITH FSIA
REQUIREMENTS .......................................................................................4

      A.     Given the "Group of Contracts" Theory On Which the
Underlying Arbitration Depends, the Congo Needed to be
Served in this Action Pursuant to the 1992 Protocol's
"Special Arrangement For Service" Because of the FSIA's
Hierarchical Service Requirements..................................................4

      B.     The Congo is Not Equitably Estopped from Standing on Its
FSIA Service Rights in This Action ................................................7

      C.     Petitioner's Purported Service upon the Congo's Ministry
of Foreign Affairs Did Not Comply with the "Signed
Receipt" Requirements of 28 U.S.C. § 1608(a)(3) in Any
Event ............................................................................................10

II     THE DEFAULT JUDGMENT SHOULD BE VACATED AS
VOID UNDER RULE 60(b)(4) FOR LACK OF SUBJECT-
MATTER JURISDICTION .....................................................................11

      A.     There Is No Article III Standing Because the Petitioner Is
Not Actually Commisimpex But Rather an Imposter...................11

      B.     Petitioner Cannot Wish Away the Insolvency Ruling Under
Which Sole Power to Conduct Commisimpex's Affairs
Was Given to a Panel of Liquidation Trustees By
Denouncing the Proceeding — and Indeed the Entire
Congolese Judicial System — as Corrupt.....................................13

      C.     The Lack of an Agreement "In Writing" to Arbitrate Is an
Additional Subject-Matter Jurisdiction Defect Under the
FAA.............................................................................................19

III      THE AMENDED DEFAULT JUDGMENT SHOULD IN ANY
         EVENT BE VACATED UNDER RULE 60(b)(1)....................................21

         A.      The Congo Has Meritorious New York Convention
                 Defenses.......................................................................................21

         B.      The Default Was Not Within the Congo's Control .......................22

         C.      There Is No Prejudice ..................................................................24

         D.      Petitioner's Personal Attacks About Other Counsel Are
                 Irrelevant.......................................................................................24

CONCLUSION.......................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abur v. Republic of Sudan*,
   437 F. Supp. 2d 166 (D.D.C. 2006) ........................................................................11

*Auster v. Ghana Airways LTD*,
   514 F.3d 44 (D.C. Cir. 2008) .............................................................................8, 9

*Austin Inv. Fund, LLC by & through Elieff v. United States*,
   88 Fed. R. Serv. 3d 839 (D.D.C. 2014) .................................................................23

*Bautista v. Star Cruises*,
   396 F.3d 1289 (11th Cir. 2005) .............................................................................19

*Bridgeway Corp v. Citibank*,
   45 F. Supp. 2d 276 (S.D.N.Y. 1999), *aff'd*, 201 F.3d 124 (2d Cir. 2000) ..............................17

*China Minmetals Materials Import and Export Co. Ltd. v. Chi Mei Corp.*,
   334 F.3d 274 (3d Cir. 2003)...........................................................................21, 22

*Czarina. L.L.C. v. W.F. Poe Syndicate*,
   358 F.3d 1286 (11th Cir. 2004) .......................................................................19, 20

*Diag Human S.E. v. Czech Republic-Ministry of Health*,
   No. CV 13-0355 (ABJ), 2014 WL 3956747 (D.D.C. Aug. 14, 2014)....................................20

*European Cmty. v. RJR Nabisco, Inc.*,
   150 F. Supp. 2d 456 (E.D.N.Y. 2001) ...................................................................18

*El–Fadl v. Central Bank of Jordan*,
   75 F.3d 668 (D.C. Cir. 1996) .........................................................................16, 17

*Fitzpatrick Int'l Ltd. v. Republic of Equatorial Guinea*,
   No. H-12-1300, 2013 WL 5964560 (S.D. Tex. Nov. 7, 2013)............................................15

*Four Seasons Hotels & Resorts B.V. v. Consorcio Barr, S.A.*,
   613 F. Supp. 2d 1362 (S.D. Fla. 2009) ..................................................................20

*Gates v. Syrian Arab Republic*,
   646 F. Supp. 2d 79 (D.D.C. 2009), *aff'd*, 646 F.3d 1 (D.C. Cir. 2011)...................................11

*In re Georgetown Building Assoc., LP v. PWA*,
   240 B.R. 124 (Bankr. D.D.C. 1999) .......................................................................9

*Haase v. Sessions*,
    835 F.2d 902 (D.C. Cir. 1987) .................................................................................14

*Irwin v. World Wildlife Fund, Inc.*,
    448 F. Supp. 2d 29 (D.D.C. 2006) ..........................................................................17

*Johnson v. Clark*,
    518 F.2d 246 (10th Cir. 1975) .................................................................................7

*LexMark Int'l, Inc. v. Static Control Components, Inc.*,
    134 S. Ct 1377 (2014) ..............................................................................................12

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .................................................................................................12

*Magness v. Russian Fed'n*,
    247 F.3d 609 (5th Cir. 2001) ...................................................................................5

*MBI Grp., Inc. v. Credit Foncier du Cameroun*,
    558 F. Supp. 2d 21 (D.D.C. 2008), *aff'd*, 616 F.3d 568 (D.C. Cir. 2010) ..............16

*Moscow Dynamo v. Ovechkin*,
    412 F. Supp. 2d 24 (D.D.C. 2006) .....................................................................19, 20

*Moses v. Howard Univ. Hosp.*,
    606 F.3d 789 (D.C. Cir. 2010) .................................................................................7

*Movahedi v. US Bank*,
    853 F. Supp. 2d 19 (D.D.C. 2012) ...........................................................................9

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ...................................................................................................7

*Osorio v. Dole Food Co.*,
    665 F. Supp. 2d 1307 (S.D. Fla. 2009),
    *aff'd sub nom. Osorio v. Dow Chem. Co.*, 635 F.3d 1277 (11th Cir. 2011) ............17

*Passarella v. Hilton Int'l Co.*,
    810 F.2d 674 (7th Cir. 1987) ..................................................................................24

*Regent Seven Seas Cruises, Inc. v. Rolls Royce*,
    No. 06-22347-CIV, 2007 WL 601992 (S.D. Fla. Feb. 21, 2007) ......................19, 20

*Sarhank Grp. v. Oracle Corp.*,
    404 F.3d 657 (2d Cir. 2005) ...............................................................................20, 22

*Standard Enterprises, Inc. v. Bag-It, Inc.*,
    115 F.R.D. 38 (S.D.N.Y. 1987) ...............................................................................23

*Thompson v. Am. Home Assur. Co.*,
   95 F.3d 429 (6th Cir. 1996) .......................................................................................23

*Trupei v. United States*,
   274 F.R.D. 38 (D.D.C. 2011).................................................................................23

*Tuazon v. R.J. Reynolds Tobacco Co.*,
   433 F.3d 1163 (9th Cir. 2006) .............................................................................17

*Wilderness Society v. Griles*,
   824 F.2d 4 (D.C. Cir. 1987)...................................................................................14

*Zeevi Holdings Ltd. v. Republic of Bulgaria*,
   No. 09 CIV. 8856 RJS, 2011 WL 1345155 (S.D.N.Y. Apr. 5, 2011),
   *aff'd*, 494 F. App'x 110 (2d Cir. 2012).................................................................17

*Zschernig v. Miller*,
   389 U.S. 429 (1968).............................................................................................18

**Statutes**

Federal Arbitration Act

   9 U.S.C. § 1 *et seq.* .............................................................................................19

   9 U.S.C. § 203.................................................................................................19, 20

Foreign Sovereign Immunities Act

   28 U.S.C. § 1608(a) ...............................................................................................5

   28 U.S.C. § 1608(a)(1)............................................................................................5

   28 U.S.C. § 1608(a)(3)................................................................................5, 10, 11

**Federal Rules of Civil Procedure**

   Fed. R. Civ. P. 17...........................................................................................12, 21

   Fed. R. Civ. P. 60.............................................................................1, 4, 23, 24

   Fed. R. Civ. P. 60(b) ...............................................................................1, 12, 21

   Fed. R. Civ. P. 60(b)(1)..................................................................................21, 23, 25

   Fed. R. Civ. P. 60(b)(4) ..................................................................................4, 6, 11, 21

**Treaties**

Convention on the Recognition and Enforcement of Foreign Arbitral Awards,
    June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 ("New York Convention")

    Article II ........................................................................................................................21

    Article II(1) ..............................................................................................................19, 21

    Article IV(1)(b) ........................................................................................................19, 21

    Article V ...................................................................................................................21, 22

    Article V(1)(a) ...............................................................................................................21

    Article V(1)(e) ........................................................................................................21, 22

    Article V(b)(2) ...............................................................................................................22

    Article VI .......................................................................................................................21

Cooperation Convention on Judicial Matters between France and the Congo,
    January 1, 1974

    Article 49 ..................................................................................................................15, 16

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COMMISSIONS IMPORT EXPORT S.A.,

*Petitioner,*

v.

Civil Action No. 1:13-cv-713-RJL

REPUBLIC OF THE CONGO,

*Respondent.*

## RESPONDENT'S REPLY MEMORANDUM OF LAW IN FURTHER
## SUPPORT OF ITS MOTION TO VACATE AMENDED DEFAULT JUDGMENT

Respondent the Republic of the Congo ("the Congo"), by its attorneys CHADBOURNE & PARKE LLP, respectfully submits this reply memorandum of law in further support of its Motion to Vacate Amended Default Judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure.

### PRELIMINARY STATEMENT

The Congo filed a simple and straightforward motion to vacate the amended default judgment under Rule 60, to which the opposition consists principally of attempting to bury the Court in an avalanche of irrelevance, invective and insult.  Once such rubble is cleared away, the fact remains that the amended default judgment should be vacated for three principal reasons.

First, there was a failure of personal jurisdiction, because the Congo was never served in this action in accordance with the requirements of the Foreign Sovereign Immunities Act ("FSIA").  The voluminous declarations and exhibits filed in opposition about how earlier judicial and arbitral proceedings allegedly were initiated in non-U.S. jurisdictions and arbitral fora are simply irrelevant to this point, because those proceedings were not subject to the FSIA

service requirements applicable to this action.  Moreover, rather than evidencing a pattern of obstruction and evasion in litigation as the opposition claims, this material if anything shows that the Congo has forgiven possible minor technical lapses in service in its global litigation with Commissions Import Export S.A. ("Commisimpex") when essentially contemporaneous actual notice was received by the proper Congolese authorities.  But when there is a failure in both service upon and actual notice to the proper authorities that has now resulted in a default judgment for more than $700 million, a sovereign defendant like the Congo is well entitled to stand on its rights and demand that FSIA service requirements be honored.

Second, there is a failure of subject-matter jurisdiction in this action (as well as a defense to the merits) because the persons who filed this action in the name of Commisimpex are, to put it bluntly, imposters.  Before this action was filed, management and control over Commisimpex was vested in a panel of liquidation trustees, and its prior management was removed from office, in an insolvency-proceeding ruling that was affirmed on appeal.  Yet this action was thereafter filed in the name of Commisimpex by the out-of-office prior management without the knowledge or approval of the liquidation trustees to whom Commisimpex's affairs were judicially entrusted, trustees who themselves are pursuing a different path for a global resolution of outstanding issues between Commisimpex and the Congo.[1]  This is a failure of standing and thus subject-matter jurisdiction in the most fundamental Article III sense, because there is no "case or controversy" when it is only strangers who deceptively and unlawfully seek to litigate in Commisimpex's name while its lawful representatives seek to proceed in a different manner.

---

[1]   In the interests of assisting clarity, the Congo in this memorandum (as it did in its opening memorandum) employs the term "Commisimpex" solely to refer to the actual Congolese legal entity as directed by the persons who are lawfully entitled to act in its name.  The term "Petitioner" is used to refer to the out-of-office prior management who improperly caused the petition in this action to be filed in Commisimpex's name.

Tellingly, Petitioner never made any disclosure to this Court about the existence of the insolvency proceeding ruling, or that the persons who caused this action to be filed in Commisimpex's name were doing so based entirely on their comity-defying claim that they were entitled to just ignore that ruling outright because of claimed objections to the ruling or to the Congolese judicial system generally.  And then Petitioner conveniently failed to make service in the proper manner on, or even give a courtesy notification to, the opposing party or its counsel who would have been expected to bring these significant omitted facts to the Court's attention — thus easing the path for the persons standing behind this improper Petitioner to obtain a judgment on default that they could then shop around the world in search of assets with which they could abscond before what they were doing was uncovered.  Sharp practice such as this in bringing an enforcement action cannot paper over the fundamental Article III subject-matter jurisdiction defect that this curiously-brought case presents.  All this aside, the opposition presents nothing that is sufficient to raise even just a genuine issue as to legal legitimacy of the Congolese court ruling, and even if it did, resolving such questions would require a complex factual hearing.

Third, even if this action were legitimately brought in Commisimpex's name and proper FSIA service had been made upon the Congo, there still has been no showing of prejudice to Commisimpex or any tactical gamesmanship or dilatory conduct on the Congo's part that would stand in the way of granting relief from a $700 million default judgment, particularly when a sovereign defendant is involved who is eager to appear and present meritorious defenses, just as it has done in various other U.S. and foreign proceedings brought against it by Commisimpex.

Notwithstanding the dramatics of the opposing papers, the fact remains that the relief the Congo seeks on this motion is exceedingly modest.  The Congo's motion does not ask the Court to dismiss this enforcement proceeding with prejudice or to enter any ruling on the merits

3

regarding the 2013 Award.  Rather, the Congo simply asks that the amended default judgment be vacated so that the question of whether or not the 2013 Award can properly be confirmed can be addressed on its merits in the customary manner, in a proceeding where both sides are present and can be heard.  There has been no showing of any ongoing activity with the amended default judgment, much less any time-sensitive activity, that would be prejudiced by such limited and narrow relief.  The Congo's Rule 60 motion should accordingly be granted and the amended default judgment vacated.

## ARGUMENT

### I

### THE AMENDED DEFAULT JUDGMENT SHOULD BE VACATED AS VOID UNDER RULE 60(b)(4) BECAUSE THE CONGO WAS NOT SERVED IN ACCORDANCE WITH FSIA REQUIREMENTS

The Congo's Rule 60 motion asserted a simple narrow position with regard to the reason why service of process was not properly made under the FSIA in this case.  The opposition responds to this principally by twisting the Congo's narrow position into a larger and more extreme assertion and then attacking the overstated straw man position that the Congo never took.  The opposition provides no basis for denying the Congo Rule 60(b)(4) relief based on the failure of personal jurisdiction due to improper FSIA service.

A.    Given the "Group of Contracts" Theory On Which the Underlying Arbitration Depends, the Congo Needed to be Served in this Action Pursuant to the 1992 Protocol's "Special Arrangement For Service" Because of the FSIA's Hierarchical Service Requirements

The Congo's position is based on the service provision in the 1992 Protocol, but the Congo did not argue that this provision constituted an exclusive worldwide requirement for service of process in all countries, contexts and disputes with Commisimpex.  Because the Congo made no such argument, the opposition's data dump regarding what may have taken place

in other litigations in other contexts in countries such as France, England and Sweden is simply irrelevant to the issue on this motion.

The Congo's position on service arises from the fact that there were no arbitration or other disputes-related provisions in the 2003 Protocol upon which the 2013 Award was based. While this should have rendered the dispute under the 2003 Protocol non-arbitrable, Commisimpex persuaded the ICC tribunal that the dispute should nevertheless be deemed arbitrable by arguing that the 1992 and 2003 Protocols should be read together as part of a unified "group of contracts" under French law. (*See* 2010 Partial Award [Schwinger Decl., Exh. 4B] ¶¶ 18, 117, 135, 145.) Acceptance of this argument, however, has consequences. If arbitration of the dispute under the 2003 Protocol is premised upon the supposed propriety of reading the two protocols together as part of a unified "group of contracts" in which the parties intended the disputes-related provisions of the 1992 Protocol to apply to the 2003 Protocol, then necessarily the "special arrangement for service" found in the 1992 Protocol must likewise apply to proceedings relating to that arbitration under the 2003 Protocol, such as this enforcement proceeding. It is certainly only logical that if the parties are deemed under the "group of contracts" principle to have intended the disputes-related provisions from one protocol to apply to the next, that intent would extend to all such disputes-related provisions, including the service provision.

The existence of such a "special arrangement for service" has important consequences under the FSIA, because under the "hierarchical" enumeration of permissible FSIA service methods in 28 U.S.C. § 1608(a), *see Magness v. Russian Fed'n*, 247 F.3d 609, 611, 612-13 (5th Cir. 2001), a plaintiff may not utilize service on a ministry of foreign affairs under § 1608(a)(3) without first attempting § 1608(a)(1) service via the "special arrangement for service."  But

proceeding out of order in that manner is exactly what the Petitioner did here, thus making the service upon the Congo improper under the FSIA and the amended default judgment therefore void under Rule 60(b)(4) for lack of personal jurisdiction.

The opposition's attempt to suggest that the ICC tribunal rejected applying anything other than the 1992 Protocol's arbitration provision to the 2003 Protocol (Opp. at 17) is unfounded. The tribunal was not asked to do so, and thus neither the 2013 Award nor the 2010 Partial Award on Jurisdiction say anything about the applicability here of the 1992 Protocol's service provisions. The Petitioner is similarly off-base (Opp. at 17) in pointing to the tribunal's rejection of the Congo's *res judicata* argument about overlapping contractual subject-matters between the 2000 Award arising out of the 1992 Protocol and the 2013 Award arising out of the 2003 Protocol. (*See* 2013 Award [Schwinger Decl., Exh. 3B] ¶¶ 227-231.) Finding no overlap between the substantive claims in the two arbitrations does not mean that the tribunal implicitly determined that the 1992 Protocol's "special arrangement for service" did not apply to the 2003 Protocol under the "group of contracts" theory along with the arbitration provision.

Given the basis upon which the Congo's position on service rests, it is of no moment if, as Petitioner claims, service on the Congo was not made under this "special arrangement for service" in other proceedings in other contexts in other countries. Those non-U.S. proceedings plainly were not subject to the FSIA's requirements. Nor has Petitioner made any showing that those proceedings were governed by FSIA-like hierarchical service rules that required utilizing a "special arrangement for service" in preference to service through diplomatic channels where such a special arrangement existed. These prior foreign proceedings tell nothing about what the FSIA requires in this U.S. action.

**B.     The Congo is Not Equitably Estopped from
        Standing on Its FSIA Service Rights in This Action**

Having falsely attributed to the Congo a broad position on service that it had not made,

the Petitioner next argues that the Congo's conduct in various other proceedings bars it from

challenging service here based on "principles of equitable estoppel."   (Opp. at 20.)   The

opposition in fact blindly intermixes equitable estoppel cases and principles with those involving

judicial estoppel, but neither doctrine has any applicability here because the Congo has neither

taken inconsistent positions nor misrepresented the factual basis of its position on the "special

arrangement for service."

Judicial estoppel "generally prevents a party from prevailing in one phase of a case on an

argument and then relying on a contradictory argument to prevail in another phase."   *New

Hampshire v. Maine*, 532 U.S. 742, 749 (2001).   Its most critical requirement is that "a party's

later position must be clearly inconsistent with its earlier position."   *Moses v. Howard Univ.

Hosp.*, 606 F.3d 789, 798 (D.C. Cir. 2010) (internal citations omitted) (citing *New Hampshire v.

Maine*, 532 U.S. at 750-51).[2]   Given the "clear inconsistency" requirement, judicial estoppel can

only apply where the proceedings in question involve "identical" questions or issues.   *Johnson v.

Clark*, 518 F.2d 246, 252 (10th Cir. 1975).   But as noted above, the prior litigations to which

Petitioner refers did not involve the FSIA or FSIA-like situations where a "special arrangement

for service" needed to be used in preference to any other service method.   Nor has Petitioner

shown any case in which the Congo gained any kind of advantageous ruling by virtue of not

---

[2]     Other relevant factors include "whether the party has succeeded in persuading a court to accept that
party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding
would create 'the perception that either the first or the second court was misled.' . . .   A third
consideration is whether the party seeking to assert an inconsistent position would derive an unfair
advantage or impose an unfair detriment on the opposing party if not estopped."   *Id.*

asserting a "special arrangement for service" defense to service.  Judicial estoppel simply has no application here.

Rather disturbingly, the opposition makes the striking assertion that "the Congo for years contended that the 'only' effective way for it to be served was via its Ministry of Foreign Affairs" (Opp. at 21), citing ¶ 7 of the declaration of Petitioner's French counsel, M. Jacques-Alexandre Genet (Dkt. No. 31-40).  This assertion flatly misrepresents the contents of M. Genet's declaration because the cited paragraph says nothing of the kind.  Rather, referring to "a series of enforcement actions" that M. Genet filed "to enforce the French judgment confirming the 2000 arbitral award" (Genet Decl. ¶ 2), what M. Genet actually said in ¶ 7 was merely that:

> "The Congo did not at any point contend there was a special arrangement for service between the Congo and Commisimpex or pertaining to the 2000 arbitral award.  The Congo also did not contend that the relevant papers had to be delivered to Caisse Congolaise d'Amortissement (CCA) or the Congolese Ministry of Finance.  The Congo *only* argued that Commisimpex did not establish that service by French diplomatic channels had been completed."

(Genet Decl. ¶ 7 (emphasis in original).)

In short, M. Genet does not attribute to the Congo the position claimed by the Petitioner, but rather simply notes that in certain French proceedings (which obviously were not governed by the FSIA but rather by different service rules (*see* Genet Decl. ¶ 3)) the Congo did not raise the FSIA "special arrangement" issue.  Given that the Genet Declaration does not substantiate Petitioner's claim that the Congo ever made the supposed statement, it is all the more remarkable to see Petitioner then make the audacious suggestion that Petitioner was *tricked* into serving the Congo improperly in this action because it supposedly relied upon this non-existent statement. (*See* Opp. at 21.)  These circumstances provide no basis for any judicial estoppel.

Petitioner fares no better with its references to equitable estoppel.  There can be no equitable estoppel without a "false representation" of fact, *Auster v. Ghana Airways LTD*, 514

F.3d 44, 48 (D.C. Cir. 2008), that in turn must be "made to a party who is not aware of the true state of affairs." *In re Georgetown Building Assoc., LP v. PWA*, 240 B.R. 124, 141 (Bankr. D.D.C. 1999).[3]  But the Congo's FSIA argument is based on the text of the 1992 Protocol, which was obviously long known to both Commisimpex and the Congo.  Legal arguments about what legal implications flow from those fully-disclosed contents are not factual representations, and equitable estoppel certainly cannot arise from a party's *not* having made certain legal arguments on prior occasions, particularly when those occasions arose in different cases and different jurisdictions governed by different laws.

Petitioner lastly points to a previous U.S. litigation brought by Commisimpex relating to the 2000 Award that arose out of the 1992 Protocol, and notes that the Congo did not raise service objections in that case.  (Opp. at 17-18.)  But the record shows that service in that case (a) was indeed made on the Caisse Congolaise as required by the "special arrangement for service," as well as (b) separately on Minister Ondongo at the Ministry of Finance, and then (c) on the Ministry of Foreign Affairs (*see* Schwinger Decl. Exh. 13, Dkt. Nos. 5-7), so there was no objection to raise even under the "special arrangement for service."  Petitioner now tries to spin this history by arguing that the service on the Caisse Congolaise was intended solely with respect to the Caisse Congolaise as defendant in that action, and that the Congo itself was served solely through the Ministry of Foreign Affairs.  (Opp. at 18.)  But the documentation of these mailings that Petitioner submitted on this motion (*see* Vasquez Decl. ¶ 6 & Exhs. 2-3) shows that

---

[3]   The elements of equitable estoppel are "(1) conduct amounting to a false representation or concealment of material fact (2) made with actual or constructive knowledge of the true facts, and (3) with the intention that another person act in reliance upon it; (4) the other person's lack of knowledge and of the means of knowledge concerning the truth of the representation, (5) and his reliance upon the misrepresentation, (6) causing him to act so as to change his position prejudicially." *Movahedi v. US Bank*, 853 F. Supp. 2d 19, 26 (D.D.C. 2012) (citations omitted).

they did not purport to limit each service to any particular defendant.  Moreover, Petitioner's after-the-fact rationalization of its service in that earlier U.S. action leaves unexplained why service there was additionally made directly to Minister Ondongo at the Ministry of Finance.

In any event, even if there was some minor technical lapse in the service in that earlier U.S. action, the Congo nevertheless elected to proceed and respond there given that the Caisse Congolaise and Minister Ondongo at the Ministry of Finance had timely received actual notice that the lawsuit had been filed — unlike what happened in the present action.  The history of the earlier U.S. lawsuit thus does nothing to undercut —and in fact supports —  the Congo's position that the FSIA requires honoring the "special arrangement for service" in this action.

**C.**     **Petitioner's Purported Service upon the Congo's Ministry of**
**Foreign Affairs Did Not Comply with the "Signed Receipt"**
**Requirements of 28 U.S.C. § 1608(a)(3) in Any Event**

Even if Petitioner could legally have served the Congo in this action solely through the Congo's Ministry of Foreign Affairs under 28 U.S.C. § 1608(a)(3), its attempt to do so did not comport with the statute's requirements and thus was defective.  The statute requires a "form of mail requiring a signed receipt," *id.*, but no signed receipt was obtained here, only an entry on a computerized DHL log.  (*See* Congo Br. at 17-19.)  Petitioner wrongly argues that the statutory requirement does not mean that an image of the signature is required (Opp. at 23), but obviously the purpose of requiring the recipient's actual signature is so that it can be examined to avoid any doubt that a signature was in fact obtained from a proper recipient and that it was genuine (*e.g.*, as opposed to being perhaps just the deliverer's own notation).  A signature is important because it is unrealistic to expect that months after the fact a claimed recipient could reliably recall that a certain envelope had *not* been part of a long-past day's DHL delivery.  Petitioner could have utilized a DHL service method that would have provided the signature image but apparently

chose not to do so (Congo Br. at 18-19), thus leaving the parties and the Court in precisely the situation that the "signed receipt" requirement was designed to foreclose.[4]

Petitioner was required to get an actual script signature for its purported § 1608(a)(3) service. Its failure to do so rendered that purported service defective and thus the amended default judgment void under Rule 60(b)(4) for lack of personal jurisdiction.

## II

### THE DEFAULT JUDGMENT SHOULD BE VACATED AS VOID UNDER RULE 60(b)(4) FOR LACK OF SUBJECT-MATTER JURISDICTION

**A.      There Is No Article III Standing Because the Petitioner Is Not Actually Commisimpex But Rather an Imposter**

This action was brought in the name of Commisimpex by what can only be called an imposter. By court order that was affirmed on appeal, the right to act for Commisimpex no longer rests with its former management but instead with a panel of liquidation trustees, thus precluding the Petitioner from litigating this action in Commisimpex's name. (*See* Congo Br. at 6-8, 20-22.) Petitioner argues that this issue has no bearing on the Court's subject-matter jurisdiction, attempting to brush it aside with the truism that "prudential" standing, unlike Article III standing, does not implicate subject-matter jurisdiction. (Opp. at 24-25.) But Petitioner's

---

[4]      Petitioner is incorrect in arguing that *Gates v. Syrian Arab Republic*, 646 F. Supp. 2d 79 (D.D.C. 2009), *aff'd*, 646 F.3d 1 (D.C. Cir. 2011), authorized judicial reliance on computerized DHL tracking log entries alone without actual signatures under § 1608(a)(3). In *Gates*, the defendant was making the fantastical claim that the signature "written in Arabic" on the "consignee-signed" delivery log was a forgery that DHL had "replicate[d]" from signatures that this particular individual at Syria's Ministry of Foreign Affairs had provided to DHL on previous deliveries, *see* 646 F. Supp. 2d at 86, and that a letter that DHL sent to plaintiff's counsel specifically reconfirming the delivery was simply "a fraud," 646 F.3d at 4. *Gates* did not hold that computerized log entries without actual signatures met the requirements of § 1608(a)(3). In *Gates*, as in *Abur v. Republic of Sudan*, 437 F. Supp. 2d 166, 173 (D.D.C. 2006), actual script signatures were presented, not just computerized log entries.

11

attempt to litigate in the name of an entity for which it has no legal authority to act is not a matter of "prudential" standing but rather goes directly to fundamental Article III standing concerns.

The situation before the Court is not a judicial policy debate about for whose benefit a statute or rule was adopted, or which class of persons has the best incentives to litigate legitimate claims. *Compare, e.g.*, *LexMark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct 1377, 1387-88 (2014). The issue here is not about policy but rather simple facts and reality. Strangers to a corporate entity cannot litigate in the entity's name, no matter how strongly they believe that the entity has suffered an injury for which they believe it should be bringing claims in litigation. (*See* Opp. at 25.) Disallowing such stranger claims is not a mere "prudential" policy decision of the judicial branch. It goes to the fundamental meaning of standing under Article III, as *Lexmark* confirms. The fact that the persons standing behind the Petitioner are now legally strangers to the Commisimpex entity means that the action they filed is nothing more than a "generalized grievance" — a claim that could equally be asserted by *any* person claiming an "interest in proper application" of the law and "seeking relief that no more directly and tangibly benefits [that person] than it does the public at large." *Lexmark*, 134 S. Ct. at 1387 n.3. Such claims, the Supreme Court confirmed in *Lexmark*, "do not present constitutional 'cases' or 'controversies'" and thus "are barred for constitutional reasons, not 'prudential' ones." *Id.*[5]

Moreover, while constitutional standing involves a party asserting a claim to obtain judicial redress of an injury, *see, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), here the actual party in interest does not in fact seek to pursue judicial redress at this time.

---

[5]   The fact that this situation may additionally implicate Rule 17 procedural defenses about capacity or real party in interest (*see* Congo Br. at 32-33) does not (contrary to Petitioner's argument, *see* Opp. at 24) erase the fundamental defect in Article III standing here.

Rather, Commisimpex's lawful representatives have explained that they are currently exploring a global resolution with the Congo of the various claims and disputes between them, and that the continued maintenance of this action by the Petitioner is unhelpful to that process.  (Mossa Reply Decl. ¶¶ 7-8.)  It would turn the notion of standing on its head to suggest that in such a situation meddling strangers could have standing to force a claim to be litigated in the entity's name when the entity's lawful representatives do not currently seek to proceed in that manner.

In sum, despite Petitioner's attempt to avoid disclosing the issue, there is a very simple principle at stake here:  There is no subject-matter jurisdiction because there is no Article III standing when a stranger purports to litigate in the name of an entity for whom that stranger is not lawfully authorized to act.  The amended default judgment should therefore be vacated.

**B.      Petitioner Cannot Wish Away the Insolvency Ruling Under Which Sole Power to Conduct Commisimpex's Affairs Was Given to a Panel of Liquidation Trustees By Denouncing the Proceeding — and Indeed the Entire Congolese Judicial System — as Corrupt**

Faced with the obvious consequences that the Congolese insolvency ruling poses to Petitioner's standing in this action, Petitioner advances an angry challenge to the legitimacy of that ruling, if not indeed the entire Congolese judicial system.  Petitioner's arguments are as short on substance as they are long on invective, and they are wholly insufficient to support denying comity to the insolvency ruling.

**1.      Petitioner's Complaints About the Insolvency Proceeding Were Raised, Heard and Addressed in the Operative Appellate Ruling, and Neither the ICC Arbitral Tribunal Nor the French Courts Have Endorsed Petitioner's Complaints**

Petitioner goes on at great length about supposed flaws in the Congolese *trial court* proceedings that led to the insolvency ruling.  But Petitioner ignores the fact that this trial court ruling was appealed to a Congolese *appellate court*, which rendered its own decision that is now the operative ruling here.  (Mossa Decl. ¶ 5 & Exh. B.)  Petitioner has not alleged there was any

corruption or unfairness in these appellate review proceedings. The appellate ruling (Mossa Decl., Exh. B) expressly shows that any complaints of procedural unfairness or irregularities in the lower court proceeding were heard and addressed (*see id.* at 6-7, 8-10),[6] and while the liquidation of Commisimpex was in general upheld (*id.* at 10), the lower court ruling was significantly modified in certain respects in favor of Petitioner's principal Mr. Mohsen Hojeij (*id.* at 11), and the objected-to member of the original panel of liquidators was removed and replaced (*id.* at 11-12). Petitioner conveniently ignores these critical facts, which belie its claim that the operative insolvency ruling is the product of fraud.[7]

Moreover, prior Commisimpex management has taken a further and final appeal of the ruling to the OHADA Common Court of Justice and Arbitration (CCJA) in the Ivory Coast, from which a decision is expected soon. (Suskin Decl. ¶¶ 7-10.) Petitioner makes no claim on this motion that there is any corruption or unfairness in such OHADA CCJA appellate proceedings.

Petitioner next tries to suggest that the ICC arbitral tribunal denounced the insolvency ruling as a fraud, but the tribunal plainly did no such thing. All the tribunal said was that because the insolvency ruling was issued after the close of the evidence in the arbitration, the tribunal (on international arbitration public policy grounds) would not allow that ruling to interrupt the completion of the arbitration. (2013 Award [Schwinger Decl., Exh. 3B] ¶¶ 214-

---

[6] Tellingly, the opposition's attacks on the trial court insolvency ruling (*see* Opp. at 27-30) raise nothing more than the typical tired complaints routinely heard from unsuccessful litigants and appellants: "The case schedule was unfair to me." "I requested an adjournment but didn't get it." "The verdict was against the weight of the evidence, if you would only see it my way." "The judge obviously must have been friends with the other side." Such complaints hardly reach the high level needed to show corruption and fraud sufficient to warrant denying comity.

[7] Furthermore, given the detailed responses already made in other proceedings to Petitioner's accusations of improprieties in the Congolese insolvency litigation (*see* Suskin Reply Decl., Exh. 2 ¶¶ 61-77), a complex factual hearing (and perhaps even discovery) would be needed before those issues could be resolved on this motion. *See, e.g.*, *Haase v. Sessions*, 835 F.2d 902, 903-04, 907 (D.C. Cir. 1987); *Wilderness Society v. Griles*, 824 F.2d 4, 17 (D.C. Cir. 1987).

218, 222-223.)   It expressly cautioned that in making this ruling it was not purporting, and indeed was not competent, to opine on the propriety of the insolvency ruling generally or to dictate the outcome of efforts elsewhere to enforce that ruling:

> "[T]he jurisdiction of the Arbitral Tribunal is limited by its *raison d'être*, which is to evaluate the effects of the bankruptcy ruling *on the arbitration proceedings*. * * * [T]he Arbitral Tribunal does not need to rule on the allegedly harmful and fraudulent nature of the liquidation of Commisimpex, as the latter requested, to note that recognizing its effects *in this arbitration proceeding* would not comply with the requirements of international public policy; . . . * * * The Arbitral Tribunal must declare itself not to have jurisdiction [to grant Commisimpex's request to bar the Congo from asserting the insolvency ruling in any other jurisdiction], in that it does not have standing to replace the other jurisdictions that could be called upon to enforce the ruling of the Court of Commerce of Brazzaville dated 30 October 2012."

(*Id.* ¶¶ 218, 222, 224 (emphases added).)   Likewise, the French court that reviewed the 2013 Award said only that "the judgment of liquidation had to be regarded as without effect *on the arbitration proceeding*" and that therefore "the arbitral tribunal did not incorrectly rule *on its jurisdiction*," without addressing recognition of the ruling outside the context of arbitral jurisdiction. (*See* Polkinghorne Decl. II ¶ 19 & Exh. 9 at 6 (emphases added).)[8]

Petitioner also attempts to find support in certain additional French court rulings and submissions (which it conveniently submitted without English translation) that Petitioner claims refused to recognize the Congolese ruling and in which the Congo supposedly conceded that the Petitioner could act in Commisimpex's name. (*See* Genet Decl. ¶¶ 14-18 & Exhs. 5-6.)   But what these documents actually state is that, pursuant to Article 49 of the 1974 Cooperation Convention on Judicial Matters between France and the Congo (*see* Suskin Reply Decl. ¶ 2 &

---

[8]   This situation here thus differs from that in *Fitzpatrick Int'l Ltd. v. Republic of Equatorial Guinea*, No. H-12-1300, 2013 WL 5964560 (S.D. Tex. Nov. 7, 2013), relied upon by Petitioner (Opp. at 25-26), where the arbitral tribunal ruled that foreign bankruptcy proceedings were invalid generally because of flaws in how service was made. *See id.* at *7.

Exh. 1), it was a given that this Congolese ruling could not be recognized or enforced in France *until all appeals from the ruling were exhausted.* (*See id.* ¶¶ 3-5 & Exhs. 2-4; Mossa Reply Decl. ¶¶ 3-5.) Thus, if affirmed by the OHADA CCJA court in the Ivory Coast, the Congolese insolvency ruling will be fully enforceable in France pursuant to this same Convention.[9]

### 2. Petitioner Has Made No Showing That Would Warrant Denouncing the Entire Congolese Legal System as Corrupt, Much Less the Supranational OHADA CCJA Court That Will Provide the Final Word on the Insolvency Ruling

Petitioner next tries to avoid the implications of the Congolese insolvency ruling by arguing that judgments of the Congolese legal system cannot be granted comity because that system supposedly is corrupt and not impartial. Petitioner's argument is first and foremost irrelevant because the Congolese insolvency ruling is now being reviewed on appeal by the supranational OHADA CCJA court in the Ivory Coast, and Petitioner has not come forward with any evidence to suggest any corruption or inadequacy in CCJA appeal proceedings.

As for the Congo's courts, Petitioner offers no expert support for its grandiose accusations but rather points solely to a few tepid sentences plucked from State Department reports and a UN document. (Opp. at 31-32.) But "binding authority in this jurisdiction defeats plaintiffs' reliance upon the State Department's report concerning [another nation's] judiciary" that makes only "general allegations of corruption in the judicial system." *MBI Grp., Inc. v. Credit Foncier du Cameroun*, 558 F. Supp. 2d 21, 30 (D.D.C. 2008), *aff'd*, 616 F.3d 568 (D.C. Cir. 2010) (re Cameroon) (citing *El–Fadl v. Central Bank of Jordan*, 75 F.3d 668, 678 (D.C. Cir.

---

[9] French courts enforce Congolese judgments under the Convention when requirements under Article 49 are met. *See, e.g.*, Cour d'appel [CA] [regional court of appeal], Versailles, 1e ch., Dec. 10, 2009, No. 08/07359 (Fr.); Cour d'appel [CA] [regional court of appeal], Douai, 1e ch., Oct. 20, 2008, No. 07/05016 (Fr.); Cour d'appel [CA] [regional court of appeal], Versailles, 1e ch., Dec. 14, 2006, No. 06/01629 (Fr.) [all available on *www.lexisnexis.com/fr/droit* (separate subscription required)].

1996) (re Jordan)); *Irwin v. World Wildlife Fund, Inc.*, 448 F. Supp. 2d 29, 34 (D.D.C. 2006) (re Gabon)); *see also Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1179 (9th Cir. 2006) ("State Department Country Reports that reference corruption, judicial bias and inefficiency, and . . . potentially improper influence . . . over the judicial process" were too "paltry" to justify rejecting country's entire legal system); *Zeevi Holdings Ltd. v. Republic of Bulgaria*, No. 09 CIV. 8856 RJS, 2011 WL 1345155, at *1 (S.D.N.Y. Apr. 5, 2011) (contents of governmental and international reports, though perhaps "unseemly," did not establish "pervasive corruption in the Bulgarian judiciary"; "principles of comity strongly caution against declaring the entire court system of another country to be inadequate"), *aff'd*, 494 F. App'x 110 (2d Cir. 2012).[10]

While Petitioner's argument may play into popular prejudices held by some about African nations, a simple look at context shows that statements very similar to the ones Petitioner cites — if not far worse — can just as easily be found in State Department Country Reports for countries such as Brazil, Argentina, the Dominican Republic, Greece, Turkey, Morocco and India. (*See* Schwinger Reply Decl. ¶¶ 3-4 & Exhs. 2-8.) As no one could seriously suggest that U.S. courts should start dismissing all legal rulings from these countries outright based simply on such remarks in State Department reports, likewise no such categorical rejection of Congolese legal rulings would be justified based on the thin remarks about the Congo to which the Petitioner points.

---

[10]  Nothing in the cited State Department reports on the Congo comes anywhere close to the depiction of the court systems in the cases upon which Petitioner relies (Opp. at 31). *Bridgeway Corp v. Citibank*, 45 F. Supp. 2d 276, 287 (S.D.N.Y. 1999), *aff'd*, 201 F.3d 124 (2d Cir. 2000), involved a Liberian judicial system in a state of near-collapse following a civil war. *Osorio v. Dole Food Co.*, 665 F. Supp. 2d 1307, 1348-49 (S.D. Fla. 2009), *aff'd sub nom. Osorio v. Dow Chem. Co.*, 635 F.3d 1277 (11th Cir. 2011), involved an increasingly deteriorating Nicaraguan justice system where "two strongmen . . . are capable of exercising control of the Supreme Court on a case by case basis" and thereby to "direct proceedings in lower courts" as well.

To the contrary, given this comparative context, the tame reports to which Petitioner points show that the Congolese legal system is indeed sufficient to warrant comity for its civil judgments. Notably, the comments in the State Department Country Report on the Congo that Petitioner cites pertain primarily to human rights and felony courts, whereas the report notes that "the civil courts review cases on a regular basis throughout the year" and "were considered to be functional." (Vasquez Decl., Exh. 15 at 9.) The Court need not waste time on Petitioner's transparent argument that no reported U.S. case has ever recognized Congolese court orders or judgments (Opp. at 32), since there likewise are no reported U.S. cases *refusing recognition* of Congolese court orders or judgments based on a condemnation of the Congolese legal system.

It bears noting that one of the purposes served by international judicial comity is to avoid judicially-created disruptions and embarrassments to the foreign relations activities of the Executive Branch. *See European Cmty. v. RJR Nabisco, Inc.*, 150 F. Supp. 2d 456, 474 (E.D.N.Y. 2001); *cf. Zschernig v. Miller*, 389 U.S. 429, 440-41 (1968). The U.S. State Department proclaims on its website that "U.S.-Republic of the Congo relations are positive and cooperative," *see* U.S. State Dept., "U.S. Relations With Republic of the Congo" (Bureau of African Affairs Fact Sheet) (May 21, 2014), http://www.state.gov/r/pa/ei/bgn/2825.htm (Schwinger Reply Decl. ¶ 2 & Exh. 1). This Court should reject Petitioner's invitation to condemn a valuable U.S. ally's entire legal system just so that Petitioner can escape a foreign judicial ruling it does not like. The Court should acknowledge the Congolese insolvency ruling that placed authority over Commisimpex into the hands of liquidation trustees and hold that subject-matter jurisdiction is lacking because the imposter Petitioner here lacked Article III standing to litigate in Commisimpex's name.

18

**C.     The Lack of an Agreement "In Writing" to Arbitrate Is an**
**        Additional Subject-Matter Jurisdiction Defect Under the FAA**

Article II(1) of the New York Convention requires that an agreement to arbitrate must be "in writing" in order to be worthy of recognition among the Contracting States to the Convention, and Article IV(1)(b) then requires that this written agreement be submitted to the court when enforcement is sought. The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, has an express jurisdictional provision governing New York Convention enforcement applications in 9 U.S.C. § 203, which provides:

> "An action or proceeding *falling under the Convention* shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States . . . shall have original jurisdiction *over such an action or proceeding*, regardless of the amount in controversy." (Emphases added.)

For this reason, the lack of a written agreement to arbitrate is not just a merits issue but also a subject-matter jurisdiction issue when enforcement of an arbitral award is sought pursuant to the New York Convention under the FAA.

Here there was no agreement "in writing" to arbitrate disputes under the 2003 Protocol, only a determination by the ICC tribunal that an agreement to arbitrate such disputes should be implied or inferred or imputed to the Congo under a French-law "group of contracts" rationale based on the 1992 Protocol. The lack of an agreement "in writing" means that the amended default judgment is void for lack of subject-matter jurisdiction. *Czarina. L.L.C. v. W.F. Poe Syndicate* 358 F.3d 1286, 1291-92 (11th Cir. 2004). [11]   This Court held likewise in *Moscow*

---

[11]   Petitioner claims that *Czarina* is "not sound," but the cases it cites (Opp. at 32-33) do not support that position. *Bautista v. Star Cruises*, 396 F.3d 1289 (11th Cir. 2005), itself cites *Czarina* in terming the New York Convention's agreement "in writing" requirement to be a "jurisdictional prerequisite" under the FAA. *Id.* at 1300. *Regent Seven Seas Cruises, Inc. v. Rolls Royce*, No. 06-22347-CIV, 2007 WL 601992 (S.D. Fla. Feb. 21, 2007), likewise cites *Bautista* in characterizing the "agreement in writing" requirement as one of the "jurisdictional prerequisites" for a Convention case, *id.* at *3,

(Cont'd on following page)

19

*Dynamo v. Ovechkin*, 412 F. Supp. 2d 24, 27-29 (D.D.C. 2006), citing *Czarina* in holding that "there is no subject-matter jurisdiction" where the alleged agreement to arbitrate was not in writing but rather was merely inferred from other documents — even though that inference had been accepted by the arbitrators.  The court in *Four Seasons Hotels & Resorts B.V. v. Consorcio Barr, S.A.*, 613 F. Supp. 2d 1362, 1368 (S.D. Fla. 2009), reached the same holding based on *Czarina*.  Indeed, on facts very similar to Petitioner's "group of contracts" argument here, that court held that for FAA subject-matter jurisdiction purposes two separate contracts did not constitute "one single contractual structure" because

> "the mere fact that two separate contracts have as their purpose the same ultimate objective is insufficient to impute the arbitration provision in one contract to the other, where the second contract lacks an arbitration provision."

*Id.* (not deferring the U.S. jurisdictional analysis *under the FAA* to the arbitral panel's decision that under foreign law *arbitral* jurisdiction could be based on such an argument); *see also Diag Human S.E. v. Czech Republic-Ministry of Health*, No. CV 13-0355 (ABJ), 2014 WL 3956747, at *3-4 (D.D.C. Aug. 14, 2014) (listing existence of "written agreement" as one of the four elements to determine when 9 U.S.C. § 203 subject-matter jurisdiction under the FAA will apply in New York Convention cases).

In sum, the lack of an agreement "in writing" presents a subject-matter jurisdiction flaw under the FAA that cannot be cured by resort to "group of contracts" arguments under French law.  The amended default judgment should therefore be vacated.

---

(Cont'd from preceding page)

holding there that a written agreement to arbitrate the subject-matter plainly did exist and the parties were merely debating whether it reached particular parties, *id.* at *4.  *Sarhank Grp. v. Oracle Corp.*, 404 F.3d 657 (2d Cir. 2005), likewise involved an actual written agreement to arbitrate the subject-matter, where the parties were merely debating whether that written agreement reached particular parties.  *Id.* at 660.

## III

## THE AMENDED DEFAULT JUDGMENT SHOULD
## IN ANY EVENT BE VACATED UNDER RULE 60(b)(1)

Even if the Court does not hold the amended default judgment jurisdictionally void under Rule 60(b)(4), it should still be vacated under Rule 60(b)(1).

### A.     The Congo Has Meritorious New York Convention Defenses

Rule 60(b)(1) vacatur is permissible where the movant can show "even a hint of a suggestion" of a meritorious defense. (Congo Br. at 31 (citing cases).) Here there is far more than a hint. In addition to the foregoing jurisdictional defenses which also raise Rule 17 procedural defenses (*id.* at 31-33), the Congo has meritorious New York Convention defenses.

The first is non-finality of the award. Article VI of the New York Convention provides that enforcement of an award can be held in abeyance while proceedings to set the award aside are pending in the jurisdiction where the arbitration was held. Article V(1)(e) identifies such non-finality as a defense against enforcement of the award. The Congo brought a proceeding to set aside the 2013 Award in France (the seat of the arbitration), and following the initial ruling recently rendered by the Paris Court of Appeal the Congo has taken a further appeal to the French Cour de Cassation. (Suskin Reply Decl. ¶ 6 & Exh. 5.) Accordingly, until such time as the Cour de Cassation has made its ruling, enforcement of the 2013 Award should be denied.

Second is the lack of a written agreement to arbitrate the subject-matter as required under Articles II(1) and IV(1)(b) of the Convention, which is a merits defense under Article V *in addition* to being a subject-matter jurisdiction defense under the FAA (*see* Point II.C., *supra*). Article V(1)(a) provides that enforcement of an award requires that there be a "valid" Article II agreement between the parties. *China Minmetals Materials Import and Export Co. Ltd. v. Chi Mei Corp.*, 334 F.3d 274, 286 (3d Cir. 2003). Thus, even though enforcement defenses may be

limited to those in Article V of the Convention, "a district court should refuse to enforce an arbitration award under the Convention where the parties did not reach a valid agreement to arbitrate." *Id*. at 286.  Moreover, courts determine this Article V issue independently under U.S. law and do not merely defer to arbitral determinations, even in an international context where arbitrators may have been given power to determine their own jurisdiction.  *See id.* at 286-90 (under Article V, "international law overwhelmingly favors some form of judicial review of an arbitral tribunal's decision that it has jurisdiction over a dispute"); *see also Sarhank Grp.*, 404 F.3d at 662 ("American federal arbitration [] law controls" on this Article V defense issue, where finding a valid agreement must be "based on American contract law").

The third defense is fraud or corruption in the underlying arbitration, pursuant to Article V(b)(2) of the Convention.  The eyebrow-raising circumstances here involve a claim founded upon a supposed 1992 letter from the Congo to Commisimpex, the original of which purportedly was mysteriously "stolen" from Commisimpex's principal in 1998, but then a "copy" of which supposedly was sent to Commisimpex in 2003 by the Congo, although the Congo itself had no copy of such letter, and the purported letter was riddled with inconsistencies and other indicia of fabrication.  (2013 Award [Schwinger Decl., Exh. 3B] ¶ 278.)  Even the ICC tribunal termed this wild story "extravagant."  (*Id.* ¶ 280.)  Such a tale presents far more than "a hint of a suggestion" of the type of corruption that provides a defense to enforcement under Article V(b)(2).

**B.  The Default Was Not Within the Congo's Control**

Petitioner argues that because the Congo has not produced any declarant who could deny that Petitioner's DHL packages reached the mailroom at the Ministry of Foreign Affairs, that means that the officials responsible for Commisimpex litigation in the Ministry of Finance were therefore on actual notice of this lawsuit since the time it was filed, and thus the default was within the Congo's control.  (Opp. at 38-40.)  This argument deserves the same respect that it

would receive if an individual litigating with the U.S. Treasury Department were to suggest that dropping off papers at the U.S. State Department had therefore put the Treasury Department on "actual notice" because the State Department gets legal papers all the time and thus surely would have forwarded them.  The fact remains that Minister Ondongo's declaration was unequivocal that neither the Ministry of Finance nor the Caisse Congolaise had actual notice of this lawsuit. (Ondongo Decl.).  Such a declaration is sufficient under Rule 60(b)(1).  *Austin Inv. Fund, LLC by & through Elieff v. United States*, 88 Fed. R. Serv. 3d 839 (D.D.C. 2014).

In any event, lost, misplaced, overlooked, non-forwarded or delayed mail constitutes "excusable neglect" under Rule 60(b)(1).  *Thompson v. Am. Home Assur. Co.*, 95 F.3d 429, 433 (6th Cir. 1996) (papers not forwarded by governmental service recipient); *Trupei v. United States*, 274 F.R.D. 38, 39 (D.D.C. 2011) ("lost mail"); *Standard Enterprises, Inc. v. Bag-It, Inc.*, 115 F.R.D. 38, 39 (S.D.N.Y. 1987) (papers "languished" in pile of junk mail for several months).

Petitioner also argues that the Congo's arbitration counsel "undoubtedly" must have been monitoring U.S. court dockets for the filing of this litigation (Opp. at 41), but counsel in fact expressly confirmed not having any such knowledge of the filings in this action.  (Morag Decl. ¶¶ 5-7.)  Petitioner further argues that the Congo's arbitration counsel had become aware of the amended default judgment at some point because that counsel also represented a bank in enforcement proceedings on this judgment starting in mid-July 2014 (roughly two months before the Congo's present counsel filed this Rule 60 motion).  Yet Petitioner cannot cite knowledge by that other counsel as effective notice to the Congo when Petitioner itself claims that such counsel's concurrent representation of the Congo and this bank created a disabling conflict of interest as to the Congo.  (Opp. at 9 n.3; Vasquez Decl. ¶¶ 15-16 & Exhs. 13-14.)  The Court should not strain in this way to find a default against a sovereign.  (*See* Congo Br. at 11-13.)

Petitioner insists without any evidence that the default here could only have been the product of tactical gamesmanship.  (Opp. at 39-41.)  But this contention makes no sense when (a) the Congo has been vigorously fighting the $700 million 2013 Award in the French courts this entire time (*see* Polkinghorne II Decl. ¶ 19 & Exh. 9; Suskin Reply Decl. ¶ 6 & Exh. 5), (b) the parties have been involved in multiple hard-fought litigations and arbitrations with one another around the world for *decades* (*see* Opp. at 17-20), and (c) Petitioner never so much as mentioned the default to the Congo's arbitration counsel, with whom it was in regular contact on related litigations around the world.  There is simply no showing nor reason to infer that the default here was intentional, tactical or anything other than "excusable."

## C.   There Is No Prejudice

Petitioner has not identified any substantive prejudice from the modest delay that would result from vacating the amended default judgment.  Petitioner points only to the previously-mentioned judgment enforcement proceedings against a bank in the Southern District of New York (Opp. at 41-42), but remarkably Petitioner never discloses that Petitioner voluntarily withdrew those proceedings on November 4, 2014.  (Schwinger Reply Decl. ¶ 5 & Exh. 9.) There is simply no prejudice here standing in the way of vacating the amended default judgment.

## D.   Petitioner's Personal Attacks About Other Counsel Are Irrelevant

The Congo in its moving papers made the minor point that in assessing the good faith with which a Rule 60 motion was made — in a matter where the same parties with the same counsel have been fighting for decades — Petitioner's failure to provide the Congo's counsel with a courtesy notification about the default is a relevant consideration.  *See Passarella v. Hilton Int'l Co.*, 810 F.2d 674, 677 (7th Cir. 1987).  Petitioner's response to this is to turn this motion into a childish name-calling contest about supposed slights by other counsel for the Congo in other litigations with Commisimpex, and indeed about supposed behavior by that other

counsel in litigations with other parties altogether, to argue that vacatur should be denied.  (Opp. at 10, 42-43.)  Such matters are irrelevant and the Congo will not degenerate to this level.  If not deemed void on jurisdictional grounds, the amended default judgment warrants Rule 60(b)(1) vacatur based on inadvertence and excusable neglect, so that this $700 million matter can be adjudicated in a fair and professional manner, with both sides present and able to be heard.

## <u>CONCLUSION</u>

For the foregoing reasons, and those set forth in the moving papers, the Congo's Rule 60(b) Motion to Vacate Amended Default Judgment should be granted in all respects.

Dated:   December 22, 2014

Respectfully submitted,

CHADBOURNE & PARKE LLP


By      _____*/s/ Robert A. Schwinger*_____
    Robert A. Schwinger (DC Bar ID # NY0092)
    Rachel W. Thorn (admitted *pro hac vice*)
    Marc Suskin (admitted *pro hac vice*)
    Members of the Firm
  Attorneys for Respondent
   Republic of the Congo
  1301 Avenue of the Americas
  New York, NY  10019
  (212) 408-5100
  *rschwinger@chadbourne.com*
  *rthorn@chadbourne.com*
  *msuskin@chadbourne.com*

Dana Frix
CHADBOURNE & PARKE LLP
1200 New Hampshire Avenue, N.W.
Washington, DC  20036
Tel. (202) 974-5600

Of Counsel