**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| COMMISSIONS IMPORT EXPORT S.A., ) | |
| ) | |
| *Petitioner*, ) | |
| ) | |
| *v.* ) | Civil Action No. 1:13-cv-713-RJL |
| ) | |
| REPUBLIC OF THE CONGO, ) | |
| ) | |
| *Respondent.* ) | |

**REPLY IN SUPPORT OF**
**COMMISIMPEX'S MOTION TO COMPEL DENIS-CRISTEL SASSOU NGUESSO**
**TO COMPLY WITH THE SEPTEMBER 19, 2016 SUBPOENA**

**WHITE & CASE LLP**

Francis A. Vasquez, Jr. (DC Bar No. 442161)
Nicolle Kownacki (DC Bar No. 1005627)
Timothy L. Wilson, Jr. (DC Bar No. 1030145)
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

*Counsel for Commissions Import Export, S.A.*

November 7, 2016

## **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................1

STATEMENT OF FACTS .................................................................................................2

I.     Background ...............................................................................................................2

II.    Mr. Nguesso Has Pervasive Links with the Government of the Congo .............................4

III.   Service of Commisimpex's Subpoena ...................................................................7

      A.    Events Leading to Service of the Subpoena on Mr. Nguesso .................................7

      B.    Mr. Nguesso Was Personally Served ....................................................8

      C.    Mr. Omar Arouna Misrepresents the Events of September 19 .............................10

ARGUMENT ....................................................................................................................11

I.     Commisimpex's Subpoena Was Personally and Properly Served on Mr. Nguesso .........11

II.    Commisimpex's Subpoena Complies with Rule 45 ...........................................13

III.   Compelling Mr. Nguesso's Deposition and Production of Documents Is
     Consistent with Principles of Comity and All Discovery Rules .......................................16

IV.   The Subpoena's Document Requests Are Properly Tailored to Seek Information
     in Aid of Execution of Commisimpex's Judgment ...........................................................20

CONCLUSION ..................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Call of the Wild Movie LLC v. Does 1-1, 062*, 770 F. Supp. 2d 332 (D.D.C. 2011)..............11, 15

*Comm'ns Imp. Exp., S.A. v. Republic of the Congo*,
  118 F. Supp. 3d 220 (D.D.C. 2015) ................................................................1, 20

*Comm-Tract Corp. v. N. Telecom*, 168 F.R.D. 4 (D. Mass. 1996) ................................16

*Dietz v. Spangenberg*, No. 11-2600 ADM/JJG, 2014 U.S. Dist. LEXIS 17046
  (D. Minn. Feb. 11, 2014) ...........................................................................14

*Edelman v. Taittinger*, 295 F.3d 171 (2d Cir. 2002)................................................17, 18

*EM Ltd. v. Republic of Argentina*, 695 F.3d 201 (2d Cir. 2012) ...................................22

*Falicia v. Advanced Tenant Servs.*, 235 F.R.D. 5 (D.D.C. 2006) ......................... 20-24

*First Am. Corp. v. Price Waterhouse LLP*, 154 F.3d 16 (2d Cir. 1998)................................17, 18

*Food Lion v. United Food & Commercial Workers Int'l Union*,
  103 F.3d 1007 (D.C. Cir. 1997) .....................................................................21

*FTC v. Staples*, No. 15-2115, 2016 U.S. Dist. LEXIS 49965
  (D.D.C. Feb. 26, 2016) ............................................................................20, 21

*GFL Advantage Fund, Ltd. v. Colkitt*, 216 F.R.D. 189 (D.D.C. 2003)....................................11, 21

*Giraldo v. Drummond Co.*, 808 F. Supp. 2d 247 (D.D.C. 2011)....................................... 12, 17-19

*Halliburton Energy Servs. v. M-I, LLC*, No. H-06-mc-00053,
  2006 U.S. Dist. LEXIS 66374 (S.D. Tex. Sep. 15, 2006) .....................................14

*In re Chase Manhattan Bank*, 297 F.2d 611 (2d Cir. 1962) ........................................17

*In re Father Christopher Hartley v. Felipe Vicini Lluberes*, No. 08-101 (RJL)
  (D.D.C. May 2, 2008) ..............................................................................15

*Linder v. Dep't of Defense*, 133 F.3d 17 (D.C. Cir. 1998) ..........................................11

*Magnaleasing, Inc. v. Staten Island Mall*, 76 F.R.D. 559 (S.D.N.Y. 1977)...........................22, 23

*Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395 (D.C. Cir. 1984) ...........................11

*Regents of the Univ. of Cal. v. Kohne*, 166 F.R.D. 463 (S.D. Cal. 1996)......................................13

*Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250 (2014) ................................... 20-24

*Robertson v. Cartinhour*, No. 09-1642, 2011 U.S. Dist. LEXIS 156059
    (D.D.C. Sept. 16, 2011) .................................................................................................21, 22

*Samantar v. Yusuf*, 560 U.S. 305 (2010) ...................................................................................17

*Yukos Capital S.A.R.L. v. Feldman*, No. 15-cv-4964 (LAK),
    2016 U.S. Dist. LEXIS 72768 (S.D.N.Y. June 3, 2016) ........................................................16

## STATUTES, RULES AND REGULATIONS

28 U.S.C. § 1782 .................................................................................................................17, 18

Fed. R. Civ. P. 26 ................................................................................................................20, 21

Fed. R. Civ. P. 26(b) ...........................................................................................................20, 24

Fed. R. Civ. P. 45 ................................................................................................................ *passim*

Fed. R. Civ. P. 45(c) .................................................................................................2, 13, 15, 16

Fed. R. Civ. P. 69(a) ..................................................................................................................20

Foreign Sovereign Immunities Act ....................................................................................17, 22

## INTRODUCTION

More than three years have passed since this Court entered its more than half-billion euro judgment against the Congo.[1]  In that time, not only has the Congo refused to pay a cent of that judgment, it has stonewalled every attempt by Commisimpex to discover information that would lead to that judgment's satisfaction.  For the past year, the Congo has defied this Court's order that it provide Commisimpex with such information.  Denis-Christel Sassou Nguesso's late-breaking opposition to Commisimpex's motion to compel is nothing but another link in the Congo's chain of defiance.

In this latest attempt to evade Commisimpex's post-judgment discovery efforts, Mr. Nguesso misrepresents the events of September 19, 2016 and the circumstances surrounding Commisimpex's service of its subpoena upon him.  Mr. Nguesso also argues that he is not a proper target for post-judgment discovery despite holding office in the Congolese government—a fact he emphasizes throughout his opposition—as well as various positions with state-owned entities that control the Congo's oil sector.  Most importantly, Mr. Nguesso's efforts to distance himself from the Congo and its assets is belied by the ample evidence in the public record demonstrating his predilection for siphoning public funds from the oil sector into his private accounts.  Mr. Nguesso's late filing represents yet another attempt by the Congo to stonewall Commisimpex's efforts to satisfy its long-held judgment.[2]

On September 19, 2016, Commisimpex properly served on Mr. Nguesso a subpoena commanding him to appear for a deposition and to produce certain documents and information in

---

[1] Judge Lamberth has also entered a similarly large judgment against the Congo in connection with a separate foreign judgment. *Comm'ns Imp. Exp., S.A. v. Republic of the Congo*, 118 F. Supp. 3d 220 (D.D.C. 2015).

[2] Commisimpex's Reply in Support of its Motion to Compel is supported by the Declaration of Francis A. Vasquez, Jr., executed November 7, 2016, and the exhibits attached thereto ("Vasquez Decl."); the Declaration of Eugene J. Kassman, executed November 1, 2016, and the exhibits attached thereto ("Kassman Decl."); the Declaration of Nina Lew, executed November 2, 2016 ("Lew Decl."); and the Declaration of Torri Schaffer, executed November 3, 2016 ("Schaffer Decl.").

his possession pertaining to assets held by him, his family, and other associates that could be connected in any way to the Congo or any of its agencies or instrumentalities.

Mr. Nguesso now implausibly asserts that service of the subpoena was defective, despite the proper procedures followed by a trained, experienced process server and photographs that corroborate his statement.   Mr. Nguesso also implausibly claims that he only heard of the subpoena in the French newspaper *Le Monde*—suggesting instead that Mr. Nguesso only decided to *respond* to the subpoena once it began to affect his international reputation.

The subpoena on Mr. Nguesso is proper as a matter of law.  First, Mr. Nguesso's business in the District of Columbia is a sufficient basis to satisfy the terms of Rule 45(c).   Additionally, there is sufficient cause to believe that Mr. Nguesso possesses the information sought regarding the Congo—and at a minimum should be compelled to appear to answer questions regarding the scope of his knowledge of the Congo's finances and his business in the District of Columbia.  In that regard, Commisimpex is ready, willing, and able to allow Mr. Nguesso to sit for a deposition anywhere that is convenient for the parties.

Finally, neither principles of comity nor the discovery rules suggest that this Court should refuse to compel Mr. Nguesso to appear for his deposition or produce the requested documents. Indeed, given Mr. Nguesso's prominent position in the Congolese government, and the fact that the Congo has spent *decades* evading payment to Commisimpex, the equities strongly counsel in favor of granting Commisimpex's motion to compel.

## STATEMENT OF FACTS

### I.     BACKGROUND

The subpoena served on Mr. Nguesso represents more than a year's worth of effort by Commisimpex to obtain information related to the Congo's assets both in the United States and abroad.  *See* Vasquez Decl. ¶¶ 6-9; *see also* Dkt. 60.  Commisimpex seeks this information so

that a final judgment entered in its favor by this Court—requiring the Congo to pay Commisimpex €567,184,160.72, $855,000, and post-judgment interest (Dkt. 18)—may at last be satisfied.  Vasquez Decl. ¶ 4.  On August 25, 2015, as part of this effort, Commisimpex served the Congo with post-judgment interrogatories seeking to identify Congolese assets.  *Id.* ¶ 6.  The Congo failed to respond to any of the interrogatories and instead provided a list of objections, none of which it was willing to modify after a meet-and-confer.  *Id.*  Commisimpex then filed a motion to compel the Congo's responses to the interrogatories (Dkt. 38), which this Court granted on December 16, 2015 (Dkt. 42).[3]  Despite Commisimpex filing a motion for sanctions against the Congo and its counsel, to this day the Congo has neither responded to the interrogatories nor given any indication that it will do so in the future.  Vasquez Decl. ¶ 6.

Faced with the Congo's intransigence, Commisimpex subsequently sought post-judgment discovery from members of the Congolese government, their family members, and other associates connected with assets of the Congo and its agencies and instrumentalities.  *Id.* ¶¶ 7-9.  On June 9, 2016, Commisimpex caused a subpoena to be personally served on Antoinette Sassou Nguesso, the wife of President Denis Sassou Nguesso and the mother of Mr. Nguesso, in the District of Columbia.  Dkt. 55.  As outlined in Commisimpex's motion to compel still pending with the Court (Dkt. 56), Ms. Nguesso failed to appear for her deposition and never even contacted White & Case regarding her nonappearance (Dkt. 56-1, at 3-4).

On September 19, 2016, Mr. Nguesso was served with the subpoena at issue.  Mr. Nguesso also failed to attend his scheduled deposition or contact Commisimpex's counsel.  On October 5, 2016, Commisimpex then caused a subpoena to be served on Mr. Calixte Ganongo,

---

[3] The Court ordered the Congo to answer Commisimpex's post-judgment interrogatories, as well as to pay Commisimpex the attorney's fees and costs associated with preparing its motion to compel and reply.  Dkt. 42.

the Minister of Finance of the Congo.   Dkt. 61.   Mr. Ganongo also failed to appear for his deposition or contact White & Case regarding his nonappearance.   Vasquez Decl. ¶ 9; *id*. Ex. A.

## II.   MR. NGUESSO HAS PERVASIVE LINKS WITH THE GOVERNMENT OF THE CONGO

Mr. Nguesso's ties to the government of the Congo and its commercial enterprises have long been matters of public record.   As Mr. Nguesso readily and repeatedly admits, he is a member of the Congo's Parliament (Opp'n 2, 3, 8, 10, 11, 13, 14, 17-19) and the son of Denis Sassou Nguesso, the long-ruling President of the Congo (*id*. at 2, 4).   In addition, Mr. Nguesso is the Deputy General Manager of SNPC, the 100% state-owned national petroleum company of the Congo.   Vasquez Decl. Ex. B, at 1.   He is also the chief executive of Congolaise de Raffinage, the Congo's national petroleum refining company.   *Id*.   Prior to holding these positions, he was the director of Cotrade, SNPC's marketing subsidiary.   *Id*.

Commisimpex subpoenaed Mr. Nguesso precisely because of the prominent role he occupies in the Congo's oil sector.   As the Deputy General Manager of SNPC, Mr. Nguesso wields extraordinary influence and control over the Congo's oil resources and the public funds that flow from them.   Courts in both England and France have found that SNPC is an alter ego of the Congo.   *See Kensington Int'l Ltd. v. Republic of the Congo* [2005] EWHC (Comm) 2684 [10] (Eng.) (Vasquez Decl. Ex. C).   In *Kensington*, the English High Court found that SNPC is "simply part of the Congolese state and has no existence separate from the state" (*id*. ¶ 55) and that Cotrade, the oil trading subsidiary of SNPC, acted as "an arm of the state" (*id*. ¶ 64).   The English High Court also found that Mr. Nguesso, during his time as director of Cotrade, entered into sham contracts for the sale of SNPC oil by means of shell companies that "were creatures of the Congo being used for the purpose of evading the payment of judgment debts."   *Id*. ¶¶ 3, 62, 197-98, 214 (referring to Mr. Nguesso as "Mr Christel").

Yet the Congo and SNPC have not only concealed oil revenues from judgment creditors, they have also allowed those revenues to flow into the pockets of the President's family members and associates.  The State Department has warned of widespread corruption regarding the misuse of oil revenues by the government and its officials.  *See* U.S. Dep't of State, *Republic of the Congo 2015 Human Rights Report* 26 (2015) (Vasquez Decl. Ex. D).  The State Department also has recognized reports regarding government officials engaging in fraud in order to divert revenues from the oil sector into private overseas accounts.  *Id*. at 26-27.  Freedom House, an international watchdog group, confirms that SNPC is directly under the control of the president's family and advisers.  Freedom House, *Congo, Republic of (Brazzaville)* 2 (2016) (Vasquez Decl. Ex. E).  Moreover, investigations have revealed that SNPC has been used to "siphon money to the regime's favored associates."  *Id*.

Mr. Nguesso stands at the center of many corrupt dealings regarding the Congo's oil revenues.  In 2007, he filed suit in England to compel an international transparency nonprofit to remove a number of documents from its website.  *Long Beach Ltd. v. Global Witness Ltd.* [2007] EWHC (QB) 1980 [1] (Eng.) (Vasquez Decl. Ex. F).  These documents included some of Mr. Nguesso's personal credit card statements for purchases totaling hundreds of thousands of dollars for hotels, clothes, first-class airfare, and other luxury items.  *See id.* ¶¶ 1, 14; Vasquez Decl. Ex. G.  Others showed that Mr. Nguesso's credit card bills were paid by an offshore company called Long Beach Limited.  *See* Vasquez Decl. Ex. F, ¶¶ 14, 49.  Yet another set of documents showed that Mr. Nguesso was the concealed beneficial owner of Long Beach and that Long Beach had received payments from the shell companies at issue in the earlier *Kensington* case.  *See id.* ¶ 1.  The English High Court found that Mr. Nguesso's beneficial ownership of Long Beach and his relationship with the shell companies involved in the Congo's oil sales gave Mr. Nguesso "an

obvious opportunity for personal gain" and that it was "an obvious possible inference that his expenditure[s] ha[ve] been financed by secret personal profits made out of dealings in oil sold by Cotrade." *Id.* ¶ 49.   The High Court further observed that the documents published by the international organization "frankly suggest" that Mr. Nguesso is "unsavoury or corrupt." *Id.* ¶ 52.  The High Court concluded that "[t]he profits of Cotrade's oil sales should go to the people of the Congo, not to those who rule it or their families." *Id.* ¶ 49.

Mr. Nguesso's credit card statements from the *Long Beach* case reveal a clear pattern of spending on luxury goods, five-star hotel stays, and global first-class air travel, likely funded by profits improperly acquired from the Congolese state.  *See* Vasquez Decl. Ex. G.  For example, in August 2006, Mr. Nguesso spent more than $35,000 on luxury fashion items in the exclusive resort town of Marbella, Spain, shelling out nearly $20,000 at Louis Vuitton alone.  *Id.* at 33. Other purchases include more than $30,000 of women's lingerie and clothing (*id.* at 2, 4, 15, 22, 28, 32-33) and restaurant visits ranging from approximately $1,300 to more than $5,000 per meal (*id.* at 15, 21).  In sum, Mr. Nguesso spent in excess of $200,000 on clothing, shoes, and fashion accessories in about two years' time.  As the High Court observed, these lavish purchases were financed by Long Beach Ltd., the offshore entity beneficially owned by Mr. Nguesso.  Vasquez Decl. Ex. F, ¶¶ 14, 49.  Four debit vouchers at issue in the *Long Beach* case show transfers made from Long Beach's bank account to Standard Chartered Bank in Hong Kong for payment of Mr. Nguesso's credit card.  Vasquez Decl. Ex. H.

While Long Beach was paying off Mr. Nguesso's personal debts, it was receiving bank transfers totaling nearly $450,000.  Vasquez Decl. Ex. I.  Transfer statements and bills of lading show the $450,000 came from the sale of Congolese oil cargoes. *Id.* at 1-2; *id.* Exs. J, K.  Most intriguingly, the bills of lading for both cargoes were executed by SNPC "for the account of the

–6–

Republic of the Congo."  Vasquez Decl. Exs. J, K.  So, instead of the revenues from the sale of the oil cargoes flowing to the Congo (to which they were owed), a significant portion flowed to an offshore company to fund Mr. Nguesso's lavish lifestyle.

## III.   SERVICE OF COMMISIMPEX'S SUBPOENA

### A.   Events Leading to Service of the Subpoena on Mr. Nguesso

In early September 2016, Commisimpex learned that Mr. Nguesso would be visiting the United States, including the District of Columbia, for a number of weeks.  Vasquez Decl. ¶ 10. To ensure successful service, Commisimpex engaged a professional process serving company, Torri's Legal Services.  *Id*.; *see also* Schaffer Decl. ¶¶ 4-5; Lew Decl. ¶ 3.  The principal of Torri's Legal Services, Torri Schaffer, has been engaged in the professional process serving business for over 25 years and is recognized as an industry leader.  Schaffer Decl. ¶ 2.

On September 18, 2016, Commisimpex learned that Mr. Nguesso planned to attend a business meeting at Washington Media Group, located at 1250 I Street NW.  Vasquez Decl. ¶ 11. White & Case immediately informed Torri's Legal Services.  *Id*. ¶ 11; Schaffer Decl. ¶ 7.  Ms. Schaffer then assigned three process servers to the team that would serve Mr. Nguesso: Nina Lew (the team leader), Tim Hill, and Eugene Kassman.  Schaffer Decl. ¶ 7; Lew Decl. ¶ 4; Kassman Decl. ¶ 3.  White & Case provided Ms. Schaffer and the team four photographs of Mr. Nguesso to assist in making a correct identification.  Schaffer Decl. ¶ 9.

On the morning of September 19, 2016, Ms. Lew arrived at 1250 I Street NW at approximately 5:30am, parking her car in the building's underground garage.  Lew Decl. ¶ 5. Ms. Lew surveyed the area several times to identify all entrances to the building and to look for the vehicle in which Mr. Nguesso might arrive.  *Id*. ¶¶ 6, 8.  Between 8:30am and 8:50am, Ms. Lew noticed a group of officials from the Congolese embassy standing on the sidewalk outside the main lobby.  *Id*. ¶ 8.  Ms. Lew recognized several of these individuals from serving

Antoinette Sassou Nguesso earlier in June. *Id*. Mr. Nguesso had likely arrived by this time because the Congolese embassy officials standing on the sidewalk appeared to be observing something occurring inside the lobby. *Id*.

At approximately 9:00am, Mr. Kassman arrived at 1250 I Street NW and parked his car on 13th Street. Kassman Decl. ¶ 4; Lew Decl. ¶ 9. As he was parking, Mr. Kassman noted that two black SUVs were parked just north of his car. Kassman Decl. ¶ 4. Upon Mr. Kassman's arrival, Ms. Lew provided him copies of the subpoena and photographs of Mr. Nguesso. *Id.* ¶ 4; Lew Decl. ¶ 9. Mr. Kassman then positioned himself outside the main entrance to 1250 I Street NW. Kassman Decl. ¶¶ 5-6; Lew Decl. ¶ 9. At approximately 9:10am, Tim Hill, the third team member, arrived and parked adjacent to 1250 I Street NW. Lew Decl. ¶ 9.

Between approximately 9:10am and 10:30am, Mr. Kassman stood on the sidewalk in front of the main entrance to 1250 I Street NW. Kassman Decl. ¶ 6. During that time, he observed people going in and out of the building, including a man and woman, both of whom he believed to be Congolese. *Id*. Mr. Kassman also observed two men standing next to the black SUVs parked north of his car on 13th Street. *Id*. These men appeared to be drivers because they repeatedly got into and out of the vehicles. *Id*. Ms. Schaffer instructed Mr. Kassman to continue covering the main entrance, Ms. Lew to cover the area in and around the building's underground garage, and Mr. Hill to cover the black SUVs. Schaffer Decl. ¶ 10. All three process servers confirmed compliance. *Id*. At approximately 10:30am, Mr. Kassman moved his car from 13th Street to I Street, directly in front of 1250 I Street NW, so that he could remain in his car and have a clear view of the main entrance. *Id*. ¶ 7.

## B.   Mr. Nguesso Was Personally Served

At approximately 11:15am, Mr. Kassman observed Mr. Nguesso and a group of people walking through the lobby towards the main entrance/exit of 1250 I Street NW. Kassman Decl.

¶ 8.   Mr. Nguesso's apparent entourage included two or three bodyguards, the man and woman whom Mr. Kassman had earlier observed entering the building, and a man holding a camera.   *Id.* Mr. Kassman immediately recognized Mr. Nguesso from the photographs given to him.   *Id.*   As Mr. Nguesso and his entourage exited the building, Mr. Kassman stepped out of his car with the subpoena papers in hand.   *Id.*; *see also* Lew Decl. ¶ 12.   Mr. Nguesso's entourage then waited on the sidewalk while Mr. Nguesso appeared to pose for photographs or video.   Kassman Decl. ¶¶ 8-9.   At that point, the black SUVs were not yet in front of the main entrance.   *Id.* ¶ 8.

While Mr. Nguesso was posing on the sidewalk, Mr. Kassman approached him—coming within arm's length—and called out Mr. Nguesso's name.   *Id.* ¶ 9.   Mr. Nguesso did not turn towards Mr. Kassman or otherwise respond and it was then that Mr. Kassman noticed two black SUVs arriving at the curbside.   *Id.*; *see also* Lew Decl. ¶ 12.   Mr. Kassman called out Mr. Nguesso's name again and Mr. Nguesso turned around.   Kassman Decl. ¶ 9.   At that moment, Mr. Kassman extended the subpoena papers towards Mr. Nguesso and stated "this is a subpoena."   *Id.*   Mr. Kassman then repeated "this is a subpoena" and Mr. Nguesso began to turn away.   *Id.*   At that moment, Mr. Kassman placed the subpoena papers physically upon Mr. Nguesso's right arm and stated "this is a subpoena, you have been served."   *Id.*   Upon effecting service, Mr. Kassman returned to his car.   When he looked back to where he served the subpoena papers, he observed the papers lying on the ground and the two SUVs idling at the curb.   *Id.*

At 11:18am, barely a minute after serving Mr. Nguesso, Mr. Kassman took two photographs of the white subpoena papers lying in a loose bundle on the ground (*Id.* Ex. A), and then recounted to Ms. Schaffer by phone that he had served Mr. Nguesso in the manner described above.   Kassman Decl. ¶ 10; Schaffer Decl. ¶ 12.   Ms. Schaffer told Mr. Kassman to meet with White & Case Associate Timothy Wilson, in order for Mr. Wilson to immediately take

Mr. Kassman's statement. Kassman Decl. ¶ 10; Schaffer Decl. ¶ 12. After meeting with Mr. Wilson, Mr. Kassman returned to Torri's Legal Services at approximately 12:40pm, where he again recounted how he had served Mr. Nguesso in the manner described above. Kassman Decl. ¶ 10; Schaffer Decl. ¶ 13; Lew Decl. ¶ 13. Both Ms. Schaffer and Ms. Lew confirm that Mr. Kassman's declaration is entirely consistent with what he told them on September 19, 2016, and with what they themselves observed that day. Schaffer Decl. ¶¶ 12-13; Lew Decl. ¶ 13.

### C.     Mr. Omar Arouna Misrepresents the Events of September 19

Mr. Omar Arouna, an acquaintance of Mr. Nguesso, submitted a declaration asserting that he was present at 1250 I Street NW when Mr. Nguesso was served. Dkt. 66-1 ("Arouna Decl."), ¶¶ 5-6. Many of the factual assertions in Mr. Arouna's declaration are obviously incorrect and contradicted by the photographs taken at the scene. First, contrary to Mr. Arouna's telling (*id*. ¶ 6), there was no "rain storm" when Mr. Nguesso exited the building and no one was holding an umbrella over him. Kassman Decl. ¶ 11. Second, Mr. Nguesso was not "rushing" to get into the SUVs. Arouna Decl. ¶ 7. Instead, Mr. Nguesso had stopped and lingered on the sidewalk after he exited 1250 I Street NW and even appeared to pose for photographs or video. Kassman Decl. ¶ 11. Moreover, the SUVs were not at the curb when Mr. Nguesso exited the building (*see* Arouna Decl. ¶¶ 6-7), but arrived only after his bodyguards had flagged them down (Kassman Decl. ¶ 11; *see also* Lew Decl. ¶ 12). Third, no one "stopped" (Arouna Decl. ¶ 7) Mr. Kassman from approaching Mr. Nguesso. Kassman Decl. ¶ 11. Indeed, Mr. Kassman came within arm's reach of Mr. Nguesso, spoke his name twice, notified him that he was being served, and then handed him the subpoena. *Id.* Finally, as the photographs confirm, the subpoena papers were not contained in an envelope or other container—brown or otherwise (Arouna Decl. ¶ 8)—and instead were a stapled bundle of white papers. Kassman Decl. ¶ 11, Ex. A.

–10–

## **ARGUMENT**

Where a nonparty fails to comply with requests for discovery, the Court will compel the nonparty to comply with subpoenas for documents and depositions to provide information relevant to the assets of the judgment debtor.  *See, e.g.*, *GFL Advantage Fund, Ltd. v. Colkitt*, 216 F.R.D. 189, 194 (D.D.C. 2003) (compelling nonparty to comply with subpoena).  The "nonparty seeking relief from subpoena compliance bears the burden of demonstrating that a subpoena should be modified or quashed." *Call of the Wild Movie LLC v. Does 1-1, 062*, 770 F. Supp. 2d 332, 354 (D.D.C. 2011) (citing *Linder v. Dep't of Defense*, 133 F.3d 17, 24 (D.C. Cir. 1998)).  Quashing subpoenas, however, "goes against courts' general preference for a broad scope of discovery." *Id.*  Additionally, the burden of proving that any subpoena is unreasonable or oppressive is also "on the party moving to quash." *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 403 (D.C. Cir. 1984).  "This is a heavy burden" (*id.*) and, as discussed below, one that Mr. Nguesso has not satisfied with respect to *any* of his litany of arguments.

## I.  **COMMISIMPEX'S SUBPOENA WAS PERSONALLY AND PROPERLY SERVED ON MR. NGUESSO**

Commisimpex does not dispute that Rule 45 requires personal service of deposition subpoenas.  *See* Opp'n 5.  Personal service was properly effected on Mr. Nguesso and he was properly "[apprised]" of the pendency of the subpoena in accordance with that rule.  *Id.*

As set forth above, Commisimpex enlisted the services of a reputable process serving company that screens and trains all of its process servers.  The team assigned to serve Mr. Nguesso followed its normal procedures, and with some patience, ultimately served Mr. Nguesso with the papers while properly apprising him of the fact that he was being served with a subpoena.  *See supra* Facts, Part III.A-B.  The contemporaneous accounts of the process servers confirm these events and are contradicted only by Mr. Arouna's declaration, which is

demonstrably full of falsehoods and second-hand information, and cannot be credited. *See supra* Facts, Part III.C. Notably, Mr. Nguesso did not deign to submit his own declaration.

Mr. Nguesso now asks this Court to make special rules for service on him because he has purportedly "imperfect" English and is "unfamiliar with the legal system of the United States." Arouna Decl. ¶¶ 3, 11. According to Mr. Arouna, who purports to speak for Mr. Nguesso, Mr. Nguesso did not understand he was receiving service papers—even though he actually makes no assertion as to whether such personal service of process is also common in his country or other countries in which Mr. Nguesso does business.[4] Even so, all Mr. Nguesso had to do was receive the subpoena papers that had been thrust onto his arm, and he could have read the papers or asked his English-speaking companions or counsel to do so.

There is little doubt Mr. Nguesso could have immediately recognized the significance of the papers, not just because his own mother had recently been similarly served with a subpoena and written about in the international press. *See* Dkt. 55; Dkt. 56-2, ¶ 13. The case caption on the front page of the subpoena included names that Mr. Nguesso, as a Congolese legislator and son of the Congolese President, *surely* would recognize as legally-related, even in English: the name of his country and the all-too-familiar "Commisimpex" name—a company that has been in a *notorious high-profile billion dollar legal dispute* with the Congo for more than fifteen years.

Instead, Mr. Nguesso, likely knowing that Commisimpex had just successfully served his mother, made a deliberate choice to allow the service documents to drop in a pile of white papers on the ground as shown in a photograph (not, as Mr. Arouna claims, in a "brown envelope"). *See* Kassman Decl. ¶¶ 9-11; *id*. Ex. A. Mr. Nguesso's choice to ignore the papers until

---

[4] Even the President of Colombia did not challenge service of a deposition subpoena thrown at him after a guest lecture at Georgetown University in a case Mr. Nguesso relies upon, *Giraldo v. Drummond Co. See* Opp'n to Mot. to Enforce Subpoena and Compel Deposition of Álvaro Uribe Vélez at 10, *Giraldo v. Drummond Co.*, 808 F. Supp. 2d 247 (D.D.C. 2011) (No. 1:10-mc-00764).

confronted with the issue in the international press cannot negate the proper service of process that was effected on him on September 19.   Accordingly, Mr. Nguesso has not satisfied his burden to quash the subpoena for lack of service of process.

## II.    COMMISIMPEX'S SUBPOENA COMPLIES WITH RULE 45

The Federal Rules of Civil Procedure permit a subpoena for production of documents or a deposition "within 100 miles of where the person resides, is employed, or regularly transacts business in person." Fed. R. Civ. P. 45(c)(1)(A).   Commisimpex's subpoena is proper because Mr. Nguesso regularly transacts business in and around the District of Columbia, and, in fact, Mr. Nguesso has not satisfied his burden of showing otherwise.

First, Mr. Nguesso took at least five recent business trips to the District of Columbia, including, significantly, three substantial visits since August 2014.  Arouna Decl. ¶ 4.  While Mr. Arouna claims in conclusory fashion that Mr. Nguesso "does not conduct any business here," he then admits that these three recent trips were all business-related, including meetings with legislators, public officials, and other heads of state, and one trip to organize and prepare for a later business trip. *Id.* ¶¶ 4, 13.  Mr. Arouna further notes that during the trip in May 2014, Mr. Nguesso travelled "as part of the official delegation representing [the Defendant]."  *Id.* ¶ 4; *see also* Opp'n 11 ("Mr. Nguesso was [ ] present in this country . . . in his official capacity as a member of Congo's Parliament.").

Mr. Nguesso argues half-heartedly that these visits do not constitute "conduct[ing] any business here."  Opp'n 8.  But he offers no case to suggest that "business" under Rule 45 is limited to for-profit business, rather than in the course of *any* employment—whether government, non-profit, or other.  *Cf. Regents of the Univ. of Cal. v. Kohne*, 166 F.R.D. 463, 465 (S.D. Cal. 1996) (analyzing the business regularity of a potential deponent by questioning whether the "nature of [deponent's] employment" takes him near the relevant area).  Moreover,

–13–

Mr. Nguesso makes no reference to any for-pleasure activities he conducted on these trips, emphasizing that his activities consisted of conducting and planning meetings, undertaking legislative and lobbying efforts, and other "official" duties.  Accordingly, it cannot seriously be suggested that the principal purpose of Mr. Nguesso's trips to the District was something other than conducting business as an official of the Congo or its related entities.

Second, Mr. Nguesso also contends that his trips to the District do not satisfy Rule 45's requirement that business in the geographic limits be conducted "regularly."  Opp'n 8-9.  The term "regularly" is not further defined in the rule, but courts generally look to the frequency and duration of visits to the area.  *See Dietz v. Spangenberg*, No. 11-2600 ADM/JJG, 2014 U.S. Dist. LEXIS 17046, at *12 (D. Minn. Feb. 11, 2014) ("Courts examine the frequency and duration of a person's business trips over a given period of time to determine whether the visits are sufficient to qualify as regularly transacting business.").  Mr. Nguesso, however, fails to provide information as to the duration of his five visits, conveniently omitting details that are likely unfavorable to him.

Courts will also, notably, look to define "regularly" within the context of the business relationship.  *See, e.g., Halliburton Energy Servs. v. M-I, LLC*, No. H-06-mc-00053, 2006 U.S. Dist. LEXIS 66374, at *4-6 (S.D. Tex. Sep. 15, 2006) (assessing number and length of visits and detailing the business relationship between the parties).  Thus the Court must ask: how often must foreign legislators meet with U.S. legislators to be considered "regularly"?  In the context of foreign and diplomatic affairs, an African statesman's three visits in two years to a single city in the United States constitutes an unusually regular pattern of visits to conduct lobbying and other legislative efforts.  Many members of foreign legislatures might go decades without

–14–

coming to the United States, but Mr. Nguesso has, of late, made the District a regular stop on his official travels, including travels throughout the United States.

Mr. Nguesso relies on a case from this Court, *In re Father Christopher Hartley v. Felipe Vicini Lluberes*, No. 08-101 (RJL), slip. op. at 1 (D.D.C. May 2, 2008), which quashed a subpoena against Father Hartley, a missionary in Ethiopia who did not regularly travel to the District. *See* Opp'n 9; *id.* Ex. C. Mr. Nguesso is clearly no missionary. Moreover, in that case the Court was provided with a *sworn declaration of the deponent* asserting that he did not "regularly travel to the District of Columbia" and providing the Court with information on the duration of his visit there. *See* Opp'n Ex. D, at 12. The Court has no such evidence here. As noted, Mr. Nguesso bears the burden of proving that Commisimpex's subpoena does not comply with Rule 45(c). *See Call of the Wild*, 770 F. Supp. 2d at 354. Yet, instead of providing this Court with the full details of his travels, or explaining—under penalty of perjury—what he did in the District of Columbia, Mr. Nguesso suspiciously relies on an acquaintance's declaration to characterize, on a second-hand hearsay basis, the nature of Mr. Nguesso's travels. *See* Arouna Decl. ¶¶ 4, 12, 13. Mr. Arouna can only swear to what he knows in his personal knowledge and easily could be unaware of other business transactions and travels by Mr. Nguesso. Moreover, as established above, Mr. Arouna's statement is littered with falsehoods and inaccuracies. Conclusory and second-hand statements from a third-party witness are not credible evidence and cannot satisfy Respondent's burden of proof to quash the subpoena here.

Even if this Court finds that the subpoena does not currently comply with the geographic limits of Rule 45(c), however, Respondent is incorrect in stating that quashing is the only option. *See* Opp'n 9. The reality is that Mr. Nguesso is a Congolese official who frequently travels throughout the world, including to the United States and including specifically to the District of

Columbia.  This Court need not quash the subpoena if it finds there are other locations to which it may modify or transfer the subpoena and at which the deponent could attend.  There is precedent for moving the location of the deposition, even moving it overseas.  "[A] subpoena that improperly seeks to require compliance beyond the geographic limits imposed by Rule 45(c) may be modified with respect to the place of compliance."  *Yukos Capital S.A.R.L. v. Feldman*, No. 15-cv-4964 (LAK), 2016 U.S. Dist. LEXIS 72768, at *5-7 (S.D.N.Y. June 3, 2016) (moving a deposition that had been ordered in New York to be held in London); *see also Comm-Tract Corp. v. N. Telecom*, 168 F.R.D. 4, 7 (D. Mass. 1996) ("[T]he just result in this case is to modify the subpoena to require [deponent] to submit to a videotape deposition in Hong Kong on a date convenient to counsel . . . .").

With respect to Mr. Nguesso, a modified location could be Miami, New York, or London, where Mr. Nguesso is known to frequently travel, or another location suggested by Mr. Nguesso himself.  *See, e.g.*, *Kensington Int'l Ltd. v. Republic of the Congo* [2005] EWHC (Comm) 2684 (Eng.) (Vasquez Decl. Ex. C) (indicating Mr. Nguesso's oil contacts with London); *Long Beach Ltd. v. Global Witness Ltd.* [2007] EWHC (QB) 1980 (Eng.) (Vasquez Decl. Ex. F) (same).  Given the equities at stake in this case, and that the Congo's government officials are also now on board with the Congo's catch-me-if-you-can strategy of avoiding its debts to Commisimpex, this Court should, at a minimum, (1) require Mr. Nguesso to be deposed by virtue of his business contacts with the United States and the District of Columbia; and (2) modify the location of the subpoena before considering whether to quash it.

### III.  COMPELLING MR. NGUESSO'S DEPOSITION AND PRODUCTION OF DOCUMENTS IS CONSISTENT WITH PRINCIPLES OF COMITY AND ALL DISCOVERY RULES

Mr. Nguesso argues that Commisimpex's subpoena should be quashed because it "implicate[s] important and delicate issues of comity and the balancing of foreign relations," in

particular because it seeks from a member of a foreign parliament information that is either unnecessary or available through other means.  Opp'n 10-11.  These arguments are unavailing.

There is no law or rule that explicitly protects Mr. Nguesso, as a member of a foreign parliament, from being subject to U.S. discovery.  To be clear, Mr. Nguesso is not immune from suit or subject to any of the protections of the Foreign Sovereign Immunities Act (*see, e.g.*, *Samantar v. Yusuf*, 560 U.S. 305, 310 n.3 (2010) (holding that the FSIA does not apply to an individual foreign official's immunity from suit)), nor does he argue as much.  Mr. Nguesso also makes no claim to common-law immunity from process.  *See, e.g.*, *Giraldo v. Drummond Co.*, 808 F. Supp. 2d 247 (D.D.C. 2011) ("The Supreme Court has recently explained that foreign official immunity is governed by common law.")  Neither does he assert that compliance with the subpoena would conflict with Congolese law or specifically offend any laws of the Congo, a central concern of the comity inquiry.  *Cf. In re Chase Manhattan Bank*, 297 F.2d 611, 613 (2d Cir. 1962) (modification of subpoena directing production of documents located in Panama appropriate to comply with Panamanian law).

Instead, Mr. Nguesso suggests that the Court should fashion a rule that would effectively provide him immunity from any subpoena in the District of Columbia, contending that because he has a right as a non-resident to come to the District to "participat[e] in government," those meetings should not bring him within the subpoena power of this Court.  *See* Opp'n 11.  To arrive at this rule, however, Mr. Nguesso conflates personal jurisdiction principles, which concern *liability* against the defendant, with the Court's broad subpoena power over both parties and non-parties.  As the Second Circuit has noted in the context of issuing a subpoena under 28 U.S.C. § 1782, "a person who is subjected to *liability* by service of process far from home may have better cause to complain of an outrage to fair play than one similarly situated who is merely

called upon to supply documents or testimony." *Edelman v. Taittinger*, 295 F.3d 171, 179 (2d Cir. 2002) (citing *First Am. Corp. v. Price Waterhouse LLP*, 154 F.3d 16 (2d Cir. 1998)). Commisimpex's subpoena merely seeks *information* from Mr. Nguesso and does not ask him to submit to the jurisdiction of this Court for purposes of answering to suit.  There is no basis to immunize Mr. Nguesso from providing this information merely because he is a member of the Congolese Parliament.

To the extent that comity principles do apply here, however, Commisimpex's subpoena remains proper.  Mr. Nguesso relies upon this Court's ruling in *Giraldo v. Drummond Co.* to suggest that, under principles of comity, all discovery requested of a foreign official, including discovery of acts outside his official capacity, must be both "necessary and unavailable through other means." 808 F. Supp. 2d at 252.  That standard, if it applies, is easily satisfied here.

First, the information requested is necessary, because Mr. Nguesso personally knows about a substantial portion of Congolese-held assets, both in the United States and around the globe, which could lawfully be subject to attachment in satisfaction of this Court's judgment.  In choosing to serve Mr. Nguesso with a subpoena, Commisimpex deliberately selected an individual with undoubted access to information regarding the Congo's most valuable asset: its oil.  Indeed, it was not Mr. Nguesso's status as a "sitting member of Congo's Parliament" (Opp'n 17), but his prominent position at the apex of the Congo's oil sector, which led Commisimpex to subpoena him.  *See* Vasquez Decl. Ex. B, at 1.  Mr. Nguesso serves as Deputy General Manager of the Congo's national oil company, SNPC, and as chief executive of the national oil refining company, a SNPC subsidiary.  *Id.*  Mr. Nguesso also previously led Cotrade, SNPC's oil trading arm.  *Id.*  These entities are alter egos of the Congo (Vasquez Decl. Ex. C, ¶¶ 10, 55, 64), and their revenues are meant to flow to the Congo and its people (*see* Vasquez Decl. Ex. F., ¶ 49;

Vasquez Decl. Exs. J, K).  The present case is readily distinguishable from *Giraldo*, in which this Court declined to allow a deposition of the Colombian president where the parties had failed to exhaust other reasonable means of obtaining the information.  808 F. Supp. 2d at 251.  Here, obtaining the deposition and documents of Mr. Nguesso *is* the other reasonable means as it is the alternative to deposing the sitting president of the Congo simply to learn about oil revenue assets and other Congolese property.

Second, the information sought from Mr. Nguesso is unavailable through other means, in part because it is based specifically on his prominence in and management of a major revenue sector of the Congo.  Commisimpex's subpoena of Antoinette Sassou Nguesso has no bearing on the availability of information in Mr. Nguesso's possession, since it is highly likely the two possess information concerning different Congolese assets.

The information sought from Mr. Nguesso is also not reasonably available from the Congo itself.  It is disingenuous for Mr. Nguesso to suggest that Commisimpex must, as a matter of comity, continue to wait for the Congo to eventually come forward with the information (Opp'n 12) after more than 15 years of the Congo's evasion tactics.  The Congo has terminated its counsel (Dkt. 44, ¶¶ 3, 6), ceased participation in the litigation (*id.*), and refused to answer a single pleading or discovery request in nearly a year of post-judgment proceedings (*see* Vasquez Decl. ¶ 6).  This is also after the Congo waited nearly a year to move to vacate Commisimpex's default judgment (Dkt. 23), at which point Commisimpex voluntarily put any post-judgment enforcement proceedings on hold until the judgment was confirmed (*see* Dkt. 38-3). Commisimpex can hardly be expected to keep waiting; it has already waited for payments for nearly *20 years*.  Moreover, as discussed further below, the Federal Rules contemplate broad use of post-judgment discovery, including upon third parties, and there is no basis for suggesting

–19–

those rules do not apply in the context of assets of a foreign sovereign.   Indeed, the recent seminal case on such post-judgment discovery involves just that.   *See generally Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250 (2014).

## IV.   THE SUBPOENA'S DOCUMENT REQUESTS ARE PROPERLY TAILORED TO SEEK INFORMATION IN AID OF EXECUTION OF COMMISIMPEX'S JUDGMENT

Mr. Nguesso's final opposition to Commisimpex's motion rests on the faulty premise that he is insufficiently linked to the Congo to be compelled to respond to Commisimpex's questions regarding the Congo's assets.  Opp'n 16-20.  In doing so, he again contends that Commisimpex's requests for information are not "necessary" to locate assets belonging to the Congo.  *Id*. at 17.

However, necessity is not the standard against which a judgment creditor's post-judgment discovery efforts are measured.   Rather, "[t]he rules governing discovery in postjudgment execution proceedings are quite permissive."  *Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250, 2254 (2014).  The Federal Rules allow a "judgment creditor . . . [to] obtain discovery from *any* person—including the judgment debtor—as provided in [the federal] rules. . . ."  Fed. R. Civ. P. 69(a)(2) (emphasis added).   "The judgment creditor may therefore utilize the discovery devices provided in Rule 26" (*Falicia v. Advanced Tenant Servs.*, 235 F.R.D. 5, 7 (D.D.C. 2006)), and serve subpoenas under Rule 45.  *FTC v. Staples*, No. 15-2115, 2016 U.S. Dist. LEXIS 49965, at *5 (D.D.C. Feb. 26, 2016).   Thus, Rule 26 does not require that a judgment creditor's discovery requests be "necessary" to discover a judgment debtor's assets, but only that they be "*relevant* to any party's claim or defense and *proportional to the needs of the case*."  Fed. R. Civ. P. 26(b) (emphasis added).  Commisimpex has already proven its claim in this case: it holds a final judgment against the Congo worth €567,000,000 plus interest (Vasquez Decl. ¶¶ 4, 6), as well as a judgment in another case that is also before this Court (*Comm'ns Imp. Exp., S.A. v. Republic of the Congo*, 118 F. Supp. 3d 220 (D.D.C. 2015)).

Faced with such obstinacy, Commisimpex faces two options: either it sits on its rights and hopes the Congo decides to start complying with the orders of this Court, or else it pursues the other persons most likely to have relevant information that may lead to satisfaction of its judgment.

Under Rule 26, "relevance is broadly construed and . . . . District Courts have considerable discretion in resolving discovery matters." *Staples*, 2016 U.S. Dist. LEXIS 49965, at *5 (citing *Food Lion v. United Food & Commercial Workers Int'l Union*, 103 F.3d 1007, 1012 (D.C. Cir. 1997)). This Court and others "have afforded judgment creditors broad opportunities to discover concealed assets of judgment debtors including acquiring such information from non-parties." *Robertson v. Cartinhour*, No. 09-1642, 2011 U.S. Dist. LEXIS 156059, at *3 (D.D.C. Sept. 16, 2011) (quoting *Falicia*, 235 F.R.D. at 7).

Given Mr. Nguesso's prominent role in the Congo's government and oil industry, Commisimpex's request to Mr. Nguesso for "information regarding a myriad of assets, bank accounts, and records owned or maintained by the Congo" were not directed to the "wrong party." *See* Opp'n 19. To the contrary, they were sent to the very party most likely to enjoy access to and control of such information. *See Robertson*, 2011 U.S. Dist. LEXIS 156059, at *3-4 (approving discovery on a third party because "financial documents and billing records are reasonably calculated to lead to admissible evidence which will provide . . . an opportunity to enforce the judgment"); *see also GFL Adv. Fund, Ltd. v. Colkitt*, 216 F.R.D. 189, 194 (D.D.C. 2003) (same). As an executive officer of multiple state-owned entities that control the Congo's oil sector, Mr. Nguesso possesses the records regarding the Congo's oil revenues that "will provide [Commisimpex] an opportunity to enforce [its] judgment." *Colkitt*, 216 F.R.D. at 194.

That such information "belong[s] to the Congo" and was "received as part of [Mr. Nguesso's] official duties" is of no moment. *See* Opp'n 19; *id* at 19 n.6. The Congo cannot

claim immunity from post-judgment discovery for any document relevant to Commisimpex's search for attachable assets. *See NML Capital*, 134 S. Ct. at 2256 (stating that the Foreign Sovereign Immunities Act neither "forbid[s] [n]or limit[s] discovery in aid of execution of a foreign-sovereign judgment debtor's assets"). Mr. Nguesso's invocation of his status as a "third-party" and "non-party" are similarly unavailing. *See EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 208 (2d Cir. 2012) (holding that a district court may order third-parties to comply with subpoenas seeking post-judgment discovery regarding assets of a foreign sovereign), *aff'd on other grounds sub nom Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250 (2014).

Mr. Nguesso also asserts that Commisimpex's request for "information regarding any payments of any kind made to [him] or his family by the Congo or any instrumentality  . . . . stray[s] too far away from the core facts of the case." Opp'n 18 (internal citations omitted). Not so. This Court "afford[s] judgment creditors broad opportunities to discover ***concealed*** assets of judgment debtors . . . ." *Robertson*, 2011 U.S. Dist. LEXIS 156059, at *3 (emphasis added); *Falicia*, 235 F.R.D. at 7. In the past, Mr. Nguesso has colluded with SNPC to defraud the Congo's judgment creditors. When he served as director of Cotrade, Mr. Nguesso entered into sham oil transactions through offshore shell companies that took in revenues from the sale of the Congo's oil. Vasquez Decl. Ex. C, ¶¶ 197-98, 214; *see also* Vasquez Decl. Ex. D, at 27. As the English High Court in the *Kensington* case concluded, these shell companies "were creatures of the Congo being used for the purpose of evading the payment of [the Congo's] judgment debts." Vasquez Decl. Ex. C, ¶¶ 197-98, 214. The Congo, with Mr. Nguesso as facilitator, actively concealed from its judgment creditors assets derived from sales of Congolese oil. Such fraudulent transfers of potentially attachable assets are precisely what the broad post-judgment discovery contemplated by *Robertson* and *Falicia* is meant to expose. *See Falicia*, 235 F.R.D. at

7 (citing *Magnaleasing, Inc. v. Staten Island Mall*, 76 F.R.D. 559, 562-63 (S.D.N.Y. 1977) (permitting discovery where relationship between judgment debtor and non-party raised reasonable doubt as to whether dealings between the two were conducted in good faith)).

These facts also belie Mr. Nguesso's insistence that Commisimpex's request for documents regarding financial accounts, real estate, and entities held by him or his family members "have nothing to do with the Congo at all." Opp'n 17. Indeed, a non-party's assets are subject to post-judgment discovery "when the parties are closely related and 'reasonable doubts' have been raised concerning 'the good faith of the transfer' of assets between the two." *Falicia*, 235 F.R.D. at 7-8. There is ample evidence that significant revenues from the Congo's oil sector are lost to corruption every year and that Mr. Nguesso and his family are at the center of it. *See* Vasquez Decl. Ex. D, at 26-27 (noting that government officials routinely divert funds from the sale of oil to private overseas accounts); Vasquez Decl. Ex. E, at 2 (reporting an investigation into Mr. Nguesso's family that resulted in seizure of several properties in France). Mr. Nguesso himself is the beneficial owner of an entity called Long Beach that has received multiple payments from the same shell companies the Congo has used to conceal oil revenues from its judgment creditors. Vasquez Decl. Ex. F, ¶¶ 1, 14, 49. Between 2004 and 2006, Mr. Nguesso used funds from Long Beach to pay for international spending sprees on first-class air travel, five-star hotel stays, fashion accessories, sumptuous meals, women's lingerie, and more, racking up hundreds of thousands of dollars in little more than two years. *See* Vasquez Decl. Exs. G, H; *see also* Vasquez Decl. Ex. F, ¶ 14. Worse yet, while Long Beach was financing Mr. Nguesso's lavish spending habits, it was also receiving large payments derived from the sale of Congolese oil cargoes. Vasquez Decl. Ex. I, at 1-2. Worst of all, these oil cargoes were sold by SNPC "for the account of the Republic of the Congo" (Vasquez Decl. ¶ 20; *id*. Exs. J, K), but rather than go

to the Congolese people, the revenue flowed into Mr. Nguesso's personal slush fund.  Needless to say, Mr. Nguesso's protest that Commisimpex's request for documents related to his travel in 2016 amounts to a "patent fishing expedition" (Opp'n 18) should fall on deaf ears.

Finally, Mr. Nguesso's argument that Commisimpex's discovery requests are "overly broad" and "not narrowly tailored to seek relevant or admissible evidence" misstates the law and ignores the facts of this case.  *Id*. at 16.  Rule 26(b)(1) expressly authorizes parties to seek discovery of information that is not "admissible in evidence."  Moreover, courts employ a "permissive" standard regarding post-judgment discovery, especially of the assets of a foreign sovereign.  *NML Capital*, 134 S. Ct. at 2254, 2258.  Commisimpex is therefore entitled to "ask for information about [the Congo's] worldwide assets generally, so that [Commisimpex] can identify where [the Congo] may be holding property that is subject to execution."  *Id*. at 2258 (emphasis omitted).  While Mr. Nguesso may take exception to the "large swathes of information" that Commisimpex seeks (Opp'n 19), that is what the law allows.  *See NML Capital*, 134 S. Ct. at 2259 (noting that the Court "approves today" a "sweeping examination of [a sovereign state's] worldwide assets . . . .") (Ginsburg, J., dissenting).  And as shown above, Commisimpex does not target Mr. Nguesso unreasonably.  Instead, Commisimpex established that Mr. Nguesso controls much of the Congo's oil sector and previously has been involved in concealing from judgment creditors monies from the Congo's oil sales.  Such evidence, by itself, raises the "reasonable doubt" required to investigate Mr. Nguesso's own assets, though he is a non-party.  *See Falicia*, 235 F.R.D. at 7-8.  Furthermore, Commisimpex has also pointed out serious questions surrounding Mr. Nguesso's lavish spending and the fact that the Congo's oil most likely finances it.  There is nothing overly broad about discovery requests targeting third

parties like Mr. Nguesso, who have been involved in multiple documented transfers of the judgment debtor's funds.

To be sure, Mr. Nguesso cannot be heard to complain about the overbreadth of Commisimpex's discovery requests when he failed to submit timely objections or attend the deposition.  Vasquez Decl. ¶ 2.  Counsel for Mr. Nguesso should not have served his objections on Commisimpex 24 days after the deadline, but should have contacted Commismpex and sought a meet-and-confer.  Instead, Mr. Nguesso served a list of boilerplate objections out of time and failed to respond to even one of Commisimpex's requests.

## CONCLUSION

For the foregoing reasons, and those stated in Commisimpex's motion and accompanying memorandum of law, Commisimpex respectfully requests that the Court grant its Motion to Compel Mr. Nguesso to Comply with the September 19, 2016 subpoena within 30 days of the Court's ruling on this motion or by agreement between Commisimpex and Mr. Nguesso.

Dated: Washington, DC
      November 7, 2016

Respectfully submitted,

**WHITE & CASE** LLP

/s/ *Francis A. Vasquez, Jr.*
Francis A. Vasquez, Jr. (DC Bar No. 442161)
Nicolle E. Kownacki (DC Bar No. 1005627)
Timothy L. Wilson, Jr. 1030145
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

*Counsel for Commissions Import Export S.A.*