UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMISSIONS IMPORT EXPORT S.A., | ) ) ) |
| *Petitioner*, | ) ) |
| *v.* | ) )   Civil Action No. 1:13-cv-713-RJL |
| REPUBLIC OF THE CONGO, | ) ) ) |
| *Respondent.* | ) ) ) |

**DECLARATION OF FRANCIS A. VASQUEZ, JR. IN FURTHER SUPPORT OF COMMISIMPEX'S MOTION TO COMPEL DENIS-CHRISTEL SASSOU NGUESSO TO COMPLY WITH THE SEPTEMBER 19, 2016 SUBPOENA**

I, Francis A. Vasquez, Jr., hereby declare as follows:

1.  I am a member of the bar of this Court and a partner with the law firm of White & Case LLP ("White & Case"). I am the attorney of record for Petitioner Commissions Import Export S.A. ("Commisimpex") in the above-captioned action. Commisimpex is a judgment creditor to a judgment entered by this Court against Respondent Republic of the Congo ("the Congo") on October 9, 2013 (the "Amended Judgment").

2.  I make this declaration in further support of Commisimpex's motion to compel Denis-Christel Sassou Nguesso to comply with a subpoena to testify at a deposition in the above-captioned action. Dkt. 60. On September 19, 2016, Commisimpex caused Mr. Nguesso to be served personally with a subpoena in the District of Columbia, pursuant to Federal Rule of Civil Procedure 45(c). Id. at 6. That same day, Commisimpex filed a notice of subpoena on the public docket in this case. Id. at 2. The subpoena commanded Mr. Nguesso to appear for this deposition, and to bring with him specified documents, at 10:00am on October 3, 2016, at the

offices of White & Case LLP, 701 Thirteenth Street, NW, Washington, DC 20005. Id. at 5. Mr. Nguesso failed to appear for his deposition, thereby necessitating Commisimpex's motion to compel.

3.  More than three weeks after failing to appear for his deposition, Mr. Nguesso has now retained US counsel to belatedly challenge Commisimpex's subpoena and oppose its motion to compel.

**Background**

4.  This submission relates to the judgment entered by this Court against the Congo on September 30, 2013 (Dkt. 16), and amended on October 9, 2013 (Dkt. 18). The Amended Judgment requires the Congo to pay Commisimpex € 567,184,160.72, $855,000, and post-judgment interest at the statutory rate.

5.  The Congo filed a motion to vacate this Court's Amended Judgment (Dkt. 23) nearly a year after its entry, a motion this Court denied on all grounds on July 6, 2015 (Dkt. 35). The Congo filed a Notice of Appeal of that denial (Dkt. 36) but ultimately moved to withdraw that appeal on February 12, 2016 (see Mot. to Dismiss Appeal and for Counsel to be Relieved, *Commissions Import Export S.A. v. Republic of the Congo*, Case No. 15-7076 (D.C. Cir.) (Dkt. 1598773))—after Commisimpex had already filed a responsive brief in the Court of Appeals. On May 18, 2016, the Court of Appeals granted the Congo's motion and dismissed its appeal with prejudice. Id. (Dkt. 1613916).

6.  Meanwhile, on August 25, 2015, Commisimpex served the Congo with a list of post-judgment interrogatories seeking to identify Congolese assets. See Dkt. 38-3, at 2. On September 28, 2015, the Congo responded to Commisimpex's interrogatories with a list of objections. See Dkt. 38-4. Following the meet-and-confer, during which the Congo declined to

2

withdraw any of its objections, Commisimpex filed a motion to compel the Congo to answer the interrogatories. Dkt. 38. On December 16, 2015, this Court granted that motion and ordered the Congo to answer Commisimpex's post-judgment interrogatories, as well as to pay Commisimpex the attorney's fees and costs associated with preparing its motion to compel and reply. Dkt. 42. Because the Congo failed to produce any documents or even indicate when it would comply, on April 4, 2016, Commisimpex filed a motion for sanctions against the Congo and its counsel (Dkt. 48) and respectfully awaits a decision from this Court on that motion. To this day, the Congo has not produced any responses to the interrogatories, nor given any indication that it will at some point respond.

7. Faced with the Congo's continued refusal to comply with this Court's judgment or its orders, Commisimpex subsequently sought post-judgment discovery from members of the Congolese government, their family members, and other associates connected with assets of the Congo and its agencies and instrumentalities.

8. On June 9, 2016, Commisimpex caused a subpoena to be served in the District of Columbia on Antoinette Sassou Nguesso, the wife of President Denis Sassou Nguesso and the mother of the subject of Commisimpex's present Motion. Dkt. 55. This subpoena commanded Ms. Nguesso to appear for a deposition, and to bring with her specified documents, at 10:00am on June 27, 2016, at the offices of White & Case LLP, 701 Thirteenth Street, NW, Washington, DC 20005. As outlined in Commisimpex's motion to compel still pending with the Court (Dkt. 56), Ms. Nguesso failed to appear for her deposition and never even contacted White & Case regarding her nonappearance (Dkt. 56-1, at 3-4).

9. And on October 5, 2016, after Mr. Nguesso was served with his subpoena and failed to attend his scheduled deposition, Commisimpex caused a subpoena to be served on

Calixte Ganongo, the Minister of Finance of the Congo. Dkt. 61. This subpoena, like those served on Mr. Nguesso and Antoinette Sassou Nguesso, commanded Mr. Ganongo to appear for a deposition, and to bring with him specified documents, at White & Case's offices in the District of Columbia. Id. at 5. Mr. Ganongo's deposition was scheduled to be held at 10:00am on October 26, 2016. Id. However, as with Mr. Nguesso and his mother, Mr. Ganongo failed to appear for his deposition and neither he nor anyone on his behalf contacted me regarding his nonappearance. Attached hereto as Exhibit A is the Certificate of Non-Attendance for Mr. Ganongo's October 26, 2016 deposition.

### Service of Subpoena

10.     In early September 2016, Commisimpex learned that Mr. Nguesso would be visiting the United States, including the District of Columbia, for a number of weeks. Commisimpex engaged a professional process-serving company, Torri's Legal Services, to serve the subpoena on Mr. Nguesso while he was present in the District of Columbia. Commisimpex specifically requested that a team of experienced process servers be ready to serve Mr. Nguesso whenever and wherever he could be found within the District of Columbia.

11.     On September 18, 2016, Commisimpex learned that Mr. Nguesso planned to arrive in the District of Columbia on the morning of September 19, 2016 and that he would be visiting Washington Media Group, located at 1250 I Street NW. Upon learning of this information, I instructed Commisimpex's team of process servers to be present at 1250 I Street NW during the morning of September 19 in order to serve the subpoena on Mr. Nguesso.

12.     During the morning of September 19, I, along with Timothy L. Wilson, Jr, Esq., a White & Case associate, maintained constant communication with the team of process servers as well as the principal of the process serving company, Torri Schaffer. At or around 8:15am, I was

notified that Nina Lew, the lead process server, had walked both inside and outside 1250 I Street NW and had identified the exits to the building.  At or around 10:05am, I was notified that two limousines were parked in front of 1250 I Street NW and that members of the process serving team were stationed at all of the exits to the building as well as near the two limousines.  At or around 11:30am, I was notified that Mr. Nguesso had been personally served by Gene Kassman.

### Mr. Nguesso Possesses Discoverable Information About Congolese Assets

13. Mr. Nguesso's ties to the government of the Congo and its commercial enterprises have long been matters of public record.  As Mr. Nguesso readily and repeatedly admits, he is a member of the Congo's Parliament (Dkt. 66, at 2, 3, 8, 10, 11, 13, 14, 17-19) and the son of Denis Sassou Nguesso, the long-ruling President of the Congo (id. at 2, 4).  In addition, according to his official government biography, Mr. Nguesso is the Deputy General Manager of Société Nationale des Pétroles du Congo, the National Petroleum Company of the Congo ("SNPC").  *Qui suis je?*, Denis Christel Sassou Nguesso 1, http://www.denischristel.cg/qui-suis-je (last visited Nov. 7, 2016) (attached hereto, with English translation, as Exhibit B).  He is also the chief executive of Congolaise de Raffinage, the Congo's national petroleum refining company ("CORAF").  *Id*.  Prior to holding these positions, he was the director of Cotrade, SNPC's marketing subsidiary.  *Id*.

14. Mr. Nguesso's prominent role in the Congo's oil sector is the primary reason Commisimpex subpoenaed him.  As the Deputy General Manager of SNPC, Mr. Nguesso wields extraordinary influence and control over the Congo's oil resources and the public funds that flow from them.  Courts in both England and France have found that SNPC is an alter ego of the Congo.  *See Kensington Int'l Ltd. v. Republic of the Congo* [2005] EWHC (Comm) 2684 [10] (Eng.) (attached hereto as Exhibit C).  In *Kensington*, the English High Court found that SNPC is

5

"simply part of the Congolese state and has no existence separate from the state" and that Cotrade, the oil trading subsidiary of SNPC, was "an arm of the state." *Id*. ¶¶ 55, 64. It is therefore clear that Mr. Nguesso's work on behalf of both SNPC and Cotrade is work done on behalf of the Congo. What is more, the same English court found that Mr. Nguesso, during his time as director of Cotrade, entered into sham contracts for the sale of oil to private entities by means of shell companies that "were creatures of the Congo being used for the purpose of evading the payment of judgment debts." *Id*. ¶¶ 197-98, 214.

15.   Indeed, the US Department of State has observed a widespread perception of corruption regarding the misuse of oil revenues by the government and its officials. *See Republic of the Congo 2015 Human Rights Report*, US Dep't of State 26 (2015), http://www.state.gov/documents/organization/252883.pdf (last visited Nov. 7, 2016) (attached hereto as Exhibit D). The State Department has also recognized numerous reports from local and international organizations regarding repeated actions by government officials, whether through bribes or other fraud, to divert revenues from the oil sector into private overseas accounts. *Id*. at 27.

16.   Respected international organizations, such as Freedom House, report that significant funds from the Congo's oil sector are lost to corruption. *Congo, Republic of (Brazzaville)*, Freedom House 2 (2016), https://freedomhouse.org/print/47995 (last visited Nov. 7, 2016) (attached hereto as Exhibit E). Freedom House confirms that SNPC is directly under the control of the president's family and advisers. Moreover, investigations have revealed that SNPC has been used to siphon money to the regime's favored associates. *Id*. And in 2015, after a years-long investigation into Mr. Nguesso's family for the embezzlement of public funds, French courts ordered the seizure of three properties in France belonging to his family. *Id*.

17. Numerous sources place Mr. Nguesso at the center of corrupt dealings regarding the Congo's oil revenues. In 2007, Mr. Nguesso filed suit in England to compel an international nongovernmental organization, Global Witness, to remove a number of documents from its website. *Long Beach Ltd. v. Global Witness Ltd.* [2007] EWHC (QB) 1980 [1] (Eng.) (attached hereto as Exhibit F). These documents included some of Mr. Nguesso's personal credit card statements—from 2004 to 2006—for purchases totaling hundreds of thousands of dollars for hotels, clothes, first-class airfare, and other luxury items in France, China, and other locales. *See id*. ¶¶ 1, 14. Others showed that Mr. Nguesso's credit card bills were paid by an offshore company called Long Beach Limited. *See id*. ¶ 14. Yet another set of documents showed that Mr. Nguesso was the concealed beneficial owner of Long Beach and that Long Beach had received payments from the shell companies at issue in the earlier Kensington case. *See id*. ¶ 1. The court, citing *Kensington*, noted that Mr. Nguesso and others had used these shell companies to facilitate sham transactions on behalf of the Congo to evade the Congo's judgment creditors. *Id*. ¶¶ 10, 49. Finding that there was a weighty public interest in the documents, the court denied Mr. Nguesso's request that Global Witness take them down from its website. *Id*. ¶¶ 45, 50, 52-54. The court went on to find that Mr. Nguesso's beneficial ownership of Long Beach and his relationship with the shell companies involved in the Congo's oil sales gave Mr. Nguesso "an obvious opportunity for personal gain" and that it was "an obvious possible inference that his expenditure[s] ha[ve] been financed by secret personal profits made out of dealings in oil sold by Cotrade." *Id*. ¶ 49. The court further observed that the documents published by Global Witness "frankly suggest" that Mr. Nguesso is "unsavoury or corrupt." *Id*. ¶ 52. The court concluded that "[t]he profits of Cotrade's oil sales should go to the people of the Congo, not to those who rule it or their families." *Id*. ¶ 49.

18. A review of Mr. Nguesso's credit card statements published by Global Witness reveals a large amount of spending on luxury goods, five-star hotel stays, and first-class air travel to destinations such as Paris, Monaco, Cannes, and Dubai. *See Denis Christel Sassou Nguesso Credit Card Bill*, Global Witness, https://www.globalwitness.org/sites/default/files/pdfs/denis_christel_sassou_nguesso_credit_card_bill.pdf (last visited Nov. 7, 2016) (attached hereto as Exhibit G). For example, in August 2006, Mr. Nguesso spent more than $35,000 on luxury fashion items in the exclusive resort town of Marbella, Spain, spending nearly $20,000 at Louis Vuitton alone. *Id.* at 33. Other purchases from 2004 through 2006 include more than $30,000 of women's lingerie and other clothing (*id.* at 2, 4, 15, 22, 28, 32-33) as well as restaurant visits ranging from approximately $1,300 to more than $5,000 per meal (*id.* at 15, 21). In sum, Mr. Nguesso spent in excess of $200,000 on clothing, shoes, and fashion accessories in little more than two years' time.

19. As the English court observed in *Long Beach Limited*, Mr. Nguesso's lavish purchases were financed by Long Beach, the offshore entity beneficially owned by Mr. Nguesso. Global Witness obtained four debit vouchers showing transfers made from Long Beach's bank account to Standard Chartered Bank in Hong Kong for payment of Mr. Nguesso's credit card. *Payments for DCSN's Credit Card Bill*, Global Witness, https://www.globalwitness.org/sites/default/files/pdfs/payments_for_dcsns_credit_card_bill.pdf (last visited Nov. 7, 2016) (attached hereto as Exhibit H).

20. Moreover, at the same time that Long Beach was paying Mr. Nguesso's personal credit card bills, Long Beach was the beneficiary of bank transfers totaling nearly $450,000. *Payments to Long Beach Referencing Oil Cargoes*, Global Witness, https://www.globalwitness.org/sites/default/files/pdfs/payments_to_long_beach_referencing_oil_

cargoes.pdf (last visited Nov. 7, 2016) (attached hereto as Exhibit I).  The bank transfer orders referenced two specific cargoes of Congolese oil: one traveling on the Marshall Islands registered tanker *Genmar Spartiate* (*id.* at 1; *see also Bill of Lading Genmar Spartiate*, Global Witness, https://www.globalwitness.org/sites/default/files/pdfs/bill_of_lading_genmar_spartiate.17jan05.pdf (last visited Nov. 7, 2016) (attached hereto as Exhibit J)) and the other on the Bermuda registered tanker *Tanabe* (*id.* at 2; *see also Bill of Lading Tanabe*, Global Witness, https://www.globalwitness.org/sites/default/files/pdfs/bill_of_lading_tanabe.21mar05.pdf (last visited Nov. 7, 2016) (attached hereto as Exhibit K)).  Most importantly, the bills of lading for both cargoes were executed by SNPC "for the account of the Republic of the Congo."[1]  *See* Ex. J, at 3; Ex. K, at 2.  However, instead of all the revenues from the sale of these cargoes flowing to SNPC and the Congo, a significant portion flowed to an offshore company that was simultaneously funding Mr. Nguesso's lavish lifestyle.

21.    Based on the foregoing and other materials, Commisimpex is confident that Mr. Nguesso possesses discoverable information pertaining to Congolese assets that may be used to satisfy its judgment against the Congo.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 7th day of November, 2016 in Washington, DC.



Francis A. Vasquez, Jr.

---

[1] Translation by counsel.