# Exhibit F

Neutral Citation Number: [2007] EWHC 1980 (QB)

Case No: HQ07X02371

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**

Royal Courts of Justice
Strand, London WC2A 2LL

Date: 15/08/2007

**Before** :

**MR JUSTICE STANLEY BURNTON**

- - - - - - - - - - - - - - - - - - - - -

**Between :**

| | |
|---|---|
| **(1) Long Beach Limited**<br>- and -<br>**(2) Denis Christel Sassou Nguesso** | **Claimants/Applicants** |
| -and- | |
| **Global Witness Limited** | **Defendant/Respondent** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Mr Matthew Nicklin** (instructed by **Schillings**) for the **Claimant Applicants**
**Mr Andrew Nicol QC** (instructed by **Finers Stephens Innocent LLP**) for the **Defendant Respondent**

Hearing dates: 12, 13 July 2007

- - - - - - - - - - - - - - - - - - - - -

Judgment

**Stanley Burnton J :**

**Introduction**

1. On 12 July 2007 I heard an application by the Claimants, made formally without notice but after notification to the Defendant of their intention to make it, for injunctions requiring it to remove from its website information and documents relating to the Claimants' affairs, obtained as a result of proceedings in the High Court of Hong Kong. The Claimants' application focuses on three specified documents or sets of documents, to which I shall refer as "the specified documents", and to information derived from them. The set of documents consists of statements of the Second Claimant's credit card account between February 2004 and September 2006; the other documents are a consultancy contract between the First Claimant and a company appropriately named Sphynx Bermuda Ltd ("Sphynx") and a company information sheet and declarations of trust relating to the First Claimant.

2. On 13 July 2007, I informed the parties of my decision to dismiss the Claimants' application. With the agreement of the parties, I proposed to defer giving the reasons for my decision until 16 July, and to do so orally on that date. At the instigation of the Claimants, I subsequently agreed to distribute my written judgment in draft, in order to give them an opportunity to consider its contents and to make submissions as to the exclusion of allegedly confidential information from my public judgment. If I were to accede to these submissions, the excluded information would be included in a separate confidential judgment which would not be available to the public.

3. I have considered those submissions in a separate judgment. I have rejected them, for the reasons set out in that judgment and in this present judgment, which will remain as a confidential draft until the Claimants indicate that they do not propose to appeal my separate judgment or the Court of Appeal decides to refuse them permission to appeal or dismisses their appeal. If the Court of Appeal reverses my decision to reject those submissions, I shall reconsider the contents of this judgment in the light of the judgment of that Court; otherwise, this judgment will be handed down in its present form.

4. This judgment sets out my reasons for refusing the Claimants' application for injunctive relief.

**The parties**

5. The Second Claimant is the son of the President of the Republic of the Congo ("the Congo"). He is also the President and Director General of Cotrade, the marketing arm of the Société Nationale des Pétroles du Congo ("SNPC"), of which it is a wholly-owned subsidiary. The First Claimant is a company incorporated in Anguilla. It is beneficially owned by the Second Claimant, as shown by the documents referred to above.

6. The Congo is both an extremely poor country and the source of a great deal of oil. According to information on the Defendant's website, 70 per cent of its people earn less than a dollar a day. It has been granted access to interim debt relief through the Heavily Indebted Poor Countries Initiative. As part of this Programme, the international community has striven to improve standards in relation to the lack of

transparency in transactions concerning extractive industries and also corruption. The Extractive Industries Transparency Initiative, which is partly funded by the Government of the United Kingdom, similarly "supports improved governance in resource-rich countries through the verification and full publication of company payments and government revenues from oil, gas, and mining".

7. The Defendant, to which I shall refer as "GW", is a well-known campaigning NGO. It is a non-profit-making company incorporated in this country. In the witness statement of Diarmid O'Sullivan made on its behalf it is described, possibly with a degree of hyperbole, as follows:

> "GW is a London based non governmental organisation which focuses in its investigatory work on links between the exploitation of natural resources, its funding and issues of conflict and corruption. In 1998 GW exposed the issue of conflict diamond mining funding civil wars in Africa and assisted in the establishment of the global process known as the Kimberley Process Certification Scheme, which was established to prevent the trade in conflict diamonds and has been adopted by more than 60 countries, As a result of that work GW was co-nominated along with Partnership Africa Canada for the 2003 Nobel Peace Prize. GW launched a campaign on revenue transparency in the oil and mining sector which led to the launch by the UK government of the Extractive Industries Transparency Initiative ("EITI") in 2003, which is the major international initiative to curb corruption in resource-rich countries and which is supported by the G8 countries, the World Bank and International Monetary Fund (IMF) and the European Union. GW sits on the board of EITI which also includes representatives of, for example, the US and UK governments. GW is globally regarded as one of the two leading anti-corruption NGOs."

8. GW does not carry on business in Hong Kong. Its only connection with that jurisdiction that has been suggested by the Claimants is that its website may be accessed from there. The same may be said of every other jurisdiction in the world.

**The events leading to this application**

9. Kensington International Ltd ("Kensington") is what is perhaps unkindly described as a vulture fund. It has acquired indebtedness of the Congo, doubtless at a considerable discount to its nominal value, and is seeking to recover that indebtedness by legal proceedings. For that purpose it is seeking to trace assets belonging beneficially to the Congo, and to establish that assets nominally in the name of other entities in fact belong to the state. Its efforts have not been unsuccessful. According to the judgment ([2005] EWHC 2684 (Comm)) of Cooke J given on 28 November 2005 in proceedings brought by Kensington in the Commercial Court against the Congo and a number of companies engaged or apparently engaged in oil trading, including Cotrade:

> "10. … there have been prior decisions which equate SNPC with the Congo albeit that such decisions are not binding on these parties. In a judgment of the Commercial Court, Tomlinson J on 16 April 2003 found that SNPC was simply part of the Congolese State and had no existence separate from it. Kensington and the Congo were parties to those proceedings. Similarly, the Court of Appeal of Paris has twice reached the view that SNPC is an alter ego of the Congo on 23 January 2003 and 3 July 2003 in the context of enforcing judgments given against the Congo, against assets belonging to SNPC."

10. In the same judgment, Cooke J held, at paragraph 200, that there had been sham sales and purchases of oil between Cotrade and African Oil and Gas Corporation and Sphynx, all of which were third parties joined in those proceedings, although Cotrade did not appear. As Cooke J pointed out, the interposition of offshore companies under the concealed control of an officer of a state-owned oil company (in that case, a Mr Gokana) between the state-owned company selling oil and the ultimate purchaser of that oil gives rise to the opportunity for personal gain on the part of such an officer: see paragraphs 79 and 92.

11. In order to trace and no doubt to seize further assets which it could establish belonged to the Congo, Kensington brought *Norwich Pharmacal* proceedings in Hong Kong. In November 2006 it obtained against ICS Secretaries Ltd, a company which provides company secretarial services, and which I assume is incorporated in or carries on business in Hong Kong, orders requiring it to disclose to Kensington's solicitors among other information details of the assets of any entity controlled by the Second Claimant and of payments made by any such entity. The order of the Hong Kong court dated 16 November 2006 permitted Kensington to use information and documents obtained as a result of that order for the purpose of "actual or contemplated proceedings against Cotrade Asia, HVL (Hemisphere Ventures Ltd) or any other entity the Applicant contends is an emanation of the Congolese state" and for the enforcement of judgment debts payable as a result of the judgment given by Cooke J in the Commercial Court in this country. That order led to the disclosure to Kensington of a considerable amount of information and documents, including the documents which are the subject of this application.

12. On 31 May 2007, the Hong Kong High Court made a further *Norwich Pharmacal* order against ICS Secretaries Ltd, requiring the disclosure to its solicitors of further documents and information. As evidence in support of its application for that order, Kensington exhibited the documents it had obtained as a result of the order of 16 November 2006, including the specific documents that are the subject of the present application. Paragraph 3 of the order of 31 May 2007 gave leave to Kensington to use the information and documents it obtained by that order for similar purposes to those stated in the earlier order.

13. It is common ground that the specified documents were referred to in a hearing in the court in Hong Kong that was open to the public. Mr Nicklin submitted that, looking at the matter realistically, the details of the credit card statements could not have been, or were at least unlikely to have been. Mr Nicol submitted that in substance they must have been. That is an issue I consider below.

14. On about 6 June 2007, Kensington passed copies of the specified documents to GW. I assume that its purpose for doing so was to put pressure on the Congo and the Claimants to satisfy the Congo's outstanding indebtedness. On 26 June 2007, GW posted them on its website, as .pdf files, available for download by anyone accessing the website. The home page of the website referred to the documents and, based on them, stated that although the Congo remains one of the poorest countries in the world, the Second Claimant appeared to have spent very large sums of money that might derive from sales of state oil on expensive luxury goods. At the same time, the Defendant issued a press notice giving further information. It stated that the documents showed that the Second Claimant's credit card bills had been paid using funds from companies that had received moneys derived from trading in Congo oil, and referred to the conflict of interest involved.

15. On learning of the disclosure of the specified documents, the Claimants, who had intervened in the Hong Kong proceedings, issued summonses in those proceedings seeking relief based on their contention that their disclosure had been in breach of the *Norwich Pharmacal* orders. The summonses were heard on 28 and 29 June 2007. GW had not been served or made a party to the proceedings. On 30 June 2007, Deputy High Court Judge Carlson, sitting in chambers (and, as I was told by Mr Nicklin, in private) upheld their contentions and granted relief. He held that the disclosure had been contrary to the *Norwich Pharmacal* orders, notwithstanding that the documents had been referred to in court open to the public, and that a great injustice had been done to the Claimants and others by that disclosure.

16. On 5 July 2007, the Claimants' London solicitors, Schillings, wrote to GW informing them of the judgment of Deputy High Court Judge Carlson and stating that they would be returning to the Hong Kong court on the following day to seek an order against them in terms of an attached summons unless by 5.30 pm that day they undertook (among other things) to remove the specified documents, and others, from the website and undertook not to republish them. The letter was headed, "Not for publication" and, curiously, "Off the record".

17. On 6 July 2007, the Claimants made an *ex parte* application to the High Court in Hong Kong. It was heard in private. The order that was made restrained GW from publishing the specified documents and other information, pending the hearing of an *inter partes* summons on 27 July 2007. It included a prohibition against GW disclosing that the Claimants had made that application, or the order itself, save for the purpose of taking legal advice or complying with it. One of the issues I have to determine is whether this Court should, in its judgment, refer to those matters. As is evident, I have rejected the Claimants' submission that the judgment of this court available to the public, as a matter of comity, should not do so. I shall give my reasons later in this judgment.

18. On 6 July 2007 Schillings sent GW a copy of the Order of 6 July 2007. GW have refused to comply with the order. In a letter dated 8 July 2007, they responded:

> Thank you for your letter dated 6th July 2007 and labelled "PRIVATE AND CONFIDENTIAL" and "URGENT, OFF THE RECORD, NOT FOR PUBLICATION", which seeks to suppress important evidence about the conduct of public figures in the Republic of Congo.

> You enclose what purports to be an injunction from a Hong Kong Court, which is under the sovereignty of China. Here in the United Kingdom we have the principle of free speech; for all that you are paid to infringe this principle, we nonetheless believe that any English judge will uphold it.
>
> We are in no way bound by the presumptuous headings of your letter and think it only right that the public should be able to judge the behaviour of your client for themselves, so we have placed it on our website.

19. The proceedings in this court were commenced on 10 July 2007. By their present application, the Claimants seek an interim injunction "pursuant to s37(1) Supreme Court Act 1981 and s25 Civil Jurisdiction and Judgments Act 1982 in aid of proceedings in the High Court of Hong Kong Special Administrative Region because the Claimants are likely to succeed in showing that they would be entitled to a final injunction in these terms in aid of the same proceedings".

**The issues before me**

20. There are conflicting interests in this case. The first is the Claimants' interest in preventing the further publication of sensitive and at least originally confidential documents and information about them, i.e. the alleged misuse of private information. The Second Claimant's rights under Article 8 are undoubtedly engaged. But this case also concerns the Convention and common law rights of freedom of expression. The Convention right is defined by Article 10 as follows:

    > 1. Everyone has the right to freedom of expression. This right shall include freedom to hold opinions and to receive and impart information and ideas without interference by public authority and regardless of frontiers. …
    >
    > 2. The exercise of these freedoms, since it carries with it duties and responsibilities, may be subject to such formalities, conditions, restrictions or penalties as are prescribed by law and are necessary in a democratic society, … for the protection of the reputation or rights of others, for preventing the disclosure of information received in confidence, ….

21. It is common ground that the Claimants must surmount the hurdle of section 12(3) of the 1998 Act, i.e., that they must establish that they are likely to establish at any trial that the GW publication of which they complain should not be allowed. Whether they have done so is ultimately the real question before me, although on the way to answering it I have to consider a number of significant issues. Section 12(4) requires the Court to:

    > "have particular regard to the importance of the Convention right to freedom of expression and, where the proceedings relate to material which the respondent claims, or which appears to the court, to be journalistic, literary or artistic material (or to conduct connected with such material), to—

      (a) the extent to which—

          (i) the material has, or is about to, become available to the public; or

          (ii) it is, or would be, in the public interest for the material to be published;

      (b) any relevant privacy code."

22. In construing and applying section 12(3) I have had the advantage of the guidance given by the House of Lords in *Cream Holdings v Bannerjee* [2005] UKHL 44, [2005] 1 AC 253. With reference to paragraph 22 of the opinion of Lord Nicholls, neither Mr Nicklin nor Mr Nicol QC suggested that in the present case the requirement that the Claimants are "likely to establish that the publication should not be allowed" should not be applied so as to require them to show that, on the assumption that they were to succeed in their application for interim relief, they would probably succeed at trial in obtaining the injunctive relief they now seek.

**The ground for this application**

23. As appears from the terms of their application, the Claimants issued this application seeking relief under section 25 of the Civil Jurisdiction and Judgments Act 1982. At the beginning of the hearing, I pointed out that, under our rules for the recognition and enforcement of foreign judgments, it did not seem that GW was subject to the jurisdiction of the Hong Kong court, and therefore it would not be bound by any final order made by that court. It seemed to me that that consideration is most material to the grant of relief under section 25. Having been given time to consider the point, the Claimants decided not to pursue their claim under section 25.

24. It follows that for the purposes of this application the Claimants must rely on their substantive rights, i.e. their rights to confidentiality and privacy, on the Second Claimant's rights under Article 8, and on what they contend was a misuse of documents by Kensington and GW.

**The status of the Hong Kong court's order of 6 July 2007**

25. Although the Claimants have disclaimed reliance on the order of 6 July for the purposes of section 25, they have nonetheless placed considerable reliance on the judgments and orders of the Hong Kong court in their favour. They submit that comity requires that this Court should not question the correctness of the judgment of 30 June 2007, and should not by its proceedings, judgment or orders question or undermine the injunctions and restrictions imposed by the order of 6 July 2007 to which I have referred above. Mr Nicol, for GW, submitted that this Court should not be bound by decisions made *ex parte* by a court of a jurisdiction to which they are not subject.

26. Comity requires this court to treat the judgments and orders of the courts of Hong Kong with due respect and even deference. However, in effect, the Claimants seek to treat those judgments and orders as binding on GW. GW was not a party to the Hong Kong proceedings when the judgment of 30 June 2007 was given, and they cannot be

bound by it. Furthermore, since it does not carry on business in Hong Kong, it is not subject to that jurisdiction under our rules for the recognition of foreign judgments, and these courts do not regard it as having an obligation to comply with the judgments of that jurisdiction. The fact that the order of 6 July was made against them *ex parte*, in circumstances in which they had been informed of the Claimants' application on the previous day, and presumably, given the time difference, less than 24 hours before the hearing before Mr Justice A Cheung, reinforces this point. True it is that GW could apply in Hong Kong to set aside the order of 6 July, but that would require a non-profit-making organisation to expend considerable resources on legal representation there and may involve its submitting to that jurisdiction. In any event, the rights of free expression on which they rely are rights under our law, not under Hong Kong law.

27. I do not consider that this court can sensibly address the issues raised in this case without referring to the order of 6 July. I asked Mr Nicklin what damage the Claimants would suffer if I were to do so in an open judgment. He has not been able to identify any significant damage, other than the fact that the restriction in the order would be subverted. But the restriction in the order, made on the *ex parte* application of the Claimants and at their instigation, in the absence of GW, is in my judgment not of itself sufficient to require this Court to in effect conceal what has occurred from public gaze. It is not clear why the Hong Kong court imposed these highly unusual restrictions on reference to its procedures.

28. If I were not to refer to the order of 6 July, I would in my view give to the public a misleading account of the relevant events and of the matters I have taken into account in reaching my conclusion. Moreover, it seems to me that the judgments of this Court are not immune to the requirement of freedom of expression. If I were to refer to that order in a separate confidential judgment, I should preclude GW and others from referring to it. In the context of this case, where there is a significant public interest in the subject matter of GW's publications, I consider that that would infringe their rights under Article 10. In addition, on the assumption that Article 6 of the European Convention on Human Rights applies to the Claimants' application for injunctive relief, it requires this Court to make its judgment public unless there is a cogent reason for not doing so. The European Court of Human Rights attaches importance to public access to judgments: see *Campbell and Fell v UK* (1984) 16 EHRR 165 at paragraph 91, and the exceptions specified in Article 6.1 are not to be lightly invoked.

29. It is not for me to say whether the Hong Kong judgment of 30 June 2007 and the order of 6 July 2007 are correct as a matter of Hong Kong law. I can say that the issues addressed in the judgment of 30 June 2007 would, in my judgment, have been decided differently under our law. The terms of Order 24 r 14A of the Rules of the High Court of Hong Kong, set out below, are identical to the same rule in our old Rules of the Supreme Court. That rule was introduced by the Rules of the Supreme Court (Amendment) 1987 following the decision of the European Commission of Human Rights in *Harman v UK* application no. 10038/82 that the restriction on the publication of documents that had been referred to in open court arguably infringed the applicants' rights of free expression under Article 10. Judge Carlson held that Order 24 r 14A did not apply to the *Norwich Pharmacal* orders made by the court in Hong Kong. In fact, there was no express restriction on Kensington contained in those orders. It seems to me that leave was given to it to use the documents and information

for identified purposes by way of exception to the normal implied undertaking. More importantly perhaps, in my judgment, the Judge's approach to the issue raised concerning the conduct of the Claimants arguably shown by the documents would not be that of an English court, for reasons that appear below.

**The parties' submissions on the Claimants' causes of action in summary**

30. For the Claimants, Mr Nicklin submitted that the specified documents remain private and confidential, notwithstanding their having been referred to in court open to the public in Hong Kong, the reference to them and their publication on GW's website and other press publicity of the allegations derived from them. He contended that the references to the documents in court in Hong Kong must have been limited: it is difficult to see why every entry should have been referred to. He submitted that all of the publications relied upon by GW resulted from its press statement. He drew a distinction between the documents and the information contained in or derived from them being available to the public and there being sufficient public knowledge of the contents of the documents and information: see e.g. *Stephens v Avery* [1988] Ch 449. He submitted that the Second Claimant's rights under Article 8 are clearly engaged and that the publication of the specified documents infringed those rights. He submitted that the misuse of the specified documents by Kensington and GW itself justified the grant of relief. He accepted that the case for restraining publication of the allegations and comment made by GW on the basis of the documents was less strong than the case for restraining publication of the documents themselves, and contended that GW could not show that there was any sufficient public interest in the publication of the entirety of the credit card statements.

31. For GW, Mr Nicol did not suggest that the specified documents had not been confidential and sensitive, or that the Second Claimant's Article 8 rights were not engaged. He submitted that the documents had ceased to be confidential as a result of their publication, and that it was irrelevant that such publication had been made or caused by GW itself. He submitted that the specified documents must have been sufficiently referred to in court in Hong Kong to have lost their confidentiality. He contended that much of the publication of the documents and information had been the result of the Claimants' delay in making this application in this jurisdiction. Lastly, he submitted that GW's rights of free expression would by infringed by any restraint this Court might order.

32. I consider the issues raised by these submissions below.

**Are the specified documents confidential?**

**(a) The effect of their having been referred to in Court**

33. I have no doubt that the specified documents were, when disclosed to Kensington, by their nature and content confidential, and, as mentioned above, Mr Nicol did not submit to the contrary. The question is whether their confidentiality has been lost by their having been referred to in open court or by publication since their disclosure.

34. That they were referred to in open court is clear; the extent of that reference is not. Nonetheless, I consider that I should proceed on the basis that there was sufficient reference to them as would have removed their confidential status if they had been

disclosed on discovery and referred to in open court in this country. In the first place, Mr Christie-Miller, of the Claimants' solicitors, fairly states in his witness statement that many of the documents were referred to at the hearing in May 2007 held in chambers but not in camera. A statement to the identical effect is in the third affidavit of Mr Gall, of the Claimants' Hong Kong solicitors, relied upon in their application of 6 July 2007. Secondly, it appears from the judgment of Deputy High Court Judge Carlson of 30 June 2007 that the principal issue before him was whether the fact that the documents had been referred to in court placed them in the public domain. He said:

> "He seeks to draw a distinction between the documents that have been passed on to 3rd parties which he says are in the public domain and therefore no longer subject to any restriction on use whether express or implied at law, and those that are still confidential and cannot be disclosed. He submits that after careful consideration only documents referred to during the hearing of 28 May, a hearing in chambers but open to the public, have been passed on to Global Witness. He submits that anything said in that hearing and any document referred to on that occasion is now in the public domain. Once in the public domain any previous restriction on use of a document is waived. He has referred me to passages in *Hollander's Documentary Evidence, 9th Edition*. At 21-48 the author citing *Mahom v Rahn* [1997] 3 All ER 687 says that the implied undertaking not to use documents disclosed in litigation save for the purposes of that litigation goes once that document has been read out in court or referred to in court. Mr Hunsworth relies on O.24r.14A of the Rules of the High Court which is of course to that effect. It is in these terms:
>
>> *"Any undertaking whether express or implied, not to use a document for any purposes other than those of the proceedings in which it is disclosed shall cease to apply to such a document after it has been read to or by the court, or referred to, in open court, unless the court for special reasons has otherwise ordered on the application of a party or of the person to whom the document belongs."*
>
> Accordingly, submits Mr Hunsworth, these parties can have no complaint. This has been disclosure advisedly made after careful consideration of what had been referred to in the hearing of 28 May and nothing else."

35. The Claimants' counsel did not take issue with the factual basis for this submission. Her submission is summarised in the judgment as follows:

> "In reply, Miss Ismail says that Mr Hunsworth's approach demonstrates a fundamental misunderstanding of the situation. O.24 r.14A has to do with undertakings as to disclosure and when that undertaking ceases to have effect. What I am

> concerned with is an express order of the court [paragraph 3 supra] which identifies the purposes to which the disclosed material obtained in draconian proceedings such as these against innocent parties could be put. That did not include passing it on to an internet website."

36. Secondly, the skeleton argument of counsel for the Claimants on their application for the order of 6 July stated:

> "The Applicants do not for present purposes rely on any confidential nature of the documents (which might be said to have ceased to be confidential upon the documents entering the public domain). The Applicants rely upon the breach of the court's order and the public interest in the integrity of the court's process."

37. So far as the Hong Kong court orders are concerned, the Claimants have not pointed to any restriction placed by an order of the Hong Kong Court on the use or publication of the documents before they were referred to in Court. Had such an order been sought and made, it may be that no subsequent publication would have occurred.

38. In these circumstances, quite apart from the later publication of the specified documents, the Claimants have not established before me that at trial they are likely to establish that those documents are protected by confidentiality.

**(b) The circumstances of GW's receipt and publication of the specified documents**

39. In their application against GW in Hong Kong the Claimants did not suggest that GW were aware of any restriction on their publication of the documents when they received them or when they posted them on their website. Their skeleton argument on their application for the order of 6 July 2007 stated:

> "… the Applicants are presently unaware of any evidence that the Respondent (GW) knew about the 1st *Norwich Pharmacal* order before publishing the protected information on its website. Accordingly, this application is not founded on contempt by the Respondent."

40. The evidence of GW is not surprisingly to the same effect. The witness statement of Dr Wykes, an employee of GW, shows that GW's concern with the Congo predates their receipt of the specified documents. She states:

> "2. I hold a doctorate from the University of London and as an employee of GW I have been involved since 2003 in the work of GW in investigating issues surrounding conflicts and transparency in oil markets globally and in the Republic of Congo (ROC).
>
> 3. In early June 2007 I was approached by Kensington International Limited ("Kensington"), a creditor of the Republic of Congo. I knew who Kensington was as in 2005

> I had seen the judgment of a case brought by them before Mr Justice Cooke in the High Court in London which examined the practice of the Congo state national oil company ("SNPC") selling oil through intermediary shell companies. The head of SNPC stated in testimony in that hearing that he had profited from sales of state oil through his privately owned companies. Subsequently, in 2006, I attended the cross examination of an oil trader employed by Denis Gokana, the head of SNPC. The cross examination revealed that, contrary to solemn undertakings given by ROC to the World Bank and IMF regarding eliminating conflict of interests in the marketing of state oil, such oil continued to be sold through shell companies controlled by the head of the state oil company and with personal benefit accruing to public officials.
>
> 6. Following the handing down of the judgment I had approached lawyers for Kensington requesting copies of documents which had been read out or referred to in the proceedings on legal advice that such documents were in the public domain.
>
> 7. On 8 June 2007 I received a phone message from Donald Schwarzkopf, a consultant of Kensington in which he stated that further documents had been put into the public domain in the course of a court action in Hong Kong brought by Kensington and as a result could be shared with GW. I was also told that references to some of the information may soon appear in the press. I understand from talking to a journalist at La Tribune on or about 12 June 2007 that he was also given by Kensington the same package of documents as GW. On about the 18 June 2007 I learned that a journalist at Dow Jones/Wall Street Journal had also got the same package of documents. At around the same time the journalist at La Tribune told me that he had shared his package of documents with another media organisation: Le Canard Enchaîné.
>
> 8. Documents were then sent to me by way of an email attachment. All of the documents which GW received were posted on the website of GW on 26 June 2007."

**Subsequent publication and its relevance**

41. The subject of the Claimants' application is "material which the respondent claims … to be journalistic". The publication of allegations and comment based on that material is clearly journalistic, as shown by the publications by UPI, Le Monde and others. In these circumstances, section 12 and the jurisprudence of the European Court of Human Rights require me to take its publication into account.

42. Dr Wykes summarises the publication of the specified documents and information derived from them as follows:

> "8. … , following posting on the website, the information contained in the documents has attracted considerable interest of the press and newswires as well as the public. For example people reacting to the information on the web site include: on the 27th June, a journalist from the business news organisation, Bloomberg, a journalist from the Sunday Times also called me around 28/29 June. In addition I received calls from a number of people identifying themselves as Congolese citizens. Examples where the information on our website appears to have resulted in stories or newswires are attached at "SJW1". I am unable to say whether in all cases publishers of these articles obtained the information they base their articles on from GW's website or elsewhere. These examples were, however, all published before GW had sight on 6 July 2007 the order of the Hong Kong Court in which it was named as defendant. I have also received enquiries from individuals as to the contents of the documents and I understand that the Congolese press has also used the information obtained. Indeed, John Bercow MP – who often asks Congo related questions, has tabled the following to the Secretary of State for DfID.
>
> > *"What recent discussions he has had with a) the IMF, b) his counterparts at the EU and c) the government of the Republic of Congo (Brazzaville) about management of oil revenues?.*
> >
> > *What assessment he has made of documents made public by Global Witness which indicate that oil revenues have been used to fund the purchase of designer goods by public officials?.*
> >
> > *What assessment he has made of the extent of corruption within the Congolese (Brazzaville) oil sector?.*
> >
> > *What representations he has received about the involvement of Denis Christel Sassou-Nguesso in the management of oil revenues in the Republic of Congo (Brazzaville)?.*
> >
> > *What representations he has received about the management of oil revenues in the Republic of Congo (Brazzaville)?.*
> >
> > *What assessment he has made of the management of oil revenues by public officials in the Republic of Congo (Brazzaville?.*

> *What assessment he has made of the Republic of Congo's (Brazzaville) compliance with its commitments under HIPC?.*
>
> *What assessment he has made of the IMF's concerns about governance and transparency in the Congolese (Brazzaville) oil sector?."*
>
> 9. On 26 June 2007 Dow Jones newswire put out a story entitled "Congo Oil Rev Paid for Luxury Spending by Son of Pres". On 29 June 2007 the *World Markets Research Centre* published a piece entitled "President's son Accused of Stealing Republic of Congo's Oil Profits". On 1 July 2007 *Le Monde* published an article entitled "The Achilles heel of capitalism". On 2 July 2007 UPI mention GW's report in a piece entitled "Analysis: corruption remains aid obstacle". *La Semaine Africaine* published a piece on 4 July 2007. The story continues to attract considerable interest from the press.
>
> 10. In the time available, GW has not been able to ascertain how many times the relevant pages of its website have been viewed. However, GW has been able to make a preliminary review of the number of times the 12 documents exhibited in pdf form on its website relating to the proposed Claimant have been downloaded. The credit card bills have been downloaded a total of 1073 times; the 4 page document entitled "contrat de consulting" a total of 229 times; the company information sheet relating to Long Beach Limited and declaration of trust by Pacific Investments a total of 235 times; payments for credit card bills have been downloaded 284 times; payments from AOGC to Longbeach have been downloaded 167 times; payments to Longbeach referencing oil cargoes have been downloaded 169 times."

43. In addition, the specified documents and others were referred to in a document placed before the Foreign Affairs Committee of the US Congress by Congresswoman Diane E Watson, the Vice Chair of the Sub-Committee on Africa and Global Health, who gave the links to the pdf files on the GW website. The documents are separately available on the website of Global Security, an organisation based in the USA. There is no evidence before me that the Claimants have taken steps to restrain Global Security from continuing to publish them.

44. These publications are extensive. That most of them result from GW's initial posting of the material on its website does not significantly diminish their importance. For the purposes of the application before me, the Claimants have not sought to establish that at trial they are likely to prove that GW knew that the material was confidential or restricted when they published it, and on the evidence before me they could not do so. The evidence is that GW was unaware of any alleged restriction on its publication of the documents and the information derived from them (other than that inherent in the nature of the documents) until 5 July 2007. Moreover, at least so far as Article 10 is concerned, the judgment of the European Court of Human Rights in *Vereniging*

*Weekblad Bluf! v the Netherlands* (Application no. 16616/90) shows that publication even after notification of a restriction is relevant to the necessity or otherwise for an interference with Article 10 rights. Furthermore, in *Radio Twist v Slovakia* (Application no. 62202/00), the Court said:

> "62. The Court further observes that the applicant company was sanctioned mainly for the mere fact of having broadcast information which someone else had obtained illegally. The Court is however not convinced that the mere fact that the recording had been obtained illegally by a third person contrary to law can deprive the applicant company which broadcast it of the protection of Article 10 of the Convention."

**Article 10**

45. In my judgment, there is a clear and overwhelming case for refusing relief on the ground that there is an important public interest in the publication of the specified documents and the information derived from them. In my judgment, it is unlikely that the Claimants can establish that their rights under Article 8 or their right to privacy or any remaining confidentiality in the specified documents or the comment and allegations derived from them can override GW's Article 10 right and the public interest in publication.

46. First, as to the background, the terrible poverty of the populations of much of sub-Saharan Africa, even in resource-rich states, is notorious. So is the apparent wealth of members of the ruling classes of some of those states, a wealth wholly disproportionate to the average income of their citizens.

47. The particular situation of the Congo was referred to in a press release issued by the World Bank in 2006:

> "WASHINGTON, March 9, 2006 – The World Bank's International Development Association (IDA) and the International Monetary Fund (IMF) have determined that the Republic of Congo qualifies for debt relief by reaching the decision point under the enhanced Heavily Indebted Poor Countries Initiative. These decisions are based on the country having put in place external arrears clearance operations, remained on track with an IMF-supported program and developed an interim Poverty Reduction Strategy. The Republic of Congo becomes the 29th country to reach its decision point under the initiative.
>
> The Government of the Republic of Congo will begin receiving interim debt relief from certain creditors, but must address serious concerns about governance and financial transparency in order to qualify for irrevocable debt relief at the completion point. The reforms to which the Republic of Congo has committed include bringing the internal controls and accounting system of the state-owned oil company (SNPC) up to internationally recognized standards; preventing conflicts of

   interests in the marketing of oil; requiring officials of SNPC to publicly declare and divest any interests in companies having a business relationship with SNPC; and implementing an anti-corruption action plan with international support, monitored by IDA and the IMF.

   "The objective of debt relief is to free up resources to improve the lot of the poor. But sustained improvements in governance are necessary for these resources not to be hijacked by vested interests and used effectively and efficiently to improve the delivery of education, health and other essential services," said Pedro Alba, the World Bank Country Director for the Republic of Congo, the Democratic Republic of Congo, Burundi and Rwanda.

   Interim debt relief will increase the resources available to the Government to finance poverty reduction programs, fight corruption, and support on-going financial and structural reforms. The Government has agreed to undertake a broad array of measures to ensure that the resources freed from debt service obligations are used for poverty reduction under a reform program that will be closely monitored by IDA and IMF."

48. Diarmid O'Sullivan, an employee of GW, states, in his witness statement of 11 July 2007:

> "6. The documents published by GW relate directly to this solemn commitment to the international community by the Republic of Congo, because they indicate (as laid out in points 9-12 below) that such conflicts of interest appear, in fact, to have continued and have not been either resolved or disclosed to the international community, raising serious concerns about the sincerity of the Republic of Congo in undertaking reforms in return for debt relief under HIPC.
>
> 7. There is continuing concern within the international community at the extent of corruption in the Republic of Congo, which is also known as Congo-Brazzaville, especially in its oil sector. The then-Secretary of State for International Development Hilary Benn MP, told Parliament in January 2007: "A particular area of concern … is the management of natural resource revenues, which lacks transparency and attracts widespread NGO criticism. Campaigners against corruption in the country have faced harassment from state officials." (Exhibit "DOS2"). Transparency International's Corruption Perceptions Index, a respected global benchmark on corruption, ranks the Republic of Congo 143rd out of 163 countries.

       8.     GW has worked for a number of years to promote greater transparency in the Republic of Congo ("ROC") both through our investigatory work and in supporting local anti corruption organizations. Transparency, meaning the publication of data regarding the oil sector, is a vital tool for curbing corruption because it makes possible the public scrutiny of government policies and the conduct of public officials. The ROC is one of the poorest countries in Africa and heavily dependent on sales of oil, which account for government revenues. The aim of GW is to allow citizens of the ROC to exercise scrutiny of their Government's management of oil revenues. By drawing attention to what appear to be questionable transactions by public officials GW informs and hopes to influence the government and international donors to enact reforms. A vital part of the work of GW is the publication of evidence of questionable behaviour on the part of individuals, companies or governments connected with the natural resource industries. This information is widely used by governments, law enforcement agencies and international financial institutions."

I have no reason to doubt the accuracy of this summary.

49. The specified documents demonstrate that the Second Claimant is the concealed beneficial owner of an offshore company, namely Long Beach, that has oil dealings with Sphynx. Sphynx was one of the companies found by Cooke J to have entered into sham purchases and resales of Congolese oil which gave an obvious opportunity for personal gain on the part of those controlling those companies. The Second Claimant's very substantial personal expenditure has been paid for by Long Beach. It is an obvious possible inference that his expenditure has been financed by secret personal profits made out of dealings in oil sold by Cotrade. The profits of Cotrade's oil sales should go to the people of the Congo, not to those who rule it or their families.

50. The public interest in the information and documents that are the subject of this application is shown by the publications in evidence. To refer to only some, Dow Jones referred to the documents and to the allegation of GW that "some of Congo's oil revenues had paid for the luxurious lifestyle of the son of the country's president". Le Monde published an article on 1 July 2007, quoted GW's allegations and said that "At the time of writing, we do not know the response of the Congolese president". UPI referred to GW's press release in an article published on 2 July 2007 under the headline "Corruption remains aid obstacle". GW's solicitor, in his second witness statement, provides the following information:

      "4.1    A French financial crime complaint was filed on 27 March 2007.

    4.2    A preliminary investigation was opened by the investigating judge on 16 June 2007. The proceedings were instituted by the Paris Asst. Prosecutor, Mr Aldebert, against Denis Sassou-Nguesso and his family, including the Second Applicant. The Respondent has a French address giving them jurisdiction.

    4.3    The charges allege "… receipt of misappropriated public assets; and Conspiracy to misappropriate public assets …"

    4.4    The complaints were made by Sherpa and Survie, two Non-Governmental Organisations and the Federation des Congolaise de France.

    4.5    The Respondent made inquiries through a French lawyer, William Bourdon, who investigated the complaints. William Bourdon found that all the documents which the Applicants claim are confidential have been "officially deposed" which means that they were lodged at the Tribunale de Grande Instance de Paris."

51.    In his judgment of 30 June 2007, Deputy High Court Judge Carlson rejected any public interest in the publication of the specified documents (and other information and documents) on the basis that it had not been proved that there had been any wrong-doing by the Second Claimant. He said:

> "I regret to say that the respondent and intervenors have been done a great injustice by this disclosure. Whether they are ultimately found to be unsavoury or corrupt is neither here nor there at this stage."

52.    However, there may never be a trial in Hong Kong of the issue whether the Claimants are "unsavoury or corrupt". The specified documents, unless explained, frankly suggest that they are. There is no obvious reason why the Second Claimant should not publicly explain that the transactions shown by these documents are consistent with his honest performance of his duties as President and Director General of Cotrade and his disclosed personal income. Once there is good reason to doubt the propriety of the financial affairs of a public official, there is a public interest in those affairs being open to public scrutiny. The approach of Deputy High Court Judge Carlson is inconsistent with our law as to the publication of documents referred to in court open to the public, and to the general principle that the courts will not enforce an obligation of confidentiality in relation to material that is alleged to show misconduct: *Initial Services Ltd v Putterill* [1968] 1 QB 396, in which the Court of Appeal refused to strike out the defence that the confidential documents showed that the plaintiff had failed to register an agreement as required by the Restrictive Trade Practices Act 1956 and had issued a misleading circular. Manifestly, in that case the defendant had not proved the misconduct alleged. The judgment of Lord Denning MR in *Initial Services*

*Ltd v Putterill* was subsequently approved by the House of Lords in *British Steel v Granada Television* [1981] AC 1096.

53. Mr Nicklin submitted that the allegations made by GW could be made without publishing the whole of the Second Claimant's credit card statements for a period of some 2 years. Doubtless they could. However, I accept Mr Nicol's submission that there is a public interest in showing precisely what was the expenditure of the Second Claimant paid for by Long Beach, and that expenditure is disclosed by the credit card statements.

**Conclusion**

54. As will by now be apparent, having had regard to the matters which I am required to take into account by section 12 of the Human Rights Act 1998, I have no doubt that the Claimants have not established that they are likely to establish at trial that publication of the material that is the subject of this application should not be allowed. To the contrary, I am clear that there is an important public interest in its publication.